**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

Case No.:

**PATRICK GAYLE**, *et al.*,

      Petitioners-Plaintiffs, on behalf
      of themselves and those
      similarly situated

**v.**

**MICHAEL W. MEADE**, *et al.*,

      Respondents-Defendants.

_____/

**PETITIONERS EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER
AND MOTION FOR PRELIMINARY INJUNCTION FOR PROPOSED CLASS AND
INCORPORATED MEMORANDUM OF LAW**

## INTRODUCTION

Petitioners-Plaintiffs are women and men detained by Respondents-Defendants in civil immigration detention at three Florida detention centers within the jurisdiction of the Miami Field Office of Immigration and Customs Enforcement ("ICE"). All Petitioners are at imminent risk of contracting coronavirus disease 2019 ("COVID-19") as a result of their inability to follow Center for Disease Control ("CDC") guidelines and state and local directives due to their continued detention. This action challenges the refusal of Respondents to release Petitioners, and others in the class they represent, so that they can shelter in place, follow CDC guidelines, and reduce their likelihood of infection and illness.

COVID-19 threatens every woman and man detained at Krome Service Processing Center ("Krome"), Glades County Detention Center ("Glades"), and Broward Transitional Center ("BTC"). A chart of the reported COVID-19 cases of people in ICE detention depicts an alarming steep curve. *See* Chart (Appx. I, Exh. 1); Declaration of Dr. Joseph Shin, MD, MSc dated April 13, 2020 ("Shin Dec.") ¶¶ 39-41(Exh. 2); Declaration of Dr. Pedro J. Greer, Jr. ("Greer Dec.") (Exh. 3).

The spread of COVID-19 in ICE detention in Florida has been marked by secrecy and cover-up. As early as March 27, 2020, local attorneys have reported to their voluntary bar association that their "clients have indicated there are sick individuals in detention locally, quarantined individuals, and detainees wearing protective gear." (Appx I, Exh. J, at 357-59, 357 ¶ 1.). ICE, however, would not confirm any positive testing. *Id*.

On April 6, 2020, the Miami Herald broke the news that ICE did indeed have COVID-19 cases in Florida. ICE told the Herald that two officers working at Krome Service Processing Center in Miami had tested positive for COVID-19, and many others were awaiting results from

2

their tests. (Appx I, Exh. C, at 33-38.)   On that same day, ICE told the Herald that *no* detained

individuals in Florida had tested positive. (Appx I, Exh. D, at 39-46, 40-41) ("For weeks—and as

recently as Monday—US Immigration and Customs Enforcement has repeatedly told the Herald

that no detainees in their custody in Florida have tested positive for the virus."). ICE's statement

was false. On April 7, the Herald ran a second story explaining that a detained individual at

Krome *had* tested positive. A federal official with first-hand knowledge told the Herald: "While

that is true that no detainee currently at the detention center tested positive for COVID-19, it's

also not completely accurate as testing is not conducted on site and detainees are sent to an off-

site hospital to be tested." (Appx I, Exh. D, at 41.)

ICE had also decided not to disclose whether third-party contractors test positive for

COVID-19, providing them a "loophole" to reporting the actual number of COVID-19 cases

among its employees in detention centers. Third-party contractors comprise a large portion of

employees in detention centers. *See* Monique O. Madan, *Two Workers at ICE Detention Center*

*in Miami-Dade Test Positive for Coronavirus*, Miami Herald (April 6, 2020).[1]

Each of the three detention centers either has confirmed cases of the virus or has groups

of individuals herded together in "cohort quarantine" because they have been exposed. Rather

than mitigate the risk of transmission, these cohort quarantines drastically increase the possibility

of transmission, infection, and facility-wide outbreak by grouping together people who have

already been exposed to the virus. *See* Shin Dec. ¶ 40 (Exh. 2) ("The analysis that I provide

above regarding screening, 'cohorting' and social distancing is not theoretical. In fact, there are a

growing number of facilities throughout the country where the rate of infection is growing

exponentially amongst both people detained as well as staff. In these settings, hundreds, and

---

[1] *Available at*: https://www.miamiherald.com/news/local/immigration/article241791511.html.

potentially thousands of people will become infected, and many will die."); Greer Dec. ¶ 30 (Exh. 3).

Under CDC Guidelines, which detention centers are required to follow, people exposed to COVID-19 should be put in *individual*, not group, quarantine: "Facilities should make *every possible effort* to quarantine close contacts of COVID-19 cases individually."  CDC Interim Guidance (Appx I, Exh. F, at 66) (emphasis added). Cohort quarantine "should only be practiced *if there are no other available options*." (*Id.*) (emphasis added).  As the CDC explains, "[c]ohorting multiple quarantined close contacts of a COVID-19 case could transmit COVID-19 from those who are infected to those who are uninfected." (*Id.*)

"Facilities without onsite healthcare capacity, or *without sufficient space to implement effective quarantine*, should coordinate with local public health officials to ensure that close contacts of COVID-19 cases will be effectively quarantined and medically monitored." (Appx I, Exh. F, at 66) (emphasis added). Additionally, "[f]acilities with limited onsite medical isolation, quarantine, and/or healthcare services should coordinate closely with state, local, tribal, and/or territorial health departments when they encounter a confirmed or suspected case, in order to ensure effective medical isolation or quarantine, necessary medical evaluation and care, and medical transfer if needed." (Appx I, Exh. F, at 62)

Respondents are defying CDC Guidelines by refusing to do the one thing they could to do comply with those guidelines – releasing individuals during the pandemic. Instead respondents are affirmatively putting detained people at risk by confining them in close sleeping, eating, and living quarters at Krome, Glades, and BTC. Because Respondents could release Petitioners and those similarly situated, "cohort quarantine" is *not* the only "available option." As Dr. Shin warns "[t]here is no way for immigration detention facilities to comply with CDC

guidelines on social distancing and quarantining unless Respondents release detained men and women on a large scale. When release from a detained setting is an option and there is lack of testing ability and an inability to employ social distancing, it is my professional opinion that failure to release during the COVID-19 pandemic is a violation of the CDC guidelines and will result in continued and wide-spread infection." Shin Dec., ¶ 39 (Exh. 2).

Detainee reports from all three facilities document that social distancing is impossible, people exhibiting flu-like symptoms are housed in the general population, and maintaining personal hygiene is constrained by the crowded facilities and lack of cleaning supplies. At BTC and Glades, men and women must ration soap weekly—two smalls bottles at BTC per person, and one 4-ounce bottle at Glades.  (Appx I, Exh. J, at 126-30) (Declaration of Francis L. Conlin, Friends of Miami-Dade Detainees).

Despite warnings from medical and public health professionals that releasing detained immigrants is the only viable option to comply with social distancing, individual quarantine, and other CDC requirements and local and state orders, the agency has generally refused to release in any meaningful way, in the absence of court intervention.   It is impossible for Petitioners to protect themselves from infection through social distancing and vigilant hygiene—the only known mitigation measures.

Federal judges across the country have ordered the urgent release of numerous immigrants, explaining the pressing health risks created by detaining groups of people at this time.[3]

On April 8, 2020, U.S. District Court Judge William G. Young ordered ICE to release detained individuals because of the COVID-19 threat: "The situation is urgent and unprecedented, and . . . a reduction in the number of people who are held in custody is

necessary." Memorandum and Order at 28, *Savino v. Souza*, Case No. 1:20-cv-10617-WGY (D.

Mass. Apr. 8, 2020) (DE 64) (copy at Appx. I, Exh. A, 1-29).

## STANDARD FOR A TEMORARY RESTRAINING ORDER
## AND PRELIMINARY INJUNCTION

The purpose of a temporary restraining order or preliminary injunction is to "protect

against irreparable injury and preserve the status a quo until the district court renders a

meaningful decision on the merits."  *Schiavo ex rel. Schindler v. Schiavo*, 403 F. 3d 1223, 1231

(CA11 2005) (citing *Canal Auth. of State of Fla. v. Callaway*, 489 F. 2d 567, 572 (CA5 1974)).

Temporary restraining orders have historically been available to prevent violations of due

process in immigration proceedings.  *See*, *e.g.*, *Louis v. Meissner*, 530 F. Supp. 924 (S.D. Fla.

1981) (ordering class-wide TRO on behalf of hundreds of Haitian refugees where legacy-I.N.S.

sought to remove Haitians *en masse* by employing tactics to deny access to counsel, and failed to

provide proper notice through inadequate translations).

In the case of stays of removal, "the 'traditional' standard for a stay applies."  *Nken v.*

*Holder*, 556 U.S. 418, 425 (2009).  These factors are:

> (1) whether the stay applicant has made a strong showing that he is likely to
> succeed on the merits; (2) whether the applicant will be irreparably injured absent
> a stay; (3) whether issuance of the stay will substantially injure the other parties
> interested in the proceeding; and (4) where the public interest lies.

*Id*., at 434 (citation omitted).  "The first two factors of the traditional standard are the most

critical."  *Id*.  However, "the movant may also have his motion granted upon a lesser showing of

a substantial case on the merits when "the balance of the equities identified in factors 2, 3, and 4

weighs heavily in favor of granting the stay."  *Garcia-Mir v. Meese*, 781 F. 2d 1450, 1453 (11th

Cir. 1986) (*citing Ruiz v. Estelle*, 650 F.2d 555, 565 (5th Cir. 1981 (*per curiam*), *cer denied*, 460

U.S. 1042 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983) (punctuation omitted)).

## STATEMENT OF FACTS

### A.  All experts agree that COVID-19 will likely ravage jails, prisons, and detention centers.

Imprisoned populations, including those in ICE detention facilities, are at higher risk for infectious disease, as compared to the general population. Factors that heighten their risk include poor sanitation, high population density, and "a higher prevalence of infectious and chronic diseases and . . . poorer health than the general population, even at younger ages."  CDC Interim Guidance (Appx I, Exh. F, at 48-74).

Dr. Shin explains that in detention settings "hundreds, and potentially thousands of people will become infected, and many will die.  This is a direct result of a failure to implement the recommended measures at an early enough to stage to prevent illness and save lives. Already, some ICE facilities the numbers of detected COVID-19 infections are growing at an exponential rate.  By the time facilities recognize this kind of exponential growth in detected cases, it will already be too late.  Therefore, individuals should be released from detention." Shin Dec., ¶ 40. (Exh. 2). *See also,* Greer Dec. ¶ 30 (Exh. 3). (There is no way for immigration detention facilities to comply with CDC guidelines on social distancing and quarantining unless Respondents release detained men and women on a large scale.)

The conclusions of Drs. Shin and Greer are consistent with the conclusions reached by Drs. Scott Allen and Josiah Rich—experts in the fields of detention health, infectious disease, and public health who advise DHS's Office of Civil Rights and Civil Liberties—who urged Congress on March 19, 2020 to take immediate actions to slow the spread of COVID-19 in ICE

detention centers, *including releasing immigrants* to facilitate maximum social distancing—an "oxymoron" in congregate settings.  (Appx I, Exh. L, at 235-41.)

In March 2020, over 3,000 medical professionals across the United States urged ICE *to release* individuals and families from detention "to prevent the spread of COVID-19 and mitigate the harm of an outbreak" to detained individuals, as well as to facility staff.[2]  They warned that social distancing measures recommended by the CDC are impossible in immigration detention and that the capacity for *individual* isolation and quarantine recommended by the CDC is extremely limited. When individual isolation is possible, the medical providers expressed concern that "isolation may be misused and place individuals at higher risk of neglect and death."

Like these and other experts,[3] Drs. Allen and Rich also warned of the dire consequences that a COVID-19 outbreak within an ICE detention facility would have on the community outside the facility.  They describe a "tinderbox" scenario where a rapid outbreak inside a facility would result in the hospitalization of multiple detained people in a short period of time, which would spread the virus to the surrounding community and create a demand for ventilators far exceeding the supply.  (Appx I, Exh. L, at 238)

Once a disease is introduced into a jail, prison, or detention facility, it spreads faster than under most other circumstances due to overcrowding, poor sanitation and hygiene, and lack of

---

[2] Janus Rose, *Thousands of Doctors Demand ICE Release Detainees to Stop a COVID-19 Disaster*, Vice.com (Mar. 18, 2020), https://www.vice.com/en_us/article/4agp4w/thousands-of-doctors-demand-ice-release-detainees-to-stop-a-covid-19-disaster

[3] See, e.g., Rich Schapiro, *Coronavirus could 'wreak havoc' on U.S. jails, experts warn*, NBC News (Mar. 12, 2020), https://www.nbcnews.com/news/us-news/coronavirus-could-wreak-havoc-u-s-jails-experts-warn-n1156586 ("An outbreak of the deadly virus inside the walls of a U.S. prison or jail is now a question of when, not if, according to health experts.").

access to adequate medical services. For these same reasons, the outbreak is harder to control.[4] The severe outbreaks of COVID-19 in congregate environments, such as cruise ships and nursing homes, illustrate how rapidly and widely COVID-19 would rip through an ICE detention facility. On the Diamond Princess cruise ship, for example, approximately 700 passengers and crew on board were infected over the course of three weeks despite the initiation of quarantine protocols.[5]

COVID-19 has indeed already started to spread inside U.S. prisons and jails across the United States, including other carceral systems in Florida,[6] Chicago,[7] and New York City.[8] Correctional staff is an especially dangerous vector for a COVID-19 outbreak within a detention center since they regularly travel back and forth between the outside world and the detention facilities where they work.

ICE's past handling of infectious disease outbreaks in detention centers has been inept—foreshadowing the impact COVID-19 will have if Petitioners are not released.  In 2019, a mumps outbreak across 57 immigration detention facilities throughout the country led to almost 900 cases of mumps overwhelmingly contracted inside the facilities[9] before the outbreak spread to

---

[4] Christina Potter, *Outbreaks in Migrant Detention Facilities*, Outbreak Observatory (Jul. 11, 2019), https://www.outbreakobservatory.org/outbreakthursday-1/7/11/2019/outbreaks-in-migrant-detention-facilities

[5] *Failures on the Diamond Princess Shadow Another Cruise Ship Outbreak*, The New York Times (Mar. 8, 2020), www.nytimes.com/2020/03/08/world/asia/coronavirus-cruise-ship.html.
[6] Florida Department of Corrections, COVID-19 Information, http://www.dc.state.fl.us/comm/covid-19.html.
[7] Timothy Williams and Danielle Ivory, *Chicago's Jail Is Top Hot Spot as Virus Spreads Behind Bars,* The New York Times (Apr. 8, 2020), www.nytimes.com/2020/04/08/us/coronavirus-cook-county-jail-chicago.html.
[8] Emma Grey Ellis, *Covid-19 Poses a Heightened Threat in jails and Prisons*, wired.com (Mar. 24, 2020), https://www.wired.com/story/coronavirus-covid-19-jails-prisons/
[9] Leung J, Elson D, Sanders K, et al. *Notes from the Field: Mumps in Detention Facilities that House Detained Migrants—United States, September 2018–August 2019*, MMWR Morb Mortal Wkly, 749–50 (Aug. 30, 2019), https://www.cdc.gov/mmwr/volumes/68/wr/pdfs/mm6834a4-H.pdf.

surrounding communities.[10] ICE and CBP facilities have been sites of other outbreaks in just the past couple years,[11] in addition to outbreaks in other prisons and jails.[12]

Nationally and internationally, governments and jail and prison staff have already recognized the threat posed by COVID-19 and released detained individuals. Iran,[13] Ethiopia,[14] and Texas[15] and have all begun to release people to mitigate the harm that the impending spread of COVID-19 will cause.

One of the largest police forces in the nation, the Miami-Dade Police Department, has ordered its officers to issue citations for all misdemeanor offenses to reduce arrests and jail

---

[10]  *See* Terrence McDonald, *Bergen County Won't Say if Mumps Outbreak Affects Only Immigrant Detainees*, Northjersey.com (Jun. 13, 2019), https://www.northjersey.com/story/news/bergen/2019/06/13/bergen-county-nj-wont-say-if-jail-mumps-outbreak-hit-only-ice-inmates/1448708001.  In addition, in 2019, thousands of individuals in 39 immigration detention centers across the country were exposed to chickenpox. Emma Ockerman, *Migrant Detention Centers Are Getting Slammed with Mumps and Chickenpox*, Vice News (Jun. 14, 2020), https://www.vice.com/en_us/article/mb8k5q/migrant-detention-centers-are-getting-slammed-with-mumps-and-chicken-pox.

[11] Christina Potter, Outbreak Observatory (describing outbreaks of acute respiratory illnesses like influenza, and other diseases like scabies and chickenpox). Both Krome and BTC have had mumps outbreaks, and other illnesses that required quarantine.

[12] J. O'Grady, et al., *Tuberculosis in prisons: anatomy of global neglect*, European Respiratory Journal (2011), https://erj.ersjournals.com/content/38/4/752.short (stating that tuberculosis prevalence among prisoners worldwide can be up to 50 times higher than national averages).

[13] Babk Dehghanpisheh and Stephanie Nebehay, *Iran Temporarily Releases 70,000 Prisoners as Coronavirus Cases Surge*, Reuters (Mar. 9, 2020), https://www.reuters.com/article/us-health-coronavirus-iran/iran-temporarily-releases-70000-prisoners-as-coronavirus-cases-surge-idUSKBN20W1E5.

[14] Bukola Adebayo, *Ethiopia pardons more than 4,000 prisoners to help prevent coronavirus spread*, CNN (Mar. 26, 2020), https://www.cnn.com/2020/03/26/africa/ethiopia-pardons-4000-prisoners-over-coronavirus/index.html.

[15] Dillon Collier, *Bexar County jail population down more than 500 inmates after release of nonviolent offenders*, KSAT.com (last updated Mar. 25, 2020), https://www.ksat.com/news/local/2020/03/25/bexar-county-jail-population-down-more-than-500-inmates-after-release-of-nonviolent-offenders/.

population during the pandemic.[16] The Broward Sheriff's Office has done the same, estimating a reduction in arrests and bookings of 60%.[17]

On April 7, 2020, a temporary restraining order was issued from this Court requiring Miami-Dade Corrections to implement health safety protocols in the Metro West Detention Center.  Order, *Swain v. Junior*, 20-cv-21457-KMW (S.D. Fla. Apr. 7, 2020) (copy at Appx I, Exh. M, at 242-47).

The Federal Bureau of Prisons has instructed prison directors to prioritize releasing federal inmates to home confinement, taking into consideration factors including "[t]he age and vulnerability of the inmate to COVID-19, in accordance with the [CDC] guidelines."[18]

### B.  The Center for Disease Control and the detention standards inform ICE's duties to people at Krome, Glades, and BTC.

Krome and BTC are subject to ICE's Performance-Based National Detention Standards 2011 ("PBNDS"). (Appx. I, Exh. K, at 152, 156). Section 4.3(II)(10) requires that "Centers for Disease Control and Prevention (CDC) guidelines for the prevention and control of infectious and communicable diseases shall be followed." ICE PBNDS (Appx I, Exh. N, at 248-97, 253).**[19]**

Glades is subject to ICE's National Detention Standards (NDS).  (Appx. I, Exh. K, at 165.) The current governing version of the NDS is the 2019 National Detention Standards for

---

[16] https://theappeal.org/miami-covid-19-arrests/

[17] *Two Broward Inmates Test Positive For Coronavirus, As Calls For Release Grow*, WLRN (Apr. 2, 2020), www.wlrn.org/post/two-broward-inmates-test-positive-coronavirus-calls-release-grow#stream/0; Opinion: *Broward County Jail: A COVID-19 time bomb*, Sun Sentinel (Apr. 3, 2020), www.sun-sentinel.com/opinion/commentary/fl-op-com-finkelstein-broward-county-jail-threat-coronavirus-covid-20200403-kb7g5zwoinf2pfluw4dsxlda7y-story.html.

[18] Office of the Attorney General, Washington, DC, Memorandum for Director of Bureau Prisons, *Prioritization of Home Confinement As Appropriate in Response to COVID-19 Pandemic* (Mar. 26, 2020),  https://www.politico.com/f/?id=00000171-1826-d4a1-ad77-fda671420000.

[19] Full copy available at: https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf.

Non-Dedicated Facilities.[20] Under section 1.1(I) of the NDS, covered "facilit[ies] will operate in accordance with all applicable regulations and codes, such as those of . . . the Centers for Disease Control and Prevention (CDC)." ICE NDS (Appx I, Exh. O, at 304).[21]

The CDC has issued an Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities. (Appx. I, Exh. F, at 48-73). This guidance stresses the vital importance of ensuring social distancing, proper hygiene, access to testing, *individual* isolation of people who have the virus, and quarantine of people exposed to the virus. The guidance specifically states that it is intended for ICE, as a law enforcement agency with custodial authority of detained populations.

The CDC Guidance requires that "detained persons who are close contacts of a confirmed or suspected COVID-19 case (whether the case is another incarcerated/detained person, staff member, or visitor) should be placed under quarantine for 14 days." (Appx. I, Exh. F, at 66.)

An individual is considered a close contact if they have been within approximately 6 feet of a COVID-19 case for a prolonged period of time, or have had direct contact with infectious secretion from such a person, such as coughing. (Appx. I, Exh. F, at 50.)  "Close contact can occur while caring for, living with, visiting, or sharing a common space with a COVID-19 case." (Appx. I, Exh. F, at 50, 66). "A confirmed case has received a positive result from a COVID-19 laboratory test, with or without symptoms," and "[a] suspected case shows symptoms." (Appx. I, Exh. F, at 51.) Symptoms "include fever, cough, and shortness of breath." (*Id.*)

Quarantine is "the practice of confining individuals who had close contact with a COVID-19 case to determine whether they develop symptoms," and it "should last a period of 14 days." (Appx. I, Exh. F, at 51.) "Ideally, each quarantined individual would be quarantined in a

---

[20] Supersession noted at: www.ice.gov/detention-standards/2000.
[21] Full copy available at: www.ice.gov/doclib/detention-standards/2019/nds2019.pdf.

single cell with solid walls and a solid door that closes." (*Id*.) "If symptoms develop during the 14-day period, the individual should be placed under medical isolation and evaluated for COVID-19." (*Id*.)  "Medical isolation refers to confining a confirmed or suspected COVID-19 case (ideally to a single cell with solid walls and a solid door that closes), to prevent contact with others and to reduce the risk of transmission." (Appx. I, Exh. F, at 51.) "Medical isolation end when the individual meets pre-established clinical and/or testing criteria for release from isolation, in consultation with clinic providers and public health officials" as detailed in the CDC's Guidance. (*Id*.)

"Cohorting refers to the practice of isolating multiple laboratory-confirmed COVID-19 cases together as a group, or quarantining close contacts of a particular case together as a group." (Appx. I, Exh. F, at 50.) "Ideally, cases should be isolated individually, and close contacts should be quarantined individually."  (*Id*.)

The CDC Guidance states that detention centers should put people exposed to close contact with confirmed or symptomatic COVID-19 cases in *individual*, not group, quarantine: "Facilities should make *every possible effort* to quarantine close contacts of COVID-19 cases individually." (Appx. I, Exh. F, at 66) (emphasis added). Cohort quarantine "should only be practiced *if there are no other available options*." (*Id*.) (emphasis added).  As the CDC explains, "[c]ohorting multiple quarantined close contacts of a COVID-19 case could transmit COVID-19 from those who are infected to those who are uninfected." (*Id*.)

According to the CDC Guidance's order of preference, the *last* option before a "safe[]" transfer to another facility with capacity to quarantine" is cohorting in a detainee's "regularly assigned housing but with no movement outside of the unit (*if an entire housing unit has been exposed*)," but only if it is possible to employ social distancing strategies "to maintain at least 6

feet of space between individuals." (Appx. I, Exh. F, at 67) (emphasis added). "If cohorted, quarantined individuals should *wear face masks at all times* (to prevent transmission from infected to uninfected individuals)." (*Id*.) (emphasis added). The last option of transfer "should be avoided due to the potential to introduce infection to another facility." (*Id*.)

But, "[f]acilities without onsite healthcare capacity, or *without sufficient space to implement effective quarantine*, should coordinate with local public health officials to ensure that close contacts of COVID-19 cases will be effectively quarantined and medically monitored." (Appx. I, Exh. F, at 66) (emphasis added).

Even stricter quarantining and isolation protocols apply in confirmed or suspected cases of COVID-19 infection. (Appx. I, Exh. F, at 62-66). However, the need to "[r]estrict quarantined individuals from leaving the facility (including transfers to other facilities)" is subject to an exception for detained individuals "released from custody." (Appx. I, Exh. F, at 68)

Release to individualized quarantining and isolation outside of a detention facility serves public health because, as the CDC explains, "[i]ncarcerated/detained persons live, work, eat, study, and recreate within congregate environments, heightening the potential for COVID-19 to spread once introduced," and "[o]ptions for medical isolation of COVID-19 cases are limited and vary depending on the type and size of facility, as well as the current level of available capacity, which is partly based on medical isolation needs for other conditions." (Appx. I, Exh. F, at 49)

Additionally, "[t]here are many opportunities for COVID-19 to be introduced into a correctional or detention facility, including daily staff ingress and egress; transfer of incarcerated/detained persons between facilities and systems, to court appearances, and to outside medical visits; and visits from family, legal representatives, and other community members." (Appx. I, Exh. F, at 49). "Some settings, particularly jails and detention centers, have

high turnover, admitting new entrants daily who may have been exposed to COVID-19 in the surrounding community or other regions." (Appx. I, Exh. F, at 49). Further, "[p]ersons incarcerated/detained in a particular facility often come from a variety of locations, increasing the potential to introduce COVID-19 from different geographic areas." (Appx. I, Exh. F, at 49)

As for new entrants, the CDC also recommends routine intake quarantining, which means "quarantining all new intakes for 14 days before they enter the facility's general population (SEPARATELY from other individuals who are quarantined due to contact with a COVID-19 case)." (Appx. I, Exh. F, at 61.) (emphasis in original). The CDC further specifies that detention centers should conduct "pre-intake screening and temperature checks for all new entrants" and to put new intakes with symptoms (fever, cough, shortness of breath) in medical isolation. (Appx. I, Exh. F, at 57)

Further, ICE's governing detention standards require reporting of the spread of communicable diseases within their detained populations.  ICE PBNDS, § 4.3(V)(C)(1) ("Facilities shall comply with current and future plans implemented by federal, state or local authorities addressing specific public health issues including communicable disease reporting requirements.") (copy at Appx I, Exh. N, at 256-57); *id*., at § 4.3(V)(C)(1)(h) ("Each facility shall have written plans that . . . shall include: . . . (h) management of infectious diseases and reporting them to local and/or state health departments in accordance with established guidelines and applicable laws."); *see also* ICE NDS, § 4.3(II)(D)(2) ("The facility will have written plans that address the management of infectious and communicable diseases, including, but not limited to, testing, isolation, prevention, and education. This also includes reporting and collaboration with local or state health departments in accordance with state and local laws and recommendations.") (copy at Appx I, Exh. O, at 314)

**C. Continued detention in the unique circumstances of the current pandemic poses a dire and imminent threat to Petitioners and others at Krome, Glades, and BTC.**

ICE's knowing and affirmative conduct in failing to address the clear foreseeability of severe outbreaks at Krome, BTC, and Glades, and to take the action of releasing Petitioners, demonstrates a disregard for the rights, well-being, and the humanity of detained immigrants. The continued detention of Petitioners and other detained individuals at Krome, Glades, and BTC is reckless.

Despite the global pandemic and shelter-in-place orders across the country and knowing the risks, ICE affirmatively continues to bring *new* people into detention centers and to transfer previously detained people between facilities.[22] ICE continues to issue detainer requests to counties instructing jail officials to hold people for them past the point of criminal custody coming to an end. ICE then transports these men and women from the local jail to immigration detention at Krome, Glades, and BTC.

With respect to people like Petitioners who are already in custody, ICE is violating the CDC guidelines and detention standards in multiple ways.

---

[22] U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement, *ICE Guidance on COVID-19* (last reviewed/updated Apr. 2, 2020), https://www.ice.gov/covid19 (" . . . our law enforcement officers and agents continue daily enforcement operations to make criminal and civil arrests."); *see also* Richard Hall, Coronavirus: ICE Crackdown Stokes Fears for Safety of Undocumented Immigrants During Pandemic, Independent (Mar. 15, 2020), https://www.independent.co.uk/news/world/americas/coronavirus-us-immigrants-ice-raids-trump-bernie-sanders-undocumented-healthcare-a9398816.html (noting that "[i]n New York, immigration advocates have noted a marked increase in ICE activity in recent months, which has not slowed as the coronavirus outbreak has worsened.").  On March 18, 2020, ICE announced it would "temporarily adjust" its enforcement practices during the COVID-19 outbreak, but declined to say it would stop arresting people altogether. Rebecca Klar, *ICE Pausing Most Enforcement During Coronavirus Crisis*, The Hill (Mar. 18, 2020), https://thehill.com/latino/488362-ice-pausing-most-immigration-enforcement-during-coronavirus-crisis.

Rather than use *individual* quarantining of people who have been exposed to COVID-19, ICE routinely uses en masse "cohort quarantining."  ICE commends itself for having placed large groups of people who have been exposed to COVID-19 together in the same living space, despite the CDC's statements that this measure *will facilitate* the spread of the virus among those quarantined and throughout the facility and outside community. (Appx. I, Exh. I, at 123 ¶10)

On top of the fact that cohorting is supposed to be last option when "there are no other available options" (Appx. I, Exh. F, at 6), it is only an option when it is possible to employ social distancing strategies "to maintain at least 6 feet of space between individuals" (Appx. I, Exh. F, at 67), because "[c]ohorting multiple quarantined close contacts of a COVID-19 case could transmit COVID-19 from those who are infected to those who are uninfected" (Appx. I, Exh. F, at 66).

Even in the general case, when a facility is not dealing with a positive or suspected COVID-19 case, or a case of a close contact to a positive or suspected COVID-19 case, detention facilities are instructed by the CDC Guidelines to "[i]mplement social distancing strategies to increase the physical space between incarcerated/detained persons (ideally 6 feet between all individuals, regardless of the presence of symptoms)."  (Appx. I, Exh. F, at 58).

ICE's cohorting practice contravenes the CDC guidelines. Cohorting is not the same as quarantine or medical isolation. The CDC guidance makes it clear that cohorting is to be used *only as a last resort.* ICE, however, is using cohorting as the planned—and primary—response to a known COVID-19 exposure, not a practice of last resort. (Appx. I, Exh. I, at 123 ¶10).

Moreover, cohorted groups are confined in spaces that prevent them from practicing social distancing. Cohorted groups are not provided with masks to prevent the transmission of COVID-19, as required by the CDC protocols. (Appx. I, Exh. F, at 67).

ICE has no plans to place suspected COVID-19 cases in individual medical isolation in which "[e]ach isolated individual should be assigned their own housing space and bathroom," as the CDC instructs. (Appx. I, Exh. F, at 62) Moreover, people who exhibit flu-like symptoms are not always removed from the general population but instead are sleeping and eating within feet of others.

Further, many of ICE's claims of having implemented COVID-19 precautions are either contradicted by reports from detained people, or the procedures they have implemented are ineffective.

Social distancing is impossible. People sleep in crowded rooms in bunk beds close together and must eat and bathe in close quarters. People are not provided sufficient soap to be able to comply with CDC hygiene inventory and hand-washing procedures. (Appx. I, Exh. F, at 54-57) The bathrooms in these facilities are often unsanitary and in poor condition. Bathrooms have been identified as a particularly potent vehicle for the spread of COVID-19.[23]

Other measures ICE claims to have taken, including temporarily suspending social visitation in detention and screening new detained immigrants for certain symptoms of COVID-19, are insufficient to curb the risk of infection within the detention centers.  Detained individuals report that ICE has not implemented the CDC's recommendation that newly detained individuals be in individual quarantine for 14 days *before* joining the rest of the population.

---

[23] *Why You Should Flush With The Lid Down: Experts Warn Of Fecal-Oral Transmission Of COVID-19*, Forbes (Apr. 2, 2020), www.forbes.com/sites/alexandrasternlicht/2020/04/02/why-you-should-flush-with-the-lid-down-virologist-warns-of-fecal-oral-transmission-of-covid-19/#6d581edd6eb8. CDC guidelines require detention centers to, "[s]everal times per day, clean and disinfect surfaces and objects that are frequently touched, especially in common areas. Such surfaces may include objects/surfaces not ordinarily cleaned daily (e.g., doorknobs, light switches, sink handles, countertops, toilets, toilet handles, recreation equipment, kiosks, and telephones)." www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

Not all COVID-19 patients present with fever or respiratory symptoms.  Many may be asymptomatic but still contagious, or have mild or less common symptoms.  As symptoms of COVID-19 can present anywhere from 2 to 14 days after exposure, individuals who pass ICE's screenings can expose other detained individuals, as well as detention center staff, if the CDC's new intake quarantining protocols are not followed.

Release from custody is both the only effective public health measure to curb increased transmission of COVID-19 and the most practical strategy to protect people like Petitioners from harm.

### Krome Service Processing Center

Krome is a detention center located at the edge of Miami-Dade County. ICE's contract with Akima Global Services ("AGS"), a third-party contractor, requires a mandatory minimum of 450 occupied beds. (Appx I, Exh. K, 149.) The population typically oscillates between 550 and 875 persons—far exceeding the contractual mandatory minimum. (Appx I, Exh. K, 149.)

ICE employs both ICE employees and AGS contract workers at the detention center. (Appx I, Exh. K, 149.) These workers typically live in Miami Dade County or other communities in South Florida.

Krome is divided into different housing units. However, all housing units share common spaces which include the recreation area, medical area, and the cafeteria. Each general population housing unit (referred to as "pods") is an open bay—meaning that there are *at least* 65 bunk bed cots per unit. (Appx I, Exh. K, 149.) The bunk beds are positioned within six feet of each other. The open bay also has a communal space with a table and seating areas, showers, toilets, and sinks. The general population units do not have individual cells.

Detained individuals prepare the communal food. Up until very recently, several housing pods ate together in the cafeteria. The cafeteria is now closed due to COVID-19, and housing units are eating together in the communal area of their pod.

Krome's failure to provide adequate medical care has been an ongoing concern. (Appx I, Exh. K, at 141-43, 150). Critical medical care is routinely delayed—sometimes for months—or denied outright. *Id*. An inspection conducted in February 2019 concluded that Krome's medical care was deficient. Lead Compliance Inspector.[24] Instead of addressing sick calls twice a day, as the detention standards require, it takes two to eight days to triage a sick call. (Appx I, Exh. K, 150.) When medical issues are addressed, individuals report not being properly treated or not treated at all. (Appx I, Exh. K, 150.) Proving ibuprofen is commonly used as a blanket solution to any and all medical issues. (Appx I, Exh. K, 150.)

 Because Krome fails to meet detained individual's medical needs under normal circumstances, the medical staff are ill-prepared to provide adequate medical treatment amidst the COVID-19 pandemic.

Krome has a large population and is often overcrowded. (Appx I, Exh. F, at 149-50) (overcrowding at Krome). ICE can tightly detain up to 1,000 individuals in the facility. (Appx I, Exh. K, 230 (endnote 118).) When the population reaches that number, it becomes dangerously overcrowded with 100 or more people in a pod with 65 beds. To house these numbers, Krome supplies stackable beds placed between bunkbeds, in front of the showers and bathrooms, next to the phones, and in the common television area. (Appx I, Exh. K, 149.) At least one pod, with 120 detainees, is currently in such a crowded state.

---

[24] *Annual Detention Inspection of the Krome Service Processing Center*, The Nakamoto Group, Inc. (Feb. 14, 2019) available at:
https://www.ice.gov/doclib/facilityInspections/kromeSPC_CL_02-14-2019.pdf.

Overcrowding at Krome has led to many sanitation and health issues. (Appx I, Exh. K, 150.) It becomes impossible to avoid human contact and the unit is harder to keep clean. (Appx I, Exh. K, 150). During the summer of 2019, there was a mumps outbreak at Krome in which housing units were group quarantined.[25] Ten years before that, there was an outbreak of the H1N1 virus at Krome.[26]

Detained men at Krome live in pods that house approximately 50 to 120 individuals. *See* Portuondo Dec. at ¶ 11 (Appx II, Exh. A, at 1-9); Gayle Dec. at ¶ 6 (Appx II, Exh. B, at 10-14). The large number of detained individuals in each pod make it infeasible to stay six feet apart and practice social distancing. *See* Arias-Martinez Dec. at ¶ 9 (Appx II, Exh. C, at 15-21); Jalloh Dec. ¶ 9(Appx II, Exh. D, at 22-29); Darwyn Dec. ¶ 5(c) (Appx II, Exh. E, at 30-34); Perez-Jeronimo Dec. ¶ 6 (Appx II, Exh. F, at 35-39); Chavez Dec. at ¶ 11 (Appx II, Exh. G, at 40-46); Jalloh Dec. ¶ 20 (Appx II, Exh. D, at 22-29); Mendez-Escobar Dec. ¶ 14 (Appx II, Exh. H, at 47-51); Zamora-Mendoza Dec. ¶ 10 (Appx II, Exh. I, at 52-54); Ocana-Guzman Dec. ¶ 8 (Appx II, Exh. J, at 55-60).

The pods have bunk beds for the detained individuals to sleep, which are not 6 feet apart. *See* Arias-Martinez Dec. at ¶ 9 (Appx II, Exh. C, at 15-21); Alfaro-Garcia Dec. at ¶ 7 (Appx II, Exh. K, at 61-67); Khan Dec. at ¶ 8a (Appx II, Exh. L, at 68-74); Jalloh Dec. ¶ 12 (Appx II, Exh. D, at 22-29); Perez-Jeronimo Dec. ¶ 6 (Appx II, Exh. F, at 35-39); Chavez Dec. at ¶ 11 (Appx II,

---

[25] Letter to ICE and Wardens from AI Justice, SPLC, AAAJ, and project South (Mar.  13, 2020), https://www.splcenter.org/sites/default/files/ltr_to_ice_and_wardens_re_covid-19_-_2020.03_-_final.pdf

[26] After a Krome employee's toddler contracted H1N1, ICE was criticized for not providing employees with proper protection, training, and information to deal with the virus. Kyle Munzenreider, *Infact Child of ICE Employee Has Swine Flu*, Miami New Times (June 23, 2009), https://www.miaminewtimes.com/news/infant-child-of-ice-employee-has-swine-flu-6565669.

Exh. G, at 40-46); Zamora-Mendoza Dec. ¶ 10 (Appx II, Exh. I, at 52-54); Ocana-Guzman Dec.

¶ 6 (Appx II, Exh. J, at 55-60).

There are at least three housing units of approximately 48, 59, and 120 people, one of

which includes a detained person with prostate cancer, that are under cohort quarantine. *See*

Portuondo Dec. at ¶ 11 (Appx II, Exh. A, at 1-9); Perez Limones Dec. at ¶ 7 (Appx II, Exh. M, at

75-78); Gayle Dec. at ¶ 12 (Appx II, Exh. B, at 10-14); Cardenas Dec. at ¶ 7 (Appx II, Exh. N, at

79-83). Petitioner Gayle is housed in a quarantined pod with 120 detained individuals, which has

a sign on the wall that says the maximum capacity is 80. *See* Gayle Dec. at ¶¶ 6, 12 (Appx II,

Exh. B, at 10-14). Detained individuals in these units share toilets and showers that are less than

six feet apart. *See* Portuondo Dec. at ¶ 11 (Appx II, Exh. A, at 1-9).  The room of 48 men has

only three urinals and one toilet. Cardenas Dec. at ¶ 11 (Appx II, Exh. N, at 79-83). At least one

of the rooms under cohort quarantine still leaves their room once a day to interact with hundreds

of other detained individuals in the recreation area, where the men are crowded into a small

space. Cardenas Dec. at ¶ 7 (Appx II, Exh. N, at 79-83). During communal meals, individuals are

forced to eat in close contact with each other. *See* Mendez-Escobar Dec. ¶ 14 (Appx II, Exh. H,

at 47-51).

A recent photograph, from a Miami Herald Article, of one of the general population units

at Krome shows men crowded into the common space. (Appx I, Exh. P, at 327-335, 334). None

of the men in the photograph are wearing masks or gloves. Men are crowded around small tables.

The bunk beds are located within a few feet of each other and of the tables. Social distancing is

impossible in this setting.

Despite the COVID-19 threat, Respondents continue to detain new people at Krome. *See*

Arrak Dec. ¶ 27 (Appx II, Exh. O, at 84-90)

Some detained individuals who require additional mental health and behavioral care are housed in the Krome Behavioral Health Unit ("BHU"), which is split into two sections. One unit can house 22 people, while the other can house eight people. Hasan Dec. ¶ 6 (Appx II, Exh. R, at 106-12). Individuals in the BHU typically share a room with another person, and sleep less than six feet apart. *See* Warsane Dec. ¶ 9 (Appx II, Exh. Q, at 98-105); Farah Dec. ¶ 6 (Appx II, Exh. P, at 91-97). Two detained individuals in the BHU do not currently share a room while sleeping, but are in close contact with others in the unit when in communal areas. *See* Hasan Dec. ¶ 7-8 (Appx II, Exh. R, at 106-12); Arrak Dec. ¶ 6-7 (Appx II, Exh. O, at 84-90); Farah Dec. ¶ 10 (Appx II, Exh. P, at 91-97).

Detained individuals in BHU are required to go to the recreation yard twice a day for an hour, despite complaints that the area is too small to allow social distancing. *See* Hasan Dec. ¶ 30 (Appx II, Exh. R, at 106-12); Arrak Dec. ¶ 12 (Appx II, Exh. O, at 84-90); Farah Dec. ¶ 21 (Appx II, Exh. P, at 91-97). The guards threaten them with being sent to the "hole," or Segregated Housing Unit, unless they go to recreation. Arrak Dec. ¶ 12 (Appx II, Exh. O, at 84-90). Some detained individuals feel they need to go into disciplinary housing or remain isolated in their rooms to prevent the risk of infection, but are concerned their mental health conditions, including post-traumatic stress disorder and major depressive disorder, will worsen. Arrak Dec. ¶ 7 (Appx II, Exh. O, at 84-90); Hasan Dec. ¶ 9 (Appx II, Exh. R, at 106-12).

Meals in the BHU are served in the dayroom to all detained individuals at the same time, but there are only two tables and few chairs, and some have to sit on the floor to eat. Warsane Dec. ¶ 12 (Appx II, Exh. Q, at 98-105); Hasan Dec. ¶ 7 (Appx II, Exh. R, at 106-12); Farah Dec. ¶ 10 (Appx II, Exh. P, at 91-97). The tables and two phones in the dayroom that all detained individuals in BHU use are not being cleaned. Warsane Dec. ¶ 12 (Appx II, Exh. Q, at 98-105);

Hasan Dec. ¶ 31 (Appx II, Exh. R, at 106-12); Arrak Dec. ¶ 10 (Appx II, Exh. O, at 84-90). They only have toilet paper available to clean the tables in the common area, and one man reports using toilet paper to clean his room. *See* Warsane Dec. ¶ 23 (Appx II, Exh. Q, at 98-105); Farah Dec. ¶ 18 (Appx II, Exh. P, at 91-97). Krome staff bring food in a cart to the unit for all meals, but do not wear masks or gloves despite requests from the detained population to do so. Warsane Dec. ¶ 21 (Appx II, Exh. Q, at 98-105). The guards laugh at these requests. Warsane Dec. ¶ 22 (Appx II, Exh. Q, at 98-105).

Detained individuals are requesting face masks, but staff have not provided them and have said they are not necessary for detainees or are only for officers. *See* Warsane Dec. ¶ 25 (Appx II, Exh. Q, at 98-105); Hasan Dec. ¶ 19-20 (Appx II, Exh. R, at 106-12); Arrak Dec. ¶ 15, 21 (Appx II, Exh. O, at 84-90); Farah Dec. ¶ 11 (Appx II, Exh. P, at 91-97).

Soap has not been readily available, and some individuals have not been able to shower unless they had funds to purchase soap from commissary. Warsane Dec. ¶ 17 (Appx II, Exh. Q, at 98-105); Hasan Dec. ¶ 11, 13 (Appx II, Exh. R, at 106-12); Arrak Dec. ¶ 8, 23 (Appx II, Exh. O, at 84-90); Farah Dec. ¶ 20 (Appx II, Exh. P, at 91-97). Even when purchased, detained individuals are not being given these items for several days and are running out of essentials like soap and shampoo. Warsane Dec. ¶ 18 (Appx II, Exh. Q, at 98-105); Hasan Dec. ¶ 11 (Appx II, Exh. R, at 106-12); Farah Dec. ¶ 20 (Appx II, Exh. P, at 91-97). Hand sanitizer appears to be only available to nurses, who sometimes spray sanitizer on detained individuals' hands when they are receiving medication. *See* Hasan Dec. ¶ 14 (Appx II, Exh. R, at 106-12); Arrak Dec. ¶ 25 (Appx II, Exh. O, at 84-90); Farah Dec. ¶ 9 (Appx II, Exh. P, at 91-97).

Individuals taking prescription medication see nurses twice a day, in the morning and evening. Warsane Dec. ¶ 20 (Appx II, Exh. Q, at 98-105). Nurses are not consistently wearing

gloves or masks when dispensing medication or checking if the person has swallowed the medication. Warsane Dec. ¶ 20 (Appx II, Exh. Q, at 98-105). Guards pat down detained individuals several times a day and do shakedowns of bedrooms three times per day, but do not always wear gloves or masks. Warsane Dec. ¶ 29 (Appx II, Exh. Q, at 98-105); Hasan Dec. ¶ 23, 24 (Appx II, Exh. R, at 106-12); Arrak Dec. ¶ 18 (Appx II, Exh. O, at 84-90); Farah Dec. ¶ 12-14 (Appx II, Exh. P, at 91-97). Around April 8, five guards were sent home while others are working overtime. Warsane Dec. ¶ 33 (Appx II, Exh. Q, at 98-105); Hasan Dec. ¶ 21, 28 (Appx II, Exh. R, at 106-12); Farah Dec. ¶ 16 (Appx II, Exh. P, at 91-97).

The number of people in all of the general population units is high, and new detained individuals have continued to come in over the past few weeks. *See* Darwyn Dec. ¶ 6(j) (Appx II, Exh. E, at 30-34); Tolentino Dec. ¶ 6, 11 (Appx II, Exh. S, at 113-17); Tepetate-Martinez Dec. at ¶ 15 (Appx II, Exh. T, at 118-23); Gayle Dec. at ¶ 11 (Appx II, Exh. B, at 10-14 ); Arias-Martinez Dec. at ¶ 10 (Appx II, Exh. C, at 15-21); Khan Dec. at ¶ 8(k) (Appx II, Exh. L, at 68-74). Petitioner Aparicio has seen about 15 new detained individuals in his unit in the last two weeks. *See* Aparicio Dec. ¶ 7 (Appx II, Exh. F, at 35-39).

As recently as April 4, 2020, new detained individuals have been transferred to Krome and were not being tested to determine whether they have COVID-19. *See* Jalloh Dec. ¶ 13 (Appx II, Exh. D, at 22-29); Portuondo Dec. at ¶ 13 (Appx II, Exh. A, 1-9).

At least two of the detained individuals recently transferred to Krome had fevers, one of whom was visibly shaking in the dining room. Both were eventually taken out of the general population. *See* Arias-Martinez Dec. at ¶ 10 (Appx II, Exh. C, at 15-21). One detained person who contracted a severe fever was removed from his room in the middle of the night by ICE agents, who were accompanied by police officers carrying guns with rubber bullets. *See*

Cardenas Dec. at ¶ 8 (Appx II, Exh. N, 79-83). The officers would not explain to the other men in the room what was happening, and the next night a new man was brought to fill the bed of the sick man. *Id.* Since then, at least four other men in that sick man's room have developed COVID-19 symptoms, and have not been able to see a doctor. Cardenas Dec. at ¶¶ 6, 8 (Appx II, Exh. N, 79-83). One of these men has asthma, putting him at severe risk of dying from COVID-19. *See* Cardenas Dec. at ¶ 5 (Appx II, Exh. N, 79-83).

One detainee tested positive for COVID-19, and the two officers who were watching him also tested positive. *See* Portuondo Dec. at ¶ 14 (Appx II, Exh. A, 1-9); Chavez Dec. at ¶ 13 (Appx II, Exh. G, at 40-46).

Approximately 60 Krome employees have been placed under quarantine, after a total of four staff tested positive for COVID-19. *See* Cardenas Dec. at ¶ 9 (Appx II, Exh. N, 79-83). The facility is so understaffed that some employees are now working 12-hour shifts. *Id*. at ¶ 9 (Appx II, Exh. N, 79-83).

Detained individuals have been transported in and out of Krome to hospital and medical visits since the outbreak, potentially having contact with infected individuals. *See* Portuondo Dec. at ¶ 6 (Appx II, Exh. A, 1-9).

The detained individuals are close together when they eat because the tables and chairs where they eat cannot be moved. *See* Portuondo Dec. at ¶ 16 (Appx II, Exh. A, 1-9); Abdul Jalloh Dec. ¶ 15 (Appx II, Exh. D, at 22-29); Tolentino Dec. ¶ 8 (Appx II, Exh. S, at 113-17); Alfaro Garcia Dec. ¶ 16 (Appx II, Exh. K, at 61-67); Tepetate-Martinez Dec. ¶ 7 (Appx II, Exh. T, at 118-23); Tolentino Dec. ¶ 5b (Appx II, Exh. S, at 113-17); Perez Limones Dec. ¶ 13 (Appx II, Exh. M, at 75-78); Chavez Dec. ¶ 14 (Appx II, Exh. G, at 40-46).

Detained individuals are not being provided with masks or gloves, even when they are in cohort quarantine. *See* Portuondo Dec. ¶ 25 (Appx II, Exh. A, 1-9); Khan Dec. ¶ 8(c) (Appx II, Exh. L, at 68-74); Escobar Dec. ¶ 8 (Appx II, Exh. H, at 47-51); Zamora Mendoza Dec. ¶ 11 (Appx II, Exh. I, at 52-54). Portuondo reported that there is one soap dispenser at the entrance to the toilet area in his pod, which was only installed 7 or 8 days ago. *See* Portuondo Dec. at ¶ 21 (Appx II, Exh. A, 1-9). They have a weekly allowance of soap and some use less than needed to make sure not to run out. *See* Abdul Jalloh Dec. ¶ 21 (Appx II, Exh. D, at 22-29). Because Krome does not provide enough personal hygiene products, detained individuals must buy them in the commissary. *See* Tolentino Dec. ¶ 10 (Appx II, Exh. S, at 113-17). But the commissary is now closed and people now have to submit a request to order items, which can take anywhere from two days to over a week to arrive. *See* Farah Dec. ¶ 20 (Appx II, Exh. P, at 91-97).

There are no masks, gloves, or hand sanitizer available for purchase. *See* Portuondo Dec. ¶ 22 (Appx II, Exh. A, 1-9); Gayle Dec. ¶ 9 (Appx II, Exh. B, at 10-14); Arias-Martinez Dec. ¶ 13 (Appx II, Exh. C, at 15-21); Jalloh Dec. ¶ 22 (Appx II, Exh. D, at 22-29); Chavez Dec. ¶ 18 (Appx II, Exh. G, at 40-46).

When detained individuals try to make their own masks, they are told they are not allowed to cover their faces. *See* Aparicio Dec. ¶ 7 (Appx II, Exh. F, at 35-39); Escobar Dec. ¶ 8 (Appx II, Exh. H, at 47-51).

There is no hand sanitizer available in the common area. *See* Portuondo Dec. at ¶ 20 (Appx II, Exh. A, 1-9); Alfaro Garcia Dec. at ¶ 11 (Appx II, Exh. K, at 61-67); Tepetate-Martinez Dec. at ¶ 8 (Appx II, Exh. T, at 118-23); Darwyn Dec. ¶ 5(d) (Appx II, Exh. E, at 30-34); Chavez Dec. at ¶ 16 (Appx II, Exh. G, at 40-46). Detained individuals have reported seeing

the guards with hand sanitizer but detained individuals are not allowed to use it. *See* Portuondo Dec. at ¶ 20 (Appx II, Exh. A, 1-9); Chavez Dec. at ¶ 16 (Appx II, Exh. G, at 40-46).

There is hand sanitizer in the nurse's area where detained men receive medication. *See* Abdul Jalloh Dec. ¶ 21 (Appx II, Exh. D, at 22-29). However, detained individuals are only allowed one squirt when receiving medication. *See* Farah Dec. ¶ 9 (Appx II, Exh. P, at 91-97).

Until recently, Krome staff were not wearing masks or gloves. *See* Portuondo Dec. at ¶ 25 (Appx II, Exh. A, 1-9); Abdul Jalloh Dec. ¶ 25 (Appx II, Exh. D, at 22-29 ); Perez Limones Dec. at ¶ 11 (Appx II, Exh. M, at 75-78); Chavez Dec. at ¶ 21 (Appx II, Exh. G, at 40-46). Some officers still fail to wear gloves or masks. *See* Warsane Dec. ¶ 21, 29 (Appx II, Exh. Q, at 98-105); Hasan Dec. ¶ 23, 24 (Appx II, Exh. R, at 106-12); Arrak Dec. ¶ 18; Farah Dec. ¶ 12-14 (Appx II, Exh. P, at 91-97); Portuondo Dec. at ¶ 26 (Appx II, Exh. A, 1-9); Chavez Dec. at ¶ 22 (Appx II, Exh. G, at 40-46). Guards are seen touching their faces and then things in the pods, such as people, food trays and other items in the living area, and they are not observed washing their hands often. *See* Abdul Jalloh Dec. ¶ 26-28 (Appx II, Exh. D, at 22-29); Alfaro Garcia Dec. at ¶¶ 10-11, 14 (Appx II, Exh. K, at 61-67); Tepetate-Martinez Dec. at ¶¶ 13-14 (Appx II, Exh. T, at 118-23); Darwyn Dec. ¶ 6(h)-(i) (Appx II, Exh. E, at 30-34); Portuondo Dec. at ¶ 27 (Appx II, Exh. A, 1-9); Chavez Dec. at ¶ 23 (Appx II, Exh. G, at 40-46).

Detained individuals have not seen efforts to clean or disinfect areas more frequently. Escobar Dec. ¶ 10 (Appx II, Exh. H, at 47-51).  Detained individuals serve the food and clean the facility, but are not provided with masks when working these jobs. *See* Abdul Jalloh Dec. ¶ 16-18 (Appx II, Exh. D, at 22-29); Aparicio Dec. ¶ 7 (Appx II, Exh. F, at 35-39); Tepetate-Martinez Dec. at ¶ 10 (Appx II, Exh. T, at 118-23); Perez Limones Dec. at ¶ 14 (Appx II, Exh. M, at 75-78). Detained individuals prepare and touch the food, distribute the clothing, and they do not use

gloves or masks or use other hygiene measures to help ensure that the virus does not spread. *See* Darwyn Dec. ¶ 6(a)-(d) (Appx II, Exh. E, at 30-34).

Detained individuals report that a nurse said masks were being reused because of supply shortages. *See* Portuondo Dec. at ¶ 25 (Appx II, Exh. A, 1-9); Chavez Dec. at ¶ 21 (Appx II, Exh. G, at 40-46).

Detained individuals have not been trained on how to limit the spread of COVID-19. *See* Portuondo Dec. at ¶ 23 (Appx II, Exh. A, 1-9). *See* Abdul Jalloh Dec. ¶¶ 19, 23 (Appx II, Exh. D, at 22-29); Alfaro Garcia Dec. at ¶ 18 (Appx II, Exh. K, at 61-67); Arias-Martinez Dec. at ¶ 14 (Appx II, Exh. C, at 15-21); *See* Darwyn Dec. ¶ 8 (Appx II, Exh. E, at 30-34). They are only getting information from Krome staff when they or their families ask, but all they are told is that there are thousands of COVID-19 cases in the country. *See* Aparicio Dec. ¶ 9 (Appx II, Exh. F, at 35-39).

As of April 7, 2020, detained individuals have had their TVs, phones, and tablets confiscated. *See* Portuondo Dec. at ¶ 19 (Appx II, Exh. A, 1-9). No unit within Krome is allowed to watch TV. *See* Portuondo Dec. at ¶ 19 (Appx II, Exh. A, 1-9); Alfaro Garcia Dec. at ¶ 7 (Appx II, Exh. K, at 61-67); *See* Darwyn Dec. ¶ 8 (Appx II, Exh. E, at 30-34).

A recent emergency that was announced over the speakers at Krome was due to COVID-19. *See* Abdul Jalloh Dec. ¶ 29 (Appx II, Exh. D, at 22-29).

On April 7, some detained individuals raised concerns about conditions and fears of COVID-19 and guards began beating them. Flores Ramos Dec. ¶ 20 (Appx II, Exh. U, at 124-30). One person was kicked in the ribs although he was not among those making complaints. Flores Ramos Dec. ¶ 20 (Appx II, Exh. U, at 124-30). The guards are not allowing detained

people to contact their attorneys, which that man believes is retaliation in response to these complaints. Flores Ramos Dec. ¶ 21 (Appx II, Exh. U, at 124-30).

Since the COVID-19 outbreak at Krome, there has been a decrease in medical staff. *See* Abdul Jalloh Dec. ¶ 35 (Appx II, Exh. D, at 22-29). There has been no increase in screenings. *See* Darwyn Dec. ¶ 10 (Appx II, Exh. E, at 30-34). Detained individuals who request evaluation and to see a doctor have had their requests denied. *See* Darwyn Dec. ¶ 7, 11 (Appx II, Exh. E, at 30-34).

When someone is sick with cold symptoms, they must wait five to eight days before they can see a doctor. *See* Aparicio Dec. ¶ 8 (Appx II, Exh. F, at 35-39); Gayle Dec. at ¶ 8 (Appx II, Exh. B, at 10-14); Perez Limones Dec. at ¶ 8 (Appx II, Exh. M, at 75-78). When other detained individuals are taken out of the pods for coughing or issues with breathing, the other detained individuals are not told whether they have been exposed to COVID-19. *See* Gayle Dec. at ¶ 10 (Appx II, Exh. B, at 10-14).

A detained man was sick with a cough and requested to see a doctor, but was told that he was not a priority. *See* Abdul Jalloh Dec. ¶ 14 (Appx II, Exh. D, at 22-29). He was not isolated from the rest of the pod. *Id* (Appx II, Exh. D, at 22-29). Detained individuals have symptoms, including fever, goosebumps, and cough, but the rest of the detained population is not being told what is wrong with them. *See* Alfaro Garcia Dec. at ¶ 12 (Appx II, Exh. K, at 61-67).

If detained individuals have severe symptoms, they are taken to another area and provided with medication for headaches, but then returned to the pod. *See* Aparicio Dec. ¶ 8 (Appx II, Exh. F, at 35-39). When one detainee developed a cough, a staff member took his temperature and gave him two pills, without explaining to him what was wrong with him. *See* Gayle Dec. at ¶ 8 (Appx II, Exh. B, at 10-14).

Detained individuals are not getting tested when they are sick, unless they are having difficulty breathing. *See* Aparicio Dec. ¶ 11 (Appx II, Exh. F, at 35-39).

The medically vulnerable, due to chronic illnesses, are not being separated from the rest of the population. *See* Abdul Jalloh Dec. ¶ 32 (Appx II, Exh. D, at 22-29); Arias-Martinez Dec. at ¶ 9 (Appx II, Exh. C, at 15-21); Khan Dec. at ¶¶ 7-8 (Appx II, Exh. L, at 68-74).

On Sunday, April 5, 2020, the Miami Herald reported that the Monroe County Jail ended its 23-year contract with the ICE Miami Field Office, and returned 48 detained individuals to the Krome "in the middle of the night Friday." "Sources told the Herald that the frequent trips to the crowded facility in Miami had the sheriff 's office uneasy over the possibility that the coronavirus could easily be transmitted." (Appx I, Exh. Q, 336-41.)

On April 8, 2020, the Assistant Field Officer Liana J. Castano stated in a declaration to this court that Krome had 3 cases of laboratory confirmed positives for COVID-19 amongst staff and a detained individual, and that at least 238 detained individuals were exposed to a confirmed case of COVID-19. (Appx I, Exh. I, at 123-224 ¶ 12.) These 238 individuals who have been exposed to a person confirmed to have COVID-19 are being placed in "cohorts with restricted movement." (Appx I, Exh. I, at 123 ¶ 10.)

The day before, investigating from the Miami Herald was released which suggests that the number of people with the virus is underreported and " 'not completely accurate as testing is not conducted on site and detained individuals are sent to an off-site hospital to be tested,' " according to a federal official interviewed by the Herald. (Appx I, Exh. D, at 41.)

The Miami Herald's April 7, 2020, report also explained that "[f]or weeks — and as recently as Monday — U.S. Immigration and Customs Enforcement has repeatedly told the Herald that no detainees in their custody in Florida have tested positive for the virus. However,

the agency got around having to disclose that any detainee was sick with COVID-19 because the detainee was technically no longer on the premises — but rather at a hospital, federal sources say." (Appx I, Exh. D, at 40-41.)

Also, on April 7, 2020, four members of Congress directed a letter to ICE's Deputy Director Matthew T. Albence, "urg[ing] [him] to significantly limit the number of immigrants held in detention and immediately expand [his] agency's use of alternatives to detention (ATD) for qualified individuals" so that "[a] mass tragedy at Krome and other ICE facilities in Florida, including Broward Transitional Center and Glades County Detention Center, can be avoided." (Appx I, Exh. R, at 342-43.) These members of Congress expressed that they were "deeply disturbed by ICE's continued activity to transfer and detain large groups of immigrants in the midst of a global pandemic, especially at a facility where detainees and employees have tested positive." (Appx I, Exh. R, at 342.)

These four members of Congress also stated that "[i]t is undisputed that jails, prisons, and detention centers are highly vulnerable to COVID-19" due to the fact that "[e]ffective social distancing is almost impossible and necessary disinfectant is rarely available to detainees," and especially so given that the situation in "Krome is particularly alarming in this respect" in light of reported "overcrowded conditions even prior to the impact of COVID-19." (Appx I, Exh. R, at 342.)  They also added that "it appears that Krome is not at all prepared to mitigate exposure to COVID-19, or to adequately respond should an outbreak at the facility occur. These issues are only compounded by the fact that COVID-19 has now reached Krome." (Appx I, Exh. R, at 342-43.)

Staff at Krome arrive and leave on a shift basis, and there is limited ability to adequately screen incoming staff for new, asymptomatic infection. Staff generally live in the communities near these facilities—areas where there are confirmed cases of COVID-19.

The outbreak at Krome has affected the immigration court housed at the facility and run by the Executive Office for Immigration Review ("EOIR"). Krome Immigration Court is accessed through the same lobby as the detention center. Judges, court staff, and both government and defense attorneys have expressed concern about their safety and health.

On March 22, 2020, the National Association of Immigration Judges ("NAIJ"), the ICE Professionals Union ("ICE Union"), and the American Immigration Lawyers Association ("AILA"), wrote a joint statement demanding that EOIR close all of the immigration courts nationwide, and stating, among other things, that:

> The DOJ's current response to the COVID-19 pandemic and its spread is disconnected from the needs and advice of community leaders and scientific experts. The Immigration Courts are especially vulnerable to the spread of the Coronavirus. Every link in the chain that brings individuals to the court, from the use of public transportation, to security lines, crowded elevators, hallways, the cramped cubicle spaces of court staff, inadequate waiting room facilities in the courthouses, and scant sanitizing resources at the courts, all place lives at risk. Individuals who in many instances have waited years for a hearing may also feel pressured to appear – even if they feel sick, for fear of being ordered deported.

(Appx I, Exh. S, at 345-47, 346)

On March 26, 2020, the NAIJ, the ICE Union, AILA, and a multitude of other organizations wrote a letter directly to Attorney General Barr demanding the closure of all immigration courts nationwide, and stating that "detained courts must also be closed to in-person hearings in order to minimize the spread of the virus, slow the rate of new infections, and to avoid overwhelming local resources." (Appx I, Exh. T, at 348-51.)

On March 30, 2020, the NAIJ issued an additional statement.  The statement begins by quoting a "current immigration judge who is a U.S. military veteran" stating:

> I don't say this lightly, but EOIR has demonstrated that they need to be gutted and rebuilt from the ashes.  I've never witnessed an utter lack of concern for people like I have here.  In my former life, we treated captured Taliban and ISIS with more humanity.  Moreover, I've never seen worse leadership.  A crisis usually brings good and bad to the light.  We have nothing but darkness.

(Appx I, Exh. U, at 352-56, 352)

 That same day, Monday, March 30, 2020, at 7:50 a.m., without explanation, EOIR suddenly announced that the Krome Immigration Court was closed for hearings for two days. (Appx I, Exh. V, at 357)

To date, there is yet to be a public explanation for why the Krome hearings were cancelled so abruptly. There are reports that the judges and court staff at Krome feared exposure to the virus and that the abrupt closure occurred to permit cleaning of the court facilities.

The Krome Immigration Court remains closed at this time.

**Glades County Detention Center**

Glades is a county jail in Moorehaven, Florida. It can house roughly 500 ICE detained men and women at a time. (Appx I, Exh. K, at 162.) Detained individuals in ICE custody are split amongst six housing units, or "pods," four designated for the men and two for the women. (Appx I, Exh. K, at 162.) Depending on the facility's capacity, pods may contain a mix of individuals in ICE custody, custody of the U.S. Marshals, or under Glades County custody. (Appx I, Exh. K, at 140.)

The cells where the detained individuals sleep are small, and there are six detained individuals in each cell, with three bunk beds that are placed close together. *See* Dairon Barredo Sanchez Dec. ¶ 8 (Appx II, Exh. V, at 131-38); Tahimi Perez ¶ 10 (Appx II, Exh. W, at 139-44);

Franklin Ramon Gonzalez ¶ 7 (Appx II, Exh. X, at 145-50). The detained individuals are only able to maintain about one-meter separation in their cells when they sleep. *See* Gerardo Vargas Dec. ¶ 7 (Appx II, Exh. Y, at 151-56); Francisco Rivero Valeron Dec. ¶ 7 (Appx II, Exh. Z, at 157-62).

Many detained individuals have experienced significant turnover of cellmates, having up to six or seven new cellmates since their detention in Glades. *See* Dairon Barredo Sanchez Dec. ¶ 6 (Appx II, Exh. V, at 131-38); Gerardo Vargas Dec. ¶ 6 (Appx II, Exh. Y, at 151-56); Tahimi Perez ¶ 9 (Appx II, Exh. W, at 139-44); Franklin Ramon Gonzalez ¶ 6 (Appx II, Exh. X, at 145-50).

There are approximately 95 detained individuals in a pod at a time. *See* Dairon Barredo Sanchez Dec. ¶ 17 (Appx II, Exh. V, at 131-38); Francisco Rivero Valeron Dec. ¶ 7 (Appx II, Exh. Z, at 157-62). The pods are so crowded, that social distancing at a safe six feet distance is impossible, especially with the constant influx of detained individuals. *See* Dairon Barredo Sanchez Dec. ¶ 12 (Appx II, Exh. V, at 131-38); Gerardo Vargas Dec. ¶ 6, 8 (Appx II, Exh. Y, at 151-56); Irvin Mendoza Silis Dec. ¶ 6 (Appx II, Exh. AA, at 163-67); Francisco Rivero Valeron Dec. ¶ 7 (Appx II, Exh. Z, at 157-62); Tahimi Perez ¶ 13 (Appx II, Exh. W, at 139-44); Franklin Ramon Gonzalez ¶ 11 (Appx II, Exh. X, at 145-50).

All detained individuals in a pod also share communal bathrooms and showers, which do not have six feet of distance between them, making it impossible to maintain a safe social distance even while using the restroom or bathing. *See* Dairon Barredo Sanchez Dec. ¶ 13 (Appx II, Exh. V, at 131-38); Gerardo Vargas Dec. ¶ 6 (Appx II, Exh. Y, at 151-56); Franklin Ramon Gonzalez ¶ 6 (Appx II, Exh. X, at 145-50).

Unlike BTC or Krome, there is no cafeteria. Detained individuals eat in the communal seating area in their pod, known as "satellite feeding." (Appx I, Exh. K, at 162.) The tables used for eating and daily living usually seat four people, but due to overcrowding, they are now seating five to six people at a time. *See* Gerardo Vargas Dec. ¶ 7 (Appx II, Exh. Y, at 151-56). As a result, there is only about 40 to 50 centimeters of separation between detained individuals when they are eating at the tables. *See* Francisco Rivero Valeron Dec. ¶ 7 (Appx II, Exh. Z, at 157-62).

New detained individuals arrive at Glades every day, some already exhibiting flu like symptoms like coughing. *See* Roseline Ostine Dec. ¶ 9 (Appx II, Exh. BB, at 168-72). There is no indication that new detained individuals are tested for COVID-19 or routinely quarantined before being placed in the pod with the rest of the detained individuals. *Id* (Appx II, Exh. BB, at 168-72); Dairon Barredo Sanchez Dec. ¶ 9 (Appx II, Exh. V, at 131-38); Francisco Rivero Valeron Dec. ¶ 11 (Appx II, Exh. Z, at 157-62); Tahimi Perez Dec. ¶ 10 (Appx II, Exh. W, at 139-44).

In all six pods, individuals share many common spaces and touch the same surfaces. All six units and the segregation unit share a common law library. In each pod, there are only four phones available per pod that everyone must share, and people must also share tablets. Similarly, all detained individuals in the segregation unit share the same two phones.

There are no sanitizing wipes or cleaning supplies available to wipe down the phones in between calls, therefore the detained individuals are forced to use just a wet paper towel in an attempt to clean the phones before and after use. *See* Francisco Rivero Valeron Dec. ¶ 9 (Appx II, Exh. Z, at 157-62).

Contractors and detained individuals have continuously reported unsanitary physical conditions, lack of medical care, and physical mistreatment. (Appx I, Exh. K, at 162.) Glades has failed to substantively remedy these poor conditions.

Unsanitary bathrooms are a persistent problem. The jail forbids the use of bleach for cleaning the bathrooms. (Appx I, Exh. K, at 162.) Shampoo is typically used as a substitute for soap. (Appx I, Exh. K, at 162.) There is mold in the bathrooms. (Appx I, Exh. K, at 162.); (Appx I, Exh. W, at 367-68) (DHS Office of Inspector Gen. Report OIG-18-32, noting lack of cleanliness, limited hygienic supplies, and potentially unsafe food handling).

There have been reports of inedible food provided to detained individuals. (Appx I, Exh. K, at 163.) The "drinking water has a yellowish hue and an odd taste." (Appx, Exh. K, at 163).

 The spread of cough, flu, and other respiratory conditions in the dorms have been attributed to the unsanitary conditions. (Appx I, Exh. K, at 162.) Even before the COVID-19 pandemic, Glades failed to provide adequate medical care to detained women and men. (Appx I, Exh. E, at 58-60; 80-81.)[27]

Glades only has one doctor in the facility, who is only available four times a week. (Appx I, Exh. K, at 163.) Critical medical care is routinely delayed—sometimes for months—or denied outright. (Appx I, Exh. K, at 141-42; 163-64)  When medical requests are finally addressed, individuals report not being properly treated or not treated at all. (Appx I, Exh. K, at 163.) Providing ibuprofen or Tylenol is commonly used as a blanket solution to any and all medical issues.  (Appx I, Exh. K, at 163.) For individuals with chronic medical conditions, it can take

---

[27] *See also* Legal Aid Service of Broward County, *Complaint and Request for Investigation Glades Detention Center in Moore Haven, Florida Physical Abuse, Inappropriate Use of Segregation, Denial of Medical and Mental Health Care and Lack of Attorney Acces*s (January 8, 2018), https://media.law.miami.edu/clinics/pdf/2018/OIG-complaint-against-glades.pdf].

months of grievances and sick calls to receive diagnostic testing or to see a specialist off-site. (Appx I, Exh. K, at 142)

Because Glades fails to meet detained individual's medical needs under normal circumstances, the jail is ill-suited to provide adequate medical treatment amidst the COVID-19 pandemic. This failure is so severe that it cannot be remedied quickly to respond to COVID-19, especially in a time when healthcare resources are in high demand.

For years, detained women and men have reported "that officers routinely misuse pepper spray, use excessive force and racial slurs, and overuse isolation in a retaliatory manner." (Appx I, Exh. K, at 164-65). One detained individual with respiratory problems reported being pepper sprayed in an isolation cell, which triggered an asthma attack. (Appx I, Exh. K, at 165.) The lack of ventilation and the unsanitary conditions further aggravated his respiratory difficulties. (*Id.*)

Detention center staff have failed to train detained individuals about hygiene measures designed to limit the spread of COVID-19. *See* Dairon Barredo Sanchez Dec. ¶ 30 (Appx II, Exh. V, at 131-38); Gerardo Vargas Dec. ¶ 12 (Appx II, Exh. Y, at 151-56); Francisco Rivero Valeron Dec. ¶ 13 (Appx II, Exh. Z, at 157-62); Franklin Ramon Gonzalez ¶ 15 (Appx II, Exh. X, at 145-50). The only information detained individuals receive about COVID-19 is from the television or posters on the wall. *See* Dairon Barredo Sanchez Dec. ¶ 30, 33 (Appx II, Exh. V, at 131-38).

Detained individuals are now being provided with half the amount of soap they are normally provided with, equaling one 4-ounce bottle per week, when they were previously provided with two bottles per week. *See* Roseline Ostine Dec. ¶ 9 (Appx II, Exh. BB, at 168-72); Francisco Rivero Valeron Dec. ¶ 8 (Appx II, Exh. Z, at 157-62); Conlin Dec. (Appx I, Exh. J, at 126-30.) Detained individuals are forced to ration this small portion of soap, one bottle, to cover

showering and hand washing for an entire week. Id; Franklin Ramon Gonzalez ¶ 13 (Appx II, Exh. X, at 145-50).

The facility is not providing hand sanitizer, and there is none available for purchase in commissary. *See* Roseline Ostine Dec. ¶ 9 (Appx II, Exh. BB, at 168-72); Francisco Rivero Valeron Dec. ¶ 7-9 (Appx II, Exh. Z, at 157-62); Tahimi Perez Dec. ¶ 14-15 (Appx II, Exh. W, at 139-44); Franklin Ramon Gonzalez Dec. ¶ 13 (Appx II, Exh. X, at 145-50).

Detained individuals are not provided with masks or gloves. *See* Roseline Ostine Dec. ¶ 11 (Appx II, Exh. BB, at 168-72); Tahimi Perez Dec. ¶¶ 8, 14 (Appx II, Exh. W, at 139-44); Conlin Dec. ¶ 17 (Appx I, Exh. J, at 126-30). Even when detained individuals attempt to make their own masks out of their personal belongings, such as t-shirts, the guards tell them that they are not allowed to cover their faces with anything. *See* Dairon Barredo Sanchez Dec. ¶ 19 (Appx II, Exh. V, at 131-38); Franklin Ramon Gonzalez Dec. ¶ 14 (Appx II, Exh. X, at 145-50).

There are no gloves or masks available for purchase in commissary. *See* Dairon Barredo Sanchez Dec. ¶ 29 (Appx II, Exh. V, at 131-38); Gerardo Vargas Dec. ¶ 11 (Appx II, Exh. Y, at 151-56); Francisco Rivero Valeron Dec. ¶ 7, 9 (Appx II, Exh. Z, at 157-62); Franklin Ramon Gonzalez Dec. ¶ 14 (Appx II, Exh. X, at 145-50).

Although some Glades staff have recently started wearing masks, the majority of the Glades staff do not use masks or gloves. *See* Roseline Ostine Dec. ¶ 9 (Appx II, Exh. BB, at 168-72); Dairon Barredo Sanchez Dec. ¶ 25 (Appx II, Exh. V, at 131-38); Gerardo Vargas Dec. ¶ 14 (Appx II, Exh. Y, at 151-56); Francisco Rivero Valeron Dec. ¶ 10 (Appx II, Exh. Z, at 157-62).

Although the staff are not using the proper protective gear, they still enter the living units, touch the detained individuals, their personal belongings, and the food trays. *See* Dairon Barredo Sanchez Dec. ¶ 25, 34 (Appx II, Exh. V, at 131-38); Gerardo Vargas Dec. ¶ 15 (Appx II, Exh. Y,

at 151-56); Francisco Rivero Valeron Dec. ¶ 10 (Appx II, Exh. Z, at 157-62). The detained

individuals have not witnessed staff washing their hands. *See* Dairon Barredo Sanchez Dec. ¶ 31

(Appx II, Exh. V, at 131-38); Francisco Rivero Valeron Dec. ¶ 10 (Appx II, Exh. Z, at 157-62).

Many staff at Glades live in the surrounding communities where there are confirmed

cases of COVID-19. Staff's failure to use proper protective gear makes it all the more likely that

COVID-19 will be spread from the staff to detained individuals.

Detained individuals prepare meals for the entire detained population despite the lack of

masks and gloves, and many of the detained individuals preparing the food have been exhibiting

signs of sickness, such as coughing. *See* Dairon Barredo Sanchez Dec. ¶ 22 (Appx II, Exh. V, at

131-38); Francisco Rivero Valeron Dec. ¶ 9 (Appx II, Exh. Z, at 157-62). The detained

individuals also clean the facility, and they do not wear gloves or masks while they clean. *See*

Dairon Barredo Sanchez Dec. ¶ 23 (Appx II, Exh. V, at 131-38); Francisco Rivero Valeron Dec.

¶ 9 (Appx II, Exh. Z, at 157-62). The walls of the facility are full of mold, so it is not clear how

often or well they are being cleaned. *See* Irvin Mendoza Silis Dec. ¶ 6 (Appx II, Exh. AA, at

163-67).

Many detained individuals in the pods are exhibiting flu-like symptoms, including

coughing and sneezing. *See* Dairon Barredo Sanchez Dec. ¶ 10 (Appx II, Exh. V, at 131-38);

Francisco Rivero Valeron Dec. ¶ 13 (Appx II, Exh. Z, at 157-62);  Tahimi Perez Dec. ¶ 11 (Appx

II, Exh. W, at 139-44); Franklin Ramon Gonzalez Dec. ¶ 9 (Appx II, Exh. X, at 145-50). Some

detained individuals are coughing up blood. *See* Dairon Barredo Sanchez Dec. ¶ 10 (Appx II,

Exh. V, at 131-38).

Despite these flu-like symptoms, there have been no known COVID-19 tests done in the

Glades facility. *See* Gerardo Vargas Dec. ¶¶ 16, 17 (Appx II, Exh. Y, at 151-56); Irvin Mendoza

Silis Dec. ¶ 8 (Appx II, Exh. AA, at 163-67); Franklin Ramon Gonzalez Dec. ¶ 17 (Appx II, Exh. X, at 145-50).

This remains true even among the population of detained individuals with medical vulnerabilities, including those with hypertension, diastolic heart failure, COPD, obesity, asthma, diabetes, and HIV. *See* Gerardo Vargas Dec. ¶ 17 (Appx II, Exh. Y, at 151-56); Irvin Mendoza Silis Dec. ¶ 8 (Appx II, Exh. AA, at 163-67); See Francisco Rivero Valeron Dec. ¶ 13 (Appx II, Exh. Z, at 157-62); Tahimi Perez Dec. ¶ 17 (Appx II, Exh. W, at 139-44); Franklin Ramon Gonzalez Dec. ¶ 5 (Appx II, Exh. X, at 145-50).

The medically vulnerable are not being protected by being moved away from the general population or from those who are exhibiting flu-like symptoms. *See* Gerardo Vargas Dec. ¶ 10 (Appx II, Exh. Y, at 151-56); Tahimi Perez Dec. ¶ 18 (Appx II, Exh. W, at 139-44).

As of a couple days ago, 12 detained individuals were put into a "quarantine pod." Franklin Ramon Gonzalez Dec. ¶ 12 (Appx II, Exh. X, at 145-50).

Detained individuals are not able to see the medical staff in a timely manner, and when they are able to see the medical staff, their temperature is not being taken. *See* Dairon Barredo Sanchez Dec. ¶ 11 (Appx II, Exh. V, at 131-38).

One detained individual was advised by a nurse that he had the flu, but another nurse informed him that he did not. *See* Dairon Barredo Sanchez Dec. ¶ 28 (Appx II, Exh. V, at 131-38).

### Broward Transitional Center

BTC is an immigration detention center in Pompano Beach, Florida for "non-criminal and low security" detained individuals operated by a private contractor, the for-profit prison corporation The GEO Group, Inc. ("GEO"). (Appx I, Exh. K at 153.) GEO has its headquarters

in Boca Raton, Florida and is ICE's largest contractor, holding more than $400 million in contracts with ICE.[28]

Since it opened in 2002, "Broward has steadily grown in population capacity from 150 detained women to 700 detained women and men." (Appx I, Exh. K at 153.). There are 595 beds for men, and 105 for women. GEO's contract with ICE includes a 500-bed quota, meaning that ICE is contractually obligated to pay for 500 beds regardless if they are being used.[29] (Appx I, Exh. K at 153.)

Each room in BTC has three sets of bunkbeds—housing up to six individuals per room that generally measures 10' x 12'. All individuals in the room share a toilet, a shower and a sink. Moreover, all 700 individuals share common areas, such as the recreation area, phones, the law library, seating areas, and the cafeteria. The cafeteria holds 300 people per shift for three meals.

GEO's operation of BTC has been dogged by complaints including denial of medical and mental health care, using detained individuals for unpaid or cheap labor, expired and rotten food, and abusive staff.[30] The DHS Office of Inspector General has repeatedly concluded that ICE fails to hold detention facility contractors accountable for meeting performance standards required to ensure humane conditions. DHS Office of Inspector Gen. Report OIG-19-18 (Appx I, Exh. X, at 377-412); DHS Office of Inspector Gen. Report OIG-18-67 (Appx I, Exh. Y, at 413-46).

Even before the COVID-19 pandemic, critical medical care at BTC has been routinely delayed—sometimes for months—or denied outright.  (Appx I, Exh. K at 141-43, 153.)

---

[28] https://www.miaminewtimes.com/news/boca-ratons-geo-group-is-ices-top-contractor-10504265.

[29] Banking on Detention: Local Lockup Quota & the Immigrant Dragnet, Detention Watch Network & Center for Constitutional Rights (2015), https://www.detentionwatchnetwork.org/sites/default/files/reports/DWN%20CCR%20Banking%20on%20Detention%20Report.pdf.

[30] Prison By any Other Name – SPLC 2019 report; BTC A 'Model' for Civil Detention – AIJ 2013 Report.

Contractors and detained individuals have continuously reported inadequate medical and mental health care. In March 2012, an inspection documented its failure to transfer detained individuals to medical and mental health providers in a timely manner.[31] Eight years later, BTC has failed to remedy this issue. Detained individuals report having to submit multiple medical requests before being medical—typically, only to be set back to their dorm with aspirin. (Appx I, Exh. K at 153.)

At BTC, individuals with chronic medical conditions reported tremendous difficulties receiving necessary accommodations for their health problems, such as dietary accommodations. (Appx I, Exh. K at 143.) One individual remembered a man with diabetes losing a finger as a result of the inadequate medical care at BTC. (Appx I, Exh. K at 143.)

During the summer of 2019, there was a mumps outbreak at BTC in which detained individuals were quarantined.[32] A couple months after, an outbreak of an unknown stomach illness affected 16% of the facility's population.[33]

Now, with the COVID-19 outbreak, BTC has placed some detained individuals in what it is calling quarantine. These detained individuals are not in an actual quarantine because they are grouped together. *See* Bibiano Soares Dec. at ¶ 13 (Appx II, Exh. CC, at 173-79); Betancourt Dec. at ¶ 9 (Appx II, Exh. DD, at 18-85); Rosas Cardenas Dec. at ¶ 9 (Appx II, Exh. EE, at 186-90); Sonay Funez Dec. at ¶ 17 (Appx II, Exh. FF, at 191-97).

---

[31] Office of Detention oversight Compliance Inspection Broward Transitional Center, U.S. Department of Homeland Securty (2012), https://www.ice.gov/doclib/foia/odo-compliance-inspections/2012browardtransitioncenter-pompanobeach-fl-feb28-mar1-2012.pdf.

[32] Letter to ICE and Wardens from AI Justice, SPLC, AAAJ, and project South (Mar.  13, 2020), https://www.splcenter.org/sites/default/files/ltr_to_ice_and_wardens_re_covid-19_-_2020.03_-_final.pdf

[33] Austen Erblat, *Stomach bug hits 115 detainees at immigration center*, South Florida Sun Sentinel (Nov. 5, 2019), https://www.sun-sentinel.com/local/broward/pompano-beach/fl-ne-pompano-beach-flu-outbreak-immigration-detention-center-20191105-xopjvimk4fgebbzcts7ausbdwu-story.html.

This "quarantined" group nonetheless uses the general population's communal space at BTC when the general population is not using this space. As a result, the quarantine group touches the telephones, tables, tablets, and chairs. *See* Bibiano Soares Dec. at ¶ 13 (Appx II, Exh. CC, at 173-79); Betancourt Dec. at ¶ 9 (Appx II, Exh. DD, at 18-85).

Detained men at BTC are sleeping in cells with five to six individuals in bunkbeds, which are not six feet apart. *See* Valera Ramirez Dec. at ¶ 6 (Appx II, Exh. GG, at 198-203); Sosa Fletes Dec. at ¶ 5 (Appx II, Exh. HH, at 204-08); Sontay Funez Dec. at ¶ 9 (Appx II, Exh. FF, at 191-97); Rosas Cardenas Dec. at ¶ 6 (Appx II, Exh. EE, at 186-90); Betancourt Dec. at ¶ 5 (Appx II, Exh. DD, at 18-85); Ferreira Borges Dec. at ¶ 6 (Appx II, Exh. II, 209-14). This sleeping arrangement makes it impossible to remain six feet apart and practice social distancing. *See* Sosa Fletes Dec. at ¶ 5 (Appx II, Exh. HH, at 204-08); Bibiano Soares Dec. at ¶ 7 (Appx II, Exh. CC, at 173-79); Rosas Cardenas Dec. at ¶ 6 (Appx II, Exh. EE, at 186-90); Betancourt Dec. at ¶ 5 (Appx II, Exh. DD, at 18-85); Ferreira Borges Dec. at ¶ 6 (Appx II, Exh. II, 209-14).

The detained individuals are close to each together when they eat because the chairs are attached to the floor, they have to sit across from each other on the table, and there is not enough room to remain six feet apart. *See* Valera Ramirez Dec. at ¶ 6 (Appx II, Exh. GG, at 198-203); Sosa Fletes Dec. at ¶ 13 (Appx II, Exh. HH, at 204-08); Ferreira Borges Dec. at ¶ 7 (Appx II, Exh. II, 209-14); Rosas Cardenas Dec. at ¶ 6 (Appx II, Exh. EE, at 186-90); Rodas Pedro Dec. at ¶ 13 (Appx II, Exh. JJ, at 215-19). Detained individuals wait in line very close to each other while waiting to enter the dining hall. *See* Valera Ramirez Dec. at ¶ 6 (Appx II, Exh. GG, at 198-203); Betancourt Dec. at ¶ 5 (Appx II, Exh. DD, at 18-85).

Some detained individuals are experiencing flu like symptoms, including coughing, congestion and difficulty breathing. *See* Bibiano Soares Dec. at ¶ 5 (Appx II, Exh. CC, at 173-

79); Sontay Funez Dec. at ¶ 15 (Appx II, Exh. FF, at 191-97); Valera Ramirez Dec. at ¶ 10

(Appx II, Exh. GG, at 198-203).

Despite having symptoms, detained individuals have difficulty being able to see the

medical staff in a timely manner. *See* Valera Ramirez Dec. at ¶ 10 (Appx II, Exh. GG, at 198-

203). One detainee with an unbearable cough submitted a written request, went twice to the

medical office, and then complained to a guard, before he was allowed to see a doctor. *See*

Valera Ramirez Dec. at ¶ 11 (Appx II, Exh. GG, at 198-203).

There has been no known test of COVID-19 done in the BTC facilities. *See* Sosa Fletes

Dec. at ¶ 11 (Appx II, Exh. HH, at 204-08); Sonay Funez Dec. at ¶ 10 (Appx II, Exh. FF, at 191-

97).

A recently transferred detained person reported having entered BTC with a bad cold and

cough, but was never tested for COVID-19 or isolated from the general population. *See* Valera

Ramirez Dec. at ¶ 10 (Appx II, Exh. GG, at 198-203); Soares Fletes Dec. at ¶ 9 (Appx II, Exh.

HH, at 204-08); Ferreira Borges Dec. at ¶ 14 (Appx II, Exh. II, 209-14).

Detained individuals have trouble accessing medical attention, including for serious

chronic conditions such as asthma. *See* Borges Dec. at ¶ 5 (Appx II, Exh. II, 209-14); Rodas

Pedro Dec. at ¶ 5 (Appx II, Exh. JJ, at 215-19). Medical staff have become so overwhelmed with

the number of sick men detained in the facility that one doctor gave an individual his entire

bottle of blood pressure medicine to take on his own, since she no longer had time to dispense

his pill regularly. *See* Valera Ramirez Dec. at ¶ 14 (Appx II, Exh. GG, at 198-203).

At least 40 men have been brought into BTC in the past few weeks. *See* Borges Dec. at ¶

14 (Appx II, Exh. II, 209-14). New detained people have been placed immediately into shared

rooms without being isolated first. *See* Borges Dec. at ¶14 (Appx II, Exh. II, 209-14); Rosas

Cardenas Dec. at ¶12 (Appx II, Exh. EE, at 186-90). One group of new arrivals came about one week ago from Krome, which already had confirmed COVID-19 cases, and they were placed with the general population of BTC. *See* Betancourt Dec. at ¶13 (Appx II, Exh. DD, at 18-85). Individuals detained at BTC were told the infected person at Krome was sent home. *See* Rodas Pedro Dec. at ¶ 7 (Appx II, Exh. JJ, at 215-19).

There are no precautions taken to protect those who are medically vulnerable to COVID-19. *See* Bibiano Soares Dec. at ¶ 18 (Appx II, Exh. CC, at 173-79); Betancourt Dec. at ¶ 11 (Appx II, Exh. DD, at 18-85); Valera Ramirez Dec. at ¶ 15 (Appx II, Exh. GG, at 198-203).

Detained individuals prepare the food and clean at BTC. One detained person who previously prepared the food at BTC reported having flu like symptoms. *See* Bibiano Soares Dec. at ¶ 5 (Appx II, Exh. CC, at 173-79). Detained individuals who work in the kitchen do not always wear masks when preparing the food and are not taught COVID-19 hygiene measures. *Id* at ¶ 9 (Appx II, Exh. CC, at 173-79); Rodas Pedro Dec. at ¶ 14 (Appx II, Exh. JJ, at 215-19).

Detained individuals have not observed greater efforts to clean in response to COVID-19. Rodas Pedro Dec. at ¶ 15 (Appx II, Exh. JJ, at 215-19). Most detained individuals are not provided with masks or gloves when they clean common areas. *See* Valera Ramirez Dec. at ¶ 8 (Appx II, Exh. GG, at 198-203); Sosa Fletes Dec. at ¶ 7 (Appx II, Exh. HH, at 204-08). When asked to clean their cells, only one pair of gloves is provided. *See* Sonay Funez Dec. at ¶ 10 (Appx II, Exh. FF, at 191-97). When masks and gloves are available, they are only for cleaning, otherwise there is no access to gloves and masks. *See* Betancourt Dec. at ¶ 6 (Appx II, Exh. DD, at 18-85).

BTC staff not using protective gear enter living facilities and use their bare hands to touch detained individuals and their personal belongings. *See* Bibiano Soares Dec. at ¶ 15 (Appx

II, Exh. CC, at 173-79); Betancourt Dec. at ¶ 6 (Appx II, Exh. DD, at 18-85); Ferreira Borges

Dec. at ¶ 13 (Appx II, Exh. II, 209-14), Valera Ramirez Dec. at ¶ 9 (Appx II, Exh. GG, at 198-

203); Sosa Fletez Dec. at ¶ 8 (Appx II, Exh. HH, at 204-08); Sonay Funez Dec. at ¶ 17 (Appx II,

Exh. FF, at 191-97). Borges Dec. at ¶13 (Appx II, Exh. II, 209-14). Recently staff have used

their bare hands to conduct pat downs, to give men high fives, and to touch their phones, tables,

and exercise equipment. *See* Valera Ramirez Dec. at ¶9 (Appx II, Exh. GG, at 198-203); Borges

Dec. at ¶13 (Appx II, Exh. II, 209-14). The detained individuals have not seen staff washing their

hands. *See* Bibiano Soares Dec. at ¶ 15 (Appx II, Exh. CC, at 173-79); Sosa Fletes Dec. at ¶ 8

(Appx II, Exh. HH, at 204-08).

Only some of the BTC staff have begun to use mask and gloves recently. *See* Bibiano

Soares Dec. at ¶ 12 (Appx II, Exh. CC, at 173-79); Betancourt Dec. at ¶ 6 (Appx II, Exh. DD, at

18-85); Ferreira Borges Dec. at ¶ 13 (Appx II, Exh. II, 209-14), Valera Ramirez Dec. at ¶ 9

(Appx II, Exh. GG, at 198-203); Rosas Cardinas Dec. at ¶ 7 (Appx II, Exh. EE, at 186-90),

Sonay Funez Dec. at ¶ 17 (Appx II, Exh. FF, at 191-97). Guards wear gloves when searching

detainees, but do not always use them otherwise. *See* Rodas Pedro Dec. at ¶ 9 (Appx II, Exh. JJ,

at 215-19).

Detained individuals receive only a small allocation of soap each week, which often runs

out. *See* Sosa Fletes Dec. at ¶ 6 (Appx II, Exh. HH, at 204-08); Sonay Funez Dec. at ¶ 11 (Appx

II, Exh. FF, at 191-97); Valera Ramirez Dec. at ¶ 7 (Appx II, Exh. GG, at 198-203); Betancourt

Dec. at ¶ 5 (Appx II, Exh. DD, at 18-85); Bibiano Soares Dec. at ¶ 10 (Appx II, Exh. CC, at 173-

79). This small amount is supposed to last them for showers and hand washing, however

detained individuals reported it is not enough. *See* Bibiano Soares Dec. at ¶ 10 (Appx II, Exh.

CC, at 173-79); Betancourt Dec. at ¶ 5 (Appx II, Exh. DD, at 18-85); Ferreira Borges Dec. at ¶ 9

(Appx II, Exh. II, 209-14); Sosa Fletes Dec. at ¶ 6 (Appx II, Exh. HH, at 204-08). They have not been given hand sanitizer. *See* Rodas Pedro Dec. at ¶ 8 (Appx II, Exh. JJ, at 215-19).

Detained individuals have not been given any formal education about hygiene measures to prevent the spread of COVID-19. *See* Bibiano Soares Dec. at ¶ 19 (Appx II, Exh. CC, at 173-79); Betancourt Dec. at ¶ 8 (Appx II, Exh. DD, at 18-85); Ferreira Borges Dec. at ¶ 16 (Appx II, Exh. II, 209-14), Valera Ramirez Dec. at ¶ 12 (Appx II, Exh. GG, at 198-203); Rosas Cardenas Dec. at ¶ 8 (Appx II, Exh. EE, at 186-90); Sosa Fletes Dec. at ¶ 8 (Appx II, Exh. HH, at 204-08); Sonay Funez Dec. at ¶ 17 (Appx II, Exh. FF, at 191-97); Rodas Pedro Dec. at ¶ 10 (Appx II, Exh. JJ, at 215-19). The only information they have received is from watching TV and posters on the wall. *See* Valera Ramirez Dec. at ¶ 12 (Appx II, Exh. GG, at 198-203); Rosas Cardenas Dec. at ¶ 8 (Appx II, Exh. EE, at 186-90).

Detained individuals have no access to masks or gloves, even from the commissary. Borges Dec. at ¶ 12 (Appx II, Exh. II, 209-14); Betancourt Dec. at ¶10 (Appx II, Exh. DD, at 18-85).

BTC staff rotate in and out of BTC on a regular basis. Staff generally live in the communities near BTC—areas where there many confirmed cases of COVID-19. BTC has a history of outbreaks of contagious illnesses. In November of 2019, there was a stomach flu outbreak at BTC during which 115 detained persons became ill.[34] On March 17, 2020, detained persons at BTC were subjected to a 5-hour water stoppage, during which they had no access to water to wash their hands, bathe, or use the toilet.[35]

---

[34] https://www.sun-sentinel.com/local/broward/pompano-beach/fl-ne-pompano-beach-flu-outbreak-immigration-detention-center-20191105-xopjvimk4fgebbzcts7ausbdwu-story.html
[35] https://www.wlrn.org/post/coronavirus-live-updates-two-broward-election-poll-workers-test-postive-covid-19#stream/0

### ICE's Alternatives to Detention Program

For over 15 years, DHS/ICE has sought and obtained congressional funding for its Alternatives to Detention ("ATD") program, which uses supervised release, case management, and monitoring of individuals instead of detention.[36] ICE has repeatedly told Congress that the ATD program increases ICE's operational effectiveness and individual compliance with release conditions.

The DHS FY2021 Congressional Budget Justification for ICE states that it costs $125.06 per day to jail an adult immigration in ICE custody. The average cost per ATD participant is $4.43 per day. The DHS FY2021 funding request seeks to support 120,000 daily participants in ATD.[37]

A 2014 GAO Report found that 95% of those on full-service ATD (those that include case management) appear for their final hearings.[38] According to 2017 contract data, supervision

---

[36] ICE's current ATD program is called Intensive Supervision Appearance Program III (ISAP III). The program features different levels of case management including in-person or telephonic meetings, unannounced home visits, scheduled office visits, and court and meeting alerts. Some are also enrolled in technology-based monitoring including telephonic monitoring, GPS monitoring via ankle bracelet, and smart phone application monitoring called SmartLink that uses facial recognition and location monitoring via GPS. The private contractor that operates the program for ICE is BI, Inc., a wholly-owned subsidiary of The GEO Group, Inc. *See* CRS Report R45804, Immigration: Alternatives to Detention (ATD) Programs, (Jul. 8, 2019). On March 23, 2020, DHS awarded BI, Inc. a 5-year $2.2 billion contract for continued ISAP support. https://beta.sam.gov/opp/2479131ff88f405999e126b52ff105f5/view

[37] DHS/ICE FY2021 Congressional Budget Justification, at Operations & Support 132, 171, 173, https://www.dhs.gov/sites/default/files/publications/u.s._immigration_and_customs_enforcement .pdf. Due to court backlogs and delays for those who are non-detained, ATD participants are enrolled for a longer period of time than the period of time that individuals remain in detention. However, even considering the average length of stay in detention and the average length of time in ATD, taxpayers are paying an average of $4,000 more per individual detained than those released on ATD.

[38] GAO-15-26, Alternatives to Detention, at 30 (Nov. 2014), available at https://www.gao.gov/assets/670/666911.pdf.

coupled with some case management results in a more than 99% appearance rate for all immigration court hearings, and a more than 91% appearance rate for final hearings.[39]

As of April 4, 2020, ICE has 89,851 individuals enrolled in ATD, including 5,057 in the Miami area.**[40]**

## PETITIONERS AND THE PROPOSED CLASS

A district court may enter class-wide injunctive relief prior to certification of the proposed class. *Sanchez v. McAleenan*, No. 8:19-cv-01728-GJH, *11 (D. Md. Feb. 7, 2020) (Memorandum Opinion); *J.O.P. v. United States of Dep't of Homeland Security.*, No. GJH-119-1944, 2019 WL 3536786, at *4 (D. Md. Aug. 2, 2019); *see also Gooch v. Life Inv'rs Ins. Co. of Am.*, 672 F.3d 402, 433 (6th Cir. 2012) ("Simply put, there is nothing improper about a preliminary injunction preceding a ruling on class certification."); *see also Newberg on Class Actions* § 4:30 (5th Ed. 2013) ("[A] court may issue a preliminary injunction in class suits preceding a ruling on the merits.")

Petitioner-Plaintiffs bring this motion on behalf of a highly vulnerable putative class: all individuals in civil immigration detention at three Florida detention centers, Krome Service Processing Center, Broward Transitional Center, and Glades County Detention Center. Each individual is at imminent risk of contracting COVID-19 because of the life-threatening conditions under which they are confined—conditions that violate CDC guidelines and State and County orders as they pertain to COVID-19.

---

[39] The Real Alternatives to Detention (June 2019), available at https://www.womensrefugeecommission.org/images/zdocs/The-Real-Alternatives-to-Detention-June-2019-FINAL-v-2.pdf.

[40] ICE website, Detention Management, https://www.ice.gov/detention-management#tab2.

Named Petitioner-Plaintiffs bring this action as representatives of the following proposed

class:

> All civil immigration detained individuals who are held, or who will be held, by Respondents at the Krome Service Processing Center ("Krome"), the Broward Transitional Center ("BTC"), and at Glades County Detention Facility ("Glades") as of the time of the filing of this action who are:

> **Sub-class A**: detained individuals with a stable location and/or place of residency in which they can self-quarantine and practice social distancing and hygiene pursuant to the CDC guidelines and Exec. Order No. 20-91 upon release.

> **Sub-class B**: all other detained individuals without access to a stable location and/or place of residency in which they can self-quarantine and practice social distancing and hygiene pursuant to CDC guidelines and Exec. Order No. 20-91 upon release.

> **Sub-class C**: all other detained individuals who opt-out of Sub-class A & B.

The proposed class meets the requirements of Federal Rules of Civil Procedure 23(a) and

(b). The class is sufficiently numerous. Krome detains an average of 600 immigrant detained

individuals at any time, with a population fluctuating between 550 and 875 people since 2006.

Southern Poverty Law Center, Prison by any Other Name: A Report on South Florida Detention

Centers (Appx I, Exh. K, at 131-234, 152).

BTC detains on average 700 immigrant detained individuals at a time, with a mandatory

minimum of 500 beds for immigrant detained individuals (Appx I, Exh. K, at 156.)

Glades detains an average of 407 immigrant detained individuals at a time. (Appx I, Exh.

K, at 165.)

All immigrant detained individuals at Krome, BTC, and Glades are detained under the

legal authority of Respondent Field Office Director, Miami Field Office, U.S. Immigration and

Customs Enforcement. *See Masingene v. Martin*, __ F. Supp. 3d __, 2020 WL 465587 (S.D. Fla.

Jan. 27, 2020).

All members of the class are bound together by common questions of law and fact – most prominently, whether in the face of the lethal COVID-19 pandemic, the continued detention of the class members at Krome, BTC, and Glades defies CDC guidelines and places the detained individuals' safety and health at grave risk in a manner that amounts to unconstitutional punishment. The named Petitioners are proper class representatives because their claims are typical of the absent class members and because they and their counsel will adequately and vigorously represent the class. Rule 23(b)(2) is also satisfied here because the Respondents-Defendants have "acted or refused to act on grounds that apply generally to the class" through creating and maintaining conditions that put the class at imminent risk of contracting COVID-19, the deadly virus that is currently sweeping the globe.

## LEGAL FRAMEWORK

### A.  Reasonable Safety

The Due Process Clause provides that no person shall "be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. Its protections extend to every person within the nation's borders regardless of immigration status. *Mathews v. Diaz*, 426 U.S. 67, 77, (1976) ("Even one whose presence in this country is unlawful, involuntary, or transitory is entitled to that constitutional protection.").  When the government takes a person into custody and detains him against the person's will, the Constitution imposes upon the Government a duty to assume responsibility for that detainee's safety and general well being. *See Helling v. McKinney*, 509 U.S. 25, 32 (1993). Under the Eighth Amendment, the Government must provide criminal detainees with basic human needs, including reasonable safety.  *Helling*, 509 U.S. at 32.

The government violates the Eighth Amendment if it confines a criminal detainee in unsafe conditions. *See Helling*, 509 U.S. at 33. When the government detains a person for the

violation of an immigration law, the person is a civil detainee, even if he has a prior criminal conviction. *See Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). As civil detainees, Petitioners are entitled to more considerate treatment than criminal detainees, whose conditions of confinement are designed to punish. See *Marsh v. Fla. Dep't of Corrections*, 330 F. App'x 179 (11th Cir. 2009) (quoting *Youngberg v. Romeo*, 457 U.S. 307, 322 (1982)).

The Fifth Amendment Due Process Clause prohibits punishment of people in civil custody. *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979); *Magluta v. Samples*, 375 F.3d 1269, 1273 (11th Cir. 2004); Hamm v. Dekalb County, 774 F.2d 1567, 1572 (11th Cir. 1985) (citing Ingraham v. Wright, 430 U.S. 651, 671 n. 40 (1977)). (1989).

To establish that a particular condition or restriction of detention constitutes impermissible punishment, a petitioner must show either (1) an expressed intent to punish; or (2) lack of a reasonable relationship to a legitimate governmental purpose, from which an intent to punish may be inferred. *See Wolfish*, 441 U.S. at 538. Absent an explicit intention to punish, a court must apply a two-part test: "First, a court must ask whether any 'legitimate goal' was served by the prison conditions. Second, it must ask whether the conditions are 'reasonably related' to that goal." *Jacoby v. Baldwin County*, 835 F.3d 1338, 1345 (11th Cir. 2016). "[I]f conditions are so extreme that less harsh alternatives are easily available, those conditions constitute 'punishment.'" *Telfair v. Gilberg*, 868 F. Supp. 1396, 1412 (S.D. Ga. 1994) (citing *Wolfish*, 441 U.S. at 538-39 n.20).

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." DeShaney v. Winnebago Cty. Dep't. of Soc. Servs., 489 U.S. 189, 199-200 (1989). The government must provide detained individuals with basic necessities, such as

adequate medical care, food, clothing, and shelter; the failure to provide these necessities violates

due process. Hamm, 774 F.2d at 1573; Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty.,

402 F.3d 1092, 1115 (11th Cir. 2005).

At a minimum, the Fifth Amendment Due Process Clause prohibits Respondents'

deliberate indifference to a substantial risk of serious harm that would rise to the level of an

Eighth Amendment violation in the post-conviction criminal context. *Revere v. Mass. Gen.

Hosp.*, 463 U.S. 239, 244, (1983) ("[T]he due process rights of a [detainee] are at least as great as

the Eighth Amendment protections available to a convicted prisoner."); s*ee also Hale v.

Tallapoosa County*, 50 F. 3d 1579, 1582 n.4 (11th Cir. 1995).

In order to show that Respondents are acting with deliberate indifference, Petitioners

must show exposure to a substantial risk of serious harm of which Respondents are aware and

have disregarded. *Farmer v. Brennan*, 511 U.S. 825, 834, 837-38 (1994); *Marbury v. Warden*,

936 F.3d 1227, 1233 (11th Cir. 2019); *Hale v. Tallapoosa Cty.*, 50 F.3d 1579, 1582 (11th Cir.

1995).

The government may violate the Eighth Amendment when it "ignore[s] a condition of

confinement that is sure or very likely to cause serious illness and needless suffering the next

week or month or year," including "exposure of inmates to a serious, communicable disease,"

even when "the complaining inmate shows no serious current symptoms." *Helling*, 509 U.S. at

33; *see also id.* at 34 (citing with approval *Gates v. Collier*, 501 F.2d 1291, 1300 (5th Cir. 1974),

which held that prisoners were entitled to relief under the Eighth Amendment when they showed,

*inter alia*, the mingling of "inmates with serious contagious diseases" with other prison inmates).

Thus, the harm that Petitioners fear—i.e., that their confinement will result in a COVID-

19 infection that will seriously injure and possibly kill them—need not become a reality to

establish a violation of their constitutional rights. Courts do not require a plaintiff to "await a tragic event" before seeking relief from a condition of confinement that unconstitutionally endangers them. *See Helling*, 509 U.S. at 33 (holding prisoner's Eight Amendment claim could be based upon possible future harm to health, as well as present harm). "Nor does it matter that some inmates may not be affected by the condition, and that the harm is thus, in a sense, only potential harm. The Court has found an Eighth Amendment violation 'even though it was not alleged that the likely harm would occur immediately and even though the possible infection might not affect all of those exposed.'" *Tittle v. Jefferson Cty. Comm'n*, 10 F.3d 1535, 1543 (11th Cir. 1994) (quoting *Helling*, 509 U.S. at 33).

## B. *Accardi* **Doctrine**

When the government has promulgated "[r]egulations with the force and effect of law," those regulations "supplement the bare bones" of federal statutes. *United States ex rel. Accardi v. Shaughnessy,* 347 U.S. 260, 266, 268 (1954) (reversing in immigration case after review of warrant for deportation). Agencies must follow their own "existing valid regulations," even where government officers have broad discretion, such as in the area of immigration. *Id*.; *see also Morton v. Ruiz*, 415 U.S. 199, 235 (1974) ("[I]t is incumbent upon agencies to follow their own procedures . . . even where [they] are possibly more rigorous than otherwise would be required."); *Battle v. FAA*, 393 F.3d 1330, 1336 (D.C. Cir. 2005) ("*Accardi* has come to stand for the proposition that agencies may not violate their own rules and regulations to the prejudice of others."). Breaches of *Accardi*'s rule constitute violations of both the Administrative Procedures Act ("APA") and the Fifth Amendment's Due Process Clause.

While violations of "internal agency procedures" do not always require a remedy, *Accardi*'s rule applies with full force when "the rights or interests of the objecting party" are

"affected." *Monitlla v. INS,* 926 F.2d 162, 167 (2d. Cir. 1991) (citing cases) ("Accardi doctrine is premised on fundamental notions of fair play underlying the concept of due process"); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545, 546 (6th Cir. 2004) (noting that an *Accardi* violation may be a due process violation, and the government's action may be set aside pursuant to the APA); *Sameena, Inc. v. U.S. Air Force*, 147 F.3d 1148, 1153 (9th Cir. 1998) ("An agency's failure to follow its own regulations . . . may result in a violation of an individual's constitutional right to due process.").

### C.  State Created Danger

The Due Process Clause imposes a duty on state actors to protect or care for citizens in when the state affirmatively places a particular individual in a position of danger the individual would not otherwise have faced." *Gregory v. City of Rogers*, 974 F.2d 1006, 1010 (8th Cir. 1992) (en banc). The government violates an individual's right to due process when it (1) "affirmatively place[s] [the] individual in danger," (2) by "acting with 'deliberate indifference to [a] known or obvious danger.'" *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1062 (9th Cir. 2006) (quoting Munger v. City of Glasgow, 227 F.3d 1082, 1086 (9th Cir. 2000); *L.W. v. Grubbs*, 92 F.3d 894, 900 (9th Cir. 1996)).

A duty of protection arises where the state has a custodial relationship with the individual, arising from such circumstances as incarceration in prison or involuntary commitment in a mental institution." *Davis v. Carter*, 555 F.3d 979, 982 n.2 (11th Cir. 2009).

**ARGUMENT**

I.     **Petitioners and members of the proposed class are likely to succeed on the merits of their claims**

A.  **Count One – *Accardi* Doctrine (Fifth Amendment/APA) – Violation of detention Standards**

Under the *Accardi* doctrine, due process and the basic principle of administrative law dictate that rules promulgated by a federal agency regulating the rights and interests of others are controlling upon the agency. That doctrine is premised on the fundamental notion of fair play underlying the concept of due process.

The *Accardi* doctrine applies with particular force when "the rights of individuals are affected." *Morton*, 415 U.S. at 235.

Krome, BTC and Glades are all subject to National Detention Standards that are issued by ICE, which set forth the medical care that must be provided to individuals in immigration detention. Both Krome and BTC are subject to ICE's 2011 Performance-Based National Detention Standards ("PBNDS"). *See* (Appx I, Exh. N, at 253.)[41] Glades is subject to ICE's National Detention Standards ("NDS").  (Appx. I, Exh. K, at 152, 156.)  The current governing version of the NDS is the 2019 National Detention Standards for Non-Dedicated Facilities.[42]

Section 4.3(II)(10) of the PBNDS requires that "Centers for Disease Control and Prevention (CDC) guidelines for the prevention and control of infectious and communicable diseases shall be followed." (Appx, Exh. N, at 253.)  The PBNDS also provides that "[f]acilities shall comply with current and future plans implemented by federal, state or local authorities addressing specific public health issues including communicable disease reporting

---

[41] Full copy available at: https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf].

[42] Supersession noted at: https://www.ice.gov/detention-standards/2000.

requirements." (Appx, Exh. N, at 256-57.) Similarly, section 1.1(I) of the NDS, covered

"facilit[ies] will operate in accordance with all applicable regulations and codes, such as those of

. . . the Centers for Disease Control and Prevention (CDC)." (Appx I, Exh. O, at 304).[43]

Respondents have failed to follow their duty to comply with the PBNDS and NDS, which

in turn require compliance with CDC guidelines and federal, state and local laws. Respondents

have neither reduced the population of Krome, Glades, and BTC. Nor have they done anything to

ensure social distancing and proper hygiene.

Respondents have failed to comply with the CDC guidelines. Respondents have not

"[e]nsure[d] that sufficient stocks of hygiene supplies, cleaning supplies, PPE, and medical

supplies . . . are on hand." *Compare* CDC Guidance at 7 (Appx I, Exh. F, at 54); *with*

Declarations of Individuals Detained at all three facilities: Krome (Warsane Dec., Hasan Dec.,

Farah Dec., Arrak Dec.); Glades (Dairon Barredo Sanchez Dec.,  Tahimi Perez Dec.,  Franklin

Ramon Gonzalez Dec., Gerardo Vargas Dec., and Francisco Rivero Valeron Dec.); and BTC

(Valera Ramirez Dec., Sosa Fletes Dec.,  Sontay Funez Dec., Rosas Cardenas Dec.,  Betancourt

Dec. Ferreira Borges Dec., and Bibiano Soares Dec) (Appx II).

Respondents have not implemented the recommended cleaning and disinfecting practices.

*Compare* CDC Guidance at 9 (Appx I, Exh. F, at 56); *with* Declarations of Individuals Detained

at all three facilities: Krome (Warsane Dec., Hasan Dec., Farah Dec., Arrak Dec.); Glades

(Dairon Barredo Sanchez Dec.,  Tahimi Perez Dec.,  Franklin Ramon Gonzalez Dec., Gerardo

Vargas Dec., and Francisco Rivero Valeron Dec.); and BTC (Valera Ramirez Dec., Sosa Fletes

Dec.,  Sontay Funez Dec., Rosas Cardenas Dec.,  Betancourt Dec. Ferreira Borges Dec., and

Bibiano Soares Dec) (Appx II).

---

[43] Full copy available at: https://www.ice.gov/doclib/detention-standards/2019/nds2019.pdf.

Respondents have not implemented the recommended hygiene practices. *Compare* CDC Guidance at 10 (Appx I, Exh. F, at 57); *with* Declarations of Individuals Detained at all three facilities: Krome (Warsane Dec., Hasan Dec., Farah Dec., Arrak Dec.); Glades (Dairon Barredo Sanchez Dec.,  Tahimi Perez Dec.,  Franklin Ramon Gonzalez Dec., Gerardo Vargas Dec., and Francisco Rivero Valeron Dec.); and BTC (Valera Ramirez Dec., Sosa Fletes Dec.,  Sontay Funez Dec., Rosas Cardenas Dec.,  Betancourt Dec. Ferreira Borges Dec., and Bibiano Soares Dec) (Appx II).

Respondents have not implemented adequate social distancing practices. *Compare* CDC Guidance at 11 (Appx I, Exh. F, at 58); *with* Declarations of Individuals Detained at all three facilities: Krome (Warsane Dec., Hasan Dec., Farah Dec., Arrak Dec.); Glades (Dairon Barredo Sanchez Dec.,  Tahimi Perez Dec.,  Franklin Ramon Gonzalez Dec., Gerardo Vargas Dec., and Francisco Rivero Valeron Dec.); and BTC (Valera Ramirez Dec., Sosa Fletes Dec.,  Sontay Funez Dec., Rosas Cardenas Dec.,  Betancourt Dec. Ferreira Borges Dec., and Bibiano Soares Dec) (Appx II).

Respondents have not communicated clearly and frequently with Petitioners regarding COVID-19 and how they can contribute to risk reduction. *Compare* CDC Guidance at 12 (Appx I, Exh. F, at 59); *with* Declarations of Individuals Detained at all three facilities: Krome (Warsane Dec., Hasan Dec., Farah Dec., Arrak Dec.); Glades (Dairon Barredo Sanchez Dec., Tahimi Perez Dec.,  Franklin Ramon Gonzalez Dec., Gerardo Vargas Dec., and Francisco Rivero Valeron Dec.); and BTC (Valera Ramirez Dec., Sosa Fletes Dec.,  Sontay Funez Dec., Rosas Cardenas Dec.,  Betancourt Dec. Ferreira Borges Dec., and Bibiano Soares Dec) (Appx II).

Respondents' cohorting practices violate CDC guidance and increase the threat posed to Petitioners.  The CDC's Interim Guidance on Management of Coronavirus Disease 2019

(COVID-19) states that cohort quarantine "should only be practiced if there are no other available options" and that "[c]ohorting multiple quarantined close contacts of a COVID-19 case could transmit COVID-19 from those who are infected to those who are uninfected." Respondents violate the CDC Guidelines by refusing to release people and instead keeping them confined in close sleeping, eating, and living quarters at Krome, Glades, and BTC.  Further, because Respondents can and should release Petitioners and those similarly situated, "cohort quarantine" is not the only "available option."

Cohorting is not the same as quarantine or medical isolation and the CDC makes it clear that cohorting is to be used only as a last resort in those "correctional facilities and detention centers do not have enough individual cells" for quarantine or medical isolation. Interim Guidance, at 3, 15 (Appx, Exh. F, at 50, 62). The CDC and other medical expert opinions confirm that cohorting individuals who have not been confirmed to be infected with COVID-19 "puts everyone at very high risk of contracting and spreading COVID-19." Shin Dec., ¶ 33 (Exh. 2).

On March 31, 2020, the President updated the guidance, renaming it "30 Days to Slow the Spread," and along with the White House Coronavirus Task Force urged Americans to continue to adhere to the CDC guidelines and expand community mitigation efforts." On April 1, 2020, Governor DeSantis issued a shelter-in-place order for the state of Florida, effective April 3, 2020.  Exec. Order No. 20-91.

As Dr. Shin explains "[t]he only effective strategies to limit wide-spread impact of COVID-19 are public health strategies.  These include containment efforts like early identification, contact tracing, isolation and quarantine measures, and intensive use of personal protective equipment.  Unfortunately, due to limited testing capacity and public health resources

combined with wide-spread community spread, mitigation efforts like social distancing and scrupulous hand and personal hygiene are critical to limit the spread of COVID-19." Shin Dec., ¶ 12 (Exh. 2).  Dr. Shin also explains that "[t]here is no way for immigration detention facilities to comply with CDC guidelines on social distancing and quarantining unless Respondents release detained men and women on a large scale."  *Id.* at ¶¶ 39-40.  Dr. Shin concluded that it is "my professional opinion that failure to release during the COVID-19 pandemic is a violation of the CDC guidelines and will result in continued and wide-spread infection." *Id.*

Dr. Shin's conclusions are consistent with every other public health expert issued early warnings about the spread of COVID-19 and the need for the federal, state and local governments to employ social distancing mitigation efforts. *Id.* ¶ 6.   The consequences of the failure of federal, state and local government to adhere to the early warning by public health officials have been borne out in the United States. *Id.* at ¶ 40.  As of the date of this Petition, there are 525,704 number of confirmed cases in the United States and 20,486 people have died.[44]

As is detailed *supra*, Respondents have failed to follow their duty to comply with the PBNDS and NDS, which in turn require compliance with CDC guidelines and federal, state and local laws. Respondents have neither reduced the population of Krome, Glades, and BTC.  Nor have they done anything to ensure social distancing and proper hygiene.

Respondents have an obligation under the PBNDS and the NDS to protect the Petitioners. The PBNDS and the NDS require Respondents protect Petitioners by following the CDC guidelines, complying with federal, state or local plans, and reports requirements.

---

[44] https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html

Petitioners have not been protected, and the Respondents' violate the *Accardi* doctrine by failing to comply with its own obligations in violation of the APA and Fifth Amendment's Due Process Clause.

**B.  Count Two – Fifth Amendment – Violation of Right to Reasonable Safety**

The Fifth Amendment to the U.S. Constitution guarantees individuals in immigration detention the right to be free from punishment. The government violates this guarantee when conditions of confinement lack a reasonable relationship to any legitimate governmental purpose, *i.e.* when a custodian's actions are excessive in relation to their purpose.

Respondents' continued detention of Petitioners during the COVID-19 pandemic is excessive in relation to any legitimate governmental purpose. Less harsh measures are available to satisfy any government interest in continuing to detain Plaintiffs, including release with conditions. Under these circumstances, Respondents' detention of Petitioners amount to impermissible punishment.

Conditions of confinement for individuals in immigration detention also violate the Fifth Amendment when the government fails, with deliberate indifference, to safeguard the health and safety of those in custody. The government acts with deliberate indifference when it knowingly exposes an individual in its custody to a substantial risk of serious harm.

Respondents have subjected Petitioners to conditions of confinement that create a substantial risk of contracting a serious case of COVID-19, for which there is no known vaccine, treatment, or cure. Respondents know or should be aware of the fact that Petitioners' underlying conditions render them especially vulnerable to severe illness or even death if they contract COVID-19. Respondents are therefore knowingly subjecting Petitioners to an unreasonable risk of serious harm, in violation of constitutional due process.

Respondents' continued detention of Petitioners fails to adequately protect Petitioners from the risks of contracting COVID-19. Petitioners' ongoing confinement lacks a reasonable relationship to any legitimate governmental purpose and is excessive in relation to their purpose.

Respondents have exposed Petitioners to a substantial risk of serious harm. Respondents have known of or disregarded the substantial risk of harm to Petitioners' health and safety. Respondents have acted with deliberate indifference to Petitioners' health and safety. Respondents' continued detention of Petitioners violates the Due Process Clause of the Fifth Amendment as detention has become punitive and is not reasonably safe.

## C.  Count Three – Fifth Amendment – State-Created Danger

The government acts with deliberate indifference to a known or obvious danger when it recognizes an unreasonable risk and actually intends to expose petitioners to such risks without regard to the consequences to petitioners. An unreasonable risk includes future harm caused by conditions of confinement. *See Helling v. McKinney*, 509 U.S. 25, 33 (1993).  Respondents have not complied its obligations to follow the CDC guidelines, and affirmatively place Petitioners at greater risk of contracting COVID-19 by implemented practices that transfer people into and out of facilities, and employs cohort quarantining approach – that drastically increases the danger of the virus spreading. Respondents have acted with deliberate indifference to the clear elevated levels of threat caused to Petitioners.

 Respondents have affirmatively placed Petitioners in danger by forcing them into a position more dangerous than it found them, exposing them to elevated dangerous by failing to following CDC guidelines including by transferring people among facilities and improperly using cohort quarantines in a manner that places Petitioners in a more dangerous situation that it found them. Respondents made the affirmative decision to not release Petitioners or use ATDs,

and instead implemented cohort quarantines in a manner that drastically increase the possibility

of transmission, infection, and facility-wide outbreak by grouping together people who have

already been exposed to the virus. *See* Shin Dec. ¶ 40 (Exh. 2); Greer Dec., ¶¶ 34-35 (Exh. 3).

Respondents continue to detain Petitioners without taking necessary precautions to

reduce the risk of COVID-19 transmission. Respondents have thus exposed Petitioners to a

greater risk of contracting COVID-19 than they would have otherwise faced.

Respondents continued to actively disregard the threat of the pandemic. Petitioners are

detained in conditions that expose them to a heightened risk of contracting COVID-19.

Respondents are confining Petitioners in close proximity to other detainees and ICE officers,

rendering Petitioners entirely unable to practice necessary social distancing.

ICE officers are failing to take necessary precautions, to avoid transmitting COVID-19 to

Petitioners, detainees, and other officers. Respondents' ongoing detention of Petitioners thus

continues to expose them to a greater risk of contracting COVID-19 than they would face if they

were not in detention and were able to take necessary precautions to protect themselves.

Respondents have acted, and continue to act, with deliberate indifference to the known

and obvious risk of COVID-19 transmission.

Respondents implemented a cohort quarantine approach that does not comply with CDC

guidelines and drastically increases the risk of COVID-19 exposure and contraction, at the time

when the federal government and State of Florida had both declared public health emergencies.

Despite being well-aware of both the risks of community transmission of COVID-19 and the

preventive measures necessary to slow that transmission, Respondents acted without regard to

the consequences to Petitioners by failing to implement a plan calculated to meaningfully

comply with CDC guidelines, instead exposing the Petitioners to drastically increased risk of

exposure by defying CDC guidelines in the use of cohort quarantining and actively transferring detainees among facilities with confirmed cases detainees and facility employees having contracted COVID-19.  *See* Shin Dec. ¶40 (Exh. 2).

For these reasons, Petitioners' detention violates the Fifth Amendment Due Process Clause because Respondents affirmatively subjected Petitioners to an unreasonable risk of danger, greater danger than before Respondents acted, with deliberate indifference to employing policies that drastically increase the risk of Petitioners' contracting COVID-19.

## II.    Petitioners and members of the proposed class will suffer irreparable harm without injunctive relief.

Petitioners, members of the proposed class, and their families will suffer irreparable injury without injunctive relief.  On March 31, 2020, the President updated the guidance, renaming it "30 Days to Slow the Spread," and along with the White House Coronavirus Task Force urged Americans to continue to adhere to the CDC guidelines and expand community mitigation efforts." On April 1, 2020, Governor DeSantis issued a shelter-in-place order for the state of Florida, effective April 3, 2020.  Exec. Order No. 20-91.

As Dr. Shin explains "[t]he only effective strategies to limit wide-spread impact of COVID-19 are public health strategies.  These include containment efforts like early identification, contact tracing, isolation and quarantine measures, and intensive use of personal protective equipment.  Unfortunately, due to limited testing capacity and public health resources combined with wide-spread community spread, mitigation efforts like social distancing and scrupulous hand and personal hygiene are critical to limit the spread of COVID-19." Shin Dec., ¶ 12 (Exh. 2).

Dr. Shin also explains that "[t]here is no way for immigration detention facilities to comply with CDC guidelines on social distancing and quarantining unless Respondents release detained men and women on a large scale." *Id.* at ¶¶ 39-40.  Dr. Shin concluded that it is "my professional opinion that failure to release during the COVID-19 pandemic is a violation of the CDC guidelines and will result in continued and wide-spread infection." *Id.*

Dr. Shin's conclusions are consistent with every other public health expert issued early warnings about the spread of COVID-19 and the need for the federal, state and local governments to employ social distancing mitigation efforts.  Drs. Scott Allen and Josiah Rich— experts in the fields of detention health, infectious disease, and public health who advise DHS's Office of Civil Rights and Civil Liberties—who urged Congress on March 19, 2020 to take immediate actions to slow the spread of COVID-19 in ICE detention centers, *including releasing immigrants* to facilitate maximum social distancing—an "oxymoron" in congregate settings.  (Appx I, Exh. L, at 235-41.) Drs. Allen and Rich also warned of the dire consequences that a COVID-19 outbreak within an ICE detention facility would have on the community outside the facility.  They describe a "tinderbox" scenario where a rapid outbreak inside a facility would result in the hospitalization of multiple detained people in a short period of time, which would spread the virus to the surrounding community and create a demand for ventilators far exceeding the supply.  *Id.*

Once a disease is introduced into a jail, prison, or detention facility, it spreads faster than under most other circumstances due to overcrowding, poor sanitation and hygiene, and lack of access to adequate medical services. For these same reasons, the outbreak is harder to

control.[45] The severe outbreaks of COVID-19 in congregate environments, such as cruise ships and nursing homes, illustrate how rapidly and widely COVID-19 would rip through an ICE detention facility.  On the Diamond Princess cruise ship, for example, approximately 700 passengers and crew on board were infected over the course of three weeks despite the initiation of quarantine protocols.[46]

The consequences of the failure of federal, state and local government to adhere to the early warning by public health officials have been borne out in the United States. *Id.* at ¶ 40. As of the date of this Petition, there are 525,704 number of confirmed cases in the United States and 20,486 people have died.[47]

Each of the three detention centers either has confirmed cases of the virus or has groups of individuals herded together in "cohort quarantine" because they have been exposed. Rather than mitigate the risk of transmission, these cohort quarantines drastically increase the possibility of transmission, infection, and facility-wide outbreak by grouping together people who have already been exposed to the virus.

Dr. Shin explains that "[t] he analysis that I provide above regarding screening, 'cohorting' and social distancing is not theoretical. In fact, there are a growing number of facilities throughout the country where the rate of infection is growing exponentially amongst both people detained as well as staff. In these settings, hundreds, and potentially thousands of people will become infected, and many will die." Greer Dec., ¶ 34 (Exh. 3). Finally, Dr. Shin

---

[45] Christina Potter, *Outbreaks in Migrant Detention Facilities*, Outbreak Observatory (Jul. 11, 2019), https://www.outbreakobservatory.org/outbreakthursday-1/7/11/2019/outbreaks-in-migrant-detention-facilities

[46] *Failures on the Diamond Princess Shadow Another Cruise Ship Outbreak*, The New York Times (Mar. 8, 2020), www.nytimes.com/2020/03/08/world/asia/coronavirus-cruise-ship.html.

[47] Available at: https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html

explains that "it should also be understood that all individuals are susceptible to infection and serious life-threatening complications that can result in death…. have been actively involved in our hospital's response and in directly treating patients. I have personally treated patients-many of these individuals are young and did not have any pre-existing medical conditions." Shin Dec., ¶ 41 (Exh. 2).

COVID-19 threatens every woman and man detained at Krome, Glades, and BTC. A chart of the reported COVID-19 cases of people in ICE detention depicts an alarming steep curve. (Appx I, Exh. E, at 47); *see also* Shin Dec. at ¶¶39-41(Exh. 2).

### III.     The government will suffer no specific injury if injunctive relief is granted, and a grant of injunctive relief is in the public interest.

"Once an applicant satisfies the first two factors, the traditional stay inquiry calls for assessing the harm to the opposing party and weighing the public interest." *Nken*, 556 U.S., at 435.  "These factors merge when the Government is the opposing party." *Id*.  Here, the government will suffer no specific injury if injunctive relief is granted. The government may utilize its Alternatives to Detention ("ATD") program, which uses supervised release, case managements, and monitoring of individuals instead of detention. Furthermore, the government will benefit from slowing the spread of COVID-19, a benefit that merges with the public interest in this case.

On March 11, 2020, the World Health Organization ("WHO") declared the outbreak a global pandemic,[48] and COVID-19 has now touched nearly every country on the planet.[49]

---

[48] Tedros Adhanom Ghebreyesus, *WHO Director-General's opening remarks at the media briefing on COVID-19 – 11 March 2020* (Mar. 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[49] *Coronavirus disease 2019 (COVID-19) Situation Report – 73*, World Health Organization (Apr. 2, 2020), https://www.who.int/docs/default-source/coronaviruse/situation-

The WHO has exhorted both immigration and criminal justice decision makers to use "non-custodial measures" to protect incarcerated men, women, and children and to stem the escalating transmission rate. (Appx I, Exh. H, at 92)

As of April 12, 2020, the number of confirmed cases worldwide has surpassed one and a half million, including over 560,000 people in the United States.  Over 114,000 people have died as a result of COVID-19 worldwide, including at least 22,000 in the United States.[50]

Nationally, projections by the CDC indicate that over 200 million people in the United States could be infected with COVID-19 over the course of the pandemic without effective public health intervention, with as many as 1.7 million deaths in the most severe projections.[51] On March 23, 2020, the WHO warned that the United States could become the next epicenter of the pandemic.[52]  Indeed, on March 26, 2020, the United States surpassed every other country in the world in number of confirmed COVID-19 cases.[53] On April 11, 2020, the United States surpassed every other country in the world in the number of confirmed COVID-19 deaths.[54]

In the state of Florida, transmission of COVID-19 has been rampant.  As of April 13,

---

reports/20200402-sitrep-73-covid-19.pdf?sfvrsn=5ae25bc7_4https://www.who.int/docs/default-source/coronavirus/situation-reports/20200330-sitrep-70-covid-19.pdf?sfvrsn=7e0fe3f8_2.

[50] Worldometer: Coronavirus, https://www.worldometers.info/coronavirus/#countries (last accessed Apr. 12, 2020).

[51] Sheri Fink, *Worst-Case Estimates for U.S. Coronavirus Deaths,* The New York Times (last updated Mar. 18, 2020), https://www.nytimes.com/2020/03/13/us/coronavirus-deaths-estimate.html.

[52] Sarah Boseley, *US may become next centre of coronavirus pandemic, says WHO,* The Guardian (Mar. 24, 2020), https://www.theguardian.com/world/2020/mar/24/us-may-become-centre-of-coronavirus-pandemic-who-says.

[53] *U.S. Now Leads the World in Confirmed Cases*, The New York Times (last updated Apr. 1, 2020), https://www.nytimes.com/2020/03/26/world/coronavirus-news.htmlhttps://www.nytimes.com/2020/03/26/world/coronavirus-news.html.

[54] *U.S. Surpasses Italy in Total Number of Confirmed Deaths*, The New York Times (last updated Apr. 12, 2020), www.nytimes.com/2020/04/11/us/coronavirus-live-updates.html.

2020, the number of reported cases in Florida is at 19,895, with the number of reported deaths from COVID-19 at 461, making Florida the state with the 11th highest number of COVID-19-related deaths in the United States.[55] The counties of Miami-Dade and Broward in South Florida account for half of all Florida cases of COVID-19.[56]

Due to the lack of widespread testing available in most countries, including the United States, the number of confirmed cases is likely but a fraction of the true number of COVID-19 cases worldwide.  As of April 12, 2020, just over 2.8 million tests have been administered in the entire United States; in Florida, only 184,926.[57] Because of the shortage of tests in the United States—admitted to be a "failing" by top infectious disease expert Dr. Anthony Fauci[58]—the CDC currently recommends prioritizing testing for symptomatic healthcare providers and hospitalized patients[59]—which means that the number of diagnosed COVID-19 cases may be only the tip of a very large iceberg.[60] The public interest lies in stopping the spread of COVID-19.

---

[55] Listing of United States Total Coronavirus Cases (last updated Apr. 9, 2020), https://www.worldometers.info/coronavirus/country/us/.

[56] Florida's COVID-19 Data and Surveillance Dashboard (last accessed Apr. 13, 2020), https://experience.arcgis.com/experience/96dd742462124fa0b38ddedb9b25e429.

[57] The COVID Tracking Project, Our most up-to date data and annotations (last updated Apr. 12, 2020, 11:22 PM), https://covidtracking.com/data/.

[58] Elizabeth Chuck, *'It is a failing. Let's admit,'* Fauci says of coronavirus testing capacity NBC News (Mar. 12, 2020), https://www.nbcnews.com/health/health-news/it-failing-let-s-admit-it-fauci-says-coronavirus-testing-n1157036.

[59] Centers for Disease Control and Prevention, Coronavirus Disease 2019 (COVID-19), *Evaluating and Testing Persons for Coronavirus Disease 2019 (COVID-19)* (last updated Mar. 24, 2020), https://www.cdc.gov/coronavirus/2019-nCoV/hcp/clinical-criteria.html.

[60] George Citroner, *How Many People in the United States Actually Have COVID-19?*, Healthline (Mar. 18, 2020), https://www.healthline.com/health-news/how-many-coronavirus-cases-are-there.

The World Health Organization, recognizing the threat to detained people, has urged that "[e]nhanced consideration should be given to resorting to *non-custodial* measures at all stages of the administration of criminal justice, including at the pre-trial, trial and sentencing as well as post-sentencing stages." (Appx I, Exh. H, at 82-121, 92) (WHO Interim Guidance) (emphasis added). This guideline applies to "immigration detention settings" as well. (*Id*., at 95 §5.)

Respondents cannot control the spread of COVID-19 without widespread testing. *See* Shin Dec. at ¶¶ 28, 33 and 39 (Exh. 2). ("The lack of wide-spread testing, transparency and data in communities in the US and all across the world allowed undetected spread in the community as well as within facilities and institutions that fueled the current pandemic.").  However, as ICE has admitted through Officer in Charge at Krome, they are not testing at the facilities. (Appx I, Exh. I, at 122-25, 123 ¶ 8-9) (noting medical screening that does not include testing or testing upon presentation of symptoms). Tests typically only occur if a person is brought to the hospital. Periodic testing of already symptomatic people does little to prevent further infections. As Dr. Shin explains, "three studies that support the likelihood that asymptomatic or mildly symptomatic individuals can spread the infection. These studies took place in China, Japan and one study included passengers from the Diamond Princess. These studies found that in COVID infected persons, 59%, 31% and 18%; respectively, were asymptomatic or mildly symptomatic." *See* Shin Dec. at ¶24 (Exh. 2).

Detainee reports from all three facilities document that social distancing is impossible, people exhibiting flu-like symptoms are housed in the general population, and maintaining personal hygiene is constrained by the crowded facilities and lack of cleaning supplies. At BTC and Glades, men and women must ration soap weekly—two smalls bottles at BTC per person,

and one 4-ounce bottle at Glades.  (Appx I, Exh. J, at 126-30) (Declaration of Francis L. Conlin, Friends of Miami-Dade Detainees).

Detained individuals have not been trained on how to use hygiene and social distancing to try and reduce the spread of COVID-19. Detained individuals have no access to personal protective equipment ("PPE"), not even through commissary. Only some facility staff use PPE. COVID-19 infections at Krome, Glades, and BTC affect the larger community, as many people travel in and out of these facilities, including staff and vendors. As of April 12, 2020, there were 10,007 confirmed cases of COVID-19 between Miami-Dade County, Broward County, and Glades County.[61] These numbers amount to over half of the total number of positive cases in the entire state of Florida, and are growing exponentially each passing day.[62]

Throughout the world, the COVID-19 pandemic is infecting and killing women, men, and children. The United States has now surpassed the rest of the world in both the number of confirmed cases and the highest number of deaths. There is no vaccine against COVID-19 and no known cure.  Currently, the only recognized strategies to reduce the risk of exposure to COVID-19 are social distancing, widespread testing, and improved hygiene, which have led to unprecedented public health measures around the world.

Unfortunately, ICE is preventing people at Krome, Glades, and BTC from complying with sheltering in place protocols and CDC guidelines. Despite warnings from medical and public health professionals that releasing detained immigrants is the only viable option to comply with social distancing, individual quarantine, and other CDC requirements and local and state orders, the agency has generally refused to release in any meaningful way, in the absence of court intervention.   As Dr. Greer explains "[c]ontinued and wide-spread infection will not only

---

[61] https://floridahealthcovid19.gov/
[62] As of April 12, 2020, there were 19, 895 positive cases of COVID-19 in the state of Florida. *Id*

occur in the detention facilities but also in the community.  Health in detention facilities is community health. Protecting the health of individuals who are detained in and work in these facilities is vital to protecting the health of the wider community."  Greer Dec., ¶ 34 (Exh. 3).

## REQUESTED RELIEF

Based upon the foregoing, the Petitioners respectfully request that the Court issue an Emergency Temporary Restraining Order, immediately enjoining the Respondents from:

(1) Transferring all Petitioners and proposed class members out of their respective detention facilities and centers to any other detention facility or center;

(2) Transferring any new immigrant detainees into Krome, BTC, or Glades from any other detention facility or center;

(3) Schedule an emergency hearing over this matter;

After a hearing can be had on this matter, the Petitioners respectfully request that the Court issue an Emergency Preliminary Injunction granting the following relief:

(1) Order the release of petitioners-plaintiffs and all similarly situated members of the proposed class in Krome, BTC, and Glades on their own recognizance with appropriate precautionary public health measures, or, in the alternative, release plaintiffs and all similar situated detainees in Krome, BTC, and Glades into community-based alternatives to detention, such as conditional release, supervision or electronic monitoring, with appropriate precautionary public health measures;

(2) Order the implementation of CDC public health guidance and protocols designed to prevent the transmission of COVID-19 in Krome, BTC, and Glades.

## CERTIFICATION OF EMERGENCY

Undersigned counsel certifies that this is an emergency motion pursuant to Local Rule 7.1(d)(1).

Petitioners, and the class they represent, are at imminent risk of transfer outside of Florida.

After reviewing the facts and researching applicable legal principles, I certify that this motion in fact presents a true emergency (as opposed to a matter that may need only expedited treatment) and requires an immediate ruling because the Court would not be able to provide meaningful relief to a critical, non-routine issue after the expiration of seven days. I understand that an unwarranted certification may lead to sanctions.

Dated:  April 13, 2020

Respectfully submitted,

By: /s/ Rebecca Sharpless
REBECCA SHARPLESS
Florida Bar No. 0131024
ROMY LERNER
Florida Bar No. 116713
KATARINA M. GOMEZ, Law Student
MEREDITH HOFFMAN, Law Student
MARIA A. LLORENS, Law Student
JACOB S. MORSE, Law Student
OLIVIA G. PARISE, Law Student
MARIA A. PISELLI, Law Student
UNIVERSITY OF MIAMI SCHOOL OF LAW
IMMIGRATION CLINIC
1311 Miller Drive Suite, E-273
Coral Gables, Florida 33146
Tel: (305) 284-3576
Fax: (305) 284-6092
rsharpless@law.miami.edu

RAPID DEFENSE NETWORK
Gregory P. Copeland*
Sarah T. Gillman*
11 Broadway, Suite 615
New York, NY 10004
Tel.: (212) 843-0910
Fax: (212) 257-7033
gregory@defensenetwork.org
sarah@defensenetwork.og

*Pro Hac Vice Admission Pending

MARK ANDREW PRADA
Fla. Bar No. 91997
ANTHONY RICHARD DOMINGUEZ
Fla. Bar No. 1002234
Prada Urizar, PLLC
3191 Coral Way, Suite 500
Miami, FL 33145
Ofc.:   (786) 703-2061
Fax:    (786) 708-9508
mprada@pradaurizar.com
adominguez@pradaurizar.com

PAUL R. CHAVEZ
FL Bar No. 1021395
MAIA FLEISCHMAN
FL Bar No. 1010709
SOUTHERN POVERTY LAW CENTER
2 S. Biscayne Blvd., Ste. 3200
Miami, FL 33101
Tel: (305) 537-0577
paul.chavez@splcenter.org
maia.fleischman@splcenter.org

ANDREA MONTAVON-MCKILLIP
Florida Bar No. 56401
LEGAL AID SERVICE OF BROWARD COUNTY, INC.
491 North State Road 7
Plantation, Florida 33317
Tel. (954) 736-2493
Fax (954) 736-2484
amontavon@legalaid.org

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY, that on April 13, 2020, I filed the foregoing document with the Clerk of the Court for the U.S. District Court for the Southern District of Florida via the CM/ECF electronic filing system. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By: /s/ *Rebecca Sharpless*
Rebecca Sharpless
Florida Bar No. 0131024
Immigration Clinic
University of Miami School of Law
1311 Miller Drive Suite E-273
Coral Gables, Florida 33146
Tel: (305) 284-3576, direct
Tel: (305) 284-6092, clinic
rsharpless@law.miami.edu