Timothy P. Fox (CA Bar 157750)
*tfox@creeclaw.org*
Elizabeth Jordan*
*ejordan@creeclaw.org*
CIVIL RIGHTS EDUCATION AND
ENFORCEMENT CENTER
1245 E. Colfax Avenue, Suite 400
Denver, CO 80218
Tel:  (303) 757-7901
Fax: (303) 872-9072

Lisa Graybill*
*lisa.graybill@splcenter.org*
Jared Davidson*
*jared.davidson@splcenter.org*
SOUTHERN POVERTY LAW
CENTER
201 St. Charles Avenue, Suite 2000
New Orleans, Louisiana 70170
Tel:  (504) 486-8982
Fax: (504) 486-8947

Stuart Seaborn (CA Bar 198590)
*sseaborn@dralegal.org*
Melissa Riess (CA Bar 295959)
*mriess@dralegal.org*
DISABILITY RIGHTS ADVOCATES
2001 Center Street, 4th Floor
Berkeley, California 94704
Tel:  (510) 665-8644
Fax: (510) 665-8511

Attorneys for Plaintiffs (continued on next page)

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## EASTERN DIVISION – RIVERSIDE

| | |
|---|---|
| FAOUR ABDALLAH FRAIHAT, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, *et al.*,<br><br>Defendants. | Case No.: 19-cv-01546-JGB(SHKx)<br><br>**DECLARATION OF HOMER VENTERS IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND CLASS CERTIFICATION**<br><br>Date: March 24, 2020 |

| | |
|---|---|
| 1 | William F. Alderman (CA Bar 47381) |
| | walderman@orrick.com |
| 2 | Jake Routhier (CA Bar 324452) |
| | jrouthier@orrick.com |
| 3 | ORRICK, HERRINGTON & |
| | SUTCLIFFE LLP |
| 4 | 405 Howard Street |
| | San Francisco, CA 94105 |
| 5 | Tel: (415) 773-5700 |
| | Fax: (415) 773-5759 |
| 6 | |
| 7 | Michael W. Johnson** |
| | mjohnson1@willkie.com |
| 8 | Dania Bardavid** |
| | dbardavid@willkie.com |
| 9 | Jessica Blanton** |
| | jblanton@willkie.com |
| 10 | Joseph Bretschneider** |
| | jbretschneider@willkie.com |
| 11 | WILLKIE FARR & |
| 12 | GALLAGHER LLP |
| | 787 Seventh Avenue |
| 13 | New York, NY 10019 |
| | Tel: (212) 728-8000 |
| 14 | Fax: (212) 728-8111 |
| 15 | Maia Fleischman* |
| | maia.fleischman@splcenter.org |
| 16 | SOUTHERN POVERTY LAW |
| | CENTER |
| 17 | 2 South Biscayne Boulevard |
| 18 | Suite 3750 |
| | Miami, FL 33131 |
| 19 | Tel: (786) 347-2056 |
| | Fax: (786) 237-2949 |
| 20 | |
| 21 | Christina Brandt-Young* |
| | cbrandt-young@dralegal.org |
| 22 | DISABILITY RIGHTS |
| | ADVOCATES |
| 23 | 655 Third Avenue, 14th Floor |
| | New York, NY 10017 |
| 24 | Tel: (212) 644-8644 |
| | Fax: (212) 644-8636 |
| 25 | |

Mark Mermelstein (CA Bar 208005)
mmermelstein@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
777 South Figueroa Street
Suite 3200
Los Angeles, CA 90017
Tel: (213) 629-2020
Fax: (213) 612-2499

Leigh Coutoumanos**
lcoutoumanos@willkie.com
WILLKIE FARR & GALLAGHER LLP
1875 K Street NW, Suite 100
Washington, DC 20006
Tel: (202) 303-1000
Fax: (202) 303-2000

Shalini Goel Agarwal
(CA Bar 254540)
shalini.agarwal@splcenter.org
SOUTHERN POVERTY LAW CENTER
106 East College Avenue
Suite 1010
Tallahassee, FL 32301
Tel: (850) 521-3024
Fax: (850) 521-3001

Maria del Pilar Gonzalez Morales
(CA Bar 308550)
pgonzalez@creeclaw.org
CIVIL RIGHTS EDUCATION AND ENFORCEMENT CENTER
1825 N. Vermont Avenue, #27916
Los Angeles, CA 90027
Tel: (805) 813-8896
Fax: (303) 872-9072

26 Attorneys for Plaintiffs (continued from previous page)
27 *Admitted Pro Hac Vice
**Pro Hac Vice Application Forthcoming
28

I, Homer Venters, declare the following under penalty of perjury pursuant to 28
U.S.C. § 1746 as follows:

**Background**

1.  I am a physician, internist and epidemiologist with over a decade of experience
    in providing, improving and leading health services for incarcerated people. My
    clinical training includes residency training in internal medicine at Albert
    Einstein/Montefiore Medical Center (2007) and a fellowship in public health
    research at the New York University School of Medicine (2009). My experience
    in correctional health includes two years visiting immigration detention centers
    and conducting analyses of physical and mental health policies and procedures
    for persons detained by the U.S. Department of Homeland Security. This work
    included and resulted in collaboration with ICE on numerous individual cases of
    medical release, formulation of health-related policies as well as testimony
    before U.S. Congress regarding mortality inside ICE detention facilities.

2.  After my fellowship training, I became the Deputy Medical Director of the NYC
    Jail Correctional Health Service. This position included both direct care to
    persons held in NYC's 12 jails, as well as oversight of medical policies for their
    care. This role included oversight of chronic care, sick call, specialty referral and
    emergency care. I subsequently was promoted to the positions of Medical
    Director, Assistant Commissioner, and Chief Medical Officer. In the latter two
    roles, I was responsible for all aspects of health services including physical and

mental health, addiction, quality improvement, re-entry and morbidity and mortality reviews as well as all training and oversight of physicians, nursing and pharmacy staff. In these roles I was also responsible for evaluating and making recommendations on the health implications of numerous security policies and practices including use of force and restraints. During this time I managed multiple communicable disease outbreaks including H1N1 in 2009, which impacts almost a third of housing areas inside the adolescent jail, multiple seasonal influenza outbreaks, a recurrent legionella infection and several other smaller outbreaks.

3. In March 2017, I left Correctional Health Services of NYC to become the Director of Programs for Physicians for Human Rights. In this role, I oversaw all programs of Physicians for Human Rights, including training of physicians, judges and law enforcement staff on forensic evaluation and documentation, analysis of mass graves and mass atrocities, documentation of torture and sexual violence, and analysis of attacks against healthcare workers.

4. In December 2018 I became the Senior Health and Justice Fellow for Community Oriented Correctional Health Services (COCHS), a nonprofit organization that promotes evidence-based improvements to correctional practices across the U.S. In January 2020, I became the president of COCHS. I also work as a medical expert in cases involving correctional health and I have a book on the health risks of jail (*Life and Death in Rikers Island*) which was

published in early 2019 by Johns Hopkins University Press. A copy of my curriculum vitae is attached to this report which includes my publications, a listing of cases in which I have been involved and a statement of my compensation.

**COVID-19 in ICE Detention**

5. Coronavirus disease of 2019 (COVID-19) is a viral pandemic. This is a novel virus for which there is no established curative medical treatment and no vaccine.

6. COVID-19 infection rates are growing exponentially in the U.S. The outbreak curve is in the early stages, meaning that communities are beginning to see their first cases, and that the number of cases overall is rising rapidly, with doubling times between one and three days. The Governor of California predicted that over half of all residents will become infected with COVID-19 and the Commissioner of Health for New Jersey predicted, "I'm definitely going to get it, we all will."[1] The Centers for Disease Control (CDC) now reports COVID-19 cases in all 50 states.

7. ICE will not be able to stop the entry of COVID-19 into ICE facilities, and the reality is that the infection is likely inside multiple facilities already. When COVID-19 impacts a community, it will also impact the detention facilities. In

---

[1] https://www.10news.com/news/coronavirus/newsom-56-percent-of-california-expect-to-get-coronavirus

New Jersey, one employee at an ICE detention facility has already tested positive,[2] and this is likely just the tip of the iceberg in terms of the number of ICE staff that are already infected but are unaware due to the lack of testing nationwide, and the fact that people who are infected can be asymptomatic for several days. In New York, one of the areas of early spread in the U.S., multiple correctional officers and jail and prison inmates have become infected with COVID-19. The medical leadership in the NYC jail system have announced that they will be unable to stop COVID from entering their facility and have called for release as the primary response to this crisis. Staff are more likely to bring COVID-19 into a facility, based solely on their movement in and out every day.

8. Once COVID-19 is inside a facility, ICE will be unable to stop the spread of the virus throughout the facility given long-existing inadequacies in ICE's medical care and also in light of how these facilities function. Newly released CDC guidance for correctional facilities makes clear that detention settings should plan for increased staffing shortages as COVID-19 impacts security and health staff.[3] ICE has faced longstanding challenges in maintaining adequate staffing of health staff for many years, and the outbreak of this pandemic will dramatically worsen this problem.

---

[2] https://www.buzzfeednews.com/article/hamedaleaziz/ice-medical-worker-coronavirus

[3] https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html#social_distancing

9. I have been inside multiple ICE detention facilities, both county jails that house ICE detainees and dedicated facilities. My experience is that the densely packed housing areas, the manner in which health services, food services, recreation, bathroom and shower facilities for detained people, as well as the entry points, locker rooms, meal areas, and control rooms for staff, all contribute to many people being in small spaces. One of the most ubiquitous aspects of detention, the sally-port, or control port, a series of two locked gates that bring every staff member and detained person past a windowed control room as they stop between locked gates, provides but one example of this concern. The normal functioning of detention centers demands that during shift change for staff, or as the security count approaches for detained people, large numbers of people press into sally-ports as they move into or out of other areas of the facility. This process created close contact and the windows in these sally ports that are used to hand out radios, keys and other equipment to staff ensure efficient passage of communicable disease from the control rooms into the sally port areas on a regular basis. Detention facilities are designed to force close contact between people and rely on massive amounts of movement every day from one part of the facility to another, e.g., for programming, access to cafeterias, commissary, and medical, just to name a few. This movement is required of detained people as well as staff. My experience managing smaller outbreaks is that it is impossible to apply hospital-level infection control measures on security staff.

7

In a hospital or nursing home, staff may move up and down a single hallway over their shift, and they may interact with one patient at a time. In detention settings, officers move great distances, are asked to shout or yell commands to large numbers of people, routinely apply handcuffs and operate heavy doors/gates, operate large correctional keys and are trained in the use of force. These basic duties cause the personal protective equipment they are given to quickly break and become useless, and even when in good working order, may impede their ability talk and be understood, in the case of masks. For officers working in or around patients at risk or with symptoms, there may be an effort to have them wear protective gowns, as one would in any other setting with similar clinical risks. These gowns cover their radios, cut down tools and other equipment located on their belts and in my experience working with correctional staff, are basically impossible to use as a correctional officer.

10. Efforts to lock detained people into cells will worsen, not improve this facility-level contribution to infection control. When people are locked into cells alone, for most of the day, they quickly experience psychological distress that manifests in self-harm and suicidality, which requires rapid response and intensive care outside the facility for mental and physical health emergencies. In addition, units that are comprised of locked cells require additional staff to escort people to and from their cells for showers and other encounters, and medical, pharmacy and nursing staff move on and off these units daily to assess the

welfare and health needs of these people, creating the same movement of virus form the community into the facilities as if people were housed in normal units.

11. Another critical way in which detention settings promote transmission of communicable disease involve lack of access to hand washing. Many common areas lack operable sinks with access to soap and paper hand towels. In addition, many of the sinks utilized in correctional settings do not operate with a faucet that can be turned and left on, but instead rely on pushing a button which provides a limited amount of water over a limited amount of time. These metered faucets are designed to save water by limiting the amount of time water flows. This approach makes adequate hand washing with soap for at least 20 seconds very difficult, if not impossible.

12. As these examples illustrate, my experience is that the design and operation of detention settings promotes the spread of communicable diseases such as COVID-19.

13. ICE currently detains thousands of people with risk factors that increase their risk of serious complications from COVID-19, including death and long-lasting complications after recovery, such as fibrotic changes to the lung. The risk factors included by the CDC include people with heart disease, lung disease, immune compromising conditions and patients who are older. Additional risk factors may also include diabetes, hypertension, asthma and chronic obstructive

pulmonary disease.[4] In correctional settings, the age of 55 is used to identify older patients, because of the extremely high level of physical and behavioral health problems among this cohort of people.[5] I believe the age of 55 should be applied to ICE detainees for the same reason.

14. On the whole, ICE's response to the COVID-19 pandemic is lacking. I've reviewed available documents with their planning. The interim guidance sheet provided by ICE Health Services Corps, which oversees medical care in ICE detention facilities, on March 6, 2020[6] as a protocol for their clinical COVID-19 response, as well as ICE's guidance on its website,[7] is grossly deficient in multiple areas, including;

    a. The protocol focuses on asking questions about travel contacts and other potential ways in which a person may have come into contact with someone who has COVID-19. It is likely that almost everyone in the general public who is not practicing social distancing is in contact with the COVID-19 virus, and these questions give a false impression that they will somehow help identify those most likely to have this type of contact. The appropriate focus should be on checking for active symptoms

---

[4] https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/high-risk-complications.html

[5] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3464842/

[6] https://www.aila.org/infonet/ice-interim-reference-sheet-coronavirus

[7] https://www.ice.gov/covid19

including fever, and known sick contacts of any type every time a person enters an ICE facility, whether a staff member or detained person. Even this approach is likely to miss staff as they bring in and transmit the virus while asymptomatic, a critical observation mentioned in the newly released CDC guidelines for correctional settings. COVID-19 is a pandemic and the exponential rates of growth in the U.S. mean that once the virus arrives in a community, it will enter the detention facilities, often via staff. These screening questions may be appropriate as a subset of questions in retrospective contact tracing, a process utilized to reveal how an infection has spread, and which is conducted by trained public health professionals, but they are no longer core to establishing the presence of COVID-19 since it has arrived in full force in every state of the U.S.

b. The ICE protocol fails to include basic infection control measures that are present in CDC guidelines for long term care facilities, and other congregate settings, including access to hand sanitizer and use of masks for anyone with a cough.

c. The protocol fails to include guidance for health staff or administrators regarding how to plan their surge capacity needs as the level of medical encounters increases, and the number of available staff decreases, due to illness. This is a critical component of the CDC guidance on long term care response and is a critical omission in this protocol.

d.  There is no guidance for clinical staff on when to test patients for COVID-19, which leaves detained patients at a significant disadvantage. While the guidelines for testing may evolve over time, the protocol should create a structure for daily dissemination of testing criteria from ICE leadership, and time for daily briefings among all health staff at the start of every shift, to review this and other elements of the COVID-19 response. This briefing must include participation by epidemiologists tasked to COVID-19 response who are also coordinating with local and federal COVID-19 activities.

e.  The protocol states that people with suspected COVID-19 contact will be monitored for 14 days with symptom checks. The protocol is written as if this is a rare occurrence, reflecting smaller outbreak management, but the prevalence of COVID-19 is now growing to such an extent that a large share of newly arrived people will have recent contact with someone who is infected. ICE would need to use this level of monitoring for every person arriving in detention. Accordingly, ICE would need to dramatically expand its medical facilities and staffing to conduct this daily monitoring of every newly arrived person for 14 days. The protocol fails to contemplate these necessary changes.

f.  The ICE protocol provides no guidance about identification of high-risk patients at the time of entry or any special precautions that will be enacted

to protect them. The protocol also fails to address the identification of high-risk patients who have already been admitted. This is a dangerous omission, because many of the ICE facilities employ paper medical records, and identification of the people who meet criteria for being high risk of serious illness and death from COVID-19 will require significant time and staffing. I have led these types of risk reviews in outbreaks using both electronic and paper based medical records in multiple correctional settings, and there must be a clear direction and protocol for how this process will occur and how often it is repeated, and how critical information will flow from health to security staff. The protocol focuses on whether patients have contact with known COVID-19 patients and whether they are symptomatic. It is true that symptomatic patients require higher levels of assessment and care, but a basic element of outbreak management is protection of patients who, if they become infected, are at high risk of serious illness or death. The ICE protocol fails to address this. Such a management plan would not only include the questions asked during the intake process, but would also include cohorted housing areas, increased infection control measures by staff who come onto the housing areas and increased medical surveillance, likely daily checks of signs and symptoms. I have established this type of surveillance for high risk patients during several outbreak responses, and the two elements that will

pose a significant challenge to ICE are the lack of appropriate housing areas, and the need for significantly more security and health staff. The protocol is crafted to address a relatively small and time-limited outbreak and lacks anticipation of what has already started elsewhere and will soon impact these facilities, widespread infection with a massive impact on the level of staffing, The newly released CDC guidelines for detention settings recommends social distancing in these facilities, maintaining 6 feet separation between people, "Implement social distancing strategies to increase the physical space between incarcerated/detained persons (ideally 6 feet between all individuals, regardless of the presence of symptoms)." ICE will be unable to adhere to this recommendation in virtually every facility it operates, and the practice of facility "lockdowns" stands in direct contradiction to this recommendation by the CDC.

15. Because the ICE response fails to create increased protections for people with risk factors for serious illness and death from COVID-19, they are unlikely to detect illness in these patients until many of them are critically ill. As with the lack of guidance on testing, this lack of clear guidance on how to determine who meets criteria for hospital transfer may prove deadly for detained people, and clinical staff encounter patients seriously ill with COVID-19 for the first time in their careers. While COVID-19 shares some similarities with influenza, there are critical aspects of this pandemic that pose greater risk to both patients and

staff, and asking staff to rely on their historical knowledge of influenza treatment without precise guidance on the critical decisions regarding COVID-19 testing, treatment and hospital transfer will leave them and their patients without clear guidelines. These deficiencies, compounded by the time it will take to evaluate and transport them to a local hospital (especially given the remoteness of many facilities), will likely result in numerous deaths, many of which could have been avoided with earlier care.

16. The ICE response, including the protocol, envisions that "isolation rooms" will be used to monitor people who are symptomatic with COVID-19. My experience in visiting and working in detention facilities across the nation is that each facility has 1-4 cells located in or near the medical clinic that meet this definition. When COVID-19 arrives in a facility, there will be many more people who meet this criteria of being symptomatic, and ICE will need to designate entire housing areas for this level of increased surveillance of symptomatic patients. This approach requires that empty housing areas be available, so that small numbers of symptomatic patients can be cohorted together away from those without symptoms. Facilities that are over 80 percent capacity will find this basic approach impossible once they start to see multiple symptomatic patients. Based on my experience visiting detention facilities, this process will be essentially impossible.

17. ICE should not employ isolation in locked cells as a primary means to protect either at risk patients, or patients who are symptomatic. When patients are places into locked cells, the level of monitoring is dramatically reduced. In addition, this practice causes new health problems in the form of risk for suicide and self-harm. Also, isolation units often drive increased physical interaction between staff and patients, in the form of increased handcuffing, escorting individuals to and from showers and other out of cell encounters, and increased uses of force due to the psychological stress these units cause. In sum, it is my expert opinion that the use of isolation and/or lockdown is not a medically appropriate method for abating the substantial risk of harm from COVID-19.

18. In addition, transferring large numbers of detained people between facilities to cohort symptomatic and asymptomatic people will increase the spread of COVID-19 infection throughout geographic areas. The newly released CDC guidelines for detention settings recommend a level of infection control measures in transportation of symptomatic patients that would require far more staffing and training ICE has the capacity to provide for large scale transfers: "If a transfer is absolutely necessary, perform verbal screening and a temperature check as outlined in the Screening section below, before the individual leaves the facility. If an individual does not clear the screening process, delay the transfer and follow the protocol for a suspected COVID-19 case – including putting a face mask on the individual, immediately placing them under medical

isolation, and evaluating them for possible COVID-19 testing. If the transfer must still occur, ensure that the receiving facility has capacity to properly isolate the individual upon arrival. Ensure that staff transporting the individual wear recommended PPE . . . and that the transport vehicle is cleaned thoroughly after transport." In other words, transferring people between facilities, as ICE routinely does and as I understand is still going on, requires far more measures than ICE implements and should be ceased.

19. As the number of infections inside ICE facilities rise, there will be fewer health and security staff coming to work. This has already been observed in other law enforcement settings and will inevitably occur inside detention facilities. The ICE response fails to address this central and inescapable reality. Critically, there will be far more work to be done inside these facilities than before, and the lack of available staffing will impact basic operations, as well as the ability to cohort high risk and symptomatic patients (in different areas) as well as provide care inside the facility and even conduct escort for emergency room evaluation and inpatient hospitalization. The protocol fails to detail how patient education will occur, both for newly arrived people and those already in detention.

20. I have reviewed 15 statements by people currently detained by ICE or who represent detained people in multiple facilities, and their observations indicate that, in detention facilities throughout ICE's system, ICE is not following even

the most basic infection control policies that they report as their standard of care including:

    a. Failure to provide hand washing supplies including soap and paper towels and ensure access to handwashing, including operable sinks;

    b. Failure to check symptoms among newly arrived detained people;

    c. Continued transfer among detention centers of detained people;

    d. Lack of symptom screening of staff arriving to work in detention centers;

    e. Failure to ask about risk factors of serious illness or death from COVID-19 infection;

    f. Failure to provide adequate supplies for cleaning of housing areas;

    g. Failure to establish standards of use of gloves and masks by security personnel;

    h. Failure to provide patient education about hand washing, infection control or COVID-19 in Spanish;

    i. Failure to enact social distancing among staff and detained people; and

    j. Lack of communication regarding COVID-19 status inside quarantined housing areas.

21. I have also reviewed the declarations of all the named subclass members and agree their medical conditions place them at high-risk and make them medically vulnerable to COVID-19.

18

22. ICE's inadequate responses to COVID-19—coupled with its pre-existing inadequate healthcare—places people with risk factors at a high risk of contracting COVID-19 and suffering serious complications—including death.

23. ICE must release all people with risk factors to prevent their serious illness and/or death. The ICE response makes clear that they do not plan to establish special protections of high-risk patients and will wait for them to become symptomatic. This approach will result in preventable morbidity and mortality. Both the oversight authority of the NYC jail system and the current medical director for geriatrics and complex care have called for high risk patients to be immediately transferred out of detention.[8] ICE faces a completely preventable disaster by keeping high risk patients in detention as COVID-19 arrived in facilities where the virus will quickly spread. The basic limitation of the physical plant and looming staffing concerns make clear that these patients are in peril of serious illness or death if they remain in detention. In addition, transfer of these patients to other ICE detention facilities will only compound exposure and transmission of COVID-19. They must be released immediately.

I declare under penalty of perjury that the statements above are true and correct to the best of my knowledge.

---

[8] https://www.newyorker.com/news/news-desk/a-rikers-island-doctor-speaks-out-to-save-her-elderly-patients-from-the-coronavirus
https://www.nbcnewyork.com/news/local/nyc-officials-call-for-release-of-most-at-risk-on-rikers-prison-as-more-test-positive-for-virus/2333348/

Signature:

Homer Venters

Date: 3/24/2020

Location: Port Washington, NY

# EXHIBIT A

# Dr. Homer D. Venters

10 ½ Jefferson St., Port Washington, NY, 11050
hventers@gmail.com, Phone: 646-734-5994

---

## HEALTH ADMINISTRATOR          PHYSICIAN          EPIDEMIOLOGIST

### *Professional Profile*

- International leader in provision and improvement of health services to patients with criminal justice involvement.
- Innovator in linking care of the incarcerated to Medicaid, health homes, DSRIPs.
- Successful implementer of nations' first electronic health record, performance dashboards and health information exchange among pre-trial patients.
- Award winning epidemiologist focused on the intersection of health, criminal justice and human rights in the United States and developing nations.
- Human rights leader with experience using forensic science, epidemiology and public health methods to prevent and document human rights abuses.

### *Professional Experience*

**President**, Community Oriented Correctional Health Services (COCHS), 1/1/2020-present.
- Lead COCHS efforts to provide technical assistance, policy guidance and research regarding correctional health and justice reform.
- Oversee operations and programmatic development of COCHS
- Serve as primary liaison between COCHS board, funders, staff and partners.

**Senior Health and Justice Fellow**, Community Oriented Correctional Health Services (COCHS), 12/1/18-12/31/2018
- Lead COCHS efforts to expand Medicaid waivers for funding of care for detained persons relating to Substance Use and Hepatitis C.
- Develop and implement COCHS strategy for promoting non-profit models of diversion and correctional health care.

**Medical/Forensic Expert**, 3/2016-present
- Provide expert input, review and testimony regarding health care, quality improvement, electronic health records and data analysis in detention settings.

**Director of Programs,** Physicians for Human Rights, 3/16-11/18.
- Lead medical forensic documentation efforts of mass crimes against Rohingya and Yazidi people.
- Initiate vicarious trauma program.
- Expand forensic documentation of mass killings and war crimes.
- Develop and support sexual violence capacity development with physicians, nurses and judges.
- Expand documentation of attacks against health staff and facilities in Syria and Yemen.

**Chief Medical Officer/Assistant Vice President**, Correctional Health Services, NYC
Health and Hospitals Corporation 8/15-3/17.

o Transitioned entire clinical service (1,400 staff) from a for-profit staffing company
model to a new division within NYC H + H.
o Developed new models of mental health and substance abuse care that significantly
lowered morbidity and other adverse events.
o Connected patients to local health systems, DSRIP and health homes using
approximately $5 million in external funding (grants available on request).
o Reduced overall mortality in the nation's second largest jail system.
o Increased operating budget from $140 million to $160 million.
o Implemented nation's first patient experience, provider engagement and racial
disparities programs for correctional health.

**Assistant Commissioner,** Correctional Health Services, New York Department of
Health and Mental Hygiene, 6/11-8/15.

o Implemented nation's first electronic medical record and health information exchange
for 1,400 staff and 75,000 patients in a jail.
o Developed bilateral agreements and programs with local health homes to identify
incarcerated patients and coordinate care.
o Increased operating budget of health service from $115 million to $140 million.
o Established surveillance systems for injuries, sexual assault and mental health that
drove new program development and received American Public Health Association
Paper of the Year 2014.
o Personally care for and reported on over 100 patients injured during violent
encounters with jail security staff.

**Medical Director,** Correctional Health Services, New York Department of Health and
Mental Hygiene, 1/10-6/11.

o Directed all aspects of medical care for 75,000 patients annually in 12 jails, including
specialty, dental, primary care and emergency response.
o Direct all aspects of response to infectious outbreaks of H1N1, Legionella,
Clostridium Difficile.
o Developed new protocols to identify and report on injuries and sexual assault among
patients.

**Deputy Medical Director,** Correctional Health Services, New York Department of
Health and Mental Hygiene, 11/08-12/09.

o Developed training program with Montefiore Social internal medicine residency
program.
o Directed and delivered health services in 2 jails.

**Clinical Attending Physician,** Bellevue/NYU Clinic for Survivors of Torture, 10/07-
12/11.

**Clinical Attending Physician,** Montefiore Medical Center Bronx NY, Adult Medicine,
1/08-11/09.

EXHIBIT A

## Education and Training
**Fellow, Public Health Research,** New York University 2007-2009. MS 6/2009
Projects: Health care for detained immigrants, Health Status of African immigrants in NYC.
**Resident, Social Internal Medicine**, Montefiore Medical Center/Albert Einstein University 7/2004- 5/2007.
**M.D.,** University of Illinois, Urbana, 12/2003.
**M.S.** Biology, University of Illinois, Urbana, 6/03.
**B.A.** International Relations, Tufts University, Medford, MA, 1989**.**

## Academic Appointments, Licensure
Clinical Associate Professor, New York University College of Global Public Health, 5/18-present.

Clinical Instructor, New York University Langone School of Medicine, 2007-2018.

M.D.   New York (2007-present).

## Media
TV
i24 Crossroads re Suicide in U.S. Jails 8/13/19.

i24 Crossroads re re *Life and Death in Rikers Island* 6/13/19.

Amanpour & Company, NPR/PBS re *Life and Death in Rikers Island* 4/15/19.

CNN, Christiane Amanpour re Forensic documentation of mass crimes against Rohingya. 7/11/18.

i24 Crossroads with David Shuster re health crisis among refugees in Syria. 7/6/18.

Canadian Broadcasting Corporation TV with Sylvie Fournier (in French) re crowd control weapons. 5/10/18

i24 Crossroads with David Shuster re Cholera outbreak in Yemen.  2/15/18.

China TV re WHO guidelines on HIV medication access 9/22/17.

Radio/Podcast
Morning Edition, NPR re Health Risks of Criminal Justice System. 8/9/19.

Fresh Air with Terry Gross, NPR re *Life and Death in Rikers Island*, 3/6/19.

Morning Edition, NPR re *Life and Death in Rikers Island*, 2/22/19.

LeShow with Harry Sherer re forensic documentation of mass crimes in Myanmar, Syria,

EXHIBIT A

Iraq. 4/17/18.

Print articles and public testimony
Oped: Four ways to protect our jails and prisons from coronavirus. The Hill 2/29/20.

Oped: It's Time to Eliminate the Drunk Tank. The Hill 1/28/20.

Oped: With Kathy Morse. A Visit with my Incarcerated Mother. The Hill 9/24/19.

Oped: With Five Omar Muallim-Ak. The Truth about Suicide Behind Bars is Knowable. The Hill 8/13/19.

Oped: With Katherine McKenzie. Policymakers, provide adequate health care in prisons and detention centers. CNN Opinion, 7/18/19.

Oped: Getting serious about preventable deaths and injuries behind bars. *The Hill*, 7/5/19.

Testimony: Access to Medication Assisted Treatment in Prisons and Jails, New York State Assembly Committee on Alcoholism and Drug Abuse, Assembly Committee on Health, and Assembly Committee on Correction**.** NY, NY, 11/14/18.

Oped: Attacks in Syria and Yemen are turning disease into a weapon of war, *STAT News*, 7/7/17.

Testimony: Connecticut Advisory Committee to the U.S. Commission on Civil Rights: Regarding the use of solitary confinement for prisoners. Hartford CT, 2/3/17.

Testimony: Venters HD, New York Advisory Committee to the U.S. Commission on Civil Rights: Regarding the use of solitary confinement for juveniles in New York. July 10, 2014. NY NY.

Testimony: New York State Assembly Committee on Correction with the Committee on Mental Health: Regarding Mental Illness in Correctional Settings. November 13, 2014. Albany NY.
Testimony: New York State Assembly Committee on Correction with the Committee on Mental Health: Regarding Mental Illness in Correctional Settings. November 13, 2014. Albany NY.

Oped: Venters HD and Keller AS, The Health of Immigrant Detainees. Boston Globe, April 11, 2009.

Testimony: U.S. House of Representatives, House Judiciary Committee's Subcommittee on Immigration, Citizenship, Refugees, Border Security, and International Law: Hearing on Problems with Immigration Detainee Medical Care, June 4, 2008.

## Peer Reviewed Publications

Parmar PK, Leigh J, **Venters H**, Nelson T. Violence and mortality in the Northern Rakhine State of Myanmar, 2017: results of a quantitative survey of surviving community leaders in Bangladesh. Lancet Planet Health. 2019 Mar;3(3):e144-e153.

**Venters H.** Notions from Kavanaugh hearings contradict medical facts. *Lancet.* 10/5/18.

Taylor GP, Castro I, Rebergen C, Rycroft M, Nuwayhid I, Rubenstein L, Tarakji A, Modirzadeh N, **Venters H**, Jabbour S. Protecting health care in armed conflict: action towards accountability. *Lancet.* 4/14/18.

Katyal M, Leibowitz R, **Venters H**. IGRA-Based Screening for Latent Tuberculosis Infection in Persons Newly Incarcerated in New York City Jails. *J Correct Health Care.* 2018 4/18.

Harocopos A, Allen B, Glowa-Kollisch S, **Venters H**, Paone D, Macdonald R. The Rikers Island Hot Spotters: Exploring the Needs of the Most Frequently Incarcerated. *J Health Care Poor Underserved*. 4/28/17.

MacDonald R, Akiyama MJ, Kopolow A, Rosner Z, McGahee W, Joseph R, Jaffer M, **Venters H**. Feasibility of Treating Hepatitis C in a Transient Jail Population. *Open Forum Infect Dis*. 7/7/18.

Siegler A, Kaba F, MacDonald R, **Venters H**. Head Trauma in Jail and Implications for Chronic Traumatic Encephalopathy. *J Health Care Poor and Underserved.* In Press (May 2017).

Ford E, Kim S, **Venters H**. Sexual abuse and injury during incarceration reveal the need for re-entry trauma screening. *Lancet.* 4/8/18.

Alex B, Weiss DB, Kaba F, Rosner Z, Lee D, Lim S, **Venters H,** MacDonald R. Death After Jail Release. *J Correct Health Care*. 1/17.

Akiyama MJ, Kaba F, Rosner Z, Alper H, Kopolow A, Litwin AH, **Venters H**, MacDonald R. Correlates of Hepatitis C Virus Infection in the Targeted Testing Program of the New York City Jail System. *Public Health Rep.* 1/17.

Kalra R, Kollisch SG, MacDonald R, Dickey N, Rosner Z, **Venters H**. Staff Satisfaction, Ethical Concerns, and Burnout in the New York City Jail Health System. *J Correct Health Care.* 2016 Oct;22(4):383-392.

**Venters H.** A Three-Dimensional Action Plan to Raise the Quality of Care of US Correctional Health and Promote Alternatives to Incarceration. *Am J Public Health*. April 2016.104.

Glowa-Kollisch S, Kaba F, Waters A, Leung YJ, Ford E, **Venters H**. From Punishment to Treatment: The "Clinical Alternative to Punitive Segregation" (CAPS) Program in New York City Jails. *Int J Env Res Public Health.* 2016. 13(2),182.

Jaffer M, Ayad J, Tungol JG, MacDonald R, Dickey N, Venters H. Improving Transgender Healthcare in the New York City Correctional System. *LGBT Health.* 2016 1/8/16.

Granski M, Keller A, Venters H. Death Rates among Detained Immigrants in the United States. *Int J Env Res Public Health.* 2015. 11/10/15.

Michelle Martelle, Benjamin Farber, Richard Stazesky, Nathaniel Dickey, Amanda Parsons, **Homer Venters**. Meaningful Use of an Electronic Health Record in the NYC Jail System. *Am J Public Health*. 2015. 8/12/15.

Fatos Kaba, Angela Solimo, Jasmine Graves, Sarah Glowa-Kollisch, Allison Vise, Ross MacDonald, Anthony Waters, Zachary Rosner, Nathaniel Dickey, Sonia Angell, **Homer Venters**. Disparities in Mental Health Referral and Diagnosis in the NYC Jail Mental Health Service. *Am J Public Health.* 2015. 8/12/15.

Ross MacDonald, Fatos Kaba, Zachary Rosner, Alison Vise, Michelle Skerker, David Weiss, Michelle Brittner, Nathaniel Dickey, **Homer Venters**. The Rikers Island Hot Spotters. *Am J Public Health*. 2015. 9/17/15.

Selling Molly Skerker, Nathaniel Dickey, Dana Schonberg, Ross MacDonald, **Homer Venters**. Improving Antenatal Care for Incarcerated Women: fulfilling the promise of the Sustainable Development Goals. *Bulletin of the World Health Organization*.2015.

Jasmine Graves, Jessica Steele, Fatos Kaba, Cassandra Ramdath, Zachary Rosner, Ross MacDonald, Nathanial Dickey, **Homer Venters**. Traumatic Brain Injury and Structural Violence among Adolescent males in the NYC Jail System *J Health Care Poor Underserved.* 2015;26(2):345-57.

Glowa-Kollisch S, Graves J, Dickey N, MacDonald R, Rosner Z, Waters A, **Venters H**. Data-Driven Human Rights: Using Dual Loyalty Trainings to Promote the Care of Vulnerable Patients in Jail. *Health and Human Rights*. Online ahead of print, 3/12/15.

Teixeira PA[1], Jordan AO, Zaller N, Shah D, **Venters H**. Health Outcomes for HIV-Infected Persons Released From the New York City Jail System With a Transitional Care-Coordination Plan. 2014. *Am J Public Health*. 2014 Dec 18.

Selling D, Lee D, Solimo A, **Venters H.** A Road Not Taken: Substance Abuse Programming in the New York City Jail System. *J Correct Health Care.* 2014 Nov 17.

Glowa-Kollisch S, Lim S, Summers C, Cohen L, Selling D, **Venters H**. Beyond the Bridge: Evaluating a Novel Mental Health Program in the New York City Jail System. *Am J Public Health*. 2014 Sep 11.

Glowa-Kollisch S, Andrade K, Stazesky R, Teixeira P, Kaba F, MacDonald R, Rosner Z, Selling D, Parsons A, **Venters H**. Data-Driven Human Rights: Using the Electronic Health Record to Promote Human Rights in Jail. *Health and Human Rights*. 2014. Vol 16 (1): 157-165.

MacDonald R, Rosner Z, **Venters H**. Case series of exercise-induced rhabdomyolysis in the New York City Jail System. *Am J Emerg Med*. 2014. Vol 32(5): 446-7.

Bechelli M, Caudy M, Gardner T, Huber A, Mancuso D, Samuels P, Shah T, **Venters H.** Case Studies from Three States: Breaking Down Silos Between Health Care and Criminal Justice. *Health Affairs*. 2014. Vol. 3. 33(3):474-81.

EXHIBIT A

Selling D, Solimo A, Lee D, Horne K, Panove E, **Venters H**. Surveillance of suicidal and non-suicidal self-injury in the new York city jail system. *J Correct Health Care*. 2014. Apr:20(2).

Kaba F, Diamond P, Haque A, MacDonald R, **Venters H**. Traumatic Brain Injury Among Newly Admitted Adolescents in the New York City Jail System. *J Adolesc Health*. 2014. Vol 54(5): 615-7.

Monga P, Keller A, **Venters H**. Prevention and Punishment: Barriers to accessing health services for undocumented immigrants in the United States. *LAWS*. 2014. 3(1).

Kaba F, Lewsi A, Glowa-Kollisch S, Hadler J, Lee D, Alper H, Selling D, MacDonald R, Solimo A, Parsons A, **Venters H**. Solitary Confinement and Risk of Self-Harm Among Jail Inmates. *Amer J Public Health*. 2014. Vol 104(3):442-7.

MacDonald R, Parsons A, **Venters H.** The Triple Aims of Correctional Health: Patient safety, Population Health and Human Rights. *Journal of Health Care for the Poor and Underserved*. 2013. 24(3).

Parvez FM, Katyal M, Alper H, Leibowitz R, **Venters H.** Female sex workers incarcerated in New York City jails: prevalence of sexually transmitted infections and associated risk behaviors. *Sexually Transmitted Infections*. 89:280-284. 2013.

Brittain J, Axelrod G, **Venters H.** Deaths in New York City Jails: 2001 – 2009. *Am J Public Health*. 2013 103:4.

Jordan AO, Cohen LR, Harriman G, Teixeira PA, Cruzado-Quinones J, **Venters H.** Transitional Care Coordination in New York City Jails: Facilitating Linkages to Care for People with HIV Returning Home from Rikers Island. *AIDS Behav. Nov.* 2012.

Jaffer M, Kimura C, **Venters H.** Improving medical care for patients with HIV in New York City jails. *J Correct Health Care*. 2012 Jul;18(3):246-50.

Ludwig A, Parsons, A, Cohen, L, **Venters H.** Injury Surveillance in the NYC Jail System, *Am J Public Health* 2012 Jun;102(6).

**Venters H**, Keller, AS. *Psychiatric Services*. (2012) Diversion of Mentally Ill Patients from Court-ordered care to Immigration Detention. Epub. 4/2012.

**Venters H**, Gany, F. *Journal of Immigrant and Minority Health* (2011) Mental Health Concerns Among African Immigrants. 13(4): 795-7.

**Venters H,** Foote M, Keller AS. *Journal of Immigrant and Minority Health.* (2010) Medical Advocacy on Behalf of Detained Immigrants. 13(3): 625-8.

**Venters H,** McNeely J, Keller AS. *Health and Human Rights.* (2010) HIV Screening and Care for Immigration Detainees. 11(2) 91-102.

**Venters H,** Keller AS. *Journal of Health Care for the Poor and Underserved*. (2009) The Immigration Detention Health Plan: An Acute Care Model for a Chronic Care Population. 20:951-957.

EXHIBIT A

**Venters H**, Gany, F. *Journal of Immigrant and Minority Health* (2009) African Immigrant Health. 4/4/09.

**Venters H**, Dasch-Goldberg D, Rasmussen A, Keller AS, *Human Rights Quarterly* (2009) Into the Abyss: Mortality and Morbidity among Detained Immigrant. 31 (2) 474-491.

**Venters H**, *The Lancet* (2008) Who is Jack Bauer? 372 (9653).

**Venters H**, Lainer-Vos J, Razvi A, Crawford J, Shaf'on Venable P, Drucker EM, *Am J Public Health* (2008) Bringing Health Care Advocacy to a Public Defender's Office. 98 (11).

**Venters H**, Razvi AM, Tobia MS, Drucker E. *Harm Reduct J.* (2006) The case of Scott Ortiz: a clash between criminal justice and public health. Harm Reduct J. 3:21

Cloez-Tayarani I, Petit-Bertron AF, **Venters HD**, Cavaillon JM (2003) *Internat. Immunol.* Differential effect of serotonin on cytokine production in lipopolysaccharide-stimulated human peripheral blood mononuclear cells.15,1-8.

Strle K, Zhou JH, Broussard SR, **Venters HD**, Johnson RW, Freund GG, Dantzer R, Kelley KW, (2002) *J. Neuroimmunol.* IL-10 promotes survival of microglia without activating Akt. 122, 9-19.

**Venters HD,** Broussard SR, Zhou JH, Bluthe RM, Freund GG, Johnson RW, Dantzer R, Kelley KW, (2001) *J. Neuroimmunol.* Tumor necrosis factor(alpha) and insulin-like growth factor-I in the brain: is the whole greater than the sum of its parts? 119, 151-65.

**Venters HD,** Dantzer R, Kelley KW, (2000) *Ann. N. Y. Acad. Sci.* Tumor necrosis factor-alpha induces neuronal death by silencing survival signals generated by the type I insulin-like growth factor receptor. 917, 210-20.

**Venters HD,** Dantzer R, Kelley KW, (2000) *Trends. Neurosci.* A new concept in neurodegeneration: TNFalpha is a silencer of survival signals. 23, 175-80.

**Venters HD,** Tang Q, Liu Q, VanHoy RW, Dantzer R, Kelley KW, (1999) *Proc. Natl. Acad. Sci. USA.* A new mechanism of neurodegeneration: A proinflammatory cytokine inhibits receptor signaling by a survival peptide, 96, 9879-9884.

**Venters HD,** Ala TA, Frey WH 2nd , (1998) Inhibition of antagonist binding to human brain muscarinic receptor by vanadium compounds. *Recept. Signal. Transduct.* 7, 137-142.

**Venters HD,** Tang Q, Liu Q, VanHoy RW, Dantzer R, Kelley KW, (1999) *Proc. Natl. Acad. Sci. USA.* A new mechanism of neurodegeneration: A proinflammatory cytokine inhibits receptor signaling by a survival peptide, 96, 9879-9884.

**Venters HD,** Ala TA, Frey WH 2nd , (1998) Inhibition of antagonist binding to human brain muscarinic receptor by vanadium compounds. *Recept. Signal. Transduct.* 7, 137-142**.**

**Venters HD,** Bonilla LE, Jensen T, Garner HP, Bordayo EZ, Najarian MM, Ala TA, Mason RP, Frey WH 2nd, (1997) Heme from Alzheimer's brain inhibits muscarinic receptor binding via thiyl radical generation. *Brain. Res.* 764, 93-100.

EXHIBIT A

Kjome JR, Swenson KA, Johnson MN, Bordayo EZ, Anderson LE, Klevan LC, Fraticelli AI, Aldrich SL, Fawcett JR, **Venters HD**, Ala TA, Frey WH 2nd (1997) Inhibition of antagonist and agonist binding to the human brain muscarinic receptor by arachidonic acid. *J. Mol. Neurosci.* 10, 209-217.

## *Honors and Presentations (past 10 years)*

**Keynote Address**, Academic Correctional Health Conference, April 2020, Chapel Hill, North Carolina.

**TedMed Presentation**, Correctional Health, Boston MA, March 2020.

**Finalist, Prose Award for Literature**, Social Sciences category for *Life and Death in Rikers Island*, February, 2020.

**Keynote Address,** John Howard Association Annual Benefit, November 2019, Chicago IL.

**Keynote Address,** Kentucky Data Forum, Foundation for a Healthy Kentucky, November 2019, Cincinnati Ohio.

**Oral Presentation,** Dual loyalty and other human rights concerns for physicians in jails an prisons. Association of Correctional Physicians, Annual meeting. 10/16, Las Vegas.

**Oral Presentation,** Clinical Alternatives to Punitive Segregation: Reducing self-harm for incarcerated patients with mental illness. American Public Health Association Annual Meeting, November 2015, Chicago IL.

**Oral Presentation,** Analysis of Deaths in ICE Custody over 10 Years . American Public Health Association Annual Meeting, November 2015, Chicago IL.

**Oral Presentation,** Medication Assisted Therapies for Opioid Dependence in the New York City Jail System. American Public Health Association Annual Meeting, November 2015, Chicago IL.

**Oral Presentation,** Pathologizing Normal Human Behavior: Violence and Solitary Confinement in an Urban Jail. American Public Health Association Annual Meeting, November 2014, New Orleans, LA.

**Training,** International Committee of the Red Cross and Red Crescent, Medical Director meeting 10/15, Presentation on Human Rights and dual loyalty in correctional health.

**Paper of the Year,** American Public Health Association. 2014. (Kaba F, Lewis A, Glowa-Kollisch S, Hadler J, Lee D, Alper H, Selling D, MacDonald R, Solimo A, Parsons A, Venters H. Solitary Confinement and Risk of Self-Harm Among Jail Inmates. *Amer J Public Health*. 2014. Vol 104(3):442-7.)

**Oral Presentation,** Pathologizing Normal Human Behavior: Violence and Solitary Confinement in an Urban Jail. *American Public Health Association* Annual Meeting, New Orleans LA, 2014.

**Oral Presentation,** Human rights at Rikers: Dual loyalty among jail health staff. American Public Health Association Annual Meeting, New Orleans LA, 2014.

**Poster Presentation**, Mental Health Training for Immigration Judges. American Public Health

EXHIBIT A

Association Annual Meeting, New Orleans LA, 2014.

**Distinguished Service Award;** Managerial Excellence. Division of Health Care Access and Improvement, NYC DOHMH. 2013.

**Oral Presentation,** Solitary confinement in the ICE detention system. American Public Health Association Annual Meeting, Boston MA, 2013.

**Oral Presentation**, Self-harm and solitary confinement in the NYC jail system. American Public Health Association Annual Meeting, Boston MA, 2013.

**Oral Presentation**, Implementing a human rights practice of medicine inside New York City jails. American Public Health Association Annual Meeting, Boston MA, 2013.

**Poster Presentation,** Human Rights on Rikers: integrating a human rights-based framework for healthcare into NYC's jail system. *American Public Health Association* Annual Meeting, Boston MA, 2013.

**Poster Presentation**, Improving correctional health care: health information exchange and the affordable care act. *American Public Health Association* Annual Meeting, Boston MA, 2013.

**Oral Presentation**, Management of Infectious Disease Outbreaks in a Large Jail System. American Public Health Association Annual Meeting, Washington DC, 2011.

**Oral Presentation,** Diversion of Patients from Court Ordered Mental Health Treatment to Immigration Detention. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation**, Initiation of Antiretroviral Therapy for Newly Diagnosed HIV Patients in the NYC Jail System. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation,** Medical Case Management in Jail Mental Health Units. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation**, Injury Surveillance in New York City Jails. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation,** Ensuring Adequate Medical Care for Detained Immigrants. Venters H, Keller A, American Public Health Association Annual Meeting, Denver, CO, 2010.

**Oral Presentation,** HIV Testing in NYC Correctional Facilities. Venters H and Jaffer M, *American Public Health Association,* Annual Meeting, Denver, CO, 2010.

**Oral Presentation,** Medical Concerns for Detained Immigrants. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Oral Presentation,** Growth of Immigration Detention Around the Globe. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Oral Presentation,** Role of Hospital Ethics Boards in the Care of Immigration Detainees. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA,

EXHIBIT A

November 2009.

**Oral Presentation,** Health Law and Immigration Detainees. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Bro Bono Advocacy Award,** Advocacy on behalf of detained immigrants. Legal Aid Society of New York, October 2009.

**Oral Presentation,** Deaths of immigrants detained by Immigration and Customs Enforcement. Venters H, Rasmussen A, Keller A, *American Public Health Association* Annual Meeting, San Diego CA, October 2008.

**Poster Presentation,** Death of a detained immigrant with AIDS after withholding of prophylactic Dapsone. Venters H, Rasmussen A, Keller A, *Society of General Internal Medicine* Annual Meeting, Pittsburgh PA, April 2008.

**Poster Presentation,** Tuberculosis screening among immigrants in New York City reveals higher rates of positive tuberculosis tests and less health insurance among African immigrants. *Society of General Internal Medicine* Annual Meeting, Pittsburgh PA, April 2008.

**Daniel Leicht Award for Achievement in Social Medicine,** Montefiore Medical Center, Department of Family and Social Medicine, 2007.

**Poster Presentation**, Case Findings of Recent Arestees. Venters H, Deluca J, Drucker E. *Society of General Internal Medicine* Annual Meeting, Toronto Canada, April 2007.

**Poster Presentation,** Bringing Primary Care to Legal Aid in the Bronx. Venters H, Deluca J, Drucker E. *Society of General Internal Medicine* Annual Meeting, Los Angeles CA, April 2006.

**Poster Presentation**, A Missed Opportunity, Diagnosing Multiple Myeloma in the Elderly Hospital Patient. Venters H, Green E., *Society of General Internal Medicine* Annual Meeting, New Orleans LA, April 2005.

## *Grants: Program*

San Diego County: Review of jail best practices (COCHS), 1/2020, $90,000.

Ryan White Part A - Prison Release Services (PRS). From HHS/HRSA to Correctional Health Services (NYC DOHMH), 3/1/16-2/28/17 (Renewed since 2007). Annual budget $ 2.7 million.

Ryan White Part A - Early Intervention Services- Priority Population Testing. From HHS/HRSA to Correctional Health Services (NYC DOHMH), 3/1/16-2/28/18 (Renewed since 2013). Annual budget $250,000.

Comprehensive HIV Prevention. From HHS to Correctional Health Services (NYC DOHMH), 1/1/16-12/31/16. Annual budget $500,000.

HIV/AIDS Initiative for Minority Men. From HHS Office of Minority Health to Correctional Health Services (NYC DOHMH), 9/30/14-8/31/17. Annual budget $375,000.

EXHIBIT A

SPNS Workforce Initiative, From HRSA SPNS to Correctional Health Services (NYC DOHMH), 8/1/14-7/31/18. Annual budget $280,000.

SPNS Culturally Appropriate Interventions. From HRSA SPNS to Correctional Health Services (NYC DOHMH), 9/1/13-8/31/18. Annual budget $290,000.

Residential substance abuse treatment. From New York State Division of Criminal Justice Services to Correctional Health Services (NYC DOHMH), 1/1/11-12/31/17. Annual budget $175,000.

Community Action for Pre-Natal Care (CAPC). From NY State Department of Health AIDS Institute to Correctional Health Services (NYC DOHMH), 1/1/05-12/31/10. Annual budget $290,000.

Point of Service Testing. From MAC/AIDS, Elton John and Robin Hood Foundations to Correctional Health Services (NYC DOHMH), 11/1/09-10/31/12. Annual budget $100,000.

Mental Health Collaboration Grant. From USDOJ to Correctional Health Services (NYC DOHMH), 1/1/11-9/30/13. Annual budget $250,000.

## *Teaching*

**Instructor,** Health in Prisons Course, Bloomberg School of Public Health, Johns Hopkins University, June 2015, June 2014, April 2019.

**Instructor**, Albert Einstein College of Medicine/Montefiore Social Medicine Program Yearly lectures on Data-driven human rights, 2007-present.

## *Other Health & Human Rights Activities*

**DIGNITY Danish Institute Against Torture**, Symposium with Egyptian correctional health staff regarding dual loyalty and data-driven human rights. Cairo Egypt, September 20-23, 2014.

**Doctors of the World,** Physician evaluating survivors of torture, writing affidavits for asylum hearings, with testimony as needed, 7/05-11/18.

**United States Peace Corps**, Guinea Worm Educator, Togo West Africa, June 1990- December 1991.
> -*Primary Project;* Draconculiasis Eradication. Activities included assessing levels of infection in 8 rural villages and giving prevention presentations to mothers in Ewe and French
> -*Secondary Project;* Malaria Prevention.

## *Books*

**Venters H.** *Life and Death in Rikers Island*. Johns Hopkins University Press. 2/19.

## *Chapters in Books*

**Venters H.** Mythbusting Solitary Confinement in Jail. In Solitary Confinement Effects, Practices, and Pathways toward Reform. Oxford University Press, 2020.

EXHIBIT A

\#

\#

MacDonald R. and **Venters H.** Correctional Health and Decarceration. In Decarceration. Ernest Drucker, New Press, 2017.


*Membership in Professional Organizations*
**American Public Health Association**


*Foreign Language Proficiency*

**French**     Proficient
**Ewe**        Conversant

#

#

## *Prior Testimony and Deposition*

Benjamin v. Horn, 75 Civ. 3073 (HB) (S.D.N.Y.) as expert for defendants, 2015

Rodgers v. Martin 2:16-cv-00216 (U.S.D.C. N.D.Tx) as expert for plaintiffs, 10/19/17

Fikes v. Abernathy, 2017 7:16-cv-00843-LSC (U.S.D.C. N.D.AL) as expert for plaintiffs 10/30/17.

Fernandez v. City of New York, 17-CV-02431 (GHW)(SN) (S.D.NY) as defendant in role as City Employee 4/10/18.

Charleston v. Corizon Health INC, 17-3039 (U.S.D.C. E.D. PA) as expert for plaintiffs 4/20/18.

Gambler v. Santa Fe County, 1:17-cv-00617 (WJ/KK) as expert for plaintiffs 7/23/18.

Hammonds v. Dekalb County AL, CASE NO.: 4:16-cv-01558-KOB as expert for plaintiffs 11/30/2018.

Mathiason v. Rio Arriba County NM, No. D-117-CV-2007-00054, as expert for plaintiff 2/7/19.

Hutchinson v. Bates et. al. AL, No. 2:17-CV-00185-WKW- GMB, as expert for plaintiff 3/27/19.

Lewis v. East Baton Rouge Parish Prison LA, No. 3:16-CV-352-JWD-RLB, as expert for plaintiff 6/24/19.

Belcher v. Lopinto, No No. 2:2018cv07368 - Document 36 (E.D. La. 2019) as expert for plaintiffs 12/5/2019.


## Fee Schedule

Case review, reports, testimony $500/hour.
Site visits and other travel, $2,500 per day (not including travel costs).


EXHIBIT A