UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-21553-CIV-COOKE

PATRICK GAYLE, et al.,

       Petitioners/Plaintiffs,

vs.

MICHAEL W. MEADE,
Field Office Director, Miami Field
Office, U.S. Immigration and
Customs Enforcement, et al.,

       Respondents/Defendants.
_____/

DEFENDANTS' RESPONSE AND OPPOSITION TO PETITIONERS'
EMERGENCY MOTION FOR PRELIMINARY INJUNCTION

Defendants, by and through their undersigned counsel, file their Response and Opposition to Petitioners' Emergency Motion for Preliminary Injunction, and state:

I.    INTRODUCTION

Petitioners are detainees in the custody of U.S. Immigration and Customs Enforcement, at three separate locations: (1) Krome Detention Center, Miami, Florida; (2) Broward Transitional Center, Pompano Beach, Florida; and (3) Glades County Detention Center, Moore Haven, Florida.[1] Petitioners allege that ICE has failed to take adequate measures to prevent them from being infected with the COVID 19 virus, and this entitles them to be released from detention. Respondents dispute petitioners' assertions, as detention staff at Krome, Broward Transitional Center, and Glades Detention Center have implemented reasonable measures to

---

[1] Glades County Detention Center is located in Moore Haven, Florida, which is in the Middle District of Florida. For this reason, this Court lacks jurisdiction to review any claim regarding the adequacy of the conditions of confinement at Glades County Detention Center. Rumsfeld v. Padilla, 542 U.S. 426, 434-37 (2004)

minimize the risk of transmission of the COVID-19 virus.

Petitioners have not demonstrated a substantial likelihood of prevailing in their claim that respondents are deliberately indifferent to their serious medical needs, which is the standard applicable to the care owed by a custodian to a detainee under the Fifth Amendment. Consequently, petitioners' motion for preliminary injunction should be denied.

> II. DEFENDANTS ARE PROVIDING ADEQUATE MEDICAL CARE TO DETAINEES AT KROME, BROWARD TRANSITIONAL CENTER, AND GLADES DETENTION FACILITY

In Hamm v. DeKalb County, 774 F.2d 1567 (11th Cir. 1985), the Eleventh Circuit held that "in regard to providing pretrial detainees with such basic necessities as food, living space, and medical care the minimum standard allowed by the due process clause is the same as that allowed by the eighth amendment for convicted persons." Id. at 1574. Applying the Eighth Amendment standard to a claim of inadequate medical care, the appellate court observed that, "[t]o recover on his claim of inadequate medical care, Hamm had to prove that jail officials engaged in 'acts or omissions sufficiently harmful to evidence deliberate indifference to [his] serious medical needs.'" Id. at 1574-75, citing Estelle v. Gamble, 429 U.S. 97, 106 (1976).

In Estelle, the Supreme Court found that deliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain." 97 S.Ct. at 291. In the medical context, the Court found that an inadvertent failure to provide adequate medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind."

> Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions

>sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment.  Id. (footnote omitted).

In Farmer v. Brennan, 511 U.S. 825, 114 S.Ct. 1970 (1994), the Supreme Court defined "deliberate indifference" as requiring that the prison official be subjectively aware of the risk in order to violate the Eighth Amendment:

>We hold instead that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety;  the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

114 S.Ct. at 1979.

### A.    Krome Service Processing Center

As of April 16, 2020, at 12:00 noon, there are two detainees at Krome with a laboratory-confirmed case of COVID-19. Declaration of Liana J. Castano, Acting Officer in Charge, D.E. 33-1 at 4, ¶ 15(a). Both are medically isolated pursuant to Center for Disease Control (CDC) guidelines. One detainee was previously admitted to the community hospital and was discharged to Krome. There have been no transfers of detainees with laboratory confirmed cases of COVID-19. Id. Twenty detainees have been tested at Krome for COVID-19.

There are four (4) staff members at Krome with a laboratory confirmed case of COVID-19. D.E. 33-1 at 4, ¶ 15(b).[2] They have been removed from the work schedule and are following CDC quarantine guidelines. Id.

There are three (3) groups of detainees at Krome subject to cohorting, due to the

---

[2] Subsequent to the filing of Ms Castano's Declaration in this case, a fourth staff member was identified as testing positive for COVID-19.

identification of a staff member who tested positive for COVID-19. D.E. 33-1 at 5, ¶ 15(c). The three cohort groups are located in: (1) Building 11 (104 detainees), which contains 3,900 square feet of living space, to include the dormitory, showers and toilets, and a common day room, which includes television, detainee phones, and tablets; (2) POD 2 (62 detainees), which contains 2,265 square feet of living space, to include the dormitory, showers and toilets, and a common day room; and (3) Krome Behavioral Health Unit (15 detainees), is a 15, 400 square foot area consisting of a nurses' station, common area day room, group therapy rooms, two dormitory areas which include television, detainee phones, and tablets. D.E. 33-1 at 5, ¶¶ 15(c) and (d).

Housing units under cohort status are monitored daily and issued surgical masks. The Immigration Health Services Corps (IHSC) performs daily dormitory rounds in housing units under cohort status. Id., ¶ 15(e). A nurse visits the housing unit daily, and provides education regarding proper hygiene, to include hand washing. Information is provided to detainees on procedures in place for health care and the sick call process. The medical staff also assess detainees for individuals reporting symptoms, and those individuals are referred to the clinic for evaluation. If a detainee has symptoms that are suspicious for COVID-19, a surgical mask is placed on the detainee's face and he is placed in isolation, pending further testing to rule out non-COVID-19 infection, such as influenza, and/or referral to the emergency department for further evaluation and testing.

To date, all detainees subject to cohorting are asymptomatic for COVID-19. D.E. 33-1 at 5, ¶ 15(d).

Each detainee is screened for disabilities upon admission by a medical professional. D.E. 33-1, ¶ 8. A detainee's temperature is taken and he is screened for respiratory illnesses. Detainees are asked if they have had close contact with a person with laboratory-confirmed

COVID-19 in the past 14 days. Id., ¶ 9. Detainees who present with symptoms compatible with COVID-19 will immediately be transported off-site to a local hospital for further evaluation and testing. If the testing is positive, the detainee will remain isolated and treated.

In cases of known exposure to a person with confirmed COVID-19, asymptomatic detainees are placed in cohorts with restricted movement for the duration of the most recent incubation period (14 days after the most recent exposure to an ill detainee) and are monitored daily.

The Krome Detention Center is within its approved capacity and is not overcrowded. D.E. 33-1 at 6, ¶ 16.

B.      Glades County Detention Center

As of 12:00 noon, April 16, 2020, there are no confirmed cases of COVID-19 at Glades County Detention Center, and no detainee is subject to cohorting. D.E. 33-1 at 4, ¶ 14. Further, there are no staff members at Glades who have tested positive for COVID-19. Id.

C.      Broward Transitional Center

As of 11:00 a.m., April 16, 2020, Broward Transitional Center has no suspected cases of COVID-19. Declaration of Juan A. Lopez-Vega, D.E. 30-1 at ¶ 14. Further, there are no confirmed cases of COVID-19 at the Broward Transitional Center, nor are there any detainees cohorted for exhibiting symptoms of COVID-19. There are two detainees who are cohorted as a precautionary measure, after they returned from a hospital stay for non-COVID-19 issues. These two detainees are medically assessed twice a day. They are housed by themselves with no other detainees in the room.

Also, there are no GEO Group or ICE staff members who have tested positive for COVID-19 at the Broward Transitional Center. Id.

ICE has taken action at Broward Transitional Center to reduce the detainee population. D.E. 30-1 at 6, ¶ 23. Detainees at high risk for COVID-19, and those with chronic conditions, are identified by ICE and GEO Group. All detainees 60 years of age and older have been released from the Broward Transitional Center. Id. Further, the detention population has been reduced by 35 per cent, in accordance with ICE's guidance of April 10, 2020, to facilitate social distancing to mitigate the spread of COVID-19. Id.

### III. PETITIONERS' MOTION FOR PRELIMINARY INJUNCTION SHOULD BE DENIED

Petitioners seek a preliminary injunction from this Court, ordering their release and the release of similarly situated detainees. D.E. 1 at 108. In order to obtain preliminary injunctive relief, petitioners must show: (1) a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest. Callahan v. U.S. Dept. Of Health & Human Svcs., 939 F.3d 1251, 1257 (11th Cir. 2019), citing McDonald's Corp. v. Robertson, 147 F.3d 1301, 1306 (11th Cir. 1998). Moreover, because a preliminary injunction "is an extraordinary and drastic remedy," relief may not be granted "unless the movant clearly established the burden of persuasion as to the four requisites." Id. (internal quotation marks and citation omitted).

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." University of Texas v. Camenisch, 451 U.S. 390, 395 (1981). "The chief function of a preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated." Suntrust Bank v. Houghton Mifflin Co., 268 F.3d 1257, 1265 (11th Cir. 2001)(citation omitted). In this case, the

preliminary injunctive relief petitioners seek – release from detention – goes well beyond preserving the status quo.  Indeed, what petitioners ask for is the complete relief that they would only be entitled to after a full adjudication of the merits of their claims.  This is well beyond the scope of a preliminary injunction.  "The purpose of a preliminary injunction is not to give the plaintiff the ultimate relief it seeks."  Warnervision Entertainment Inc. v. Empire of Carolina, Inc., 101 F.3d 259, 261 (2nd Cir. 1996).  Since the remedy petitioners seek is beyond what preliminary injunctive relief is meant to address, petitioners' motion should be denied.

      A.      Petitioners Have Failed to Establish a Substantial Likelihood of Success on the Merits of Any of their Three Claims

In Count One, petitioners claim defendants have not followed the National Detention Standards in a variety of ways, relying upon declarations signed by petitioners.  D.E. 1 at 98-104.  In Count Two, petitioners allege a violation of the Fifth Amendment, which is a deliberate indifference claim.  D.E. 1 at 104-105.  In Count Three, petitioners allege a separate claim under the Fifth Amendment under the state created danger doctrine.  D.E. 1 at 105-107.

Defendants have provided declarations explaining the screening procedures for new detainees; the medical capabilities at all three facilities; the testing capabilities, confirmed cases, and cohort information at each facility; the frequency of sanitation and the provision of sanitation supplies at each facility; the personal protective equipment for staff and attorney visitation, as well as the suspension of social visits at each facility to prevent exposure; the measures to screen all detainees and educate them on COVID-19; the physical plant where detainees are housed at each facility, to include the space between detainees' beds; the number of toilets and the average distance between them; where meals are served and the average space between dayroom tables; the number of showers available and the space between them; when showers may be taken by detainees; and the efforts implemented at reducing the detainee population.  D.E. 33-1,

Declaration of Liana J. Castano, D.E. 30-1; Declaration of Juan A. Lopez Vega; D.E. 30-2, Declaration of Supervisory Detention and Deportation Officer Paul J. Swartz.[3]

These declarations establish that defendants are in substantial compliance with the National Detention Standards. The Coronavirus Pandemic has challenged all institutions, to include federal, state and local governments; the court system; the medical care establishment; as well as all aspects of industry and commerce, worldwide. DHS and ICE have followed their National Detention Standards, making adjustments where required by circumstances, in order to provide a reasonably safe environment for detained individuals in their custody.

Petitioners have failed to demonstrate a substantial likelihood of success on their claim of inadequate medical care because they cannot show defendants have been deliberately indifference to their serious medical needs. DHS and ICE, relying upon CDC Guidance, have implemented measures to minimize the risk of a detainee contracting COVID-19. These measures include screening of detainees coming into the three facilities; education of detainees on hygiene and social distancing; isolation and monitoring of detainees whom may have had contact with an infected individual; cleaning and sanitizing the physical plant of the detention facilities; and prompt medical intervention when there is reason to believe a detainee may have contracted COVID-19. A detainee's contacts with persons from outside the detention facility have been limited due to the potential for infection. Visitation with relatives, an important morale program in any penal institution, was curtailed early on. Noncontact professional visits are encouraged at Krome, but if an attorney wants to meet in-person with a detainee, the attorney is required to wear personal protective equipment. Castano Decl., D.E. 33-1 at 6, ¶ 19.

---

[3] Deportation Officer Swartz's declaration was filed in response to the Court's inquiry on whether any of the 34 petitioners have been transferred since the filing of the habeas petition. None of the 34 petitioners has been transferred. D.E. 30-2, ¶ 4.

In Keohane v. Fla. Dept. of Corrections Secretary, 952 F.3d 1257 (11th Cir. 2020), the Eleventh Circuit noted that, "[w]e have held, for instance, that the Constitution doesn't require that the medical care provided to prisoners be 'perfect, the best obtainable, or even very good.'" Id. at 1266, citing Harris v. Thigpen, 941 F.2d 1495, 1510 (11th Cir. 1991). Instead, "[m]edical treatment violates the [E]ighth [A]mendment only when it is so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Id. at 1505.

In this case, petitioners have provided declarations from Dr. Shin and Dr. Greer, expressing their opinions on the measures taken by ICE and DHS regarding prevention of COVID-19 infection to detainees. Those opinions do not demonstrate deliberate indifference to petitioners' serious medical needs since "a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment [fails to] support a claim of cruel and unusual punishment." Keohane, 952 F.3d at 1266 (citations omitted).

Petitioners also claim they are entitled to release under the state-created danger doctrine. D.E. 1 at 105. In Perez-Guerrero v. U.S. Atty General, 717 F.3d 1224 (11th Cir. 2013), the Eleventh Circuit explained that "only custodial relationships automatically give rise to a governmental duty, under substantive due process, to protect persons from harm by third parties." Id. at 1233, citing Doe v. Braddy, 673 F.3d 1313, 1318 (11th Cir. 2012). Defendants agree that petitioners are in a custodial relationship, but the COVID-19 virus is not a third party. The cases in which individuals invoked the state created danger doctrine involved harm caused by individuals, not a communicable disease. White v. Lemacks, 183 F.3d 1253 (11th Cir. 1999)(nurse working in prison infirmary assaulted by inmate); Perez-Guerrero (alien claimed life would be threatened if deported to Mexico due to reprisals by persons he testified against in

9

United States); and Doe v. Braddy (five-year old child sexually assaulted by teenaged minor placed by state social workers in adoptive home). Inasmuch as the coronavirus is not a third party, petitioners cannot claim a substantive due process right to protection from it.

      B.      The Public Interest Does Not Favor Granting Injunctive Relief

Petitioners are aliens who are in various stages of their removal proceedings under the Immigration and Nationality Act. "U.S. Immigration law authorizes the Government to detain certain aliens seeking admission into the country under [8 U.S.C.] §§ 1225(b)(1) and (b)(2). It also authorizes the Government to detain certain aliens already in the country pending the outcome of removal proceedings under §§ 1226(a) and (c)." Jennings v. Rodriguez, 138 S.Ct. 830, 838 (2018). Under this authority granted by Congress, the DHS and ICE have determined that petitioners should be detained pending the outcome of their proceedings.

Aside from their claims of inadequate medical care, petitioners do not challenge the lawfulness of their detention. In Demore v. Kim, 538 U.S. 510 (2003), the Supreme Court observed, "this Court has recognized detention during deportation proceedings as a constitutionally valid aspect of the deportation process." Id. at 523. ICE has considered factors such as risk of flight and danger to the community in its decision to detain the petitioners. These judgments are entrusted to DHS and ICE through the INA, so those agencies can exercise their judgment to protect the public.

Granting an injunction ordering petitioners' release would disserve the public interest. Petitioners assail the measures implemented by ICE at Krome, Broward Transitional Center, and Glades County Detention Center, to minimize exposure to COVID-19. They claim defendants "violate CDC Guidelines by refusing to release people and instead keeping them confined in close sleeping, eating, and living quarters at Krome, Glades, and BTC. Further, because

10

Respondents can and should release Petitioners and those similarly situated, 'cohort quarantine' is not the only 'available option.'" D.E. 1 at 101-102, ¶ 331.

The Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities (March 23, 2020)(CDC Guidelines), recognizes the unique challenges posed by housing many people in a single physical setting. CDC Guidelines at 2-3. In recognition of the many differing conditions existing at correctional and detention facilities, the CDC states:

> **The guidance may need to be adapted based on individual facilities' physical space, staffing, population, operations, and other resources and conditions.**

CDC Guidelines at 1 (emphasis in original). The CDC clearly recognized that detention center administrators and health care professionals would need to exercise their judgment in applying the Guidelines to their facility.

For every alleged deficiency petitioners identify, they claim the Government has an "available option," which is to release them. CDC health care professionals expended tremendous time and effort in preparing a 26-page, single-spaced guidance, to assist detention center administrators and staff in implementing measures to minimize the risk of infection, and to manage those who are suspected of being infected. Plainly, the CDC understood that releasing a detainee is not the sole "available option." Instead, the judgment as to whether a detainee should be released rests in the hands of those administering the detention facility, and those officials must balance the risk of infection or potential harm to a detainee with the public interest in detaining the individual. Those judgments should remain in the hands of those entrusted by Congress to make them, the DHS and ICE. Consequently, the motion for preliminary injunction should be denied.

## IV. THE REMEDY FOR INADEQUATE MEDICAL CARE IS NOT RELEASE FROM DETENTION

Petitioners are aliens who are in various stages of removal proceedings under the Immigration and Nationality Act. They are lawfully detained by ICE pursuant to authority granted by Congress in 8 U.S.C. §§ 1225, 1226, or 1231. Petitioners seek an injunction from this Court, requiring ICE to release them from detention, because ICE is allegedly not providing adequate medical care sufficient to prevent them from being infected with the COVID 19 virus. Defendants dispute petitioners' claim of inadequate medical care, but even if the medical care was found to be inadequate, the remedy would not be to order release from detention.

In Gomez v. United States, 899 F.2d 1124 (11th Cir. 1990), plaintiff Gomez, a convicted criminal, filed a habeas petition, claiming he had AIDS, and was not receiving adequate treatment for his medical condition. Id. at 1125. The district court ordered Gomez released pending final resolution of the habeas claim, finding that the treatment of Stage IV AIDS at the Metropolitan Correctional Center was inadequate. On appeal, the Eleventh Circuit reversed, observing that, "[t]he district court apparently overlooked the fact that even if Gomez prevails on his habeas corpus petition, he would not be entitled to be released from prison." Id.

The appellate court noted that, "even if a prisoner proves an allegation of mistreatment in prison that amounts to cruel and unusual punishment, he is not entitled to release." Id. at 1126, citing Cook v. Hanberry, 596 F.2d 658, 660 (5th Cir. 1979). Further, the Court stated, "[t]he appropriate Eleventh Circuit relief from prison conditions that violate the Eighth Amendment during legal incarceration is to require the discontinuance of any improper practices, or to require correction of any condition causing cruel and unusual punishment." Id., citing Cook, 596 F.2d at 660. As to Gomez's claim of inadequate medical treatment, the Court found:

> Assuming arguendo that his allegations of mistreatment

12

>demonstrate cruel and unusual punishment, the petitioner still would not be entitled to release from prison.  The appropriate remedy would be to enjoin continuance of any practices or require correction of any conditions causing him cruel and unusual punishment.  Id. at 1126 (citations omitted).

In the specific context of Gomez's inadequate medical care claim, the Eleventh Circuit observed that, "[i]f Gomez proves his claim of cruel and unusual punishment because of medical treatment, the most relief that he could obtain would be an injunction against practices that are in violation of the Eighth Amendment, or a mandatory injunction to bring his treatment up to constitutional standards."  Id. at 1126-27.

One other aspect of Gomez applies to this case.  The Eleventh Circuit found that granting bail to Gomez pending consideration of his habeas petition "gave Gomez more relief on a preliminary basis that he would be entitled to if he ultimately prevails on his constitutional claims."  Id. at 1127.  This is precisely what petitioners seek in this case, and is relief to which they are not entitled, even if they could demonstrate the medical care was inadequate under the Constitution.

## CONCLUSION

Petitioners have failed to establish a likelihood of success on the merits of their claims of inadequate medical care.  The public interest would be disserved by granting injunctive relief.  Therefore, petitioners' motion for preliminary injunction should be denied.

DATED: April 17, 2020

Respectfully submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

By: s/ Dexter A. Lee
DEXTER A. LEE
Assistant U.S. Attorney
Fla. Bar No. 0936693
99 N.E. 4th Street, Suite 300

Miami, Florida 33132
(305) 961-9320
Fax: (305) 530-7139
E-mail: dexter.lee@usdoj.gov

s/Natalie Diaz
NATALIE DIAZ
ASSISTANT U.S. ATTORNEY
Florida Bar No. 85834
E-mail: Natalie.Diaz@usdoj.gov
99 N.E. 4th Street, Suite 300
Miami, Florida 33132
Telephone: (305) 961-9306

ATTORNEYS FOR DEFENDANTS

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 17, 2020, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

　　s/ Dexter A. Lee
DEXTER A. LEE
Assistant U.S. Attorney