UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 20-21553-COOKE/GOODMAN

PATRICK GAYLE, et al.,

      Plaintiffs,

v.

MICHAEL W. MEADE, et al.,

      Defendants.

_____/

**REPORT AND RECOMMENDATIONS ON EMERGENCY MOTION
FOR INJUNCTIVE RELIEF**

**I.    Introduction and Summary of Recommendations**

In an ideal world, all federal, state and local governments would operate prisons, jails and detention facilities in a way which could immediately and comprehensively address and resolve all potential health risks associated with the COVID-19 pandemic.

Focusing on the three South Florida federal immigration detention facilities at issue in this lawsuit, an ideal world would be one where (1) all beds, tables, chairs, toilets, and showers were more than six feet apart; (2) all detainees, guards, and other staffers would be issued surgical masks and gloves, replaced daily; (3) sinks used by detainees would not have any limits on the amount of water which passes through a faucet; (4) all detainees, guards, and detention center employees would be tested for COVID-19; (5) the

results of those tests would be provided the very same day they were taken; (6) high-risk detainees would be easily identified; and (7) those detainees who were exposed to someone with COVID-19 would each be quarantined in a separate and isolated room (as opposed to being placed in "cohorts" with similarly-situated detainees).

We do not, of course, live in an ideal world.

Far from it.

Which brings us to this lawsuit.

Petitioners are 34 immigration detainees housed in three federal immigration detention centers in Florida: the Krome Detention Center in Miami (a/k/a Krome Service Processing Center), the Broward Transitional Center in Pompano Beach, and the Glades County Detention Center in Moore Haven. The Petition (for a writ of habeas corpus) is 106 pages, with a 446-page Appendix and two single-spaced doctor declarations (totaling 16 pages). [ECF No. 1]. Petitioners bring the action as a purported class action, on behalf of themselves and all other detainees in the three detention centers. Nineteen of the Petitioners are at Krome, eight are in Broward, and seven are in Glades. As of April 20, 2020, when Defendants filed a Court-ordered census [ECF No. 48], there were 1,440 detainees in the three centers.

The proposed class also includes all immigration detainees "who will be held" at the three facilities.

At bottom, Petitioners claim that they are at imminent risk of contracting the

Coronavirus 2019 ("COVID-19") because their detention renders them unable to follow the Center for Disease Control and Prevention's ("CDC") guidelines. They allege that there is "currently no way" for the three centers to comply with the CDC's guidelines on social distancing and quarantining. [ECF No. 1, p. 9].

They say that (1) each facility "holds individuals in close proximity"; (2) people are less than six feet away from each other when they sleep, eat, and use common areas; (3) "it is impossible for Petitioners to protect themselves from infection through social distancing and vigilant hygiene – the only known mitigation measures"; (4) groups of individuals are "herded together in 'cohort quarantine' because they have been exposed" to others who might have COVID-19 symptoms; and (5) "cohort quarantines drastically increase the possibility of transmission, infection, and facility-wide outbreak by grouping together people who have already been exposed to the virus." [ECF No. 1, pp. 9-10].

Along with their Petition, Petitioners also filed a 74-page emergency motion for both a temporary restraining order and a preliminary injunction (the "TRO motion"). [ECF No. 4].

The TRO motion seeks an order against Respondents (Michael W. Meade, the Field Director for the Miami Field Office of Immigration and Customs Enforcement ("ICE"), and U.S. Attorney General William P. Barr). Specifically, it seeks to enjoin them from transferring any of the 34 named class members and all other proposed class member to any other detention facility and from transferring any new immigration detainees from

any other center into the three South Florida detention centers.[1]

The preliminary injunction motion seeks the immediate release of all 1,400 detainees in the three centers, to be released on their own recognizance so that they can shelter in place. Alternatively, it seeks the immediate release of all detainees into community-based alternatives, such as conditional release or supervision through electronic monitoring. The release which Petitioners demand includes the release of detainees subject to "mandatory detention," which would include detainees convicted of aggravated felonies, such as narcotics trafficking.

According to defense counsel's comments at a recent hearing, "most" of the Glades detainees are subject to mandatory detention. [ECF No. 43]. He said he was not sure of the percentage of mandatory detainees at the other two facilities, however.

To be sure, the preliminary injunction motion also seeks an order requiring ICE to implement the CDC public health guidance. Nevertheless, Petitioners' counsel unequivocally advised, during a two-and-a-half-hour Zoom hearing on April 17, 2020, that **immediate release** of **all** detainees is the overarching, primary focus of their emergency applications for injunctive relief. [ECF No. 43]. The motion contends that

---

[1]    In an April 20, 2020 Court-required [ECF No. 45] filing [ECF No. 51], Respondents advised that (1) they agree to not transfer any of 34 named petitioners during the pendency of the case as long as the agreement does not include executing a removal order, include transferring a petitioner to a hospital, or include transferring a petitioner's custody to another law enforcement agency upon request of the law enforcement agency; (2) they could not agree to not transfer any other detainee at any of the three facilities; and (3) they could not agree to not accept any new detainee at any of the three facilities.

releasing detained immigrants is "the only viable option to comply with social distancing, individual quarantine and other CDC requirements" and that ICE has "generally refused to release in any meaningful way, in the absence of court intervention." [ECF No. 4, p. 72].

Although Mr. Meade and Attorney General Barr are technically the Respondents, Petitioners' arguments focus on what ICE has (and has not) done about the COVID-19 risks at the three immigration detention centers. Therefore, this Report will often refer to Respondents simply as ICE.

ICE disputes the Petitioners' assertions and contends that they have implemented reasonable measures to minimize the risk that COVID-19 will be transmitted. [ECF No. 40]. The Petition was filed on April 13, 2020, but virtually all of Petitioners' declarations were signed between April 7 and April 10, which was before ICE implemented its April 10, 2020 "Enforcement and Removal Operations Covid-19 Pandemic Response Requirements." [ECF Nos. 7; 8; 30-1, p. 3].

ICE's opposition memorandum, filed on April 17, 2020, also raised legal arguments about the legal viability of Petitioners' claims. [ECF No. 40]. On April 16, 2020, ICE also submitted declarations which gave information about the number of COVID-19-infected detainees and staffers at the facilities and the specific measures being taken to prevent further transmission of the virus. [ECF No. 30].

United States District Judge Marcia G. Cooke referred Petitioners' motion for an

emergency hearing and motion for a TRO/preliminary injunction to the Undersigned on April 14, 2020. [ECF No. 14].

For the reasons outlined in greater detail below, the Undersigned **respectfully recommends** that Judge Cooke **grant in part and deny in part** (but without prejudice) the motion for a TRO/preliminary injunction. Specifically, the Undersigned recommends the following rulings and measures:

1.      The Court <u>not</u> immediately **order** the release of all (or even some) detainees, estimated to be approximately 1,400. Although the law is different in some circuits, the law in the Eleventh Circuit (which comprises federal courts in Florida, Georgia, and Alabama) does not permit a detained person to pursue a habeas corpus remedy of being released from custody *even if* cruel and unusual punishment were to be established. Instead, in our circuit, the remedy is to discontinue the practice or correct the condition causing the unconstitutional punishment.

2.      Require ICE to accelerate its review of its "Alternatives to Detention" program (or other protocols resulting in detainee release) with the goal of *substantially* increasing the rate and volume of detainees being released from the three facilities -- so that the medically-accepted objective of social distancing becomes feasible (by, for example, spacing out sleeping arrangements so that detainees are not sleeping right over, or immediately next to, other detainees).

3.      Require ICE to make all efforts to comply with its suggested, published

guideline to reduce the population to 75% of capacity at each of the three detention centers within two weeks of an Order approving this Report and Recommendations.

4.     Require ICE to immediately take all reasonable steps to reduce the number of detainees at the three centers to a percentage sufficient to permit social distancing. Because applicable law does not permit a detained person to obtain a release-from-custody Order as a remedy for an unconstitutional incarceration due to jail conditions, the requirement will not order the release of any specific detainee or group of detainees, nor will it mandate the release of any particular number or percentage of detainees at the three centers. Instead, the Order would require ICE to *review* in good faith (and on an expedited basis) all detainees and see who is eligible for release -- and to then promptly release those eligible if ICE exercises its discretion to do so.

Note: To eliminate any confusion, this Report and Recommendations ("R & R"), if adopted by Judge Cooke, does not technically require ICE to actually release anyone, as the law in our circuit does not permit that in these circumstances. It requires ICE to only conduct its own, internal review in a good faith effort to cause the release of a substantial number of detainees. Thus, ICE would not be violating an Order adopting this R & R if it refused or otherwise failed to release detainees at the three centers. That hypothetical result would be horribly disappointing and extremely distressing, and it would undermine the spirit of this R & R. But it would not cause ICE (or the two named Respondents) to be held in contempt of court.

5.      In an effort to prod ICE into releasing far more detainees, require ICE to file with the Court twice-weekly reports (I suggest Tuesday mornings and Friday afternoons) on the number of detainees who were released, with detail about the facility from which they were released and the nature of the detainee released (e.g., in a high-risk category because of age, in a high-risk category because of specific, documented medical condition, etc.).

6.      In a further effort to compel ICE into releasing additional detainees, require ICE to, within 10 days of a Judge Cooke Order adopting this R & R, to file a report disclosing the number of detainees, and at which of the three facilities they are located, who are considered high-risk for serious illness, according to ICE's COVID-19 April 10, 2020 Pandemic Response Requirements ("PRR").[2] Although that PRR list of higher-risk detainees does not include pregnant detainees, this R & R adds that category to the list for the three detention centers at issue.

7.      To encourage ICE to be reasonable and to help the Court evaluate whether ICE is acting in good faith in response to an Order confirming and adopting this R & R, ICE should be required to also submit twice-weekly reports on how many of its detainees, and at which of the three centers they are housed, have no prior criminal convictions and no pending criminal charges.

---

[2]      The medically higher-risk detainees are listed on pages 5 and 6 of the PRR, and they include people 65 years old and older and those with underlying medical conditions.

8.      Likewise, ICE should be required to provide similar reports on the numbers of detainees who are deemed "mandatory detainees."

9.      Direct the parties to agree on a neutral, Court-appointed expert to inspect the three facilities and file a report with opinions on (1) the number of detainees who would need to be released from each facility in order to achieve the most amount of social distancing possible, and (2) whether the protocols required and/or recommended in ICE's PRR are being met. Judge Cooke would determine when the report would be filed and when the inspections would occur.

10.     In the meantime, before the expert report is filed, require ICE to immediately comply, to the extent feasible, with the CDC and ICE guidelines on providing adequate amounts of soap and water and cleaning materials to detainees.

11.     Require ICE to, within two days of a Judge Cooke Order adopting this R & R, provide masks to all detainees exhibiting COVID-19 symptoms and to all detainees being "cohorted," and to replace those masks at least once per week.

12.     Require ICE to provide education and training about measures to reduce the health risks associated with COVID-19 to all staff members and detainees and to make sure that the training and education is provided to any new detainees or employees.

13.     Require ICE to advise the Court, in a filing on CM/ECF, whether it has any plans, even preliminary ones, to modify any of the detention centers, to construct new immigration detention facilities in South Florida or to erect provisional housing, such as

"tent cities," at either existing or new South Florida locations. The reason for this recommended requirement is a response which ICE's attorney made at the hearing when discussing the Eleventh Circuit law prohibiting the habeas corpus remedy of release in connection with a conditions of confinement claim (because the relief would be an order terminating or correcting the practice). Specifically, he proffered that the United States might have to build a new detention facility, including a temporary one like a tent city, to correct an unconstitutional medical/health condition at one or more of the detention centers.

II.   **Factual and Procedural Background**

A.  Keeping Things in Perspective:  These Are *Detention* Facilities

The Undersigned has a great amount of concern for all the detainees at the three immigration detention centers and the fear they are undoubtedly facing every single day in the midst of this horrific and scary pandemic. Their legitimate worry about contracting COVID-19 is real and serious and bone-chilling and should not be minimized in any way.

On the other hand, there are real-world realities about prisons and detention centers which cannot be ignored. The Undersigned also has concern for the staff operating and working at the facilities. They, too, are undoubtedly scared -- for themselves and also for their families, who they see at home when their work shifts are over.

The Undersigned finds persuasive and logical the overview of detention

management provided in *Mays v. Dart*, No. 20 C 2134, 2020 WL 1812381 (N.D. Ill. Apr. 9, 2020). Although that case involved the Cook County Jail in Chicago, the same basic realities of managing prisoners there apply to the oversight of immigration detainees at the three South Florida immigration detention centers. Therefore, the Undersigned will highlight some of the salient points from *Mays*:

- Operating and administering a very large physical prison or detention facility "is an extraordinarily difficult task." *Id.* at *1.

- Operating a jail or immigration detention facility, "even under normal circumstances, is a very challenging task," and "these are not normal circumstances." *Id.*

- Fashioning a public policy and public health response to the COVID-19 pandemic "has challenged government officials across our country and throughout the world, who are facing a crisis unlike any we have faced for decades, and perhaps generations. The task is not less difficult, and no less familiar, for administrators of jails." *Id.*

- The pandemic does not mean that "constitutional protections fall by the wayside" because detention facility administrators "are bound by constitutional requirements even when they are dealing with difficult and unfamiliar challenges to public health and safety." *Id.* at *2.

- "Reducing the spread of the virus is, however, especially challenging in jails and prisons" (and immigration detention facilities). *Id.*

- "[E]stablishing appropriate policies does not fully discharge a detention [facility's manager's] obligations; a policy is only as good as its execution." *Id.* at *9.

- There is "deference owed" to the operator of a jail, prison or detention facility in his "development of internal procedures to maintain safety, order, and security and to respond to this severe crisis." *Id.* at *14.

- "Though the existing situation likely increases the risk to detainees, the CDC's guidance expressly recognizes that complete social distancing may not be possible in the sleeping areas of a jail. Space constraints at the Jail [or immigration detention facility] do not allow for the more preferable degree of social distancing that exists in the community at large." *Id.* at *10.

- The CDC's guidance "recognizes that some facilities may not have enough individual cells for individual isolation and may need to quarantine together groups of detainees exposed to others who have tested positive." *Id.* at *12.

Other courts tasked with the responsibility of evaluating petitions for the large-scale release of prisoners or detainees have also sometimes recognized the potential common-sense consequences of a mass release of prisoners. For example, in *Money v. Pritzker*, Nos. 20-cv-2093 and 2094, 2020 WL 1820660, at *1 (N.D. Ill. Apr. 10, 2020), the Court noted that "the release of inmates requires a process that gives close attention to detail, for the safety of each inmate, his or her family, and the community at large," and that this "demands a sensible and individualized release plan – especially during a

12

pandemic." *See also Coleman v. Newsom*, Nos. 01-cv-01351 and 2:90-cv-0520, 2020 WL 1675775, at *5 (E.D. Cal. Apr. 4, 2020, special three-judge court) (emphasis in original) ("Creating physical distancing is uniquely difficult in a congregate environment like a prison. But crucially, this is a problem shared by *all* prisons,[3] not just those with foundering health care delivery systems.").

Moreover, the Supreme Court itself has flagged the importance of recognizing the

---

[3]      "The American criminal justice system holds almost 2.3 million people in 1,833 state prisons, 110 federal prisons, 1,772 juvenile correctional facilities, 3,134 local jails, 218 immigration detention facilities, and 80 Indian Country jails as well as in military prisons, civil commitment centers, state psychiatric hospitals, and prisons in the U.S. territories." Wendy Sawyer and Peter Wagner, *Mass Incarceration: The Whole Pie 2020* (March 24, 2020), https://www.prisonpolicy.org/reports/pie2020.html. "The number of state facilities is from Census of State and Federal Correctional Facilities, 2012, the number of federal facilities is from the list of prison locations on the Bureau of Prisons website (as of February 24, 2020), the number of youth facilities is from the Juvenile Residential Facility Census Databook (2016), the number of jails from Mortality in Local Jails, 2000-2016, the number of immigration detention facilities from Immigration and Customs Enforcement's Dedicated and Non Dedicated Facility List (as of February 2020), and the number of Indian Country jails from Jails in Indian Country, 2016. We aren't currently aware of a good source of data on the number of the facilities of the other types." *Id.* at n.1.

"Turning to the people who are locked up criminally and civilly for **immigration-related reasons**, we find that 11,100 people are in federal prisons for criminal convictions of immigration offenses, and 13,600 more are held pretrial by the U.S. Marshals." *Id.*

"Slightly under 1.5 million people were in prison at the end of 2017, a slight decrease from 2016 but still a population that, if gathered in one place, would be one of the largest cities in the country. County and city jails held around 750,000 inmates in mid-2017." Campbell Robertson, *Crime Is Down, Yet U.S. Incarceration Rates Are Still Among the Highest in the World*, April 25, 2019, https://www.nytimes.com/2019/04/25/us/us-mass-incarceration-rate.html.

realities of prison and detention facilities when evaluating the reasonableness of prison officials' conduct. *See Farmer v. Brennan*, 511 U.S. 825, 845 (1994) (internal citation omitted) (finding a prison official's duty under the Eighth Amendment is to ensure reasonable safety, a standard that "incorporates due regard for prison officials' unenviable task of keeping dangerous men in safe custody under humane conditions"); *Helling v. McKinney*, 509 U.S. 25, 37 (1993) (stating that when evaluating whether prison officials were deliberately indifferent to health issues the Court should consider "arguments regarding the realities of prison administration").

### B.   The *Fraihat* Case and its Possible Impact Here

On April 20, 2020, a federal district judge in the Central District of California entered an Order providing provisional certification of two subclasses of ICE detainees - - on a *national* basis. The Court in *Fraihat v. ICE*, No. EDCV 19-1546 JGB (C.D. Cal. Apr. 20, 2020), ECF No. 132, certified a subclass of *all* ICE detainees who have one of the risk factors placing them at heightened risk of severe illness and death upon contracting the COVID-19 virus.  The Court (United States District Judge Jesus G. Bernal) also certified a subclass of *all* ICE detainees whose disabilities place them at heightened risk of severe illness and death upon contracting the COVID-19 virus.

In the Order, Judge Bernal explained that ICE "cited no authority for, and the Court rejects, the implication that it lacks authority to enter [nationwide] class-wide relief to require a constitutionally adequate response to COVID-19 from ICE." *Id.* at p. 28, n. 25.

By its terms, the Order would almost certainly encompass many of the detainees in the three South Florida federal immigration detention centers and would also likely impact some of the 34 named plaintiffs. The Judge explained that "the evidence suggests **systemwide** inaction" -- which means he is addressing all ICE action (or lack of action) across the country, not merely in California. *Id.* at p. 32 (emphasis added). Thus, the Order seems to encompass an assessment of what ICE has done (or not done) at the three South Florida detention centers.

*Fraihat* was filed in August 2019 as a putative class action complaint for declaratory and injunctive relief. Because the lawsuit was filed last year, it, unlike the instant case, initially had nothing to do with the COVID-19 pandemic. The April 20, 2020 Order discusses ICE's response to the pandemic on a national scale and it provides national statistics.

The Order explains that the number of individuals in ICE custody has *slightly* decreased since a national emergency was declared. As of March 13, 2020, the Order notes ICE had 35,980 single adults in custody. *Id.* at p. 9. More than half of ICE's average daily population at that time had not been convicted of a criminal offense and had no pending criminal charge. *Id.* A month later, the Order goes on to explain, ICE advised that 31,709 individuals were in custody as of April 13, 2020. *Id.* at p. 10. That reflects a reduction of approximately 12%. Of those 31,709, approximately 14,000 had no prior criminal conviction and no pending criminal charges. *Id.*

The Order does not, however, break down how many ICE detainees in the three South Florida detention facilities had a similar criminal status (or, to be more accurate, no criminal status).

Significantly, the Order explains that ICE could reduce the detained population "by about half," simply by releasing detainees with no prior convictions and no pending charges." *Id.* at p. 33, n. 31.

C.  Petitioners' Allegations

Petitioners submitted their own declarations and the declarations of three doctors in support of the emergency motion for injunctive relief.

The first doctor declaration is from Dr. Joseph Shin, an assistant professor of medicine at Weill Cornell Medicine. [ECF No. 1-2]. His declaration says nothing about personally inspecting any of the three facilities and it also does not mention the declarations of Petitioners themselves. Instead, it discusses the COVID-19 pandemic and discusses, in general, the risks of transmission in detention facilities, jails and prisons.

It also discusses an April 8, 2020 declaration (in another case)[4] from Liana J. Castano, Acting Officer in Charge at the Krome facility who also has oversight responsibility at Glades. That declaration was provided before ICE issued its April 10,

---

[4]       *Campbell v. Wolf*, Case No. 1:20-cv-20768-KMW (S.D. Fla.). The district judge dismissed the case on April 8, 2020, the day the Castano declaration was submitted, because ICE had released Petitioner. *Id.* at ECF No. 30.

2020 COVID-19 PRR. Ms. Castano later provided an updated, more-comprehensive declaration in the instant case (and then, even later, provided a third declaration). [ECF Nos. 33-1; 35-1]. Dr. Shin opines that the first declaration presents a plan "claiming to implement what are clearly inadequate measures" which violated CDC guidance and "knowingly expose anyone interacting with the faculty [sic] to an even more elevated deadly risk or contracting COVID." [ECF No. 1-2].

Dr. Shin's declaration focuses only on the Krome facility; it does not address the Broward and Glades detention centers. He opines that the screening measures are insufficient because they may not obtain full and accurate information from asymptomatic persons. *Id.* He also criticizes the use of cohorting[5] at Krome because he is not convinced that the practice is being used only as a last resort. *Id.* Dr. Shin says that ICE should place suspected COVID-19 cases "in individual medical isolation" in which each person is assigned "their own housing space and bathroom," as recommended by CDC. *Id.*

Finally, Dr. Shin opines that the social distancing measures detailed in the original April 8, 2020 Castano declaration[6] are insufficient to address the pandemic. *Id.* He notes

---

[5]     Cohorting is "the practice of isolating multiple laboratory-confirmed COVID-19 cases together as a group, or quarantining close contacts of a particular case together as a group." The CDC's *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (March 23, 2020).

[6]     The declaration she submitted in this case is dated April 16, 2020. [ECF No. 33-1]. A more-updated declaration [ECF No. 53-1] was filed on April 21, 2020.

that "shared dining halls, bathrooms, showers, common areas, sleeping quarters, and shared equipment such as telephones, all present opportunities for greater transmission." *Id.*

 The second doctor declaration is from Dr. Pedro J. Greer, Jr., a professor of medicine at Florida International University's medical school. [ECF No. 1-3]. Dr. Greer's declaration discusses the heightened risk of epidemics in prisons, jails and detention centers and profiles COVID-19 as an infectious disease. *Id.* His declaration does not suggest that he visited any of the three facilities in connection with the pandemic. But it does say that he reviewed the detainees' declarations and the first April 8, 2020 Castano Declaration. *Id.* at pp. 6-7.

In his opinion, based on his review of the declarations, he concludes that the three immigration detention facilities are "under-equipped and ill-prepared to prevent and manage a COVID-19 outbreak, which would result in severe harm to detained individuals, detention center staff, and the broader community." *Id.* at p. 6. He says that the layout and crowded environment make it "impossible to provide an environment where social distancing can take place, depriving individuals of being able to use one of the most important CDC-recommended measures to protect themselves." *Id.*

Similar to Dr. Shin, Dr. Greer also criticizes cohorting at Krome. *Id.* at p. 7. He notes that the Castano Declaration mentions that 238 detainees are (or were, at the time of the declaration) being cohorted. *Id.* Significantly, he says, "there is no indication that a

cohorted group will be permitted to practice social distancing as recommended by CDC or that a cohorted group will be provided with masks to prevent the transmission of COVID-19."[7] *Id.* The final paragraph of his declaration opines that "there is no way for immigration detention facilities to comply with CDC Guidelines on social distancing and quarantining unless Respondents release detained men and women on a large scale." *Id.* at pp. 7-8.

Petitioners obtained leave of Court to file a supplemental submission for the emergency hearing [ECF No. 41] and submitted the declarations of Dr. Homer Venters from *Fraihat*, the Central District of California, Eastern Division case discussed above. [ECF No. 39-1]. His declaration focuses on ICE's April 10, 2020 COVID-19 PRR. It does not discuss any of the three South Florida detention centers, the declarations from Petitioners, the Castano Declarations or the declarations from Drs. Greer and Shin. Instead, it aims to criticize the April 10, 2020 PRR as being inconsistent with CDC Guidelines. He predicts that "ICE is unlikely to ensure compliance with the policies laid out in this document due to longstanding lack of information systems, quality assurance and oversight mechanisms that are standard in other carceral or detention settings." [ECF No. 39-1, p. 3].

---

[7]     The April 16, 2020 Castano Declaration provides updated information, explaining that "housing units under cohort status are monitored daily and issued surgical masks." [ECF No. 33-1, p. 4].

Dr. Venters takes issue with the ICE Enforcement and Removal Operations' ("ERO") omission of CDC Guidelines for self-monitoring and quarantine for staff and detainees who have had contact with a suspected or known case of COVID-19. *Id.* He also finds fault with a purported lack of adequate guidance of "key aspects" of social distancing. *Id.* And he says the ERO document does not include guidance on the importance of communicating with detainees about changes to their daily routine and how they can help reduce risk.[8] *Id.* at p. 9.

The detainees' declarations are, by and large, substantially similar. [ECF No. 8]. Although the declarations are not identical, the declarations collectively raise one or more of the following allegations: (1) the petitioner is in a cohort quarantine; (2) the petitioner cannot social distance; (3) the petitioner has developed a cough but has not been tested for COVID-19; (4) the petitioner sleeps in bunkbeds less than a meter away from each other; (4) the petitioner does not have adequate amounts of soap throughout the day; (5) the petitioner has difficulty washing his hands for 20 seconds because the water turns off too quickly; (6) the petitioner is worried that the crowded conditions will result in him (or her) contracting COVID-19; (7) most officers do not wear masks when near the detainees; (8) the petitioner typically eats less than six feet away from another detainee;

---

[8]     The second Castano Declaration outlines in detail the education for COVID-19 which is now being provided at Krome. It also mentions the education being provided at Glades. In addition, the declaration of Juan A. Lopez Vega [ECF No. 30-1], the Acting Officer in Charge of Broward, details the education measures occurring at the facility he oversees.

(9) dozens of detainees in a pod must share one toilet or the toilets are too close together for social distancing to occur;  (9) the detainees do not have access to masks, gloves, or hand sanitizer; and (10) the detainees who prepare the food do not wear masks and sometimes do not wear gloves. *Id.*

D. <u>ICE's Response</u>

ICE filed an opposition memorandum [ECF No. 40] and submitted declarations from ICE officials in charge of the three detention facilities [ECF Nos. 30; 33; 53]. The Undersigned required the declarations in order to obtain information about the existence and scope of the COVID-19 virus at the facilities and to obtain specific information about whether the physical layout hindered complete social distancing, the sanitation and hygiene protocols which are being used and the education being provided to detainees about the virus and how to avoid contracting it. [ECF Nos. 18-20].

Juan A. Lopez Vega's declaration concerned the Broward facility and the Castano declarations discussed Krome and Glades. [ECF Nos. 30-1; 33; 53].

Vega's Broward-based declaration [ECF No. 30-1] explains the situation there, and the Undersigned quotes the relevant portions of the declaration here verbatim:

Epidemiological Tracking and ICE Pandemic Response Guidance

5. Since the onset of reports of Coronavirus Disease 2019 (COVID-19), ICE epidemiologists and GEO officials have been tracking the outbreak, regularly updating infection prevention and control protocols, and issuing guidance to field staff on screening and management of potential exposure among detainees.

6. In testing for COVID-19, Broward Transitional Center's Medical Department is also following guidance issued by the Centers for Disease Control (CDC) to safeguard those in its custody and care.

7. On April 10, 2020, U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) released its *ERO COVID-19 Pandemic Response Requirements (PRR)*, a guidance document that builds upon previously issued guidance and sets forth specific mandatory requirements expected to be adopted by all detention facilities housing ICE detainees, as well as best practices for such facilities, to ensure that detainees are appropriately housed and that available mitigation measures are implemented during this pandemic which is available at https://www.ice.gov/sites/default/files/documents/Document/2020/eroCOVID19response ReqsCleanFacilities.pdf.

Screening Procedures

8. Each detainee is screened for disabilities upon admission by a medical professional. Identified disabilities are further evaluated and reasonable accommodations are provided as medically appropriate.

9. At the Broward Transitional Center, prior to entering the facility, the detainees' temperatures are assessed for fevers, and detainees are screened for respiratory illnesses. During intake, medical screenings are conducted on all detainees within a 12-hour time frame. Detainees are asked to confirm if they have had close contact with a person with laboratory-confirmed COVID-19 in the past 14 days, and whether they have traveled from or through area(s) with sustained community transmission in the past two weeks.

10. The detainees' responses and the results of these assessments will dictate whether to monitor or isolate the detainees. Those detainees who present symptoms compatible with COVID-19 will immediately be transported off-site to Broward Health North for further evaluation and testing. If testing is positive, they will remain isolated and treated. If the detainee returns to the facility with a positive diagnosis, he/she will be kept quarantined until he/she is no longer infectious.

11. In cases of known exposure to a person with confirmed COVID-19, asymptomatic detainees are placed in cohorts with restricted movement for the duration of the most recent incubation period (14 days after most recent exposure to an ill detainee) and are monitored twice daily for fever and symptoms of respiratory illness. Cohorting is an infection-prevention strategy which involves housing detainees together who were exposed to a

person with an infectious organism but are asymptomatic. This practice lasts for the duration of the incubation period of 14 days, because individuals with these and other communicable diseases can be contagious before they develop symptoms and can serve as undetected source patients. Those that show onset of fever and/or respiratory illness are referred to a medical provider for evaluation. Cohorting is discontinued when the 14-day incubation period completes with no new cases. Per ICE policy, detainees diagnosed with any communicable disease who require isolation are place in an appropriate setting in accordance with CDC or state and local health department guidelines.

12. An option to cohorting at the Broward Transitional Center is the use of negative pressure rooms at local hospitals. The Broward Transitional Center has contracts with several local hospitals that have over 100 negative pressure rooms. These hospitals are readily available to meet the needs of the facility and detainee population, if needed.

### Medical Capabilities

13. Broward Transitional Center has the following medical capabilities:

- The clinic staff which manages both males and females, provides daily access to sick calls in a clinical setting and has an onsite medical observation room, pharmacy, tele-psychiatry, and access to 24/7 specialty services and hospital care within the community, including mental health.

### Testing, Confirmed Cases, Cohorting Information

14. As of 11:00 p.m. on April 16, 2020, Broward Transitional Center has the following information:

- There are zero suspected cases of COVID-19 at the Broward Transitional Center. In the event a detainee exhibits flu like symptoms, the detainee is immediately isolated from the rest of the population and a mask and gloves are issued to him/her. If symptoms are suggestive of COVID-19, the detainee will be transported to Broward Health North for further testing.

- There are zero confirmed cases of COVID-19 in the Broward Transitional Center.

- There are two detainees cohorted as a precautionary measure, per the established protocol, after they returned to the Broward Transitional Center from a hospital stay for non-COVID-19 issues. These two detainees are medically assessed twice a day. They are housed by themselves with no other detainees in their room. Both detainees remain afebrile. The cohort will end on April 18th, 2020 for the first one and on the 24th for the second one.

- There have been zero detainees and zero GEO Group and ICE staff members who have tested positive for COVID-19 at the Broward Transitional Center.

- There has been one detainee who was tested for COVID-19 at the Broward Transitional Center, but the test result was negative.

- Broward Transitional Center has test kits on site and readily available to use should a detainee present with symptoms suggestive of COVID-19.

15. The Broward Transitional Center has populations within its approved capacities and is not overcrowded. As of April 16, 2020, the population is 65% capacity, in compliance with the guidelines published on April 10 and referenced in paragraph 7 above.

<u>Sanitation Frequency and Supplies</u>

16. The Broward Transitional Center has increased sanitation frequency and provides sanitation supplies as follows:

- The Broward Transitional Center provides disinfectant spray to cleaning crews and detainees for the sanitizing of the facility and rooms. Antibacterial soap is available and provided to all detainees in every housing unit at its facility. Every room contains a 7.5-ounce bottle of Dial antibacterial soap, and the dispenser is filled up as needed seven days per week. The administration is encouraging both staff and the general population to use these tools often and liberally.

- The Broward Transitional Center provides hand sanitizer to staff upon entering the facility and throughout the facility. Detainees are provided hand sanitizer upon entering the dining hall and medical.

<u>Social Visits, Vendor Access, and Personal Protective Equipment</u>

17. The Broward Transitional Center has suspended in-person social visitation and facility tours.

18. The Broward Transitional Center is screening all GEO and ICE staff members, including medical staff, transport officers, administrative personnel, and ICE attorneys when they enter the facility, including the taking of body temperatures.

19. All staff members are required to wear personal protective equipment (PPE).  Masks are issued to all staff members on a weekly basis, and they were previously issued permanent eye protection.  Intake staff, front lobby staff, transport staff, and medical staff have been issued face shields in addition to the masks and eye protection.  All staff members have access to gloves that are located throughout the facility.

20. The Broward Transitional Center has suspended all vendors from visiting the facility unless prior approval is obtained. Private bar attorneys are encouraged to utilize Skype to communicate with the detainee population. In the event a contractor or private bar attorney

must enter the facility, he/she must wear self-provided eye protection, gloves, and a mask at all times while they remain in the facility.

## Education for COVID-19

21. The Broward Transitional Center is providing education on COVID-19 to staff and detainees to include the importance of hand washing and hand hygiene, covering coughs with the elbow instead of with the hands, and requesting to seek medical care if they feel ill. Detainees are also informed of the importance of sleeping in a head-to-toe position. During intake, the detainees are educated on how to access the medical department and to report any and all symptoms to medical. Signs are also posted throughout the facility in English and Spanish. The facility provides detainees daily access to sick call.

## Housing of Detainees

22. The Broward Transitional Center provides the following information regarding the housing arrangements at the facility:

- Detainees are housed in rooms and separated by gender, with a maximum of six detainees per room.

- Bunk beds in the male rooms are two feet apart. Bunk beds in the female rooms are 6.5 feet apart

- Bunk beds in the male ADA-compliant rooms are three feet apart. Bunk beds in the female ADA-compliant room are 6.5 feet apart.

- There is only one bathroom in each room that includes one shower and one toilet. Detainees do not utilize the bathroom at the same time and are provided sufficient cleaning supplies to sanitize the restroom, shower, and toilets between users.

- The distance between chairs in the dining hall is four feet, taking into account the removal of every other chair so detainees are not seated next to each other or directly across from one another. The facility is also practicing social distancing by staggering meal lines with reduced numbers of individuals in the dining room and markers have been added every six feet to visually facilitate social distancing.

## Reduction of Detainee Population

23. GEO and ICE regularly share information on detainees who may be at high risk for COVID-19 and have chronic conditions. ICE has reviewed its detained "at risk population" as identified by the CDC guidelines to determine if detention remains appropriate, considering the detainee's health, public safety and mandatory detention requirements, and adjusted custody conditions, when appropriate, to protect health, safety

and well-being of its detainees.  Currently, all detainees 60 years of age and older have been released from the Broward Transitional Center.  In addition, the detention population has been reduced by 35 percent, in accordance with ICE's guidance of April 10, 2020 that is referenced in paragraph 7, to facilitate social distancing and to mitigate the spread of COVID-19.

[ECF No. 30-1].

The Castano Declaration [ECF No. 33-1] discusses both the Krome and Glades centers, and the Undersigned quotes verbatim the relevant sections:[9]

11. In cases of known exposure to a person with confirmed COVID-19, asymptomatic detainees are placed in cohorts with restricted movement for the duration of the most recent incubation period (14 days after most recent exposure to an ill detainee) and are monitored daily.   I have been informed by IHSC that a dormitory round consists of a

---

[9]     Paragraphs 5-10 of the two declarations are identical or nearly identical, so the Undersigned will not repeat them here.

nurse visiting the housing unit daily, providing education on and encouraging hygiene to include hand washing. Sharing information with the detainee population with regards to what the medical staff is doing to ensure they continue to get health care and the sick call process. IHSC will also assess the population for any individuals reporting symptoms and refer the detainee to the clinic if necessary.

12. Cohorting is an infection-prevention strategy which involves housing detainees together who were exposed to a person with an infectious organism but are asymptomatic. This practice lasts for the duration of the incubation period of 14 days, because individuals with these and other communicable diseases can be contagious before they develop symptoms and can serve as undetected source patients. Those that show onset of fever and/or respiratory illness are referred to a medical provider for evaluation. Cohorting is discontinued when the 14-day incubation period completes with no new cases. Per ICE policy, detainees diagnosed with any communicable disease who require isolation are placed in an appropriate setting in accordance with CDC or state and local health department guidelines.

## Medical capabilities

13. Krome has the following medical capabilities: A clinic staff which manages male detainees and provides daily access to sick calls in a clinical setting, as well as mental health services and the ability to admit patients at the local hospital for medical and mental health care. Glades County Detention Center has the following medical capabilities: A clinical staff which manages male and female detainees and provides daily access to sick calls in a clinical setting, as well as mental health services and the ability to refer patients to the local hospital for medical and mental health care, if clinically indicated.

## Testing capabilities, confirmed cases, and cohort information

14. As of Noon, April 16, 2020, there are no confirmed cases of COVID-19 at Glades County Detention Center, and no detainee is subject to cohorting. Similarly, there are no staff members at Glades who have tested positive for COVID-19.

15. Krome SPC reports the following information:

    a. There are two detainees with a laboratory confirmed case of COVID-19 housed at Krome who are being medically isolated per CDC guidelines, as the detainee previously admitted to the community hospital has been discharged to Krome SPC. There have been no transfers of detainees with laboratory confirmed cases of COVID-19. Twenty detainees have been tested at Krome SPC for COVID-19.

    b. There are 3 staff members with a laboratory confirmed case of COVID-19. They have been removed from the schedule and are following CDC quarantine guidelines.

c. To date, there are three groups of detainees subject to cohorting, to include Building 11, which includes 104 detainees, the projected end date for their cohort is April 18, 2020; POD 2, which contains 62 detainees, and the Krome Behavioral Health Unit (KBHU), which contains 15 detainees. The projected end date of the POD 2 and KBHU cohorts is April 20, 2020. All three groups are subject to cohorting measures due to the identification of a staff member who tested positive for COVID-19. Housing units under cohort status are monitored daily and issued surgical masks. The CDC recommends that "if cohorted, quarantined individuals should wear face masks at all times to prevent transmission."

d. To date, all detainees subject to cohorting are asymptomatic for COVID-19. Building 11, which contains the largest cohort group, contains 3900 sq. ft. of living space to include the dormitory, showers and toilets, and a common day room, which includes television, detainee phones, and tablets. Pod 2 contains 2265 sq. ft. of living space, to include the dormitory, showers and toilets, and a common day room. The KBHU is 15,400sq ft., area consisting of a nurses station, common area day room, groups therapy rooms, two dormitory areas with their corresponding restroom and shower areas, dormitory day room areas which include television, detainee phones, and tablets as well as a detainee barber shop. The detainee barber shop has been closed for social distancing purposes.

e. When a housing unit is placed under cohort status, IHSC performs daily dormitory rounds. I have been informed by IHSC that a dormitory round consists of a nurse visiting the housing unit daily, who provides education regarding proper hygiene, to include hand washing. The nurse also provides information to the detainee population regarding procedures in place for health care and the sick call process. The medical staff conducting daily dormitory rounds also assesses the population for any individuals reporting symptoms and refers the detainee to the clinic for evaluation. If symptoms are not suspicious for COVID 19 or other respiratory illness, the patient is treated based on history and symptoms presentation. If the symptoms are suspicious for COVID 19, a surgical mask is placed on the detainee's face and he is placed in isolation, pending further testing to rule out non COVID 19 infection (e.g. influenza A or B) and/or referral to emergency department for further evaluation and testing.

f. I have been advised by the medical staff at Krome that the medical facility has a limited number of COVID 19 test kits provided by LABCORP. At present, suspected cases that have tested negative for Influenza A and B have been referred to a community hospital for management and COVID 19 testing, as the turnaround time for the in-hospital test is only 24-48 hours, provided there is no back log, as opposed to 5-6 days with LABCORP. Similarly, I have been advised by the staff at Glades County that tests for COVID-19 are available at the detention center. The tests would be administered if the doctor at Glades

determines that the detainee is presenting COVID-19 symptoms. Alternatively, a detainee could be sent to an outside hospital for COVID-19 testing.

   g. Cohorting a group of people that have been exposed to a person with suspected or confirmed COVID 19 infection is the prescribed management by the Immigration Health Services Corps as per Interim Reference Sheet on 2019-Novel Coronavirus (COVID 19): Detainee Care Version 9.1, April 6, 2020. Space constraint dictates the use of group cohort vs. individual isolation.

16. Both the population at Krome SPC and the population at Glades County Detention Center is within its approved capacities and are not overcrowded.

<u>Sanitation Frequency and Supplies</u>

17. Krome has increased sanitation frequency and provides sanitation supplies as follows:

o Krome provides disinfectants to staff and cleaning crews and CDC recommended cleaning and disinfection above and beyond normal activity have been implemented.

o Krome cleans and disinfects each housing unit between shifts and entire housing units on a rotational schedule.

   Krome provides every housing unit in the detention center with disinfectant wipes, anti-bacterial soap, hot water and paper towels. Krome staff and the general population are directed to use these cleaning tools often and liberally.

18. I have been advised that Glades County issues male detainees 4 ounces of soap, twice a week which is replenished as needed. Female detainees are issued a 7.5 ounce bottle of body wash, which is also replenished as needed at no cost to the detainee.

<u>Personal Protective Equipment for Staff and Attorney Visitation<br>and Suspension of Social Visits</u>

19. At Krome, noncontact professional visits are highly encouraged but if an attorney must meet with a detainee in person, the attorney is required to wear personal protective equipment (PPE) to include mask, gloves and eye protection. No visitors are permitted to enter without the PPE. In person social visitation and facility tours are suspended. All ICE staff at Krome have been issued Personal Protective Equipment to include gloves and N-95 respirator masks. Security contract staff assigned to the main gate have been issued a face shield, N95 respirator mask and gloves. All janitorial and maintenance staff at Krome have been issued Personal Protective Equipment to include gloves and N-95 respirator masks.

20. Similarly, I have been advised that all staff at Glades County were issued masks and nitrile gloves, which are available throughout the facility.

<u>Detainee Screening and Education for COVID-19</u>

21. Krome is utilizing security staff medically trained to conduct temperature screening and health history questionnaires of all staff and vendors when they enter the facilities including body temperatures.

22. Krome medical staff are screening all detainee intakes when they enter the facilities including travel histories, medical histories and checking body temperatures and have procedures to continue monitoring the populations' health. The facility has posted CDC information posters in all housing units and common areas to encourage proper hand washing techniques and cough etiquette. The facility has implemented head to toe sleeping configuration to increase distance and promote social distancing. The facility has staggered the recreation schedule to avoid comingling and promote social distancing. The facility is serving meals in the housing units to avoid comingling and promote social distancing.

23. I have been advised that the medical staff at Glades has provided oral instruction on the proper procedure to wash their hands and maintain safe hygiene. The CDC hand washing flyer that ICE has provided has been posted at every pod, medical unit, law library and intake area.

24. The IHSC Krome medical staff provide education on COVID-19 to staff and detainees to include the importance of hand washing and hand hygiene, covering coughs with the elbow instead of with hands, and requesting to seek medical care if they feel ill. The facilities provide detainees daily access to sick call.

25. Krome medical staff has identified housing units for the quarantine of patients who are suspected of or test positive for COVID-19 infection to be addressed as set forth in paragraphs 9, 10 and 11, *supra*.

<u>Housing of Detainees</u>

26. Krome SPC houses its detainees in a dormitory style setting. There are no single cells in the general population area. Each housing unit varies in size. The average space between beds for each dormitory is as follows:

Pod 1 – 53.63 in
Pod 2 – 54.58 in
Pod 3 – 54.35 in.
Pod 4 – 57.07 in.
Pod 5 – 56.33 in.
Pod 6 – 57.97 in.
11A – 38.54 in.

6

11B – 38.64 in.
14A – 42.91 in.
14B – 45.45 in
SMU – 38 in.
KBHU 47.56 in.

27. Detainees in adjacent bunk beds are encouraged to sleep in a head-to-toe position as recommended by the CDC.

28. Each housing unit also contains a different number of toilets. The list below contains the number of toilets in each building and the average distance between them.

Pod 1 – 5 toilets, 20.30 in
Pod 2 – 5 toilets, 19.5 in
Pod 3 – 5 toilets, 21.10 in
Pod 4 – 5 toilets, 20.50 in.
Pod 5 – 5 toilets, 20.5 in
Pod 6 – 5 toilets, 20.3 in.
Bldg 11 – 13 toilets, 11A, 24 in.; 11B, 24 in.

Bldg 14A – 4 toilets, 25.67 in
Bldg 14B – 4 toilets, 25.67 in
SMU – 25 toilets, 25 in. 25 double occupancy CELLS with 1 bunk bed and 1 toilet.
KBHU – 4 toilets, 3 urinals, 24 in.

29. Meals are no longer served in the cafeteria at Krome. Instead, meals are being served in the dormitories in the day rooms as recommended by the CDC. The average space between dayroom tables is as follows:

Pod 1 – 38 in
Pod 2 – 38 in.
Pod 3 – 38 in.
Pod 4 – 38 in.
Pod 5 – 38 in.
Pod 6 – 38 in.
Bldg 11A – 64.83 in.
Bldg 11B – 64.83 i.
Bldg 14A – 108 in.
Bldg 14B – 55 in.
SMU – 1 table per cell
KBHU – 38 in.

30. The housing units in Krome and Glades have available running water and soap 24 hours a day, 7 days a week.

31. Krome and Glades do not have a designated shower time. The showers in the housing units are available for use by the detainee population during the "lights-on" period at the facility (*with the exception of count and meal times*), typically between 5:00AM and 11:00PM.

32. ICE detainees housed at Glades County are also in dormitory style housing.  The detainees are housed in a two-story open floor pod.  The bunkbeds are separated into subgroups of six bunkbeds per group.  The groups are positioned in a cubby opening with no front wall.  The bunks are lined up in rows of three approximately 12 inches apart from the head of one bunk to the foot of the next bunk and about seven feet apart side to side.  The distance between the upper bunk and the lower bunk is 34 inches. The distance between beds is 7 feet 2 inches.

33. I have been advised that chairs or benches where detainees eat at Glades are 3 feet apart.  Showers are separated by a wall 6 inches wide and 4 feet tall.  Toilets are separated by a wall 6 inches wide and 4 feet tall.

<u>Reduction of Detainee Population</u>

34. ICE has reviewed its detained "at risk population" as identified by the CDC guidelines to determine if detention remains appropriate, considering the detainee's health, public safety and mandatory detention requirements, and adjusted custody conditions, when appropriate, to protect health, safety and well-being of its detainees.  I rely on IHSC to provide me information as to which detainees are at a heightened medical risk for contracting COVID-19. It is my understanding that the CDC has identified populations potentially being at higher-risk for serious illness from COVID-19, include:

   o   People aged 65 and older
   o   People of all ages with underlying medical conditions, particularly if not well   controlled, including:
   o   People with chronic lung disease or moderate to severe asthma
   o   People who have serious heart conditions
   o   People who are immunocompromised (*Many conditions can cause a person to be immunocompromised, including cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids and other immune weakening medications*)
   o   People with severe obesity (body mass index [BMI] of 40 or higher)
   o   People with diabetes
   o   People with chronic kidney disease undergoing dialysis
   o   People with liver disease

E.  Some Significant Take-aways From the Declarations

There are many significant points arising from the recently-submitted declarations about conditions and procedures at the three detention centers. One of the most-important points is that the conditions vary, sometimes significantly, among the three centers. The other critical point is that conditions, at least at Krome, appear to be getting worse in recent days. A supplemental declaration filed late on April 21, 2020 reveals that more detainees are being held in cohort quarantine. [ECF No. 53]. The Undersigned will highlight some of the other, more-significant points here.

As an initial point, it is clear that ICE can, if it makes a conscious and substantial effort, significantly reduce the number of detainees at a center. At Broward, for example, all detainees over 60 years of age have been released and the overall detention population has **decreased by 35%**. [ECF No. 30-1, p. 7]. According to the Lopez Vega Declaration, this census reduction was done "to facilitate social distancing and to mitigate the spread of COVID-19." *Id.*

So, it is clear that ICE fully understands the benefit of reducing the detainee population and the benefit a reduction has to eliminating the risk of transmitting COVID to detainees, staff members, the families of employees and independent contractors and vendors/others who visit the facilities.

i.  **Broward**

There are no confirmed cases of COVID-19 at Broward and no detainees being

cohorted at Broward for exhibiting symptoms of COVID-19. [ECF No. 30-1, p. 4]. There are two Broward detainees cohorted as a precautionary measure, and they are housed by themselves with no other detainees in the room. *Id.* There are no detainees, GEO Group[10] staff members, or ICE staff members who have tested positive for COVID-19 at Broward. *Id.* One Broward detainee was tested for the virus, but the result was negative. *Id.* at p. 5. Broward has test kits on site, readily available for use. *Id.*

Antibacterial soap is provided to all Broward detainees and every room has a 7.5-ounce of antibacterial soap which is "filled up as needed seven days per week." *Id.*

Broward provides hand sanitizer to all staff upon entering the facility and detainees are provided with sanitizer when they enter the dining hall and medical unit. *Id.*

All Broward staff members are required to wear personal protective equipment. *Id.* Masks are provided weekly, permanent eye protection was issued, and face shields (in addition to masks and eye protection) are issued to intake staff, front lobby staff, transport staff and medical staff. *Id.*

Broward provides COVID-19 education to staff and detainees and specifically instructs them on the importance of sleeping in a head-to-toe position. *Id.* at p. 6.

Bunk beds in Broward are two feet apart for male rooms and 6.5 feet apart in the

---

[10]     GEO Group, Inc. is a private company which owns and operates Broward, a contract detention facility. [ECF No. 30-1, p.1].

female rooms. *Id.*

Bunks in Broward's male ADA-compliant rooms are three feet apart and are 6.5 feet apart in the female ADA-compliant rooms. *Id.*

There is only one bathroom in each room, and it includes one shower and one toilet. Detainees do not use the bathroom at the same time. *Id.*

The distance between chairs in the dining hall is four feet. *Id.* Broward staggers its meal lines, has reduced the number of persons in the dining room, and has installed markers every six feet to designate the social distancing gap. *Id.*

### ii.    Krome

As of April 16, 2020, there were two detainees with a laboratory-confirmed case of COVID-19 housed at Krome and who have been medically isolated. [ECF No. 33-1, p. 4]. As of the same date, 20 detainees have been tested. *Id.*

Three staff members have a laboratory-confirmed case of COVID-19 and have been removed from the work schedule and are following CDC quarantine guidelines. *Id.* As of 2:00 p.m. on April 20, 2020, however, 8 staff members had a laboratory-confirmed case of COVID-19. [ECF No. 53-1]. They were removed from the schedule and are following CDC quarantine guidelines. *Id.*

As of April 16, 2020, there are three groups of detainees subject to cohorting: one group contains 104 detainees (with an April 18, 2020 deadline to end the cohort), one with 62 detainees (with an April 20, 2020 deadline to end the cohort) and one with 15 detainees

(with an April 20, 2020 deadline). [ECF No. 33-1, p. 5]. All cohorting was caused by exposure or potential exposure to a staff member who tested positive for COVID-19. *Id.*

Housing units in cohort status are issued surgical face masks. *Id.*

All ICE staff have been issued personal protective equipment, including gloves and N-95 respirator masks. *Id.* at p. 6. Security contract staff assigned to the main gate were issued a face shield, an N-95 respirator, and gloves. *Id.* All janitorial and maintenance staff have received gloves and N-95 respirator masks. *Id.* The declaration does not indicate whether security contract staff at other locations (e.g., in the housing units) were issued gloves and/or N-95 masks or other types of masks.

As of April 16, 2020, all detainees subject to cohorting are asymptomatic for COVID-19. *Id.* at p. 5.

The Krome medical facility has only a "limited number" of COVID-19 test kits. *Id.*

Space constraints require the use of a group cohort, as opposed to individualized isolation. *Id.*

All housing units receive disinfectant wipes, anti-bacterial soap, hot water and paper towels. *Id.* at p. 6. The declaration does not disclose how much soap is being provided or how frequently, however.

CDC information posters have been posted in all housing units and common areas and the medical staff provides COVID-19 education to staff and detainees. *Id.* at p. 7.

Head-to-toe sleeping arrangements have been implemented to help promote

social distancing. *Id.* at p. 8.

Meals are being served in the housing units, rather than the dining hall/cafeteria, to avoid comingling and to promote social distancing. *Id.*

Krome houses its detainees in a "dormitory style" setting, which means there are no single cells in the general population area. *Id.* at p. 7.

The distance between beds varies, from 38 inches to 57.07 inches. *Id.* at pp. 7-8. In other words, no bed complies with the six-foot social distancing protocol.

The housing units have different numbers of toilets, and the distances between them range from 19.5 inches to 25.67 inches. *Id.* at p. 8.

As noted, meals are served in the dormitories, in the dayroom, and the distance between the dayroom tables varies, from 38 inches to 108 inches. *Id.* The declaration does not disclose the distance between seats or chairs at each table, however.

Housing units have running water and soap available "24 hours a day, 7 days a week." *Id.* The declaration does not explain whether the sinks have an automatic cutoff feature, which turns the water off in less than the 20 seconds recommended for hand washing.

ICE reviews its "at risk" population to determine if detention "remains appropriate." *Id.* at p. 9. Unlike the declaration concerning Broward, the Castano Declaration about Krome does not mention whether any detainees have been released, or what percentage have been released or whether certain populations (e.g., detainees 60

years old and older) have been released.

### iii.    Glades

As of April 16, 2020, at noon, there were no confirmed cases of COVID-19 at Glades and no detainee is subject to cohorting. [ECF No. 33-1, p. 4]. Likewise, no Glades staff member has tested positive for the virus. *Id.*

COVID-19 tests are available at the detention center. *Id.* at p. 5.

The detainee population at Glades is within its approved capacity and is "not overcrowded." *Id.* at p. 6.

Glades (which is administered by the Sheriff of Glades County) issues male detainees 4 ounces of soap, twice a week, which is replenished as needed. Female detainees receive a 7.5-ounce bottle, at the same frequency. *Id.* at p. 6. The housing units have available running water and soap 24 hours a day, 7 days a week. *Id.* at p. 8.

All staff received masks and "nitrile gloves." *Id.* at p. 7. The declaration does not specify what types of masks were provided.

The medical staff provides oral instruction on the proper procedure to wash hands and maintain safe hygiene. *Id.* The declaration does not say who -- i.e., non-medical staff and/or the detainees themselves -- receives these oral instructions.

The CDC handwashing flyer was posted in every housing pod, the medical unit, the law library and the intake area. *Id.*

The detainees are housed in a dormitory-style setting. The bunks are

approximately 12 inches apart from the head of one bed to the foot of the next bunk and about seven feet apart, side to side. *Id.* at p. 9. The distance between the upper bunk and lower bunk is 34 inches, and the distance between beds is 7 feet, 2 inches. *Id.*

The chairs or benches where detainees eat are 3 feet apart. *Id.*

Both the showers and toilets are separated by a wall 6 inches wide and four feet tall. *Id.* The declaration does not say how far apart the showers are from each other, nor does it mention the width of each shower stall area.

No information was provided about the number of released ICE immigration detainees, the percentage of census reduction (assuming one occurred) or if certain categories of detainees have been released.

F.   ICE's Alternatives to Detention Program

According to recent published reports,[11] ICE has in recent weeks released hundreds of immigration detainees across the country in response to the COVID-19 crisis. ICE has, in fact, released at least one detainee from Krome under this program.

During the April 17, 2020 hearing, Petitioners' counsel acknowledged familiarity with the program but took the position that ICE is not releasing anywhere near enough

---

[11]     *See, e.g.*, "ICE Releases Hundreds of Immigrants as Coronavirus Spreads in Detention Centers," explaining in an April 16, 2020 article that ICE "says it has released nearly 700 detainees after evaluating their 'immigration history, criminal record, potential threat to public safety, flight risk, and national security concerns.'" https://www.npr.org/sections/coronavirus-live-updatges/2020/04/16 (attached to this Report and Recommendations as Exhibit A).

detainees and suggested that part of the holdup might be due to the fact that "ICE is a bureaucracy." [ECF No. 43].

At the hearing, Petitioners' counsel also advised that a 50% reduction in the detainee census through ICE-initiated release would be "insufficient." *Id.* In other words, releasing 700 detainees from the three federal immigration detention centers would not, from Petitioner's perspective, moot the emergency injunctive relief request. As noted, Petitioners want every single detainee released and they want them released immediately. The Alternatives to Detention Program, they say, will never yield acceptable results. At bottom, Petitioners say, the only way to get ICE to release even a sufficient number of detainees for health purposes is to file a lawsuit (which they did) and obtain a Court Order compelling release of detainees.

In the past few weeks, attorneys for individual detainees have filed lawsuits in this district, seeking an immediate release order. Some of those cases have been dismissed as moot when ICE agrees to release a specific detainee under the program. *See, e.g.*, *Campos v. Diaz*, No. 20-cv-21550-KMW (S.D. Fla.), ECF No. 6 (dismissing case on April 16, 2020, three days after lawsuit was filed, because ICE released Petitioner under the Alternatives to Detention program).[12]

_____

[12]    The attorney who represented Petitioners here, the director of the Immigration Clinic at the University of Miami School of Law, also represented Campos in the lawsuit which was just dismissed following her client's release. Similar to the instant lawsuit, the short-lived *Campos* lawsuit was a habeas corpus action seeking release from Krome because Petitioner, who represented himself as high-risk because he suffers from asthma

But this lawsuit is the first (and likely only, as best as the Undersigned can tell) lawsuit filed in this district seeking an Order requiring ICE to release all detainees at all three detention centers.

G. The Narrow, Incomplete and Inconsistent Factual Record

The factual record has not been extensively developed. None of the three doctors who submitted declarations visited any of the three detention centers. No expert has inspected any of the three centers for the purpose of providing the Court with an independent assessment.

Given the emergency nature of the motions, the Court has not held an evidentiary hearing, and no one has requested one. But even if the Undersigned were inclined to

---

and seizures, had confronted a grave risk of contracting COVID-19. Counsel verified the Petitions in both this case and in *Campos*. The verification in the instant case is based on discussions she had with members of the legal team and on her information and belief.

Counsel's verification said that the statements in the Petition are "true and correct **to the best of my knowledge."** [ECF No. 1, p. 111 (emphasis added)]. Presumably, the verification was submitted pursuant to 28 U.S.C. § 1746, which is the federal statutory substitute for the more-traditional affidavit. The statute provides that an unsworn declaration has the same "force and effect" of an affidavit if it is in substantially the following form: "I declare (or certify, verify or state) under penalty of perjury that the foregoing is true and correct." 28 U.S.C. § 1746. Significantly, it does not include a "to the best of my knowledge" phrase, which might be deemed to suggest an equivocation or an attempt to provide "wiggle room" if the statements turn out to be materially incorrect or incomplete. *See id*.

The United States did not move to dismiss the Petition because of a defective verification. On the other hand, the Castano and Lopez Vega declarations *also* contained the "to the best of my knowledge" qualifier in the verification block. [ECF Nos. 30; 33; 53].

have an evidentiary hearing, it would be logistically difficult to arrange for an effective one, given the COVID-19 pandemic and the reality that district courts in our district are having telephone or video-conference hearings, rather than in-person hearings. Moreover, it would be difficult for counsel to adequately prepare their witnesses and even more difficult for the attorneys to conduct cross-examination during a telephone or virtual hearing.  Reviewing exhibits would be problematic, and the effectiveness of cross-examination would be undermined if counsel had to submit exhibits to the other side's witnesses before those witnesses were cross-examined.

Similarly, it would be logistically cumbersome to arrange for a hearing in which the detainees who submitted declarations were questioned and it would place a substantial burden on an already-challenged staff at the detention centers to arrange for detainees to be questioned.

In addition, Petitioners' counsel have urged this Court to proceed at an expedited pace. In fact, they bypassed an opportunity to submit a reply memorandum before the emergency hearing because they did not want to postpone, even for three days, that hearing.

So, the Undersigned's Report and Recommendations is based on a less-than-optimum record. Therefore, the Undersigned is recommending that the primary relief requested -- immediate release of all 1,400 detainees -- be denied *without prejudice.*

As even a cursory comparison of the detainees' declarations and the more-recent

declarations of ICE managers reveals, there are significant factual differences between the scenarios portrayed by each side. For example, Petitioners complain that they are not provided enough soap and ICE says that soap is available around the clock and is always replenished when needed. It may well be that the disputes are more illusory than real and were caused by a simple timing issue: maybe the detainees' declarations were correct when signed (e.g., on April 8, 2020) but the ICE managers' declarations were also correct when signed (on April 16, 2020) because ICE had adjusted its procedures, perhaps because of the April 10, 2020 PRR.

The Undersigned cannot resolve these possible factual disputes based on the limited record, but it's worthwhile to at least note them.

## III.   <u>Applicable Legal Standards and Analysis</u>

In a two-sentence footnote in its opposition response, ICE mentions that the Glades facility is in the Middle District of Florida and says that this Court therefore lacks jurisdiction over any claim concerning the conditions there. The Undersigned rejects this comment for two reasons.

First, ICE has waived the argument by mentioning it only in a footnote. It did not seek to dismiss the Petition, or even part of it, for this purported jurisdictional theory, nor did it discuss it in the text of its opposition brief.

"A party may abandon a claim by failing to 'plainly and prominently raise it, for instance by devoting a discrete section of his argument to' that claim." *Dash 224 LLC v.*

44

*Aerovias de Integracion Reg'l Aires SA*, 605 F. App'x 868, 870 (11th Cir. 2015) (citing *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014)).

Therefore, "burying a substantive argument in a footnote (only) is impermissible and waives the argument." *Zuma Seguros, CA v. World Jet of Delaware, Inc.*, No. 15-22626-CIV, 2017 WL 4237874, at *9 (S.D. Fla. Sept. 25, 2017); *see also Mock v. Bell Helicopter Textron, Inc.*, 373 F. App'x 989, 992 (11th Cir. 2010) (emphasis added) ("First, because Bell mentions its Rule 60(b)(5) argument in passing *in a footnote only* and does not elaborate on it in any further detail in either one of its briefs, we deem this argument waived.").

Second, even if the argument had not been waived, the Undersigned substantively rejects it. *See Masingene v. Martin*, No. 19-CV-24693, 2020 WL 465587, at *1 (S.D. Fla. Jan. 27, 2020) (rejecting government argument that the Southern District of Florida court lacked jurisdiction over petition filed by detainee in the Baker County Detention Center in the Middle District of Florida because the warden of the contract county facility is a non-federal actor, and the federal official most directly responsible for overseeing the contract facility -- the field office director for ICE's Miami field office -- is the appropriate respondent).

The *Masingene* Court, after noting that the Eleventh Circuit has not weighed in on the issue of the appropriate respondent in an immigrant detention case, held that it had jurisdiction over the habeas corpus petition filed by the Middle District detainee because the appropriate respondent, the Miami-based ICE Miami field office director, could be

reached by service of process. *See also Khodr v. Adduci*, 697 F. Supp. 2d 774, 776 (E.D. Mich. 2010) (finding proper respondent was the ICE District Director, not the warden of county jail); *Abner v. Sec'y of Dep't of Homeland Security*, No. 06CV308(JBA), 2006 WL 1699607, at *3-4 (D. Conn. June 19, 2006) (finding ICE field office director, not warden of county facility, was the correct respondent); *Zabadi v. Chertoff*, No. C 05-01796 WHA, 2005 WL 1514122, at *3 (N.D. Cal. June 17, 2005) (finding ICE district director, also known as the field office director, who could direct the county warden to release the petitioner was the proper respondent).

Although the Petition itself portrays itself as a class action, no motion for class certification was filed. Neither party has briefed the class action issue, and the issue was not discussed at all during the recent two-and-a-half-hour emergency hearing. [ECF No. 43]. In addition, Petitioners have not moved for conditional class certification either. For these reasons, the Undersigned deems it premature to rule on the class action theory.

The standard for obtaining a TRO is identical to that for obtaining a preliminary injunction. *Windsor v. United States*, 379 F. App'x 912, 916-17 (11th Cir. 2010). To obtain injunctive relief, Petitioners must make the following four showings:

(1) They have a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunctive relief issues; (3) the threatened injury to the movants outweighs whatever damage the proposed injunctive relief may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public

interest. *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1247 (11th Cir. 2016) (citing *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000)); *accord Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995).

As explained in *Wreal*, a preliminary injunction is an "extraordinary and drastic remedy," and a party seeking the relief bears the "burden of persuasion" to clearly establish all four of these prerequisites. *Id.*; *see also Siegel*, 234 F.3d at 1176 (citing *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998)).

Obtaining injunctive relief is, therefore, always a challenge. But the hurdles are higher than usual here for two reasons: Petitioners are, in effect, seeking a **mandatory** injunction and are seeking an injunction against **government officials**. That generates two additional hurdles.

A preliminary injunction is typically prohibitive in nature if it seeks to maintain the status quo by prohibiting a party from taking certain action pending resolution of the case. *Haddad v. Arnold*, 784 F. Supp. 2d 1284, 1295-96 (M.D. Fla. 2010). But when the injunction would force a party to act, and not simply maintain the status quo, it becomes mandatory. *Id.*

The Eleventh Circuit standard for a mandatory injunction is a "heightened standard" where the party seeking the relief must make a "clear" showing on each of the four elements of the injunction (instead of proceeding under a preponderance of the evidence standard). *See, e.g., FHR TB, LLC v. TB Isle Resort, LP.*, 865 F. Supp. 2d 1172, 1192

(S.D. Fla. 2011) ("When the moving party is seeking a *mandatory* injunction, it faces 'a particularly heavy burden of persuasion' . . . Moreover, if the requested injunction is mandatory, then [the movant's] burden is elevated to making a 'clear' showing on each of the four elements (instead of proceeding under a preponderance of the evidence standard).").

Florida district courts often adopt this heightened burden concerning mandatory injunctions. *See, e.g.*, *OM Group, Inc. v. Mooney*, No. 2:05CV546FTM33SPC, 2006 WL 68791, at *8 (M.D. Fla. Jan. 11, 2006) (citing *Miami Beach Fed. Sav. & Loan Ass'n v. Callander*, 256 F.2d 410, 415 (5th Cir. 1958); *Fla. Gun Shows, Inc. v. City of Fort Lauderdale*, No. 18-62345-FAM, 2019 WL 2026496, at *6, n.1 (S.D. Fla. Feb. 19, 2019) (internal citation omitted) ("A movant seeking a mandatory injunction, i.e., an injunction which goes beyond the status quo and forces a party to act, must meet a stricter test; such injunctions are only to be granted in rare circumstances in which the facts and law are clearly in favor of the moving party."). Plaintiff's request for a preliminary injunction arguably seeks a mandatory injunction and should be measured against that exacting standard. *See Haddad*, 784 F. Supp. 2d at 1295-96 (internal citation omitted) ("When a preliminary injunction is sought to force another party to act, rather than simply to maintain the status quo, it becomes a mandatory or affirmative injunction and the burden on the moving party increases . . . Accordingly, a plaintiff seeking such relief bears a heightened burden of demonstrating entitlement to preliminary injunctive relief."); *Verizon Wireless Pers. Commc'n LP v. City of*

*Jacksonville, Fla.*, 670 F. Supp. 2d 1330, 1346 (M.D. Fla. 2009) (internal citation omitted) ("Where a mandatory injunction is sought, courts apply a heightened standard of review; plaintiff must make a clear showing of entitlement to the relief sought or demonstrate that extreme or serious damage would result absent the relief.").

Given this perspective, courts generally *disfavor* mandatory injunctions. *Oscar Ins. Co. of Fla. v. Blue Cross & Blue Shield of Fla., Inc.*, 360 F. Supp. 3d 1278, 1284 (M.D. Fla. 2019) (citing *Powers v. Sec'y, Fla. Dep't of Corrs.*, 691 F. App'x 581, 583 (11th Cir. 2017) ("Mandatory preliminary relief, which goes beyond simply maintaining the status quo[,] is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party.")).

The primary injunctive relief sought here against ICE is, for all practical purposes, a mandatory injunction: it asks that ICE be required to release all the detainees. It is not merely asking that the status quo be maintained. The status quo is that the 34 Petitioners (and all the other potential class members) are currently detained. So, an order requiring ICE to release them is a mandatory injunction, which requires Petitioners to carry the heightened burden.

Because the Respondents are government officials, Petitioners face an additional burden. As succinctly explained in *Gwinnett Cnty. NAACP v. Gwinnett Cnty. Bd. Of Registration and Elections*, No. 20-cv-00912-SDG, 2020 WL 1031897, at *5 (N.D. Ga. Mar. 3, 2020) (denying motion for TRO and preliminary injunction against county board of

registration and elections and board members):

> [W]hen a party seeks to affirmatively enjoin a state **governmental agency,** requiring it to perform a certain action, the "case must contend with the well-established rule that the Government has traditionally been granted the **widest latitude** in the dispatch of its own affairs." *Martin v. Metro. Atlanta Rapid Transit Auth.*, 225 F. Supp. 2d 1362, 1372 (N.D. Ga. 2002) (citing *Rizzo v. Goode*, 423 U.S. 362, 378-79 (1976)). The court must also exercise greater caution when, as here, "the injunction will require detailed and continuous supervision over the conduct of that [government] subdivision." *Id.* (emphasis added).

Another district court in our circuit adopted a similar approach in *Martin v. Metro.*

*Atlanta Rapid Transit Auth.*, 225 F. Supp. 2d 1362, 1372–73 (N.D. Ga. 2002), and held that:

> This "well-established" rule [granting the government the widest latitude] bars federal courts from interfering with non-federal government operations in the absence of facts showing an immediate threat of substantial injury. *Midgett v. Tri–County Metropolitan District of Oregon*, 74 F. Supp. 2d 1008, 1012 (D.Or.1999), aff'd 254 F.3d 846 (9th Cir. 2001). *See also Brown v. Board of Trustees of LaGrange Ind. Sch. Dist.*, 187 F. 2d 20 (5th Cir. 1951). Therefore, any injunction against a state agency must be narrowly tailored to "fit the nature and extent" of the established constitutional or statutory violation. *See Gibson v. Firestone*, 741 F.2d 1268, 1273 (11th Cir.1984). **Greater caution** or care should be exercised where a **government subdivision** is involved, particularly where the injunction will require "detailed and continuous supervision" over the conduct of that subdivision. *Brown*, 187 F.2d at 24. Thus, Plaintiffs must show an **even stronger likelihood of success** when they request mandatory injunctive relief rather than prohibitory injunctive relief against a government entity. *See Harris v. Wilters*, 596 F.2d 678, 680 (5th Cir.1979) (emphasis added).

A.  Petitioner's Legal Theories

Petitioners assert three counts in their habeas corpus petition.

Count I is based on the so-called *Accardi* doctrine and asserts a claim under the

Fifth Amendment and the Administrative Procedures Act for violation of applicable

detention standards. The *Accardi* doctrine arises from *United States ex. rel Accardi v. Shaughnessy*, 347 U.S. 260, 266, 268 (1954), and Plaintiffs say the rule arising from that case is that agencies must follow their own rules and regulations. Plaintiffs allege that an agency which violates its own rules and regulations violates the Administrative Procedures Act ("APA") and the Fifth Amendment's Due Process Clause.

Count II asserts a Fifth Amendment claim for violating the detainees' right to be free from cruel and unusual punishment by being deliberately indifferent to the medical risks at the detention centers.

Count III is a Fifth Amendment claim under the so-called state-created danger doctrine.

But regardless of which of the counts they rely on, Petitioners are seeking **release** from custody -- but that remedy is *unavailable* in the Eleventh Circuit under these circumstances.

B. The 11th Circuit's *Gomez* Rule

In *Gomez v. United States*, 899 F.2d 1124 (11th Cir. 1990), the district court granted bail to a convicted criminal, who was an AIDS victim, pending consideration of his petition for habeas corpus. Convicted of a controlled substance violation, Gomez was given a 10-year sentence of imprisonment. His claim was that the medical treatment he was receiving for AIDS was inadequate, and therefore unconstitutional. Given his medical condition, Gomez argued that the ten-year sentence "amounts to a life sentence."

*Id.* at 1125.

Our appellate court reversed the bail and release order, noting that "the district court apparently overlooked the fact that *even if* Gomez prevailed on his habeas corpus petition, he would **not be entitled to be released** from prison." *Id.* (emphasis added).

The *Gomez* Court noted that a habeas corpus petition is the sole remedy for prisoners "challenging the fact or duration of their imprisonment" and emphasized that the Supreme Court had not addressed whether it could be used as a vehicle for relief from prison *conditions*. *Id.* Noting a split in the circuits, *Gomez* held that a prisoner is *not* entitled to release even if he proves an allegation of mistreatment in prison that amounts to cruel and unusual punishment. *Id.* at 1126.

Instead, *Gomez* held, the "appropriate Eleventh Circuit relief from prison conditions that violate the Eight Amendment during legal incarceration is to require the discontinuance of any improper practices, or to require correction of any condition causing cruel and unusual punishment." *Id.*

Therefore, the *Gomez* Court held, the "most relief" he could obtain if he proved cruel and unusual medical treatment of his AIDS would be an injunction against practices which violate the Eighth Amendment or a mandatory injunction "to bring his treatment up to constitutional standards." *Id.* at 1127.

There is no doubt that Petitioners in this lawsuit are challenging the *conditions* of their confinement at the three immigration detention centers, not the fact or duration of

their confinement.

To be sure, *Gomez* is a 30-year-old opinion. But it remains the law in our circuit and our courts are still bound by it: "[T]he law of the Eleventh Circuit is clear that the appropriate relief from unconstitutional prison conditions is not release by writ of habeas corpus. Instead, it is a discontinuance of the improper practice or correction of the conditions." *McLendon v. Vasquez*, No. CIV A CV206-280, 2007 WL 1116592, at *1-2 (S.D. Ga. Apr. 11, 2007) (citing *Gomez v. United States*, 899 F.2d 1124, 1127 (11th Cir. 1990)).

Because our circuit does not permit release from prison as a remedy for an unconstitutional condition of confinement, courts note that prisoners have the ability to bring a civil rights claim for the violation, which provides a remedy other than release:

> The proper vehicle for a prisoner to challenge his conditions of confinement is a civil rights action, rather than a habeas corpus action. . . . Since Moses is challenging the conditions of his confinement, the Court recharacterizes this proceeding as one arising under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), which authorized constitutional tort suits against federal officials. *See Castro v. United States*, 540 U.S. 375, 381, 124 S.Ct. 786, 157 L.Ed.2d 778 (2003) (substance must govern over nomenclature, so a proceeding's label that a litigant chooses is irrelevant).

*Moses v. Kramer*, No. CV412-024, 2012 WL 1448114, at *1 (S.D. Ga. Feb. 2, 2012).

The *Gomez* rule appears to be a minority view,[13] and some parties undoubtedly view it as rigid or outdated. Nevertheless, it remains vital and the passage of time has not

---

[13]    *Dawson v. Asher*, No. C20-0409JLR-MAT, 2020 U.S. Dist. LEXIS 47891, at *26 (W.D. Wash. Mar. 19, 2020) ("[T]he majority of federal circuit courts allow detainees to challenge their conditions of confinement via a habeas petition."). In denying a second motion for

eroded it. *See generally McLendon v. Vasquez*, No. CIV A CV206-280, 2007 WL 1116592, at

*1-2 (S.D. Ga. Apr. 11, 2007) (citing *Gomez*, 899 F.2d at 1126-27); *see also Hampton v. Fed.*

*Corr. Inst.*, No. CIV A 1:09CV00854RWS, 2009 WL 1703221, at *2 (N.D. Ga. June 18, 2009)

("In general, however, the proper vehicle for a prisoner to challenge his conditions of

confinement is a civil rights, rather than a habeas corpus, action.").

     Not only is the rule still very much alive, but a panel of the Eleventh Circuit (albeit

in an unpublished opinion) confirmed its application a few years ago with the following

unequivocal language: "We have held that release from custody is not an available

remedy, even if a prisoner establishes an Eighth Amendment violation." *Vaz v. Skinner*,

634 F. App'x 778, 781 (11th Cir. 2015). **"**Instead, '[t]he appropriate Eleventh Circuit relief

from prison conditions that violate the Eighth Amendment during legal incarceration is

to require the discontinuance of any improper practices, or to require correction of any

condition causing cruel and unusual punishment.'" *Id.* (citing *Gomez*, 899 F.2d at 1126).

---

a TRO brought by five detainees who ICE is holding in civil detention, the Court noted
that ICE had already released four other Petitioners and explained that "no one can
entirely guarantee safety in the midst of a global pandemic." *Id.*

     Not all circuits reject the *Gomez* rule. The Fifth Circuit Court of Appeals, for
example, follows the Eleventh Circuit approach. *See Sacal-Micha v. Longoria*, No. 1:20-CV-
37, 2020 WL 1815691 (S.D. Tex. Apr. 9, 2020) (denying habeas petition filed by
immigration detainee who alleged a risk of COVID-19 because he is elderly and has
serious medical conditions and emphasizing that the Fifth circuit has not recognized a
claim for habeas corpus release based on unconstitutional prison conditions).

There are even more-recent cases which continue to use the *Gomez* rule. *See e.g.,* *Helbig v. United States*, No. 4:18-CV-449-WS/MJF, 2019 WL 3976571, at *2 (N.D. Fla. July 31, 2019), *report and recommendation adopted*, No. 4:18-CV-449-WS/MJF, 2019 WL 3976314 (N.D. Fla. Aug. 22, 2019).

Therefore, even if Petitioners could establish their claims and even if they demonstrated a right to some type of injunctive relief, that relief would not include an order requiring this Court to release all the detainees (or even specific detainees). The Eleventh Circuit law does not permit that remedy.

**However**, the Undersigned concludes that the *Gomez* rule is based on the implicit assumption that a "correction" or discontinuance" of the unconstitutional practice is actually *available*. If no correction is feasible, then the remedy which the Eleventh Circuit relied upon would become illusory. If that were the case, then the Undersigned would reconsider the conclusion that there is no habeas corpus release remedy for the detainees at the three South Florida detention centers. *See A.S.M. v. Donahue*, No. 7:20-CV-62, 2020 U.S. Dist. LEXIS 65226, at *5 (M.D. Ga. April 10, 2020) (denying emergency motion for preliminary injunctive relief filed by ICE detainees held at two local detention centers who alleged risk of COVID-19 virus infection but noting that the Court might reconsider habeas relief as persuasive if the conditions "cannot be modified to reasonably eliminate those risks").

C. <u>The State-Created Danger Doctrine</u>

The Undersigned concludes that Petitioners have not demonstrated a substantial likelihood of success on their state-created danger theory. They *might* be able to ultimately prevail on the theory, but I cannot now conclude that they have met the substantial-likelihood-of-success standard. As explained below, it appears as though Petitioners' theory is akin to trying to jam a square peg into a round hole.

In *Perez-Guerrero v. U.S. Atty General*, 717 F.3d 1224 (11th Cir. 2013), the Eleventh Circuit explained that "only custodial relationships automatically give rise to a governmental duty, under substantive due process, to protect persons from harm by third parties." *Id.* at 1233 (citing *Doe v. Braddy*, 673 F.3d 1313, 1318 (11th Cir. 2012)). There is no dispute that Petitioners are in a custodial relationship, but ICE argues that COVID-19 is not a third party. [ECF No. 40, p. 9]. It says the cases in which individuals invoked the state-created danger doctrine involved harm caused by individuals, not a communicable disease. *White v. Lemacks*, 183 F.3d 1253 (11th Cir. 1999) (involving a nurse working in prison infirmary assaulted by inmate); *Perez-Guerrero,* 717 F.3d at 1124 (involving an alien claiming that his life would be threatened if deported to Mexico due to reprisals by persons he testified against in United States); *Doe v. Braddy* (involving a five-year old child sexually assaulted by teenaged minor placed by state social workers in adoptive home).

Therefore, ICE argues, "inasmuch as the **coronavirus** is not a third party,

petitioners cannot claim a substantive due process right to protection from it." [ECF No. 40, p. 10 (emphasis supplied)].

But this argument overlooks the possibility that other detainees with COVID-19 are (or could be, under a creative legal theory) the third parties from whom ICE should be providing protection. But this appears to be a stretch, because a detainee with the virus, especially a detainee who has no symptoms or who has been quarantined or put in a cohort group, is significantly different than a *criminal*.

At bottom, the state-created danger doctrine typically deals with the government's failure to protect a victim from the **criminal actions of third parties**.

Petitioners have not provided any legal authority holding that detainees (or ICE staffers or others at the detention centers) with COVID-19 constitute third parties who are causing criminal harm to the Petitioners. *See, e.g.*, *TM v. Polk Cnty. Sch. Bd.*, No. 8:06-CV-1370-T-MSS, 2006 WL 8440282, at *2 (M.D. Fla. Nov. 1, 2006) (emphasis added) ("Three exceptions, however, have emerged over the years to the general rule that a state is not constitutionally obligated to protect individuals against **criminal acts of private third parties**. Courts refer to these exceptions as (1) the special-relationship exception, (2) the state-created danger exception, and (3) the shocks the conscience exception.") (citing *Niziol v. Dist. Sch. Bd. of Pasco County*, 240 F. Supp. 2d 1194, 1204 (M.D. Fla. 2002)); *Brown v. Grabowski,* 922 F.2d 1097, 1100-01 (3d Cir. 1990) (finding "that a state's failure to take affirmative action to protect a victim from the actions of a third party will not, in the

absence of a custodial relationship . . . support a civil rights claim"); *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902 (3d Cir. 1997) ("As matter of law, third party's murder of daycare teacher, in classroom which daycare operator leased from school district, was not foreseeable and fairly direct result of operator's and district's act of allowing construction workers to use unlocked back entrance for access to school building in which classroom was located, for purpose of establishing liability of operator and district under state-created danger theory, despite defendants' alleged knowledge of previous security breaches.").

Under the state-created danger exception, the government "has a duty to protect an individual from third parties when the state's actions place an individual in 'special danger.'" *Polk Cnty. Sch. Bd.*, 2006 WL 8440282, at *3; *Mitchell v. Duval Cnty. Sch. Bd.*, 107 F.3d 837, 839 (11th Cir. 1997) ("In order for a plaintiff to hold the state liable under the "special danger" analysis, he must show that the state affirmatively placed him in a position of danger which was distinguishable from that of the general public.").

Thus, ICE's actions would need to involve **affirmative conduct** on the part of its detention center managers and staff, placing Petitioners in danger. *See Graham v. Ind. Sch. Dist. No. I-89*, 22 F.3d 991, 994 (10th Cir. 1994). Significantly, the state actor's *inaction* in the face of a known danger is *not enough* to trigger a constitutional duty to protect. *See id.* at 995.

The state-created danger theory has been applied in cases based on "discrete, grossly reckless acts committed by the state or state actors using their peculiar positions as state actors, leaving a *discrete* plaintiff vulnerable to foreseeable injury." *Kneipp v. Tedder*, 95 F.3d 1199, 1208 (3rd Cir. 1996) (emphasis added). Petitioners are not discrete plaintiffs. To the contrary, they and the putative class members appear to be the precise opposite of a discrete plaintiff.  Indeed, if *all* 1,400 detainees are part of the proposed class, then everyone is theoretically vulnerable, and that is not a specific and discrete plaintiff.

In describing the necessary factors finding liability under the state-created danger theory, the Fifth Circuit has emphasized that "the **acts of the state must facilitate the crime's commission**: [T]he environment created by the state actors must be dangerous; they must know it is dangerous; and to be liable, they must have used their authority to create an opportunity that would not otherwise have existed for the third party's crime to occur." *Polk Cnty. Sch. Bd.*, 2006 WL 8440282, at *4 (emphasis added) (citing *Mitchell*, 107 F.3d at 839).

"The essential elements of a meritorious 'state-created danger' claim" are:

(1) the harm ultimately caused was foreseeable and fairly direct; (2) a state actor acted with a degree of culpability that shocks the conscience; (3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all. U.S.C.A. Const. Amend 14.

*Bright v. Westmoreland Cnty.*, 443 F.3d 276 (3d Cir. 2006).

"The Eleventh Circuit has recognized that the Supreme Court has superseded the latter 'state-created danger' category. Now, the government's affirmative acts 'rise to the level of a substantive due process violation [when] the act can be characterized as arbitrary or conscience shocking in a constitutional sense.'" *L.L. ex rel. Linda L. v. Tuscaloosa City Bd. of Educ.*, No. 7:08-CV-2051-LSC, 2013 WL 169612, at *8 (N.D. Ala. Jan. 15, 2013) (citing *Waddell v. Hendry Cnty. Sheriff's Office*, 329 F.3d 1300, 1305 (11th Cir. 2003)).

By way of summary, the Undersigned is not convinced that Petitioners have established a likelihood of prevailing on this theory.[14]

D.  <u>The Accardi Theory</u>

The Eleventh Circuit has recognized the viability of an *Accardi* claim that an agency has violated its own guidelines and policies. *Kurapati v. U.S. Bureau of Citizenship & Immigration Servs.*, 775 F.3d 1255, 1262 (11th Cir. 2014) (finding that district court had subject matter jurisdiction over the claims raised in complaint because government agency failed to follow its own regulations); *see also Gonzalez v. Reno*, 212 F.3d 1338, 1349 (11th Cir. 2000) ("Agencies must respect their own procedural rules and regulations.");

---

[14]     Had Petitioners opted to file a reply memorandum rather than urge the Undersigned to keep a hearing date scheduled only a few days after the emergency motions were filed, the Undersigned may have benefitted from additional legal argument and been persuaded.

*Romano-Murphy v. Comm'r*, 816 F.3d 707, 718 (11th Cir. 2016).

Petitioners allege that ICE has failed to follow the National Detention Center Guidelines, which they say require ICE to also follow CDC Guidelines. The Undersigned finds that Petitioners have not established a substantial likelihood of prevailing on the merits because the applicable CDC Guidelines contain a substantial amount of flexibility and courts confronted with emergency motions to release state and federal prisoners and detainees because of COVID-19 have relied on this adaptability when denying applications for release of inmates or detainees.

Specifically, the CDC's Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities emphasizes, in bold font on the very first page, that **"the guidance may need to be adapted based on individual facilities' physical space, staffing, population, operations, and other resources and conditions."**

In addition, the guidelines for social distancing strategies explains that "strategies will need to be **tailored** to the individual space in the facility and the need of the population and staff. **Not all strategies will be feasible in all facilities."** (emphasis added).

Concerning cohorting, which is a primary issue on which Petitioners focus, the guidelines explain that "cohorting should only be practiced if there are no other available options." According to an ICE-filed supplemental Castano Declaration submitted on

61

April 21, 2020, there are 350 detainees in cohort status. [ECF No. 53-1]. Krome does not have anywhere near 350 separate rooms or cells in which to house these cohorts. So, cohorting is indeed a last resort.

Petitioners contend that cohorting is not a last resort measure because *release* of all cohorted detainees (350, as of now) is an alternative. The CDC Guidelines do not say this. And Petitioners have not called the Court's attention to a case which unequivocally holds that cohorting is not permitted. Theoretically, release is *always* an option, so, under Petitioners' theory, cohorting would never be an acceptable method because there would be another alternative (i.e., cohorting could never be the "last resort").

The CDC's decision to include a flexible, center-by-center approach was recently mentioned by a federal district court confronted with a challenge to the conditions at Chicago's Cook County Jail, which it described as being the "size of a small (but not all that small) town." *Mays*, 2020 WL 1812381, at *1.

The Court there acknowledged that "current housing arrangements make social distancing impossible or virtually so," and then noted that "the CDC's guidance is not as definitive as plaintiffs suggest; it acknowledges that space limitations may require a departure from better social-distancing practices." *Id.* at *10. Therefore, recognizing that "the CDC's guidance expressly recognizes that complete social distancing may not be possible in the sleeping areas of the jail" and that "space constraints at the Jail do not allow for the more preferable degree of social distancing that exists in the community at

large," the Court held that Plaintiffs had not established that the Sheriff is acting in an objectively unreasonable manner." *Id.*; *see also Plata v. Newsome*, No. 01-cv-01351 (N.D. Cal. Apr. 17, 2020), ECF No. 3266, p. 9 (noting "most significantly" that the CDC Guidelines recognize that strategies will "need to be tailored").

   E.   <u>Depending on the Facts, Petitioners May Have Demonstrated a Substantial Likelihood of Prevailing on Their Deliberate Indifference Theory</u>

To prevail on their request for injunctive relief under Count II, Petitioners must show a substantial likelihood of establishing that ICE has been deliberatively indifferent to their serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *cf. Hamm v. DeKalb County*, 774 F.2d 1567 (11th Cir. 1985); *see also Jordan v. Doe*, 38 F.3d 1559, 1564 (11th Cir. 1994).

The Undersigned is confronted with a muddy and uncertain factual record. Petitioners represent that certain conditions exist and that certain measures have or have not been taken, while ICE often makes different representations. I cannot determine from a review of the competing declarations which scenarios are true, which are partially true, which are false, which are misleading, and which are incomplete by omission.

For example, ICE represents that it issues sufficient soap to all detainees and that it is replenished. Some of the detainees say otherwise.

This type of factual dispute exists for several aspects of the Petitioners' claims, though some are surely not contested. For example, there is little doubt that social distancing is currently impossible at Krome because the sleeping arrangements and some

63

of the toilet and shower arrangements are too tight to permit it.

Thus, to the extent that ICE is not providing sufficient amounts of soap and cleaning material and masks (to detainees who have exhibited symptoms and those who are quarantined in cohorts), they are required to do so because the detainees have established irreparable harm (if this is, in fact, what is happening at the centers) and because the equities and public interest support such a preliminary injunction. Failure to do so, in the midst of a pandemic, constitutes deliberate indifference. *See Swain v. Junior*, No. 1:20-cv-21457-KMW (S.D. Fla. Apr. 7, 2020) ECF No. 25 (granting motion for TRO concerning Miami-Dade County's Metro West Detention Facility and noting that Plaintiffs' met the preliminary injunction standards, including a likelihood of success of prevailing on the merits of a deliberate indifference claim concerning the treatment of 1,800 prisoners raising allegations similar to the ones at issue here).

There can be little doubt that the Petitioners will suffer irreparable harm of the increased likelihood of severe illness and death if a preliminary injunction is not entered. In fact, ICE **does not even address the irreparable harm issue in its opposition brief**. As noted in *Fraihat*, No. EDCV 19-1546 JGB, ECF No. 132, p. 36, "the Constitution protects those in detention against a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year." (citing *Helling*, 509 U.S. at 33 ("It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had

happened to them.")).

The limited preliminary injunctive relief recommended here is in the public interest. When the government is the opposing party, the balancing of the harm and the public interest merge. *Niken v. Holder*, 556 U.S. 418, 435 (2009).

In its opposition brief, ICE argues that injunctive relief would not favor the public interest, but it seems clear that this argument is limited to the primary relief requested -- the immediate release of 1,400 detainees. The opposition memorandum does not explain how or why an Order requiring the steps outlined in the earlier section of this Report and Recommendations would undermine the public interest.

In fact, it is likely that the limited preliminary injunction recommended here could substantially **help** ICE because it could lead to the slowing of the spread of COVID-19 at the three centers. Not only would that be of critical importance to the detainees, but it would also be extremely helpful to ICE staff and employees and vendors, whose risk of contracting COVID-19 would also be decreased if certain health measures were undoubtedly used and if the census were to be substantially increased.

There are, of course, certain aspects of detention at the three facilities which undermine efforts to minimize the health risk -- but those conditions are, at least for now, an unavoidable reality.[15] But the Report and Recommendations, if adopted, could lead to

---

[15]    The Undersigned is not prepared to recommend that ICE not transfer to another ICE detention facility any of the current detainees. It is not clear to me that this is necessary or even advisable. In fact, in other recent lawsuits challenging prison or

a situation where those problematic conditions are either removed or reduced.

For example, it is impossible for the detainees to engage in adequate social distancing when their beds are so close together. But if the number of detainees were to substantially decrease through ICE-selected release on a substantial scale, then it might be possible for the detainees to skip beds and arrange for more than six feet between beds used by detainees. That would promote and perhaps allow adequate social distancing. For now, though, the Undersigned deems these conditions to be part of the harsh realities of operating a detention facility.

In other words, the situation at the three centers is not ideal and, short of closing down the centers or building new ones overnight or releasing all detainees, there is unfortunately not much can be done to change some prison realities under current Eleventh Circuit law.

## IV.   <u>Conclusion</u>

The Undersigned **respectfully recommends** that Judge Cooke adopt and affirm this Report and Recommendations and implement the 13 specific measures described in the introduction and summary section.

The Undersigned assumes that ICE officials, managers, employees, and staffers technically working for third-party contractors are all overworked, underpaid, stressed,

---

detention center conditions due to COVID-19, the petitioners have *requested* transfers. In *Mays v. Dart,* for example, certain petitioners asked to be transferred out of the Cook County Jail "to a safe facility." 2020 WL 1812381, at *15.

and under great pressure. They are likely also nervous. Some may be shaken by the pandemic and the intense responsibility which has been placed on them. ICE has not expressly said any of this in its opposition memorandum or during the emergency hearing. But it would be naïve to think otherwise.

This R & R does not demand the impossible. Reviewing protocols and striving to release a substantial number of detainees is workable. Following through and actually releasing detainees, especially those with medically high-risk conditions, is surely possible. ICE has already demonstrated its ability to achieve this by releasing detainees at Broward. The Undersigned does not expect ICE to release all detainees at the three centers, even though that is what Petitioners demand. But in the words of Petitioner's counsel during the emergency hearing, "don't let the perfect be the enemy of the good."

So, ICE can do this.

If it does not, then several things can happen. None of them will be good. Dozens and dozens of individual detainees could file separate federal court lawsuits, burdening this Court and the attorneys representing ICE. And, as noted, if the Court were to conclude that a correction to the unacceptable conditions of confinement is not possible through internal, good faith review of the census, then the *Gomez* rule might have to bend under these extraordinary circumstances.

So, ICE has the chance to do the right thing. This R & R, if adopted, gives ICE an opportunity to demonstrate its recognition of an unprecedented health crisis and its

ability to correctly (albeit belatedly) take steps to avoid a disaster.

## V.     Objections

The parties will have only **two calendar days** from the date of being served with a copy of this Report and Recommendations within which to file written objections, if any, with the District Judge. Each party may file a response to the other party's objection within **two calendar days** of the objection.[16] Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1 (2016).

**RESPECTFULLY RECOMMENDED** in Chambers, in Miami, Florida, on April 22, 2020.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

---

[16]     The Undersigned is significantly shortening the time for objections and responses because this Report addresses a bona fide emergency concerning critical health and safety issues. Thus, objections must be filed by one second before midnight on Friday, April 24, 2020, and the responses must be filed by one second before midnight on Sunday, April 26, 2020.

**<u>Copies furnished to:</u>**
The Honorable Marcia G. Cooke
All counsel of record