## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 20-21553-Civ-COOKE/GOODMAN

**PATRICK GAYLE**, *et al.*,

    *Petitioners-Plaintiffs*, on behalf of
    themselves and those similarly situated,

**v.**

**MICHAEL W. MEADE**, *et al.*,

    *Respondents-Defendants.*

_____/

### PETITIONERS' OBJECTIONS TO REPORT & RECOMMENDATIONS

Petitioners are being confined by Respondents in conditions that Judge Goodman correctly recognized are "serious and bone-chilling" in the midst of the deadly pandemic terrorizing our country.  ECF 63 at 10.  But Petitioners are not in Respondents' custody because they are serving criminal prison sentences.  Instead, Petitioners are in civil immigration detention.  Respondents insist that they have done all they can or will to ameliorate Petitioners' harsh conditions and that, given the current population levels at the three detention facilities at issue here, nothing more can be done to protect Petitioners against the serious risk of contracting the COVID-19 virus, which for many of them would entail a serious risk of slowly suffocating to death, alone, in the coming weeks.

Judge Goodman understood the danger to all Petitioners.  Properly acknowledging the risk to Petitioners' health and lives, Judge Goodman recommended that the ICE facilities reduce below capacity and that the Court implement a monitoring program to ensure the safety of remaining individuals detained.  Despite acknowledging that "immediate release of all detainees is the overarching, primary focus," the Magistrate nonetheless misunderstood the nature of the lawsuit as a "conditions case" and underestimated the Court's authority in habeas to protect Petitioner's lives.  ECF 63 at 4.  Historically, "common-law habeas corpus was, above all, an adaptable remedy" in which the "court's role was most extensive in cases of pretrial and noncriminal detention." *Boumediene v. Bush*, 553 U.S. 723, 779-80 (2008).  As

a result, the Magistrate's recommendations were far too modest.  Although the Magistrate correctly recognized Petitioners' chances of success with their count II claim for deliberate indifference under the Fifth Amendment, the Magistrate erred in his analysis of Petitioner's Claim for a State-Created Danger under the Fifth Amendment and their *Accardi* claim. Petitioners have a strong likelihood of success for both claims.

When the proper context of this case is understood—that this is a case involving men and women in civil detention who are seeking release to avoid irreparable harm, not people serving criminal sentences seeking to improve their conditions—the magistrate's unassailable factual conclusions inevitably lead to one legal conclusion:  the Court should release Petitioners and order ICE to implement CDC guidance and protocols "because detention facility administrators 'are bound by constitutional requirements even when they are dealing with difficult and unfamiliar challenges to public health and safety.'" ECF 63 at 11 (*citing Mays v. Dart*, No. 20 C 2134, 2020 WL 1812381 (N.D. Ill. Apr. 9, 2020)).  While Judge Goodman may be right that Respondents cannot take the precautions needed to guard against the spread of this disease within the three facilities at issue here given the current populations of those facilities, the populations of those facilities can—and must—be greatly reduced.

Just yesterday, the United States District Court for the Central District of California considered a nearly identical case and ordered ICE to *immediately* release detained individuals so that remaining detained individuals could follow CDC guidelines for social distancing. *Roman v. Wolf,* EDCV 20-00768 TJH (PVC) (C.D. CA Apr. 23, 2020) (Ex. A).  Indeed, Federal judges across the country have ordered the urgent release of numerous immigrants because of the pressing health risks created by ICE detention and other types of imprisonment.[1]

---

[1] *See, e.g., Xochihua-Jaimes v. Barr*, 2020 WL 1429877 (9th Cir. Mar. 24, 2020);*Vazquez Barrera v. Wolf*, Case No. 4:20-cv-01241 (S.D. T.X. Apr. 17, 2020), ECF No. 41; *Barbecho v. Decker*, Case No. 1:20-cv-02821 (S.D. N.Y. Apr. 15, 2020), ECF No. 20; *Hope v. Doll*, Case No. 1:20-cv-00562-JEJ (M.D. Pa. Apr. 7, 2020), ECF No. 11; *Martin Munoz v. Wolf*, Case No. 20-cv-00625-TJH-SHK (C.D. Cal. Apr. 2, 2020), ECF No. 14; *Robles Rodriguez v. Wolf*, 20-cv-00627-TJH-GJS (C.D. Cal. Apr. 2, 2020), ECF No. 37; *Hernandez v. Wolf,* CV 20-60017-TJH (KSx)(C.D. Cal. Apr. 1, 2020), ECF No. 17; *Arana v. Barr*, 2020 WL 1502039 (S.D.N.Y. Mar. 27, 2020); *Xuyue Zhang v. Barr*, 2020 WL 1502607 (C.D. Cal. March 27, 2020); *Basank v. Decker*, 2020 WL 1481503 (S.D.N.Y. Mar. 26, 2020); *Castillo v. Barr*, 2020 WL 1502864 (C.D. Cal. March 27, 2020); *Thakker v. Doll*, No. 1:20-cv-00480-JEJ (M.D. Pa. Mar. 31, 2020), ECF

The Court should do the same here.  Petitioners simply ask not to be confined in conditions that will all but guarantee they contract the deadly COVID-19 disease.  The Court has the power to order their release, and indeed, Petitioners submit that the undisputed facts leave that as the only proper result.

## STANDARD

In reviewing a report and recommendation issued by a magistrate judge, the district court must make a *de novo* determination of those portions of the report and recommendation to which an objection is made.  28 U.S.C. § 636(b).  Even in the absence of an objection, the district judge also reviews legal conclusions *de novo*. *See Cooper-Houston v. S. Ry. Co.*, 37 F.3d 603, 604 (11th Cir. 1994); *Castro Bobadilla v. Reno*, 826 F. Supp. 1428, 1431-32 (S.D. Fla. 1993), aff'd, 28 F.3d 116 (11th Cir. 1994). *De novo* review requires independent consideration of factual issues based on the record.  *Diaz v. United States*, 930 F.2d 832, 836 (11th Cir. 1991) (citing *Jeffrey S. by Ernest S. v. State Board of Educ.*, 896 F.2d 507, 513 (11th Cir. 1990)).

## ARGUMENT

**I.   THE MAGISTRATE ERRED BY ASSUMING THAT PETITIONERS HAVE FEWER RIGHTS THAN PEOPLE SERVING CRIMINAL SENTENCES.**

Unfortunately, Judge Goodman's evocative descriptions of the grim conditions Petitioners face are accurate and, if anything, understate the dangers to Petitioners.  But the legal analysis that flows from these facts in the Report and Recommendations is misaligned.  The Report and Recommendations repeatedly pulls from and focuses its analysis on cases involving prisoners who are detained because they are serving a criminal sentence.  For example, the Magistrate discusses at length the prison population and how any decision must incorporate "the realities of prison administration." ECF 63 at 13-14 (internal quotation omitted).  This perspective pervades the Report and Recommendations.  The Magistrate improperly evaluated the issues as if Petitioners are seeking early release from a term of imprisonment as a punishment for a crime.  But Petitioners are not serving criminal sentences.

No. 47; *Coronel v. Decker*, 2020 WL 1487274 (S.D.N.Y. Mar. 27, 2020); *Fraihat v. Wolf*, No. ED CV 20-00590 TJH (KSx) (C.D. Cal. Mar. 30, 2020); *Calderon Jimenez v. Wolf*, No. 18 Civ. 10225 (D. Mass. Mar. 26, 2020), ECF No. 507; *United States v. Stephens*, 2020 WL 1295155, at *2 (S.D. N.Y. Mar. 19, 2020); *Matter of Extradition of Toledo Manrique*, 2020 WL 1307109, at *1 (N.D. Cal. Mar. 19, 2020).

Respondents are voluntarily imprisoning Petitioners for civil immigration purposes. Accordingly, the proper question before the Court is not the one the Magistrate asked about the tools a court has available to it to improve the conditions of mandatory confinement. Rather, the question is whether, given conditions the Magistrate rightly found intolerable and unable to be remedied, Respondents can justify Petitioners' continued confinement at all. The answer is clearly "no."

As civil detained individuals, immigrants are afforded *greater protection* by the Fifth Amendment's Due Process Clause than convicted prisoners or even pretrial criminal detained individuals. Civil immigration detained individuals "must be afforded more considerate treatment" than criminal pretrial detained individuals. *See Unknown Parties*, 2020 WL 813774, at *12 (citing *Youngberg v. Romeo*, 457 U.S. 307, 321-22 (1982)). That is, unlike a convicted prisoner, who may be punished as long as the punishment is not "cruel and unusual," *Pierce v. Cty of Orange*, 526 F.3d 1190, 1205 (9th Cir. 2008), Respondents, as civil detained individuals, *may not be punished at all*. *Bell v. Wolfish*, 441 U.S. 520, 535 (1970) ("[U]nder the Due Process clause, a detainee may not be punished prior to adjudication of guilt.") And this is especially true here because Petitioners are not even awaiting a criminal trial, so at no point in this process can they be punished.

A presumption of punishment arises when a civil detained individual is held in similar or more restrictive conditions than his criminal counterparts. *See Jones v. Blanas*, 393 F. 3d 918, 932 (9th Cir. 2004); *see also Torres v. U.S. Dep't of Homeland Sec.*, 411 F. Supp. 3d 1036, 1065 (C.D. Cal. 2019) (finding a presumption of punitiveness where plaintiffs "allege[d] conditions at Adelanto and policies by ICE that are not 'more considerate' than at criminal facilities"); *Telfair v. Gilberg*, 868 F. Supp. 1396, 1412 (S.D. Ga. 1994) ("[I]f conditions are so extreme that less harsh alternatives are easily available, those conditions constitute 'punishment.'"). Respondents' position is that they are doing their best. But under current conditions, Petitioners are being treated **worse** than people serving criminal sentences.

Both the U.S. and Florida governments are currently reducing their prison populations to protect against the spread of COVID-19. Nearly three weeks ago, Attorney General Barr issued a memorandum to the Federal Bureau of Prisons urging the increase of home confinement at federal institutions most impacted by COVID-19. April 3, 2020 Memorandum of Hon. W. Barr to the Director of Bureau of Prisons, at 1 (Ex. B). "[W]e are

experiencing significant levels of infection at several of our facilities. . . . We have to move with dispatch in using home confinement, where appropriate, to move vulnerable inmates *out of these institutions*." *Id.* (emphasis added). The memorandum also declared "emergency conditions" within Bureau of Prisons facilities, thus clearing the way under the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) for the BOP to impose home confinement for a greater percentage of inmates. CARES Act § 12003(b), Pub. L. No. 116-136, 134 Stat. 281 (2020). But Attorney General Barr did not stop there. Just three days later, on April 6, 2020, he issued a memorandum directing federal prosecutors to consider COVID-19-related medical risks in their advocacy under the Bail Reform Act. April 6, 2020 Memorandum of Hon. W. Barr to the Director of Bureau of Prisons (Ex. C). Attorney General Barr explained that every new admission "presents at least some risk to the personnel who operate that facility and to the people incarcerated therein." *Id.* Moreover, any admission "presents risk to the individual being remanded into custody — risk that is particularly acute for individuals who are vulnerable to a serious infection." *Id.* In short, Attorney General Barr directed federal prosecutors and the Federal Bureau of Prison to do what ICE refuses to do – evaluate and release individuals in custody to home confinement.

Florida prisons have similarly released convicted prisoners to reduce the risk of passing COVID-19. In one high-profile example, Corrine Brown, the former Congresswoman convicted of 18 counts of fraud and lying on her tax returns and congressional financial disclosures, was recently released several years before her sentence was completed. Richard Tribou and Katie Rice, *Corrine Brown Released From Central Florida Prison Amid COVID-19 Concerns*, Orlando Sentinel (Apr. 22, 2020) (Ex. D). This stands in stark contrast to ICE's refusal to stop detaining 1,400 men and women from their custody – not one of whom is serving a sentence for a crime.

These policies and releases from the Federal and Florida Bureau of Prisons confirm that release is the appropriate remedy for Petitioners (who are not serving criminal sentences). More than that, it shows that it is entirely within Respondents' power to protect all of the people at the three facilities at issue here by releasing Petitioners and other detained individuals; Respondents have simply chosen to not release sufficient numbers of detained individuals for reasons that remain elusive. Having artificially constrained the available remedies, Respondents insist that no more can be done. This disparate treatment—with

Petitioners, as civil detained individuals, facing worse conditions than people serving permissibly punitive criminal sentences—is the very definition of the kind of punitiveness that is improper and inconsistent with lawful justifications for civil detention.  This disparate treatment means that Petitioners and other detained individuals are being punished and mandates their release.

Although the Magistrate cited several other cases involving the release of prisoners, he failed to apply the applicable standard for when people in civil detention seek release from confinement.  Properly framed as a case involving people in civil detention, the disturbing facts that Judge Goodman found lead only to the conclusion that Petitioners can and should be released so that they can protect themselves.  The Court should require ICE to immediately release the vast majority of detained individuals such that the remaining detained individuals can be held in full compliance with CDC Guidelines.

## II.   THE MAGISTRATE INCORRECTLY CONCLUDED THAT THE COURT DOES NOT HAVE THE AUTHORITY TO RELEASE PETITIONERS.

Along the same lines, the Magistrate incorrectly framed this case as a case challenging the *conditions* of confinement, when Petitioners are challenging the *fact* of their confinement. This legal error led the Magistrate to conclude that the law in the Eleventh Circuit prohibits the Court from ordering the release of civil detained individuals.  ECF 63 at 51-55.  As a result, the Magistrate decided that he could not recommend the release of any detained individuals, despite his serious concern for Petitioners' health and wellbeing at ICE facilities. *See* ECF 63 at 51.

But the law does allow the Court to release these people from civil detention if they challenge the fact of their confinement.  First, the Magistrate misunderstood the challenge in Petitioners' complaint—the fact of their confinement—while acknowledging that habeas corpus is an appropriate remedy for detained individuals challenging the fact of confinement. Second, the very case the Magistrate relies upon in the Report and Recommendations, *Gomez v. United States*, 899 F.2d 1124 (11th Cir. 1990), expressly allows the Court to release detained individuals under the circumstances present here—the same circumstances which have been found compelling for release in courts around the country.  Petitioners here are civil immigration detained individuals, who have traditionally had recourse to § 2241 for constitutional challenges to their detention. *See, e.g.*, *Zadvydas v. Davis*, 533 U.S. 678, 687-88,

(2001) (holding that § 2241 was a proper vehicle to challenge an immigration detainee's detention as violating due process due to its length). This Court has the inherent authority to release Petitioners.

### A.   The Magistrate Misunderstood Petitioners' Requested Relief.

The Magistrate misconstrued the relief Petitioners seek, writing that: "no doubt that Petitioners in this lawsuit are challenging the *conditions* of their confinement at the three immigration detention centers, not the fact or duration of their confinement." ECF 63 at 52-53. Not so. Petitioners are challenging *the fact* of their confinement by alleging that their confinement is improper under the circumstances and conditions at the detention facilities. *See Malam v. Adducci*, No. 20-10829, 2020 U.S. Dist. LEXIS 59407, at *6-8 (E.D. Mich. Apr. 5, 2020) ("Supreme Court and Sixth Circuit precedent support the conclusion that where a petitioner claims no set of conditions would be sufficient to protect her constitutional rights, her claim should be construed as challenging the fact, not conditions, of her confinement and is therefore cognizable in habeas."); *see also Adams v. Bradshaw*, 644 F.3d 481, 483 (6th Cir. 2011) (upholding habeas jurisdiction over a claim where a petitioner challenged the method of his execution but did not concede that any acceptable alternative existed because "Adams has not conceded the existence of an acceptable alternative procedure. . . . Thus, Adams's lethal-injection claim, if successful, could render his death sentence effectively invalid."). *Awshana v. Adducci*, No. 20-10699, 2020 U.S. Dist. LEXIS 62415, at *4 (E.D. Mich. Apr. 9, 2020) ("The petitioners . . . argue, the *only* remedy that will vindicate their due process right under the Fifth Amendment is *release* from custody. That form of relief falls squarely within the prevue of section 2241.").

As the Magistrate states, *Gomez* held that habeas corpus is the "sole remedy" for prisoners—like the Petitioners—who are challenging the fact or duration of their imprisonment. ECF 63 at 52. Thus, even *Gomez* recognizes that its bar to release only applies to a conditions case of the sort Petitioners do not raise here, and that habeas corpus is the proper remedy for the type of claim Petitioners assert here.

### B.   *Gomez* Allows the Court to Release Petitioners.

The Magistrate's conclusion that the Court cannot release Petitioners is based on an incorrect reading of the Eleventh Circuit's decision in *Gomez*. While the court in that case concluded that it was improper to release the prisoner on bail because of the medical treatment

he was receiving, the court also articulated the standard in the Eleventh Circuit for when a prisoner *may* be released on bail pending a habeas corpus petition.  Even as to people incarcerated as punishment for a crime (which Petitioners are not), *Gomez* allows this relief under certain circumstances:

"A prisoner seeking release pending habeas corpus can be granted bail under two sets of circumstances:  *first*, he must demonstrate a likelihood of success on the merits of a substantial constitutional claim; *second*, extraordinary and exceptional circumstances must exist which make the grant of bail necessary to preserve the effectiveness of the habeas corpus relief sought."  *Gomez* at 1125; *see also Lukaj v. McAleenan,* 420 F. Supp. 3d 1265 (M.D. Fla. 2019); *Siegel v. U.S. Parole Comm'n*, 613 F. Supp. 127 (S.D. Fla. 1985).  Courts in the other circuits have applied analogous standards to release detained individuals during the pendency of habeas claims challenging immigration detention during the COVID-19 pandemic.  *See e.g., Rafael L.O. v. Tsoukaris*, Civil Action No. 20-3481 (JMV), 2020 U.S. Dist. LEXIS 62389, at *14 (D.N.J. Apr. 9, 2020) (noting court's inherent authority to grant release on a writ of habeas corpus on the under the "extraordinary circumstances" standard from *Lucas v. Hadden*, 790 F.2d 365 (3d Cir. 1986)); *Rafael L.O. v. Tsoukaris*, Civil Action No. 20-3481 (JMV), 2020 U.S. Dist. LEXIS 62389, at *14 (D.N.J. Apr. 9, 2020) (same); *Coronel v. Decker*, No. 20-cv-2472 (AJN), 2020 U.S. Dist. LEXIS 53954, at *26 (S.D.N.Y. Mar. 27, 2020) (applying standard from *Mapp v. Reno*, 241 F.3d 221, 226 (2d Cir. 2001), the court "must inquire into whether 'the habeas petition raises substantial claims and [whether] extraordinary circumstances exist[] that make the grant of bail necessary to make the habeas remedy effective.'").

In *Gomez*, the petitioner claimed that his Eighth Amendment rights were violated because he was not receiving adequate treatment for AIDS.  *Gomez* at 1125.  It was clear that the Bureau of Prisons had the ability to treat AIDS patients in its facilities.  *Id.* at 1126.  The court concluded that even if Gomez succeeded on his 8th Amendment claim, the most relief he would be entitled to was cessation of the cruel and unusual punishment.  *Id.* at 1127.  Release from prison, therefore, would afford Mr. Gomez more relief than he would have been entitled to if he prevailed on his claims, and it was therefore not an appropriate remedy.  *Id*.

Nevertheless, the Eleventh Circuit made it clear that people in Petitioners' situation *can* be released if they can demonstrate a likelihood of success on the merits of a substantial

constitutional claim, and if they can demonstrate that "extraordinary and exceptional circumstances" exist that make release necessary. *Gomez* at 1125. Unlike Mr. Gomez, Petitioners meet both of these conditions. As discussed below, Petitioners can demonstrate a likelihood of success on the merits of substantial constitutional claims. Moreover, it is apparent that the "horrific and scary" COVID-19 pandemic has created "extraordinary and exceptional circumstances" requiring the release of Petitioners to prevent infection and the spread of disease to themselves and others. *See* ECF 63 at 51.

The Magistrate also discussed an unpublished Eleventh Circuit opinion, *Vaz v. Skinner*, 634 F. App'x 778, 781 (11th Cir. 2015), to show that the court continues to hold that a prisoner may not be released from custody even if they establish an Eighth Amendment violation. *See* ECF 63 at 54. In that case, a detained individual who had been convicted of domestic violence and theft sought release from custody because he allegedly had not received adequate medical treatment following extraction of his wisdom teeth. *Id.* at 780. The parties did not contest whether such treatment was available; presumably, it was, as in *Gomez*. The district court concluded that release from custody was not an available form of relief because the detained individual's complaint was about the conditions of his confinement, not the fact or duration of it. *Id.* at 780-81. Instead, as in *Gomez*, the court stated that the relief available to the detained individual was discontinuance of the prohibited activity, not release.

Both *Gomez* and *Vaz* differ from this case, and neither bars Petitioners' release. In those cases, the petitioners suffered from medical conditions that could be treated by the Bureau of Prisons and the Department of Homeland Security, respectively. The remedy of curative medical treatment was therefore available to them, and release was not necessary because the fact of confinement was not the source of the threat. Here, on the contrary, Petitioners contest the very fact of their continued detention because ICE *cannot* implement procedures to ensure that they will not develop COVID-19. Petitioners are not asking Respondents to provide better medical care; they are asking to be released from a facility where they are all but certain to contract a highly virulent, lethal virus.

Even if Petitioners' habeas corpus petition were based solely on the conditions of their confinement, the Court should still grant Petitioners' Motion. *See Thakker v. Doll,* No. 1:20-cv-480, 2020 U.S. Dist. LEXIS 59459, at *6 (M.D. Pa. Mar. 31, 2020) ("we note that federal courts, including the Third Circuit, have condoned conditions of confinement challenges

through habeas."). Judge Goodman acknowledged that prohibiting the release of prisoners based on the conditions of their confinement is the minority view. ECF 63 at 53. Most circuits that have addressed the issue allow the release of prisoners under similar circumstances. *Aamer v. Obama*, 742 F.3d 1023, 1035 (D.C. Cir. 2014) (recognizing that a court may order the release of prisoners where the conditions of their confinement violate their constitutional rights); *U.S. v. DeLeon*, 444 F.3d 41, 59 (1st Cir. 2006) ("If the conditions of incarceration raise Eighth Amendment concerns, habeas corpus is available."); *Thompson v. Choinski,* 525 F.3d 205, 209 (2d Cir. 2008) ("This court has long interpreted § 2241 as applying to challenges to the execution of a federal sentence, including such matters as the . . . prison conditions."); *Woodall v. Fed'l Bureau of Prisons*, 432 F.3d 235, 242 (3d Cir. 2005) (holding that prisoner's habeas challenge could proceed "even if what is at issue . . . is 'conditions of confinement'"); *McNair v. McCune*, 527 F.2d 874, 875 (4th Cir. 1975) (holding that a habeas challenge could proceed regarding "the complaint of a federal prisoner who is challenging not the validity of his original conviction, but the imposition of segregated confinement without elementary procedural due process and without just cause"); *Adams,* 644 F.3d at 482-83 (the Sixth Circuit holding that prisoner's Eighth Amendment challenge to the state's lethal injection procedures could be brought in habeas).

That Petitioners' continued civil confinement by Respondents exposes them to an extreme risk of contracting COVID-19 and suffocating to death in the coming weeks is exactly the type of extraordinary circumstance contemplated by the holding in *Gomez* that release is allowed under extraordinary circumstances. It is undisputed that COVID-19 is a deadly disease that has infected millions of people and is killing tens of thousands—putting a strain on the entire medical system. As the Magistrate recognized, Respondents cannot properly implement CDC social distancing measures in the three facilities at issue here given the current populations of those facilities. Indeed, Respondents purport to be doing their absolute best to protect the health of detained individuals, but as the Magistrate observed, Petitioners still face appalling conditions and risks. As a result, the only way to preserve Petitioners' health and lives is their immediate release so that they can protect themselves – which is why Petitioners sought that remedy. The Court should order such a release.

**C.**     **The Magistrate Failed to Consider the Court's Power to Release Petitioners on Bail Pending Final Resolution of Their Habeas Claims.**

Even if the Court concludes that Petitioners have not met the requirements for a preliminary injunction, the Court may release them on bail pending final resolution of their habeas claims under the Second Circuit's decision in *Mapp v. Reno*, 241 F.3d 221, 226 (2d Cir. 2001); *see also* Opinion and Order at 24, *Basank v. Decker*, No. 20 Civ. 2518 (S.D.N.Y. Apr. 23, 2020) (Ex. E).  In *Mapp*, the Second Circuit held "that the federal courts have inherent authority to admit to bail individuals properly within their jurisdiction," including individuals detained for immigration purposes petitioning for habeas relief.  *Mapp*, 241 F.3d at 226.  A habeas petitioner's "fitness for bail" depends on "whether the habeas petition raises substantial claims and whether extraordinary circumstances exist that make the grant of bail necessary to make the habeas remedy effective."  *Id.* at 230 (internal quotation marks, citation, and alteration omitted).

Petitioners' habeas claims are plainly substantial.  As Judge Goodman described, the threat Petitioners face from the COVID-19 pandemic are "bone-chilling" and "horrific."  ECF 63 at 10.  And releasing Petitioners from confinement pending final adjudication of their petition is necessary to "make the habeas remedy effective."  *Id.*  "Severe health issues have been the prototypical but rare case of extraordinary circumstances that justify release pending adjudication of habeas."  *Coronel v. Decker*, No. 20 Civ. 2472, 2020 WL 1487274, at *9 (S.D.N.Y. Mar. 27, 2020); *see also Barbecho v. Decker*, No. 20 Civ. 2821, 2020 WL 1876328, at *8 (S.D.N.Y. Apr. 15, 2020) ("If these Petitioners—whose medical conditions place them at a higher risk of severe illness, or death, from COVID-19—were to remain detained, they would face a significant risk that they would contract COVID-19—the very outcome they seek to avoid.  Release is therefore necessary to make the habeas remedy effective.") (internal quotation marks and citation omitted).  "Detention of Petitioners pending final adjudication of this action could cause severe illness or death—precisely the harm their petition seeks to avert."  *Basank* Order at 25 (Ex. E).  The effectiveness of the habeas remedy can be preserved only by releasing Petitioners.

Indeed, forcing Petitioners to remain locked in the unsafe conditions at Glades, Krome and BTC on the grounds that habeas relief is unavailable on these facts – with no other remedy and no available due process rights – would be such an extreme outcome as to run afoul of

the Suspension Clause.  *See Boumediene*, 553 U.S. at 792 (requiring adequate substitute from habeas process to avoid suspension clause violation—particularly for claims involving civil confinement); Art. I, § XI clause 2.  The governing decisions do not dictate this result.

## III.   THE MAGISTRATE ERRED BY CONCLUDING THAT THE STATE-CREATED DANGER DOCTRINE DID NOT APPLY.

Petitioners' continued detention violates their constitutional rights.  President Trump has said that he is a "wartime President" fighting an "invisible enemy."[2]  Despite this apt personification of COVID-19, Respondents argue that the state-created danger doctrine does not apply because COVID-19 is not a "third party."  ECF 40, p. 10.  This misses the point.  Petitioners are not asking for protection from COVID-19 – they are asking for protection from Respondents, who are forcing Petitioners to live in unsanitary and tight conditions with third parties carrying the deadly virus.  "[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being."  *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 199-200 (1989).  The duty in such cases arises from the limitations which the government has imposed on the freedom of the individual to act on his own behalf.  *Id*.  If Petitioners are released, they can isolate themselves from people who have been infected with COVID-19.  Instead, Respondents are forcing them to share air, water, toilet facilities, and tight dormitories with people who have been exposed to COVID-19.  There is no doctrinal reason why the state's obligation to care for people in its custody is limited to protection from "third parties," and such an exclusion would defy common sense.[3]

Tellingly, Respondents have not cited any cases holding that the intentional, malicious act of a "third party" is required to invoke the state-created danger doctrine.  It is not.  In fact, the Third Circuit has recognized that the state itself can create a dangerous situation by its inability to control infectious disease.  In *Kaucher v. County of Bucks*, 455 F.3d 418, 420 (3d

---

[2] https://www.politico.com/news/magazine/2020/04/09/trump-coronavirus-invisible-enemy-177894 (accessed April 23, 2020).

[3] Though the Report and Recommendations further narrows this to "criminal actions of third parties" [ECF No. 63, p. 57], as shown below, the doctrine applies to situations where the state actors are the ones who create the dangerous situation.

Cir. 2006), a corrections officer and his wife sued the County of Bucks, contending that "they contracted Methicilin Resistant Staphylococcus aureus infections as a result of defendants' conscience-shocking behavior in creating unsanitary and dangerous conditions at the jail." They alleged that the county should be held liable under the state-created danger doctrine. *Id*. at 424. While the Court ultimately concluded that the Kauchers failed to allege that the state actors acted "with a degree of culpability that shocks the conscience," *id*. at 431, the opinion shows that the state's creation of "unsanitary and dangerous conditions at the jail" are actions that trigger the doctrine.[4]

The Ninth Circuit has similarly found that environmental conditions can be the basis for the state-created danger doctrine. In *Pauluk v. Savage*, 836 F.3d 1117, 1119 (9th Cir. 2016), employees of the Clark County Health District alleged that a "workplace environment infested with toxic mold" was a due process violation. The court determined that the plaintiffs "stated a claim under the state-created danger doctrine, notwithstanding the fact that the danger at issue is a physical condition in the workplace." *Id*. In reaching that conclusion, the Court noted that "a state actor can be held liable for failing to protect a person's interest in his personal security or bodily integrity when the state actor affirmatively and with deliberate indifference placed that person in danger." *Id*. at 1122; *see also Munger v. City of Glasgow Police Dept.*, 227 F.3d 1082, 1087 (9th Cir. 2000) (finding that police officers could be held liable for a death caused by hypothermia where they ejected an intoxicated person from a bar late at night when they knew that the person was "wearing only a t-shirt and jeans, was intoxicated, was prevented by the officers from driving his truck or reentering Stan's Bar, and was walking away from the nearby open establishments.).

None of the cases cited in the Report and Recommendations compel the Court to reject Petitioners' theory here.

The Report and Recommendations also misconstrues the law with respect to the necessity of showing affirmative conduct. ECF 63, pp. 58. The Report and Recommendations suggest that ICE is merely a passive observer to the conditions at the

---

[4] Several pretrial detained individuals who contracted infections in the Bucks County Correction Facility successfully sued because the facility's "deliberate indifference allowed conditions in the facility that were likely to cause disease, injury, or suffering." *Keller v. County of Bucks*, CIV.A.03-4017, 2005 WL 675831, at *1 (E.D. Pa. Mar. 22, 2005).

detention facility, which is "not enough to trigger a constitutional duty to protect." *Id.*  This conclusion is flawed for two reasons.  First, the "affirmative conduct" cases cited all involve non-custodial conduct, which is vastly different from the situation here.  *See TM v. Polk County Sch. Bd.*, 8:06-CV-1370-T-MSS, 2006 WL 8440282, at *4 (M.D. Fla. Nov. 1, 2006) (claim involving student at public school); *Mitchell v. Duval County Sch. Bd.*, 107 F.3d 837, 839 (11th Cir. 1997) (same); *Graham v. Indep. Sch. Dist. No. I-89*, 22 F.3d 991, 995 (10th Cir. 1994) ("In the absence of a custodial relationship, we believe plaintiffs cannot state a constitutional claim based upon the defendants' alleged knowledge of dangerous circumstances.").  As *Graham* explains, "[i]naction by the state in the face of a known danger is not enough to trigger the obligation; according to *DeShaney* the state must have limited in some way the liberty of a citizen to act on his own behalf."  *Graham*, 22 F.3d at 995.  Petitioners here are limited, and "inaction" is not a proper consideration.

Second, Respondents' affirmative conduct endangers Petitioners:

- **Not restricting transfers.**  CDC guidelines recommend that transfers of detained individuals be restricted with few exceptions.  Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities ("CDC Guidelines") at 9 (Ex F).  ICE not only declined to agree to restrict transfers during the April 17 hearing, but their own declarations prove that detained individuals are being transferred even now as more staff and detained individuals test positive for COVID-19.  For example, Acting Officer in Charge Castrano filed declarations on April 16 and again four days later on April 20.  *See* Apr. 16, 2020 Castrano Aff. [ECF 33-1]; Apr. 20, 2020 Castrano Aff. [ECF 53-1].  On both dates, Building 11 was under cohorting quarantine – with 104 detained individuals on April 16 but only 98 detained individuals on April 20.  Six detained individuals were released from the quarantine, transferred to another location in violation of CDC guidelines, despite the fact that the number of staff who tested positive increased by more than 100% during those four days.

- **Quarantining new detained individuals.**   CDC recommends routine intake quarantining, which means "quarantining all new intakes for 14 days before they enter the facility's general population (SEPARATELY from other individuals who are quarantined due to contact with a COVID-19 case)." (Appx. I, Ex. F, at 61.) (emphasis in original).  This also is not being done.

- **Not allowing appropriate social distancing.**  CDC describes social distancing as the "cornerstone" of reducing transmission of COVID-19.  CDC Guidelines at 4.  CDC recommends that individuals should maintain at least 6 feet of distance between all individuals.  *Id.*  ICE's declarations, as cited in the Report & Recommendations, prove that ICE is not allowing Petitioners to appropriately social distance.  At Broward, male

Petitioners sleep in *bunk beds that are two feet apart*.  ECF 63 at 26.  Petitioners sleep an average of 4.4 feet away from each other, use toilets that are less than two feet apart from each other and eat only inches away from each other at Krome.  *Id.* at 31-2.

- **Inadequate medical checks**.  Once daily a nurse walks through Petitioners' living areas "providing education on and encouraging hygiene", despite the recommendations from CDC of regular temperature checks and verbal screening.  ECF 33-1 at para. 11; *contra* CDC Guidelines at 26.

- **Not performing pre-intake screening.**  CDC recommends "pre-intake screening and temperature checks for all new entrants.  Screening should take place in the sallyport, before beginning the intake process."  CDC Guidelines at 10.  But ICE is performing screening within 12 hours *after* admission to the facility.  ECF 63 at 22.

- **Cohort quarantining.**  ICE practices with regard to "cohort" quarantining run completely contrary to CDC guidelines, and are exposing the plaintiffs and other class members to grave risks to their health.  The CDC Guidance states that detention centers should put people exposed to close contact with confirmed or symptomatic COVID-19 cases in individual, not group, quarantine:  "Facilities should make every possible effort to quarantine close contacts of COVID-19 cases individually." (Appx. I, Ex. F, at 66) (emphasis added). Cohort quarantine "should only be practiced if there are no other available options." (Id.) (emphasis added). As the CDC explains, "[c]ohorting multiple quarantined close contacts of a COVID-19 case could transmit COVID-19 from those who are infected to those who are uninfected." (Id.)  In the face of this guidance, the declaration of Acting Office in Charge Liana Castano, filed on April 21, 2020, revealed that there are 350 detained individuals at the Krome Service Processing Center in cohort quarantine.  ECF 53-1 at ¶ 4.  Moreover, cohorted groups are confined in spaces that prevent them from practicing social distancing. Cohorted groups are not provided with masks to prevent the transmission of COVID-19, as required by the CDC protocols. (Appx. I, Ex. F, at 67).

- **Making hygiene supplies and cleaning supplies available.**  CDC Guidance is clear: "[e]nsure that sufficient stocks of hygiene supplies, cleaning supplies, PPE, and medical supplies . . . are on hand and available."  CDC Guidelines at 7 (Ex. F). Respondents do not even claim they are complying with these guidelines. Respondent's Declarations instead only states that they are providing a modest amount of soap *or* body wash which is replenished as needed.  ECF 63 at 30.

ICE's creation of this dangerous situation satisfies the affirmative acts requirement.  *See Helling v. McKinney*, 509 U.S. 25, 33 (1993) (an unreasonable risk includes future harm caused by conditions of confinement).

Moreover, the Magistrate's conclusion that Petitioners are "the precise opposite of a discrete plaintiff" [ECF at 59] is incorrect and his reliance on *Kneipp v. Tedder*, 95 F.3d 1199 (3rd Cir. 1996) is misplaced.  The Third Circuit has specifically noted that "a 'discrete plaintiff' may mean a specific person or a *specific class of persons*."  *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 913 (3d Cir. 1997) (emphasis added).  While there are over 1,400 Petitioners, they are a specific class of persons and not merely members of the public.

In his Report and Recommendations, Judge Goodman acknowledges that Petitioners' "legitimate worry about contracting COVID-19 is real and serious and bone-chilling and should not be minimized in any way."  ECF 63, p. 10.  By choosing to detain Petitioners in facilities that do not even approach compliance with CDC guidelines, ICE has created a dangerous situation that may prove deadly.  If released, Petitioners can protect themselves. But Respondents are currently forcing them into close contact in the precise sort of unsanitary conditions that are highly dangerous right now.  It would be a perverse interpretation of the law to conclude that Petitioners are without a remedy here.

## IV.   PETITIONERS HAVE SHOWN A LIKELIHOOD OF SUCCESS ON THE MERITS WITH REGARD TO COUNT I, VIOLATION OF THE *ACCARDI DOCTRINE*.

Petitioners have amply demonstrated a likelihood of success on the merits with regard to their *Accardi* claim over and over again.  First, the *Accardi* doctrine is a viable legal theory that binds ICE to follow mandatory agency procedures (the CDC Guidelines), and ICE has not disputed the validity of this doctrine or its applicability to this case.  Second, in the Report and Recommendations, Judge Goodman did not make any findings that are inconsistent with the *Accardi* claim.  Instead, he based his reluctance to grant relief on concerns about the remedies sought by the lawsuit overall.  *See* ECF 63 at 61.  Third, the CDC Guidelines as applied to ICE's operations in the three detention centers at issue are mandatory, which is not disputed by the government, and are precisely intended to benefit the Petitioners and other class members.  Fourth, a review of the declarations submitted by both sides makes it clear that ICE is not complying with the CDC Guidelines in the three facilities at issue in a number of absolutely critical respects.  Indeed, in their opposition to the Emergency Motion [ECF 40], ICE all but admits that this is the case.  While, as discussed below, ICE may be in partial compliance with certain of the CDC Guidelines, partial compliance is not enough under the

*Accardi* doctrine.  Fifth, ICE has attempted to blunt the impact of the *Accardi* doctrine by mistakenly reframing the dispute as one about medical care, which it is not.

First, the *Accardi* doctrine remains a viable legal theory, and the types of agency rules that are at issue here *are* enforceable in federal court.  In *Accardi,* a case involving a habeas challenge to the denial of suspension of deportation, the Supreme Court objected to the agency's "alleged failure to exercise its own discretion contrary to existing valid regulations." *Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954).  *Accardi* requires federal agencies to follow applicable rules.  Since *Accardi,* federal courts have considered which types of agency rules are enforceable in court, and which types are not.  In the employment context, the Court held in *Service v. Dulles*, 354 U.S. 363, 373–76 (1957), that where dismissal from employment is based on a defined procedure, even though generous beyond the requirements binding the agency, that procedure must be scrupulously followed.  Further, in *Vitarelli v. Seaton,* 359 U.S. 535 (1959), the Court held that the dismissal of a former government employee was illegal and of no effect because the agency's termination did not meet "the requirements of the applicable department regulations."  *Id.* at 545.

This line of cases demonstrates that a court's duty to enforce an agency regulation, while most apparent when compliance with the regulation is mandated by the Constitution or federal law, "embraces as well agency regulations that are not so required."  *Lopez v. Federal Aviation Admin.* 318 F.3d 242 (D.C. Cir. 2003).  Admittedly, some agency rules are not reviewable, but they differ from those at issue here.  As the D.C. Circuit observed in *Lopez*:

> In *American Farm Lines v. Black Ball Freight Serv.*, 397 U.S. 532, 539, 90 S.Ct. 1288, 1292–93, 25 L.Ed.2d 547 (1970), a case involving regulations designed to provide the agency with information it needed to reach an informed decision, the Court held that the regulations were unreviewable absent a showing of substantial prejudice by the complaining party.  On the other hand, had the agency's rules been "intended primarily to confer important procedural benefits upon individuals in the face of otherwise unfettered discretion as in *Vitarelli*," *id.* at 538–39, 90 S.Ct. at 1292, or had the agency failed to exercise independent discretion required by the rule, as in *Accardi*, *id.* at 539, 90 S.Ct. at 1292–93, the Court indicated the case would be "exempt" from the general principle that an administrative agency may "relax or modify its procedural rules adopted for the orderly transaction of business ... when ... the ends of justice require it.

*Lopez*, 318 F.3d at 247.  Here, Petitioners have amply demonstrated substantial prejudice, and the CDC Guidelines are precisely the type of procedural rules intended to confer important

benefits on plaintiffs (in this case, protection from a deadly virus) in the face of otherwise unfettered agency discretion.

Second, in the Report and Recommendations, Judge Goodman made no findings inconsistent with the *Accardi* claim, but rather expressed concern about the overall remedies sought by Petitioners:  "[R]egardless of which of the counts they rely on, Petitioners are seeking release from custody -- but that remedy is unavailable in the Eleventh Circuit under these circumstances."  ECF 63 at 51.  However, as explained above, the Magistrate is incorrect as a matter of law.

Third, the CDC Guidelines are mandatory, which is not disputed by Respondents, and are precisely intended to benefit Petitioners and class members, who have already demonstrated substantial prejudice from ICE not following the mandatory guidelines. Krome, BTC and Glades are all subject to National Detention Standards that are issued by ICE, which set forth the medical care that must be provided to individuals in immigration detention.  Both Krome and BTC are subject to ICE's 2011 Performance-Based National Detention Standards ("PBNDS").  *See* ECF 7, Appx I, Ex. N, at 253.  Glades is subject to ICE's National Detention Standards ("NDS").  *See* ECF 7, Appx. I, Ex. K, at 152, 156.  The current governing version of the NDS is the 2019 National Detention Standards for Non-Dedicated Facilities.  Section 4.3(II)(10) of the PBNDS requires that "Centers for Disease Control and Prevention (CDC) guidelines for the prevention and control of infectious and communicable diseases shall be followed."  ECF 7, Appx I, Ex. N, at 253.  The PBNDS also provides that "[f]acilities shall comply with current and future plans implemented by federal, state or local authorities addressing specific public health issues including communicable disease reporting Prevention (CDC) guidelines for the prevention and control of infectious and communicable diseases shall be followed."  ECF 7, Appx I, Ex. N, at 253.  The PBNDS also provides that "[f]acilities shall comply with current and future plans implemented by federal, state or local authorities addressing specific public health issues including communicable disease reporting requirements."  ECF 7, Appx I, Ex. N, at 256-57.  Similarly, section 1.1(I) of the NDS, covered "facilit[ies] will operate in accordance with all applicable regulations and codes, such as those of . . . the Centers for Disease Control and Prevention (CDC)."  ECF 7, Appx I, Ex. O, at 304.  Therefore, both documents make it clear that compliance with CDC Guidelines is mandatory.  In light of this clear language, is it perhaps

not surprising that in its opposition brief, *see* ECF No. 40, ICE does not dispute that the guidelines are mandatory.

Fourth, the evidence before the Court makes it clear that ICE is not following the CDC guidelines at the three facilities at issue in many critical respects. *See generally* ECF 8, Appx II (detained individual declarations). ICE itself admits that its actions fall short, stating that, at most, the "declarations [submitted] establish that defendants are in *substantial compliance* with the National Detention Standards." ECF 40 at 9 (emphasis added). But as demonstrated above, this is simply not the case. At most, ICE is in partial compliance, which is simply not sufficient under the *Accardi* doctrine. In the same vein, the government contends that "DHS and ICE have followed their National Detention Standards, *making adjustments where required by circumstances*, in order to provide a reasonably safe environment for detained individuals in their custody." *Id.* (emphasis added). However, "making adjustments where required by circumstances," if permitted, would be the exception that swallows the rule. What this really means, once again, is that ICE is not following the guidelines strictly and is only in partial compliance.

Under the *Accardi* doctrine, partial compliance with mandatory agency rules designed to protect the plaintiffs and other class members is not sufficient. For example, in *Vitarelli*, it was held that "scrupulous observance of departmental procedural safeguards is clearly of particular importance" where no other agency rules protect the employee. *Vitarelli*, 359 U.S. at 540. *See also Morton v. Ruiz*, 415 U.S. 199, 235 (1974) ("[I]t is incumbent upon agencies to follow their own procedures . . . even where [they] are possibly more rigorous than otherwise would be required.").

Here, there is ample evidence that the actual practices of ICE in the three facilities at issue fall far short from what is required by the CDC Guidelines, as discussed at length in Section III.

Fifth, the Court should reject ICE's attempt to blunt the force of the *Accardi* doctrine by mistakenly attempting to reframe the dispute as one about medical care, which it is not. For example, the government argues: "Petitioners have failed to demonstrate a substantial likelihood of success on their claim of inadequate medical care because they cannot show defendants have been deliberately indifference to their serious medical needs." ECF 40 at 8. However, while ICE presumably enjoys some discretion on how to provide medical care to

each detained individual, that is a red herring – the CDC guidelines apply to the specific concern about infectious diseases, and the whole point is that the agency does not have discretion to ignore them.  Put simply, this is not a case about medical care.

## CONCLUSION

As noted above, just yesterday, the United States District Court for the Central District of California considered a nearly identical case and ordered ICE to *immediately* release detained individuals so that remaining detained individuals could follow CDC guidelines for social distancing.  *Roman v. Wolf,* EDCV 20-00768 TJH (PVC) (C.D. CA Apr. 23, 2020) (Ex. A).  For all of the foregoing reasons, Petitioners ask that this Court do the same and grant their motion and release them from the life-threatening conditions at Glades, Krome and BTC or order the necessary changes be made immediately so that the detained individuals can fully follow CDC Guidelines.

Date:  April 24, 2020

Respectfully Submitted,

*/s/ Scott M. Edson*
Scott M. Edson, Esq.
Florida Bar No. 17258
**KING & SPALDING LLP**
1700 Pennsylvania Avenue NW, STE 200
Washington, DC 20006-4707
Telephone:  (202) 737-0500
Facsimile:  (202) 626-3737
sedson@kslaw.com

Kathryn S. Lehman
Florida Bar No.: 95642
Chad A. Peterson
Florida Bar No.: 91585
**KING & SPALDING LLP**
1180 Peachtree Street, N.E.
Atlanta, GA 30309
Telephone: (404) 572-4600
Facsimile: (404) 572-5100
klehman@kslaw.com
cpeterson@kslaw.com

Rebecca Sharpless
Florida Bar No. 0131024
Romy Lerner

20

Florida Bar No. 116713
**UNIVERSITY OF MIAMI SCHOOL OF LAW**
**IMMIGRATION CLINIC**
1311 Miller Drive Suite, E-273
Coral Gables, Florida 33146
Tel: (305) 284-3576
Fax: (305) 284-6092
rsharpless@law.miami.edu

Gregory P. Copeland
Sarah T. Gillman
**RAPID DEFENSE NETWORK**
11 Broadway, Suite 615
New York, NY 10004
Tel.: (212) 843-0910
Fax: (212) 257-7033
gregory@defensenetwork.org
sarah@defensenetwork.org

*Appearing Pro Hac Vice*

Mark Andrew Prada
Fla. Bar No. 91997
Anthony Richard Dominguez
Fla. Bar No. 1002234
**PRADA URIZAR, PLLC**
3191 Coral Way, Suite 500
Miami, FL 33145
Tel.:   (786) 703-2061
Fax:    (786) 708-9508
mprada@pradaurizar.com
adominguez@pradaurizar.com

Paul R. Chavez
FL Bar No. 1021395
Maia Fleischman
FL Bar No. 1010709
**SOUTHERN POVERTY LAW CENTER**
2 S. Biscayne Blvd., Ste. 3200
Miami, FL 33101
Tel: (305) 537-0577
paul.chavez@splcenter.org
maia.fleischman@splcenter.org

Andrea Montavon McKillip
Florida Bar No. 56401

**LEGAL AID SERVICE OF BROWARD COUNTY, INC**.
491 North State Road 7
Plantation, Florida 33317
Tel. (954) 736-2493
Fax (954) 736-2484
amontavon@legalaid.org

Lisa Lehner
Florida Bar No. 382191
**AMERICANS FOR IMMIGRANT JUSTICE**
5355 NW 36 Street, Suite 2201
Miami, FL 33166
Tel: (305) 573-1106 Ext. 1020
Fax: (305) 576-6273
Llehner@aijustice.org


*Counsel for Petitioners*

## CERTIFICATE OF SERVICE

I hereby certify that on the 24th day of April, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

/s/ Scott M. Edson
Scott M. Edson, Esq.
Florida Bar No. 17258
**KING & SPALDING LLP**
1700 Pennsylvania Avenue NW, STE 200
Washington, DC 20006-4707
Telephone:  (202) 737-0500
Facsimile:  (202) 626-3737
sedson@kslaw.com

*Attorney for Petitioners*

23