UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 20-21553-Civ-COOKE/GOODMAN

**PATRICK GAYLE**, *et al.*,

    Petitioners-Plaintiffs, on behalf of
    themselves and those similarly situated,

v.

**MICHAEL W. MEADE**, *et al.*,

    Respondents-Defendants.

_____/

**PETITIONERS' RESPONSE TO RESPONDENTS'
OBJECTIONS TO REPORT & RECOMMENDATIONS**

**INTRODUCTION**

Without exaggeration, ICE's conduct challenged in this matter has life or death consequences. Petitioners are being exposed to unjustifiably high risks of contracting the deadly coronavirus that is ravaging the globe. Petitioners—like many others—are in a fight for their lives. But because ICE is holding them in civil detention, Petitioners are unable to take the steps necessary to protect themselves from what Judge Goodman recognized is a "serious and bone-chilling" risk of infection to COVID-19. Report & Recommendation ("R&R") [ECF 63] at 1. Without this Court's intervention, Petitioners' lives are in ICE's hands.

Exposing people in civil detention to such immediate, irreparable, and grave risks does not accord with the Constitution and the laws of this country regarding civil detention. This is an exceptional time, and it requires this Court's protection of Petitioners' rights to constitutionally meaningful and timely process—with judicial review—that is responsive to the immediate deadly threat faced. *Jones v. Cunningham*, 371 U.S. 236, 243 (1963) ("[habeas] is not now and never has been a static, narrow, formalistic remedy; its scope has grown to achieve its grand purpose—the protection of individuals against erosion of their right to be free from wrongful restraints upon their liberty"). In all but the most unique circumstances,

1

the magnitude of the threat posed—not only to Petitioners, but also staff working at Krome, BTC and Glades, and the generally public—substantially outweighs the government's interests in civil immigration detention when alternatives are readily available to vindicate the purported governmental interests.

Judge Goodman properly acknowledged the dire circumstances Petitioners and others in ICE custody face. In fact, he noted that the conditions at the facility at issue here with the largest population of detained men and women "appear to be getting worse." *Id.* at 34. And after considering the undisputed material facts, Judge Goodman recommended granting preliminary injunctive relief that is exceedingly modest and fails to correct the constitutional violations in light of the circumstances. *Id.* at 6-10.[1] In this respect, the most critical components of Judge Goodman's proposed injunctive relief—those that address the steps ICE must take to improve conditions for the people it is holding—speak flexibly in terms of "goal[s]," "tak[ing] all reasonable steps," and complying with Judge Goodman's order "to the extent feasible." *Id.* at 6-10. As such, Petitioners contend that Judge Goodman's recommendations, while certainly an improvement over the status quo, are insufficient to meet this extraordinary moment; COVID-19 will not wait while the Court slowly "encourage[s]" and "prod[s]" ICE to take "reasonable" steps it should have already taken on its own. *Id*. at 8.

Yet, ICE objects to even Judge Goodman's narrow recommendations, training its fire on a requirement to update the Court with basic information that ICE should already have at its fingertips if it were doing its job. Judge Goodman proposes to have ICE report to the Court twice a week with the number of detainees at each of the three facilities at issue here, information about why each person is being detained, and information identifying whether each person is at an elevated risk for getting seriously ill or dying of respiratory distress if infected with COVID-19 (including whether individuals are pregnant). *Id*. at 8. This reporting requirement would demand ICE to do nothing more than provide the same information that ICE itself needs in order to (1) assess who needs to be released under *Fraihat*, and (2) implement the CDC's Guidelines.

---

[1] Although ICE bemoans a supposed "inability to discern the true detention conditions from the record," ICE Objection [ECF 71] at 2-3, it does not challenge any of the **material** facts Judge Goodman found that cry out for immediate judicial intervention.

But for ICE, providing the Court with this basic information is a bridge too far.  In a stunning passage, ICE protests that compiling the information Judge Goodman required would be "unduly burdensome" because preparing those reports requires "review and analysis of each individual detainee's file to determine whether they are high-risk, subject to mandatory detention, or have no criminal record or pending criminal charges."  ICE Objection at 5.  If that is accurate, then it means that ICE **does not currently know** which of the people it is holding are "high risk" for serious complications from a COVID-19 infection.  Indeed, if ICE's protests are to be believed, then ICE does not even know which of the people it is detaining are, in its view, "subject to mandatory detention"—that is, ICE does not even know **why** it is holding the very people it refuses to release.  This eyebrow-raising assertion that ICE knows so little about the men and women in its care affirms Judge Goodman's wisdom in not trusting Petitioners' lives to blind faith in ICE.

In fact, if ICE is not already tracking which people under its care are at high risk of severe COVID-19 complications, then ICE is not taking the most rudimentary steps needed to comply with the CDC's Guidelines, which emphasize the acute risks faced by "older adults and persons of any age with serious underlying medical conditions such as lung disease, heart disease, and diabetes."  CDC Guidelines at 22 (ECF 1-4 at 70).  Moreover, ICE is **already under** an order from the *Fraihat* court to track this information in order to evaluate which people must be released.  *See* ECF 63 at 14-16 (discussing *Fraihait* class certifications and requirements).  So, ICE's assertion that it does not know (and is not already in the process of finding out) who in its care is at a high risk of having severe complications from a COVID-19 infection, then **ICE is already violating** at least one federal court's order aimed at protecting people in ICE's custody from COVID-19 infections.  This hardly counsels in favor of the hands-off approach ICE advocates.

Similarly revealing is ICE's objection that the twice-weekly reports are "unduly burdensome" because "many of the deportation officers and administrative staff at who would compile the proposed reports have been on telework status since mid-March, 2020 to minimize the potential transmission of the coronavirus" and "have limited access to detainee files and information."  R&R at 5.  Once again, if this is correct, it means that ICE is not currently tracking the rudimentary information it needs to begin protecting Petitioners from COVID-19 infection.  Moreover, this objection confirms that ICE does not want its

3

employees to come to its facilities due to the risk of COVID-19 infection. Petitioners, of course, have no ability to leave ICE facilities, let alone avail themselves of the same opportunities that ICE employees have to socially distance, use personal protective equipment, or use the other measures set forth in the CDC Guidelines.

In fact, ICE's objection to the burden of compiling information it should already have misses the point. While the reporting requirement is designed to ensure the Court has basic information it needs to monitor the circumstances at Glades, Krome and BTC, that is not the only purpose.[2] Rather, the process of preparing the reports is also designed to "prod ICE into releasing far more detainees." *Id*. at 8. If ICE finds the process of collecting and informing the Court of this information "unduly burdensome" given the number of men and women it is holding in civil detention at these three facilities, then ICE can reduce the burden by releasing far more people. If, on the other hand, ICE truly believes that holding these people in civil detention is necessary despite the "bone-chilling" danger it places them in, then ICE cannot rightly complain that the burdens of collecting and reporting information about why these people are being held and whether they are at high risk to serious complications from COVID-19 are "undu[e]."

## ARGUMENT

**I. ICE'S ARGUMENTS MISUNDERSTAND THE STANDARD FOR A PRELIMINARY INJUNCTION.**

ICE's attack on Judge Goodman's analysis of the preliminary injunctive standard are unwarranted. Indeed, as it did in opposing Petitioners' motion for a preliminary injunction before Judge Goodman, ICE continues to "**not even address the irreparable harm**" that Petitioners will face if exposed to COVID-19 while ICE is detaining them. *See* R&R at 64 (emphasis in original). Applying the proper standard, and understanding the extreme risk Petitioners face, reveals that at a minimum the modest injunctive relief Judge Goodman recommended is needed.

A party seeking a preliminary injunction needs to meet four elements:

---

[2] ICE's assertion that it "understand[s] that the Court needs meaningful information on ICE's efforts to reduce the detainee population," ICE Objection at 5, rings rather hollow given that ICE offers no way for the Court to obtain the information it would need to monitor the conditions at Glades, Krome and BTC.

4

> (1) a substantial likelihood that he will ultimately prevail on the merits; (2) that he will suffer irreparable injury unless the injunction issues; (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) that the injunction, if issued, would not be adverse to the public interest.

*U.S. v. Jefferson Cnty.,* 720 F.2d 1511, 1519 (11th Cir. 1983). The standard for obtaining a temporary restraining order is the same as a preliminary injunction. *Windsor v. U.S.,* 379 F. App'x 912, 916-17 (11th Cir. 2010).

Although four elements must be present to some degree, "none of the four prerequisites has a fixed quantitative value. Rather a sliding scale is utilized, which takes into account the intensity of each in a given calculus." *State of Tex. v. Seatrain Intern., S.A.,* 518 F.2d 175, 180 (5th Cir. 1975). Thus, "when 'the balance of the equities [identified in factors 2, 3, and 4] weighs heavily in favor of granting the stay,'" an injunction may be proper on a lessor showing of likelihood of success on the merits. *Garcia-Mir v. Meese*, 781 F.2d 1450, 1453 (11th Cir. 1986). That is, where the threat of irreparable harm to the moving party is great and the prejudice to the nonmoving party slight, an injunction may be proper even if there is less evidence that the moving party will ultimately prevail on the merits. As the Eleventh Circuit has recognized, "[a] showing of irreparable injury is 'the sine qua non of injunctive relief.'" *See Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (quoting *Northeastern Fla. Chapter of the Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990)).

In the R&R, Judge Goodman stated that Petitioners face "an additional burden" in seeking injunctive relief in this case because Respondents are governmental entities. *See* R&R at 49. Judge Goodman quoted from an unreported decision from a district court in Georgia:

> As succinctly explained in *Gwinnett Cnty. NAACP v. Gwinnett Cnty. Bd. Of Registration and Elections*, No. 20-cv-00912-SDG, 2020 WL 1031897, at *5 (N.D. Ga. Mar. 3, 2020) (denying motion for TRO and preliminary injunction against county board of registration and elections and board members): [W]hen a party seeks to affirmatively enjoin a state governmental agency**,** requiring it to perform a certain action, the "case must contend with the well-established rule that the Government has traditionally been granted the widest latitude in the dispatch of its own affairs." *Martin v. Metro. Atlanta Rapid Transit Auth.*, 225 F. Supp. 2d 1362, 1372 (N.D. Ga. 2002) (citing *Rizzo v. Goode*, 423 U.S. 362, 378-79 (1976)). The court must also exercise greater caution when, as here, "the injunction will require detailed and continuous supervision over the conduct of that [government] subdivision." *Id.* (emphasis added).

5

R&R at 49-50.

The cases Judge Goodman discussed all involved claims against **state** governmental agencies—with overriding concerns of federalism that, of course, are wholly absent here. At any rate, even allowing ICE wider discretion because it is an arm of the government would not justify the blank check it demands here. Courts in the Eleventh Circuit and across the country have granted preliminary injunctions against governmental entities where the petitioners have met the requirements for injunctive relief. *See, e.g., Louis v. Meissner,* 530 F. Supp. 924, 929-30 (S.D. Fla. 1981) (awarding preliminary injunction against Immigration and Naturalization Services); *see also O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft,* 342 F.3d 1170, 1187 (10th Cir. 2003) (holding religious organization satisfied the four requirements for a preliminary injunction against the federal government to allow them to use hoasca as part of religious services), *aff'd, Gonzales v. O Centro Espirita Beneficiente Uniao Do Vegetal,* 546 U.S. 418 (2006); *Legatus v. Sebelius*, 901 F. Supp. 2d 980, 997, 999 (E.D. Mich.) (granting preliminary injunction against the Department of Health and Human Services even though neither party had demonstrated a substantial likelihood of success on the merits). Indeed, as set forth in Petitioners' Objection, courts around the country have been enjoining **ICE** over these **exact issues** in recent weeks given the extreme risk to people in ICE detention and the woefully insufficient steps ICE has taken to address this crisis.

The Court should do the same here because Petitioners have clearly met the requirements for a preliminary injunction. There is a substantial likelihood that Petitioners will prevail on the merits of at least one of their claims. Judge Goodman recognized that Petitioners may prevail on their Fifth Amendment claim for deliberate indifference and has recommended injunctive relief on that basis. *See* R&R at 63-65. As discussed in Petitioners' Objections to Report and Recommendations, Petitioners also have a substantial likelihood of prevailing on their other claims. Indeed, ICE makes no serious effort to challenge Judge Goodman's findings concerning Petitioners' the Fifth Amendment claim for deliberate indifference; ICE just offers a single conclusory statement with no factual or legal support. *See* ICE Objection at 2. That claim alone justifies the relief Judge Goodman has recommended.

Because of the "bone-chilling" risks that Petitioners face, and the scant showing of prejudice to ICE (conclusory assertions that collecting basic information is "unduly

burdensome"),[3] the likelihood-of-success element is substantially relaxed. *See Garcia-Mir*, 781 F.2d at 1453 (noting that a lesser showing of a substantial likelihood of success on the merits can support a preliminary injunction "when 'the balance of the equities [identified in factors 2, 3, and 4] weighs heavily in favor of granting the stay") (internal quotation marks and citation omitted)). ICE may be content to ignore "**the irreparable harm**" Petitioners face, *see* R&R at 64, but the law takes cognizance of the life-threatening danger. Judge Goodman was correct that "there can be little doubt that the Petitioners will suffer irreparable harm of the increased likelihood of severe illness and death if a preliminary injunction is not entered," and to place substantial weight on this finding. *Id.* As he put it, "the Constitution protects those in detention against a condition of confinement that is sure or very likely to cause serious illness and needless suffering in the next week or month or year." *Id.* (quoting *Fraihat* Order at 36).

And a preliminary injunction protecting these detained individuals from COVID-19 serves the public interest—the opposite of being "adverse" to it. When the government is the opposing party, the third and fourth elements merge. *Niken v. Holder*, 556 U.S. 418, 435 (2009). Judge Goodman recognized that the injunctive relief he recommended would be in the public interest because it "could lead to the slowing of the spread of COVID-19 at the three centers." *See* R&R at 65. While Petitioners submit that their release so that they can socially distance would weigh more heavily in the public interest, beyond grousing about unquantified administrative burdens and offering generic platitudes about deference to the executive department, ICE offers no concrete explanation of how that injunctive relief would be against the public interest.

## II. ICE DOES NOT SERIOUSLY OBJECT TO ANY RELIEF EXCEPT THE REPORTING REQUIREMENTS.

While ICE's conclusory assertions about the "burdens" of having to report basic information it should readily have to this Court twice a week are thoroughly unpersuasive

---

[3] Moreover, ICE has not even attempted to show that releasing Petitioners and others would prejudice any legitimate interest ICE has. Alternatives to detention, like reporting requirements, are well known to ICE and readily available to them. ICE has not explained why these are not adequate to protect its interests while shielding Petitioners from the serious risk of COVID-19 infection they face while in ICE custody.

given the exigencies of the COVID-19 crisis, it also bears noting that ICE does not articulate any specific objection to any of the other forms of injunctive relief Judge Goodman recommends. These include requirements for ICE to accelerate its review of the "Alternatives to Detention" program and the appointment of an independent investigator to help find the facts needed to evaluate the need for permanent injunctive relief. While Petitioners believe the relief Judge Goodman recommends does not go far enough, and in particular believes their immediate release pending further litigation in this Court is warranted by these exigent circumstances, ICE has effectively conceded that the Court should order at least the measures set out in items 2,[4] 3, 4, 9, 10, 11, 12, and 13 of the Report and Recommendation.

### III. ICE'S ARGUMENTS REGARDING PETITIONERS' *ACCARDI* CLAIM MISS THE MARK.

Judge Goodman's findings regarding Petitioners' likelihood of success on its Fifth Amendment claim for deliberate indifference—which that ICE does not seriously dispute—suffice to justify preliminary injunctive relief here. R&R at 63–65. But it bears addressing ICE's incorrect arguments concerning Petitioners' *Accardi* claim.

In their Objection to the Report and Recommendations, ECF 70, Petitioners explained how they have demonstrated a likelihood of success on the merits on their *Accardi* claim. Petrs.' Objection [ECF 70] at 16-20. ICE's position on this point appears born of a mistaken belief that the CDC Guidelines are just advisory such that it is legally impossible for ICE to be out of compliance with them. Not only is that incorrect as discussed above, but it bespeaks a casual nonchalance towards the obligation to care for Petitioners that cries out for judicial oversight.

In its objection, ICE once again attempts to distinguish the *Accardi* line of cases, but ICE's effort completely misses the mark. As explained in more detail in Petitioner's

---

[4] Petitioners' counsel have received reports that ICE deportation officers have been refusing to accept requests for release under ICE's "Alternatives to Detention" program via email or other electronic means and have instead demanded that these requests be sent through the regular United States Mail, substantially delaying the delivery and processing of requests. To avoid needless delay, if the Court adopts Judge Goodman's recommendation number 2, Petitioners ask the Court to specify that applications must be received and processed as quickly as possible using electronic means. This will also serve ICE's concern about forcing workers who are currently on telework to take the risks associated with entering ICE's facilities.

Objection, the Court should adopt Judge Goodman's findings that (1) the CDC Guidelines are mandatory as applied to ICE's operations at the three correctional facilities at issue; and (2) ICE is failing to follow the CDC Guidelines at these three facilities in a number of material, critical respects, and that, because of ICE's failure to follow the Guidelines, Petitioner's lives have been seriously endangered.

On the first point, ICE's position is rebutted by Petitioners' careful explanation in their Objection of how the CDC Guidelines are in fact mandatory, *see* Petrs.' Objection at 18. Ignoring the binding documents, ICE instead argues:

> To be enforceable under the *Accardi* doctrine, however, an agency regulation or rule must impose "binding norm[s]" on the agency. *Padula v. Webster*, 822 F.2d 97, 100 (D.C. Cir. 1987). But "[s]tatements that are merely prospective, imposing no rights or obligations on the respective parties, will not be treated as binding norms," nor will "[p]ronouncements that impose no significant restraints on the agency's discretion." *Padula*, 822 F.2d at 100.
>
> As the Report correctly concluded, petitioners were unlikely to prevail on their *Accardi* theory because ICE's applicable guidelines do not impose such restraints on the agency's discretion. Instead, as the Report acknowledges, the guidelines "contain a substantial amount of flexibility," (D.E. 63 at 61), which allows for adaption while still ensuring its underlying purpose is fulfilled.

ECF 71 at 3-4. These arguments, however, are belied by the CDC Guidelines themselves, *see* ECF 70-6 (Ex. F to Petrs.' Objection), which clearly contain numerous non-optional requirements when applied in a carceral setting, as Petitioners have thoroughly explained in their Objection.

Specifically, Petitioners identified the following aspects of the CDC Guidelines that are clearly mandatory and that the undisputed facts demonstrate ICE is not following: restricting transfers, quarantining new detained individuals, allowing appropriate social distancing, performing adequate medical checks, performing pre-intake screening, not engaging in cohort quarantining, and making sufficient hygiene and cleaning supplies available. *See* Petrs.' Objection at 14-15. The CDC Guidelines contain specific requirements in each of these areas that impose "significant restraints on the agency's discretion." ICE Objection at 3. By not addressing these specific areas in its Objection, ICE has in essence conceded the point. While it may be true that certain aspects of the CDC Guidelines contain "flexibility," that does not change the mandatory nature of the key sections cited above or

protect against the corresponding dangers that Petitioners face because ICE is ignoring the Guidelines.

Moreover, ICE is incorrect that portions of the CDC Guidelines that contain flexibility do not contain any "binding norms." ICE Objection at 3. It is true that the CDC Guidelines recognize that "strategies will need to be tailored to the individual space in the facility and the need of the population and staff" and that "[n]ot all strategies will be feasible in all facilities." R&R at 61. But that does not mean ICE is free (as it contends) to ignore the CDC Guidelines entirely; it simply means that in those provisions, the CDC Guidelines mandate that ICE follow the prescribed strategies as closely as circumstances allow. Further, ICE cannot simultaneously (a) point to the CDC Guidelines as demonstrating the provision of adequate protections to Petitioners **and** (b) claim it is not bound by the CDC Guidelines to provide any protections. ICE's argument that it is not bound by **any** part of the CDC Guidelines is just further evidence that it is not complying with those Guidelines, and that Petitioners have a viable *Accardi* claim.

On the second point, ICE's arguments that they are in fact complying with the CDC Guidelines also fall short. According to ICE:

> There is no basis for this Court's oversight of ICE's administration of its sound policies, particularly with no showing of a failure to deploy those policies in good faith. Indeed, the Report acknowledged as much when it concluded petitioners had not established a substantial likelihood of prevailing on the merits of their *Accardi* theory, which alleged that ICE had failed to follow its applicable guidelines.

ICE Objection at 3. These contentions, however, are conclusively rebutted by the record. First, Petitioners have in fact demonstrated, and Judge Goodman has found, that ICE has "fail[ed] to deploy" certain key policies, namely the CDC Guidelines, that were intended to protect the Petitioners and other class members. As explained above, there are a number of specific aspects of the CDC guideless that are critical that ICE is simply not following in key respects. ICE's assertion that there is no showing of a "failure to deploy those policies in good faith" thus begs the question. While at this early stage of the litigation there has not been discovery of ICE's internal decision making, the record evidence that ICE has failed to follow the CDC Guidelines is enough. As explained in Petitioners' Objection, partial compliance—

in good faith or otherwise—is noncompliance under the *Accardi* doctrine. *See* Petrs.' Objection at 19.

Finally, ICE is simply wrong that the Report concluded that Petitioners had not demonstrated a substantial likelihood of prevailing on the merits of their *Accardi* theory because ICE is in substantial compliance with the Guidelines. Rather, as explained in Petitioner's Objection, Judge Goodman misunderstood the remedies available to the Court in a case like this, and in particular, assumed that the Court could not order Petitioners' release. While that is not correct for the reasons set forth in Petitioners' Objection, it would not justify declining to enter the relaxed injunctive relief Judge Goodman recommended.

## CONCLUSION

ICE's objection to compiling the most basic information it needs to protect people under its care from the risk of contracting COVID-19 only confirms that Judge Goodman was correct not to blindly trust ICE to protect Petitioners and others in its custody. For the reasons set forth herein and in Petitioner's Objection, injunctive relief is warranted.

Date: April 26, 2020

                                        Respectfully Submitted,

                                        */s/ Scott M. Edson*
                                        Scott M. Edson, Esq.
                                        Florida Bar No. 17258

| | |
|---|---|
| Gregory P. Copeland* | Scott M. Edson, Esq. |
| Sarah T. Gillman* | Florida Bar No. 17258 |
| **RAPID DEFENSE NETWORK** | **KING & SPALDING LLP** |
| 11 Broadway, Suite 615 | 1700 Pennsylvania Avenue NW, STE 200 |
| New York, NY 10004 | Washington, DC 20006-4707 |
| Tel.: (212) 843-0910 | Telephone: (202) 737-0500 |
| Fax: (212) 257-7033 | Facsimile: (202) 626-3737 |
| gregory@defensenetwork.org | sedson@kslaw.com |
| sarah@defensenetwork.org | |
| | |
| *Appearing Pro Hac Vice* | |
| | |
| Rebecca Sharpless | Kathryn S. Lehman |
| Florida Bar No. 0131024 | Florida Bar No.: 95642 |
| Romy Lerner | Chad A. Peterson |
| Florida Bar No. 116713 | Florida Bar No.: 91585 |

Katarina M. Gomez, Law Student
Meredith Hoffman, Law Student
Maria A. Llorens, Law Student
Olivia G. Parise, Law Student
**UNIVERSITY OF MIAMI SCHOOL OF LAW - IMMIGRATION CLINIC**
1311 Miller Drive Suite, E-273
Coral Gables, Florida 33146
Tel: (305) 284-3576
Fax: (305) 284-6092
rsharpless@law.miami.edu

Paul R. Chavez
FL Bar No. 1021395
Maia Fleischman
FL Bar No. 1010709
**SOUTHERN POVERTY LAW CENTER**
2 S. Biscayne Blvd., Ste. 3200
Miami, FL 33101
Tel: (305) 537-0577
paul.chavez@splcenter.org
maia.fleischman@splcenter.org

Lisa Lehner
Florida Bar No. 382191
**AMERICANS FOR IMMIGRANT JUSTICE**
5355 NW 36 Street, Suite 2201
Miami, FL 33166
Tel: (305) 573-1106 Ext. 1020
Fax: (305) 576-6273
Llehner@aijustice.org

**KING & SPALDING LLP**
1180 Peachtree Street, N.E.
Atlanta, GA 30309
Telephone: (404) 572-4600
Facsimile: (404) 572-5100
klehman@kslaw.com
cpeterson@kslaw.com

Mark Andrew Prada
Fla. Bar No. 91997
Anthony Richard Dominguez
Fla. Bar No. 1002234
**PRADA URIZAR, PLLC**
3191 Coral Way, Suite 500
Miami, FL 33145
Tel.:   (786) 703-2061
Fax:   (786) 708-9508
mprada@pradaurizar.com
adominguez@pradaurizar.com

Andrea Montavon McKillip
Florida Bar No. 56401
**LEGAL AID SERVICE OF BROWARD COUNTY, INC.**
491 North State Road 7
Plantation, Florida 33317
Tel. (954) 736-2493
Fax (954) 736-2484
amontavon@legalaid.org

*Counsel for Petitioners*

## **CERTIFICATE OF SERVICE**

     I hereby certify that on the 26th day of April, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

                                                  */s/ Scott M. Edson*
                                                  Scott M. Edson, Esq.
                                                  Florida Bar No. 17258
                                                  **KING & SPALDING LLP**
                                                  1700 Pennsylvania Avenue NW, STE 200
                                                  Washington, DC 20006-4707
                                                  Telephone:  (202) 737-0500
                                                  Facsimile: (202) 626-3737
                                                  sedson@kslaw.com

                                                  *Attorney for Petitioners*