**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 20-21553-Civ-COOKE/GOODMAN**

PATRICK GAYLE, *et al.*,

Petitioners,

vs.

MICHAEL W. MEADE, *et. al.*,

Respondents.
_______________________________________/

**ORDER ADOPTING IN PART MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

THIS MATTER is before me upon the Report and Recommendation ("R&R") of the Honorable Jonathan Goodman, U.S. Magistrate Judge (ECF No. 63), regarding Petitioners' Petition for Writ of Habeas Corpus (ECF No. 1), and Emergency Motion for Temporary Restraining Order and Motion for Preliminary Injunction for Proposed Class (ECF No. 4). On April 24, 2020, both Petitioners and Respondents filed Objections to the R&R (ECF Nos. 70; 71).

The Court may "accept, reject, modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b). If no specific objections to findings of facts are filed, the district court is not required to conduct a *de novo* review of those findings. S*ee Garvey v. Vaughn*, 993 F.2d 776, 779 n.9 (11th Cir. 1993); *see also* 28 U.S.C. § 636(b)(1). However, the Court must review legal conclusions *de novo*. *See Cooper-Houston v. Southern Ry. Co.*, 37 F.3d 603, 604 (11th Cir. 1994); *United States v. Rice*, No. 2:07-mc-8-FtM-29SPC, 2007 WL 1428615 at *1 (M.D. Fla. May 14, 2007). I have reviewed the matter *de novo*. Having done so, I find the Magistrate Judge's R&R should be adopted in part for reasons explained herein.

**BACKGROUND**

In a matter of a mere three months, Coronavirus ("COVID-19") has thrust humankind into an unprecedented global public health crisis. COVID-19 is a highly communicable respiratory disease that spreads among people who are in close contact—less

than six feet apart. The virus can be fatal for all age groups and works by attacking the human lungs and other vital organs. COVID-19 has spread rapidly throughout the world—there are at least 2 million globally confirmed cases and 250,000 deaths. In the United States, there are over 1 million confirmed cases and over 57,000 have died. These numbers are the highest in the world. The virus affects individuals very differently, and while it is impossible to predict exactly who will fall victim to the illness, health experts indicate that older people and those with underlying medical problems like cardiovascular disease, diabetes, chronic respiratory disease, and cancer are more likely to develop serious illness and possibly die.[1] The Centers for Disease Control and Prevention ("CDC") estimates approximately 16 days between the onset of symptoms and death with an incubation period between 2 and 14 days.[2] There is no approved treatment, vaccine, or cure for COVID-19.

COVID-19 is a novel virus, and experts are learning more about it every day. Nevertheless, health and medical experts have gathered enough information about the virus to inform the public about how to mitigate the contagion. To that end, the CDC has promulgated a set of guidelines on the best practices and methods to prevent and to mitigate the contagion. One of the main tenets of the CDC's recommendations and guidelines is that everyone practice social distancing, maintaining a distance of no less than six feet between people so as to limit the spread of the virus. The CDC also recommends that people wash their hands frequently and wear masks when in public or in close proximity with others.

COVID-19 has ravaged every corner of American society, including jails, prisons, and immigration detention facilities. Currently, there are at least 9,000 confirmed COVID-19 cases within the United States prison system.[3] In an attempt to slow down the spread of the virus inside the prison system, Attorney General William P. Barr initially issued a directive to the Bureau of Prisons urging the bureau to identify and release all inmates who, *inter alia*, were eligible for home confinement, no longer posed a threat to the public, and

---

[1] https://www.who.int/health-topics/coronavirus#tab=tab_1(Accessed April 26, 2020).
[2] Stephen A. Lauer, MS, PhD, The Incubation Period of Coronavirus Disease 2019 (COVID-19) From Publicly Reported Confirmed Cases: Estimation and Application, Mar. 10, 2020, https://annals.org/aim/fullarticle/2762808/incubation-period-coronavirus-disease-2019-covid-19-from-publicly-reported.
[3] themarshallproject.org/2020/04/24/tracking-the-spread-of-coronavirus-in-prisons (Accessed April 26, 2020).

were particularly vulnerable to the Coronavirus.[4] Mr. Barr issued a second directive expanding the group of federal inmates eligible for early release.[5] Mr. Barr directed the bureau to immediately maximize the number of appropriate transfers to home confinement.[6]

The U.S. Immigration and Customs Enforcement ("ICE") has also issued a set of pandemic response guidelines titled ICE's COVID-19 April 10, 2020 Pandemic Response Requirements ("PRR"). ICE reportedly developed the guidelines in consultation with the CDC and calls for compliance with the CDC's guidelines in correctional and detention facilities.[7] ICE's guidelines also require the identification of any detainee who meets the CDC's guidelines for populations at higher-risk for serious illness from COVID-19.[8]

**DISCUSSION**

The Petitioners in this case are 34 immigrant detainees. Petitioners claim that they are housed at one of three immigration detention centers in Florida: the Krome Detention Center in Miami ("Krome"), the Broward Transitional Center in Pompano Beach ("BTC"), and the Glades County Detention Center in Moore Haven ("Glades")[9]. Petitioners maintain that they are particularly vulnerable to COVID-19 for different underlying chronic ailments and are at imminent risk of contracting the virus because the overflow of detainees within

---

[4] Office of the Attorney General, Washington, DC, Memorandum for Director of Bureau Prisons, Prioritization of Home Confinement as Appropriate in Response to COVID-19 Pandemic (Mar. 26, 2020), https://www.politico.com/f/?id=00000171-1826-d4a1-ad77-fda671420000.

[5] April 3, 2020 Memorandum of Hon. W. Barr to the Director of Bureau of Prisons, at 1. "[W]e are experiencing significant levels of infection at several of our facilities. . . .We have to move with dispatch in using home confinement, where appropriate, to move vulnerable inmates out of these institutions." *Id.*

[6] Although Mr. Barr's Memorandums are directed to the Federal Bureau of Prisons, ICE's guidelines contain specific standards that mirror Mr. Barr's directives with respect to which detainees should be immediately released.

[7] ICE's Enforcement and Removal Operations, April 10, 2020, at 3, https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities.pdf.

[8] *Id.* at 5-6.

[9] Although Glades is located in the Middle District, this Court finds that it has jurisdiction to review claims related to conditions of confinement there. *See Masingene v. Martin*, 424 F. Supp. 3d 1298, 1303 (S.D. Fla. 2020) ("[A] district court acts within its respective jurisdiction. . .as long as the custodian can be reached by service of process.") (internal citations omitted).

the constricted detention centers makes it impossible to comply with the CDC's guidelines. Petitioners, *inter alia*, seek immediate release from the detention centers.

Both the Petitioners and ICE have filed objections to the Magistrate Judge's R&R. ICE maintains that injunctive relief is not warranted because the Magistrate Judge did not find any legal violations that warrant injunctive relief. ICE also maintains that even if the R&R identified a legal violation, any violation is based on a narrow, incomplete and inconsistent record. Petitioners, on the other hand, argue that the Magistrate Judge incorrectly concluded that release of the Petitioners was an inappropriate remedy. The Court considers each argument in turn.

To obtain either a temporary injunction or a preliminary injunction, a party must demonstrate that: "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1247 (11th Cir. 2016). Based on the Court's review of the record, and relevant case law, Petitioners have met that standard.

**A. Fifth and Eighth Amendment Violations**[10]

It is important to note that the Petitioners in the instant case are merely civil detainees, not convicted criminal prisoners.[11] *Troville v. Venz*, 303 F.3d 1256, 1260 (11th Cir. 2002) ("[O]nly individuals who, at the time they seek to file their civil actions are detained as a result of being accused of, convicted of, or sentenced for criminal offenses are prisoners within the definition of. . .28 U.S.C. § 1915.") (internal citations omitted). Immigration detainees are subject to the same rights as civil detainees. *Mehmood v. Guerra*, 783 F. App'x 938, 941 (11th Cir. 2019) (holding that the district court improperly classified immigration

---

[10] The Court recognizes that the limitations imposed by the Eighth Amendment and the Due Process Clause arise in different contexts. However, with respect to the provision of medical care and supervision to individuals in the state's custody, the two provisions necessarily yield the same result. *Hamm.*, 774 F.2d at 1574 (holding that the standard to measure the state's duty under the Due Process Clause for pretrial detainees for medical care can equally and fairly be measured by the same standard as the Eighth Amendment's prohibition against cruel and unusual punishment).

[11] This distinction is important because convicted prisoners may seek early release through "compassionate release," but civil detainees cannot.

detainee as a prisoner rather than as a civil detainee). And civil detainees are afforded "more constitutional protection, more considerate treatment, and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg v. Romeo*, 457 U.S. 307, 321-22 (1982). The Government may not impose on civil detainees conditions that would violate a convicted prisoner's Eighth Amendment rights. *See Hamm v. DeKalb Cty.*, 774 F.2d 1567, 1573-74 (11th Cir. 1985) (citing *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983) ("[T]he due process rights of a [pretrial detainee] are at least as great as the Eighth Amendment protections available to a convicted prisoner.").

The Eighth Amendment prohibits the infliction of cruel and unusual punishment. *Robinson v. California*, 370 U.S. 660 (1962). Under that provision, the Government may not impose punishments that shock the conscience, involve unnecessary and wanton infliction of pain, offend evolving notions of decency, or are grossly disproportionate to the offense for which they are imposed. *See Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976); *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *Trop v. Dulles*, 356 U.S. 86, 101 (1958). Various conditions, "alone or in combination, may deprive inmates of the minimal civilized measure of life's necessities. Such conditions could be cruel and unusual under the contemporary standard of decency." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). On that basis, courts have held that states violate the Eighth Amendment when they are deliberately indifferent to a prisoner's serious medical needs. *See, e.g. Estelle*, 429 U.S. at 106.

The minimum standard of care to be provided to civil detainees under the Due Process Clause is the same as that allowed by the Eighth Amendment for convicted persons. *Hamm*, 774 F.2d at 1574; *see also Bell v. Wolfish,* 441 U.S. 520, 535 n. 16 (1979) (holding that the Due Process Clause rights of a civil detainee are at least as great as the Eighth Amendment protections available to a convicted prisoner).

When the Government takes people into custody and detains them against their will, the Constitution confers upon the Government a duty to assume responsibility for those detainees' safety and general well-being. *See Helling v. McKinney*, 509 U.S. 25, 32 (1993).

The Due Process Clause similarly "imposes a duty on state actors to protect or care for citizens when the state affirmatively places a particular individual in a position of danger the individual would not otherwise have faced." *Gregory v. City of Rogers, Ark*, 974 F.2d 1006, 1010 (8th Cir. 1992) (en banc). The Government violates an individual's right to due process

when it (1) "affirmatively place[s] [the] individual in danger," or (2) by "acting with 'deliberate indifference to [a] known or obvious danger.'" *Jones v. Phyfer*, 761 F.2d 642 (11th Cir. 1985) (a constitutional right to protection by the state exists when there is a showing that the victim faces a special danger distinguishable from that of the public at large).

There is record evidence demonstrating that ICE has failed in its duty to protect the safety and general well-being of the Petitioners. For example, the Magistrate Judge found that social distancing at Krome is not only practically impossible, the conditions are becoming worse every day. (ECF No. 63 at 63) ("[T]here is little doubt that social distancing is currently impossible at Krome because the sleeping arrangements and some of the toilet and shower arrangements are too tight to permit it."). At Glades the bunk beds are a paltry 12 inches apart, the distance between the upper bunk and the lower bunk is 34 inches, and the chairs and benches where detainees eat at Glades are only three feet apart, contrary to CDC guidelines. (*Id.* at 40.) Further, ICE has failed to provide detainees in some detention centers with masks, soap and other cleaning supplies, and failed to ensure that all detainees housed at the three detention centers can practice social distancing. (*Id.* at 34-42.)

These failures have placed Petitioners at a heightened risk of not only contracting COVID-19, but also succumbing to the fatal effects of the virus as some of the Petitioners have serious underlying medical illness. *See, e.g. Pauluk v. Savage*, 836 F.3d 1117, 1119 (9th Cir. 2016) (recognizing that environmental conditions can be the basis for the state-created danger doctrine.) Such failures amount to cruel and unusual punishment because they are exemplary of deliberate indifference. *Estelle,* 429 U.S. at 104 ("[D]eliberate indifference to serious medical needs of prisoners [is] proscribed by the Eighth Amendment.); *Helling*, 509 U.S. at 32. (noting that the Government acts with deliberate indifference when it "ignore[s] a condition of confinement that is sure or very likely to cause serious illness.").

ICE can make a conscious effort to address detention conditions in light of COVID-19. For example, at BTC, all detainees over the age of 60 have been released and the overall detention population has decreased by 35%. (ECF No. 63 at 34). So, it is clear that ICE fully understands the benefit of reducing the detainee population. Thus, to the extent that ICE fails to commit to addressing the conditions complained of, ICE has demonstrated deliberate indifference.

Accordingly, there is sufficient evidence in this record to determine that the present

conditions at the three detention centers constitute a violation of the Petitioners Fifth and Eighth Amendment rights.

**B. Application of the *Accardi* Doctrine**

Petitioners assert that Government agencies are required to follow their own rules and regulations and that an agency which violates its own rules and regulations violates the Administrative Procedures Act and the Fifth Amendment's Due Process Clause. Petitioners further allege that ICE has failed to follow the National Detention Center Guidelines, which Petitioners argue require ICE to also follow CDC Guidelines. In the R&R, the Magistrate Judge found that Petitioners had not established a substantial likelihood of prevailing on the merits because "the applicable CDC Guidelines contain a substantial amount of flexibility and courts confronted with emergency motions to release state and federal prisoners and detainees because of COVID-19 have relied on this adaptability when denying applications for release of inmates or detainees." (ECF No. 63 at 61.) The Court respectfully disagrees.

When the Government has promulgated "[r]egulations with the force and effect of law," those regulations "supplement the bare bones" of federal statutes. *United States ex rel. Accardi v. Shaughnessy,* 347 U.S. 260, 266, 268 (1954). Agencies must follow their own "existing valid regulations," even where Government officers have broad discretion, such as in the area of immigration. *Id*. at 268; *see also Gonzalez v. Reno*, 212 F.3d 1338, 1349 (11th Cir. 2000) ("Agencies must respect their own procedural rules and regulations."); *Morton v. Ruiz*, 415 U.S. 199, 235 (1974) ("[I]t is incumbent upon agencies to follow their own procedures . . . even where [they] are possibly more rigorous than otherwise would be required.").

A violation of the *Accardi* doctrine may constitute a violation of the Fifth Amendment's Due Process Clause. *United States v. Teers*, 591 F. App'x 824, 840 (11th Cir. 2014) (recognizing that an *Accardi* violation may be a due process violation,); *Jean v. Nelson*, 727 F.2d 957, 976 (11th Cir. 1984) ("Agency deviation from its own regulations and procedures may justify judicial relief in a case otherwise properly before the court.").

ICE is an agency that operates its detention system under a set of National Detention Standards ("NDS"), which set forth the medical care that must be provided to individuals in immigration detention. Both Krome and BTC are subject to ICE's 2011 Performance-Based National Detention Standards ("PBNDS"). (*See Compl.*, Appx. I, Ex. K, at 152, 156.) Glades is subject to ICE's NDS. (*Id.*, Appx. I, Ex. K, at 152, 156.) Section

4.3(II)(10) of the PBNDS requires that "Centers for Disease Control and Prevention (CDC) guidelines for the prevention and control of infectious and communicable diseases shall be followed." (*Id.* at Appx I, Ex. N, at 248-97, 253.) The PBNDS also provides that "[f]acilities shall comply with current and future plans implemented by federal, state or local authorities addressing specific public health issues including communicable disease reporting requirements." (*Id.*, Appx, Ex. N, at 256-57.) Similarly, section 1.1(I) of the NDS states, "facilit[ies] will operate in accordance with all applicable regulations and codes, such as those of . . . the Centers for Disease Control and Prevention (CDC)." (*Id.* Appx I, Ex. O, at 304.)

It is abundantly clear that ICE is required to comply with CDC's guidelines pursuant to its own regulations and policy statements. Yet, ICE has flouted its own guidelines by, *inter alia*, failing to ensure that each detainee practices social distancing. Indeed, ICE admits that its actions fall short, stating that "declarations [submitted] establish that defendants are in *substantial compliance* with the National Detention Standards." (ECF 40 at 9.) (emphasis added). ICE's purported "substantial compliance" does not pass muster under the *Accardi* doctrine. At BTC, beds in male rooms are only two feet apart, when they should be six feet apart under the CDC's guidelines. (ECF No. 63 at 36.) At Krome, there are at least five laboratory-confirmed cases of COVID-19 (two of which are detainees). (*Id.* at 36). Yet, ICE has distributed personal protective equipment only to Krome staff members but none to detainees

Further, ICE's argument that the *Accardi* doctrine is inapplicable fails because although the CDC's guidelines contain some flexibility, there are certain aspects of the guidelines that are mandatory. For example, pursuant to the CDCs guidelines, ICE is required to restrict transfers, quarantine new detained individuals, allow appropriate social distancing, perform pre-intake screening, supply detainees with sufficient hygiene and cleaning supplies.[12] Thus, while the CDC guidelines allow flexibility, that does not absolve ICE of its responsibility with respect to the mandatory provisions of the guidelines designed to protect the health of detainees. ICE is still expected to follow its own regulations. *See Rowe v. U.S. Atty. Gen.*, 545 F. App'x 888, 890 (11th Cir. 2013) (recognizing that the Board of

[12] https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (Accessed April 28, 2020).

Immigration Appeals is required to follow its own regulations even when exercising discretion). Moreover, the Due Process Clause is implicated here because Petitioners are relying on ICE and the CDC's regulations promulgated for their guidance or benefit during this pandemic. It is easily conceivable that in failing to comply with its own guidelines, ICE caused Petitioners to suffer substantially because of their violations.

Accordingly, the Court finds that ICE has violated Petitioners' Due Process Clause protections pursuant to the *Accardi* doctrine.

**C. Habeas Corpus Release Under *Gomez***

In their Objection, Petitioners assert that the Magistrate Judge misunderstood their request and erred in his interpretation of *Gomez v. United States*, 899 F.2d 1124 (11th Cir. 1990). Petitioners argue that *Gomez* allows this Court to provide the Petitioners relief because it recognizes court's inherent authority to grant release on a writ of habeas corpus under the "extraordinary circumstances" standard. Petitioners cite to no Eleventh Circuit cases; however, they urge the Court to consider whether this habeas petition raises substantial claims and makes release necessary.

In *Gomez v. United States,* 899 F.2d 1124 (11th Cir. 1990), petitioner, who was serving a 10-year sentence of imprisonment for a controlled substance violation, was suffering from Acquired Immune Deficiency Syndrome. *Id.* at 1125. Petitioner filed a habeus corpus petition, alleging that the medical treatment he was receiving in prison was inadequate, and therefore unconstitutional. *Id.* The district court granted bail, but the Eleventh Circuit reversed the bail and release order stating, "the district court apparently overlooked the fact that even if Gomez prevailed on his habeas corpus petition, he would not be entitled to be released from prison." *Id.* Noting a split in the circuits, the Eleventh Circuit held that a prisoner is not entitled to release even if he proves an allegation of mistreatment in prison that amounts to cruel and unusual punishment. *Id.* at 1126.

Petitioners' interpretation of *Gomez* is misplaced. First, the facts in *Gomez* are not analogous to the instant matter as *Gomez* dealt with a convicted criminal, not civil detainees. Next, the Court interprets *Gomez* to stand for the proposition that the appropriate relief from prison conditions that violate the Eighth Amendment is to require the discontinuance of any improper practices, or to require correction of any condition causing cruel and unusual punishment. *Id.* Requirement of a discontinued practice does not amount to releasing

detainees who complain of prison conditions. Accordingly, *Gomez* does not support the kind of relief requested here.

**CONCLUSION**

In sum, there is sufficient evidence in the record to determine that the present conditions at the three detention centers constitute a violation of the detainees Fifth and Eighth Amendment rights. Accordingly, the Court finds that injunctive relief is appropriate. However, the record is not clear as to whether each individual Petitioner is eligible for release under ICE's PPR. For example, it is unclear who among the Petitioners would be considered "mandatory detainees."

It is hereby **ORDERED and ADJUDGED** that Judge Goodman's R&R (ECF No. 63) is **ADOPTED *in part*** as follows:

1. Petitioners' Emergency Motion For Temporary Restraining Order And Motion For Preliminary Injunction For Proposed Class And Incorporated Memorandum Of Law (ECF No. 4) is **GRANTED *in part* and DENIED *in part***.

2. Within **seven (7) days** of this Order, ICE shall evaluate each of the 34 detainees named in the instant action consistent with ICE's PRR[13] and inform the Court who among them can be released promptly in light of COVID-19. ICE must take into consideration the detainees' current health status, eligibility for bond, immigration status, immigration court history and orders, and prior criminal history.

3. Within **three (3) days** of this Order, ICE shall submit a report the Court informing the Court as to how it intends to accelerate its review of its "Alternatives to Detention" program (or other protocols resulting in detainee release) with the goal of reducing the population to 75% of capacity at each of the three detention centers within two weeks of this Order.

4. ICE shall perform an internal review pursuant to ICE's PRR and file with the Court weekly reports (every **Friday by 4:00 P.M.**) on the following:

   a. The number of detainees who have been released;

---

[13] The medically higher-risk detainees are listed on pages 5 and 6 of the PRR, and they include people 65 years old and older and those with underlying medical conditions. Although ICE's PRR list of higher-risk detainees does not include pregnant detainees, this Order adds that category to the list for the three detention centers at issue.

    b. Which facility they were released from; and

    c. The nature of the detainee released (e.g., in a high-risk category because of age or a specific, documented medical condition, etc.).

5. Within **ten (10) days** of this Order, ICE shall submit twice-weekly (every **Monday and Thursday by 4:00 P.M.**) reports on the following:

    a. How many detainees it is housing on the date of reporting;

    b. At which of the three centers the detainees are being housed;

    c. Which of the detainees are considered "mandatory detainees"; and

    d. Which of the detainees have no prior criminal convictions and no pending criminal charges.

6. ICE shall immediately comply with the CDC and ICE guidelines on providing adequate amounts of soap and water and cleaning materials to detainees at each of the three detention centers at issue. Further, within **two (2) days** of this Order, ICE shall provide masks to all detainees and shall replace those masks at least once per week.

7. ICE shall provide education and training about measures to reduce the health risks associated with COVID-19 to all staff members and detainees and to any new detainees or employees. ICE shall provide such education and training without any costs to the detainees.

8. This Temporary Order is valid for a limited period of **14** days or until further order of this Court, or until ICE demonstrates that it has substantially complied with this Order. The Court's ruling is subject to change based on a more fully developed record.

9. The Court recognizes that complying with this Order poses several procedural and logistical hurdles for ICE, however, at the time of this writing there are at least 30,000 confirmed COVID-19 cases and over 1,000 related deaths in Florida alone. Time is of the essence. Accordingly, the Court fully expects ICE to work with a sense of urgency to meet the deadlines set forth and refrain from requests for extensions of time absent extenuating circumstances.

**DONE and ORDERED** in chambers, at Miami, Florida, this 30th day of April 2020.

MARCIA G. COOKE
United States District Judge

Copies furnished to:
*Jonathan Goodman, U.S. Magistrate Judge*
*Counsel of record*