## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 20-21553-Civ-COOKE/GOODMAN

**PATRICK GAYLE**, *et al.*,

      Petitioners-Plaintiffs, on behalf of
      themselves and those similarly situated,

**v.**

**MICHAEL W. MEADE**, *et al.*,

      Respondents-Defendants.

_____/

## PETITIONERS' EMERGENCY MOTION TO COMPEL COMPLIANCE WITH THE COURT'S APRIL 30, 2020 TEMPORARY RESTRAINING ORDER

In its April 30, 2020 Order, the Court found that "[t]here is record evidence demonstrating that ICE has failed in its duty to protect the safety and general well-being of the Petitioners." ECF 76 at 6. For example, at one detention center, the detained individuals' beds are "a paltry 12 inches apart," and ICE has failed to "ensure that all detainees housed at the three detention centers can practice social distancing." *Id.* As a result, the Court found that the conditions at Glades, Krome, and Broward Transitional Center ("BTC") violated Petitioners' constitutional rights. *Id.* at 10.

To ameliorate the situation ICE created, the Court ordered ICE to

1. Evaluate each of the named Petitioners consistent with its regulations and inform the Court which of the Petitioners can be released by May 7, 2020.

2. Submit a report to the Court by May 3, 2020 describing how it intends to accelerate its review of its protocols resulting in release of detained individuals with the goal of reducing the population to 75% of capacity by May 14, 2020.

3. File weekly reports every Friday with information on the detained individuals ICE is releasing.

4. File twice-weekly reports containing information on the detained individuals remaining in custody.

1

5. Comply "immediately" with the CDC and ICE guidelines on providing adequate amounts of soap, water, and cleaning materials. ICE must have provided masks by May 2, 2020.

6. Provide appropriate training to its staff and detained individuals on the risks of COVID-19.

*Id.* at 10-11.  The Order was valid for 14 days "or until further order of this Court, or until ICE demonstrates that it has substantially complied with this Order."  *Id.* at 11.  The Court extended the order on May 15.  ECF 101.

On May 2, 2020, the Court clarified its Order, allowing ICE to transfer detained individuals but only after "evaluating each detainee and making a determination as to the detainees' eligibility for release pursuant to ICE's COVID-19 April 10, 2020 Pandemic Response Requirements."  ECF 78.

Unfortunately, ICE has not fully complied with the Court's orders and instead continues to fail to protect the safety and well-being of Petitioners and others in its custody at Krome, Glades, and BTC.  Moreover, ICE has provided no evidence that it has conducted the evaluations to determine eligibility for release before transferring detained individuals to other facilities, in direct contravention of the Court's May 2 Order.  The Court correctly recognized that time is of the essence in dealing with COVID-19 at these detention facilities.  That is why the Court ordered ICE to "work with a sense of urgency" in meeting the requirements in its April 30 Order.  [ECF 76 at 11.]

And yet, ICE's conduct to date smacks of an agency focused *not* on protecting the people in its care but on moving the Named Petitioners and putative Class Members away from this Court where, in ICE's incorrect view, this Court would lack continuing jurisdiction to protect them.  In declarations submitted pursuant to this Court's April 30 Order, ICE touts population reductions at the three facilities at issue here.  But the attached declarations show an agency that is merely shuffling people around the country to make the population statistics at Krome, Glades, and BTC look better on paper.

ICE conducts the transfers in highly unsanitary conditions—the attached declarations tell of cross-state and cross-country trips conducted without proper social distancing or protective equipment.  People are then deposited into conditions at least as bad or worse than the conditions this Court outlined on April 30.  And ICE has done this in the apparent (and

erroneous) belief that the Court loses jurisdiction over these individuals at the gates of the three facilities at issue here—ICE told Judge Goodman as much during the recent class certification hearing. This naked (and legally erroneous) attempt to shirk this Court's oversight crosses over from the deliberate indifference this Court previously found and moves into the realm of outright disregard for this Court's authority—to say nothing of ICE's constitutional and other obligations to protect the Named Petitioners and putative Class Members from the risk of COVID-19 infection.

And this is especially true because—despite its aggressive use of transfers—ICE has also not improved the conditions at Krome, Glades, and BTC. Social distancing is still not possible at these facilities. Access to soap, hand sanitizer, masks, gloves, and cleaning supplies is still not reliable or consistent. And this is to say nothing of ICE's woefully inadequate attempts to comply with its obligations under the April 30 Order to make individualized determinations of whether to release people and to include information in its mandatory reports to the Court that explain the individual reasons for ICE's determinations.

It is critical that ICE fulfill **all** of its obligations immediately, and Petitioners respectfully request the Court to order ICE to do so. Accordingly, Petitioners hereby move the Court to compel immediate compliance with its April 30 Order, as clarified on May 2, and order ICE to immediately provide documentation of the required evaluations this Court ordered on April 30 and May 2, and to further provide Petitioners' counsel with documentation of its determination for **each** detained individual **before** transferring them to a different facility. Due to the urgencies in responding to COVID-19 that the Court has already recognized, Petitioners request this relief on an emergency basis.

## LOCAL RULE 7.1 CERTIFICATION

Undersigned counsel for Petitioners, Scott Edson and Kathryn Lehman, reached out to all counsel of record for Respondents by email on May 11 and May 14 in a good faith attempt to resolve these issues without judicial involvement. By email dated May 15, Senior Litigation Counsel Dexter Lee stated that Respondents opposed the relief requested in this motion.

## ARGUMENT

**I.    ICE IS STILL NOT COMPLYING WITH CDC GUIDELINES AT KROME, GLADES, AND BTC.**

Despite the Court's Orders, ICE's treatment of Petitioners continues to violate CDC Guidelines at the three instant facilities.  Although ICE has filed declarations asserting that the populations at Krome, Glades, and BTC are below 75 percent of capacity, the attached declarations (collected in Exhibit A) show that the conditions at these facilities remain woefully inadequate and dangerous, and in direct violation of CDC Guidelines.  For example, in a May 14 declaration, Dushane Spaulding reports that he was transferred from Krome to Glades on April 22.  He shares his "cell with five other men, and [they] sleep in a room of six bunk beds, so it is impossible to social distance."  Spaulding Decl. ¶ 7.  Although ICE has said that population at Glades is at 74 percent capacity, [ECF 89-1 ¶ 4], Mr. Spaulding's pod has "81 or 82" and a capacity of "around 95 people"—meaning that the pod where Mr. Spaulding is being held is about 85 percent full, *see* Spaulding Decl. ¶ 7.  He also reports that "we all share the common area, where we also eat our meals" and that when they eat, they have to "sit very close together, with four people at a table, less than 6 feet apart."  *Id.*  He reports that when having recreation "we are also close together, and we share the same soccer ball and drink from the same cooler."  *Id.* ¶ 8.  The individuals held at Glades "often run out of soap, because the guards give us soap only once every two weeks."  *Id.*  When Mr. Spaulding "asked for a refill" of soap, he was accused of "wasting the soap" and told he had to "wait for soap day."  *Id.*  So, he sometimes tries to wash his hands, but he has no soap.  *Id.*  He is unable to wear his mask because it is "dirty and broken," but the guards have told him he has "to wait to receive another one."  *Id.*

In a May 15 declaration, James Saintyl reports a similar failure of ICE to comply with CDC guidelines at the Glades facility.  While this Court's April 30 Order singled out ICE's practice at Glades of having beds "a paltry 12 inches apart," [ECF 76 at 6], Mr. Saintyl (who has asthma) reports that he is sharing a ten-by-thirteen-foot cell with four other men, with bunkbeds configured 4 feet apart, and that he sleeps "less than one foot away" from the person in the upper bunk, Saintyl Decl. ¶ 5.  He likewise relates that meals are eaten with four people to a table, and that the only way to socially distance is to go into solitary confinement.  *Id.* ¶ 6.  When Mr. Saintyl went to seek medical treatment on May 15—two full weeks after this

Court's April 30 Order—"only one or two of the fifteen people in the waiting room were wearing a mask." *Id.* ¶ 7. He does not have access to disinfecting materials but instead must rely on other people in detention to clean his cell—a task they sometimes forget to perform. *Id.* ¶ 8. There is no hand sanitizer, and soap dispensers are only refilled weekly, even though they are empty after about a day. *Id.* ¶ 9.

The May 5 declaration of Danny Ruiz Garcia reports that he is being held at BTC, where he sleeps in a room with five people sleeping in three bunkbeds, making proper social distancing impossible. Ruiz Garcia Decl. ¶ 14. When he goes to lunch, there are more than fifty people in line at once all standing in line together. *Id.* ¶ 15. They eat with one stool between each person but they are still not six feet apart. *Id.* When the detained people go to exercise, "hundreds" go out at once and it is impossible to socially distance "throughout the day." *Id.* ¶ 16. Most staff members do not wear masks, and access to hand sanitizer and shower gel is unreliable. *Id.* ¶ 4-7, 12, 14; *see also* Miguel Angel Marroquin Perez Decl. (describing similar conditions).

In his May 11 declaration, Iran Pichardo Perez-Borroto reports that, although his Krome pod has been under quarantine "on and off for about two months," "[t]he [bunk]beds are still positioned next to each other" and that the people sleeping on either side of him "sleep in the same direction I do, not head to feet." Perez-Borroto Decl. ¶¶ 7, 10. "Social distancing requirements are not met." *Id.* ¶ 11.

In fact, the general conditions at these facilities continue to stand in violation of the CDC Guidelines:

- "There is no hygiene here." Guiber Avila Decl. at 1 (at Krome). Individuals are not provided consistent and adequate supply of soap or hand sanitizer. Maharaj Decl. at 2 (at Glades); Marroquin Perez Decl. at 2 (at BTC); Ruiz Garcia Decl. at 1 (at BTC); Perez-Borroto Decl. at 2 (at Krome); Spaulding Decl. at 2 (at Glades); Dorival Decl. at 1-2 (at Krome and Glades); Corona Matos Decl. at 3 (at BTC); Rodriguez Del Rio Decl. at 2 (at BTC); Arrak Decl. at 3 (at Krome); Hasan Decl. at 4 (at Krome); Auguste Decl. at 2 (at Krome and Glades).

- Individuals exhibiting cough and other symptoms of COVID-19 are kept in the same space as others rather than being appropriately quarantined. Maharaj Decl. at 2 (at Glades); Diaz Decl. at 3 (at Krome); Hasan Decl. at 3 (at Krome).

- ICE packs approximately 20 detained men into a single holding cell at a time. Maharaj Decl. at 1 (at Glades). In one incident, the men were so overcrowded that at least five people were forced to sleep on the floor. *Id.*

- Social distancing is not possible during basic activities like eating and seeking medical care. Perez Valladares Decl. at 2 (at BTC and Krome); Ruiz Garcia Decl. at 2 (at BTC); Dino Dean Declaration at 3 (at Krome); Maharaj Decl. at 2-3 (at Glades); Dorival Decl. at 1-2 (at Krome and Glades); Hasan Decl. at 1-2 (at Krome); Saintyl Decl. at 2 (at Krome and Glades); Corona Matos Decl. at 2 (at BTC); Rodriguez Del Rio Decl. at 2 (at BTC); Djadju Decl. at 2 (at BTC). "When we are eating, it's impossible to socially distance with each other since the chairs are close together, with tables of four chairs, one on each side. It is also impossible to socially distance when we go to medical." *Id.* at 2. "When we eat our meals, we sit very close together, with four people at a table, less than 6 feet apart." Spaulding Decl. at 1-2 (at Glades). "[S]ocial distancing does not exist here. It is impossible." Guiber Avila Decl. at 1 (at Krome). "The bottom beds are just a few inches apart. While in my bed, I can kick or touch the person next to mine." Cooper Decl. at 2 (at Glades).

- "At Glades . . . Staff did not make any accommodations to allow social distancing." Garay Decl. at 1. And "the conditions at Krome were not conducive to being able to follow the social distancing guidelines provided by the CDC—there were just too many people." Melissa Dominguez Decl. at 2. "I continue to think about going into confinement or disciplinary housing in order to isolate myself and avoid getting the virus. In confinement, I would be able to social distance properly." Hasan Decl. at 5 (at Krome); *see also* Auguste Decl. at 2 (at Krome and Glades).

- Masks are not consistently provided. Perez Valladares Decl. at 2 (at Krome); Hasan Decl. at 3-4 (at Krome); Arrak Decl. at 2 (at Krome); Cooper Decl. at 3 (at Glades). Even when they are provided, masks are not consistently worn. Spaulding Decl. at 2 (at Glades); Djadju Decl. at 3 (at BTC); Saintyl Decl. at 3 (at Glades).

- Gloves are not consistently provided. Spaulding Decl. at 2 (at Glades).

- Staff are not consistently wearing masks. Perez Valladares Decl. at 2 (at Krome); Marroquin Perez Decl. at 1 (at BTC); Maggie Arias Decl. at 4 (at Glades); Spaulding Decl. at 2 (at Glades); Dorival Decl. at 2 (at Glades).

- Other than putting up posters saying that detained individuals should wash their hands, ICE has not provided training on how to prevent

COVID-19.  Spaulding Decl. at 2 (at Glades); Dorival Decl. at 2 (at Glades); Arrak Decl. at 2 (at Krome); Cooper Decl. at 2 (at Glades).

- ICE does not provide detained individuals with access to cleaning supplies, and ICE does not regularly clean the facilities.  Hasan Decl. at 2-3 (at Krome); Cooper Decl. at 2-3 (at Glades); Arrak Decl. at 2-3 (at Krome); Djadju Decl. at 3 (at BTC).

In fact, in recent days, Petitioners' counsel has leaned of a disturbing story of ICE's officers being willfully blind to the plight of COVID-19-positive patients in their midst.  A client of one of Petitioners' counsel who was being held at Krome was experiencing symptoms of COVID-19 but was not given a test.  Rather, staff told him it was probably a cold and he was left to solider through.  He was then transferred along with 32 other detained individuals to BTC—none of whom were tested before the transfer.  But after being transferred, they were tested and approximately **16** of them (including this individual) tested positive for COVID-19.[1]  It is unclear why they were transferred and why they were not tested until after they were introduced into a different facility.[2]

In short, even within the three facilities at issue here, despite the reductions in population reflected in ICE's declarations, the precise sort of dangerous conditions the Court's April 30 Order was meant to mitigate persist.  The Court should compel ICE to comply immediately with the provisions in its April 30 Order, as clarified by the Court on May 2.  And it should further make clear to ICE that population reduction cannot be achieved at the cost of safety and implementation of CDC Guidelines.  Rather, in addition to population reduction, ICE must **also** improve the conditions to come into full compliance with the April 30 Order.  [*See* ECF 76 at 8 ("ICE's purported 'substantial compliance' does

---

[1]    This information was also related by an unnamed "senior employee" of the GEO Group, which operates BTC for ICE, in a recent *Miami Herald* article.  *See* Monique O. Madded, *Coronavirus cases skyrocket at ICE detention center in Broward after transfer from Miami*, Miami Herald (May 19, 2020) ("The spike in cases came after 33 detainees were transferred from Krome to BTC late last week, federal sources, detainees and their families told the Miami Herald. After the detainees arrived at the facility on Thursday, they were separated into groups of six and then tested for the coronavirus. Results were given on Friday.").

[2]    Counsel's attempts to follow-up with the client to obtain a declaration have proved elusive, possibly because the client is now in quarantine without access to a phone to contact counsel.  Counsel is reluctant to identify this individual without his express consent out of fear of exposing him to a risk of retaliation from ICE officials.

not pass muster under the *Accardi* doctrine.").]

## II.   ICE'S TRANSFERS HAVE FAILED TO COMPLY WITH THE COURT'S ORDERS AND INSTEAD HAVE EXPOSED PEOPLE TO FURTHER RISKS OF COVID-19 INFECTION.

The record shows that ICE has accomplished reductions at Krome, Glades, and BTC almost entirely through transfers rather than releases.  ICE has, in fact, leaned so heavily on transferring people to reduce the population at these three facilities that its recent declarations have taken to characterizing transfers **as** releases.  *See* ECF 100-1 (lumping together people who were "transferred or released" and then counting transfers and release together as "releases" in setting out facility-specific information).  According to its own declarations, ICE claims to have "released" 230 people at the three facilities.  *See* ECF 90, 100.  However, 111 of the people ICE claims to have released were actually transferred to other ICE facilities.  *See id.*  As a result, since May 1, ICE has actually released only 119 people.  And of those, ICE states it has released only **6** people (approximately 0.4% of the population) due specifically to COVID-19 in the 20 days since the Court's Order.  [*See* ECF 90, 100.]

While ICE may claim that these transfers serve the purpose of improving conditions at the three facilities, early reports suggest that ICE has been conducting these transfers without fulfilling its obligations under this Court's May 2 Order, and that it is transferring people in unsanitary conditions and then depositing them into conditions that are as bad or worse than the those the Court outlined on April 30.  In short, the record shows not a good faith attempt to accomplish the goals set out in this Court's April 30 Order, but instead that ICE is using dangerous transfers to manufacture reduction statistics without improving conditions for the Named Petitioners and putative Class Members.  The Court should rebuke this shell game.

### A.   ICE Has Failed to Show that it Performed the Required Evaluations of Detained Individuals Before Transferring them.

The Court's April 30 Order requires ICE to evaluate the individuals in its custody at the three facilities to determine whether they can be released, and its May 2 Order requires that this evaluation occur **before** any detained individual is transferred to a different detention center.  Yet, to date, ICE has transferred many detainees from the three facilities to various far-flung detention centers but offered no evidence that it seriously evaluated each person to

assess their suitability for release before transferring them.  This is a direct violation of the Court's May 2 Order.

The declarations attached as Exhibit A show that since the Court's May 2 Order, several detained individuals have been transferred to facilities in Texas and New Mexico without ICE providing any explanation for its individual decisions to transfer these people rather than releasing them.  Garay Decl. at 2; Stefanie Crespo Aff. at 3-4; Ana Maria Candela Decl. at 1; Maggie Arias Decl. at 3-4; Marlene Markowitz Decl. at 1-2; Dominguez Decl. at 2; Claudia Del Castillo Decl. at 2-3; Sandy Pineda Decl. at 1.  Indeed, Petitioners understand that some of the transferred individuals have underlying health conditions that put them at heightened risk if they develop COVID-19, but there is no evidence that ICE ever considered these conditions before transferring them.  *See* Arias Decl. at 6 ("My client suffers from asthma and is high risk if he were to contract the COVID-19 virus."); Melissa Dominguez Decl. at 1 (stating that her client "is immune-compromised due to his underlying condition of Asthma" and has suffered severe asthma attacks while in custody); Del Castillo Decl. at 3 (client suffers from sinusitis); Spaulding Decl. at 1 ("I fear that my history of seizures and smoking makes me particularly vulnerable if I contract COVID-19.").  At least one of these individuals specifically requested his release due to his severe underlying asthma, but instead of responding to that request, ICE simply transferred him from Krome to Glades.  Dominguez Decl. at 2.

Indeed, rather than conducting and tracking its own testing, ICE appears to be engaging in the sham of demanding that people who have been transferred certify **to ICE**— in English, which they may not read or understand—that ICE tested them for COVID-19 before transferring them, quite without regard to whether ICE actually tested them.  Named Petitioner Alejandro Ferrara Borges was transferred from BTC to Stewart Detention Center in Georgia on May 14, 2020.  *See* Fabra Decl. at 1.  Before the transfer, ICE told Mr. Borges to sign a document in English, which he does not speak.  *Id.*  He was not given a form in Spanish.  *Id.*  Later, Mr. Borges learned that the form he signed stated that ICE had tested Mr. Borges for COVID-19 before his transfer and that he was negative.  *Id.*  But Mr. Borges was **not** tested before the transfer and has never been tested.  *Id.*  The only evaluation Mr. Borges underwent before the transfer was to have his temperature taken.  *Id.*  Of course, if

ICE had actually tested Mr. Borges, it would not need him to certify whether he was tested; it would have a record of his test and the result.

This kind of ruse stands in stark contrast to the measures this Court ordered on April 30 and May 2.  The Court's May 2 Order could not have been clearer:  "ICE may only transfer detainees **after first** evaluating each detainee and **making a determination as to the detainees' eligibility for release** pursuant to ICE's COVID-19 April 10, 2020 Pandemic Response Requirements."  [ECF 78 at 1 (emphasis added).]  But as yet, ICE has failed to provide any evidence that it is conducting this required pre-transfer analysis.  These individuals' families and attorneys are often notified after they have been transferred that they are now being held in a different facility, sometimes thousands of miles away, with no justification given for the transfer.[3]

Furthermore, the Court specifically required ICE to evaluate the named Petitioners and "inform the Court who among them can be released promptly in light of COVID-19." ECF 76 at 10.  "ICE must take into consideration the detainees' current health status, eligibility for bond, immigration court history and orders, and prior criminal history."  *Id.* But the declarations ICE has filed have generally grouped together ICE's decision making by category, making it impossible to discern (let alone challenge) ICE's reason for not releasing a given person.  This is yet another direct violation of the Court's Orders.

To ensure that ICE actually complies with this Court's Orders this time, Petitioners ask the Court to order Respondents to provide evidence of the evaluation they have performed in accordance with the Court's May 2 Order **before** transferring any additional detained individuals from one of the three facilities at issue here, including transfers between the three facilities.  Given that ICE is required to perform this evaluation, and given its refusal to date to comply with its obligations under this Court's Orders, ICE cannot credibly claim that the slight burden of this requirement would be undue.

---

[3]     The only information ICE has provided about the factors it has considered is a blank spreadsheet showing columns labeled age, health status, bond eligibility, and whether they have criminal convictions or pending charges.   Petitioners do not have any further information, and the spreadsheet does not include a field to identify why the individual was not released or who made the decision.

**B.**     **The Conditions During the Transfers Do Not Comply with the Letter or Spirit of the Court's Orders.**

The attached Declarations show that ICE simply has not received the message this Court sent on April 30 that ICE must take seriously its obligations to Petitioners and the putative Class Members, particularly while they are in transit.  For example, Jordy Humberto Molina Garay and seven other persons were transferred from Glades to a facility in New Mexico on May 4, 2020.  Garay Decl. at 2.  Staff at Glades made no effort to determine whether any of these individuals were infected with COVID-19 before transferring them.  *Id.* at 2.  Mr. Garay was not given a mask or gloves during the transfer, and the guards did not wear masks or gloves when interacting with him and the other detained individuals.  *Id.*  Mr. Garay was placed on a bus and taken to Krome with around 40 other people, but ICE staff did not make any accommodations for the detained individuals to sit apart from each other. *Id.*  Indeed, Mr. Garay saw the guards **block the cameras** monitoring them during the transfer. *Id.*

Once at Krome, Mr. Garay was placed in the "Hielera," also known as "the fridge," a cold holding cell, with around 20 other people less than an arm's length from one another for hours.  *Id.*  He was then transferred to Miami International Airport.  During the flight from Miami to New Mexico, employees from the company ICE hired to perform the transfer openly threatened to retaliate against Mr. Garay if he reported the conditions of the transfer to his lawyers or his family: they warned he would "suffer more inside detention."  *Id.* at 3. Nonetheless, Mr. Garay bravely reported those conditions in a Declaration, but he now fears retaliation from ICE for doing so.  *Id.*

ICE did not perform a medical evaluation on Mr. Garay when he arrived in New Mexico.  However, on May 12, 2020, Mr. Garay learned that someone in his transfer group tested positive for COVID-19.  *Id.*  Mr. Garay asked ICE if he could be tested for the virus, given the proximity the detained individuals during their lengthy transfer.  *Id.*  He was told they would not be tested unless they "showed symptoms."  *Id.*  Now, Mr. Garay believes "we are all in danger.  I fear for my life."  *Id.*

Mr. Garay's experience is not unique.  Indeed, other detained individuals have reported the unsanitary conditions faced during their transfers:

- No social distancing was permitted in the buses or vans transferring detained individuals between facilities. Arias Decl. at 5; Rodney Martin Decl. at 2; Del Castillo Decl. at 4; Spaulding Decl. at 1.

- ICE did not offer detained individuals gloves or hand sanitizer on the bus transferring individuals to Krome. Arias Decl. at 5; Martin Decl. at 2; Del Castillo Decl. at 4.

- ICE did not provide face masks to detained individuals on buses. Martin Decl. at 2.

- Officers did not allow at least one detained individual on a transfer flight to New Mexico to wash his hands or use hand sanitizer. Arias Decl. at 6.

- ICE has not consistently tested or screened detained individuals after arriving at their new facilities. Martin Decl. at 3-4.

In fact, ICE's general treatment of the transferred individuals has been unacceptable. Rodney Martin, who had injured his foot so severely in ICE custody at Krome that he could not walk, was put on a bus that was not wheelchair-accessible and transferred to Baker County Detention Facility. Martin Decl. at 2-3. After being transferred, non-medical ICE staff told Mr. Martin that, in fact, he did not need a wheelchair and stopped providing him with one for several days. *Id*. at 4. Mr. Martin reports that he has not had access to a shower since May 5. *Id.* at 5. Additionally, Mr. Martin, a diabetic, is no longer receiving his diabetes-specific diet at the new facility, and he now "barely eats." *Id*. Another detained individual, Mr. Chavez, was placed in "the burrito," a straitjacket-like device, for his entire flight from Miami to New Mexico, ostensibly as retaliation for not consenting to the transfer. Arias Decl. at 6. The other detained individuals were told that if they objected to their transfers, the same thing would happen to them. Del Castillo Decl. at 4.

In another recent incident, ICE transferred **three Named Petitioners** from BTC to Lumpkin, Georgia—just to turn around and ship them directly back to BTC. *See* Fabra Decl. at 2. It is entirely unclear what ICE hoped to accomplish with this. But it, of course, did nothing to reduce the population or improve conditions at BTC. Instead, the only practical effect was to subject these individuals to a grueling 20-hour round-trip bus ride, in conditions that exposed them to the risk of contracting COVID-19, and then to return them to BTC

12

where, if they became infected along the way, they could then expose other people. *See id.*
And these individuals' status as Named Petitioners here may well chill others from
cooperating with this lawsuit—which, perhaps, was the point. But whatever motivation ICE
could have had, its decision to ping-pong these individuals to Georgia and back is not the
work of an agency that understands the risks inherent in transferring individuals or that is
deciding to use transfers as a last resort.

Petitioners request the Court order ICE to put a stop to these practices immediately.
If ICE truly believes that transfer rather than release is necessary for an individual, it should
only do those in limited, extreme circumstances that could justify transfer **given the increased
risk of COVID-19 infection** and then execute that transfer under conditions that conform to
the Court's April 30 Order and CDC Guidelines.

> **C.**   **The Conditions at the Facilities to Which Detained Individuals Have Been
> Sent Are as Bad, if Not Worse, than the Conditions at Krome, Glades and
> BTC.**

The attached declarations further show that ICE has been accomplishing reductions
in the populations at Krome, Glades, and BTC by transferring the very detained individuals
this Court's April 30 Order seeks to protect to conditions that are at least as bad as those the
Court outlined in that Order.[4]

For instance, several people have been transferred to the Torrance Detention Facility
in New Mexico. Mr. Garay now shares a bunk bed and reports that he is very dehydrated.
Garay Decl. at 3. He shares a single sink with 20 other detained individuals. *Id.* He is not
alone. Kyle Maharaj, who was transferred from Krome to Torrance, shares a sleeping room
less than ten steps wide with another person. Maharaj Decl. at 2. They share a toilet and
sink, which are both inside the cell. *Id.* It is "impossible" to practice proper social distancing
at Torrance during meals, when detained individuals are seated four to a table. *Id.* It is
likewise impossible for people at Torrance to socially distance on the occasions when they do

---

[4]   ICE has not provided the Court or Petitioners with any information on the places to
which the putative class members have been transferred, including whether the living spaces
are at 75 percent capacity, whether social distancing under CDC guidelines is available, or
whether adequate soap, hand sanitizer, and other hygienic necessities are provided at those
facilities. As explained below, it is doubtful that the facilities to which the putative class
members have been sent comply with these conditions.

receive medical attention. *Id.* Similarly, the people at Torrance cannot practice social distancing in the common area, which 25 people share. *Id.* at 2-3. Worse, Mr. Maharaj, who has asthma, was told by a nurse at Torrance on May 5 that he needed to see a doctor. *Id.* at 1, 3. To date, ICE has not taken him to see a doctor, which would be bad enough under normal circumstances but is downright alarming in light of the threat of COVID-19. *Id.* at 3.

Other ICE detention centers are scarcely any better. Several detained people have been transferred to Baker County Detention Facility, where conditions are very poor. Baker does not provide sufficient soap, guards do not consistently wear gloves or masks, and detained individuals have not been provided with masks or other protective equipment. Bilbao Decl. at 1. Many detained individuals exhibiting symptoms of COVID-19 remain in the general population, and there is no clear or consistent policy for quarantining them. *Id.* As if that were not enough, there are reports that individuals detained at Baker have had to eat rotten food. *Id.* And Baker does not have enough beds for everyone at the facility, so people are forced to sleep in makeshift cots. *Id.*; *see also* Amaral Decl. at 3.

Anderson Amaral was transferred from Glades to Baker on May 1. Amaral Decl. at 1. When he arrived with a group of about 25 people, the floor in the unit where he was held was wet and littered with open food packages. *Id.* at 2. ICE made Mr. Amaral and the other transferees clean the unit themselves. *Id.* The only hygiene products Mr. Amaral received at Baker was a thin bar of soap and a small tube of toothpaste. *Id.* at 3. Although the soap only lasted two days, ICE told Mr. Amaral he could not receive more soap until the next week's distribution. *Id.* Most of the guards and medical staff do not wear masks at Baker. *Id.* Several people, including Mr. Amaral, had to sleep on the floor. *Id.* at 3-4. While in ICE custody at Baker, Mr. Amaral, who has a metal plate in his shoulder, suffered a shoulder injury from sleeping on the floor. *Id.* at 4. Despite his injury, ICE guards ordered him to lug his own mattress to a different room. *Id.* When Mr. Amaral explained that he could not, ICE guards physically and verbally abused him. *Id.* He now believes that "the metal plate in my shoulder shifted . . . you can see it through the skin, whereas before, you could not tell. *Id.* at 5. Certainly, Mr. Amaral's transfer to Baker did not protect him from COVID-19 and did nothing but worsen the conditions of his confinement.

It does Petitioners and the putative Class Members no good to be transferred to a facility which presents the same or greater risk of infection. Accordingly, Petitioners ask the

Court to order that ICE transfer detained individuals only to facilities that are in documented compliance with its April 30 Order.

## III.   THE RECORD SHOWS THAT ICE HAS NOT TAKEN ITS OBLIGATIONS SERIOUSLY.

Underlying all of ICE's failures seems to be a steadfast determination to proceed as if all is normal. Even after this Court's April 30 Order, ICE is not acting with the urgency and good faith that the crisis demands.

ICE's lackluster response is, unfortunately, not unique to this case. Rather, on May 15, the Central District of California expressed frustration that ICE's "cavalier approach to [a] Preliminary Injunction" and emphasized that ICE's "stance on compliance" with its obligations "ignores the acute threat posed by COVID-19." *See* Order (1) GRANTING Plaintiffs' Ex Parte Application (Dkt. No. 136); and (2) DENYING Defendants' Ex Parte Applications to Strike at 6 (Dkt. Nos. 141, 148) (IN CHAMBERS), *Fraihat v. ICE,* No. 5:19-cv-01546-JGB-SHK (C.D. Cal. May 15, 2020) (Ex. B). The *Fraihat* court reported that ICE's "response to date" to that court's preliminary injunction "has been lackadaisical and likely objectively deliberately indifferent." *Id.*; *see also Fraihat v. ICE,* --- F. Supp. 3d ----, No. 5:19-cv-01546-JGB-SHK, 2020 WL 1932570, at *24 (C.D. Cal. Apr. 20, 2020) ("The evidence suggests systemwide inaction that goes beyond a mere difference of medical opinion or negligence.").

This Court's April 30 and May 2 Orders **ordered** ICE to give serious consideration to actually releasing people in its custody at Krome, Glades, and BTC. And yet, it has largely refused to do so—and has even taken the position that this Court's order does not require it to individually consider whether release is appropriate for each putative Class Member. *See* Order at 4 & n.4, *Portuondo v. Field Officer Director Miami Field Office*, No. 20-21543-CIV-WILLIAMS (S.D. Fla. May 7, 2020) (relating ICE's refusal to consider releasing person in detention with prostate cancer and granting habeas corpus relief) (Ex. C). As the District of Massachusetts recently explained, ICE's "near-blanket opposition to the release of detainees throughout the bail process" itself shows ICE's deliberate indifference to its obligations. *Savino v. Souza*, CV 20-10617-WGY, 2020 WL 2404923, at *1 (D. Mass. May 12, 2020). This Court showed incredible restraint in its April 30 and May 2 Orders in allowing ICE flexibility to find the best way to protect the putative Class Members from the risk of COVID-19

infection—leaving ICE discretion even to continue transferring people in the midst of the pandemic if ICE felt that was the best way to protect against COVID-19 infection under the circumstances.  And yet, "[w]here elasticity is vital, they are rigid; where life hangs upon a carefully drawn line, they opt for near-blanket incarceration."  *Id.* at *9.

Indeed, ICE's legal positions in this case bespeak its general nonchalance.  Although this Court's April 30 and May 2 Order clearly ordered ICE to accelerate efforts to release putative Class Members, ICE refuses to do so.  Instead, brazenly flouting this Court's direction that ICE consider releasing putative Class Members before transferring them, ICE has now taken to redefining "transfers" to mean "releases."  [ECF 100-1.]  That is contrary to the plain text of this Court's May 2 Order, which expressly distinguished "transfer" from "release."  [ECF 78 at 1.]

Moreover, ICE has stated on the record that it will flatly refuse to consider releasing **anyone** who it deems subject to "mandatory detention."  *See, e.g.*, *Portuondo* Order at 4 & n.4 (reflecting ICE's position that this Court's April 30 and May 2 orders did not require it to consider releasing people in "mandatory detention").  This rigidity confirms ICE's deliberate indifference not only to its obligations to protect people in its detention from the COVID-19 crisis, but also to its mandatory obligations under Orders by this Court.  Petitioners submit that this case therefore cries out for the Court to take further corrective action necessary to compel ICE to do what this Court has already required.

Notably, ICE well knows that the mere fact that ICE has labeled a person's detention as "mandatory" does not prevent their release.  Indeed, in the May 7 *Portuondo* Order, Judge Williams rejected this very position and laid out a series of rulings confirming that ICE's position on this point is untenable.  In that case, ICE refused to release a Cuban man detained at Krome suffering from prostate cancer who was indisputably at high risk of contracting a severe case of COVID-19.  At a hearing on May 4, 2020 (after this Court's May 2 Order), the AUSA informed Judge Williams of ICE's categorical position that it could not release the petitioner because he was in "mandatory detention."  *See id.* at 2 & 4 n.4.  Nevertheless, the court ordered him released.  *Id.* at 11.  As Judge Williams explained, ICE has lost this position again and again and again in district courts.  *See id.* at 6-11.  And, in fact, the decisions

rejecting ICE's position are legion.[5]  That ICE would nonetheless read this Court's April 30 and May 2 Orders as to not require ICE to even **consider** releasing people ICE deems subject to "mandatory detention" (beyond merely reaching the conclusion that the "mandatory" label applies) shows a lack of seriousness and good faith in complying with the structures of this Court's Orders.

Along the same lines, ICE's flurry of recent transfers—and the conditions of those transfers—cannot be divorced from its position (taken in the class certification papers and at the hearing on that issue) that a putative Class Member somehow loses standing (and therefore, this Court loses jurisdiction over his or her conditions of confinement) the moment that person leaves the gates of one of the facilities at issue here.  ICE apparently thinks it has

---

[5]      *See, e.g., Vazquez Barrera v. Wolf*, No. 4:20-CV-1241, 2020 WL 1904497, at *5 (S.D. Tex. Apr. 17, 2020) ("[T]he Supreme Court has consistently allowed for habeas challenges to detention statutorily mandated by the Immigration and Nationality Act."); *Moore v. Nielsen*, No. 418CV01722LSCHNJ, 2019 WL 2152582, at *9 (N.D. Ala. May 3, 2019) ("[A]n appreciable number of district courts since Jennings have ruled that immigrants facing §§ 1225(b) and 1226(c) removal proceedings, regardless of their immigration status, enjoy due process rights against prolonged detention."); *Valenzuela Arias v. Decker*, No. 20 CIV. 2802 (AT), 2020 WL 1847986 (S.D.N.Y. Apr. 10, 2020) (concluding that the respondents "failed to justify [p]etitoners' continued detention in unsafe conditions" and "courts have the authority to order those detained in violation of their due process rights released, notwithstanding § 1226(c)"); *Basank v. Decker*, No. 20 CIV. 2518 (AT), 2020 WL 1481503, at *6 (S.D.N.Y. Mar. 26, 2020) ("[C]ourts have the authority to order those detained in violation of their due process rights released, notwithstanding § 1226(c)"); *Bent v. Barr*, No. 19-CV-06123-DMR, 2020 WL 1812850, at *2 (N.D. Cal. Apr. 9, 2020) ("To the extent that Respondents claim Bent is absolutely prohibited from seeking release because he is mandatorily detained under 18 U.S.C. § 1226(c), the court has already rejected that argument."); *Ferreyra v. Decker*, No. 20 CIV. 3170 (AT), 2020 WL 1989417, at *11 (S.D.N.Y. Apr. 27, 2020) ("[C]ourts have the authority to order those held in violation of their due process rights released, notwithstanding § 1226(c)"); *Hernandez v. Wolf, et al.*, No. 20-cv-00617-TJH, (C.D. Ca. April 1, 2020) ("Hernandez's habeas petition and the relief it seeks from this Court are not barred by the fact that he might be subject to mandatory detention pursuant to INA § 236(c). *See Singh v. Holder*, 638 F.3d 1196, 1202 (9th Cir. 2011). While the INA does restrict jurisdiction in federal courts for certain claims, it does not restrict habeas jurisdiction for petitions that raise constitutional claims."); *Dada v. White et al.*, No. 20-cv-00458, at *13 (W.D. La. April 30, 2020) ("But mandatory detention statutes must, and often do, give way to the dictates of the Constitution, including Petitioners' rights under the Fifth Amendment."); *Malam v. Adducci et al.*, No. 20-cv-10829, at *13 (E.D. Mich. April 5, 2020), as amended (Apr. 6, 2020) ("Petitioner's continued detention is in violation of the United States Constitution, to which 8 U.S.C. § 1226(c) must give way.").

found a creative way to circumvent this Court's authority: since this Court declined to bar further transfer, ICE can simply ship Named Petitioners and putative Class Members far and wide, simultaneously lowering the populations at Krome, Glades and BTC and also (in ICE's position) taking those people beyond this Court's power to do anything about their conditions in transit or after they arrive at their new detention facilities.

ICE's position is not just legally untenable; it contradicts decades of precedent: The Court acquired jurisdiction due to the Named Petitioners' and putative Class Members' standing when this suit was filed, and ICE's unilateral decision to disperse them across the Nation does not deprive the Court of jurisdiction.[6]  Indeed, even if ICE temporarily released Class Members or put them in perfect conditions, ICE's voluntary cessation of the challenged practice would not moot their claims.  *See City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982).  For ameliorative actions (and, as explained above, these transfers are anything but ameliorative) to render an individual's claims moot, ICE would first have to establish (1) there was no reasonable expectation that the alleged violations would recur as to that individual, and (2) interim events had "completely and irrevocably eradicated the effects of the alleged violation."  *LaMarca v. Turner*, 662 F. Supp. 647, 715 (S.D. Fla. 1987).

That ICE would press such a legally untenable position while rapidly transferring people away from this Court—under unsanitary conditions—shows that ICE is not focused on good-faith compliance with this Court's April 30 and May 2 Orders or on protecting the people before the Court who are in ICE's care.  Instead, ICE has devoted itself to inventing loopholes around this Court's authority—no matter what pain in causes in the process.

The Court should put an end to this.  It should compel ICE to take seriously its obligation to consider releasing the Named Petitioners and putative Class Members and to immediately comply with the terms of this Court's April 30 and May 2 Orders.

---

[6]     *See, e.g.*, *Ex parte Mitsuye Endo*, 323 U.S. 283, 306 (1944) ("We only hold that the District Court acquired jurisdiction in this case and that the removal of Mitsuye Endo did not cause it to lose jurisdiction where a person in whose custody she is remains within the district."); *see also, e.g.*, *Ahrens v. Clark*, 335 U.S. 188, 193 (1948) (distinguishing *Endo* in case where district court did not have jurisdiction at time of habeas action was filed).

## CONCLUSION

For the foregoing reasons, Petitioners respectfully request the Court to (1) order ICE to comply immediately with the requirements in its April 30 and May 2 Orders; (2) order ICE to provide documentation of its evaluations for release before any transfer is executed; (3) and prohibit the transfer of any detained individual to a facility that does not comply with the requirements in the Court's April 30 Order.  The Court should further admonish ICE that acts of retaliation against detained individuals for assisting with this lawsuit will not be tolerated and require ICE to ensure that all people acting under its authority are appropriately directed not to retaliate against the Named Petitioners or putative Class Members for consulting with counsel or assisting in this lawsuit.

Date:  May 20, 2020

Respectfully Submitted,

*/s/  Scott M. Edson*
Scott M. Edson, Esq.
Florida Bar No. 17258

Gregory P. Copeland*
Sarah T. Gillman*
**RAPID DEFENSE NETWORK**
11 Broadway, Suite 615
New York, NY 10004
Tel.: (212) 843-0910
Fax: (212) 257-7033
gregory@defensenetwork.org
sarah@defensenetwork.org
*Appearing Pro Hac Vice*

Scott M. Edson, Esq.
Florida Bar No. 17258
**KING & SPALDING LLP**
1700 Pennsylvania Avenue NW, STE 200
Washington, DC 20006-4707
Telephone:   (202) 737-0500
Facsimile:  (202) 626-3737
sedson@kslaw.com

Rebecca Sharpless
Florida Bar No. 0131024
Romy Lerner
Florida Bar No. 116713
**UNIVERSITY OF MIAMI SCHOOL OF LAW - IMMIGRATION CLINIC**
1311 Miller Drive Suite, E-273
Coral Gables, Florida 33146
Tel: (305) 284-3576
Fax: (305) 284-6092
rsharpless@law.miami.edu

Paul R. Chavez
FL Bar No. 1021395
Maia Fleischman
FL Bar No. 1010709
**SOUTHERN POVERTY LAW CENTER**
2 S. Biscayne Blvd., Ste. 3200
Miami, FL 33101
Tel: (305) 537-0577
paul.chavez@splcenter.org
maia.fleischman@splcenter.org

Lisa Lehner
Florida Bar No. 382191
**AMERICANS FOR IMMIGRANT JUSTICE**
5355 NW 36 Street, Suite 2201
Miami, FL 33166
Tel: (305) 573-1106 Ext. 1020
Fax: (305) 576-6273
Llehner@aijustice.org

Kathryn S. Lehman
Florida Bar No.: 95642
Chad A. Peterson
Florida Bar No.: 91585
**KING & SPALDING LLP**
1180 Peachtree Street, N.E.
Atlanta, GA 30309
Telephone: (404) 572-4600
Facsimile: (404) 572-5100
klehman@kslaw.com
cpeterson@kslaw.com

Mark Andrew Prada
Fla. Bar No. 91997
Anthony Richard Dominguez
Fla. Bar No. 1002234
**PRADA URIZAR, PLLC**
3191 Coral Way, Suite 500
Miami, FL 33145
Tel.:   (786) 703-2061
Fax:    (786) 708-9508
mprada@pradaurizar.com
adominguez@pradaurizar.com

Andrea Montavon McKillip
Florida Bar No. 56401
**LEGAL AID SERVICE OF BROWARD COUNTY, INC.**
491 North State Road 7
Plantation, Florida 33317
Tel. (954) 736-2493
Fax (954) 736-2484
amontavon@legalaid.org

*Counsel for Petitioners-Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 20th day of May, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

*/s/ Scott M. Edson*
Scott M. Edson, Esq.
Florida Bar No. 17258
**KING & SPALDING LLP**
1700 Pennsylvania Avenue NW, STE 200
Washington, DC 20006-4707
Telephone:  (202) 737-0500
Facsimile:  (202) 626-3737
sedson@kslaw.com

*Attorney for Petitioners-Plaintiffs*