# Ex. A

## DECLARATION OF ANDERSON JESUS AMARAL

I, Anderson Jesus Amaral, hereby declare under the penalty of perjury pursuant to 28 U.S.C. § 1746:

1.  I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to these matters.

2.  I am thirty-five years old. I am a citizen of Brazil.

3.  I was ordered removed by an immigration judge on July 21, 2014.

4.  I have been in ICE custody since February 21, 2020.

5.  I am currently detained at Baker County Jail ("Baker") in Macclenny, Florida. When I entered ICE custody, I was initially detained at Glades County Detention Center ("Glades") in Moore Haven, Florida. On May 1, 2020, I was transferred from Glades to Baker.

6.  About eight years ago, as a result of an accident, I had surgery on my shoulder, where doctors inserted metal plates.

7.  On April 30, 2020, while still at Glades, I noted that my phone account had been shut off, so I knew I would be moved out of the facility. I was not provided any documents or notice regarding a transfer.

8.  On May 1, 2020, I was transferred out of Glades with about thirty-five people on a bus. We were not told where we would be going. No one knew what was going on. On the bus, everyone was seated side by side, except for one person who was at the front of the bus because he is disabled.

9.  The bus was dirty. There was garbage on the floor. It was obvious that the bus was not adequately prepared to transfer people. The metal floor was very dirty as well. It was very hot on the bus. We asked the guards to turn up the air conditioning several times.

10.We were not given any masks or gloves during the transfer. The guards did not wear any masks or gloves either.

11.There was a bathroom on the back of the bus, but it had no door. It was very inhumane. The bathroom was very dirty. We were only allowed to use the restroom to urinate.

12.There was no hand sanitizer or disinfecting wipes on the bus. There was not even water in the bathroom to wash our hands after using it.

13.The transfer took about six hours.

14.There were about three vans behind the bus. There were some detained people with masks in the vans. I estimate about twelve to fifteen people were in the vans, but it was hard to see the vans from the bus.

15.During the transfer, we stopped in Orlando. During that stop, about fifteen more people were brought on the bus. None of the new arrivals were wearing masks or gloves. The driver and accompanying officer switched with a new driver and officer during the stop. The new driver and officer were not wearing masks or gloves either.

16.On May 1, 2020, when we arrived at Baker around 8:30 to 9:00 P.M., a group of about twenty-five people, including myself, were taken out of the bus. We were taken into Unit B1 before being processed into the facility. The unit was really dirty. The floor was wet, there were open food packages from commissary all over. We asked the guards whether we were going to stay in the unit. A guard said no. The guard later left, and then came back and told us yes and that we had to clean the unit. I, along with a few others, told the guard we did not understand why we had to clean the unit if the facility knew we were coming. Eventually, we started cleaning the unit because we noticed there was no way out of the situation and we thought we were going to stay in the unit.

17. After we started cleaning, we asked for a cooler with drinking water. The guards told us that they do not give out water coolers and that we had to drink out of the sinks instead. The only sinks in the unit are the sinks in the bathroom. I went to my cell and to get water out of the sink, but the faucet was not working.

18. After about two and a half hours, we were taken out of the unit to be processed into the facility.

19. After processing, which took several hours, we were provided a jumper, underwear, hygiene products, and one roll of toilet paper. A small bar of soap, which was very thin and just a little bit bigger than a matchbox, and small toothpaste were the only hygiene products we received. The soap only lasted me two days. When I ran out, I requested it from the guards, I was told I could not get more soap until the weekly distribution.

20. After booking, we went to the medical unit as a part of our intake process. I noticed that the medical staff were not wearing masks.

21. I am currently in Unit B7. There are fifteen cells that sleep two people each. My unit is currently under quarantine. We have been under quarantine for about five days. We were told the quarantine would last fourteen days total.

22. Most of the time when the nurses and guards come into the unit, they do not wear masks. This is true even as we are under quarantine.

23. The first two nights I spent in Unit B7, I slept on the floor in a boat bed because the all of the cells were full. The boat bed brand is "EZBunk." There were two other men who also slept on the floor in boat beds both of those nights. Both of the men have been transferred out.

24. Before the unit went on quarantine, there were about three or four people sleeping on boat beds on the floor. When we began the quarantine, the guards moved the men sleeping in the boat beds out of the unit, but I do not know where they went.

25. On May 3, 2020, I went to medical because my right shoulder was really hurting from sleeping on the floor. In the medical unit, a nurse examined me and called a local hospital. I was transferred to a local hospital, where I had an x-ray. I was told everything looked normal, but the doctor warned me that the metal plate may require a small surgery.

26. When I returned to Baker from the hospital, I was put on medical observation for 24 hours in the medical unit. I was put in a cell with padded walls. I questioned why I was put in that cell and I was told that there was no space anywhere else.

27. The next day, on May 4, 2020, I went back to my unit. My arm was in a sling. Before entering the unit, a guard told me to get my mattress and pillow because I would be moving to another room. I told the guard I was not able to grab my mattress and pillow because of my shoulder injury. I even showed the guard the bracelet I still had from the hospital. The guard insisted that I grab the mattress and pillow. I asked if I could get assistance from one of my pod-mates. The guard said, "you're going to get it." Another guard grabbed my right bicep, forcing me against the wall and pulled my arms behind my back, which caused me immense pain. Because the sling was made of cloth, the sling gyrated with my arm behind my back as well. Another guard came to my left side and kicked my left leg four times. I lost my balance, but a guard held me up by my uniform and yelled at me to get up. As the guard kicked my legs, my knees would hit the wall. I started to cry from the pain, but the guard yelled "shut up bitch." A sergeant came in at that time and asked me why I did not want to pick up my mattress and pillow. I stayed silent, and she started yelling at me. That is when I told her I couldn't do it because I was in pain. At that moment, a nurse also arrived, and I was taken to the medical unit.

28. After the incident, I was put back in the medical observation cell that I was in previously. About twenty minutes later, I was taken to a standard cell in the medical

unit. I was in that cell for about five hours when a nurse told me I would return to my unit in general population.

29. Since the incident, the metal plate in my shoulder shifted. As a result, it is now clear that there is metal in my shoulder as you can see it through the skin, whereas before, you could not tell.

30. I have authorized Sawyeh Esmaili to sign on my behalf given the difficulty of arranging visitation and travel in light of the current COVID-19 pandemic. If required to do so, I will provide a signature when I am able to do so.

Executed on May 11, 2020.

_____

Sawyeh Esmaili, on behalf Anderson Jesus Amaral

CERTIFICATION

I, Sawyeh Esmaili, declare that on May 11, 2020, I read the foregoing declaration to Anderson Jesus Amaral. I communicated to Mr. Amaral with the help of two interpreters, Iris (Interpreter ID # 211505) and Marcela (Interpreter ID # 206278), both employed by Language Line Solutions, who translated the foregoing declaration from English to Brazilian Portuguese in the presence of the declarant. The declarant subsequently verified that the contents of the foregoing declaration are true and accurate.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 11, 2020.

_____

Sawyeh Esmaili

**ATTORNEY DECLARATION**

I, Sawyeh Esmaili, declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

1. My name is Sawyeh Esmaili. I am a licensed attorney in good standing in the state of Florida.

2. Out of necessity in light of the COVID-19 pandemic, I signed Anderson Jesus Amaral's declaration on his behalf and with his expressed consent.

3. On May 1, 2020, ICE transferred Mr. Amaral to Baker County Jail, which is located in Macclenny, Florida.

4. Further, ICE is now requiring legal visitors to provide and wear personal protective equipment, including disposable latex gloves, surgical masks, and

eye protection while visiting any detention facility. These supplies are not easily accessible, given the increase in demand. Any available supplies are prioritized for hospitals and other medical facilities that are experiencing dangerous shortages.

5. There are documented cases of COVID-19 in all fifty U.S. states and most inhabited U.S. territories. The Center for Disease Control and Prevention ("CDC") issued statements warning that individuals are at a higher risk of infection while traveling. In addition, I am a resident of Miami-Dade County, Florida and unable to travel to visit my client under a state "Stay at Home" order issued by the Governor of Florida Ron DeSantis on April 1, 2020.

6. In light of the above, to protect public health, I am not able to travel to the Baker County Jail to obtain Mr. Amaral's signature.

7. I spoke with Anderson Jesus Amaral via phone call, read the declaration to him, and confirmed the accuracy of the information therein. Anderson Jesus Amaral confirmed the accuracy of the information therein.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 11, 2020 at Miami, Florida.

_____

Sawyeh Esmaili, on behalf of Anderson Jesus Amaral

## DECLARATION OF MAGGIE ARIAS

I, Maggie Arias, declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

1. I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to these matters.

2. My name is Maggie Arias. I am a licensed attorney in good standing in the state of Florida. I am a partner at the law firm of Arias and Pereira, PLLC.

3. I represent Jose Diaz, Alien Number 216-645-311.

4. Mr. Diaz is married to Mrs. Jessica Diaz, who is a U.S. citizen. Together they reside in Brandon, Florida with their two U.S. citizen children.

5. On February 11, 2020, Immigration Customs Enforcement (ICE) apprehended Mr. Diaz at his probation appointment in Plant City, Florida, detained him, transferred him to Tampa, Florida, and eventually transferred him to the Krome Service Processing Center ("Krome") in Miami, Florida where ICE initiated removal proceedings before the Immigration Court.

6. On February 19, 2020, Mr. Diaz appeared *pro se* at his first Master Calendar (MC) Hearing before Immigration Judge Martyak while his family was still interviewing attorneys for representation.

7. On March 2, 2020, Mr. and Mrs. Diaz retained my law firm to provide Mr. Diaz with direct representation before the Immigration Court in Miami, Florida. The same day we entered our appearance as attorneys representing Mr. Diaz in his removal proceedings at the Krome Immigration Court.

8. I have represented Mr. Diaz at a total of four (4) MC Hearings before the Immigration Judge in Miami, Florida, on March 3, 2020, March 26, 2020, April 21, 2020, and May 5, 2020.

9. At some time in April 2020, ICE transferred Mr. Diaz from the Krome Service Processing Center ("Krome") to the Glades County Detention Center ("Glades") located in Moore Haven, Florida, for reasons that remain unknown today. Prior to the transfer, Mr. Diaz was given a document indicating that the transfer destination was to the Glades County Detention Center.

10. Prior to my client's departure from Krome, during the transit to Glades, and upon arrival at Glades, I never received any communication from ICE regarding why he was transferred instead of released.

11. On March 24, 2020, I communicated with ICE Deportation Officer ("DO") Carlos Sanchez and with Supervising Detention and Deportation Officer ("SDDO") James Gamboa to request that my client's Alien File be transferred to U.S. Citizenship and Immigration Services (USCIS) to expedite the client's pending Form I-130 application.

12. On April 9, 2020, I renewed my pending request from March 24, 2020 with ICE DO Carlos Sanchez and SDDO James Gamboa. I received a nonresponsive email from DO Carlos Sanchez regarding Mr. Diaz's case, stating "Any request made by USCIS to ERO [Enforcement Removal Operations] will be reviewed and adjudicated at the best of our abilities." Promptly, I replied to the email to clarify the purpose and procedure for the request to expedite the Alien File transfer to the USCIS and to confirm that ICE would contact USCIS immediately per the established policy between agencies.

13. On May 5, 2020, at my client's fifth MC hearing, Immigration Judge Martyak informed me that ICE transferred my client to El Paso, Texas.  This was the first time I received any notice that ICE transferred my client out of the State of Florida.

14. On May 5th, I communicated once again with DO Carlos Sanchez, SDDO James Gamboa, and attorneys with the Office of the Chief Counsel (OCC) regarding the sudden transfer of my client to another jurisdiction across the country and, separately, to facilitate the transfer of my client's Alien File so that the USCIS could proceed with processing Form I-130. I did not receive a response to this email.

15. On May 7, 2020, I contacted the Krome Immigration Court Clerk of Court who confirmed that on the afternoon of May 5, 2020, Immigration Judge Maryak signed an Order granting the OCC's Motion to Change Venue to the immigration court in El Paso, Texas. On May 6, 2020, my client's wife informed my associate attorney (Alexandra De Leon) that my client was now located in a detention facility in New Mexico.

16. After ICE transferred my client to New Mexico, my firm did not hear from him until Friday, May 8, 2020.

17. On May 8, 2020, I attempted to communicate with DO Carlos Sanchez and SDDO James Gamboa by emailing them and asking once more why Mr. Diaz was transferred by ICE to New Mexico (in the Torrance Detention Facility) with the Immigration court hearings now set in El Paso, Texas.

18. I did not receive a reply until May 11, 2020 when DO Carlos Sanchez stated generally that "The agency transfers detainees all the time, and the transfers are based on the need of the agency. A[lien] files are sent along the alien to the new EOIR where the court proceedings will take place. Than[k] you for your understanding." Again, I did not

Declaration of Maggie Arias                                                                                      3

receive communication from ICE regarding why ICE chose to transfer Mr. Diaz out of state rather than release him from custody.

19. On May 12th, I was finally able to conduct a legal call with my client. I describe what he recounted to me over the phone as follows. On May 4, 2020, after count was completed at Glades, at around 4:00 pm, Glades officers told Mr. Diaz and other detainees to pack their belongings. He and the group, along with others from a different pod, were taken to the booking area at Glades. There, they sat in a cell and changed out of their uniforms into their property clothes in a small room nearby. Mr. Diaz then boarded a bus with others and the group was transferred from Glades to Krome. Mr. Diaz was never told why he would be transferred to Krome nor was he ever considered for release. His only indication on May 4, 2020 that he may be moved was when his phone account at Glades was closed.

20. According to my client, during the transfer from Glades to Krome, he and the other detainees wore masks that they were given by correctional officers for the very first time, a couple of days earlier on the weekend before May 4th. The mask was soft, blue and white, and had a metal strip to adjust over the nose. He learned how to use the mask by reading a bulletin ICE posted inside his pod at Glades. There was no personal instruction on proper mask usage. Mr. Diaz was not given gloves at any point in time.

21. My client informed me that he observed correctional officers at Glades wearing masks for the first time, consistently, during the week of April 27, 2020; however, only some officers wore them. He recalls that one officer in particular, Sierra, did not ever wear a mask.

Declaration of Maggie Arias                                                                    4

22. Prior to the transfer on May 4, 2020, Mr. Diaz asked officer Sierra why he was being moved, to which officer Sierra replied jokingly that the group would be going to China.

23. According to my client, around 40 detainees from Glades were placed on a coach bus, similar to Greyhound buses. There was no distancing between passengers as people sat next to each other. My client himself sat directly next to someone. Everyone wore masks. No one wore gloves. There was no hand sanitizer available nor was any sanitizer offered.

24. Upon arrival at Krome, ICE officers checked the temperature of each detainee's forehead prior to entry. Detainees were taken to the processing area. In the bathroom area, there was no soap readily available, only a sign that read that soap could be provided upon request. Here, too, detainees continued to wear masks. No one wore gloves. There was no hand sanitizer available nor was any sanitizer offered.

25. During the processing, my client asked where he was being taken but the officers would not respond. The officers presented Mr. Diaz with a document indicating that a transfer destination was New Mexico. The officers instructed my client to sign the transfer document, but Mr. Diaz refused.

26. On May 5th, Mr. Diaz and others were separated into three (3) vans and (1) bus and taken to the Miami International Airport for an 8am flight to Albuquerque, New Mexico. Mr. Diaz was in one of the vans where there was no distancing between about nine (9) occupants.

27. Mr. Diaz recalls hearing that there were around 90 people onboard the flight. He recalls seeing detainees from Glades and Krome.

28. According to Mr. Diaz, at the Miami International Airport, he was asked for his name. Mr. Diaz refused to provide it because he did not consent to this transfer. The officers

Declaration of Maggie Arias                                                                                5

walked him down and told him that they would see how tough he was and told him he needed to be wrapped in "the burrito." Mr. Diaz said the burrito is a jacket that restrains the arms. Four (4) officers aggressively placed the jacket on Mr. Diaz and fitted a spit-guard over his facemask.  Mr. Diaz described that the jacket and mouth guard looked similar to what Anthony Hopkins wore in the film Silence of the Lambs. Mr. Diaz was forced onto the plane in this physical restraint jacket and spit guard. He was the only detainee placed into this physical restraint jacket and spit guard. He remained like this for the duration of the four (4) hour flight.

29. During the flight, Mr. Diaz was told that if he needed to go to the bathroom, he was out of luck. He was hungry and thirsty but was not able to eat the bag of food provided or drink water. Though Mr. Diaz needed to urinate and defecate, he did not complain and struggled to hold in his necessities during the entire flight.

30. Fifteen (15) to twenty (20) minutes after landing in Albuquerque, New Mexico, Mr. Diaz's physical restraint jacket and spit guard were removed by an officer. Mr. Diaz then removed his mask while onboard the plane, ate his food and drank water. There were around four (4) officers and 10 detainees remaining aboard the plane. Mr. Diaz was finally able to go to the bathroom, though under an officer's watch. The officer did not allow Mr. Diaz to wash his hands and did not provide him with hand sanitizer. The officer pulled Mr. Diaz from the bathroom immediately after Mr. Diaz finished using the toilet.

31. After exiting the plane, while still on the tarmac, officers again placed restraints on Mr. Diaz (a jacket and spit-guard). The detainees, including my client, were sorted into two buses. Mr. Diaz said that about 40 people were put on a bus to El Paso, Texas, and

another 40 were boarded on a bus to Estancia, New Mexico. The bus ride to the Torrance Detention Center lasted about 1.5 hours according to Mr. Diaz. He was wearing the physical restraints the entire time.

32. Upon arriving at the Torrance Detention Center, Mr. Diaz was provided with a cloth mask and his mask from Glades was discarded. He was taken into isolation by four (4) officers for about an hour because of his early refusal to accept his transfer. However, the assistant warden at Torrance allowed him to be moved to the general population.

33. After arriving at Torrance, my client was finally able to wash his hands.

34. My client describes that since his arrival to the Torrance Detention Center, he and others he traveled with, have been housed separately from other detainees, as if under quarantine.

35. My client suffers from asthma and is high risk if he were to contract the COVID-19 virus. He has informed medical personnel at Krome, Glades, and Torrance that he suffers from asthma. At Glades, he was provided with an inhaler, which was released to him at Torrance sometime last week.

36. At no point has my client been told that he would be tested for the novel coronavirus.

37. My client, Mr. Diaz, remains in active removal proceedings and he will be affected if proceedings have to continue in this new jurisdiction in El Paso, Texas because my law firm, Arias & Pereira PLLC, has limited resources and staff, and is unable to represent Mr. Diaz before the El Paso Immigration Court or to assist with the cost of traveling to and from El Paso, Texas and Miami, Florida.

Declaration of Maggie Arias

38. Mr. Diaz's transfer affects his access to counsel and his ability to present evidence in his removal case to defend against his deportation and prevent separation from his wife and two children.

39. Witnesses in my client's case, including his wife, Mrs. Jessica Diaz, his 3-year-old son, and his 6-year-old stepdaughter, all reside in Florida. Key witnesses cannot travel. Moreover, Mrs. Diaz cannot travel to El Paso, Texas because she is a medical assistant at the Tampa General Hospital in Florida and is now the sole provider and caretaker of their children.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 13, 2020 at Miami, Florida.

Maggie Arias, Esq.

## DECLARATION OF NAIM ARRAK

I, Naim Arrak, hereby declare under the penalty of perjury pursuant to 28 U.S.C. § 1746:

1.     I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to these matters.

2.     My name is Naim Arrak and I am a Plaintiff in *Gayle v. Meade et al.* I am currently detained at the Krome Service Processing Center ("Krome") in the Krome Behavioral Health Unit ("KBHU"). I have been detained here since September 12, 2019 after I was transferred to Krome due to mental health concerns. I have major depressive disorder.

3.     I am housed on the B side of KBHU where there are currently 11 people total. The A side of KBHU currently has six individuals. I have my own room in the KBHU, but I share a common area with everyone else. I interact with them when I receive medication in pill line, during meals, when I watch television, and when I attend group therapy and other classes.

4.     The KBHU was supposed to be taken off quarantine on May 11, 2020. However, on May 10, 2020, an officer confirmed that Officer Seal, who recently worked in the KBHU, tested positive for COVID-19. Officer Seal would work at the desk in the KBHU on the B side. He would hand out tablets, conduct shakedowns, and do pat downs before we went to pill line.

5.     Today, May 11, 2020, the KBHU staff told us we would start classes again. However, I asked the doctor why KBHU would be taken off quarantine given Officer Seal's recent positive COVID-19 test. The KBHU staff decided to end the class as a result of me asking about Officer Seal, and we are currently on "standby," waiting for the officers to determine if the KBHU will continue its quarantine or not. The Krome staff have not tested the detainees in

KBHU for COVID-19 as part of the process to determine whether or not quarantine will continue or at any point in time when we have been quarantined in the past.

6.      The last time I received a mask was Wednesday, May 6, 2020. Since then, the mask I was given ripped, and I cannot use it. The officers have not replaced my ripped mask. When the officers hand out masks each week, they take our old masks, put them in a trash bag, and then give each individual a new masks all while wearing the same pair of gloves. Any germs on our old masks will be passed to the new masks because the officers do not change their gloves during this process. The officers have not provided us with any education on when we should wear the masks or where in the unit we need to be wearing them.

7.      It is impossible to adequately social distance in the KBHU. For example, in the dayroom, we have two small tables that each have four seats. The seats are no more than two feet apart. While we eat our meals or sit in the dayroom of the KBHU, we cannot stay more than six feet apart from each other.

8.      We are required to go to recreation. All 17 people in KBHU go to rec together, and if we refuse, we will be sent to confinement or general population. The rec yard has a small basketball court and three tables all next to each other. The rec yard is not large enough for each of us to remain six feet apart at all times.

9.      On May 11, 2020 in the morning, I asked the officer on duty for wipes to clean the door handles in the KBHU. The officer refused my request. The officers have wipes that they use to clean their station, but they will not share their supply.

10.      The tables in the KBHU on the B side are dirty. There are ants crawling around on the floor and on the tables. I have been told that the cleaning crew is supposed to clean these tables twice a day, but I have not seen that happen.

11.     The KBHU has two phones for 11 people to share. The phones are cleaned by another detainee once a day. The phones are not cleaned between every use. Normally, I put a sock around the phone when I use it in order to try and stop the spread of germs from the phone to my hand.

12.     As of May 11, 2020, there are two soap dispensers in the bathroom, but one is empty and the other one only has a little bit of soap left in it. The commissary has been intermittently closed and open. Right now, commissary is closed. There have been backlogs on fulfilling orders as well. Currently, we are unable to purchase additional shampoo and hygiene supplies. Many people in KBHU have run out of soap. They are using hand soap to wash their bodies or not showering at all.

13.     There is one hand sanitizer dispenser on B side of KBHU and it is located near the nurses' station. It dispenses a foamy substance. I am not even sure this is hand sanitizer. The nurses told us that it is hand sanitizer, but they also told us it does not have an alcohol-based solution.

14.     Many of the officers in KBHU don't wear masks or gloves. Officer Goldberg previously tested positive for COVID-19. He stopped working at Krome for a period of time. I had interacted with Goldberg before I knew he tested positive for COVID-19. He had patted me down and served me food. Goldberg has since returned to work at Krome and is assigned to the KBHU. Approximately two days ago, Officer Goldberg was not wearing a mask in the B side of the KBHU when he handed me a tablet without any gloves on.

15.     The officers have told me that they continue to work in the compound in other housing units of Krome while their COVID-19 test results are pending. My fear is that I will contract COVID-19 from one of these officers.

16.     If I am released from detention, I will comply with any applicable conditions of release including attending check-ins and immigration court hearings. My parents are United States Citizens. They have a home in Virginia. I will live with them if I am released. I will practice social distancing and appropriate isolating behavior if I am released from ICE custody.

17.     I have authorized Lily Hartmann to sign on my behalf given the difficulty of arranging visitation and travel in light of the current COVID-19 pandemic. If required to do so, I will provide a signature when I am able to do so.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed on May 11, 2020


_____

Lily Hartmann, on behalf of Naim Arrak

## LEGAL ASSISTANT DECLARATION

I, Lily Hartmann, declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.      My name is Lily Hartmann. I am a legal assistant at Americans for Immigrant Justice, a legal services organization located in Miami, Florida.

2.      I am a legal assistant working with the legal team in *Gayle v. Meade et al.* Out of necessity in light of the COVID-19 pandemic, I signed Naim Arrak's declaration on his behalf and with his expressed consent.

3.      Further, ICE is now requiring legal visitors to provide and wear personal protective equipment, including disposable latex gloves, surgical masks, and eye protection while visiting any detention facility. These supplies are not easily accessible, given the increase in demand. Any available supplies are prioritized for hospitals and other medical facilities that are experiencing dangerous shortages.

4.      There are documented cases of COVID-19 in all fifty U.S. states and most inhabited U.S. territories. The Center for Disease Control and Prevention ("CDC") issued statements warning that individuals are at a higher risk of infection while traveling. In addition, I am a resident of Miami-Dade County, Florida and unable to travel to visit Naim Arrak under a state "Stay at Home" order issued by the Governor of Florida Ron DeSantis on April 1, 2020.

5.      In light of the above, to protect public health, I am not able to travel to the Krome Service Processing Center to obtain Naim Arrak's signature.

6.      I spoke with Naim Arrak via phone call, read the declaration to him, and confirmed the accuracy of the information therein. Naim Arrak confirmed the accuracy of the information therein.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 11, 2020 at Miami, Florida.

_____

Lily Hartmann

## DECLARATION OF JEAN AUGUSTE

I, Jean Auguste, hereby declare under the penalty of perjury pursuant to 28 U.S.C. § 1746:

1.  I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to these matters.

2.  I am 31 years old and was born in Haiti.

3.  I am currently detained at Glades County Detention Center ("Glades") in Moore Haven, Florida.

4.  I have been in ICE custody since July 18, 2017. I was initially detained by ICE outside of the state of Florida. I was transferred to Krome Service Processing Center ("Krome") from Essex County Correctional Facility in Newark, New Jersey on October 1, 2019. On November 20, 2019, I was transferred from Krome to Monroe County Jail ("Monroe") in Key West, Florida. On April 3, 2020, I was transferred from Monroe back to Krome. On April 23, 2020, I was transferred from Krome to Glades.

5.  I have asthma. I was diagnosed when I was about eleven years old. I need to have multiple inhalers on my person at all times.

6.  On November 13, 2013, I broke my nose. As a result, I had to get a closed reduction procedure. Since that procedure, I have been unable to breathe fully out of my left nostril. This on top of my asthma makes it much harder to breathe.

7.  When I was at Krome in October of 2019, I had to be treated with a breathing machine because I got very sick. The dirty conditions interfered with my asthma. I was sick for about two weeks, and I received treatment on the breathing machine for about five days, three times a day. I was coughing up blood, had a runny nose, experienced difficulty breathing, and had an abnormal cough. During this time,

I was still housed in general population, but had to go to the medical unit three times a day to receive the treatment through the breathing machine.

8.      On or about May 12, 2020, I asked a guard if I could go into protective custody. I would like to go into protective custody because the conditions at Glades are horrible. I am trying to get away from people and the dirty unit. I am just trying to isolate myself. The guard told me that I need to give a name of someone that I am scared of in order for me to go to into protective custody. I told him I don't have a name, but I just would feel safer and better off alone. I am trying to stay clean and healthy. The guard told me protective custody was not made for my comfort.

9.      I am very scared. I do not want to get sick like I was at Krome again.

10.     At Glades, the guards want us to be clean, but they won't allow us to have enough hygiene products. When I was transferred from Krome to Glades, the guards at Glades did not let me keep any of my hygiene products from Krome.

11.     We only get soap once a week. It is liquid and comes in a small 4 ounce bottle. It is a three-in-one product—it is supposed to be used as shampoo, shave gel, and body wash. We have to use this one small bottle for three different things. Because of this, I run out of soap before the week is over. I will not be provided additional soap until the restock day.

12.     I am currently in confinement for refusing an order to go back into general population. I was last in my pod on May 5, 2020. As of that date, there were about 69 people in my pod. The capacity of the pod is about 94.

13.     The pod is divided into cubicles. Each cubicle sleeps six people. There are two bunk beds and two single beds. On April 23, 2020, when I arrived at Glades, I was put in a cubicle with five others. Either on May 2 or 3, 2020, I moved to a cubicle with two others. The single bed is about six inches away from the bunk bed on one side. The space between the top bunk and the bottom bunk is about two and half feet.

14.     When I was in the cubicle with the two other people, I slept in a single bed. There was someone else sleeping in the other single bed about a foot away. The third person was in the bottom bunk next to the other single bed, about six inches away. It is not possible to practice social distancing under these conditions, even with just three people in the cubicle.

15.     I have authorized Sawyeh Esmaili to sign on my behalf given the difficulty of arranging visitation and travel in light of the current COVID-19 pandemic. If required to do so, I will provide a signature when I am able to do so.

I declare under penalty of perjury that the things described above are true and correct.

Executed on May 14, 2020.

_____

Sawyeh Esmaili, on behalf Jean Auguste

## ATTORNEY DECLARATION

I, Sawyeh Esmaili, declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.  My name is Sawyeh Esmaili. I am a licensed attorney in good standing in the state of Florida.

2. Out of necessity in light of the COVID-19 pandemic, I signed Jean Auguste's declaration on his behalf and with his express consent.

3. ICE is now requiring legal visitors to provide and wear personal protective equipment, including disposably vinyl gloves, surgical masks, and eye protection while visiting any detention facility. These supplies are not easily accessible, given the increase in demand. Any available supplies are prioritized for hospitals and other medical facilities that are experiencing dangerous shortages.

4. There are documented cases of COVID-19 in all fifty U.S. states and most inhabited U.S. territories. The Centers for Disease Control and Protection (CDC) has issued statements warning that individuals are at a higher risk of infection when traveling. In addition, I am a resident of Miami Dade County, Florida and unable to travel to visit Jean Auguste under a state 'Stay at home' order issued by the Governor of Florida Ron DeSantis on April 1st, 2020.

5. In light of the above, to protect public health, I am not able to travel to the Glades County Detention Center to obtain Mr. Auguste's signature.

6. I spoke with Jean Auguste on the phone, read the declaration to him, and confirmed the accuracy of the information therein. Jean Auguste has confirmed the accuracy of the information therein.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 14, 2020 at Miami, Florida.

_____

Sawyeh Esmaili, on behalf of Jean Auguste

## DECLARATION OF REINIER GUIBER AVILA

I, Reinier Guiber Avila, hereby declare under the penalty of perjury pursuant to 28 U.S.C. § 1746:

1.  I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to these matters.

2.  I have been in ICE custody since April 12, 2019.

3.  On September 5, 2019, an immigration judge ordered me removed to Cuba.

4.  I have been detained at Krome since April 17, 2020. I was previously detained in Broward Transitional Center for about two months before my transfer to Krome.

5.  At Krome, I am in Pod 14A.

6.  There is no hygiene here. We are charged with cleaning are own pod. However, there are not enough cleaning supplies. We are just given a small amount of water for a very large space. We are only given two rags to clean the entire pod. I am not sure what exact cleaning products we are provided.

7.  We do not have disinfecting wipes to use regularly. I was only given one on the day I arrived to clean my bed but have not been provided any additional wipes since my first day.

8.  I try to keep my distance from others, but social distancing does not exist here. It is impossible.

9.  I have authorized Sawyeh Esmaili to sign on my behalf given the difficulty of arranging visitation and travel in light of the current COVID-19 pandemic. If required to do so, I will provide a signature when I am able to do so.

I declare under penalty of perjury that the things described above are true and correct.

Executed on May 6, 2020.

_____

Sawyeh Esmaili, on behalf Reinier Guiber Avila

## CERTIFICATION

I, Sawyeh Esmaili, declare that I am proficient in the English and Spanish languages.

On May 6, 2020, I read the foregoing declaration to Reinier Guiber Avila and orally translated it faithfully and accurately into Spanish in the presence of the declarant. After I completed translating the declaration, the declarant verified that the contents of the foregoing declaration are true and accurate.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 6, 2020.

_____

Sawyeh Esmaili

## **ATTORNEY DECLARATION**

I, Sawyeh Esmaili, declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

1. My name is Sawyeh Esmaili. I am a licensed attorney in good standing in the state of Florida.

2. Out of necessity in light of the COVID-19 pandemic, I signed Reinier Guiber Avila's declaration on his behalf and with his express consent.

3. ICE is now requiring legal visitors to provide and wear personal protective equipment, including disposably vinyl gloves, surgical masks, and eye protection while visiting any detention facility. These supplies are not easily accessible, given the increase in demand. Any available supplies are prioritized for hospitals and other medical facilities that are experiencing dangerous shortages.

4. There are documented cases of COVID-19 in all fifty U.S. states and most inhabited U.S. territories. The Centers for Disease Control and Protection (CDC) has issued statements warning that individuals are at a higher risk of infection when traveling. In addition, I am a resident of Miami Dade County, Florida and unable to travel to visit Reinier Guiber Avila under a state 'Stay at home' order issued by the Governor of Florida Ron DeSantis on April 1st, 2020.

5. In light of the above, to protect public health, I am not able to travel to the Krome Service Processing Center to obtain Mr. Avila's signature.

6. I spoke with Reinier Guiber Avila on the phone, read the declaration to him, and confirmed the accuracy of the information therein. Reinier Guiber Avila has confirmed the accuracy of the information therein.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 6, 2020 at Miami, Florida.

_____

Sawyeh Esmaili, on behalf of Reinier Guiber Avila

## DECLARATION OF VILERKA S. BILBAO

I, Vilerka S. Bilbao, make the following declaration based on my own personal knowledge and if called to testify, I could and would do so competently as follows:

1) My name is Vilerka S. Bilbao. I am an attorney licensed to practice in Florida and focus mainly on immigration law.

2) I currently represent six individuals who have been detained at Baker County Detention Facility ('Baker') within the past two months.

3) I have visited Baker as part of my work with my clients and am aware of the general conditions of the facility. During the COVID-19 pandemic, I have visited Baker at least four different times.

4) From my conversations with detainees, clients, and my visits, I compiled a list of general conditions inside Baker which include:
   a) **There is insufficient soap.** Detainees are provided a small bar of soap during intake and can get a refill once a week. The size of the soap has been described as "smaller than the soaps at motels."
   b) **There is no running water in some bathroom sinks.**
   c) **Some toiles do not work.** Toilets in various rooms do not work or flood the rooms when flushed.
   d) **Food is rotten.** Some of my clients have had food poisoning immediately after eating rotten food.
   e) **Guards do not wear gloves.** This includes guards who are giving daily medication to detainees with known medical conditions.
   f) **Guards are not wearing masks or protective equipment.**
   g) **Detainees have not been provided with masks or protective equipment.** Several detainees that were transferred into Baker from other facilities have been allowed to keep their masks.
   h) **A large number of detainees are participating in hunger strikes.** Detainees report that every day in the past week anywhere between 50-150 plates are returned to the kitchen uneaten.
   i) **Sometimes there are not enough beds or rooms.** Detainees report having to sleep in makeshift cots.
   j) **There is no testing for COVID-19 available.**
   k) **There are no clear or consistent quarantine procedures in place.** Many who are sick or exhibiting symptoms of COVID-19 remain in general population.

5) There is only one hospital and only 25 beds available in Baker County to treat COVID-19 patients.

6) In the last two weeks amidst the COVID-19 pandemic, five of my clients were transferred from Baker to Broward Transitional Center (BTC). One of my clients was transferred to BTC the same morning as his Master Calendar Hearing, preventing my client from attending and prompting his case to be transferred to another court.

7) During my last visit to Baker on May 7, 2020, I observed that:
    a) Guards were not wearing masks or protective equipment;
    b) Guards were not wearing gloves;
    c) Detainees had not been provided with masks or protective equipment; and
    d) Three front office staff members were not wearing masks nor gloves.

8) It is of great concern that detainees continue to report transfers into and out of Baker, despite the repeated warnings about COVID-19 exposure.

I declare under penalty of perjury and under the laws of the United States that the foregoing is true and correct to the best of my knowledge, memory, and belief.

Executed this 8th day of May, in the year 2020, in the State of Florida.

_____
Vilerka S. Bilbao
FL Bar No. 1012139
Bilbao Law LLC
1029 Lasalle Street
Jacksonville, FL 32207
T: 904-300-0825
Vilerka@BilbaoLaw.com

## <u>DECLARATION OF ANA MARIA CANDELA, ESQ.</u>

I, Ana Maria Candela, declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

1. I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to these matters.

2. My name is Ana Maria Candela. I am a licensed attorney in good standing in the state of Florida.

3. I represent Jose Villa, in removal and bond proceedings at the Krome Immigration Court.

4. On May 4, 2020, I received a call from my client's family member that my client had called her to tell her that he was going to be placed on a bus and taken to another facility. He used a friend's account to call her because his account had been abruptly closed.

5. For over thirty hours, neither I nor my client's family heard from him.

6. It was only after I affirmatively contacted my client's Deportation Officer on May 5th asking the whereabouts of my client that I received an answer on May 6th indicating that he was transferred to Baker County Jail.

7. I never received any communication from ICE regarding why he was transferred instead of released.

8. ICE knew I already represented my client because on April 3, 2020 I requested my client's release.  On April 9, 2020, ICE denied my request without an explanation as to why he could not be released.

9. My client has a hearing in active removal proceedings on May 28, 2020 at the Krome Immigration Court.

10. If the venue of my client's case is transferred to another jurisdiction, the witnesses in my client's case who all reside in Florida will not be able to travel.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 14, 2020 at Miami, Florida.


Ana Maria Candela, Esq.

### DECLARATION OF STEVE COOPER

I, Steve Cooper, hereby declare under the penalty of perjury pursuant to 28 U.S.C. § 1746:

1.      I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to these matters.

2.      My name is Steve Cooper and I am 39 years old and a citizen of Jamaica. I am currently detained at the Glades County Detention Center ("GCDC") in Moore Haven, Florida. I have been in the custody of Immigration and Customs Enforcement ("ICE") since May 2, 2019. I have been detained at GCDC the whole time.

3.      I have asthma but I do not receive treatment for it at GCDC. Previously, in Jamaica, I used an inhaler to manage my asthma, but I have not used an inhaler since 2015. Occasionally, when I do physical activity during recreation, like play soccer, I get short of breath.

4.      I also sustained an injury to my wrist after I fell out of my bunk at GCDC on approximately June 22, 2019. At the time, I was receiving medication for an infection related to a tooth extraction that was done by the dentist at GCDC. The medical staff at GCDC gave me the incorrect medication, and I fainted and fell off the bed. A specialist found that I had torn ligaments in my wrist, and on approximately February 13, 2020, I had an operation to put in screws and restructure my wrist. Since the operation took place, medical staff said that I was supposed to receive weekly physical therapy. However, I have been waiting three months to go to therapy. I still have pain in my wrist, and it has not healed.

5.      Currently, I am housed in Pod A1 where there are approximately 75 to 80 other people. The pod is full. There is one man in the unit who is approximately 72 years old and a few others who are in their 60s.

6.      In each section of Pod A1, there are a total of six beds. The section where I am assigned to sleep is currently full; there are five other people sleeping the section in addition to myself. I sleep on a bottom bed. The bottom beds are just a few inches apart. While in my bed, I can kick or touch the person in the bed next to mine.

7.      I am only permitted to go to the recreation yard three times per week for an hour at a time. Most days, I am unable to leave the pod at all.

8.      The news says that social distancing requires you to stay six feet part from others to help prevent the spread of the coronavirus. But in Pod A1, we are all clustered up together. We are unable to social distance in the pod. We eat all three meals in the pod at tables that are positioned close together. There are approximately six seats at every table, and each seat is no more than two feet apart. There have been no changes in our seating arrangements or how GCDC serves our food in order to allow for adequate social distancing.

9.      There are four phones in Pod A1 that are spaced less than six feet apart. The phones are only cleaned one time each day. They are not cleaned between every use. I make sure to try and wash my hands after I make a phone call because many people touch the phone before I do.

10.      Cleaning in Pod A1 is sporadic and does not happen on a regular schedule. Other detainees clean our pod with a watery cleaning solution. They do not use bleach. Normally, they sanitize the pod about once a day. I do not have access to any cleaning supplies or disinfecting wipes in order to clean on my own.

11.     There is a bathroom on each floor of the unit. Each bathroom has one toilet, two urinals, and three showers. The walls and floors in the bathroom are dirty. The bathrooms are usually cleaned by other detainees once a day or not at all.

12.     In the bathroom, there is a soap dispenser that the GCDC staff refill every Monday. With approximately 75 to 80 people living in this pod, the soap in the dispenser runs out very quickly. It does not last more than a couple days, but the staff only refill the dispenser once a week.

13.     On Tuesday and Fridays, we are provided with a small bottle of white soap. The bottle is labeled "Shampoo gel." The bottle is so small that the gel only lasts for one or two showers. When I request additional soap from the GCDC staff, they often refuse to give it to us.

14.     We are also provided each week with toilet paper and toothpaste, but the toothpaste is always expired. When you use the toothpaste, it makes your gums bleed.

15.     Over a week ago, on a Tuesday, I was given a mask. I have only been provided with one mask. I do not know when the officers will provide me with a new one. We did not receive any education about how often we should be wearing the masks. Only a few of the GCDC guards wear masks.

16.     I have learned that a staff person who manages with the kitchen tested positive for COVID-19. Approximately five people who lived in my pod and worked in the kitchen became sick and never returned to the pod. Two people from Pod A1 who worked in the barbershop got sick and never came back. We are told that people who are exhibiting symptoms of the coronavirus are held in holding cells in the booking unit of GCDC or in cells in solitary confinement.

17.     The GCDC officers are not providing us with information on who has been tested for coronavirus at GCDC and how many of those tests were positive. The medical staff have not tested me or others in Pod A1 for coronavirus up to this date.

18.     There has been a lot of movement in and out of GCDC recently. Last week, a group of individuals detained at GCDC were transferred to New Mexico. Prior to that, a large group of people was transferred to the Baker County Detention Center. Yesterday, four people were taken out of Pod A1 and they never returned. Today, three people were removed from the pod.

19.     People have been transferred from Krome to GCDC in the last couple weeks. I am concerned about this because we have been told that there are many cases of COVID-19 at Krome. I am worried that those people who are transferred from Krome to GCDC will bring the virus to this facility.

20.     About three weeks ago, I wrote to my deportation officer to request to be released from detention. Since I made that request, my deportation officer has not called or spoken to me. I have not received an answer to my request for release.

21.     If I were to be released from detention, I would live with my father who is a United States citizen and lives in Florida.

22.     I have authorized Lily Hartmann to sign on my behalf given the difficulty of arranging visitation and travel in light of the current COVID-19 pandemic. If required to do so, I will provide a signature when I am able to do so.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 14, 2020

Lily Hartmann, on behalf of Steve Cooper

**LEGAL ASSISTANT DECLARATION**

I, Lily Hartmann, declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.      My name is Lily Hartmann. I am a legal assistant at Americans for Immigrant Justice, a legal services organization located in Miami, Florida.

2.      I am a legal assistant working with the legal team in *Gayle v. Meade et al.* Out of necessity in light of the COVID-19 pandemic, I signed Steve Cooper's declaration on his behalf and with his expressed consent.

3.      Further, ICE is now requiring legal visitors to provide and wear personal protective equipment, including disposable latex gloves, surgical masks, and eye protection while visiting any detention facility. These supplies are not easily accessible, given the increase in demand. Any available supplies are prioritized for hospitals and other medical facilities that are experiencing dangerous shortages.

4.      There are documented cases of COVID-19 in all fifty U.S. states and most inhabited U.S. territories. The Center for Disease Control and Prevention ("CDC") issued statements warning that individuals are at a higher risk of infection while traveling. In addition, I am a resident of Miami-Dade County, Florida and unable to travel to visit Steve Cooper under a state "Stay at Home" order issued by the Governor of Florida Ron DeSantis on April 1, 2020. Furthermore, the State of Florida has a State of Emergency in place that the Governor renewed for sixty (60) additional days on Monday, May 11, 2020.

5.      In light of the above, to protect public health, I am not able to travel to the Glades County Detention Center to obtain Steve Cooper's signature.

6.      I spoke with Steve Cooper via phone call, read the declaration to him, and confirmed the accuracy of the information therein. Steve Cooper confirmed the accuracy of the information therein.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 14, 2020 at Miami, Florida.

Lily Hartmann

## DECLARATION OF BRYAN ALEXANDER CORONA MATOS

I, BRYAN ALEXANDER CORONA MATOS, hereby declare under the penalty of perjury pursuant to 28 U.S.C. § 1746:

1. I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to these matters.

2. I am 20 years old and currently detained at Broward Transitional Center ("BTC"), in Pompano Beach, FL. I have been detained here since March 20, 2020. I was previously detained in Stewart Detention Center in Georgia.

3. I have had asthma since birth. To manage my asthma, I use an inhaler. I often experience flare ups in my asthma due to changes in temperature and dust in the air. I have had to use his inhaler frequently at BTC due to the changes in temperature when I was transported by ICE from Georgia to South Florida – typically about three times per day.

4. Even though I am at higher risk of complications from COVID-19 due to my asthma, I have not received any additional testing for COVID-19 or medical attention to discuss my risk factors. The only time I am seen by the medical staff is when I need to refill the medicine in my inhaler.

5. On approximately May 11, 2020, a guard told me that there were three confirmed cases of COVID-19 at BTC. The first man who was diagnosed was transferred to the facility recently with a group of people, but he is now housed on his own in a separate room. An officer said he is concerned that others in quarantine may have the virus too.

6. As far as I am aware, there are approximately 200 people in quarantine at BTC. About 100 of these people were recently transferred to BTC from other ICE detention facilities and are now in quarantine.

7. Those in quarantine are housed in regular rooms, not in the medical unit.

8. People in quarantine are permitted to go out to the recreational area when the rest of the population at BTC is locked in their rooms. People in quarantine use the same phones as the rest of the population. I have been told that people in quarantine are required to clean the recreational equipment, tables, and phones before returning to their rooms, but I cannot be sure the equipment and tables are cleaned every time they leave the recreational area.

9. Today, May 13, 2020, about 30 new detainees were brought to BTC from another detention center.

10. I currently live in a room with five other individuals. Our beds are not spaced more than six feet apart. When we are locked in our rooms, it is crowded, and we are unable to be more than six feet apart at any given time.

11. Social distancing is not respected at all. Groups of more than ten people walk through the small hallways together. Groups of approximately thirteen men gather to play cards together each day. During recreational time, approximately 120 men are outside in the recreational area together. We are forced to stand in line close together to make purchases from the commissary. Large groups of people wait in line to use the phones in the recreational area to make calls.

12. At BTC, we receive a new mask twice per week. The BTC staff did not inform us how often we should be wearing these masks or where we should be wearing the masks. The majority of detainees do not use them. Most BTC staff members also do not wear masks.

13. At BTC, one soap for hand and body washing is given out to each person once a week. I have been assigned to receive any hygiene products, including soap, on Thursdays. Normally, the amount of soap provided is not enough to last the entire week. I can ask officers for more if I run out. However, depending on the officer who is working or if there is not enough supply, extra soap is not always provided.

14. I have authorized Lily Hartmann, a legal assistant, to sign on my behalf given the difficulty of arranging visitation and travel in light of the current COVID-19 pandemic. If required to do so, I will provide a signature when I am able to do so.

I declare under penalty of perjury that the things described above are true and correct.

Executed on May 13, 2020.

Lily Hartmann, on behalf of Bryan Alexander Corona Matos

**CERTIFICATION**

I, Lily Hartmann, declare that I am proficient in the English and Spanish languages. On May 8, 2020, I read the foregoing declaration to Bryan Alexander Corona Matos and orally translated it faithfully and accurately into Spanish in the presence of the declarant. After I completed translating the declaration, the declarant verified that the contents of the foregoing declaration are true and accurate. I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 13, 2020.

Lily Hartmann

## LEGAL ASSISTANT DECLARATION

I, Lily Hartmann, declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

1. My name is Lily Hartmann. I am a legal assistant in the litigation program at Americans for Immigrant Justice in Miami, Florida.

2. Out of necessity in light of the COVID-19 pandemic, I signed Bryan Alexander Corona Matos's declaration on his behalf and with his express consent.

3. ICE is now requiring legal visitors to provide and wear personal protective equipment, including disposably vinyl gloves, surgical masks, and eye protection while visiting any detention facility. These supplies are not easily accessible, given the increase in demand. Any available supplies are prioritized for hospitals and other medical facilities that are experiencing dangerous shortages.

4. There are documented cases of COVID-19 in all fifty U.S. states and most inhabited U.S. territories. The Centers for Disease Control and Protection (CDC) has issued statements warning that individuals are at a higher risk of infection when traveling. In addition, I am a resident of Miami Dade County, Florida and unable to travel to visit Bryan Alexander Corona Matos under a state 'Stay at home' order issued by the Governor of Florida Ron DeSantis on April 1st, 2020.

5. In light of the above, to protect public health, I am not able to travel to the Broward Transitional Detention Center in Pompano, Florida, to obtain Bryan Alexander Corona Matos's signature.

6. I spoke with Bryan Alexander Corona Matos via Skype video call, read the declaration to him, and confirmed the accuracy of the information therein. Bryan Alexander Corona Matos has confirmed the accuracy of the information therein.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 13, 2020 at Miami, Florida.

Lily Hartmann, on behalf of Bryan Alexander Corona Matos

## ATTORNEY AFFIDAVIT

STATE OF FLORIDA          )
COUNTY OF HILLSBOROUGH  )

**BEFORE ME, the undersigned authority, an officer duly commissioned by the laws of the State of Florida, to administer oaths and take acknowledgments, personally appeared Ms. <u>STEFANIE Y. CRESPO</u>, who upon this oath deposes and says as follows:**

I, Stefanie Y. Crespo, declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

1. I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to these matters.

2. My name is Stefanie Y. Crespo. I am a licensed attorney in good standing in the state of Florida.

3. I represent Jose Eduardo Chavez Aguilar (Mr. Chavez) in his immigration case before the Board of Immigration Appeals. I previously represented him at the Miami Immigration Court and the Krome Immigration Court as well.

4. On November 6, 2019, ICE detained Mr. Chavez at the Glades County Detention Center, in Moore Haven, FL.

5. Mr. Chavez's appeal is currently pending.

6. On January 23, 2020, I submitted a written release request to ICE.

7. On February 10, 2020, I followed up on my pending request.

8. On February 14, 2020, ICE responded and indicated my request was being reviewed.

9. On March 28, 2020, I visited my client. He disclosed to me that he had been prescribed medication for high blood pressure and that the nurses were pricking his finger twice per week for two months although he was told he was not diabetic. Mr. Chavez also mentioned

he was supposed to be seen by a gastroenterologist because he was having stomach pain and rectal bleeding, but the Glades medical staff was prescribing him unknown pills.

10. Mr. Chavez also informed me that he was working in the kitchen, delivering food to detainees in all of the housing pods of the Glades County Detention Center.

11. I instructed Mr. Chavez to request his medical records to determine if he was deemed high-risk in case he were exposed to COVID-19 while in detention.

12. On March 30, 2020, after hearing about Mr. Chavez's medical concerns, I renewed my request with ICE for my client's release informing the deportation officer of the medical issues Mr. Chavez disclosed to me. On March 31, 2020 I also requested Mr. Chavez's medical records.

13. On April 15, 2020, I contacted ICE again to follow up on my prior request for release and for medical records.

14. On April 16, 2020, ICE officially denied the request for release.

15. On April 17, 2020, I requested a bond hearing that took place on April 23, 2020. The Immigration Judge denied our request.

16. That same day, Mr. Chavez informed me that while he was on duty, a cook who was an actual employee of the Glades County Detention Center, not a detainee, was tested for COVID-19 and after about two to three hours of being at the facility she was dismissed because she tested positive for the virus.

17. Another detainee who was Mr. Chavez's cellmate was removed after showing symptoms of illness for about a week. Mr. Chavez's cellmate had been in direct contact with the detention employee in the kitchen.

18. On April 28, 2020, without notice or reason, ICE suddenly transferred Mr. Chavez to Baker County Detention Center in Jacksonville, FL. Fifteen (15) other detainees were also transferred with Mr. Chavez . ICE only took the temperature of the detainees before leaving Glades County and when they arrived at Baker County.

19. During the five-hour transfer journey from Glades County to Baker County, none of the detainees were provided with any protective gear such as masks or gloves. ICE restrained them in handcuffs.

20. During the first part of the journey they traveled on a bus, then they were transferred to a "family-sized van."

21. The detainees being transferred were fed only one time; they were given a peanut butter sandwich with juice.

22. No medication was administered during the transfer.

23. After arriving at Baker County Detention Center, ICE failed to administer medication to Mr. Chavez for his high blood pressure. ICE also began monitoring Mr. Chavez's blood sugar levels again by pricking his finger twice per day.

24. On May 5, 2020, ICE again transferred Mr. Chavez for a second time, to the Wakulla County Detention Center in Crawfordville, FL. This took place exactly one week later, for reasons unknown and without notice.

25. ICE did not communicate with my client or me in any capacity prior to this second transfer.

26. After he departed Baker County Detention Center and prior to arriving at Wakulla, during the transfer, ICE provided a single-use facemask on the bus.

27. However, upon arrival to Wakulla County Detention Center, ICE revoked my client's facemask for reasons unknown.

28. I never received any communication from ICE regarding why he was transferred instead of released.

29. ICE has known I represent my client since January 23, 2020 and on no occasion did they ever advise me of my client's transfers.

30. As of the day I am writing this statement, I have requested that ICE provide me with the determination as to whether it was appropriate to transfer my client and the ICE deportation officer has avoided answering that specific question twice already.

31. I spoke with Mr. Chavez via phone call, and confirmed the accuracy of the information here. Mr. Chavez has confirmed the accuracy of the information here.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on the ___14th___ day of ___May___ 2020 at Tampa, Florida.


Stefanie Y. Crespo, Esq.
Florida Bar No.: 103127


SWORN TO and SUBSCRIBED before me this ___May 14th___, 2020 by Stefanie Y. Crespo, who is **Personally** Known to me or who produced as identification the following document: **Driver's License** or ~~Passport No.~~ _C621·799·86·514·1_.


Notary Public, State of Florida

PRINCE JEOM EL
MY COMMISSION # GG 056789
EXPIRES: December 29, 2020
Bonded Thru Budget Notary Services

## DECLARATION OF D'ANGELO DINO DEAN

I, D'Angelo Dino Dean, hereby declare under the penalty of perjury pursuant to 28 U.S.C. § 1746:

1.  I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to these matters.

2.  I am detained at Krome Service Processing Center ("Krome"). I am in Pod 2.

3.  I entered ICE custody on April 3, 2020.

4.  I am thirty years old. I am a citizen of the Bahamas.

5.  In 2015 I was in a serious car accident. From that accident, my left elbow was broken. I now have steel in that elbow. I also hit my head and bruised my kidney. Since my accident, I suffer from chronic seizures. Sometimes, I have them as often as three times a month. I require medication two times a day for my seizures.

6.  I also have high blood pressure, which requires daily medication. I have been taking blood pressure medication since 2015.

7.  Since I have been at Krome, I have not been receiving my seizure medication in a consistent manner. When I first arrived, I went about three to four days without my seizure medication.

8.  About two weeks after my arrival at Krome, I had a seizure. It took the medical staff about thirty minutes to get me from the pod. When they finally transferred me to the medical unit, I told them I did not feel safe inside the medical unit room by myself. I asked to be transferred back to my pod because I was scared if something were to happen to me, no one would find me in time.

9.  At this moment, there are almost sixty people in my pod.

10. There are about thirty bunk beds in my pod. I am in a bottom bunk. There are still people sleeping in the beds next to me and above me. There is about four to four

and a half feet of distance between each bunk bed. There is no specific way that we have to sleep.

11. The beds have not moved around since I have been at Krome. The beds cannot be moved, they are steel beds that are drilled into the floor.

12. In the pod, there are twelve tables that seat four people each. There are not enough tables for the amount of people the unit holds. During mealtimes, the tables are full and the area where the tables are gets very crowded.

13. On Monday, May 4, 2020, about thirty people were taken out of my pod.

14. Between Tuesday, May 5, 2020, and Friday, May 8, 2020, there have been new people brought into my pod. There are at least forty new people now. I heard some came from finishing their time in jail.

15. From my pod, we can see Pod 1 through a window. Yesterday, May 7, 2020, I saw that all of Pod 1 was emptied out. Today, May 8, 2020, it looks almost full again with new arrivals. I know they are new arrivals because I heard a guard comment about how frustrated he was that ICE continues to move people around and bring people into the facility. The guard said the transfers are just a "band aid on a wound."

16. In the month of April, my pod was on two quarantines, fourteen days each, back to back. I missed about three court dates because of the quarantines. We just came off of a quarantine about three to four days ago. A guard told us it was because at least one person in the pod, who is no longer in the pod, tested positive for coronavirus.

17. I have authorized Sawyeh Esmaili to sign on my behalf given the difficulty of arranging visitation and travel in light of the current COVID-19 pandemic. If required to do so, I will provide a signature when I am able to do so.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed on May 8, 2020 at Miami, Florida.

_____

Sawyeh Esmaili, on behalf of D'Angelo Dino Dean


## ATTORNEY DECLARATION

I, Sawyeh Esmaili, declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

1. My name is Sawyeh Esmaili. I am a licensed attorney in good standing in the state of Florida.

2. Out of necessity in light of the COVID-19 pandemic, I signed D'Angelo Dino Dean's declaration on his behalf and with his express consent.

3. ICE is now requiring legal visitors to provide and wear personal protective equipment, including disposably vinyl gloves, surgical masks, and eye protection while visiting any detention facility. These supplies are not easily accessible, given the increase in demand. Any available supplies are prioritized for hospitals and other medical facilities that are experiencing dangerous shortages.

4. There are documented cases of COVID-19 in all fifty U.S. states and most inhabited U.S. territories. The Centers for Disease Control and Protection

(CDC) has issued statements warning that individuals are at a higher risk of infection when traveling. In addition, I am a resident of Miami Dade County, Florida and unable to travel to visit the Krome Service Processing Center under a state 'Stay at home' order issued by the Governor of Florida Ron DeSantis on April 1st, 2020.

5. In light of the above, to protect public health, I am not able to travel to the Krome Service Processing Center.

6. I spoke with D'Angelo Dino Dean on the phone, read the declaration to him, and confirmed the accuracy of the information therein. D'Angelo Dino Dean has confirmed the accuracy of the information therein.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 8, 2020 at Miami, Florida.

_____

Sawyeh Esmaili, on behalf of D'Angelo Dino Dean

<u>DECLARATION OF CLAUDIA DEL CASTILLO, ESQ.</u>

I, Claudia Del Castillo, declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.  I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to these matters.

2.  My name is Claudia Del Castillo. I am a licensed attorney in good standing in the state of Florida.

3.  I represent Mr. Josue Ernesto Munoz, A# 209-299-888, who has a Petition for Review pending in the United States Court of Appeals for the Eleventh Circuit, Case No. 20-10084-DD.

4.  Mr. Munoz-Garcia is a national and citizen of El Salvador, who entered without inspection with his young daughter on August 2016. Both were put in removal proceedings.

5.  I have represented Mr. Munoz-Garcia and his daughter through removal proceedings. He has always complied and appeared for his court hearings.

6.  Mr. Munoz-Garcia always complied with appearing at ICE Miramar as well while his proceedings are pending.

7.  Mr. Munoz-Garcia filed an I-589 Asylum, Withholding of Removal and relief under Convention Against Torture.

8.  His applications for relief were denied and we filed a timely appeal with the Board of Immigration Appeals "BIA".

9.  While his BIA Appeal was pending he was detained last year 2019 by ICE when he presented himself to his appointment at ICE Miramar office.

10. He was detained at Krome Processing Center at the time.

11. The Immigration Judge at Krome at that time determined he was not a flight risk nor a danger to the community and he was released on bond.

12. His BIA Appeal was later denied and we filed a timely Petition for Review with the Court of Appeals of the Eleventh Circuit.

13. However, a few months ago, on March 17, 2020 while his Petition for Review is still pending, ICE officers went to detain him at 6.30am.

14. His long term partner contacted me letting me know what happened.

15. Please be advised that Mr. Munoz Garcia lived with his long term partner and their U.S. citizen 8 month old baby and had a close relationship with his young daughter who was in proceedings with him as well.

16. Mr. Munoz Garcia has been detained at Krome Processing Center since then.

17. I submitted several Requests for Release with ICE at Krome Processing Center via email which had been denied via email as well without specifying reasons.

18. As soon as the Gayle Order came out, I contacted the ICE officer in charge of his case at Krome Processing Center again and submitted a new Request for his Release via email last Friday May 1st, 2020. The Officer said he will now need a hard copy to even consider the Request. So I sent the Request for Release via Fedex to make sure it will get to him by Monday morning.

19. However, over the weekend, on May 2nd, 2020 ICE transferred Mr. Munoz-Garcia to Glades County Detention Center, in Moore Haven, Florida.

20. ICE a few days later transferred Mr. Munoz Garcia from Glades County Detention Center to Torrance Detention Center located in Estancia, New Mexico, where he is currently detained.

21. ICE did not inform me as to my client's transfer.

22. I have contacted the ICE Officer in Krome as I never received a response to my Request for Release, but I have not received an answer.

23. I never received any communication from ICE regarding why he was transferred instead of released.

24. Mr. Munoz-Garcia has been suffering of Sinusitis since he was young and he has been having the following symptoms and medical conditions:

- difficulty breathing

- nasal bleeding

- nasal congestion

- fatigue

- difficulty sleeping

25. Mr. Munoz-Garcia was taking medication at Krome for his symptoms but when I spoke with him he had requested for something stronger as his symptoms had not improved.

26. I had included these medical issues in my Request.

27. As you can see as he within the group with risk factors for COVID 19 .

28. Also, Mr. Munoz- Garcia's partner and mother of his baby is suffering a lot of hardship being quarantined by herself with their 8 month old baby.

29. During the transfer, my client advised me that the transfer included restraints for many.

30. As of the day I am writing this statement, I still have not heard back from ICE Officer at Krome Processing Center.

31. In addition, Mr. Munoz- Garcia has advised me of the following conditions during his transfer to New Mexico:

   a. That on Saturday, May 2nd when he was being transferred from Krome Processing Center to Glades County Detention center the buses were completely full. In addition, they only had masks and there was no social distancing at all.

   b. Once they arrived to Glades County Detention Center they didn't have any protection, the guards only wore gloves to check them and they had chains in their hands, waists, and feet, to the point that Mr. Munoz-Garcia's ankle is inflamed and that he went several days to complain about the inflammation but they would only give him Tylenol.

   c. On Monday May 4th, he was transferred from Glades to Krome they left him all night in the processing jail and the next day when they took him to the airport he went in a bus and there were 4 microbuses completely full as well. There they mixed them up with people coming from other detention centers again without any regard for social distancing.

   d. On Tuesday May 5th, when he was transferred from Krome to New Mexico, him and another detainee didn't want to sign a document for the transfer and the officer came and said that if they did not sign the document they were going to be arrested and were going to be pressing charges against them.

   e. And once they arrived to the airport one of the detainees didn't want to go into the airplane so the guards put him in a straitjacket and they forced him into the plane. And they told the rest of them that if any of them did not want to go into the plane the same was going to happen to them.

4

32. Furthermore, Mr. Munoz-Garcia has been advised by medical personnel in Torrance that as of today there is a detainee with COVID-19 in the inmate population.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 13, 2020 at Boca Raton, Florida.



_____

Claudia Del Castillo, Esq.

## DECLARATION OF YAIKEL LARA DIAZ

I, Yaikel Lara Diaz, hereby declare under the penalty of perjury pursuant to 28 U.S.C. § 1746:

1.  I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to these matters.

2.  I am a 27-year-old Cuban national.

3.  I suffer from chronic asthma. I require an inhaler and constant access to an oxygen tank.

4.  I have been in ICE custody since approximately February 3, 2020.

5.  On February 21, 2020 I received an order of removal. I am currently awaiting my deportation to Cuba.

6.  I am now detained at Krome Service Processing Center ("Krome") in Miami, Florida. I have been detained at Krome since March 12, 2020.

7.  I have had about six asthma attacks since I have been detained at Krome.

8.  On or about March 15, 2020, I started to feel symptoms consistent with COVID-19. I experienced headaches, fever, bone aches, and I lost my senses of smell and taste.

9.  After I started to feel these symptoms, I sent medical requests almost daily, but I was never called to the medical unit.

10. During that time, when a nurse would come to the pod to distribute medication, I reported my symptoms to the nurse. I was told that what I was feeling was just a small cold.

11. On or about March 25, 2020, I was told that I was suspected of having contracted the coronavirus. The nurse told me that they could not be sure because I could not be tested. She did not give me a reason why I could not be tested in that moment. At that time, I was still in my pod in general population.

12. I would shower to try to lower my fever, which helped at first. I thought I was better, but after a few days, my symptoms came back even stronger. I could not bear it. I had a fever, horrible headache, experienced shortness of breath, and lost my sense of taste and smell again. I even had an asthma attack so bad that it caused me to faint and have a seizure. I was unconscious for about ten minutes. The only ones who helped me in that moment were my pod-mates.

13. Medical staff took a very long time help me. It wasn't until about three hours after I fainted and had a seizure that I was taken to the medical unit in Krome, where I stayed for about two days. At first, medical staff insisted that this issue was psychological. When I saw the psychologist, he noted that I was fine and sent me back to my pod.

14. On or about April 25, 2020, I was transferred to Larkin Community Hospital ("Larkin"). During my intake in Larkin I saw that my fever was 108 degrees.

15. On the same day I was taken to Larkin, I tested positive for coronavirus.

16. When I was told I tested positive, I felt very bad and defeated. I became very depressive. I thought I would never see my three-year-old son, who is back in Cuba and is autistic, again.

17. I remained hospitalized in Larkin for about three or four days.

18. When I was discharged from Larkin, I was still feeling some symptoms, but the doctors told me I was doing better.

19. On or about April 29, 2020, I returned to Krome. I was put in medical isolation in the medical unit. I was in a room with three other people who also tested positive for the coronavirus. The only treatment I received was a vitamin C tablet once a day.

20. On or about May 8, 2020, I requested ICE release me. I was told that people who had contracted the virus were not permitted to leave the facility. I continued to insist for my release because I was so scared. I thought about my son and I was

scared I would die in the facility as a person with chronic asthma who contracted the coronavirus. I also insisted on my release because I knew social distancing in the facility was impossible and there was a risk that I could get sick again. I am scared because if I get sick again, I do not know if I will survive it again. My lungs are too weak. ICE told me that there was nothing they could do and told me to get a lawyer. I then tried to hire a lawyer but could not afford her services.

21. I maintain that I should be considered for release because of my medical condition and lack of criminal record.

22. On May 13, 2020, I was discharged from the medical unit and sent back to my pod in general population. Before my discharge, I was not tested for coronavirus. I was just told that because I was not exhibiting anymore symptoms, I would go back to general population.

23. Days before I was discharged from the medical unit back to my pod, a guard told me and the other three with whom I was in isolation with that there were about eighteen guards who tested positive for coronavirus and one guard had passed away from the virus.

24. In all reality, I do not know if I actually still have the coronavirus because no test was ever done. I am very upset about that because if I still have the virus, I do not want to spread it. If I am deported, I do not want to spread the virus to my son.

25. Because I was so sick, it is difficult for me to remember the exact dates that these occurrences happened. The dates mentioned in this declaration are estimates made to the best of my abilities.

26. I have authorized Sawyeh Esmaili to sign on my behalf given the difficulty of arranging visitation and travel in light of the current COVID-19 pandemic. If required to do so, I will provide a signature when I am able to do so.

Executed on May 15, 2020.

_____

Sawyeh Esmaili, on behalf of Yaikel Lara Diaz

CERTIFICATION

I, Sawyeh Esmaili, declare that I am proficient in the English and Spanish languages.

On May 15, 2020, I read the foregoing declaration to Yaikel Lara Diaz and orally translated it faithfully and accurately into Spanish in the presence of the declarant. After I completed translating the declaration, the declarant verified that the contents of the foregoing declaration are true and accurate.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 15, 2020.

_____

Sawyeh Esmaili

**ATTORNEY DECLARATION**

I, Sawyeh Esmaili, declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

1. My name is Sawyeh Esmaili. I am a licensed attorney in good standing in the state of Florida.

2.  Out of necessity in light of the COVID-19 pandemic, I signed Yaikel Lara Diaz's declaration on his behalf and with his express consent.

3.  ICE is now requiring legal visitors to provide and wear personal protective equipment, including disposably vinyl gloves, surgical masks, and eye protection while visiting any detention facility. These supplies are not easily accessible, given the increase in demand. Any available supplies are prioritized for hospitals and other medical facilities that are experiencing dangerous shortages.

4.  There are documented cases of COVID-19 in all fifty U.S. states and most inhabited U.S. territories. The Centers for Disease Control and Protection (CDC) has issued statements warning that individuals are at a higher risk of infection when traveling. In addition, I am a resident of Miami Dade County, Florida and unable to travel to visit Mr. Diaz under a state 'Stay at home' order issued by the Governor of Florida Ron DeSantis on April 1st, 2020.

5.  In light of the above, to protect public health, I am not able to travel to the Krome Service Processing Center to obtain Mr. Diaz's signature.

6.  I spoke with Yaikel Lara Diaz on the phone, read the declaration to him, and confirmed the accuracy of the information therein. Yaikel Lara Diaz has confirmed the accuracy of the information therein.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed on May 15, 2020 at Miami, Florida.


_____

Sawyeh Esmaili, on behalf of Yaikel Lara Diaz

## DECLARATION OF GOGA DJADJU

I, Goga Djadju, hereby declare under the penalty of perjury pursuant to 28 U.S.C. § 1746:

1. I make this declaration based on my personal knowledge except where I have indicated otherwise.  If called as a witness, I could and would testify competently and truthfully to these matters.

2. I am currently detained at Broward Transitional Center ("BTC"), in Pompano Beach, FL. I have been detained here since July 3, 2018.

3. At BTC currently, there are approximately 143 detainees in "cohort quarantine." I think this makes up about 50% of the detainees. All of the detainee rooms on the first floor are now cohort rooms, and the staff is preparing some of the rooms on the second floor to house cohorted detainees. In order to achieve this, non-cohorted detainees have been moved around to different rooms multiple times this week to accommodate these cohorted rooms.

4. We were told on May 7, 2020 that a Brazilian detainee in room 125 tested positive for Coronavirus. He was previously in cohort quarantine for 14 days, then he was put back in general population. He was then taken out of BTC; a guard told me that he was taken to another state for deportation. A few days ago, he was brought back to BTC and he was put in quarantine alone. He has his own recreation time alone. After the case of Coronavirus was confirmed, they "recohorted" everyone who was already cohorted, meaning, that the clock started over on their 14 days of quarantine.

5. There is now a second confirmed positive case of COVID-19, a Guatemalan man who was previously taken to Krome and then brought back to BTC.

6. Yesterday, on May 12, 2020, a guard told me that there are seven positive cases of COVID-19 at BTC.

7. On Tuesday May 5, 2020, Emergency Medical Technicians came at around 11:20-30am and took one of the detainees from room 117 away from BTC because he had a high fever. The guards took all of the people out of the room and they disinfected it and threw away all of the sheets, shoes, and trash.

8. Today, May 13, 2020, I saw approximately 35 people who had just been transferred from Krome packed into the tiny intake room.

9. The only two rooms at BTC where anyone respects social distancing are the library and the chapel. In the line to get in the cafeteria, detainees stand right next to each other. There are tape marks on the floor, but they are not enforced.

10. There is no social distancing in the line to change uniforms, get razors, to receive soap, or for the commissary. There is no social distancing in the recreation yard – detainees sit 6 to a table close to each other.

11. Sometimes groups have church out in the recreation yard, and I would estimate that there are typically 20 to 50 people who participate and do not distance six feet from each other.

12. Cohorted detainees are still playing contact sports like soccer with no social distancing.

13. In the medical department, cohorted individuals use the same bathroom as the non-cohorted individuals and I have not seen anyone clean the bathroom in between users.

14. The BTC guards are frequently short staffed lately. I have seen GEO Transport staff members filling in for the regular BTC guards in every shift. I never saw GEO Transport staff serving as guards before the pandemic.

15. The guards do not consistently use masks and gloves when dealing with the general population of BTC. I usually see them using masks and gloves only with cohorted detainees.

16. However, on May 8, 2020 I saw a guard escorting a cohorted detainee and the guard was wearing only a mask and no gloves. On May 12, 2020, I saw a guard delivering food to the cohorted detainees; she was handling their trays and distributing their food without gloves on.

17. Guards who work with cohorted detainees wear only surgical masks, not N-95 masks. This week, I overheard on the of the guards say that he sent a grievance to his supervisor asking not to be put on the cohort post because they did not have the proper protective equipment. I do not know if he was taken off that post.

18. I have seen detainees who have been recently sick with respiratory symptoms but were not isolated from the general population because they did not have a fever. Fever seems to be the only symptom that causes a detainee to be put in quarantine.

19. The staff started giving detainees masks on about April 24, 2020. We receive new masks about every two to three days. The majority of people do not use them – I would say that about 25% of the detainees wear masks.

20. I have not seen the doors, windows, recreation yard, or phones being sanitized every four hours. Cleaning happens about 1-2 times a day.

21. I have authorized my attorney to sign on my behalf given the difficulty of arranging visitation and travel in light of the current COVID-19 pandemic. If required to do so, I will provide a signature when I am able to do so.

I declare under penalty of perjury that the things described above are true and correct.

Executed on May 13, 2020.

Allison Norris, Esq., on behalf of Goga Djadju

## ATTORNEY DECLARATION

I, Allison Norris, Esq., declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

1. My name is Allison Norris, Esq. I am a licensed attorney in good standing with the Florida Bar.

2. Out of necessity in light of the COVID-19 pandemic, I signed Goga Djadju's declaration on his behalf and with his express consent.

3. ICE is now requiring legal visitors to provide and wear personal protective equipment, including disposably vinyl gloves, surgical masks, and eye protection while visiting any detention facility. These supplies are not easily accessible, given the increase in demand. Any available supplies are prioritized for hospitals and other medical facilities that are experiencing dangerous shortages.

4. There are documented cases of COVID-19 in all fifty U.S. states and most inhabited U.S. territories. The Centers for Disease Control and Protection ("CDC") has issued statements warning that individuals are at a higher risk of infection when traveling. In addition, I am a resident of Miami Dade County, Florida and unable to travel to visit my Goga Djadju under a state 'Stay at home' order issued by the Governor of Florida Ron DeSantis on April 1st, 2020.

5. In light of the above, to protect public health, I am not able to travel to the Broward Transitional Detention Center in Pompano, Florida, to obtain my Goga Djadju's signature.

6.  I spoke with Goga Djadju via Skype video call, read the declaration to him, and confirmed the accuracy of the information therein. Goga Djadju has confirmed the accuracy of the information therein.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 13, 2020 at Miami, Florida.

_____

Allison Norris, Esq., on behalf of Goga Djadju

## <u>DECLARATION OF MELISSA DOMINGUEZ</u>

I, Melissa Dominguez , hereby declare under the penalty of perjury pursuant to 28 U.S.C. § 1746:

1. I am at least 18 years of age and am competent to sign this declaration. I make this declaration based on my personal knowledge except where I have indicated otherwise.  If called as a witness, I could and would testify competently and truthfully to these matters.

2. I represent detainee SD A# ending in 756.  My client SD is 64 years old and a citizen of Cuba.  He has resided in the United States for nearly 17 years and is currently a Legal Permanent Resident of the United States. He has a wife and two children who are United States Citizens.

3. My client is currently detained at Glades Detention Center in Moore Haven, FL after being suddenly transferred from Krome Detention Center in Miami, FL.  He has been in ICE custody since January 16, 2020, when he was placed in removal proceedings based on a conviction for Lewd and Lascivious conduct in 2018 for which he received 3 years probation. He was in  full compliance of the sentence imposed on him at the time he was taken to ICE Custody.

4. SD is immuno-compromised due to his medical condition of Asthma.

5. My client's condition was often difficult to manage while in ICE custody prior

to the COVID 19 pandemic.

6. However, since the COVID 19 pandemic the situation only got worse. My client had severe asthma attacks while at Krome Detention Center and his condition became more difficult to manage as the pandemic progressed.

7. To the best of my knowledge based on the information provided by my client, the conditions at Krome were not conducive to being able to follow the social distancing guidelines given by the CDC- there were just too many people.

8. My client also informed me that his pod was under quarantine from April 20th until May 2nd due to cases of COVID 19 at Krome and was under even more difficult conditions for nearly two weeks.

9. My client has an Individual Hearing on June 9, 2020. He is eligible for a 212(h) waiver and all pertinent applications and evidence have been submitted to the Court. He has significant equities in the United States including his wife and children.

10. For these reasons I have submitted several requests for my client's release which have been promptly denied. This is despite the many equities my client has in the United States, clearly stating he would accept any conditions mandated with his release and his being at severe risk with COVID 19 given both his age and health condition.

11. The last request I submitted was on May 1, 2020 to which I have yet to receive

a response.

12. Instead, on May 4, 2020 my client was suddenly transferred from Krome Detention Center to Glades Detention Center.

13. To the best of my knowledge the transfer of my client was sudden and without warning. He was on the phone with his daughter on the evening of May 3, 2020 when an officer called his name and told him he was being taken somewhere else. The next morning he was transferred. Further, my client was transferred with out a determination having been made on my most recent request for his release on May 1, 2020.

14. To this day, I have not received any communication from ICE to advise me of why my client was transferred rather than released. Despite the fact I am on record as his attorney. I became aware of his transfer when his family called me to tell me what he had said on the phone and I learned where he was through the online detainee locator.

15. To the best of my knowledge ICE has not done any individualized medical evaluation to determine whether any special measures are needed to treat my client's asthma or to reduce his risk of exposure to COVID 19. My client and his family, as well as myself are worried for his life.

16. Based on information provided by my client, they are being told at Glades Detention Center that detainees will be transferred to detention centers in other states including Texas. This has served only to worry him even more given the high risk he has for COVID 19.

17. If my client were released from detention, he will comply with any applicable

conditions of release, including attending check-ins and immigration court hearings. This has been made clear to ICE previously.

18. Upon release, my client will go to his home (which he owns) at 2612 25th St W, Lehigh Acres, FL 33971 and rejoin his U.S. Citizen wife. He will self-quarantine in accordance with the government's recommendations and will be able to be there for his wife who has mental and medical health conditions of her own- evidence of which has been provided to ICE.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Signed on May 13, 2020. at Miami, FL.


_____

Melissa Dominguez, Esq.

**Declaration of Wilkens Dorival**

1. My name is Wilkens Dorival. I am from Haiti and am 24 years old. I arrived in the United States in 2000 as a lawful permanent resident. I was four years old.

2. My mother and older brother live in Orlando and are all lawful permanent residents. I have a little brother and sister, both U.S. citizens. My grandfather and grandmother are U.S. citizens. And I have a five-year-old son, who is also a U.S citizen.

3. I have significant health issues that I understand put me at high risk of serious complications if I catch COVID-19, including obesity and high blood pressure.

4. I take Amlodipine 10 mg twice a day for my high blood pressure, along with hydrochlorothiazide 25 mg every night.

5. I suffer from anxiety, major depressive disorder, schizophrenia, and other disorders. I take Divalproex sodium, Zoloft, and Mirtazapine to treat my mental health issues.

6. Also, I have a metal plate in my arm that was put in before I was detained. I need a follow up appointment, but I have not been able to get one since I have been detained.

7. I have been detained by ICE for more than ten months in three different detention centers. I have applied for asylum and for relief under the Convention Against Torture (CAT). My next hearing was scheduled for March 30, 2020 but it was cancelled and then rescheduled for June 5, 2020. Unfortunately, my family cannot afford an immigration lawyer.

8. First, they held me at the Krome detention center, before they transferred me to Glades detention center on March 19, 2020. Then I was transferred to Baker on April 28, 2020.

9. When I arrived at Glades, they checked my temperature, and that's it. After that transfer, I had cold symptoms.

10. While at Glades, I had problems with my medical care. Whenever I happened to be asleep or indisposed when the guards passed out medications in the morning, they just skipped me and forced me to wait until the next day.

11. I was also mistreated by non-medical staff at Glades. I was in solitary confinement for weeks in April 2020, I think because guards were retaliating against me for reporting what goes on in the facility to people outside.

12. The facility itself had problems with regularly running out of supplies like toilet paper, soap, and even food. It was also impossible for me to keep a safe distance of six feet from the people that I was housed with.

13. There are four dorms in Glades. Before I was moved to Baker at the end of April, there were more than 90 people in my dorm, which has two floors. Each floor of the dorm has 8 cubicles. Six people lived in my cubicle, and the next bed was only one foot away from mine. I shared

the cubicle with five new people over a matter of weeks. And our recreation yard was very small.

14. It was hard to maintain good hygiene there. I didn't have access to disinfectant wipes or anything to clean my cubicle with, even when new people moved in. In the dorm I shared with more than 90 other people, there were only six sinks, toilets, and showers. Detainees were designated to clean the showers, toilets, and sinks (three on each floor in my dorm) three times a day, but they didn't do it consistently or carefully. The bathrooms were almost always dirty. In the bathrooms and in other areas in our dorm, we had to share common spaces and touch common objects that had not been cleaned. But we got just one small bottle of soap twice a week, and no hand sanitizer.

15. At Glades, I saw some guards wearing masks, but not all of them. And I saw some who coughed and sneezed without covering their mouths.

16. The staff didn't talk to us about COVID-19, but there was a piece of paper on the wall with what I was told was COVID-19-related information (the one I saw was in Spanish, which I don't speak). I never heard of anyone getting tested at the facility. This was especially scary because I saw at least 20 people coughing or sick there.

17. On April 28, 2020, I was placed in a group of 20 people and told we were being transferred to the Baker County Detention Center. We were all put in the same room and ordered to stand very close together, almost shoulder to shoulder, without masks.

18. At that time, when we learned we were being taken to Baker unexpectedly, some detainees asked to speak with an ICE officer. In response, we were pepper sprayed. I became disoriented and told the guards I could not breathe. Instead of helping, two or three of them tackled me to the floor, choked me, punched me in the head, and pepper sprayed me directly me in the face. Another guard helped me to the medical unit, but some of the first guards came back later, took me to the showers, pushed me forcefully against the wall, twisted my injured arm, and threatened that they would be beat me up and pepper spray me again if I asked more questions.

19. I was transferred to the Baker facility the same day and have been here ever since. My temperature was not checked before I left the Glades facility. And, on the bus to Baker, we had no choice but to sit very close to each other again, without masks. I had someone sitting right next to me.

20. As of Tuesday, May 5, 2020, there were 33 people in my dorm here at the Baker facility, which has 32 beds. We receive transfers from the Krome Service Processing Center and the Glades facility multiple times each week, so the number changes regularly. I am lucky to be in a two-bed cell right now, but I know others in the facility are in four-beds cell, and I cannot maintain social distancing in common areas in my dorm. In the dining area, there are just three long tables, where we sit within inches of each other, sometimes touching each other.

21. It is hard to maintain good hygiene at the Baker facility. Detainees themselves are responsible for cleaning the common areas and cells. Other than the mop and bucket of water we are given once a day to all share, we receive no gloves, no disinfectants and no other cleaning supplies. I

have seen the common areas be cleaned only once since arriving at this facility. The phones, and the kiosks we use for commissary, requests, and grievances, never get cleaned.

22. We get just one toilet paper roll and a small hotel-style bar of soap once or twice per week. We are supposed to get resupplied every Friday and Monday. But, since at least May 4, 2020, they have run out of soap. The toilet paper is not enough; I have had to borrow some from other detainees. We receive no hand sanitizer.

23. There are no signs about COVID-19 in my dorm. We are not given any information about the virus.

24. We have received no masks, and I have seen no guards wearing masks, even though I've seen them coughing. Even when they put us in handcuffs to go the medical area and other areas outside the dorm, they wear no masks and often no gloves.

25. Even in the medical area, which has just four patient rooms, the nurses and other staff do not wear masks consistently.

26. If I'm released, I will be able to stay with my mom in her two-bedroom apartment, or with my big brother who is willing to support me now that he has a good job, and to include me in his medical benefit plan.

27. I have made mistakes. Most recently, in 2019 I was convicted of battery on a law enforcement officer. Several officers approached me while I was walking down the street, chased me, and tackled me; I was scared, and I swung. They tazed me and arrested me. For this, I was sentenced to 15 months in prison, with credit for 1 year of 38 days of time served. My expected release date was July 1, 2019, but ICE came and picked me up two days prior.

28. I had had similar bad experiences and made similarly bad choices three times before—once in 2011, when I was 16, and twice in 2012, when I was 17. As a result of those experiences, I pled guilty to resisting an officer, once with violence and twice without. In 2011, when I was 16, I also had arrests and was later convicted for robbery (after a street altercation where no weapon was involved) as well as burglary and theft (after I made a stupid bet with my friends that we could get inside someone's house). I also received a conviction for delivery of cannabis in 2013, in addition to three smaller possession of cannabis and paraphernalia offenses. In 2015, I received a global sentence of 55 months in prison, with 848 days of time served, for all of these offenses. I was released on November 18, 2018.

29. I am sorry for being hard-headed. I know I messed up, I take responsibility for my actions, and, as a man, I apologize. Everyday I wake up angry at myself because I've let a lot of people down. I regret every bad thing I did. I am struggling mentally and physically. I know there is no way to go back to the time before I made mistakes, but I have been praying to God to help me make better choices. These recent experiences in prison and detention have been a wake-up call. Lately I have worked to reevaluate my life by getting certificates in educational programs like parenting and coaching, and taking anger management class. But I have grown up a lot in the last few years, and I have committed myself to self-improvement. I don't want to get sick and see all that progress go away.

I, Amien Kacou, certify that I reviewed the statements in this declaration with Mr. Dorival by telephone on April 17 and 18 and May 4 and 6, 2020 and that he certified under penalty of perjury that the statements were true and correct to the best of his knowledge.

_____*/s/ Amien Kacou*_____
Amien Kacou (FL bar 44302)
American Civil Liberties Union of Florida
4343 W Flagler St #400
Miami, FL 33134
(786) 363-2700
akacou@aclufl.org

## <u>DECLARATION OF MAYA WEISSMAN FABRA</u>

I, Maya Weissman Fabra, declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

1. I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to these matters.

2. My name is Maya Weissman Fabra. I am a licensed attorney in good standing in the District of Columbia.

3. I represent Alejandro Ferrera Borges, in his present immigration matters.

4. My client has the following medical issues: asthma and high blood pressure. Mr. Ferrera Borges requires use of his inhaler 3 to 4 times per day.

5. On May 14, 2020, ICE transferred my client to from Broward Transitional Center (BTC) to Stewart Detention Center in Georgia.

6. My client told me that prior to the transfer, he was told to sign a document in English, a language he does not speak. He informed me there was no translator present to interpret for him, and he was not given the same form in his native language, Spanish.

7. From speaking with others, Mr. Ferrera Borges learned that the form he signed said that he had been tested for COVID-19 prior to the transfer. My client told me that he was not tested for COVID-19 prior to his transfer and in fact has never been tested. Only his temperature was taken prior to transfer. It is unclear to him why he was asked to sign a form indicating that he had been tested when he had never been tested.

8. Mr. Ferrera Borges told me he was not given an explanation regarding his transfer. He was also not given a determination regarding his release prior to his transfer.

9. My client told me he was transferred in a group of eighteen men in total along with Daivys Perez Valladares and Adrian Sosa Fletes.

10. Daivys Perez Valladares had been previously transferred from BTC to Krome, and Adrian Sosa Fletes was in BTC.

11. All three men are named plaintiffs.

12. During the transfer, my client told me he was exposed to guards who were not wearing masks.

13. My client told me that medical staff did not arrange for him to have access to his inhaler during the entirety of the transfer, including a ten-hour bus ride. This is particularly concerning to me as my client uses his inhaler multiple times per day to mitigate his asthma.

14. During the transfer, my client told me he was shackled for ten hours on a bus with seventeen other men. During the ten-hour bus ride, they were only given a sandwich, bag of chips, cookies, and an apple. Although the detained people were given masks, guards did not wear masks.

15. My client told me two hours after arriving to Stewart Detention Center, Alejandro Ferrera Borges, Daivys Perez Valladares, and Adrian Sosa Fletes were put on a bus and driven back to BTC. They arrived back at BTC on May 15, 2020. Mr. Ferrara Borges was confused as to why they had all been transferred to Stewart and potentially exposed to COVID-19 only to be brought back to BTC.

16. My client is now cohorted in BTC and exposed to the other confirmed COVID-19 cases at BTC when he shares the yard time with them.

17. I learned my client was transferred on May 18, 2020 when my client called me from BTC.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 19, 2020 at Miami, FL

*Maya Weissman Fabra*
_____

Maya Weissman Fabra, Esq.

## DECLARATION JORDY HUMBERTO MOLINA GARAY

I, Jordy Humberto Molina Garay, hereby declare under the penalty of perjury pursuant to 28 U.S.C. § 1746:

1.      I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to these matters.

2.      I am 38 years old and I am a citizen of Nicaragua.

3.      I am currently detained at Torrance County Detention Facility (Torrance) in Estancia, New Mexico. I was previously detained at Glades County Detention Center (Glades) in Moore Haven, Florida from March 5, 2020 to May 4, 2020. On May 4th, I was transferred from Glades to Krome Service Processing Center (Krome). On May 5, 2020, I was transfer on an airplane from Miami to New Mexico, where I got relocated at Torrance.

4.      Due to coronavirus (COVID-19) pandemic, the Miami immigration court canceled the hearing I had scheduled for my immigration case on April 5, 2020. My immigration case hearing was rescheduled for May 7, 2020. On May 6th, I told my deportation officer at Torrance I was afraid of missing my hearing due to the transfer and he said I was going to have it through Video Teleconferencing. I did not have my immigration case hearing on May 7th and as of May 14, 2020, I have not received any rescheduling notice.

5.      I should have been considered for release because I have severe depression. I have also developed severe gastritis since being detained and I am required to take a pill every day to manage my stomach pain. I have informed the staff at Torrance about my need but have not received my medication as of May 14, 2020. When I made a medical request to get my medication, they told me I needed to wait fourteen days to be seen by a healthcare worker.

6.      At Glades, I shared a pod with approximately 89 other people. I slept in a bed clustered next to five other bunk beds, which made it impossible to create social distancing. I did not experience symptoms of COVID-19 but I am aware of people who were showing symptoms in my pod. Staff did not make any accommodations to allow social distancing.

1

7.      During the entire transfer from Glades to Torrance, I was put very close to different groups. I was unable to practice social distancing. On May 4, 2020 at approximately 4:00 pm, an immigration officer at Glades told me and seven other persons in the same pod we needed to pack our belongings because we were going to be transferred. I never received a decision or explanation of why I was transferred instead of release. Guards were verbally aggressive when I asked about the reason for transfer. They rejected giving us any information about our place of relocation. Staff at Glades did not complete a medical examination or confirmed we were in good state of health before transferring us. We had shackles restraining our hands, feet, and waist during transfer. We were not given any masks or gloves. Guards were not wearing masks or gloves when interacting with us. I was transferred from Glades to Krome in a bus with approximately 40 other people and two guards. Guards did not make accommodations for us to sit separately from each other during transfer. There were four surveillance cameras inside the bus. One of the guards blocked the cameras that were pointing to him and the other guard with a piece of plastic.

8.      Staff at Krome took our temperature when we arrived at approximately 9:00 pm. They gave us a meal when we arrived. They did not do a complete medical examination on us or provide information about COVID-19. Guards were only using masks at Krome. They provided us a mask when we arrived. I was placed in "the fridge", a very cold holding cell, where I stayed until 6:00 am on May 5th with approximately 20 other people. We were within less than an arm of length from each other. Guards neglected us when we asked for blankets or sweaters to cover up because we were laying down in the cold concrete. There were two toilets next to each other in the holding cell without division or privacy.

9.      There were four vans and one bus used to transfer approximately 70 people from Krome to the Miami airport.  I was transferred in one of the four vans with five other people. During our transportation to the airport, I was wearing the mask provided at Krome. Staff did not provide us with additional masks or protective equipment for the airplane transfer. At the airplane, I received two small sandwiches and a bottle of water. We were in shackles for about five hours until we arrived at New Mexico. Personnel from the company who was supporting our airplane transfer started being verbally offensive to us, saying that we deserved our detention because of coming from another country. They kept

saying that if we told our lawyers or family members about the transfer we were going to suffer more inside detention. I am afraid of the retaliatory measures ICE could take against me. When we arrived at the airport, we were transferred to Torrance in two buses. We waited for about one hour until all detained people used the bathrooms inside the buses.

10.     Once we arrived at Torrance, staff took our temperature and gave us two cloth masks. They also provided me with a 4oz. bottle of shampoo. As of May 14, 2020, they have not provided a thorough medical evaluation.

11.     I was placed in a unit with approximately 20 other people. I share a dorm with one detained person who sleeps in the lower part of my bunk bed. I am very dehydrated. There is one sink with low water pressure for all of us in the unit and the water tastes like lead.

12.     On May 12, 2020, staff at Torrance told me and the other detained people in my unit that there was a person who got transferred in our original group from Glades on May 4th that was confirmed positive for COVID-19. When I asked if we could get tested for the virus, given that it is a high possibility we were all in close contact with the person or staff who interacted with him, they said we were not going to be tested unless we showed symptoms. I believe we are all in danger. I fear for my life.

13.     On May 14, 2020 at approximately 9:30 am, guards at Torrance locked up all of us detained people in my unit until 2:30 pm. We were given a meal at 6:00 am on that day and then left without food until we were released from locked down. We were all starving as we have normally received lunch at 11:00 am.  They did not give us any reason why we were locked up for five hours.

14.     I have authorized Andrea Ruiz-Sorrentini, a paralegal, to sign on my behalf given the difficulty of arranging visitation and travel in light of the current COVID-19 pandemic. If required to do so, I will provide a signature when I am able to do so.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 14, 2020 at Miami, Florida.

_____

Andrea C. Ruiz-Sorrentini, on behalf of Jordy Humberto Molina Garay

## <u>CERTIFICATION OF TRANSLATION</u>

I, Andrea C. Ruiz-Sorrentini, declare that I am proficient in the English and Spanish languages.

On May 11, 2020, I read the foregoing declaration to Jordy Humberto Molina Garay and orally translated it faithfully and accurately into Spanish in the presence of the declarant. After I completed translating the declaration, the declarant verified that the contents of the foregoing declaration are true and accurate.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 14, 2020 at Miami, Florida.

_____

Andrea C. Ruiz-Sorrentini

## PARALEGAL DECLARATION

I, Andrea Cristina Ruiz-Sorrentini, declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.  My name is Andrea Cristina Ruiz-Sorrentini. I am an outreach paralegal working with Southern Poverty Law Center at Miami, Florida.

2.  Out of necessity in light of the COVID-19 pandemic, I signed Jordy Humberto Molina Garay's declaration on his behalf and with his express consent.

3.  On May 4, 2020 ICE transferred Mr. Molina Garay to Krome Service Processing Center in Miami, Florida, and then Torrance County Detention Facility in New Mexico.

4.  ICE now requires legal visitors to provide and wear personal protective equipment, including disposable latex gloves, surgical masks, and eye protection while visiting any detention facility. These supplies are not easily accessible, given the increase in demand. Any available supplies are prioritized for hospitals and other medical facilities that are experiencing dangerous shortages.

5.  There are documented cases of COVID-19 in all fifty U.S. states and most inhabited U.S. territories. The Centers for Disease Control and Protection (CDC) has issued statements warning that individuals are at a higher risk of infection when traveling. In addition, I am a resident of Miami-Dade County, Florida and unable to travel to visit my client under a state "Stay at Home" order issued by the Governor of Florida Ron DeSantis on April 1, 2020.

6.  In light of the above, to protect public health, I am not able to travel to the Torrance County Detention Facility in New Mexico to obtain Mr. Molina Garay's signature.

7.  I spoke with Jordy Humberto Molina Garay via phone call, read the declaration to him and confirmed the accuracy of the information therein. Mr. Molina Garay has confirmed the accuracy of the information therein.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 14, 2020 at Miami, Florida.

_____

Andrea Cristina Ruiz-Sorrentini

andrea.ruiz-sorrentini@splcenter.org

786-582-0386

## DECLARATION OF MOHAMED HASAN

I, Mohamed Hasan, hereby declare under the penalty of perjury pursuant to 28 U.S.C. § 1746:

1.      I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to these matters.

2.      My name is Mohamed Hasan and I am a Plaintiff in *Gayle v. Meade et al.* I am currently detained at the Krome Service Processing Center ("Krome") in the Krome Behavioral Health Unit ("KBHU"). I have been in the custody of Immigration and Customs Enforcement ("ICE") since August of 2017. I have post-traumatic stress disorder and major depressive disorder. I also have abnormal liver functions and abnormal thyroid function. My cholesterol is high; I think this is because of how long I have been in ICE custody because I did not have these issues before.

3.      I am housed on the A side of KBHU where there are currently 5 people total. The A side of KBHU only holds eight people. I do not have a roommate, but I share a common area with everyone else. I interact with them when I receive medication in pill line, during meals, when I watch television, and when I attend group therapy and other classes. I sit right next to people during all three meals. The day room where we eat our meals is very small. There are two tables a few inches away from each other; there is no other place for me to eat.

4.      We are required to go to recreation in the yard next to KBHU twice a day for one hour. The recreation yard is a small fenced area that includes two tables each with four chairs. Previously, participation in one hour of recreation was mandatory while the second hour was optional. Now, if we refuse to go to recreation, the officers will take us out of the KBHU program and put us in confinement or disciplinary housing. I do not understand why recreation is

now required if we are trying to social distance because it is impossible for us to remain six feet apart from one another when we are in the yard.

5.      Every morning, the entire KBHU population meets for about an hour. During these meetings, we sit close together in chairs. The meeting involves not only all the detained people on A side, but also nurses and other KBHU staff, normally about 14 people. It does not make sense to me why we are continuing these gatherings when we are supposed to be practicing social distancing.

6.      As far as I am aware, social distancing is supposed to be practiced by everyone in order to prevent the spread of the virus, but we are forced in KBHU to take part in many mandatory activities throughout the day. If I refuse to take part in order to properly social distance, I risk facing disciplinary action like confinement or solitary disciplinary housing. For example, this morning, I was not feeling well, and I did not want to attend community meeting. In the end, I went because I did not want to risk being removed from KBHU at this time. I feel like I am in a situation where I cannot win.

7.      In the course of a normal day in the KBHU, I am patted down by an officer about 21 times. As I pass through various doors in the KBHU or go outside to the recreation yard, a guard will pat me down upon leaving KBHU and prior to entering the yard. Because of this, I am in close contact with many officers throughout the day. The officers do not change their gloves between pat downs. They will touch multiple people before they get to me. I am fearful that these pat downs will cause the virus to spread quickly in the KBHU.

8.      The KBHU has been on and off quarantine for approximately two months. Officers who work in the KBHU have tested positive for the coronavirus. For example, I learned on May 11, 2020 that Officer Seal, who recently worked in the KBHU, tested positive for

COVID-19. Officer Seal would work at the desk in the KBHU and would often conduct pat downs with people in A side including myself.

9.      The Krome staff have not tested the detained individuals in KBHU at any point in time when we have been quarantined.

10.      About a week ago, I started experiencing frequent, strong headaches, shortness of breath, and a dry cough. Despite being housed in a unit where there are nurses always present, I have not received any medical attention for these symptoms. On May 13, 2020, I woke up with a bad headache and felt short of breath. I am concerned that I may have a mild case of COVID-19, so I asked Commander Sharrieff, who is in charge of the KBHU, during our regular morning community meeting if I could be tested for COVID-19. I explained to him my symptoms and that I feared I may have the virus. The Commander denied my request stating that currently Krome only has a total of eight test kits for the entire facility. He said that the facility is having difficulties accessing enough test kits for the number of guards who need them. It appears that only people who are seriously ill will have access to COVID-19 testing.

11.      On approximately May 12, 2020, a Spanish-speaking man named Mr. Montalvo returned to the KBHU. He previously tested positive for COVID-19 and was at a hospital. Mr. Montalvo was then in the medical unit at Krome for a period of time. I am unable to communicate with Mr. Montalvo because we do not speak the same language, so I am not sure if he has since tested negative for COVID-19 or why he was transferred back into the KBHU. I am fearful that he could pass the virus to me.

12.      The last time I received a mask was about a week and a half ago. I do not know when I will receive a new one. I have been told by officers that masks are in short supply and that is why we don't receive masks more frequently.

13.     Many of the officers who work in the KBHU do not wear masks. I do not feel safe around them because they go out into the community and can bring the virus into the facility. I would like them to wear protective equipment, including masks, but if I ask them to do so, I risk facing disciplinary action.

14.     The only soap we are provided is a small bar of hard soap. After two or three uses, the soap is gone. There is no additional soap in the bathroom, and the guards often refuse to provide extra soap. If we want any additional hygiene supplies, we must order if from the commissary which is very expensive. I currently do not have the funds in order to purchase additional soap and hygiene products.

15.     The A side of KBHU does not have a hand sanitizer dispenser. In order to access the hand sanitizer dispenser near the nurses' station in KBHU, I must pass through a series of doors and therefore, pat downs. Because I want to avoid contact with the guards and other detained people as much as possible, I avoid leaving A side to get hand sanitizer.

16.     There is a woman who comes and cleans A side of KBHU twice a day. However, she does not use bleach. The woman cleans the tables in the unit twice a day. Because we eat three times a day, I think it would make sense to clean the tables to be cleaned three times a day but that does not happen.

17.     I do not have any cleaning supplies to clean the bathrooms or other shared spaces throughout the day. I have asked for wipes to clean the bathrooms and other surfaces. The last time I asked was May 12, 2020, and I was denied. The officers have told me that the wipes are in short supply and they are only for the staff. Every time I ask for cleaning supplies, the guards say to me, "Unless it is important, you can't have it."

18.     The A side of KBHU has one phone that we share. The phone is cleaned once a day in the morning by the woman who comes and cleans the unit. We do not have supplies to clean the phone between every use. Sometimes, I try to wipe off the phone with my shirt before I pick it up to make a call.

19.     The chaos at Krome related to the coronavirus is taking a toll on my mental health. I do not feel safe in the KBHU. I continue to think about going into confinement or disciplinary housing in order to isolate myself and avoid getting the virus. In confinement, I would be able to social distance properly. However, I am worried about how my mental illness would get worse if I go into confinement, so I do not know if it is a good thing to do right now.

20.     If I am released from detention, I will comply with any applicable conditions of release including attending check-ins and immigration court hearings. I will live with my sister in Ohio. She is a United States citizen. I will practice social distancing if I am released.

21.     I have authorized Lily Hartmann to sign on my behalf given the difficulty of arranging visitation and travel in light of the current COVID-19 pandemic. If required to do so, I will provide a signature when I am able to do so.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 14, 2020

_____

Lily Hartmann, on behalf of Mohamed Hasan

## LEGAL ASSISTANT DECLARATION

I, Lily Hartmann, declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.      My name is Lily Hartmann. I am a legal assistant at Americans for Immigrant Justice, a legal services organization located in Miami, Florida.

2.      I am a legal assistant working with the legal team in *Gayle v. Meade et al.* Out of necessity in light of the COVID-19 pandemic, I signed Mohamed Hasan's declaration on his behalf and with his expressed consent.

3.      Further, ICE is now requiring legal visitors to provide and wear personal protective equipment, including disposable latex gloves, surgical masks, and eye protection while visiting any detention facility. These supplies are not easily accessible, given the increase in demand. Any available supplies are prioritized for hospitals and other medical facilities that are experiencing dangerous shortages.

4.      There are documented cases of COVID-19 in all fifty U.S. states and most inhabited U.S. territories. The Center for Disease Control and Prevention ("CDC") issued statements warning that individuals are at a higher risk of infection while traveling. In addition, I am a resident of Miami-Dade County, Florida and unable to travel to visit Mohamed Hasan under a state "Stay at Home" order issued by the Governor of Florida Ron DeSantis on April 1, 2020. Furthermore, the State of Florida has a State of Emergency in place that the Governor renewed for sixty (60) additional days on Monday, May 11, 2020.

5.      In light of the above, to protect public health, I am not able to travel to the Krome Service Processing Center to obtain Mohamed Hasan's signature.

6.      I spoke with Mohamed Hasan via phone call, read the declaration to him, and confirmed the accuracy of the information therein. Mohamed Hasan confirmed the accuracy of the information therein.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 14, 2020 at Miami, Florida.

_____

Lily Hartmann

## DECLARATION OF KYLE MAHARAJ

I, Kyle Maharaj, hereby declare under the penalty of perjury pursuant to 28 U.S.C. § 1746:

      1.      I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to these matters.

      2.      I am 21 years old and am a citizen of Trinidad and Tobago.

      3.      I am currently detained at Torrance County Detention Facility in Estancia, New Mexico. I was previously detained at Glades County Detention Center in Moore Haven, Florida. On May 4, I was transferred from Glades to Krome. On May, 5, 2020, I was transferred from Krome to Torrance.

      4.      I put in a request for humanitarian release about two weeks ago but have not received a response. I was never told that they made a determination about whether to release me because of the virus.

      5.      I should have been considered for release because I have had asthma all my life, and I use an inhaler regularly.  I did not have access to the inhaler when I was on the plane from Miami to New Mexico, and I had a very hard time breathing because of my anxiety. There were other people transferred with me who were asthmatic, and other people who traveled with me who were diabetic, and I am not sure if they received their insulin.

      6.      During the entire trip, I was put very close to different groups of people. I was unable to practice social distancing.

      7.      I was taken from Glades to Krome, along with nearly 40 other people from Glades. From Glades to Krome, I was in a van with three rows of seats. I was on the second row seated between two other people. When we were in the van from Glades to Krome, we sat right next to each other, so our arms, shoulders, and legs were touching each other.

      8.      At Krome, I stayed in a holding cell for about 12 hours. The cell was cold and we were not given any food. I slept on the floor. There were about 20 people packed into the cell together. We were within less than an arm length from each other.

      9.      There were two toilets on the holding cell and people were sitting on the toilet and leaning on the sink to sleep. There were at least 5 people sleeping on the floor because of the lack of space, and some people couldn't even sleep because it was so cold.

      10.     I was then transferred via bus with about 30 other people to an airplane, and

1

four vans of about 9 people were also transferred to the plane. I was one of about 70 people (everyone who had come from Glades, plus 30 more) transferred from Krome to the New Mexico facility in an airplane. We didn't eat from about 4 p.m. until the next day at 9 am when we were on the plane. From the moment we left Krome to the booking in New Mexico, we were in shackles, in total about 5 ½ or 6 hours in shackles.

11.      When we were in the plane, we were also all right next to each other. The plane was in very bad condition so people were nervous. At one point a flight attendant tried to look for her seatbelt and when she pulled on it part of the seat came off. The lights were flashing the whole time in the plane.

12.      There were some people during the transfer who were coughing, and it is unclear whether they had COVID-19. ICE took our temperatures before we left Glades, but then we did not receive masks until we were leaving Krome, after we had all slept close together in the holding cell. ICE then made us wear masks, and they were all wearing masks. They were not often wearing gloves. The only time we received hand sanitizer was right before we boarded the entrance of the plane.

13.      None of us were told why we were being transferred. No one knew we were getting transferred until I went up to talk an officer about my commissary account, because they had not cashed me out for my whole commissary account, and they had mixed up my account with that of another detainee.

14.      During the transfer, I saw one contractor worker for ICE who was yelling at detainees, pushing at them, and yelling at one that he would take him outside and "f" him up. They also put extra restraints on one detainee when they had him on the bus

15.      At Torrance, I share my sleeping room, which is less than ten steps wide and twenty-five steps long, with one bunkmate who sleeps below me. It is impossible for us to remain 6 feet apart because the room is so small. The toilet and sink are inside of the cell so when he uses the bathroom I have to be on the other side of the cell. When we are eating, it is impossible to socially distance with each other since the chairs are close together, with tables of four chairs, one on each side. It is also impossible to socially distance when we go to medical. The guards are using masks but not gloves.

16.      Twenty-five of us share the common area, which is 60-80 steps long and about the same wide. When we are all in the common area together it is impossible to

2

socially distance. We also eat our meals in that room.

17.     Because I am asthmatic, the nurse who did my initial screening said I needed to see a doctor since I am asthmatic, but I have still not been able to see a doctor.

18.     I have not had any contact with the deportation officer at the new facility. I have been trying to contact my deportation officer for over a week now but have received no response.

19.     I have authorized Meredith Hoffman, a law student, to sign on my behalf given the difficulty of arranging visitation and travel in light of the current COVID-19 pandemic. If required to do so, I will provide a signature when I am able to do so.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 9, 2020 at Miami, Florida.

*Meredith Hoffman*

Meredith Hoffman

on behalf of Kyle Maharaj

## LAW STUDENT DECLARATION

I, Meredith Hoffman, declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

1. My name is Meredith Hoffman. I am a law student at the University of Miami School of Law, working as a Research Assistant for my Professor Rebecca Sharpless, Director of the Immigration Clinic.

2. Out of necessity in light of the COVID-19 pandemic, I signed Mr. Maharaj's declaration on his behalf and with his express consent.

3. On May 4-5, ICE transferred Mr. Maharaj to Krome Detention Center in Miami, Florida, and then Torrance County Detention Center in New Mexico.

4. ICE now requires legal visitors to provide and wear personal protective equipment, including disposable latex gloves, surgical masks, and eye protection while visiting any detention facility. These supplies are not easily accessible, given the increase in demand. Any available supplies are prioritized for hospitals and other medical facilities that are experiencing dangerous shortages.

5. There are documented cases of COVID-19 in all fifty U.S. states and most inhabited U.S. territories. The Centers for Disease Control and Protection (CDC) has issued statements warning that individuals are at a higher risk of infection when traveling. In addition, I am a resident of Miami-Dade County and unable to travel to visit my client under a state "Stay at Home" order issued by the Governor of Florida Ron DeSantis on April 1, 2020.

6. In light of the above, to protect public health, I am not able to travel to the Torrence County Detention Center in New Mexico to obtain Mr. Maharaj's signature.

7. I spoke with Mr. Maharaj via phone call, read the declaration to him and confirmed the accuracy of the information therein. Mr. Maharaj has confirmed the accuracy of the information therein.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 8, 2020 at Miami, Florida.

*Meredith Hoffman*

Meredith Hoffman

## DECLARATION OF MARLENE MARKOWITZ

I, Marlene Markowitz, declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

1. I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to these matters.

2. My name is Marlene Markowitz. I am a licensed attorney in good standing in the state of Florida.

3. I represent ULISES DANAET VIRUETE GONZALEZ, in Florida.

4. My client has a hearing in active removal proceedings on May 20, 2020 in Krome Immigration Court.

5. Between the dates of May 6 and May 8, 2020, ICE transferred my client to TORRANCE COUNTY DETENTION CENTER, in ESTANCIA, New Mexico.

6. ICE previously transferred my client from Krome Detention Center to Glades County Detention Center.

7. As a result of my client's transfer to Torrance County Detention Center, I am unable to meet with my client and have him sign forms necessary for his removal proceedings. Additionally, I have been unable to mail him forms to sign because of his multiple transfers.

8. My client will be affected if proceedings have to continue in this new jurisdiction because I am unable to travel to meet with him, unable to travel to attend any in person hearings, and will not have a proper attorney client meeting.

9. Witnesses in my client's case all reside in Florida but now that my client's case is in ESTANCIA, New Mexico, they will not be able to travel due to COVID-19 travel restrictions and social distancing measures.

10. After my client was transferred, I have yet to hear from him or his assigned deportation officers.

11. I learned my client was scheduled to be transferred on May 6, 2020. I was advised of the transfer by my client's spouse.

12. I never received any communication from ICE regarding why he was transferred instead of released.

13. ICE knew the client had representation my client was previously represented by Attorney Vanessa Paz. Vanessa Paz previously requested release from ICE.

14. As of the day I am writing this statement, I have requested that ICE provide me with the determination as to whether it was appropriate to transfer my client and I have not heard back from them.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 11, 2020, at Miami, Florida

_____

Marlene Markowitz, Esq.

# DECLARATION OF MIGUEL ANGEL MARROQUIN PEREZ

I, Miguel Angel Marroquin Perez, hereby declare under the penalty of perjury pursuant to 28 U.S.C. § 1746:

1. I make this declaration based on my personal knowledge except where I have indicated otherwise.  If called as a witness, I could and would testify competently and truthfully to these matters.

2. I am currently detained at Broward Transitional Center (BTC) in Pompano Beach, FL I have been detained here since August 12, 2019. I am appealing Immigration Judge Barry Chait's denial of my asylum application.

3. At BTC, we are given a mask every three days. It is not mandatory to use them. Guards don't tell us anything when the masks are handed out. The masks are usually thrown on our beds or on top of the table, so most people do not want to wear them because they are contaminated. I would say maybe eight (8) or (9) detainees wear their masks.

4. Most employees at BTC do not wear masks. It is not mandatory for them and two (2) or (3) employees wear their masks.

5. I saw one person leaving BTC in an ambulance last week.

6. As of this week, I know there are at least 90 people in cohort because I saw the cart with their food trays being taken to their rooms with a piece of paper that said "90" on top of it.

7. I can see the cohorted people from my room when they go out to the yard. Although they wear masks, they touch the phones in the yard space and the yard equipment. The phones are yard equipment is often not wiped down after the cohorted people leave the yard.

8. Sometimes there is hand sanitizer available outside the cafeteria, but sometimes there is not. I have not seen any hand sanitizer next to the phones.

9. There are over sixty people eating at once in the cafeteria. We all stand in line together. It is impossible to practice social distancing when we eat together with only one empty space between us and all of us standing in line together.

10. All men go out to the yard at the same time, and there are hundreds of us. It is impossible to be more than six feet away from each other.

11. I work cleaning the common areas at BTC, typically polishing the floors. There is a man who tested positive for COVID-19 at BTC and I saw him in the yard this morning on May 8, 2020 while I was working. I know it was this man because he had written a sign saying he tested positive. He was using the phone in the yard space. He was wearing a mask and gloves and had a BTC guard near him. Those of us who were working tried going around him so we would not get too close.

12. I have not received any education regarding hygiene and preventing the infection of COVID-19. I have not seen any posters in the Spanish language about COVID-19 in BTC.

13. When people create too much of a fuss about the detention conditions to the BTC guards, they are transferred to Krome.

14. This detention center was not built to keep us safe. We are six people in a room very close together. People cough and no one wears a mask because guards have not said it's mandatory. I am not safe here.

15. I have authorized my attorney to sign on my behalf given the difficulty of arranging visitation and travel in light of the current COVID-19 pandemic. If required to do so, I will provide a signature when I am able to do so.

I declare under penalty of perjury that the things described above are true and correct.

Executed on May 8, 2020.

*Maya Weissman Fabra*

Maya Weissman Fabra, on behalf Miguel Angel Marroquin Perez

CERTIFICATION

I, Maya Weissman Fabra, declare that I am proficient in the English and Spanish languages.

On May 8, 2020, I read the foregoing declaration to Miguel Angel Marroquin Perez and orally translated it faithfully and accurately into Spanish in the presence of the declarant.  After I completed translating the declaration, the declarant verified that the contents of the foregoing declaration are true and accurate.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 8, 2020.

*Maya Weissman Fabra*

Maya Weissman Fabra

## ATTORNEY DECLARATION

I, Maya Weissman Fabra, declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

1. My name is Maya Weissman Fabra. I am a licensed attorney in good standing in the District of Columbia.

2. I represent the declarant, Miguel Angel Marroquin Perez, in his immigration case in Krome/BTC immigration court in Miami, Florida. Out of necessity in light of the COVID-19 pandemic, I signed Miguel Angel Marroquin Perez's declaration on his behalf and with his express consent.

3. ICE is now requiring legal visitors to provide and wear personal protective equipment, including disposably vinyl gloves, surgical masks, and eye protection while visiting any detention facility. These supplies are not easily accessible, given the increase in demand. Any available supplies are prioritized for hospitals and other medical facilities that are experiencing dangerous shortages.

4. There are documented cases of COVID-19 in all fifty U.S. states and most inhabited U.S. territories. The Centers for Disease Control and Protection (CDC) has issued statements warning that individuals are at a higher risk of infection when traveling. In addition, I am a resident of Miami Dade County,

Florida and unable to travel to visit my client under a state 'Stay at home' order issued by the Governor of Florida Ron DeSantis on April 1st, 2020.

5. In light of the above, to protect public health, I am not able to travel to the Broward Transitional Center Detention Center in Pompano Beach, Florida, to obtain my client's signature.

6. I spoke with Miguel Angel Marroquin Perez via Skype video call, read the declaration to him, and confirmed the accuracy of the information therein. Miguel Angel Marroquin Perez has confirmed the accuracy of the information therein.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed on May 8, 2020 at Miami, Florida.

*Maya Weissman Fabra*
_____

Maya Weissman Fabra, on behalf of Miguel Angel Marroquin Perez

## DECLARATION OF RODNEY MARTIN

I, Rodney Martin, hereby declare under the penalty of perjury pursuant to 28 U.S.C. § 1746:

1.      I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to these matters.

2.      I am a 48-year-old man from Jamaica, and I have been detained by Immigration and Customs Enforcement ("ICE") since August 6, 2018. I am currently detained at the Baker County Detention Center ("Baker") located in MacClenny, Florida.

3.      I previously filed for relief before the Immigration Court, but the Immigration Judge denied my case on September 25, 2019. I filed an appeal with the Board of Immigration Appeals. The Board of Immigration Appeals denied my appeal on March 12, 2020, and I now have a final order of removal.

4.      I have the following medical issues: type two diabetes, high blood pressure, ulcers, and shattered bone fragments in my right foot due to an injury I sustained while detained at Krome Processing Center ("Krome").

5.      At Krome, I took four medications each day, including insulin to manage my diabetes. I would take medication for high blood pressure, a water pill, and Metformin.

6.      In ICE custody, I injured my foot playing soccer. Initially after I injured my foot, the doctor only provided me with ibuprofen. However, my foot became swollen, and the medical department decided to conduct an x-ray. The x-ray found bone fragments in my foot. I was taken to Larkin Hospital and told I need a surgical operation on my foot. This operation has not yet taken place. My foot remains swollen and it hurts. I am unable to walk on my right foot.

7.      As a result, I have used a wheelchair since approximately December 2019. At Krome, I would use the handicap shower so that I could hold myself up.

8.      On May 2, 2020, the Krome staff came to Pod 1 and told me that I would be transferred out of the facility. I began to cry because I was afraid of where they would take me. I refused to leave the housing unit and asked to speak to an ICE officer. The Krome staff decided to not transfer me that day and moved me to Pod 3.

9.      On May 5, 2020, the Krome staff came to get me at about 2:00 a.m. to transfer me out of the facility. I was taken out to the bus in my wheelchair. The bus was not handicap accessible and did not have a ramp. Four guards had to lift me and carry me onto the bus. As they dragged me up the stairs, my back rubbed against the stairs and floor of the bus, cutting into my butt and lower back and leaving me with abrasions and wounds. I asked the guards to take a report to document these injuries, but they refused.

10.      The guards placed me in one of the front rows of the bus. I was handcuffed with my hands restrained to a chain around my waist. My right foot was too swollen for the officers to place me in leg irons.

11.      In the bus, all the detained people who were being transferred sat next to each other. The bus was full. Many of the men on the bus had been taken from Pod 2 at Krome which was still on quarantine the day we left Krome. We were not provided face masks or gloves. There were two guards in the bus during the transfer, and they did not always wear their masks.

12.      During the bus ride, I could not use the bathroom the entire ride because I was unable to move around the bus due to my mobility issues. During the transfer, we received food twice which included bread with cheese and some water.

13.     The bus stopped at another location before we reached Baker so that we could switch drivers. When we stopped, I made a complaint to an officer about the way I was dragged onto the bus at Krome and that my butt and lower back were in pain. They asked me who lifted me on the bus, causing the scrapes, and I explained it was the AGS staff at Krome. Two nurses came onto the bus and looked at the abrasions and wounds on my lower back. The nurses said, "It's just a scratch," and wiped it and put antibacterial. One officer at the place we stopped suggested taking a picture of my wounds, but they never did. The bus then continued on to Baker.

14.     When the bus arrived at Baker in the late afternoon on May 5, 2020, the Baker staff said, "Get out and walk." I told them I cannot walk as my foot is injured and I am waiting for an operation. Baker officers lifted me out of the bus and put me on the cement ground. The did not have a wheelchair for me to use. They claimed that Krome never told them that I needed a wheelchair. Later, an officer came out with a grey chair that had belts connected to it to restrain people. The Baker staff placed me in the chair and brought me into the booking area of the facility.

15.     From May 5, 2020 when I arrived at Baker until Friday, May 8, 2020 in the evening, the staff left me in the cell in the booking area. The cell has a toilet and two mattresses each about four inches thick on the ground. There is no bed, and I am forced to sleep on the floor with just the thin mattress and a blanket.

16.     When I arrived at Baker, the staff did not take my temperature. I have not been screened or tested for the coronavirus since I arrived at Baker. The nurses or doctors at this facility have yet to conduct a full medical evaluation. The medical department does not have my complete medical records from Krome that document my injury and the medical care I was

previously receiving. A nurse said they received a note from Krome stating that I walked on the bus at Krome and that I do not need a wheelchair, which is not true. Other men who were on the bus with me witnessed how I was dragged by the officers onto the bus.

17.     At Baker, I filed a sick call request to receive medical attention for my wounds from the transfer. The nurse first came to see me, she looked at my back and refused to put bandages. She said it was better if my wounds were left open to heal on their own. On approximately Sunday May 10, 2020, I started receiving ibuprofen for my back pain, and the nurses bandaged the wounds on my butt and lower back. My butt and back are still in pain from the way I was taken on and off the bus.

18.     At Krome, I received a special diet for diabetics. At Baker, I have not received any food that meets my specific medical needs. For example, in the morning, I receive two brown cakes, grits, and a boxed drink. For lunch, on May 8, 2020, I received two slices of white bread with peanut butter, a cookie, and juice. At night, I barely eat and often only drink the juice that is handed out. My blood sugar levels are difficult to control without a proper diet.

19.     On May 7, 2020, I was not able to have two legal calls because the Baker staff refused to help me go over to where the phone is, and I did not have a wheelchair.

20.     On May 8, 2020, while speaking with a legal assistant at Americans for Immigrant Justice, I was finally provided a wheelchair by the Baker staff. That same day in the evening, the Baker staff transferred me into a room in the medical unit. The cell had padded walls, a bed in the middle, and a toilet in the back of the cell.

21.     On Saturday, May 9, 2020, the medical staff took an x-ray of my right foot. The medical staff have not provided me with a report on the results of the x-ray. The medical staff

have wrapped my right foot but have not provided me with any other information on how they plan to treat my injured foot.

22.      On May 13, 2020 in the early morning, the Baker staff moved me out of the medical unit and back into a cell in the booking area. The cell I am now housed in has just a bed and a toilet. I remain isolated from the rest of the population at Baker. The cell does not have windows, and it is hard for me to keep track of what day it is.

23.      I have not had access to a shower since I arrived at Baker on May 5, 2020. I asked to take a shower, but the staff denied my request stating that the wheelchair cannot be taken into the shower. The staff did not offer to help me take a shower. In my current cell in the booking area, I do not have access to a shower.

24.      The officers at Baker are aggressive. They scream at me and call me names. The other day in the medical unit, an officer came into my cell when I tried to ask a question and yelled at me, "Shut up! Shut up!" The officer kicked my wheelchair in order to intimidate me, while I sat on my bed. The staff here do not want to help, and I am fearful that they will continue to threaten me or even harm me.

25.      Officers at Baker have mentioned that they may move myself and others to Wakulla County Jail soon. I am scared of being transferred again after the wounds I have from the last transfer.

26.      On March 27, 2020, I filed a release request with ICE based on my numerous medical issues. On April 23, 2020, I filed for a custody redetermination because I am a subclass member in *Fraihat v. Immigration and Customs Enforcement* due to my serious medical conditions and multiple risk factors.

27.     Up to this date, ICE has not provided me with a decision on my request for release. When I was leaving Krome, I never received any decision on my release request or information on my case and was just transferred.

28.     I have multiple family members living in the United States, including my six-year-old daughter and my uncle who could serve as my sponsor if I were released.

29.     I have authorized Lily Hartmann to sign on my behalf given the difficulty of arranging visitation and travel in light of the current COVID-19 pandemic. If required to do so, I will provide a signature when I am able to do so.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 13, 2020

Lily Hartmann, on behalf of Rodney Martin

## LEGAL ASSISTANT DECLARATION

I, Lily Hartmann, declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.     My name is Lily Hartmann. I am a legal assistant at Americans for Immigrant Justice, a legal services organization located in Miami, Florida.

2.     I am a legal assistant working with the legal team in *Gayle v. Meade et al.* Out of necessity in light of the COVID-19 pandemic, I signed Rodney Martin's declaration on his behalf and with his expressed consent.

3.     On May 5, 2020, ICE transferred Rodney Martin to Baker County Jail, which is located in MacClenny, Florida.

4.     Further, ICE is now requiring legal visitors to provide and wear personal protective equipment, including disposable latex gloves, surgical masks, and eye protection while visiting any detention facility. These supplies are not easily accessible, given the increase in demand. Any available supplies are prioritized for hospitals and other medical facilities that are experiencing dangerous shortages.

5.     There are documented cases of COVID-19 in all fifty U.S. states and most inhabited U.S. territories. The Center for Disease Control and Prevention ("CDC") issued statements warning that individuals are at a higher risk of infection while traveling. In addition, I am a resident of Miami-Dade County, Florida and unable to travel to visit Rodney Martin under a state "Stay at Home" order issued by the Governor of Florida Ron DeSantis on April 1, 2020.

6.     In light of the above, to protect public health, I am not able to travel to the Baker County Jail to obtain Rodney Martin's signature.

7.      I spoke with Rodney Martin via phone call, read the declaration to him, and confirmed the accuracy of the information therein. Rodney Martin confirmed the accuracy of the information therein.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 13, 2020 at Miami, Florida.

Lily Hartmann

## DECLARATION OF IRAN PICHARDO PEREZ-BORROTO

I, Iran Pichardo Perez-Borroto, hereby declare under the penalty of perjury pursuant to 28 U.S.C. § 1746:

1. I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to these matters.

2. I am currently detained at Krome Service Processing Center ("Krome") in Miami, Florida. I have been detained here since April 16, 2020. I have been in ICE custody since about August 7, 2019. I was transferred to Krome from El Paso Processing Center.

3. I am fifty-five years old. I have asthma. ICE is in charge of my well-being and my life. I beg that they help or release me.

4. On December 18, 2019, I was ordered removed by an immigration judge in El Paso. I am now awaiting my deportation to Cuba.

5. I spoke with a Deportation Officer the week before last week. He did not have information on my pending deportation. The Deportation Officer said that at this moment, there are no flights going out to Cuba. He merely told me that I am in a process and I have to wait, but he did not tell me how long the wait would be.

6. At Krome, I am in Pod 14A.

7. We are currently under quarantine. We were told that the quarantine will be lifted tomorrow, May 12, 2020. The pod has been under quarantine on and off for about two months.

8. We, in Pod 14A, are only receiving soap and shampoo once or twice a week. The amount we are receiving is not sufficient for what we need. If we need more shampoo or soap, we request it, but we do not always receive it. It is up to the guards whether we actually receive the additional soap or shampoo.

9. In the pod, there are currently about fifty detained people.

10. The beds are still positioned next to each other. I am in the lower bunk because of my age. I have someone sleeping on each side of me. They both sleep in the same direction I do, not head to feet. Social distancing requirements are not met.

11. The man who slept on the bunk above me was taken out of the pod the week before last because he was exhibiting symptoms consistent with COVID-19.

12. We are in charge of cleaning our own pod. No one else helps us with cleaning the pod. To clean, we are given gloves, some rags, and a spray to wipe counters. We are not told what the spray is. We are not given any disinfecting wipes. Sometimes, to clean the tables, we also use toilet paper. We use toilet paper because there are no paper towels in the bathroom.

13. When we request medical attention, we are often not called back. For example, on May 5, 2020, I submitted a medical request because I was feeling short of breath. Two days after, a nurse came to speak with me. I told her I was feeling short of breath and headaches. She said that she would let the doctor and the doctor would follow up with me. I still have not heard from the doctor.

14. I am asthmatic. I have been given an inhaler, but still feel difficulty breathing. Despite having an inhaler, I still feel like I am not receiving adequate treatment for my asthma.

15. I have authorized Sawyeh Esmaili to sign on my behalf given the difficulty of arranging visitation and travel in light of the current COVID-19 pandemic. If required to do so, I will provide a signature when I am able to do so.

I declare under penalty of perjury that the things described above are true and correct.

Executed on May 11, 2020.

_____

Sawyeh Esmaili, on behalf Iran Pichardo Perez-Borroto

## CERTIFICATION

I, Sawyeh Esmaili, declare that I am proficient in the English and Spanish languages.

On May 11, 2020, I read the foregoing declaration to Iran Pichardo Perez-Borroto and orally translated it faithfully and accurately into Spanish in the presence of the declarant.  After I completed translating the declaration, the declarant verified that the contents of the foregoing declaration are true and accurate.

I declare under penalty of perjury that the foregoing is true and correct.


Executed on May 11, 2020.


_____

Sawyeh Esmaili


## ATTORNEY DECLARATION

I, Sawyeh Esmaili, declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

1. My name is Sawyeh Esmaili. I am a licensed attorney in good standing in the state of Florida.

2. Out of necessity in light of the COVID-19 pandemic, I signed Iran Pichardo Perez-Borroto's declaration on his behalf and with his express consent.

3. ICE is now requiring legal visitors to provide and wear personal protective equipment, including disposably vinyl gloves, surgical masks, and eye

protection while visiting any detention facility. These supplies are not easily accessible, given the increase in demand. Any available supplies are prioritized for hospitals and other medical facilities that are experiencing dangerous shortages.

4.  There are documented cases of COVID-19 in all fifty U.S. states and most inhabited U.S. territories. The Centers for Disease Control and Protection (CDC) has issued statements warning that individuals are at a higher risk of infection when traveling. In addition, I am a resident of Miami Dade County, Florida and unable to travel to visit Mr. Pichardo under a state 'Stay at home' order issued by the Governor of Florida Ron DeSantis on April 1st, 2020.

5.  In light of the above, to protect public health, I am not able to travel to the Krome Service Processing Center to obtain Mr. Pichardo's signature.

6.  I spoke with Iran Pichardo Perez-Borroto on the phone, read the declaration to him, and confirmed the accuracy of the information therein. Iran Pichardo Perez-Borroto has confirmed the accuracy of the information therein.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 11, 2020 at Miami, Florida.

_____

Sawyeh Esmaili, on behalf of Iran Pichardo Perez-Borroto

## <u>DECLARATION OF DEIVYS PEREZ VALLADARES</u>

I, Deivys Perez Valladares, hereby declare under the penalty of perjury pursuant to 28 U.S.C. § 1746:

      1.      I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to these matters.

      2.      I am 34 years old and I am a citizen of Cuba.

      3.      I am currently detained at Krome Service Processing Center ("Krome") in Miami, Florida. I was previously detained at Broward Transitional Center ("BTC") in Pompano Beach, Florida from March 20, 2020 to May 6, 2020. On May 6th, I was transferred from BTC to Krome.

      4.      I should have been considered for release because I have type-1 diabetes and hypertension. I am medically dependent on insulin to manage my diabetes. My diabetes has worsened since being detained. My sugar levels are very high. I typically required 15 units of insulin, and right now I am requiring 28 units of insulin. While I was detained in Georgia, I suffered from a heart condition that required me to be hospitalized for four days. I am now taking heart medication daily, but I was never told what my heart condition is. I have also developed cholesterol since being detained and I am now taking a pill every day to control my cholesterol.

      5.      My diabetes type-1 requires daily insulin to manage. I have informed the staff at Krome about my need but have not received my medication as of May 7, 2020. I fear for my life.

      6.      At BTC, I shared a room with five other people. No one in my room, including myself, had symptoms of the coronavirus (COVID-19). On May 6, 2020 at approximately 9:00 pm an official at BTC asked me and three other detained persons in the same room if we feared contracting COVID-19 given the confirmed case at the facility. The four of us affirmed we were afraid, and the official told us we were going to be transferred. I never received a decision or explanation of why I was transferred instead of released. Guards were verbally aggressive when I asked about the reason for transfer. They rejected giving us any information about our place of relocation. Staff at BTC did not complete a medical examination or confirmed we were in good state of health before transferring us.

1

We had shackles restraining our hands and feet during transfer. We were not given any masks or gloves. Guards were not wearing masks or gloves when interacting with us. They did not make accommodations for us to sit separately from each other during transfer. We waited for approximately an hour and a half in the dark inside a van before we left BTC. There were two surveillance cameras inside the van.

7.      We arrived at Krome at approximately 1:00 am on May 7, 2020. Guards threw away the snacks and drinks I brought from BTC without explanation. Staff took our temperature and weight when we arrived at Krome. They did not do a complete medical examination on us or provide information about COVID-19. No masks or gloves were provided when we arrived. Only guards are using masks at Krome.

8.      I was placed in general population with approximately 60 other people. The beds are very close to each other which makes it impossible to create social distancing in the pod. There is a man staying in the lower part of my bunk who has been showing symptoms. The toilets, showers, and beds are filthy. The bathroom has five toilets next to each other without division or privacy.

9.      I have not had any contact with the deportation officer at Krome as of May 7, 2020.

10.      I have authorized Andrea Ruiz-Sorrentini, a paralegal, to sign on my behalf given the difficulty of arranging visitation and travel in light of the current COVID-19 pandemic. If required to do so, I will provide a signature when I am able to do so.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 7, 2020 at Miami, Florida.

_____
Andrea C. Ruiz-Sorrentini, on behalf of Deivys Perez Valladares

## <u>CERTIFICATION OF TRANSLATION</u>

I, Andrea C. Ruiz-Sorrentini, declare that I am proficient in the English and Spanish languages.

On May 7, 2020, I read the foregoing declaration to Deivys Perez Valladares and orally translated it faithfully and accurately into Spanish in the presence of the declarant.  After I completed translating the declaration, the declarant verified that the contents of the foregoing declaration are true and accurate.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed on May 7, 2020 at Miami, Florida.


_____

Andrea C. Ruiz-Sorrentini

## PARALEGAL DECLARATION

I, Andrea Cristina Ruiz-Sorrentini, declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

1. My name is Andrea Cristina Ruiz-Sorrentini. I am an outreach paralegal working with Southern Poverty Law Center at Miami, Florida.

2. I am a paralegal working with the legal team that represents the declarant in *Gayle v Meade et al*. Out of necessity in light of the COVID-19 pandemic, I signed Deivys Perez Valladares' declaration on his behalf and with his express consent.

3. On May 6, 2020 ICE transferred my client to Krome in a van at approximately 9:00 pm.

4. ICE now requires legal visitors to provide and wear personal protective equipment, including disposable latex gloves, surgical masks, and eye protection while visiting any detention facility. These supplies are not easily accessible, given the increase in demand. Any available supplies are prioritized for hospitals and other medical facilities that are experiencing dangerous shortages.

5. There are documented cases of COVID-19 in all fifty U.S. states and most inhabited U.S. territories. The Centers for Disease Control and Protection (CDC) has issued statements warning that individuals are at a higher risk of infection when traveling. In addition, I am a resident of Miami-Dade County, Florida and unable to travel to visit my client under a state "Stay at Home" order issued by the Governor of Florida Ron DeSantis on April 1, 2020.

6. In light of the above, to protect public health, I am not able to travel to the Krome Service Processing Center in Miami, Florida, to obtain my client's signature.

7. I spoke with Deivys Perez Valladares via phone call, read the declaration to him and confirmed the accuracy of the information therein. Deivys Perez Valladares has confirmed the accuracy of the information therein.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 7, 2020 at Miami, Florida.

_____

Andrea Cristina Ruiz-Sorrentini

andrea.ruiz-sorrentini@splcenter.org

786-582-0386

## DECLARATION OF SANDY R. PINEDA

I, Sandy R. Pineda, declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

1. I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to these matters.

2. My name is Sandy R. Pineda. I am a licensed attorney in good standing in the state of Florida.

3. I represent Celso Paz-Vega, in removal proceedings.

4. My client has a hearing in active removal proceedings on May 21, 2020 in Krome Immigration court.

5. On Monday, Monday 4, at night, ICE transferred my client to Krome Detention Center.

6. ICE later transferred my client from Krome Detention Center to Torrance Detention Facility in Estancia, New Mexico.

7. During this period, my client was exposed to confirmed cases of COVID-19; cohorted housing; guards or employees with COVID-19; quarantined housing.

8. During the transfer, my client was restrained, and he transferred with new detainees he had never met that were housed in Glades or Krome. He was exposed to many detainees that he had never seen, met or interacted with. He had no idea who had been exposed to COVID-19 and who had not. He was boarded on a plane without any indication of why he was being transferred.

9. As a result of my client's transfer to Torrance Detention facility in New Mexico, his family and his attorney have been unable to visit him and prepare for his family law hearing which is on Tuesday, May 12, 2020 in Plant City, Florida or his individual hearing that is scheduled to take place on Thursday, May 21, 2020. Additionally, he has

a very sick child with cerebral palsy, and a child requires hearing aids, that will be unable to go to New Mexico.  Mr. Paz has six U.S. citizen children.

10. My client will be affected if proceedings have to continue in this new jurisdiction because all of his witnesses, his family members, and his attorney, Sandy Pineda is located in Florida.

11. Witnesses in my client's case all reside in Florida but now that my client's case is in Estancia, New Mexico, they will not be able to travel.

12. After my client was transferred, I did not hear from him until Thursday, May 7, 2020.

13. I learned my client was transferred on May 5, 2020. Client's family and I had not heard from him and we were unsure where he was.  I checked the ICE detainee center from Tuesday – Thursday, and the location of where he was detained was not specified.

14. The client's older daughter received a call from someone who was housed with our client because he was unable to make any calls at the time since he could not input himself into the system to make any calls, so he asked someone for the favor of telling the family and the lawyer of where he was.

15. ICE did not inform me as to my client's transfer.

16. ICE knew I already represented my client because I have filed an EOIR-28, a motion to continue, and he had previous counsel for bond. None of the lawyers were advised of the transfer.  Also, as his lawyer I had visited him various times, and if my client had been asked if he had counsel, he would have stated so.  My EOIR-28 had already been filed for weeks, and the motion I presented to the judge had already been granted.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on 11th, day of May 2020 at Miami, Florida

Sandy R. Pineda, Esq.

### DECLARATION OF FREDDY RODRIGUEZ DEL RIO

I, Freddy Rodriguez Del Rio, hereby declare under the penalty of perjury pursuant to 28 U.S.C. § 1746:

1. I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to these matters.

2. I am currently detained at Broward Transitional Center ("BTC"), in Pompano Beach, FL. I have been detained here since late March 26, 2020. I was previously detained at El Paso Service Processing Center, Torrence County Detention Facility, Alexandria Staging Facility, and Pine Prairie ICE Processing Center.

3. I suffer from several medical conditions, including asthma and high blood pressure.

4. A doctor came around to all of the detainee rooms on approximately May 6, 2020 and told us that there are 2 positive cases of COVID-19 at BTC.

5. The detainees who are positive for COVID-19 are housed in rooms by themselves, but they leave to use the same recreation yard, water fountain, and phone that we use. I have not seen officials disinfecting the things that he touches before we use them.

6. I think there are about 150 people in quarantine right now. They are in regular rooms with 6 people to each room.

7. All of the detainee rooms on the first floor are now quarantine rooms. In order to achieve this, non-quarantined detainees have been moved around to different rooms multiple times this week to accommodate these quarantine rooms. I was moved rooms 2 times this week.

8. Those in quarantine have their clothes washed together with those of us who are not quarantined.

9. Today, May 13, 2020, approximately 33 detainees arrived at BTC from another detention center.

10. In the line for the cafeteria, detainees have to stand very close together. Every other seat in the cafeteria is blocked off, but we are still sitting very close together.  When I am sitting in the cafeteria, I can reach my hand out and touch another detainee very easily. There are not 6 feet of distance between anyone on any side. Also, there is a line to get a uniform change and another line to purchase items in the commissary. In both of these lines, everyone is standing very close together.

11. When detainees watch television, they all sit next to each other. There is also a religious group that meets regularly, and the room is full of people and no one is practicing social distancing.

12. I have not seen the doors, windows, recreation yard, or phones being sanitized every four hours. The cleaning crew only cleans once per day. In addition, the cleaning crews only work on weekdays. If a high touch surface is infected on a Friday, it will not be cleaned until Monday.

13. At BTC we started to receive masks about two weeks ago and they typically give us new masks three times per week. The majority of detainees do not use them; they are not required to wear them.

14.  At BTC, soap is given out to each person once a week. You are either assigned Tuesdays or Thursdays to receive soap. I have been assigned Thursdays. The staff give detainees a small amount of soap that has to last a week and it never does. Especially now, because we also have to use this soap to wash our hands. I have asked for more soap before and they have told me that I have to wait until the next Thursday.

15. I have authorized my attorney to sign on my behalf given the difficulty of arranging visitation and travel in light of the current COVID-19 pandemic. If required to do so, I will provide a signature when I am able.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 13, 2020.

_____
Allison Norris, Esq., on behalf of Freddy Rodriguez Del Rio

**CERTIFICATION**

I, Allison Norris Esq., declare that I am proficient in the English and Spanish languages. On May 8, 2020, I read the foregoing declaration to Freddy Rodriguez Del Rio's and orally translated it faithfully and accurately into Spanish in the presence of the declarant. After I completed translating the declaration, the declarant verified that the contents of the foregoing declaration are true and accurate. I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 8, 2020.

_____
Allison Norris, Esq.

## ATTORNEY DECLARATION

I, Allison Norris Esq., declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

1. My name is Allison Norris, Esq. I am a licensed attorney in good standing with the Florida Bar.

2. Out of necessity in light of the COVID-19 pandemic, I signed Freddy Rodriguez Del Rio's declaration on his behalf and with his express consent.

3. ICE is now requiring legal visitors to provide and wear personal protective equipment, including disposably vinyl gloves, surgical masks, and eye protection while visiting any detention facility. These supplies are not easily accessible, given the increase in demand. Any available supplies are prioritized for hospitals and other medical facilities that are experiencing dangerous shortages.

4. There are documented cases of COVID-19 in all fifty U.S. states and most inhabited U.S. territories. The Centers for Disease Control and Protection (CDC) has issued statements warning that individuals are at a higher risk of infection when traveling. In addition, I am a resident of Miami Dade County, Florida and unable to travel to visit my client under a state 'Stay at home' order issued by the Governor of Florida Ron DeSantis on April 1st, 2020.

5. In light of the above, to protect public health, I am not able to travel to the Broward Transitional Detention Center in Pompano, Florida, to obtain my client's signature.

6. I spoke with Freddy Rodriguez Del Rio via Skype video call, read the declaration to him, and confirmed the accuracy of the information therein. Freddy Rodriguez Del Rio has confirmed the accuracy of the information therein.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 3, 2020 at Miami, Florida.

_____

Allison Norris, Esq., on behalf of Freddy Rodriguez Del Rio

## DECLARATION OF DANNY RUIZ GARCIA

I, Danny Ruiz Garcia, hereby declare under the penalty of perjury pursuant to 28 U.S.C. § 1746:

1.      I make this declaration based on my personal knowledge except where I have indicated otherwise.  If called as a witness, I could and would testify competently and truthfully to these matters.

2.      I am currently detained at Broward Transitional Center (BTC). I have been detained here since March 26, 2020. I was previously detained in Pine Prairie ICE Processing Center in Louisiana.

3.      I suffer from permanent lung damage on my right lung from pneumonia and a surgery when I was a child.

4.      At BTC we get masks every three days, but virtually no one wears them. Most BTC staff members also do not wear masks.

5.      There is a hand sanitizer pump by the court, cafeteria, and medical area. There is no hand sanitizer pump near the phones. The hand sanitizer in the cafeteria is often empty. When it is empty, we are only given hand sanitizer by a guard during lunch time.

6.      Whether you get additional shower gel depends on which BTC staff member you ask. We are all given shower gel once a week. On May 5, 2020 at around 8:30 p.m., I asked a BTC staff member for additional shower gel and was denied. My roommate asked another BTC staff member and was given additional shower gel.

7.      I have not received any education regarding hygiene or how to prevent the spread of COVID-19 at BTC. There are no posters in the facility with any information. What I know about COVID-19 is all from watching the news.

8.    The general areas of the detention center are cleaned maybe twice a day, but not every four hours. On May 5, 2020 I did not observe the common areas being cleaned twice.

9.    There are over 13 rooms in cohort. I believe most of those cohorted are transfers from Baker County Detention Center.

10.    There are 90 people cohorted in one section of the detention center. Those rooms are for people that were transferred in. There are seven additional rooms cohorted for people we know are sick. Those rooms with sick people have three to four people per room. Room 125 is one of the rooms where there is someone sick. I know he is cohorted there alone.

11.    I know there are seven rooms with people who are sick because we line up to receive cleaning supplies and other things right next to those seven rooms.

12.    On the night of May 5, 2020, I observed a nurse give medication to the man in room 125 from a distance while she was in full protective gear. Typically, the medical staff at BTC go into the cohorted rooms to give medicine or take someone's temperature, but the nurse behaved differently when she approached room 125. The nurse did not even open the door of the room, just slipped in the medicine.

13.    During yard recreational time, those cohorted because they were transferred and those cohorted because they are sick can mix together since they go out at the same time.

14.    We are five people sleeping in my room. There are three bunk beds. It is impossible to stay six feet away from my roommates.

15.    When we eat in the cafeteria at BTC, we are more than fifty people eating at once. We all stand in line together. When we sit down to eat, there is an

empty stool between each one of us, but we are still not six feet apart from each other as we eat.

16.    When we go to the yard, there are hundreds of us at once. All men who are not cohorted go to the yard at the same time. It is impossible to practice social distancing at any point throughout the day.

17.    I have authorized my attorney to sign on my behalf given the difficulty of arranging visitation and travel in light of the current COVID-19 pandemic. If required to do so, I will provide a signature when I am able to do so.

I declare under penalty of perjury that the things described above are true and correct.

Executed on May 8, 2020.

*Maya Weissman Fabra*

Maya Weissman Fabra, on behalf of Danny Ruiz Garcia

CERTIFICATION

I, Maya Weissman Fabra, declare that I am proficient in the English and Spanish languages.

On May 8, 2020, I read the foregoing declaration to Danny Ruiz Garcia and orally translated it faithfully and accurately into Spanish in the presence of the

declarant.  After I completed translating the declaration, the declarant verified that the contents of the foregoing declaration are true and accurate.

I declare under penalty of perjury that the foregoing is true and correct.


Executed on May 8, 2020.


*Maya Weissman Fabra*
_____

Maya Weissman Fabra

## <u>ATTORNEY DECLARATION</u>

I, Maya Weissman Fabra, declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

1. My name is Maya Weissman Fabra. I am a licensed attorney in good standing in the District of Columbia

2. Out of necessity in light of the COVID-19 pandemic, I signed Danny Ruiz Garcia's declaration on his behalf and with his express consent.

3. ICE is now requiring legal visitors to provide and wear personal protective equipment, including disposably vinyl gloves, surgical masks, and eye protection while visiting any detention facility. These supplies are not easily accessible, given the increase in demand. Any available supplies are prioritized for hospitals and other medical facilities that are experiencing dangerous shortages.

4. There are documented cases of COVID-19 in all fifty U.S. states and most inhabited U.S. territories. The Centers for Disease Control and Protection (CDC) has issued statements warning that individuals are at a higher risk of infection when traveling. In addition, I am a resident of Miami Dade County, Florida and unable to travel to visit my client under a state 'Stay at home' order issued by the Governor of Florida Ron DeSantis on April 1st, 2020.

5. In light of the above, to protect public health, I am not able to travel to the Broward Transitional Center in Pompano Beach, Florida, to obtain Danny Ruiz Garcia's signature.

6. I spoke with Danny Ruiz Garcia via Skype video call, read the declaration to him, and confirmed the accuracy of the information therein. Danny Ruiz Garcia has confirmed the accuracy of the information therein.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 8, 2020 at Miami, Florida.

*Maya Weissman Fabra*
_____

Maya Weissman Fabra, on behalf of Danny Ruiz Garcia

## DECLARATION OF JAMES SAINTYL

I, James Saintyl, hereby declare under the penalty of perjury pursuant to 28 U.S.C. § 1746:

1.      I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to these matters.

2.      My name is James Saintyl and I am 23 years old and a citizen of Haiti. I am also a Legal Permanent Resident ("LPR") in the United States and I arrived in the United States as an LPR when I was just five years old. All of my family lives in the United States, and my sister is in the military.

3.      I am currently detained at the Glades County Detention Center ("GCDC") in Moore Haven, Florida. I have been in the custody of Immigration and Customs Enforcement ("ICE") since October 15, 2019. I was first detained at the Monroe County Jail until April 3, 2020 when I was transferred to the Krome Service Processing Center ("Krome"). On or about April 15, 2020, I was transferred from Krome to GCDC. I am currently in active removal proceedings, and my individual hearing is scheduled for May 26, 2020 at the Krome Immigration Court.

4.      I have had asthma since I was a child and I keep an inhaler on my person in order to manage my asthma. I also have swollen airways that lead to labored breathing. I take Nasonex to try and manage this. In addition to my respiratory issues, I am slightly overweight. I fear I face a higher risk of complications from COVID-19 if I were to contract the virus due to my health issues.

5.      I am currently detained in Pod D1 at GCDC. I am assigned to an open bay cell in this housing unit, which means the cell does not have a door and is open to the rest of the

housing unit. The cell is approximately ten feet by thirteen feet. The cell has six beds total; I am assigned to a bottom bunk. Currently, there are a total of five people assigned to this cell. The bunk beds are about four feet apart, but the person to my head is less than one foot away. The cell is very crowded.

6.     At GCDC, I am stuck in the pod all day. We eat all three meals in the pod at tables in the common area. There are about four chairs around each table, and we sit close together as we eat. Given that my cell is currently full, and the housing unit continues to receive transfers from outside of GCDC, the only way I can social distance is by going to solitary confinement, but I am fearful of the conditions of solitary confinement at this facility.

7.     When you go to medical, the GCDC staff or the nurses do not require that we wear a mask. The transporting officer will escort about twenty people at a time to reduce trips back and forth to the pods, so we all walk together to medical and wait in close quarters in the medical department waiting room. When I went to medical on May 14, 2020, only one or two of the fifteen people in the waiting room were wearing a mask.

8.     Other detainees sanitize the pod only once a day. However, they often forget and do not clean. For example, on May 13, 2020, my pod was not cleaned. I do not have access to disinfecting wipes to clean on my own.

9.     In my pod, we do not have access to hand sanitizer. A soap dispenser was installed in each of the bathrooms, but the soap is only refilled once a week. Given the large number of people in the pod, the soap runs out in about a day.

10.    On Tuesdays and Fridays, the GCDC staff provide a small bottle of a solution called "shampoo gel." The bottle is very small and so it does not last more than a couple uses.

11.     About two weeks ago, on May 1, 2020, we started receiving a mask each Friday. Up to this point, I have received two masks from GCDC staff. The first mask looked like a proper, blue medical mask. However, the second mask appears to have been stitched together by hand. It was made out of a hair net and a coffee filter. I do not believe that this makeshift mask will block germs or air carrying the virus. Many of the officers have masks but they wear them around their necks and do not use the masks to cover their mouths.

12.     There has been a lot of movement in and out of the pod where I am at GCDC. The pod was nearly emptied about a week ago when people were transferred and then filled back up with new arrivals within a matter of hours. As far as I am aware, there is no routine intake quarantine at GCDC. When people are transferred to GCDC, they are brought directly to the pods. On May 15, 2020, I spoke to one man in my pod who was transferred from Krome to GCDC on May 15, 2020 with 30 other people on a bus. He was immediately placed in the pod at GCDC and was not placed in quarantine first.

13.     When I first arrived at GCDC, a woman who works in the kitchen was reported to have the virus. A few who worked in the kitchen got quarantined because she had the virus.

14.     At Krome Service Processing Center, I fell off the bunk and was taken to Larkin Hospital. At Larkin Hospital, I was tested for COVID-19. I never received the results of my COVID-19 test and was transferred back to Krome Service Processing Center. Since I have been detained at GCDC, I have not been tested for COVID-19.

15.     ICE officers have not visited my pod at GCDC for the last month while I have been detained at GCDC. I am not able to speak directly to ICE and make complaints about the conditions at the facility or ask questions about my case.

16.     On Monday, May 12, 2020, I filed a release request with ICE asking that I be released from detention pending my removal proceedings given my multiple health issues and increased risk of complications if I were to contract COVID-19 in detention. Since I made that request, the deportation officer has not provided a response to my release request. If I were to be released from detention, I would comply with proper social distancing rules.

17.     I have authorized Lily Hartmann to sign on my behalf given the difficulty of arranging visitation and travel in light of the current COVID-19 pandemic. If required to do so, I will provide a signature when I am able to do so.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 15, 2020

Lily Hartmann, on behalf of James Saintyl

## LEGAL ASSISTANT DECLARATION

I, Lily Hartmann, declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.      My name is Lily Hartmann. I am a legal assistant at Americans for Immigrant Justice, a legal services organization located in Miami, Florida.

2.      I am a legal assistant working with the legal team in *Gayle v. Meade et al.* Out of necessity in light of the COVID-19 pandemic, I signed James Saintyl's declaration on his behalf and with his expressed consent.

3.      Further, ICE is now requiring legal visitors to provide and wear personal protective equipment, including disposable latex gloves, surgical masks, and eye protection while visiting any detention facility. These supplies are not easily accessible, given the increase in demand. Any available supplies are prioritized for hospitals and other medical facilities that are experiencing dangerous shortages.

4.      There are documented cases of COVID-19 in all fifty U.S. states and most inhabited U.S. territories. The Center for Disease Control and Prevention ("CDC") issued statements warning that individuals are at a higher risk of infection while traveling. In addition, I am a resident of Miami-Dade County, Florida and unable to travel to visit James Saintyl under a state "Stay at Home" order issued by the Governor of Florida Ron DeSantis on April 1, 2020. Furthermore, the State of Florida has a State of Emergency in place that the Governor renewed for sixty (60) additional days on Monday, May 11, 2020.

5.      In light of the above, to protect public health, I am not able to travel to the Glades County Detention Center to obtain James Saintyl's signature.

6.      I spoke with James Saintyl via phone call, read the declaration to him, and confirmed the accuracy of the information therein. James Saintyl confirmed the accuracy of the information therein.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 15, 2020 at Miami, Florida.

_____

Lily Hartmann

## DECLARATION OF DUSHANE SPAULDING

I, Dushane Spaulding, hereby declare under the penalty of perjury pursuant to 28 U.S.C. § 1746:

1.      I make this declaration based on my personal knowledge except where I have indicated otherwise.  If called as a witness, I could and would testify competently and truthfully to these matters.

2.      I am 33 years old, from Jamaica.

3.      I am currently detained at Glades County Detention Center in Moore Haven, Florida. I have been detained here since April 22, 2020. I was previously detained at Krome. I have been in immigration detention since July 2019.

4.      I have a U.S. Citizen wife and two U.S. Citizen children, including a developmentally disabled baby. I am a lawful permanent resident facing removal because of my criminal history, and I am seeking a U-visa because I was the victim of attempted murder while in jail serving my criminal sentence.

5.      I suffer repeated seizures and chronic migraine headaches, along with ongoing pain in my face and jaw. I fear that my history of seizures and smoking makes me particularly vulnerable if I contract COVID-19.

6.      I was transferred from Krome on April 22, 2020. I was in a full Jitney bus of about 20 people with a bathroom in the back, and I was seated immediately next to another detainee. We were seated so close that we were touching each other. We weren't given masks, hand sanitizer, or gloves during the transfer.

7.      At Glades, I share my cell with five other men, and we sleep in a room of six bunk beds, so it is impossible to social distance. There are currently about 81 or 82 people in my pod, and we all share the common area, where we also eat our meals.  The pod is nearly full, and its capacity is around 95 people. When we eat our meals, we sit very close together, with four people at a table, less than 6

feet apart. When we go to medical it is also impossible to stay 6 feet apart from each other, because we all wait next to each other. When we go to recreation, we are also close together, and we share the same soccer ball and drink from the same cooler. Sometimes the men from the next pod also are in the recreation space while we are. We often run out of soap, because the guards give us soap only once every two weeks, and when I asked for a refill they told me I was wasting the soap and that I had to wait for soap day. Sometimes when I try to wash my hands in the sink, there is none.

8.      Detainees prepare the food and do the cleaning. When detainees are preparing the food they sometimes wear gloves and a hair net, along with the mask that they already have been given by the facility, but sometimes they do not wear the mask or gloves. When we clean, we often do not receive gloves. Last night I cleaned the space where we all sleep and I did not receive gloves. I have been at Glades for three weeks, and I have received a disposable mask two different times. My mask is dirty and has broken so I can't use it and the guards told me I have to wait to receive another one. We have not been trained on hygiene measures in order to limit the spread of infectious diseases while completing these tasks. A couple of days ago the guards put up some posters that said to wash your hands, but otherwise we have not received training.

9.      I have to purchase soap from the commissary since there is not enough soap made available for us. I sometimes do not have enough money to buy soap in my commissary account. Most guards are wearing masks, but sometimes they take down their masks to talk to detainees. They sometimes are not wearing gloves. The sergeant, a head guard called Sergeant Sierra, usually does not wear gloves or a mask. I've noticed the guards are touching things in the living space, medical, and other parts of the facility and they do not change their gloves all day, so we have to ask them to change their gloves, but when we ask them to they

sometimes get offended.

10.     I was brought to Glades just a few weeks ago, and I was not put into isolation before I was placed in a large pod and shared bedroom with five other men in bunk beds. Since I was brought in, I have been moved to a different pod, so I have shared a pod with a total of nearly 200 men since I arrived here. I have seen new men brought into my pod from different detention facilities and from outside of detention, and they have not been placed into quarantine when they have first arrived.

11.     I have had trouble accessing medical help while in ICE detention. Because of my ongoing pain from the attack I suffered, I have repeatedly asked to see a doctor but have often been denied an appointment. I got an MRI when I was detained in Monroe Detention Center, before I was transferred to Glades, because of my pain. Despite my repeated requests at Krome, I was not advised of the results of my MRI. I have been in Glades three weeks and have requested to see the results of the MRI and to get further treatment for my pain, but I still have not gotten a copy of the MRI and the doctor just gave me some pain killers and told me I have to deal with the rest of the pain. He said I need to see an oral surgeon but that I cannot see one until I leave detention.

12.     The guards put all the detainees who worked in the kitchen into quarantine, and I heard this was because someone tested positive in the kitchen. We have all requested tests, but none of the detainees have been able to get a test. Recently the detainees who work in the kitchen were taken off quarantine, but the guards never explained why there was the quarantine. The other men in my pod and I requested to the sergeant three weeks ago to speak with ICE to try to understand what is going on with COVID-19, but they still have not responded to our request.

13.     I have seen people in my pod coughing, but we do not know if anyone

has COVID because we have not received tests. We heard that one guard tested positive for COVID.  I am not aware of any increases of medical staffing or medical screenings.

14.     My temperature was taken once before I entered the facility, but otherwise I have received no screening. Despite my vulnerabilities to COVID-19, no member of the medical staff has evaluated my conditions or well-being to determine whether any additional precautionary measures are necessary to protect me from the illness. I am afraid for my life.

15.     If I am released from detention, I will comply with any applicable conditions of release including attending check-ins and immigration court hearings.

16.     If released, I would live with my U.S. Citizen wife Syboney DeGrasse in Palm Bay, Florida, where I would be able to socially distance.

17.     I have authorized a law student, Meredith Hoffman, to sign on my behalf given the difficulty of arranging visitation and travel in light of the current COVID-19 pandemic. If required to do so, I will provide a signature when I am able to do so.

I declare under penalty of perjury that the things described above are true and correct.

Executed on May 14, 2020.

_Meredith Hoffman_
_____
Meredith Hoffman, On Behalf of Dushane Spaulding

## LAW STUDENT DECLARATION

I, Meredith Hoffman, declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

1. My name is Meredith Hoffman. I am a law student in the University of Miami School of Law, supervised by Attorney Rebecca Sharpless.

2. Out of necessity in light of the COVID-19 pandemic, I signed Dushane Spaulding's declaration on his behalf and with his express consent.

3. ICE is now requiring legal visitors to provide and wear personal protective equipment, including disposably vinyl gloves, surgical masks, and eye protection while visiting any detention facility. These supplies are not easily accessible, given the increase in demand. Any available supplies are prioritized for hospitals and other medical facilities that are experiencing dangerous shortages.

4. There are documented cases of COVID-19 in all fifty U.S. states and most inhabited U.S. territories. The Centers for Disease Control and Protection (CDC) has issued statements warning that individuals are at a higher risk of infection when traveling. In addition, I am a resident of Miami Dade County, Florida and unable to travel to visit my client under a state 'Stay at home' order issued by the Governor of Florida Ron DeSantis on April 1st, 2020.

5. In light of the above, to protect public health, I am not able to travel to the Glades County Detention Center in Moore Haven, Florida, to obtain Dushane Spaulding's signature.

6. I spoke with Dushane Spaulding via phone call, read the declaration to him, and confirmed the accuracy of the information therein. Dushane Spaulding has confirmed the accuracy of the information therein.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 14, 2020 at Miami, Florida.

*Meredith Hoffman*

Meredith Hoffman, On Behalf of Dushane Spaulding