**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 20-21553-COOKE/GOODMAN**

PATRICK GAYLE, et al.,

      Plaintiffs,

v.

MICHAEL W. MEADE, et al.,

      Defendants.

_____/

## REPORT AND RECOMMENDATIONS ON CLASS CERTIFICATION MOTION

### I.    Introduction and Summary of Recommendations

Petitioners/Plaintiffs are 58 persons who Immigration and Customs Enforcement ("ICE") are detaining at three South Florida detention centers. They have filed a lawsuit against ICE, challenging the conditions at the three centers as violating guidelines promulgated by the Centers for Disease Control and Prevention ("CDC"). They contend that their health and lives are in jeopardy at the centers because the novel Coronavirus ("COVID-19") unreasonably exposes them all to the potentially-deadly virus.

Plaintiffs have filed an Expedited Motion for Class Certification. [ECF No. 81]. They want the Court to certify as a class all individuals currently detained at the three centers when the lawsuit was filed (on April 13, 2020, [ECF No. 1]), since the action was filed, and in the future. They have not identified any proposed sub-classes. Based on

numbers ICE provided during a May 14, 2020 hearing on this class certification motion [ECF No. 98], there were 1,124 detainees as of May 13, 2020.

During the hearing and in their written submissions, Plaintiffs advocated for the immediate release of all the detainees. But during the hearing, they acknowledged that any release procedure would inevitably involve a prioritization of which persons would be released first. Similarly, in a recently-filed "Emergency[1] Motion to Compel Compliance With the Court's April 30, 2020 Temporary Restraining Order" [ECF No. 106], Plaintiffs stated that decisions about whether to transfer a detainee involve "individualized determinations of whether to release people." *Id.* at p. 3. And they agreed during the hearing that factors such as health risks, danger to the community, and risk of flight, should be used in the release decisions.

Evaluating these types of factors necessarily involves both an individualized determination of a detainee's suitability for release (and/or transfer) and a detainee-by-detainee assessment of what conditions, if any, should be imposed with a release decision.

---

[1]     Plaintiffs' Emergency Motion did not contain or attach a "certification of emergency," as required by Southern District of Florida Local Rule 7.1(d)(1). But Plaintiffs' earlier-filed Emergency Motion for Temporary Restraining Order and Preliminary Injunction [ECF No. 4] *did* contain the required certification. Despite this rule violation, United States District Judge Marcia G. Cooke promptly issued a briefing schedule order [ECF No. 107] and required the parties to be prepared to discuss the emergency motion at an already-scheduled May 27, 2020 hearing on the preliminary injunction motion.

For example, ICE[2] would evaluate for possible release a wheelchair-bound diabetic detainee with high blood pressure, liver disease, no criminal convictions, no pending criminal charges, and relatives with an unoccupied bedroom in their home in rural Florida much differently than a healthy, 22-year-old soccer-playing detainee with drug trafficking and aggravated battery convictions, pending criminal charges for armed robbery and no family members living in the United States.

Given the inevitable detainee-specific factors which must be considered in any release decision, Petitioners' habeas corpus claim for immediate release is inappropriate for class certification.

The habeas corpus claim for immediate release of all detainees does not meet the commonality requirement of Federal Rule of Civil Procedure 23(a)(2). In addition, it does not meet Rule 23(b)(2)'s requirement that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief . . . is appropriate respecting the class as a whole." That rule does not warrant class treatment here because the requested injunction would generate highly individualized determinations, not release assessments about the entire class as a whole.

---

[2]    Although Michael W. Meade (the Miami Field Office Director for ICE) and Attorney General William P. Barr are technically the Respondents, Petitioners' arguments focus on what ICE has (and has not) done about the COVID-19 risks at the three immigration detention centers. Therefore, this Report will often refer to Respondents simply as ICE.

So, the Undersigned **respectfully recommends** that United States District Judge Marcia G. Cooke, who referred [ECF No. 82] the class action motion to me, <u>deny</u> the class certification motion concerning the habeas corpus demand for release.

**On the other hand**, the remaining claims and requests for relief (other than a request to prevent ICE from transferring detainees to other facilities and the request to include future detainees) *are* appropriate for class action treatment. Specifically, the claims for injunctive relief (to require appropriate precautionary health measures) and for declaratory relief (i.e., finding that the continued detention of all class members creates an undue increased risk of severe illness or death, thus violating the U.S. Constitution's Due Process Clause) justify class treatment under Federal Rule of Civil Procedure 23(a) and (b)(2).

The affidavits/declarations Plaintiffs submitted with their Emergency Motion for Temporary Restraining Order and Preliminary Injunction [ECF Nos. 4; 7; 8], their Notice Regarding New Named Petitioners-Plaintiffs [ECF No. 61-1], and in support of their class certification motion [ECF No. 94-1] portray a stressful scenario where the detainees are legitimately concerned over the COVID-19 risk in facilities which (as currently configured) do not permit adequate social distancing, and which purportedly do not provide sufficient cleaning and sanitizing supplies. In addition, the picture painted in the more-recent emergency motion to compel compliance is one where Plaintiffs allege (with supporting declarations) that "ICE has not fully complied" and "instead continues to fail

to protect the safety and well-being" of the detainees. [ECF No. 106, p. 2].

Thus, because all detainees in all three facilities confront, in general, the same conditions vis-à-vis COVID-19, a class action should be approved.

Therefore, the Undersigned **respectfully recommends** that Judge Cooke <u>grant</u> the motion, in part, and certify a class of all current detainees at the three South Florida facilities for the conditions-of-confinement claims (as opposed to the claim for release).

**However,** the mere fact that a class might be certified (or is in fact certified) does not necessarily mean that the class will ultimately *prevail.* If a class for the conditions-of-confinement claims were to be certified, then the class claims would rise or fall together on the merits. Based on a recent decision from the Eleventh Circuit Court of Appeals and other recent appellate decisions, the chances that the 58 named Plaintiffs or the class will succeed in obtaining a preliminary injunction or declaratory relief in their favor have arguably *decreased* since the Court initially entered a Temporary Restraining Order last month. This potential significant change in the Plaintiffs' ability to ultimately prevail on the merits does not mean that a class of some type should not be certified. Instead, it simply means that the certified class might not succeed on the merits.

By pointing out this procedural reality, the Undersigned is not predicting, suggesting, or implying in any way that Judge Cooke will not issue a preliminary injunction or that our Appellate Court would reverse one if entered. Rather, I am simply noting that appellate courts appear to not treat the COVID-19 crisis as affecting prisoner-

filed or detainee-filed lawsuits and the requirement that those plaintiffs prove deliberate ignorance (as opposed to mere negligence) by government officials or their agents in order to succeed.

## II.    <u>Factual Background</u>

Petitioners/Plaintiffs are 58 immigration detainees housed in three federal immigration detention centers in Florida: the Krome Detention Center in Miami (a/k/a Krome Service Processing Center), the Broward Transitional Center in Pompano Beach, and the Glades County Detention Center in Moore Haven. There were 34 Plaintiffs who filed the original lawsuit, but the Undersigned granted [ECF No 65] a motion [ECF No. 60] to add named Petitioners/Plaintiffs.

At bottom, Petitioners claim that they are at imminent risk of contracting COVID-19 because their detention renders them unable to follow the Center for Disease Control and Prevention's ("CDC") guidelines. They allege that there is "currently no way" for the three centers to comply with the CDC's guidelines on social distancing and quarantining. [ECF No. 1, p. 9].

They say that (1) each facility "holds individuals in close proximity"; (2) people are less than six feet away from each other when they sleep, eat, and use common areas; (3) "it is impossible for Petitioners to protect themselves from infection through social distancing and vigilant hygiene – the only known mitigation measures"; (4) groups of individuals are "herded together in 'cohort quarantine' because they have been exposed"

to others who might have COVID-19 symptoms; and (5) "cohort quarantines drastically increase the possibility of transmission, infection, and facility-wide outbreak by grouping together people who have already been exposed to the virus." [ECF No. 1, pp. 9-10].

The Undersigned assumes that all parties and their counsel are familiar with COVID-19 and the global health crisis it has generated. Consequently, the Undersigned does not deem it necessary to discuss here in detail the background of the virus and the CDC's recommendation that everyone practice social distancing, which involves the maintenance of not less than six feet between people in order to limit the virus' spread. For present purposes, however, the Undersigned will simply provide a recent statistic: As of May 20, 2020, the CDC website reported 1,551,095 confirmed COVID-19 cases and 93,061 COVID-19 related deaths in the United States; the World Health Organization reported 4,789,205 cases and 318,789 deaths globally.

According to the CDC, the following persons have a heightened vulnerability to severe illness or death if they contract the coronavirus: those who are 65 years of age or older, people who live in a nursing home or long-term care facility, persons who are immunocompromised, and those with other pre-existing health conditions, such as serious heart conditions, diabetes, chronic lung disease, chronic kidney disease, liver disease, asthma, hemoglobin disorders, and severe obesity.[3]

---

[3]      The Court's Temporary Restraining Order added pregnant detainees to the Pandemic Response Requirements' list of higher-risk detainees. [ECF No. 76, p. 10, n. 13].

The CDC's Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities summarizes some of the harsh realities of the increased COVID-19 risks at detention centers like Krome, Broward and Glades:

- Incarcerated/detained persons live, work, eat, study, and recreate within congregate environments, heightening the potential for COVID-19 to spread once introduced.

- In most cases, incarcerated/detained persons are not permitted to leave the facility.

- There are many opportunities for COVID-19 to be introduced into a correctional or detention facility, including daily staff ingress and egress; transfer of incarcerated/detained persons between facilities and systems, to court appearances, and to outside medical visits; and visits from family, legal representatives, and other community members. Some settings, particularly jails and detention centers, have high turnover, admitting new entrants daily who may have been exposed to COVID-19 in the surrounding community or other regions.

- Persons incarcerated/detained in a particular facility often come from a variety of locations, increasing the potential to introduce COVID-19 from different geographic areas.

- Options for medical isolation of COVID-19 cases are limited and vary depending on the type and size of facility, as well as the current level of available capacity, which is partly based on medical isolation needs for other conditions.

- Adequate levels of custody and healthcare staffing must be maintained to ensure safe operation of the facility, and options to practice social distancing through work alternatives such as working from home or reduced/alternate schedules are limited for many staff roles.

- Correctional and detention facilities can be complex, multi-employer settings that include government and private employers. Each is organizationally distinct and responsible for its own operational, personnel, and occupational health protocols and may be prohibited from issuing guidance or providing services to other employers or their staff within the same setting. Similarly, correctional and

8

detention facilities may house individuals from multiple law enforcement agencies or jurisdictions subject to different policies and procedures.

- Incarcerated/detained persons and staff may have medical conditions that increase their risk of severe disease from COVID-19.

- Because limited outside information is available to many incarcerated/detained persons, unease and misinformation regarding the potential for COVID-19 spread may be high, potentially creating security and morale challenges.

- The ability of incarcerated/detained persons to exercise disease prevention measures (e.g., frequent handwashing) may be limited and is determined by the supplies provided in the facility and by security considerations. Many facilities restrict access to soap and paper towels and prohibit alcohol-based hand sanitizer and many disinfectants.

- Incarcerated persons may hesitate to report symptoms of COVID-19 or seek medical care due to co-pay requirements and fear of isolation.

## III.   <u>Procedural Background</u>

Following a Report and Recommendations [ECF No. 63], Objections (by both sides) [ECF Nos. 70-71], Responses (by both sides) to the Objections [ECF Nos. 72-73], two Petitioners-filed Notices of Supplemental Authority [ECF Nos. 74-75], Judge Cooke issued a 14-day Temporary Restraining Order [ECF No. 76], which she later extended for another 14 days on May 15, 2020 [ECF No. 101]. The Order extending the TRO also scheduled a hearing on the Emergency Motion for Preliminary Injunction for May 27, 2020. *Id.*

Noting that the Petitioners are merely civil detainees,[4] not convicted criminal

---

[4]      Although the Petitioners are civil detainees who are not serving a federal prison sentence, that does not mean that they all lack criminal records. In a post-TRO Report, for

prisoners (serving a prison sentence at the facilities), the TRO held that ICE's failures to protect the safety and well-being of Petitioners "amount to cruel and unusual punishment because they are exemplary of deliberate indifference." [ECF No. 76, p. 6]. The Court also noted that ICE had made a conscious effort to address detention conditions at one center by releasing all detainees over age 60 and decreasing the overall detainee population by 35%. *Id.* Therefore, the TRO explained, "to the extent that ICE fails to commit to addressing the conditions complained of, ICE has demonstrated deliberate indifference." *Id.*

Although the Court found that injunctive relief is appropriate because of the Fifth and Eighth Amendment violations, it also noted that "the record is not clear as to **whether each individual Petitioner is eligible for release** under ICE's PRR."[5] *Id.* at p. 10 (emphasis added). For example, Judge Cooke noted, "it is unclear **who** among the Petitioners would be considered "mandatory detainees." *Id.* (emphasis added).

The Court granted in part and denied in part Petitioners' Emergency Motion for a

---

example, ICE explained that 35 of the 58 Petitioners are subject to mandatory detention and that 11 have criminal convictions "or pending criminal charges which [in ICE's stated opinion] make them a threat to public safety." [ECF No. 89-1].   And in a later Report filed on May 11, 2020, ICE advised [ECF No. 93-1] that 241 of the 419 Krome detainees have criminal convictions, 253 of the 348 Glades detainees have criminal convictions and 87 of the 419 Broward detainees have criminal convictions. In addition, 153 of the 443 Krome detainees are facing pending criminal charges, 96 of the 419 Broward detainees are facing pending criminal charges, and 95 of the 348 Glades detainees are facing pending criminal charges.

[5]      PRR refers to ICE's COVID-19 April 10, 2020 Pandemic Response Requirements.

Temporary Restraining Order and imposed several requirements on ICE. Some requirements concerned specific steps which ICE must take to accomplish the goal of reducing the population to 75% of capacity at each of the three centers, some imposed reporting requirements, and some required specific health-related protocols.

Although both sides filed Objections to the Undersigned's Report and Recommendations, neither side appealed the TRO, which largely adopted the specific measures suggested in the R & R.[6]

28 U.S.C. § 1292(a)(1) gives federal appellate courts jurisdiction over interlocutory orders of district courts "granting, continuing, modifying, refusing or dissolving **injunctions**, or refusing to dissolve or modify **injunctions**, except where a direct review may be had in the Supreme Court." (emphasis added). Although a TRO provides a type of injunctive relief, it is not a preliminary injunction. This distinction is critical, as "preliminary injunctions are appealable but temporary restraining orders are not." *Mitsubishi Intern. Corp. v. Cardinal Textile Sales, Inc.*, 14 F.3d 1507, 1515 (11th Cir. 1994).[7]

The TRO did not order ICE to release any specific detainee, nor did it require ICE to release any specific categories of detainee. Similarly, it did not specifically instruct ICE

---

[6]    The TRO did not adopt the Report and Recommendations' suggestion that the Court appoint an independent expert to evaluate the three facilities.

[7]    Where a temporary restraining order has the effect of a preliminary injunction, however, then the appellate court has jurisdiction to review the order and is not bound by the district court's designation of the order. *Mitsubishi Intern. Corp.*, 14 F. 3d at 1515, n.14.

as to how to prioritize any release decisions. The TRO did not mandate that ICE in fact reduce the census at each facility to 75% of capacity. Rather, it required ICE to (1) evaluate the named detainees and inform the Court who among them could be released; (2) consider health status, bond eligibility, immigration status, immigration court history and prior criminal history when making the evaluations; and (3) submit a report about how it intends to accelerate its review of detainee release protocols "with the **goal** of reducing the population to 75% of capacity at each of the three detention centers within two weeks" of the TRO. [ECF No. 76, p. 10 (emphasis added)]. The TRO did not direct ICE to consider one or more factors as more or less important than other factors, nor did it impose any specific barriers to ICE's ability to lower the detainee population through transfers.

After Judge Cooke entered the TRO, she granted in part [ECF No. 78] a motion for clarification [ECF No. 77] to permit ICE to "**transfer detainees from the three facilities at issue,**" but only after "first evaluating each detainee and making a determination" of the detainee's release eligibility under the PRR. [ECF No. 78, p. 1 (emphasis added)]. Neither the TRO nor this clarification Order required ICE to provide copies of completed forms used to evaluate detainees for possible release to the Court or to Plaintiffs' counsel.

A.    ICE's TRO-Required Reports

In its <u>first</u> post-TRO Report, filed on May 2, 2020, ICE provided information on a center-by-center basis. [ECF No. 79].

Concerning Krome, ICE advised that it issued every detainee a surgical mask on April 29, 2020 and agreed to exchange the masks every Wednesday. [ECF No. 79-1, p. 1]. It also said it would continue to provide, at no cost to the detainees, "adequate" amounts of soap, water and cleaning materials to the detainees. *Id.* It further advised that disinfecting wipes are provided to detainees for cleaning of mattresses and bunks (though it did not reveal how often). *Id.* at p. 2.

In addition, ICE advised that the dormitories are equipped with antibacterial soap dispensers, running water and paper towels. *Id.* Similarly, it advised that hand sanitizer dispensers have been installed in all housing units and that staffers visit each unit daily and replenish supplies daily. *Id.*

At Glades, ICE said in its first report, the staff issued every ICE detainee a surgical mask, and they also provided instructions in multiple languages. *Id.* The masks are to be replaced every Friday. *Id.* The report also explained that "adequate" amounts of soap, water and cleaning materials are provided to ICE detainees, at no cost to them. *Id.* In addition, all dormitories are equipped with antibacterial soap dispensers, running water and paper towels. *Id.* The report advised that dormitories are sanitized twice daily. *Id.* The report later explained that four ounces of antibacterial soap are provided for individual use and is "replenished as needed." *Id.*

At Broward, all detainees were issued masks on April 17, 2020 and are exchanged once per week. [ECF No. 79-2, p. 1]. The staff gives detainees two four-ounce bottles of

soap, which is replenished as needed, at no cost to the detainee. *Id.* at p. 2. In addition, detainees are also issued a 7.5-ounce pump bottle of antibacterial soap for each room, which is refilled as needed seven days per week. *Id.* The report also advises that cleaning supplies are issued daily and that a facility sanitation team conducts a deep cleaning of each detainee bathroom twice per week. *Id.* The sanitation team uses two pump sprayers to spray the turf twice per day. *Id.* The cleaning crew, which includes detainee volunteers, uses masks and gloves while cleaning. *Id.*

ICE's <u>second</u> post-TRO report [ECF No. 80], filed on March 3, 2020, focused on release, and it outlined the decision-making process and the numbers of detainees released. Relevant portions of this report are provided here verbatim:

> 3. ICE's goal is to reduce the population to 75%, which has been met at Broward Transitional Center. ICE has and will continue to review cases and exercise its discretion to pursue alternatives to detention within the confines of the law.

> 4. Alternatives to detention can include a release on GPS ankle monitor, release on parole, release on an order of recognizance (OREC) with or without a bond pending removal proceedings, and release on an order of supervision (OSUP) with reporting requirements. Whether a detainee is eligible for release pursuant to any of the mechanisms above depends upon his or her manner of entry, and the applicability of the mandatory detention statutes under the Immigration and Nationality Act (INA).

> 5. When evaluating custody, ICE considers immigration history, criminal record, potential threat to public safety, flight risk, and national security concerns, as well as current health status and COVID-19 vulnerability in accordance to the Centers for Disease Control (CDC) guidelines.

> 6. ICE is reducing its detainee population at Krome and Glades to reach the target capacity through a continuous review of all cases, where detainees

have been identified by ICE Health Service Corps as having a medical condition that makes them "at risk" for COVID-19, according to the CDC guidelines and the factors enumerated in U.S. District Court for the Central District of California preliminary injunction order in *Fraihat v. ICE*, ---F. Supp. 3d ---, 2020 WL 1932570 (Apr. 20, 2020), to determine if their detention remains appropriate.

7. To that end, ICE also identifies within five days of coming to ICE custody all detainees with risk factors and considers them in making custody determinations.

8. ICE further intends to continue reducing its detained population at Krome and Glades by identifying eligible arriving alien cases for parole consideration.

9. Arriving aliens who establish a credible fear of persecution or torture are to be detained for further consideration of the application for asylum. INA § 235(b)(l)(B)(ii), 8 U.S.C. § 1225(b)(1)(B)(ii). Such aliens, however, may be paroled on a case-by-case basis for "urgent humanitarian reasons" or "significant public benefit," provided the aliens present neither a security risk nor a risk of absconding. 8 C.F.R. § 212.5(b).

10. ICE will continue to provide eligible detainees with a Parole Advisal and Scheduling Notification Form, which inform the detainee that he/she will be interviewed for potential parole and provides the detainee instructions on how to submit any supporting documentation.

11. ICE will continue to review all previously-granted bonds to determine whether reduction of the bond amount or release on an order of recognizance, with a GPS ankle monitor to mitigate risk of flight, is appropriate.

12. ICE intends to continue reduction of the population at Krome and Glades by accelerating the review and release on Orders of Supervision for all final order detainees, where ICE has determined that there is no significant likelihood of removal in the reasonably foreseeable future.

13. ICE detained population at Krome and Glades will be further reduced through release of detainees granted relief or bond by an Immigration

Judge, or through the enforcement of removal orders where logistically feasible.

14. During February, March and April 2020, ICE officials at Krome and Glades released **289** individuals on an Order of Recognizance, Order of Supervision, Parole or Bond.

15. During February, March and April 2020, officials at BTC released **218** individuals on an Order of Recognizance, Order of Supervision, Parole or Bond.

[ECF No. 80-1, pp. 1-3].

ICE's <u>third</u> Report [ECF No. 89] addressed the population of the three centers (i.e., whether they were below capacity) and information about the release status of the 58 Petitioners, including information about the factors used to assess eligibility for release (e.g., whether a detainee is subject to mandatory detention, has criminal convictions or pending charges, or has health conditions which would increase their vulnerability to COVID-19). Relevant portions of this report are provided here verbatim:

3. As of May 7, 2020, Krome's population is presently at 71% capacity. The detainee population at Glades is presently at 74% capacity. BTC's detainee population is presently at 65% capacity.

4. ICE has reviewed each of the 58 petitioners' detention pursuant to the district court's order. Of the 58 petitioners, six of the petitioners have been released from ICE custody, to include Tahimi Perez, Francisco Rivero Valeron, Eitan Yefet, Fernando Goncalves, Maxuel De Souza, and Maria Rodriguez Claras.

5. ICE determined that of the 52 remaining petitioners, 35 are subject to mandatory detention.

6. ICE found that of the 52 petitioners, 17 are not subject to mandatory detention.

7. ICE determined that 11 of the petitioners who are not subject to mandatory detention have criminal convictions or pending criminal charges which make them a threat to public safety.

8. An immigration judge denied a bond to one of the non-mandatory detention plaintiffs based upon flight risk. The plaintiff did not appeal the bond denial. The immigration judge ordered removal and the plaintiff did appeal the removal order. The appeal remains pending.

9. ICE released an additional two petitioners on alternatives to detention, Eliseo Zamora-Mendoza and Alejandro Mugaburu Tapia.

10. The remaining three petitioners who are not subject to mandatory detention, do not have a criminal history, and do not have any known chronic health conditions that would increase their vulnerability to COVID 19 per the Center for Disease Control (CDC) guidelines.

11. ICE found that of the 52 petitioners, one is over the age of 60. That petitioner has criminal convictions for carrying a concealed weapon, possession of narcotic equipment, possession of marijuana, larceny and arson and is subject to mandatory detention. He is scheduled for a hearing on his request for relief [] with an immigration judge on May 21, 2020.

12. ICE found that of the 52 petitioners, 25 had no known chronic health conditions that would increase their vulnerability to COVID 19 per the Center for Disease Control (CDC) guidelines.

13. ICE found that of the 52 petitioners, 27 did have known chronic health conditions that would increase their vulnerability to COVID 19 per the Center for Disease Control (CDC) guidelines.

14. ICE found that of those 27 petitioners that had a known chronic health condition, 22 are subject to mandatory detention under the Immigration and Nationality Act and are not statutorily eligible for release pursuant to an order of recognizance, parole, or other alternative to detention.

15. ICE found that of the 27 petitioners that had a known chronic health condition, 5 are eligible for some form of release under the Immigration and Nationality Act. After reviewing all factors to include health status, bond

eligibility, immigration history, immigration status and criminal history, ICE has approved 2 petitioners for release.

16. However, ICE found that the remaining three petitioners have criminal convictions for [i]ntimidation, probation violation, fraud, illegal use of credit cards and traffic offenses.

17. Additionally, some of the three plaintiffs are also pending criminal charges for [p]roperty damage, possession of stolen property, sale of stolen property, drug possession, larceny, weapons offense, firing a weapon, and aggravated assault with a weapon and failure to appear.

[ECF No. 89-1, pp. 1-3].

ICE's <u>fourth</u> report [ECF No. 93], filed on May 11, 2020, focuses on the criminal histories of all the current detainees, not merely the 58 named Petitioners. Relevant portions are provided here verbatim:

3. As of 6:00 a.m. on May 11, 2020, ICE detained 1210 detainees at Krome, BTC, and Glades.

4. ICE is housing 419 detainees at BTC; 443 detainees at Krome; and 348 at Glades.

5. Of the 1210 detainees, 787 detainees are considered to be subject to mandatory detention.

6. Of the 419 detainees housed at BTC, 87 have criminal convictions and 332 do not have criminal convictions. However, 96 of them are pending criminal charges.

7. Of the 443 detainees housed at Krome, 241 have criminal convictions and 202 do not have criminal convictions. However, 153 of them are pending criminal charges.

8. Of the 348 detainees housed at Glades, 253 have criminal convictions and 95 do not have criminal convictions. However, 95 of them are pending criminal charges.

[ECF No. 93-1, pp. 1-2].

ICE's <u>fifth</u> report, submitted May 14, 2020 [ECF No. 97], provides an update on the criminal histories and pending charges for the detainees. Relevant portions are listed here verbatim:

> 3. As of 6:00 a.m. on May 14, 2020, ICE detained 1194 detainees at Krome, BTC, and Glades.
>
> 4. ICE is housing 462 detainees at BTC; 403 detainees at Krome; and 329 at Glades.
> 5. Of the 1194 detainees, 860 detainees are considered to be subject to mandatory detention.
>
> 6. Of the 462 detainees housed at BTC, 108 have criminal convictions and 354 do not have criminal convictions. However, 94 of the 354 detainees with no criminal convictions are pending criminal charges.
>
> 7. Of the 403 detainees housed at Krome, 229 have criminal convictions and 174 do not have criminal convictions. However, l16 of the 174 detainees with no criminal convictions are pending criminal charges.
>
> 8. Of the 329 detainees housed at Glades, 246 have criminal convictions and 83 do not have criminal convictions. However, 83 of the detainees with no criminal convictions are pending criminal charges.

[ECF No. 97-1, pp. 1-2].

ICE's <u>sixth</u> report, filed on May 15, 2020 [ECF No. 100], revealed specifics about the methods used to release 170 detainees from the three centers between May 8 and May 15, 2020. Specifically, **111 of the 170** detainees who were removed or released from the three centers were <u>transferred to other facilities</u>. Relevant portions of this report are provided here verbatim:

3. Between May 8, 2020 and May 15, 2020 at 9:00 a.m., ICE released or removed a total of 170 detainees. Those detainees were released or removed from the following facilities: 119 detainees from Krome, 17 detainees from Glades and 34 detainees from BTC.

4. The nature of the 119 releases from Krome are as follows:

    a. 9 detainees were released on bond.

    b. 1 detainee was removed from the United States.

    c. 1 detainee was released because an immigration judge granted relief from removal.

    d. 1 detainee was released on an order of supervision based on a COVID-19 high risk category.

    e. 2 detainees were released on an order of supervision subsequent to a procedural ERO custody review.

    f. 3 detainees were turned over to local law enforcement on a warrant.

    g. 2 detainees departed voluntarily.

    h. 100 detainees were transferred out of Krome.

5. The nature of the 17 releases from Glades are as follows:

    a. 3 detainees were released on bond.

    b. 4 detainees were released because an immigration judge granted relief from removal.

    c. 4 detainees were released on an order of supervision subsequent to a procedural ERO custody review.

    d. 6 detainees were transferred out of Glades.

6. The nature of the 34 releases from BTC are as follows:

    a. 1 detainee was released on bond.

    b. 13 detainees were removed from the United States.

    c. 1 detainee was released because an immigration judge granted relief from removal.

    d. 1 detainee was released on Parole subsequent to a procedural ERO custody review.

    e. 10 detainees were released on an order of supervision subsequent to a procedural ERO custody review.

    f. 3 detainees were released on an order of supervision based on a COVID-19 high risk category.

    g. 5 detainees were transferred out of BTC.

[ECF No. 100-1, pp. 1-2].

ICE's <u>seventh</u> report, filed on May 18, 2020 [ECF No. 104], provides an update on the number of detainees on a facility-by-facility basis and the categories in which they have been described. Relevant portions are provided here verbatim:

> 3. As of 6:00 a.m. on May 18, 2020, ICE detained 1191[8] detainees at Krome, BTC, and Glades.
> 4. ICE is housing 456 detainees at BTC; 397 detainees at Krome; and 338 at Glades.
>
> 5. Of the 1191 detainees, 846 detainees are considered to be subject to mandatory detention.
>
> 6. Of the 456 detainees housed at BTC, 112 have criminal convictions and 344 do not have criminal convictions. However, 93 of the 344 detainees with no criminal convictions are pending criminal charges.
>
> 7. Of the 397 detainees housed at Krome, 223 have criminal convictions and 174 do not have criminal convictions. However, 119 of the 174 detainees with no criminal convictions are pending criminal charges.
>
> 8. Of the 338 detainees housed at Glades, 248 have criminal convictions and 90 do not have criminal convictions. However, 62 of the 90 detainees with no criminal convictions are pending criminal charges.

[ECF No. 104-1, pp. 1-2].

B.      <u>Petitioners' New Declarations</u>

Petitioners filed their expedited motion for class certification on May 5, 2020. [ECF No. 81]. Petitioners filed a reply in further support of their motion on May 12, 2020 [ECF

---

[8]      The total census was slightly reduced, from 1,194, to 1,191, in a four-day period.

No. 94] and attached new declarations which they say shows that ICE is "continuing to place these people in conditions that violate CDC Guidelines." [ECF No. 94, p. 7].

Some of these declarations, which were signed after the TRO was entered and after ICE issued its first report, contend that the conditions at the three centers continue to permit unacceptable conditions to exist, though Petitioners' counsel acknowledge that "ICE may dispute these accounts." [ECF No. 94, p. 8].

If the declarations are factually accurate and complete, then there is a significant factual discrepancy between what ICE represents in its submissions (through declarations made under penalty of perjury) and what the Petitioner declarants describe. Other significant points are not necessarily factual disputes -- they merely document certain realities which ICE does not address in its reports and declarations (e.g., adequate social distancing at all times is impossible).

The following excerpts from the new Petitioner declarations illustrate factual discrepancies, as opposed to undisputed descriptions which simply reflect certain realities of the conditions at the three detention centers:

In a declaration signed on May 6, 2020, Reinier Guiber Avila says that "there is no hygiene here." [ECF No. 94-1, p. 6]. He says, "there are not enough cleaning supplies" and he and his fellow podmates are given only two rags to clean the entire pod. *Id.* He also claims that "we do not have disinfecting wipes to use regularly." *Id.* He states that he was given one wipe when he arrived at Krome (on April 17, 2020) but has not been

provided any additional wipes since his first day (i.e., a period of 15 days). *Id.*

Miguel Angel Marroquin Perez is detained at Broward and signed a declaration on May 8, 2020. [ECF No. 94-1, pp. 15-17]. Although he says that masks are provided every three days, he says that mask use is not required, that the masks are usually thrown on the beds or on tabletops and "most people do not want to wear them because they are contaminated." *Id.* at p. 15. He also advises that hand sanitizer is "sometimes" available outside the cafeteria and that he has not seen any hand sanitizer next to the telephones. *Id.* at p. 16. He also says that he has not received any education about hygiene and preventing the spread of COVID-19. *Id.* at p. 17. Moreover, he says he has not seen any Spanish-language posters about COVID-19 at Broward. *Id.*

Iran Pichardo Perez-Borroto has been detained at Krome since April 16, 2020. [ECF No. 94-1, pp. 21-23]. He says he receives soap and shampoo "once or twice a week," that the amount of soap is insufficient and that he and his other podmates do not always receive additional soap or shampoo when they request it. *Id.* at p. 22. He further contends that disinfecting wipes are not provided and that detainees sometimes use toilet wiper to clean the tables. *Id.*

Deivys Perez Valladares has been at Krome since May 6, 2020 and was previously at Broward. [ECF No. 94-1, p. 26]. According to his declaration, Broward guards were not wearing masks or gloves when interacting with the detainees. *Id.* at p. 27. Staff at Krome did not provide information about COVID-19 when they arrived. *Id.* In addition, the

Perez-Valladares declaration says that no masks or gloves were given to detainees when they arrived at Krome from Broward and that only guards are using masks at Krome. *Id.*

Danny Ruiz Garcia is detained at Broward, where he has been housed since March 26, 2020. [ECF No. 94-1, p. 31]. According to his declaration, there is no hand sanitizer near the telephones, the hand sanitizer in the cafeteria is often empty and guards are given hand sanitizer only during lunch. *Id.* Mr. Ruiz also says that a Broward staffer denied his request for additional shower gel on May 5, 2020. *Id.* He also says that he has not received any education about hygiene or how to prevent the spread of COVID-19 at Broward. *Id.*

## IV.    <u>Applicable Legal Standards & Analysis</u>

Petitioners' class action certification motion is the precise legal issue currently before the Court.

Nevertheless, the Undersigned will first discuss *Swain v. Junior*, No. 20-11622-C, 2020 WL 2161317 (11th Cir. May 5, 2020) because it is a very recent and binding published Eleventh Circuit opinion concerning a challenge to conditions of confinement raised in the midst of the COVID-19 pandemic.[9] Moreover, *Swain* is helpful to a discussion of

---

[9]     There have been several district court and appellate court opinions in the past three months concerning COVID-19 prompted lawsuits filed by prisoners and detainees in federal, state and local prisons, jail and detention facilities. Those opinions are all non-binding.  *Swain* is the only **binding** appellate decision which the Undersigned knows of which addresses the conditions of confinement and a demand for release as a result of the COVID-19 pandemic.

whether the merits of the prisoners' claims there, which are similar to the ones here, affect the analysis of Petitioners' class action motion.

A.    _Swain v. Junior_

In a 2-1 published opinion with a written dissent, our Appellate Court in _Swain_ granted a motion to stay the District Court's preliminary injunction pending an appeal by the Defendants (i.e., Miami-Dade County and the Director of its Corrections and Rehabilitations Department). The preliminary injunction, which was stayed, required the Defendants in that similar case to use myriad safety measures to prevent the spread of COVID-19 at the Metro West jail.

The _Swain_ Court considered the Plaintiffs' § 1983 claim that Defendants violated the Eighth and Fourteenth Amendments through their purportedly deliberate indifference to the COVID-19 risks affecting the jail detainees. The Court noted that an Eighth Amendment challenge has two components: an objective one and a subjective one.

To prevail on the objective component, a plaintiff must show "an objectively intolerable risk of harm." _Swain_, 2020 WL 2161317, at *4.

To satisfy the subjective component, a plaintiff must show that the prison official "acted with deliberate indifference." _Id._ The _Swain_ Court noted that the deliberate indifference element requires a prison official to have a subjective "state of mind more blameworthy than negligence." _Id._

25

The Eleventh Circuit held that the District Court "incorrectly collapsed" the subjective and objective components. *Id.* Moreover, it held that the *Defendants* are likely to prevail on appeal. *Id.*

More specifically, the Eleventh Circuit held that the trial court "treated the increase in COVID-19 infections as proof that the Defendants deliberately disregarded an intolerable risk," an approach which "likely violated the admonition that resultant harm does not establish a liable state of mind." *Id.* It also held that the Defendants are likely to prevail for the additional reason that Plaintiffs "offered 'little evidence' to suggest that the Defendants were deliberately indifferent." *Id.* Instead, the Appellate Court held, the evidence supports the conclusion that the Defendants "are taking the risk of COVID-19 seriously." *Id.*

The *Swain* Court also held that the trial court "likely erred" by treating Metro West's inability to achieve meaningful social distancing as "evincing a reckless state of mind." *Id.*

Although the specific conditions at the three federal detention centers and the County's Metro West facility have not been established to be identical, some of the problematic conditions at the Metro West jail (e.g., the impossibility of achieving "social distancing") seem to be also present at Krome, Broward, and Glades. But *Swain* held that the provisions of the preliminary injunction (e.g., specifying specific measures which county jail officials must take, such as requiring that soap and mask be provided) are

illustrations of a scenario where the District Court designated itself as a *de facto* "super-warden" and incorrectly required those officials to, in effect, obtain a "permission slip" from the Court before taking action at the jail. *Id.* at *5.

Some of the measures in the preliminary injunction stayed in *Swain* are similar to, and at times identical to, the measures included in the temporary restraining order issued by the District Court in this case. Unlike the Defendants in *Swain*, however, the Defendants here (ICE, for all practical purposes) have not filed a notice of appeal of the TRO (because, presumably, the statute does not permit interlocutory appeal of a TRO, as opposed to a preliminary injunction). Instead, they have filed reports which provide information on what steps they have taken in response to the TRO.

Given the similarities between *Swain* and the instant case,[10] there could theoretically be a question about Petitioners' chances of succeeding on the merits of their efforts to convert the TRO in the instant case into a preliminary injunction. To be sure, each case turns on its facts. The *Swain* facts are not identical to the facts here, so the appellate court's ruling about the preliminary injunction in *Swain* and whether the evidence established deliberate indifference there does not necessarily mean it would reach a similar conclusion here about the deliberate indifference standard at the three

---

[10]     *Swain* was issued on May 5, 2020, which means that the Undersigned (who issued the Report and Recommendations on April 22, 2020) and Judge Cooke (who issued the TRO on April 30, 2020) did not have the benefit of *Swain,* which is *now* binding precedent, when we analyzed the issues.

immigration detention centers. In addition, the legal theories asserted by the parties in the two cases are not identical, either.

Therefore, the mere fact that our Appellate Court stayed the preliminary injunction concerning Metro West does not mean that it would issue an identical ruling in this case, which, of course, has different facts. The health risks confronting the immigration detainees could be significantly greater than those affecting defendants housed at Metro West. Likewise, an evaluation of the mental states of ICE officials operating the three federal immigration facilities could show greater culpability than county officials operating Metro West. In other words, the *Swain* Plaintiffs may not have submitted sufficient evidence of deliberate indifference, while the Plaintiffs here may have provided more-substantial evidence of deliberate indifference.

But it is not necessary to determine whether Petitioners will ultimately *succeed* in obtaining a preliminary injunction or declaratory relief here in order to decide the class certification issue. As the Advisory Committee Notes to the 2003 Amendment of Federal Rule of Civil Procedure 23(c)(1)(A) explains: "an evaluation of the probable outcome of the merits is not properly part of the certification decision." *Cf. Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013) (emphasis added) ("Rule 23(b)(3) requires a showing that questions common to the class predominate, not that those questions will be answered, on the **merits**, *in favor* of the class.").

The purpose of a class-certification ruling "is not to adjudicate the case," but "to

select the method best suited to adjudication of the controversy." *Id.* at 460 (internal citation omitted). Adjudicating the merits to determine certification "put[s] the cart before the horse." *Id.*; *see generally Cooper v. Southern Co.*, 205 F.R.D. 596, 608-90 (N.D. Ga. 2001) ("The Court's responsibility is to make sure that the common bond between the class representatives' claims and those of the class is strong enough so that it is fair for the fortunes of the class members to rise or fall with the fortunes or the class representatives."); *see also In re Chiquita Brands Int'l Inc. Alien Tort Statute and Shareholders Derivative Litigation*, 331 F.R.D. 675, 682 (S.D. Fla. 2019) (finding that at the class certification motion stage, "the Court should not pass on the merits of the claims"); *cf. Amgen*, 568 U.S. at 465-66 ("Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage" and merits questions "may be considered to the extent – but only to the extent – they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied").[11]

---

[11]     The *Swain* Court pointed out that an expert report found that "Metro West appears to have implemented many measures to curb the spread of the virus." 2020 WL 2161317, at *4. It also emphasized that the Defendants "adopted extensive safety measures such as increasing screening, providing protective equipment, adopting social distancing when possible, quarantining symptomatic inmates, and enhancing cleaning procedures." *Id.* at *5. These circumstances, the appellate court pointed out, are inconsistent with a finding of deliberate indifference.

In its memorandum opposing the class action motion [ECF No. 92, pp. 13-14], ICE advised that it "began taking measures, prior to the filing of the lawsuit, to address the threat posed by COVID-19." *Id.* at p. 13. The measures included some of the ones mentioned in *Swain.* ICE contends that its conduct, as evidenced by the pre-lawsuit

So an order certifying a class does not by itself indicate whether the claims certified will succeed. However, the Undersigned deems it prudent to point out that other appellate courts[12] have recently issued opinions staying preliminary injunctions on rationales similar to the one articulated in *Swain*. *See generally Valentine v. Collier*, 956 F.3d 797, 801, 803 (5th Cir. 2020) (staying preliminary injunction entered against the executive director of the Texas prison system and the warden of one of its prisons for the elderly and infirm, noting that the preliminary injunction created an "administrative nightmare," and explaining that "the incidence of diseases or infections, standing alone, do not imply unconstitutional confinement conditions, since any densely populated residence may be subject to outbreaks"); *Marlowe v. Leblanc*, No. 20-30276, 2020 WL 2043425, at *2-4 (5th Cir. 2020) (staying district court's preliminary injunction entered against Louisiana's prison system officials in a lawsuit filed by a diabetic who is "particularly vulnerable to the

_____

measures, "does not evince deliberate indifference to detainees' serious medical needs." [sic]. *Id.* at pp. 13-14.

The appellate courts which have stayed COVID-19 preliminary injunctions against officials operating state and federal prison and detention facilities seem to have all relied on that view to stay the trial court's preliminary injunction. *See, e.g., Marlowe*, 2020 WL 2043425, at *2 (stating the question is whether the state prison officials are required "to do more than [they] have already done to mitigate the risk of harm" and noting that the evidence did not show deliberate indifference because the officials were taking "a plethora of measures" to "abate the risks posed by COVID-19").

[12]   On the other hand, some trial-level district courts have issued orders granting injunctive relief and certifying classes or sub-classes in COVID-19 prisoner/detainee litigation. *See, e.g., Fraihat v. U.S. Immigration & Customs Enforcement*, No. EDCV-19-1546 JGB, 2020 WL 1932570 (C.D. Cal. Apr. 20, 2020).

virus's effects"; noting that the virus has spread within the prison but emphasizing that, given the many prevention measures taken by the prison, "an increase in infection rate alone is insufficient to prove deliberate indifference"; and holding that the harm to the state's interest in administering its prison system is "particularly acute" because the preliminary injunction "interferes with the rapidly-changing approach" that the state has "used to respond to the pandemic so far"); *cf. Roman v. Wolf*, No. 20-55436, 2020 WL 2188048, at *1 (9th Cir. May 5, 2020) (staying preliminary injunction except for paragraph requiring substantial compliance with CDC Guidelines at ICE immigration detention facility in Adelanto, California).

B.    <u>Federal Rule of Civil Procedure 23</u>

It is well established that trial courts have "broad discretion" in determining whether to certify a class and to subsequently amend a class. *See, e.g., Coon v. Georgia Pac. Corp.*, 829 F.2d 1563, 1566 (11th Cir. 1987); *Kilgo v. Bowman Transp., Inc.*, 789 F.2d 859, 877 (11th Cir. 1986). As a result, the appellate court will review a District Court's decision about whether to certify a class for an abuse of discretion. *See Babineau v. Fed. Express Corp.*, 576 F.3d 1183, 1189 (11th Cir. 2009). The Eleventh Circuit will find an abuse of discretion in a class certification ruling only if the District Court applies the wrong legal standard, follows improper procedures in making its determination, bases its decision on clearly erroneous findings of fact, or applies the law in an unreasonable or incorrect

manner. *See Klay v. Humana, Inc.*, 382 F.3d 1241, 1251 (11th Cir. 2004), *abrogated in part on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008).

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979)). To fall within the exception, Plaintiffs "must affirmatively demonstrate [their] compliance" with Federal Rule of Civil Procedure 23. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

"A district court must conduct a rigorous analysis of the Rule 23 prerequisites before certifying a class." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1266 (11th Cir. 2009) (citation omitted). "A party seeking class certification must affirmatively demonstrate his compliance with [Rule 23]—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Dukes,* 564 U.S. at 350. "In other words, 'the party seeking class certification has a burden of *proof,* not a burden of pleading.'" *Reyes v. BCA Fin. Servs.*, No. 16-cv-24077, 2018 WL 3145807, at *7 (S.D. Fla. June 26, 2018) (quoting *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1234 (11th Cir. 2016)).

Plaintiffs seek class certification pursuant to Federal Rules of Civil Procedure 23(a) and (b)(2). Specifically, Plaintiffs seek certification of the following class:

> All civil immigration detained individuals held by Respondents at the Krome Service Processing Center ("Krome"), the Broward Transitional Center ("BTC"), or at Glades County Detention Facility ("Glades") when this action was filed, since this action was filed, or in the future.

[ECF No. 81, p. 5].

According to Petitioners, ICE has not even attempted to show this Court that it is fully implementing CDC Guidelines. Instead, as phrased by Plaintiffs, the ICE-submitted declarations "illustrate a consistent pattern of unhygienically cramped conditions, inadequate personal protective equipment, and grossly inadequate practices by ICE, such as late screening and use of massive cohort quarantining." *Id.* at p. 2. Plaintiffs contend that putative class members are "uniformly not provided basic necessities to fight against COVID-19, such as space, face masks, soap, and hand sanitizer."[13] *Id.* at p. 6. "Each class member is therefore not only subject to similar conditions, but similarly subject to the same devastating risk of contracting COVID-19." *Id.*

Class certification is governed by Federal Rule of Civil Procedure 23. Class certification is proper where the party seeking certification demonstrates that (1) each of the prerequisites of Federal Rule of Civil Procedure 23(a) have been met; and (2) the proposed class satisfies at least one of the requirements listed in Rule 23(b). *Dukes*, 564 U.S. at 345 (2011).

---

[13]    ICE disputes this description, as illustrated by the representations made in its post-TRO reports. The Undersigned acknowledges a significant factual dispute but will not resolve it here. If a class of some type is certified for claims concerning this alleged lack of hygiene, then all class members will have their claims succeed or fail based on an evidence-based determination of which set of facts is the correct one. Of course, this Court could always determine that the facts are not the ones portrayed by Plaintiffs *or* those described by ICE – and that the actual scenario is somewhere between the two competing versions.

The Rule 23(a) requirements are as follows:

(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

i.      Analysis of the Rule 23(a) Factors

The Supreme Court has held that "actual, not presumed, conformance with Rule 23(a) [is] indispensable." *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 160 (1982). The party seeking class certification bears the burden of demonstrating it has satisfied all four Rule 23(a) prerequisites and that the class lawsuit falls within one of the three types of actions permitted under Rule 23(b). *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 614 (1997).

1.   Numerosity

The proposed class satisfies the requirement that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). While there is no fixed rule, generally a class size less than twenty-one is typically considered inadequate, while a class size of more than forty is generally adequate. *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 489-90 (S.D. Fla. 2003).

This requirement is easily met here because there are many hundreds of people (indeed, approximately 1,124) in civil immigration detention who are being held by the same Respondent across Krome, BTC, and Glades, and each of them is affected by the

policies and practices challenged in this lawsuit. *See, e.g., Rosas v. Baca*, No. CV 12-00428 DDP (SHx), 2012 WL 2061694, at *2 (C.D. Cal. June 7, 2012) ("The Jails currently house thousands of inmates, and are certain to house many more in the future. The court therefore agrees with Plaintiffs' undisputed assertion that the numerosity requirement has been satisfied.").

The size of the proposed Class seeking injunctive or declaratory relief make joinder impracticable. The proposed Class thus easily satisfies the numerosity requirement of Rule 23(a)(1).

## 2.   Commonality

Determining whether Petitioners/Plaintiffs meet the commonality requirement depends on the nature of the claims.  The claims seeking release on bond or on conditions require a much-different analysis than the claims concerning the conditions (e.g., more soap and disinfecting products, reconfiguring sleeping arrangements to more easily facilitate social distancing).

Commonality "requires at least one question common to all of the class members, the answer to which is "apt to drive the resolution of the litigation." *Money v, Pritzker*, Nos. 20-cv-2093, 20-cv-2094, 2020 WL 1820660, at *14 (N.D. Ill. Apr. 10, 2020) (internal citation omitted).

The Undersigned will first evaluate the conditions-related claims seeking a declaratory judgment and injunctive relief concerning improved hygiene and health

measures.  In other words, the non-release claims.

"Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury." *Dukes*, 564 U.S. at 350. The common contention of injury "must be of such a nature that it is capable of class wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*

A critical question for the class is whether ICE has been deliberately indifferent to the risk that people detained at Krome, Broward, and Glades will contract COVID-19 due to the allegedly unhygienic conditions and an inability to protect themselves through social distancing. *See Helling v. McKinney*, 509 U.S. 25, 32 (1993) (stating the Constitution confers upon the Government a duty to assume responsibility for safety and general well-being of people detained).

Common questions also circle on the (in)adequacy of ICE's policies and practices governing the conditions of confinement, including ICE's failure to follow CDC Guidelines. These issues, which are at the core of the claims asserted by Plaintiffs and the class constitute the type of common questions that courts have found sufficient to meet the commonality requirement. For example, in *Hernandez v. City of Monterey*, the court certified "a class of inmates challenging jail safety and health care policies and practices, and a subclass of inmates challenging jail disability policies and practices." 305 F.R.D. 132, 139 (N.D. Cal. 2015).

Moreover, the very nature of this suit and the relief requested (other than release of detainees) also support a finding of commonality.

Specifically, in a civil rights lawsuit such as this, "commonality requires only that there be at least one issue whose resolution will affect all or a significant number of the putative class members." *Braggs v. Dunn*, 321 F.R.D. 653, 664 (M.D. Ala. 2017) (quoting *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1355 (11th Cir. 2009)) (internal brackets omitted). This "relatively light burden" does not require that all questions of law and fact be common to the putative class members. *See Vega*, 564 F.3d at 1268.

Here, ICE's uniform safety and hygiene practices and its alleged consistent refusal to follow CDC Guidelines at Krome, Broward, and Glades expose each class member to the same "substantial risk of serious harm." *See Hernandez*, 305 F.R.D. at 157.

All of the current detainees have been, or will be, subjected to these common conditions and common policies and practices, and a determination that ICE's conduct is unconstitutional and violated CDC guidelines will therefore "resolve an issue that is central to the validity" of each and every class member's detention. *Dukes*, 564 U.S. at 350.

Plaintiffs say that ICE is holding all members of the class in the same horrific conditions, and the Court should find the necessary facts and rule on the constitutionality of those common conditions "in one stroke." *See id.*

The fact that certain details relating to their conditions of confinement may or will vary between class members does not defeat commonality. *Reid v. Donelan*, 297 F.R.D.

185, 191 (D. Mass. 2014), *rev'd on other grounds*, 819 F.3d 486 (1st Cir. 2016) (granting class certification despite individual differences among class members, where common issues pervade).

Those inevitable differences -- which at most might entail some tailoring in the ultimate non-release remedy the Court might fashion -- do not change the fact that conditions experienced in all three South Florida detention centers at issue here are purportedly all uniformly unsanitary and unconstitutional or that ICE has supposedly shown deliberate indifference towards the risk of COVID-19 infection to all people they are detaining at those three facilities.

In other words, that class members may suffer varying degrees of injury does not defeat commonality. *See, e.g., In re Deepwater Horizon*, 739 F.3d 790, 810-11 (5th Cir. 2014) ("[T]he legal requirement class members have all 'suffered the same injury' can be satisfied by an instance of the defendant's injurious conduct, even when the resulting injurious effects—the damages—are diverse.").

The class members face a common risk of infection, and a ruling that ICE's conduct is unconstitutional and illegal will "resolve an issue that is central to the validity" of each class member's claim. *Dukes*, 564 U.S. at 350.[14]

_____

[14]     ICE contends that the detainees all have "unique characteristics, including their age, gender, general state of health, and specific medical conditions which might render them more vulnerable to COVID-19 infection." [ECF No. 110, p. 2]. This, it says, demonstrates that a challenge to conditions cannot be handled on a class basis.  Moreover, ICE notes, Plaintiffs included affidavits detailing their specific medical situations

Plaintiffs have met Rule 23(a)'s commonality requirement for the claims seeking relief other than release. Thus, a class action seeking a declaration that the conditions at the three South Florida immigration detention centers constitute cruel and unusual punishment or an injunction requiring that cleaning and hygiene products be provided on a regular basis and that beds be reconfigured to promote social distancing meets the commonality requirement.

**The demand for release, however, presents a far-different picture.**

At bottom, the release demand does not meet the commonality requirement. The release demand arises from Petitioners' habeas corpus claim under 28 U.S.C. § 2241. The Undersigned finds *Money v. Pritzker* insightful and persuasive and relies upon it to support the conclusion that the purported class seeking release does not meet Rule 23(a)'s

---

"because they believed those are relevant facts insofar as whether ICE is obligated to take into account their unique medical conditions because such conditions create a risk of serious harm to them, and the disregard of that risk, by conduct more than mere negligence, would constitute deliberate indifference to their serious medical need." *Id.* at p. 3.

The Undersigned is not convinced that these different medical conditions render class treatment unavailable for claims demanding compliance with CDC Guidelines, however. The purported failure to issue sufficient soap or cleaning products or masks is a scenario applicable to all three facilities, in general. Determining whether ICE officials are deliberately indifferent because they failed to provide these items would typically not depend on whether one detainee is 35 years old or 55 years old, or if one detainee has a cholesterol level of 241 while another has a level of 144. Similarly, the failure to place beds more than six feet apart to facilitate social distancing affects all detainees, and the health status of each detainee would usually not be distinct enough to cause a different conclusion about whether close bed placement constitutes deliberate indifference to a virus-created health risk.

commonality requirement. 2020 WL 1820660, at *14-15.  Because I find *Money* persuasive, I will provide a detailed discussion of its more-important features.

The *Money* Plaintiffs asked the Court to force the State of Illinois executive branch to start a process for the potential release of thousands of inmates, through medical furlough or home detention. In particular, the Plaintiffs are ten individuals serving prison sentences in various Illinois facilities. They brought two purported class action lawsuits seeking release of prisoners from state corrections facilities in light of the COVID-19 pandemic.

The Court noted that Plaintiffs are "correct in asserting that the issue of inmate health and safety is deserving of the highest degree of attention." *Id.* at *1.

The foundation of those two lawsuits is, for all essential purposes, the same as the one here: the Plaintiffs contend that (1) the prison setting makes them (and other purported class members) especially vulnerable to COVID-19; (2) the government's responses to the danger are insufficient; and (3) the only way to solve the problem is moving prisoners out of prisons.

Similar to the Plaintiffs here, the *Money* Plaintiffs also filed a motion for a TRO and a preliminary injunction.

Similar to the instant case, *Money's* ultimate aim is "unmistakably [to] seek to reduce the prison population," which is "the whole point" of the lawsuits, which seek to "remove inmates from prison because they are vulnerable in those facilities." *Id.* at *13.

The Court noted that the impetus for Plaintiffs' claims is the living conditions inherent in a congregate setting during the COVID-19 epidemic. It further pointed to the reality that "all prison facilities, by definition have living conditions that prevent inmates from practicing the social distancing required by current guidance from the CDC" and the Illinois state government. *Id.* The Court also flagged a truism applicable to the instant case: "If prisons could be reconfigured to permit social distancing and observance of CDC's hygiene recommendations, Plaintiffs would have no claim." *Id.*

Shifting its analysis to the commonality requirement, the Court noted that the public interest, which must be considered when evaluating a request for a TRO or preliminary injunction,[15] "mandates **individualized** consideration of any inmate's suitability for release and on what conditions, for the safety of the inmate, the inmate's family, and the public at large." *Id.* at *14 (emphasis added).

The *Money* Court expressed myriad points which apply to the instant lawsuit against ICE:

1.    "Each putative class member comes with a unique situation – different crimes,[16] sentences, outdates, disciplinary histories, age, medical history, places of

_____

[15]    The public interest factor is one of four requirements for injunctive relief in the Eleventh Circuit. *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1247 (11th Cir. 2016).

[16]    Although the detainees here are civil, ICE officials would, and should, consider a detainee's criminal history when assessing him or her for release, as it could easily impact the danger-to-the-community factor used when evaluating appropriateness of release in a given case.

incarceration, proximity to infected inmates, availability of a home landing spot, likelihood of transmitting the virus to someone at home detention, likelihood of violation or recidivism, and danger to the community." *Id.* at \*15.

2.      Although commonality does not require perfect uniformity, it "does require more uniformity that these Plaintiffs would have on the only matter 'apt to drive the resolution of this litigation' (*Wal-Mart*, 564 U.S. at 350) -- namely, which class members should actually be given a furlough?" *Id.*

3.      "Assessment of the safety risk must be based on an individualized analysis." *Id.*

4.      "[T]here is no way to decide which inmates should stay, and which inmates should go, without diving into an inmate-specific inquiry." *Id.*

5.      The "permutations here are endless, as rarely, if ever, will any two plaintiffs be alike on the factors that matter at the point of decision." *Id.*

6.      The differences among the factors for all inmates (or detainees, to use the term from the instant case) "are so vast and fundamental that class treatment . . . is completely unworkable." *Id.*

Thus, as outlined by the *Money* Court, the claims for release are inappropriate for class treatment because they do not meet the commonality element.[17]

_____

[17]     In a supplemental memorandum of law [ECF No. 103], Plaintiffs attempt to distinguish *Money* by emphasizing that Plaintiffs' sole claim for relief there was release from confinement (while the claims here include requests for relief to protect them from

3.   Typicality

The typicality requirement centers on the relationship between the proposed class representatives and the other members of the class. *Ibrahim v. Acosta*, 326 F.R.D. 696, 700 (S.D. Fla. 2018) (citing *Vega*, 564 F.3d at 1275). This analysis turns on "whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named class plaintiffs, and whether other class members have been injured by the same course of conduct." *In re checking Account Overdraft Litig.*, 286 F.R.D. 645, 653 (S.D. Fla. 2012). "A sufficient nexus is established if the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory." *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 686 (S.D. Fla. 2004) (internal citation omitted).

Commonality and typicality tend to overlap, as each looks to the nature of the claims presented in the case, and whether the class members and the named plaintiffs are similarly situated as to those claims. *See Dukes*, 564 U.S. at 349, n.5

Here, the proposed class members have suffered the same injury because they are subject to the same confinement under the same allegedly unconstitutional conditions caused by the same purported deliberate indifference by the same entity (i.e., ICE) which

---

the risk of COVID-19 infection. They note that the TRO-imposed measures benefit every person at all three facilities. The Undersigned appreciates this important distinction. And that is why I'm recommending that a class be certified for the non-release claims, e.g., for claims designed to require health-focused measures at the facilities).

is exposing them to the same risk of developing COVID-19. [*See* ECF No. 76, pp. 6-10]; *see also Armstrong v. Davis*, 275 F.3d 849, 869 (9th Cir. 2001) (finding typicality requirement is satisfied when "the cause of the injury is the same—here, the Board's discriminatory policy and practice"). All class members are forced to live in close quarters with others in civil detention -- when they sleep, eat, shower, and use the toilet. Furthermore, all class members are exposed to a similar lack of hygiene and health products and an alleged lack of screening, personal protective equipment and medical oversight.

Therefore, to the extent that the named representatives and putative class members are seeking relief other than release, then they have met the typicality requirement. But to the extent that they all seek release, then the typicality requirement, which is similar to the commonality requirement, is not met for the same reasons outlined in *Money.* 2020 WL 1820660, at *14.

### 4. Adequacy

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Adequacy depends on the resolution of two questions: "(1) whether plaintiffs' counsel are qualified, experienced, and generally able to conduct the proposed litigation and . . . (2) whether plaintiffs have interests antagonistic to those of the rest of the class." *See Cheney*, 213 F.R.D. at 496 (quoting *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 726 (11th Cir. 1987)).

The Undersigned rejects ICE's argument that typicality is not met because the claims may vary depending on which of the three detention facilities are at issue.

ICE also argues that adequacy is not met because *future* putative class members may confront different conditions, which "may vary over time." [ECF No. 92, p. 9]. But this concern is easily addressed by limiting the class to detainees currently housed at the three facilities and excluding those who will be housed there in the future. *Savino v. Souza*, No. 20-10617, 2020 WL 1703844, at *8 (D. Mass. Apr. 8, 2020) (excluding future ICE detainees from class because "the situation is rapidly evolving and future detainees may well be subject to different confinement conditions than those now obtaining," which means that the named representatives might not be able to "fairly and adequately protect the interests of those future detainees").

ICE has not challenged the adequacy of Plaintiffs' counsel, and the Undersigned has little difficulty concluding that they are experienced and will fairly and adequately represent the interests of the class.[18]

Plaintiffs have met the adequacy requirement, but the class for the non-release claims will not include future detainees and it will not include those detainees who have already been transferred. Judge Cooke has already entered an Order authorizing ICE to

---

[18]     The proposed class counsel are King & Spalding LLP, the Immigration Clinic at the University of Miami School of Law, the Rapid Defense Network (a New York State nonprofit legal services organization), Prada Urizar, LLC, the Southern Poverty Law Center, Americans for Immigrant Justice, and the Legal Aid Service of Broward County.

transfer detainees at the three South Florida facilities to other immigration detention facilities. This was done in order to provide a method to quickly reduce the census populations. In addition, the option of using a transfer to reduce the number of detainees is one which some prisoners actually **request** in the COVID-19 lawsuits. *See e.g., Mays v. Dart*, No. C 2134, 2020 WL 1987007, at *1 (N.D. Ill. Apr. 27, 2020).

ii. <u>Analysis of the Rule 23(b) Factor</u>

Plaintiffs say they are proceeding under Rule 23(b), which authorizes a class action if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

When assessing a Rule 23(b) theory, "the critical inquiry is whether the class members have suffered a common injury that may properly be addressed by class-wide injunctive or equitable relief." *Ibrahim*, 326 F.R.D. at 701 (citing *Holmes v. Continental Can Co.*, 706 F.2d 1144, 1155 (11th Cir. 1983)); *see also Dukes*, 564 U.S. at 360 (internal citation omitted) ("The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.").

"The touchstone of a 23(b)(2) class is that the class claims must be cohesive." *Harris v. Union Pacific R.R. Co.*, 953 F.3d 1030, 1033 (8th Cir. 2020). Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member

of the class. *Dukes*, 564 U.S. at 360. More importantly, a Rule 23(b)(2) class action is appropriate "only when a single injunction or declaratory judgment would provide relief to each member of the class," not "when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant." *Id.*

Plaintiffs' argument in favor of Rule 23(b)(2) certification focuses on their challenges to conditions (as opposed to a demand for release from detention). For example, they say they all "are being denied the same opportunity to socially distance, the same soap and cleaning items, and the same personal protective equipment." [ECF No. 81, p. 15].

The Undersigned agrees that injunctive relief concerning these types of remedial measures can be provided on a class-wide basis. A decision to issue masks twice a week, for example, inures to the benefit of all detainees.

But Rule 23(b)(2) is "the sticking point for the **habeas corpus** plaintiffs' attempts to bring a representative action . . ." *Mays*, 2020 WL 1987007, at *18 (emphasis added). The Undersigned finds *Mays v. Dart* persuasive and will therefore provide a comprehensive review of its legal analysis.

Two Cook County Jail (in Chicago, Illinois) detainees filed a lawsuit against the county sheriff, who operates the jail, on behalf of themselves and a purported class of similarly situate persons. They alleged that the sheriff violated the constitutional rights of jail detainees by failing to provide them with reasonably safe living conditions in the

face of the current coronavirus pandemic. They asserted claims under 42 U.S.C. § 1983 and for writs of habeas corpus under 28 U.S.C. § 2241.[19]

The *Mays v. Dart* Court evaluated the case on a claim-by-claim basis and therefore needed to address the propriety of a representative action for the habeas corpus claim. After noting that Rule 23's class action provisions do not apply to habeas corpus proceedings in the Seventh Circuit, the Court noted that representative actions, which "are analogous to class actions," can on rare occasion be brought in habeas corpus proceedings. *Id.* at 16. Moreover, the Court held that Rule 23 "is instructive in analyzing whether plaintiffs can bring a representative action." *Id.*

Significantly, the plaintiffs there also relied on, or analogized to, Rule 23(b)(2). But the Court held that the Plaintiffs did *not* meet its requirements. Specifically, the Court explained that "in actions where plaintiffs seek an injunction that would 'merely initiate a process through which highly individualized determinations of liability and remedy are made,' Rule 23(b)(2) is not satisfied." *Id.* at *19 (citing *Jamie S v. Milwaukee Public Schools,* 668 F.3d 481, 499 (7th Cir. 2012)).

The Court noted the reality that issuing writs of habeas corpus "would entail individualized proceedings," a result which made Rule 23(b)(2) unavailable. *Id.* at *19.

---

[19]   Unlike Plaintiffs in the instant case, who urge an injunction *preventing* ICE from transferring any detainees to other facilities, the plaintiffs in *Mays v. Dart* affirmatively *requested* a transfer from the Cook County Jail to other jail locations within the sheriff's control.

48

Moreover, it noted that the Court would "need to consider the circumstances of the detained persons and any threat they pose to public safety, which plainly would vary from one person to another." *Id.* at *20.[20] This, the Court explained, "is a process that would render the claim unsuitable for certification under Rule 23(b)(2) or its analogy for representative actions." *Id.*

The same scenario applies here (as to the habeas corpus claims for release). Because release orders must be made individually, there cannot be a class-wide injunction for all detainees (i.e., there would not be one injunction requiring a mass release of all 1,214 detainees). Thus, Rule 23(b)(2) is inapplicable.

## V.    Conclusion

The Undersigned **respectfully recommends** that Judge Cooke **grant** the class certification motion for the claims concerning the conditions of confinement and for declaratory relief but **deny** it for the habeas corpus claims for release. Moreover, the class for the habeas corpus claims for release would not include those challenging their recent

---

[20]    The Court noted that the Prison Litigation Reform Act of 1995 ("PLRA") mandates that a court "give substantial weight to any adverse impact on public safety" before issuing preliminary injunctive or prospective relief" that would apply to the habeas corpus claim. *Id.* at *19. Neither side has argued that the PLRA applies here, and Plaintiffs' counsel took the position in a recent hearing that it did *not* apply. Nevertheless, Plaintiffs are demanding release or release on conditions, and they have not suggested that a danger-to-the-community analysis is somehow unavailable or improper in an assessment of eligibility for release. These assessments would have to be made on an individualized basis, which is contrary to the class-wide requirement of Rule 23(b)(2) relief.

transfers out of the three facilities (because those decisions are made on an individualized basis) or those who will be transferred into the facilities in the future.

But the detainees who have been transferred would still be in the class for the non-release claims challenging the conditions, as this Court does not lose jurisdiction over the claims of a detainee who was transferred.

Plaintiffs allege in their new emergency motion (which has not been referred to me) that ICE is playing a shell game. Specifically, they allege that ICE's transfers are a "naked (and legally erroneous) attempt to shirk this Court's oversight" and that the hygiene conditions associated with the transfers are horrific. [ECF No. 106, p. 3]. But ICE has not yet had the chance to respond to these allegations, so the Undersigned cannot conclude or even speculate about whether ICE is legitimately using transfers to minimize the census for appropriate, health-focused reasons, or whether it is doing what Plaintiffs accuse it of doing: "cross[ing] over from the deliberate indifference this Court previously found and mov[ing] into the realm of outright disregard for this Court's authority." *Id.*

Any detainee transferred *into* the three facilities would reap the benefit of injunctive or declaratory relief concerning conditions provided to the named Petitioners and other class members, regardless of whether they were in a certified class or sub-class. *See generally Dixon v. Ivey*, No. 2:20-cv-248-WHA, 2020 U.S. Dist. LEXIS 81183, at *4 (M.D. Ala. May 6, 2020) (recommending denial of inmate's motion for class certification in COVID-19-related lawsuit over allegedly unsafe and hazardous conditions and citing a

Tennessee federal case denying a class certification motion involving county jail inmates because "any declaratory relief granted . . . would likely inure to the benefit of other similarly-situated individuals," even if not technically in a class).

One final point:

The 58 named detainees and those in the prospective class are all in an unenviable position. Many of them are likely scared. In fact, *most* of them may be scared of the COVID-19 health risks they confront while being housed at the detention centers. To succeed on their legal claims, however, they must trudge through the legal headwinds created by *Swain*, a case admittedly based on different facts but one maintaining the deliberate indifference hurdle which prisoners and detainees still must clear to prove cruel and unusual punishment, even in the midst of a once-in-a-century pandemic which has killed more than 93,000 persons in the United States and more than 318,000 persons globally.

The current inability to achieve social distancing is, to be sure, a significant medical issue at the three facilities, but *Swain* held that this is likely not a scenario "evincing a reckless state of mind." 2020 WL 2161317, at *14. The Undersigned outlined the realities of detention centers and the difficulties inherent in operating them in the Report and Recommendations [ECF No. 63] issued on the TRO motion, and there is no need to repeat them here. For present purposes, it is sufficient to simply note that a post-*Swain* Plaintiff class will need to address and overcome these realities when attempting to obtain a

preliminary injunction or other relief requiring deliberate indifference. In addition, they will need to grapple with *Swain*'s perspective that officials operating jails have experience and expertise which a Court should respect before deciding to classify their conduct as deliberately indifferent.

At bottom, class certification on some claims is certainly a step forward for Plaintiffs. But it is only one step on a multi-step journey likely to be filled with precedent-based potholes and *Swain*-influenced legal road hazards. But "a journey of a thousand miles begins with a single step,"[21] and Plaintiffs have already taken a few substantial steps (e.g., a TRO, the extension of the TRO and this Report and Recommendations recommending class certification of some claims).

## VI.   <u>Objections</u>

The parties will have only **fourteen (14) calendar days** from the date of being served with a copy of this Report and Recommendations within which to file written objections, if any, with the District Judge. Each party may file a response to the other party's objection within **fourteen (14) calendar days** of the objection.[22] Failure to timely

---

[21]     Well-known ancient Chinese proverb, probably first written between the 4th and 6th Centuries. *Meaning of "A Journey of a Thousand Miles Begins with a Single Step,"* Literary Devices: Definition and Examples of Literary Terms, https://literarydevices.net/a-journey-of-a-thousand-miles-begins-with-a-single-step/ (last visited May 22, 2020).

[22]     The Undersigned is aware that Judge Cooke has scheduled [ECF No. 101 and May 19, 2020 Order] a Zoom hearing on the motion for a preliminary injunction for May 27, 2020. The motion for injunctive relief is designated as an emergency. But the Undersigned does not view the later-filed, relatively-recent class certification motion as an *emergency*,

file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1 (2016).

 **RESPECTFULLY RECOMMENDED** in Chambers, in Miami, Florida, on May 22, 2020.


Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE


**Copies furnished to:**
The Honorable Marcia G. Cooke
All counsel of record

---

and Plaintiffs (who asked for "expedited" treatment) have not designated it as one either. Therefore, the Undersigned is using the 14-day presumptive deadline established by Local Rule 4.