UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO: 20-21553-CIV-COOKE/GOODMAN

**PATRICK GAYLE, et al.,**

    Petitioners,

v.

**MICHAEL W. MEADE, et al.,**

    Respondents.

_____/

**RESPONDENTS' RESPONSE TO PETITIONERS' EMERGENCY
MOTION TO COMPEL COMPLIANCE WITH THE COURT'S APRIL 30, 2020 ORDER**

Respondents, by and through their undersigned counsel, file their Response to Petitioners' Emergency Motion to Compel Compliance with the Court's April 30, 2020 Order, and state:[1]

**I. RESPONDENTS HAVE COMPLIED WITH THE COURT'S APRIL 30, 2020 TEMPORARY RESTRAINING ORDER, AS CLARIFIED BY ITS MAY 2, 2020 ORDER ON MOTION FOR CLARIFICATION**

On April 30, 2020, the district court entered its Order Adopting in Part Magistrate Judge's Report and Recommendation. D.E. 76. The Order directed respondents, Immigration and Customs Enforcement, to complete various tasks, to include "providing adequate amounts of soap and water and cleaning materials to detainees at each of the three detention centers at issue. Further, within two (2) days of this Order, ICE shall provide masks to all detainees and shall replace those masks at least once per week." D.E. 76 at 11, item 6 (emphasis in original). ICE complied with this portion of the Order. D.E. 79.

The Court also ordered that, within three (3) days of its Order, ICE should submit a report

---

[1] Respondents respectfully apologize for filing the attached response beyond the Court's deadline of noon. Respondents encountered logistical issues and attempted in good faith to file the response before the Court's deadline.

to the Court informing the Court as to how it intended to accelerate its review of its "Alternatives to Detention" program (or other protocols resulting in detainee release) with the goal of reducing the population to 75% of capacity at each of the three detention centers within two weeks of the Order. D.E. 76 at 10, item 3.

The Court directed that, within seven (7) days of its Order, ICE should evaluate each of the 34 detainees named in the complaint, consistent with the ICE's Pandemic Response Requirement, and inform the Court who among them could be released promptly in light of COVID-19. The Court further directed that, "ICE must take into consideration the detainees' current health status, eligibility for bond, immigration status, immigration court history and orders, and prior criminal history." D.E. 76 at 10, item 2.

On Saturday, May 2, 2020, the Court issued its Order on Petitioners' Motion for Clarification. D.E. 78. The Court clarified its April 30, 2020 Order to include all fifty-eight (58) named petitioners in the case. Also, the Court clarified its April 30, 2020 Order

> to permit Immigration and Customs Enforcement ("ICE") to transfer detainees from the three facilities at issue. However, ICE may only transfer detainees after first evaluating each detainee and making a determination as to the detainees' eligibility for release pursuant to ICE's COVID-19 April 10, 2020 Pandemic Response Requirements.

D.E. 78.

The April 30, 2020 Order also imposed various reporting requirements, including a report to be filed by Friday, at 4:00 p.m., to show the number of detainees released; which facilities they were release from; and the nature of the detainee released (e.g. in a high-risk category because of age or a specific documented medical condition, etc.). D.E. 76 at 10-11, item 4.

Also, ICE was directed to file a twice-weekly (Monday and Thursday at 4:00 p.m.) report on the following: (a) how many detainees it is housing on the date of reporting; (b) at which of

the three centers the detainees are being housed; (c) which of the detainees are considered "mandatory detainees," and (d) which of the detainees have no prior criminal convictions and no pending criminal charges.  D.E. 76 at 11, item 5.

In its Order, the Court recognized "that complying with this Order poses several procedural and logistical hurdles for ICE," but also noted that "time is of the essence," and the Court "fully expects ICE to work with a sense of urgency to meet the deadlines set forth and refrain from requests for extension of time absent extenuating circumstances."  D.E. 76 at 11, item 9.

ICE has complied with the reporting requirements and did not seek a single extension of time.  Petitioners filed an expedited motion for class certification, and the Court directed a response be filed to petitioners' motion on Saturday, May 9, 2020, at 12:00 noon.   Respondents' opposition to the motion for class certification was timely filed.

## II.   ICE HAS PROPERLY EXERCISED ITS DISCRETIONARY AUTHORITY IN 8 U.S.C. § 1231(g)(1) TO TRANSFER DETAINEES TO OTHER LOCATIONS

Petitioners assail ICE for transferring detainees from Krome, BTC, and Glades, to other detention centers, claiming that such a practice is "not a good faith attempt to accomplish the goals set out in this Court's April 30, Order …."  D.E. 106 at 8.  Further, petitioners argue that ICE has failed to show that it performed the required evaluations of detained individuals before transferring them.  D.E. 106 at 8-10.

Long before there was a global coronavirus pandemic, Congress granted the Attorney General of the United States, in the Immigration and Nationality Act of 1952, broad authority to determine places of confinement for aliens in proceedings under the INA.  8 U.S.C. § 1252(c) provided, in pertinent part, that "the Attorney General is authorized and directed to arrange for appropriate places of detention for those aliens whom he shall take into custody and detain under

3

this section."   This section conferred broad authority on the Attorney General to determine appropriate places of detention for aliens.  Sasso v. Milhollan, 735 F.Supp. 1045 (S.D.Fla. 1990).

In 1996, Congress amended the INA extensively, and the successor to § 1252(c) is codified at 8 U.S.C. § 1232(g)(1), which provides that, "[t]he Attorney General shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal."  In Calla-Collado v. Atty. General, 663 F.3d 680 (3rd Cir. 2011), the Third Circuit observed that "as a part of DHS, ICE 'necessarily has the authority to determine the location of detention of an alien in deportation proceedings … and therefore, to transfer aliens from one detention center to another.'" Id. At 685, citing Gandarillas-Zambrana v. Bd. Of Immigration Appeals, 44 F.3d 1251, 1256 (4th Cir. 1995).

The clear direction provided by the Court in its April 30, 2020 Order was for ICE to reduce its detainee populations at Krome, BTC, and Glades.  In item 3, the Court directed ICE, within 3 days of the Order, to submit "a report [to] the Court informing the Court as to how it intends to accelerate its review of its "Alternative to Detention" program (or other protocols resulting in detainee release) with the goal of reducing the population to 75% of capacity at each of the three detention centers within two weeks of this Order."  D.E. 76 at 10.

ICE chose to reduce its detainee population by releasing some detainees, and transferring others, based upon its broad statutory authority in 8 U.S.C. § 1231(g)(1).   This was an appropriate exercise of authority by a prison facility administrator to manage the population of a detention center, to facilitate the distancing requirements presented by the COVID-19 pandemic.

Petitioners claimed initially that the crowded conditions at Krome, BTC, and Glades unreasonably exposed them to contracting the COVID-19 virus, and they sought release from detention.  Now that ICE has effected reductions of the detainee populations at the three facilities

4

through transfers of detainees, petitioners now assail the manner in which they have been transferred to other detention facilities, and the conditions at their new detention locations. D.E. 106 at 8-15.

The Court's May 2, 2020 order clarifying its earlier order expressly permits ICE to transfer detainees, but only after ICE first evaluated each detainee and made a determination as to the detainees' eligibility for release pursuant to ICE's COVID-19 April 10, 2020 Pandemic Response Requirements. D.E. 78. For detainee transfers occurring after the May 2, 2020 order, ICE has evaluated each detainee's eligibility for release under the Pandemic Response Requirements in conjunction with other relevant factors such as detainee' criminal history and eligibility for bond; the Court required the same method of review for the named Petitioners. D.E.76 at 10. If the evaluation resulted in a finding that release was not warranted, the detainee was transferred.

Petitioners contend that, "ICE has transferred many detainees from the three facilities to various far-flung detention centers but offered no evidence that it seriously evaluated each person to assess their suitability for release before transferring them. This is a direct violation of the Court's May 2 Order." D.E. 106 at 8-9. Nothing in the Court's May 2, 2020 order required ICE to obtain the concurrence or consent of petitioners' counsel prior to effecting a transfer. ICE exercised its broad authority to manage its detention facilities by transferring detainees to other locations to reduce the detainee population at the three facilities.

Moreover, ICE complied with the Court's May 2, 2020 order by not only evaluating each transfer's release under the Pandemic Response Requirements, but every detainee in the three facilities at issue. This is evidenced by ICE's reports in DE: 90-1, 100-1, and 115-1 in compliance with item 4 of the Court's order, which required ICE to evaluate each detainee for release and explain the nature of release, such as COVID-19 high risk category. Exhibit A, Declaration of

5

Acting Officer in Charge Liana Castano, ¶ 8; Exhibit B, Declaration of Assistant Field Director Juan Lopez Vega, ¶ 9. These reports were created after ICE reviewed its detainee population for release under the Pandemic Response Requirement and the other relevant factors such as criminal history and bond eligibility.

ICE also reviewed its detainee population, including detainees that were eventually transferred, according to the nationwide order in Fraihat v. ICE, 19-cv-01546 (C.D. Cal. Apr. 20, 2020). Exhibit A, Declaration of Acting Officer in Charge Liana Castano, ¶ 20. Exhibit B, Declaration of Assistant Field Director Juan Lopez Vega, ¶ 18. That case required nationwide review of detainees falling with one of two subclasses for release— including those who have been identified by ICE Health Service Corps as having a medical condition that makes them "at risk" for COVID-19, pursuant to the CDC guidelines and the factors enumerated in U.S. District Court for the Central District of California preliminary injunction order in Fraihat v. ICE, ---F. Supp. 3d ---, 2020 WL 1932570 (Apr. 20, 2020). Id.

Additionally, ICE performs custody determinations of all detainees with risk factors within five days of entering custody. Exhibit A, Declaration of Acting Officer in Charge Liana Castano, ¶ 7. Exhibit B, Declaration of Assistant Field Director Juan Lopez Vega, ¶ 18. Specifically, ICE receives a chronic care list generated by ICE Health Services Corps relating to all new intakes who have been identified as having a chronic care condition and input the COVID-19 risk factors into ICE records to ensure the appropriate risk factors are entered. Exhibit A, Declaration of Acting Officer in Charge Liana Castano, ¶ 7.

### III. ICE HAS COMPLIED WITH ITS TRANSFER POLICY

Petitioners complain that ICE conducts transfers in highly unsanitary conditions and imply that ICE willfully transfers sick detainees to other detention centers. D.E. 106 at 2, 7. However,

ICE has implemented policies that dictate the steps needed to determine a detainee's health suitability for transfer and the conditions for conducting such transfer.

Prior to any transfer, ICE reviews the detainee's medical history and obtains a medical clearance. Exhibit A, Declaration of Acting Officer in Charge Liana Castano, ¶ 24; Exhibit B, Declaration of Assistant Field Director Juan Lopez Vega, ¶ 26.

Additionally, as of May 5, 2020, a new Coronavirus Disease 2019 (COVID-19) checklist was created to mitigate the effects of COVID-19 when transferring, removing, or releasing an alien from custody. Exhibit A, Declaration of Acting Officer in Charge Liana Castano, ¶ 21; Exhibit B, Declaration of Assistant Field Director Juan Lopez Vega, ¶ 19. These guidelines are in addition to all other transfer, removal, and release requirements, per the detention standards. Id. The checklist requires completion by ICE staff prior to a detainee being booked out of the detention facility and is served on the detainee. Id. A completed copy of the checklist is maintained in the detainee's detention file. Id.

Detainees that are in isolation, are symptomatic, have pending test results or that are cohorted due to exposure to a person with confirmed or suspected COVID-19 are not transferred or transported unless medically necessary. Exhibit A, Declaration of Acting Officer in Charge Liana Castano, ¶ 22; Exhibit B, Declaration of Assistant Field Director Juan Lopez Vega, ¶ 20.

Recently, detainees that were transferred from Krome to BTC were reported to have tested positive for COVID-19. Exhibit A, Declaration of Acting Officer in Charge Liana Castano, ¶ 33; Exhibit B, Declaration of Assistant Field Director Juan Lopez Vega, ¶ 31. Those detainees were cleared medically prior to their transfer to the receiving facility, and COVID-19 checklists were also completed. Id. ICE has taken appropriate measures, in accordance with the CDC's interim guidance, by implementing procedures for isolation of new transfers for a period of 14-day

monitoring. Id. In light of the cohorting procedures in place for new transfers for a period of 14 days, ICE does not believe that the transfer has resulted in an increase in COVID-19 cases at BTC. Id. At this time, the 14 day period required for isolation is still in effect. Id.

Further, in compliance with the Performance Based National Detention Standard 7.4 and National Detention Standard 7.2, ICE detention and transportation staff provide each detainee with a mask prior to a land transfer and monitor detainees during the transportation process. Exhibit A, Declaration of Acting Officer in Charge Liana Castano, ¶ 26; Exhibit B, Declaration of Assistant Field Director Juan Lopez Vega, ¶ 24.

As to transfers that occur via airplane, ICE Air conducts temperature checks at the flight line prior to departure. Exhibit A, Declaration of Acting Officer in Charge Liana Castano, ¶ 27; Exhibit B, Declaration of Assistant Field Director Juan Lopez Vega, ¶ 25. Aliens arriving at the flight line without the requisite forms to include a medical transfer summary and COVID-19 checklist are denied boarding. Id.  In addition, any detainee transferred by air is required to wear a mask on the flight and while transferring to the receiving detention facility.  Id.

**IV.    ICE HAS GRIEVANCE PROCEDURES IN PLACE**

Petitioners allege a variety of ways that ICE is not complying with the Court's Temporary Restraining Order including insufficient soap, cleaning supplies, and inability to socially distance from other detainees.  D.E. 106 at 3.  They also allege that ICE is retaliating against detainees for not consenting to be transferred or complaining of the conditions of the transfer. Id. at 7, 12.

As explained in its reporting requirement, ICE has been providing hygiene products and replenishing as needed.  Exhibit A, Declaration of Acting Officer in Charge Liana Castano, ¶11; Exhibit B, Declaration of Assistant Field Director Juan Lopez Vega, ¶ 16.  ICE views the requests for additional soap and hygiene products as a matter requiring resolution as soon as possible, since

the request affects the health and safety of the detainee. Exhibit A, Declaration of Acting Officer in Charge Liana Castano, ¶19; Exhibit B, Declaration of Assistant Field Director Juan Lopez Vega, ¶ 16.

Detainees can file a grievance if the facility is not timely received a replenishment of hygiene products. Exhibit A, Declaration of Acting Officer in Charge Liana Castano, ¶ 13; Exhibit B, Declaration of Assistant Field Director Juan Lopez Vega, ¶ 12. Additionally, retaliation against an employee that filed a grievance is prohibited. Exhibit A, Declaration of Acting Officer in Charge Liana Castano, ¶ 16; Exhibit B, Declaration of Assistant Field Director Juan Lopez Vega, ¶15.

Each facility is required to have a written policy and procedure for detainee grievances. Detainees are informed of the grievance procedure upon admittance to a facility. Exhibit A, Declaration of Acting Officer in Charge Liana Castano, ¶ 12; Exhibit B, Declaration of Assistant Field Director Juan Lopez Vega, ¶14. Further, detainees are provided with the ERO National Detainee Handbook, which includes instructions on how to file complaints and grievances, how to appeal the decision, and how to report staff misconduct. Id. The handbook is available in English, Spanish, Creole. Id.

In addition to explaining the grievance procedure, the handbook provides information on other ways to submit a complaint or report staff misconduct to entities outside the facility, such as the DHS Office of the Inspector General, DHS Joint Intake and the ICE Detention Reporting and Information Line. Id. Page 48 states, "No harassment, punishment of disciplinary action will result simply for contacting the Inspector General. You have every right to present a complaint." Id.

Each facility is required to maintain records of detainee grievances. Exhibit A, Declaration of Acting Officer in Charge Liana Castano, ¶ 17; Exhibit B, Declaration of Assistant Field Director

Juan Lopez Vega, ¶15. A grievance log must be maintained and is subject to regular inspection by the Field Office Director and ICE headquarters staff. Id. Our logs reflect no allegations of retaliation based upon this case or any other. Id.

## V. THE COURT SHOULD DEFER TO THE JUDGMENT OF ICE IN ITS EFFORTS TO MANAGE ITS FACILITIES DURING THE COVID-19 PANDEMIC

The United States Supreme Court has observed that running a prison "is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." Turner v. Safley, 482 U.S. 78, 85 (1987). The high Court also noted that the formidable task of running a prison "falls to those other two branches," and "separation of powers concerns counsel a policy of judicial restraint" and "deference to the appropriate prison authorities." 482 U.S. at 85.

In the midst of the Coronavirus Global Pandemic, which has challenged the prison administration system in ways unforeseen, substantial deference should be given to ICE detention facility administrators as they cope with the issues of creating sufficient space within its facilities, sanitizing its facilities, providing health care to detainees, and ensuring the health and welfare of detainees and staff. These efforts require significant expenditures of time and attention to detail. In Swain v. Junior, -- F.3d --, 2020 WL 2161317 (May 5, 2020), the Court of Appeals granted a stay pending appeal to the Miami-Dade Corrections and Rehabilitation Department (MDCR), which was appealing a preliminary injunction entered by a district court. In its analysis of irreparable injury to MDCR, the Eleventh Circuit observed that, "[a]bsent a stay, the defendants will lose the discretion vested in them under state law to allocate scarce resources among different country operations necessary to fight the pandemic."

ICE is responsible for operating detention centers and managing conditions within those

10

facilities to ensure the safety and security of those locations. ICE did evaluate each detainee's eligibility for release, but it was not obligated to create a detailed analysis to support its decision not to release a particular detainee, nor was it obligated to provide an explanation to a detained individual as to why he or she was being transferred, as petitioners claim. D.E. 106 at 9 ("several detained individuals have been transferred to facilities in Texas and New Mexico without ICE providing any explanation for its individual decisions to transfer these people rather than releasing them.").

### VI. THIS COURT LACKS JURISDICTION TO REVIEW CONDITIONS OF CONFINEMENT AT THE LOCATIONS TO WHICH DETAINEES HAVE BEEN TRANSFERRED

Petitioners argue that the ICE's transfers of detained aliens do not divest the Court of jurisdiction. D.E. 106 at 17-18. This issue first arose in petitioners' motion for class certification, when the class definition included aliens who had been detained at some point at Krome, BTC, or Glades, but were no longer in detention at those locations. D.E. 81 at 7 n.2. Respondents argued that, insofar as petitioners' claims regarding unlawful conditions of confinement, a detainee no longer detained at any of those locations could not complain about such conditions. D.E.92 at 5. Respondents relied upon McKinnon v. Talladega Cty. Alabama, 745 F.2d 1360, 1363 (11th Cir. 1984)("[t]he general rule is that a prisoner's transfer or release from a jail moots his individual claim for declaratory and injunctive relief.")(citation omitted).

During the hearing on May 14, 2020 on petitioners' motion for class certification, the issue arose of whether a detainee no longer detained at Krome, BTC, or Glades, had standing to complain about allegedly unlawful conditions of confinement at those locations. Petitioners maintained that such a detainee had standing.

In City of Miami Gardens v. Wells Fargo & Co., 931 F.3d 1274 (11th Cir. 2019), the

Eleventh Circuit observed that, "to have a case or controversy, a litigant must establish that he has standing, which must exist 'throughout all stages of litigation.'" Id. At 1282, citing United States v. Amodeo, 916 F.3d 967, 971 (11th Cir. 2019). A detainee who was once housed at Krome, BTC, or Glades, but has been transferred to another detention facility, no longer has standing to complain of conditions at those facilities, even though standing may have existed at the inception of the lawsuit.

Petitioners complain that the conditions at the new detention centers are as bad, or worse than those at Krome, BTC, or Glades. If those transferred detainees believe the conditions of confinement at their current detention location violates their rights, then the appropriate course would be to file an action in that jurisdiction.

## CONCLUSION

Petitioners' Emergency Motion to Compel Compliance with the Court's April 30, 2020 Order should be denied because Respondents have complied with this Court's order.

DATED: May 25, 2020                             Respectfully submitted,

                                                ARIANA FAJARDO ORSHAN
                                                UNITED STATES ATTORNEY

                                        By:     /s/ Dexter A. Lee
                                                DEXTER A. LEE
                                                ASSISTANT U.S. ATTORNEY
                                                Florida Bar No. 0936693
                                                E-mail: dexter.lee@usdoj.gov
                                                99 N.E. 4th Street, Suite 300
                                                Miami, Florida 33132
                                                Telephone: (305) 961-9320


                                        By:     /s/ Natalie Diaz
                                                NATALIE DIAZ
                                                ASSISTANT U.S. ATTORNEY
                                                Florida Bar No. 85834
                                                E-mail: Natalie.Diaz@usdoj.gov

99 N.E. 4th Street, Suite 300
Miami, Florida 33132
Telephone: (305) 961-9306

Counsel for Respondents