IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

PATRICK GAYLE, et al.

Petitioners,

v.

MICHAEL W. MEADE,
Field Office Director, Miami Field Office, U.S. Immigration and Customs Enforcement et al.,

Respondents.

Case No. 20cv21553

## DECLARATION OF ACTING OFFICER IN CHARGE LIANA J. CASTANO

I, Liana J. Castano, Acting Officer in Charge (OIC), make the following statements under oath and subject to the penalty of perjury:

1. I am employed by U.S. Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), and currently serve as the Acting OIC of the Krome Service Processing Center (Krome). I am also an Assistant Field Office Director (AFOD) at Krome. I have held this position since September 2, 2018.

2. I provide this declaration based on my personal knowledge, belief, reasonable inquiry, and information obtained from various records, systems, databases, other DHS employees, employees of DHS contract facilities, and information portals maintained and relied upon by DHS in the regular course of business. This declaration responds to the court's order of May 21, 2020, relating to ICE's compliance with the court's temporary restraining order.

3. I am familiar with the court's orders requiring ICE to (1) evaluate the named Petitioners in this case and inform the court who could be released; (2) consider health status, bond eligibility, immigration status, immigration court history and prior criminal history when making the evaluations; and (3) submit a report about how it intends to accelerate its review of detainee release protocols "with the goal of reducing the population to 75% of capacity at each of the three detention centers within two weeks" of the TRO; and (4) permitting ICE to "transfer detainees from the three facilities at issue," but only after "first evaluating each detainee and making a determination" of the detainee's release eligibility under the PRR.

4. To ensure compliance with Item 2 of the court's order requiring a custody review of each of the named Petitioner's in this litigation, and as an organizational tool and for purposes of this case, ICE created a spreadsheet containing each of the named 58 Petitioners in this case, which included their names, dates of births, date of entry into each of the three detention centers named in this case, their health status, whether they were eligible for bond, their immigration status to include the removal charges, the status of their removal proceedings before the immigration court, prior criminal convictions, and any pending criminal charges.

5. The spreadsheet was populated with the information pertaining to each of the 58 Plaintiff's. ICE requested from the facilities' medical provider a list of detainees with chronic health conditions. ICE used that list to populate the "current health status" column. Each case was reviewed using information available from various DHS records, systems, and databases.

6. As of May 7, 2020, and as set forth in my declaration of May 7, 2020, ICE reviewed the custody status and other factors as requested by the court, for each of the named Petitioners, to determine who could be released. In addition to the factors listed by the court, ICE's decisions were also informed by the EPP, which incorporated by reference the CDC's Interim Guidance on Management of Coronavirus Disease (COVID-19) in Correctional and Detention Facilities; U.S. Immigration and Customs Enforcement, Updated ICE statement on COVID-19 (Mar. 18, 2020), https://www.ice.gov/news/releases/updated-ice-statement-covid-19 (Attachment A); ICE National Detention Standards 2019, Standard 4.3, Medical Care, https://www.ice.gov/doclib/detention-standards/2019/4_3.pdf (Attachment B); 2011 ICE Performance-Based National Detention Standards, Revised 2016, Standard 4.3, https://www.ice.gov/doclib/detention-standards/2011/4-3.pdf (Attachment C); 2008 ICE Performance-Based National Detention Standards, Standard 4-22, Medical Care, https://www.ice.gov/doclib/dro/detention-standards/pdf/medical_care.pdf (Attachment D); Centers of Disease Control and Prevention, Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf (Attachment E); Memorandum from Executive Associate Director Enrique Lucero, Enforcement and Removal Operations, Memorandum on Coronavirus 2019 (COVID-19) Action Plan, Revision 1 (Mar. 27. 2020) (Attachment F); Centers of Disease Control and Prevention, Public Health Recommendations for Community-Related Exposure, https://www.cdc.gov/coronavirus/2019-ncov/php/public-health-recommendations.html (last visited Apr. 9, 2020) (Attachment G); Centers for Disease Control and Prevention, Strategies to Optimize the Supply of PPE and Equipment, https://www.cdc.gov/coronavirus/2019-ncov/hcp/ppe-strategy/ (last visited Apr. 9, 2020) (Attachment H); Centers for Disease Control and Prevention, Cleaning and Disinfection for Community Facilities,

https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/cleaning-disinfection.html (last visited Apr. 9, 2020) (Attachment I); U.S. Environmental Protection Agency, List N: Disinfectants for Use Against SARS-CoV-2, https://www.epa.gov/pesticide-registration/list-n-disinfectants-use-against-sars-cov-2 (last visited Apr. 9, 2020) (Attachment J); and Assistant Director Peter Berg, Enforcement and Removal Operations, Updated Guidance: COVID-19 Detained Docket Review (Apr. 4, 2020) (Exhibit K).

7. ICE provided information related to custody reviews in conformance with the court's order, and in compliance with ICE's PRR, in declarations dated April 16, 2020, May 3, 2020, and May 6, 2020. In those prior declarations, ICE advised that it identifies within five days of coming to ICE custody all detainees with risk factors and considers them in making custody determinations. Specifically, ERO receives a chronic care list generated by ICE Health Services Corps relating to all new intakes who have been identified as having a chronic care condition. That list is forwarded to me. I review each case to ensure that all custody indicators have been entered into DHS records to ensure that the appropriate risk factor alerts are entered. The alerts reflect the detainee's COVID-19 risk factors.

8. Item 4 of the court's order required a report every Friday of (a) the number of detainees who have been released; (b) which facility they were released from; and (c) the nature of the detainee released (e.g., in a high-risk category because of age or a specific, documented medical condition, etc.). ICE has complied with this provision of the court's order, as set forth in its declarations of May 8, 2020, May 15, 2020 and May 22, 2020.

9. Item 5 of the court's order requested twice weekly reports from ICE relating to (a) how many detainees it is housing on the date of reporting (b) at which of the three centers the detainees are being housed; (c) which of the detainees are considered "mandatory detainees"; and (d) which of the detainees have no prior criminal convictions and no pending criminal charges. ICE provided this information to the court in its declarations of May 11, 2020, May 14, 2020, May 18, 2020, and May 21, 2020.

10. Item 6 of the court's order require that "ICE shall immediately comply with the CDC and ICE guidelines on providing adequate amounts of soap and water and cleaning materials to detainees at each of the three detention centers at issue. Further, within two (2) days of this Order, ICE shall provide masks to all detainees and shall replace those masks at least once per week. ICE maintains that it is in compliance with the court's order regarding provision of soap and water, cleaning materials and masks to detainees at Krome and Glades.

11. As noted in our declaration dated May 2, 2020, detainees at Krome and Glades are provided soap and water, as well as cleaning materials and masks to every detainee at the facility. ICE routinely replenishes requests for soap and hygiene products, as needed, upon request of the detainee. At Krome, hand sanitizing stations are also replenished on an as-needed basis. Masks are exchanged once per week at Krome and

Glades pursuant to the court's order. Masks are also exchanged upon request if excessively soiled or broken. I am responsible for ensuring the good order and security of the detention facility and for ensuring compliance with the detention standards and ICE procedures.

12. I am responsible for ensuring the good order and security of the detention facility and for ensuring compliance with the detention standards and ICE procedures.
Each facility is required to have a written policy and procedure for detainee grievances. Detainees are informed of the grievance procedure upon admittance to a facility. Further, detainees are provided with a handbook, the ERO National Detainee Handbook, which includes instructions on how to file complaints and grievances, how to appeal the decision, and how to report staff misconduct. The handbook is available in English, Spanish, Creole, Chinese, Hindi, Portuguese, Arabic and Russian. The handbook explains the difference between a request and a grievance. It explains how to make a request to staff verbally or in writing. It explains how to submit a grievance. In addition to explaining the grievance procedure, the handbook provides information on other ways to submit a complaint or report staff misconduct to entities outside the facility, such as the DHS Office of the Inspector General, DHS Joint Intake and the ICE Detention Reporting and Information Line. Page 48 states, "No harassment, punishment of disciplinary action will result simply for contacting the Inspector General. You have every right to present a complaint." Krome also provides a local facility supplement which is available in English, Spanish, and Creole.

13. PBNDS Standard 6.2 sets forth the grievance procedures at a detention facility, to include Krome. The Performance Based National Detention Standards 2011(rev. Dec. 2016) apply to ICE and ICE-contracted facilities. The Grievance System standard (Part 6.2) establishes a grievance procedure system for use within a facility. The standard provides for informal grievances, emergency grievances, formal written grievances and medical grievances. It includes the right to appeal a grievance to a higher level, and to be free from retaliation for filing any complaint. The Informal Grievance process affords the detainee a chance to quickly resolve a grievance before resorting to a written, formal procedure. The staff at the facility must strive to resolve a grievance at the lowest level possible, in an orderly and expeditious manner. The Emergency Grievance process provides written procedures to identify and address time-sensitive grievances that involve an immediate threat to health, safety or welfare. Such grievances may include urgent access to legal counsel and the law library. All staff must be trained to respond to emergency grievances in an appropriate and expeditious manner. The Formal Written Grievance process includes three levels of formal review. It may be filed at any time, even in lieu of an informal grievance. The detainee must be provided a written or oral response within five days of the grievance. The Medical Grievance process follows the formal written grievance process. The grievance is submitted directly to medical personnel at the facility and it may be sealed or marked "medically sensitive." Medical staff must act on the grievance within five working days of receipt and must provide the detainee with a written decision, including the rationale for the decision.

14. To the extent a detainee complains that he is not timely receiving replenishment of soap and other hygiene items, the detention standards set forth grievance procedures to ensure that a detainee's needs are met in a timely manner. These requests are considered emergency requests under the PBNDS, since they affect the health and safety of detainees in the detention facility.

15. The grievance system at Glades is governed by the National Detention Standards 2019, which apply to ICE's Intergovernmental Service Agreement facilities. NDS 6.2 explains the grievance system. The Grievance Process standard requires facilities to implement a grievance system to receive and process detainee grievances. Like Krome, Glades has procedures for informal or oral grievances, making every effort to resolve a grievance at the lowest level possible. A detainee is not required to make an informal or oral grievance in order to utilize the formal grievance process. The facility must ensure meaningful access to the grievance process, through the use of interpretation and translation services. Formal or written grievance can be made after an informal grievance or in lieu of one. Such grievances must be addressed within five business days. A detainee may obtain assistance in preparing the grievance. Medical grievances are be addressed by the medical department. The detention standard prohibits a person who is the subject of a grievance shall not be responsible for adjudicating it.

16. An emergency grievance procedure shall be implemented to address a grievance that involves an immediate threat to a detainee's health, safety, or welfare. The detainee may appeal the grievance decision and an appeal process must be implemented. The facility must also allow a detainee who is unsatisfied with the facility's response to the grievance to communicate directly with ICE/ERO.

17. All forms of retaliation against a detainee who files a grievance are prohibited. Each facility is required to maintain records of detainee grievances. A grievance log must be maintained and is subject to regular inspection by the Field Office Director and ICE headquarters staff. Our logs reflect no allegations of retaliation based upon this case or any other.

18. Detention staff receive yearly training regarding reporting allegations of misconduct and are counseled that retaliation will not be tolerated.

19. Item 7 of the court's order requires that ICE provide education and training about measures to reduce the health risks associated with COVID-19 to all staff members and detainees and to any new detainees or employees, without cost to the detainees. As set forth in Respondents' declaration of April 16, 2020 and May 15, 2020, education relating to cough etiquette, hand washing, and other mitigation efforts are accomplished through various means, to include prominent display of CDC posters in housing units as well as common areas of the detention facility as well as instruction through ICE Health Service Corps, conducted during medical rounds at the detention facility. In addition, and as set forth in ERO's declaration of May 15, 2020, both staff and detainees have received instructions relating to the proper use of masks and the importance of hand washing. To encourage social distancing, AGS trained their detention officers

during electronic shift briefings, using pass on books and has posted CDC educational posters in staff break rooms.  To encourage social distancing, Glades trains their staff via email communication including educational pamphlets and has posted CDC educational posters in staff break rooms.. At both Krome and Glades, medical staff is available to answer any questions regarding proper usage of PPE.

20. As of the date of the court's May 2, 2020 order, ERO had reviewed not only the Petitioners' custody and health conditions pursuant to its PRR, but was also required to review its cases pursuant to the court's nationwide order in Fraihat v. ICE, 19-cv-01546 (C.D. Cal. Apr. 20, 2020).  That case required nationwide review of detainees falling with one of two subclasses, who have been identified by ICE Health Service Corps as having a medical condition that makes them "at risk" for COVID-19, according to the CDC guidelines and the factors enumerated in U.S. District Court for the Central District of California preliminary injunction order in Fraihat v. ICE, ---F. Supp. 3d ---, 2020 WL 1932570 (Apr. 20, 2020), to determine if their detention remains appropriate.  Declaration of March 3, 2020.  Further, ICE  advised the court that it also identifies within five days of coming to ICE custody all detainees with risk factors and considers them in making custody determinations.

21. On May 5, 2020, ERO introduced a new Coronavirus Disease 2019 (COVID-19) checklist intended to provide ERO and contracted staff with steps to take prior to transferring, removing, or releasing an alien from ERO custody to further mitigate the spread of COVID-19. These guidelines are in addition to all other transfer, removal, and release requirements, per the detention standards. The checklist requires completion by an ERO officer or contracted staff prior to a detainee being booked out of the detention facility and is served on the detainee.  A completed copy of the checklist is maintained in the detainee's detention file.

22. Detainees that are in isolation, are symptomatic, have pending test results or that are cohorted due to exposure to a person with confirmed or suspected COVID-19 are <u>not</u> transferred or transported unless medically necessary or ordered released from custody.

23. The COVID-19 checklist requires verification of a detainee's current health status and exposure history prior to transfer.

24. ERO reviewed the custody status of each detainee prior to transfer and obtained a medical clearance for each detainee transferred in accordance with the detention standards and ERO's PRR.

25. Detainee transfers are based upon bed-space considerations and custody classification. ERO does not transfer detainees who have been identified as release candidates.

26. Transportation of detainees at Krome is governed by Performance Based National Detention Standard 7.4 and National Detention Standard 7.2 at Glades.  With respect to transportation by land from one facility to another, detention and transportation staff

provide each detainee with a mask prior to transfer, and monitor detainees during the transportation process. Staff monitors detainees during transport and encourages proper usage of masks.

27. With respect to transfers or removals by air, the COVID-19 checklist is in addition to and does not take the place of the medical transfer summary advising the alien is medically cleared for travel and utilized for ICE Air charters. In addition to required temperature screening prior to leaving the facility, ICE Air conducts temperature checks at the flight line prior to departure. Aliens arriving at the flight line without the requisite forms to include a medical transfer summary and COVID-19 checklist are denied boarding. In addition, any detainee transferred by air is required to wear a mask on the flight and while transferring to the receiving detention facility. An alien without a mask will be denied boarding by ICE Air operations.

28. Prior to any transfer, ICE Health Service Corps at Krome, or the medical staff at Glades, must review the detainee's medical history and medically-clear the detainee in advance of a transfer to another detention facility. The medical staff, whether ICE Health Service Corps, or the contract medical staff at Glades, provides the medical clearance form in advance of the detainee's transfer for his detention file. Medical summaries are then provided to the receiving detention facility.

29. I am aware of allegations in the Petitioners' motion to compel that transfers have been ordered as either retaliation for the filing of this lawsuit or to otherwise circumvent the court's jurisdiction in this case. The allegations are untrue.

30. On May 24, 2020, I reviewed the detention location of the 58 Plaintiffs. I found that of the initial 34 Plaintiffs, 7 have been released from ICE custody. The remaining 27 are currently detained at the detention location where they were housed when this lawsuit was filed, and they remain under the court's jurisdiction.

31. I found that of the additional 24 Plaintiffs who joined the lawsuit, 6 have been released from ICE custody and 15 are currently detained at the detention location where they were housed when this lawsuit was filed, and they remain under the court's jurisdiction. ICE has transferred 3 of these Plaintiffs.

    a. On May 2, 2020, ICE transferred Plaintiff Lenor to a local hospital for mental health evaluation and treatment. Plaintiff Lenor was not transferred as retaliation for filing this lawsuit or to circumvent the court's jurisdiction. Plaintiff Lenor remains under the court's jurisdiction.
    b. On May 18, 2020 ICE transferred Plaintiff Perez Valladares from BTC to Krome due to security reasons. Plaintiff Perez-Valladares was found to have been part of a small group of detainees attempting to organize and incite a facility disturbance. Plaintiff Perez Valladares was not transferred as retaliation for filing this lawsuit or to circumvent the court's jurisdiction. Plaintiff Perez-Valladares remains under the court's jurisdiction.

 c. On May 21, 2020, Plaintiff Lucien was transferred to the Alexandria Staging Facility in preparation for his upcoming removal flight. This type of transfer is part of the standard operating procedure for removal flights to Haiti. Plaintiff Lucien was not transferred as retaliation for filing this lawsuit or to circumvent the court's jurisdiction. Plaintiff Lucien was transferred in order to enforce the removal order issued by an immigration judge.

32. Additionally, I am aware of allegations that ICE is not compliant with the CDC's guidance relating to social distancing. ERO continues to encourage social distancing between detainees at detention facilities by encouraging detainees to sleep head to toe, staggering of recreation and meals, and suspension of social visitation. Notably, the Interim Guidance promulgated by the CDC for detention centers notes that "[t]he guidance may need to be adapted based on individual facilities' physical space, staffing, population, operations, and other resources and conditions." For example, while Krome has made an accommodation for detainee use of hand sanitizer, not all detention facilities have determined that the benefit of using hand sanitizer is outweighed by the security risk inherent in its use. Detention officials may determine that, based upon security concerns, that use of soap and water for hand hygiene is more appropriate based upon the detainees' risk classification at the detention facility. Similarly, rearranging of furniture to allow for six feet of social distancing may not be feasible at detention facilities, where much of the furniture to include bunkbeds and benches is bolted to the floor. Such is the case of the bunkbeds and benches at Krome and Glades.

33. I am aware that detainees transferred from Krome to BTC were reported to have tested positive for COVID-19. Those detainees were cleared medically prior to their transfer to the receiving facility, and COVID-19 checklists were also completed. Upon their arrival to BTC, they were placed on cohort as is the standard practice for new intakes at BTC. ICE believes that it has taken appropriate measures to mitigate the risk of spread of COVID-19 from detention facilities and believes that the procedures for isolation of new transfers for a period of 14-day monitoring, in accordance with the CDC's interim guidance, appropriately mitigates the risk of spread of disease. In light of the cohorting procedures in place for new transfers for a period of 14 days, the detainees transferred from Krome to BTC did not come into contact or interact with any detainee already at BTC. I do not believe that the transfer has resulted in an increase in COVID-19 cases at the receiving detention facility. At this time, the 14 day period required for isolation is still in effect.

DATED: May 25, 2020

               _____
               Liana J. Castano
               Assistant Field Office Director
               Enforcement and Removal Operations
               U.S. Immigration and Customs Enforcement