UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 20-21553-Civ-COOKE/GOODMAN

**PATRICK GAYLE**, *et al.*,

    Petitioners-Plaintiffs, on behalf of
    themselves and those similarly situated,

v.

**MICHAEL W. MEADE**, *et al.*,

    Respondents-Defendants.
_____/

**REPLY IN SUPPORT OF PETITIONERS' EMERGENCY
MOTION TO COMPEL COMPLIANCE WITH THE COURT'S
<u>APRIL 30, 2020 TEMPORARY RESTRAINING ORDER</u>**

<u>ARGUMENT</u>

**I.    ICE DOES NOT DISPUTE PETITIONERS' MATERIAL FACTUAL SUBMISSIONS.**

ICE's Response[1] to Petitioners' Emergency Motion to Compel Compliance with the Court's April 30, 2020 Order [ECF 116] accepts the factual premise of Petitioners' Motion. And for good reason: Petitioners presented sworn declarations [ECF 106-1] showing that ICE is not making a good-faith effort to uphold the spirit or the letter of this Court's April 30 and May 2 Orders [ECF 76 & ECF 78, respectively]. ICE makes no attempt to dispute these sworn statements.

In fact, ICE has confirmed *sub silentio* its erroneous position that if it deems someone subject to "mandatory detention," it will do no more to evaluate whether to release them even though "mandatory" detainees are eligible for release. [ECF 106 at 16.] Instead, it is now clear that ICE's nearly singular focus following this Court's Orders is on transferring people away from Krome, BTC, and Glades. These transfers form the backbone of ICE's assertion that it has reduced the populations at these facilities, *see* [ECF 116 at 3], and its mistaken

---

[1]     For simplicity, Petitioners refer to Respondents collectively as "ICE."

1

argument that, in doing so, it has successfully moved these vulnerable people beyond this Court's jurisdiction, [*see id.* at 11-12].

Indeed, the unrebutted declarations Petitioners filed with their Emergency Motion show that conditions both at these facilities and for the people ICE has chosen to transfer continue to violate not only CDC Guidelines, but also this Court's April 30 and May 2 Orders. ICE does not dispute that, despite its mass transfers, social distancing is still not possible at Krome, Glades, and BTC. [ECF 106 at 4-6.] Soap, hand sanitizer, and cleaning materials are tightly rationed and requests to replenish the inadequate supplies are often dismissed with directions to wait for the next day those materials are dispensed. [*See id.*] Soiled and broken masks are not replaced, and education about the need for proper precautions is scant. [*Id.*] As a result, the basic protocols needed to quell the spread of COVID-19 are not followed. [*See id.*]

Moreover, the unrebutted evidence shows that, rather than ameliorating the situation, ICE's hasty transfers away from these facilities serve to subject the people transferred to additional risks of contracting COVID-19. The sworn declarations Petitioners submitted show that ICE's transfer protocols do not adequately screen for detainees already infected with COVID-19. The procedures are so lax or ineffective that 16 people out of 33 who cleared ICE transfer protocols tested positive shortly after being transferred. [ECF 106 at 7.][2] The unrebutted evidence shows that ICE personnel have not only failed to require masks, gloves, and social distancing during transfers, but that ICE personnel have actually **blocked cameras** to shield their noncompliance from oversight. [*Id.* at 11-12.] ICE does not dispute that it placed about 20 people being transferred in the "Hielera" ("the fridge") less than an arm's length from one another for hours while awaiting a trip to the airport. [*Id.* at 11.] It does not assert that social distancing is occurring during the cross-country flights—even though putative Class Members were put on close-quarters flights. ICE does not even dispute that it sent three Named Petitioners from BTC to Lumpkin, Georgia—only to return to BTC shortly

---

[2]   It is unclear how ICE's declarants can swear under oath that they "do not believe that this transfer has resulted in an increase in COVID-19 cases" at BTC when it objectively increased the number of such cases at BTC by 16. [*See* ECF 116-1 ¶ 33; ECF 116-2 ¶ 31.] They also do not say that they evaluated whether any of these people became affected **as a result of** ICE's decision to transfer them.

after they arrived.  [*Id.* at 12.]³  Nor does ICE attempt to reconcile this episode with its assertion that it has "properly exercised its discretionary authority in 8 U.S.C. § 1231(g)(1) to transfer detainees to other locations."  [*See* ECF 116 at 3 (boldface and all caps omitted).]

ICE likewise does not dispute the specific, sworn accounts showing ICE employees retaliating or threatening to retaliate against putative Class Members for their participation in or assistance with this lawsuit.  [ECF 106 at 11-12.]  ICE's only response on this point is to assert that it has not found any grievances filed through its formal grievance process (ignoring why people threatened with retaliation might not feel comfortable using it).  But the record contains sworn statements identifying specific acts of retaliation, and ICE cannot ignore them simply because they were not submitted through its internal grievance process.  ICE has provided no evidence that it has attempted to drill down on the specific instances.  Nor does it present any declarations to dispute the accounts in the declarations Petitioners filed.

Thus, while ICE seeks to cling to its assertions that it has proper policies in place, the only material evidence showing what is happening is the unrebutted evidence Petitioners submitted.  And as explained below, the unrebutted evidence confirms that ICE is not complying with its obligations—and that it will not do so unless the Court forces it to do so.

## II. THE UNDISPUTED FACTS SHOW THAT ICE HAS VIOLATED THIS COURT'S ORDERS.

It is difficult to see how ICE could think these egregious, undisputed facts show it is complying with its obligations under this Court's Orders, the CDC Guidelines, or the Fifth and Eighth Amendments.  Indeed, ICE argues only that it has policies—but it does not argue it has consistently followed those policies.  And ICE cannot escape the unrebutted evidence of the conditions the putative Class Members face.

This Court's April 30 Order found it "abundantly clear that ICE is required to comply with CDC's guidelines" but that "ICE has flouted its own guidelines by, *inter alia*, failing to

---

³   Petitioners have now learned that a 34-year old man in immigration detention at the Lumpkin facility has died from COVID-19-related complications.  *See* Hamed Aleaziz, *An Immigrant Man In ICE Custody Died After Contracting The Coronavirus*, Buzz Feed News (updated May 25, 2020), *available at* https://www.buzzfeednews.com/article/hamedaleaziz/immigrant-ice-coronavirus-death?fbclid=IwAR2NlPapdLeKDh8ks9wGWx1CEQaTVAoqksxNvfkdhT6UimzTcKiTV5UdWCI.

3

ensure that each detainee practices social distancing." [ECF 76 at 8]. The Court ruled that "ICE's purported 'substantial compliance' does not pass muster under the *Accardi* doctrine." [*Id.*] It therefore ordered that "ICE shall immediately comply with the CDC and ICE guidelines on providing adequate amounts of soap and water and cleaning materials to detainees at each of the three detention centers at issue." [*Id.* at 11 (¶ 6).] It further mandated the provision of masks at least weekly, and that it "provide education and training about measures to reduce the health risks associated with COVID-19 to all staff members and detainees and to any new detainees or employees." [*Id.* (¶¶ 6-7).]

The undisputed evidence shows that ICE has not complied with these provisions. In this respect, Petitioners agree with ICE that "requests for additional soap and hygiene products" are "a matter requiring resolution as soon as possible, since the request affects the health and safety of the detainee." [*See* ECF 116 at 8-9.] But ICE seems to believe that this is accomplished because its official policy, **on paper**, is that its personnel should provide sufficient amounts of soap, cleaning materials, and masks. [*See id.*] But the evidence before the Court shows that this is **not actually happening**. [ECF 106 4-6 (collecting declaration testimony).] Indeed, as the Court recognized, the gravamen on Petitioners' *Accardi* claim is that ICE actually has written policies to address the risk of COVID-19 outbreaks, but that ICE is not following through in implementing them (and it is certainly not doing so with the diligence required by this historic moment calls). [ECF 76 at 8.] By again pointing to its black-letter policies while leaving undisputed sworn declarations showing that it is not consistently **implementing** those policies, ICE has only confirmed its failure to **actually and fully** comply with this Court's Orders and the CDC Guidelines.

ICE has similarly failed with its obligations under the May 2 Orders to evaluate each putative Class Member for release before transferring him or her. [*See* ECF 76 at 10 (¶ 2); ECF 78 at 1.] Although ICE **claims** to have done this, it bristles at the suggestion that it should have documented its decision making in any way. [*See* ECF 116 at 5.] This makes no sense. Indeed if, in fact, ICE is neither tracking nor documenting the specific pre-transfer release decisions the Court mandated on May 2, then it cannot certify to the Court in good faith that it has scrupulously complied with this obligation as to each of the more than 100 people it has transferred. That sort of undocumented delegation creates the perfect conditions for arbitrary and capricious decisions.

4

Moreover, ICE's apparent refusal to even document (let alone provide the documentation) that it is performing this required evaluation leaves Petitioners (and ultimately the Court) unable to evaluate ICE's bare claims that it has complied with its obligations under the May 2 Order.[4]  By allowing ICE to conduct transfers, the Court invested a substantial amount of trust in ICE to evaluate, in good faith, whether to release or transfer each person.  ICE's reading of this Court's forbearance as carte blanche—right after the Court found that "ICE has flouted its own guidelines" [ECF 76 at 5]—is not credible.  The Court should find that ICE violated this provision and require ICE to immediately remedy it by providing the basis for its decision not to release each person it transferred, or if it cannot, to release those individuals.[5]

ICE's failure to document its decisions on whether to release or transfer people is all the more troubling because ICE appears to be taking the legally untenable position that its unilateral determination that someone is subject to "mandatory detention" justifies ICE's decision to keep that person in confinement—without any further evaluation.  [*See* ECF 106 at 16-17 & n.5.]  ICE ignores this point entirely, as well as the robust authority Petitioners submitted showing ICE's position is legally unfounded.  [*See id.*]  This silence only confirms that, in fact, ICE's evaluation of whether to release a putative Class Member stops when ICE

---

[4]  ICE misses the mark in asserting that, "[n]othing in the Court's May 2, 2020 order required ICE to obtain the concurrence or consent of petitioners' counsel prior to effecting a transfer."  [ECF 116 at 5.]  Petitioners do not claim that the May 2 Order gives them a veto over ICE's transfer decisions; they simply demand that ICE show its work so that Petitioners can evaluate and (if necessary) challenge ICE's methodology.

[5]  On May 25, ICE produced a spreadsheet, which purports to document its decisions not to release the Named Petitioners.  [*See* ECF 99 (ordering ICE to produce that spreadsheet unless it objected by May 18).]  While the spreadsheet contains some information about the Named Petitioners, it does not provide any field for the basis for the decision not to release a given Petitioner or the identity of the officer responsible for that decision.  Moreover, although the spreadsheet is limited to information about the Named Petitioners and the production was directly to Petitioners' counsel, ICE "redacted information including alien numbers, medical histories, and relating to asylum or credible fear."  In addition, the spreadsheet was rendered in a PDF form and some of the fields were not fully legible.  Thus, Petitioners' counsel are unable to fully grasp the reasons that the vast majority of Named Petitioners have not been released.  Petitioners' counsel have asked ICE to produce the unredacted version but, as of the time of this filing, ICE has not responded to this request.

5

determines that the putative Class Member is subject to mandatory detention—and that ICE has no legal justification for this conclusion.[6]

In short, with this Court's April 30 Temporary Restraining Order (as clarified and extended) is set to expire, ICE has failed to fulfil its most basic obligations under that Order.

## III. ICE'S STANDING POSITION IS MERITLESS.

Finally, the Court should reject ICE's position that its unilateral decision to transfer a putative Class Member away from the facilities at issue here somehow ousts this Court's jurisdiction. As Petitioners explained, bedrock jurisprudence provides that transferring a habeas petitioner outside of the jurisdiction does not divest the original court of jurisdiction so long as (a) the petitioner was detained within the district court's territory at the time the lawsuit was filed and (b) the detainee remains within the custody of a person over whom the district court retains authority. [*See* ECF 106 at 18 & n.6 (citing *Ahrnes v. Clark*, 335 U.S. 188, 193 (1948), and *Ex parte Mitsuye Endo*, 323 U.S. 283, 306 (1944))]. And this rule applies even if the transfer "is not colored by any purpose to effectuate a removal in evasion of the habeas corpus proceedings." *Ex parte Mitsuye Endo*, 323 U.S. at 304-05. Moreover, under the voluntary cessation doctrine, if ICE wants to take the position that its transfer of a putative Class Member moots that person's claim, the **ICE** bears a heavy burden of proving that. [*See* ECF 106 at 18 (citing *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982), and *LaMarca v. Turner*, 662 F. Supp. 647, 715 (S.D. Fla. 1987)].

ICE apparently has no response to this longstanding jurisprudence because it offers none. Instead, as it did in its class certification papers, it relies principally on *McKinnon v. Talladega County, Alabama*, 745 F.2d 1360, 1363 (11th Cir. 1984). [*See* ECF 116 at 11.] But as Petitioners have explained repeatedly, *McKinnon* does not apply here. [*See* ECF 94 at 5-6.] The habeas petitioner in *McKinnon* challenged the "overcrowding, inadequate internal security, poor lighting and ventilation, inadequate plumbing, unacceptable food, and

---

[6] This confusion is compounded by ICE's refusal to comply with the Court's requirement that it report, each Monday and Thursday, "**[w]hich** of the detainees are considered 'mandatory detainees'" and "**[w]hich** of the detainees have no prior criminal convictions and no pending criminal charges." [ECF 76 at 11 (¶¶ 5(c) & (d)) (emphasis added).] Despite this clear language, ICE has been simply reporting aggregate statistics, making it impossible to figure out which category any one putative Class Member falls into— a pattern ICE has continued right through its May 25 report. [*See* ECF 117-1.]

unsanitary conditions" at "a single jail." 745 F.2d at 1361-63. Thus, once he was transferred from that "single jail," his "prospective" claims for declaratory and injunctive relief concerning the conditions at that "single jail" became moot. *Id.* at 1362.

But here, the risk that ICE's deliberate indifference will expose the putative Class Members to COVID-19 does not stop at the gates of Krome, Glades, and BTC. Rather, as ICE transfers putative Class Members around the country in unhygienic conditions, the risk of COVID-19 infection (the injury that gives rise to standing) travels with them. And therefore, so does this Court's jurisdiction.

In this respect, ICE continues to misconstrue Petitioners' claims. Petitioners do not challenge the conditions at Krome, Glades, and BTC; they challenge ICE's persistent refusal to take the steps necessary to protect **them** from contracting COVID-19. The claims before the Court may be held together because each putative Class Members has been held at one of those three facilities by the same detaining authority, but it does not follow that, having properly invoked this Court's jurisdiction, a Petitioner somehow loses constitutional standing merely because ICE unilaterally decides to deposit him or her elsewhere.[7] Rather, because the Court properly acquired jurisdiction at the time of the filing, and because the transfer does not automatically alleviate the injury, the Court's jurisdiction continues. *See Ex parte Mitsuye Endo*, 323 U.S. at 304-05; *see also Lemon v. Green*, 514 F.3d 1312, 1315-16 (D.C. Cir. 2008) (government's transfer of disputed property did not moot the underlying controversy because a "case becomes moot when 'intervening events make it **impossible** to grant the prevailing party effective relief,'" but court had authority to unwind transaction if necessary (emphasis added)). This Court's jurisdiction is large enough to provide meaningful relief to the putative Class Members—even if ICE choses to transfer them away.

## CONCLUSION

Petitioners respectfully request the Court to (1) order ICE to comply immediately with the requirements in its April 30 and May 2 Orders; (2) order ICE to provide documentation

---

[7] Given the undisputed evidence that ICE has continued not following CDC Guidelines and endangering putative Class Members during and after transfer, its assertion that "standing . . . must exist throughout all stages of litigation" is especially curious. [*See* ECF 116 at 11-12.] The undisputed evidence certainly shows that the injuries continue through—and are even exacerbated by—the transfers.

7

of its evaluations for release before any transfer is executed; (3) and prohibit the transfer of any detained individual to a facility that does not comply with the requirements in the Court's April 30 Order. The Court should further admonish ICE that acts of retaliation against detained individuals for assisting with this lawsuit will not be tolerated and require ICE to ensure that all people acting under its authority are appropriately directed not to retaliate against the Named Petitioners or putative Class Members for consulting with counsel or assisting in this lawsuit.

Date: May 26, 2020

Respectfully Submitted,

*/s/ Scott M. Edson*
Scott M. Edson, Esq.
Florida Bar No. 17258

<div style="display: flex;">

Gregory P. Copeland*
Sarah T. Gillman*
**RAPID DEFENSE NETWORK**
11 Broadway, Suite 615
New York, NY 10004
Tel.: (212) 843-0910
Fax: (212) 257-7033
gregory@defensenetwork.org
sarah@defensenetwork.org
*\*Appearing Pro Hac Vice*

Rebecca Sharpless
Florida Bar No. 0131024
Romy Lerner
Florida Bar No. 116713
**UNIVERSITY OF MIAMI SCHOOL OF LAW - IMMIGRATION CLINIC**
1311 Miller Drive Suite, E-273
Coral Gables, Florida 33146
Tel: (305) 284-3576
Fax: (305) 284-6092
rsharpless@law.miami.edu

Scott M. Edson, Esq.
Florida Bar No. 17258
**KING & SPALDING LLP**
1700 Pennsylvania Avenue NW, STE 200
Washington, DC 20006-4707
Telephone: (202) 737-0500
Facsimile: (202) 626-3737
sedson@kslaw.com

Kathryn S. Lehman
Florida Bar No.: 95642
Chad A. Peterson
Florida Bar No.: 91585
**KING & SPALDING LLP**
1180 Peachtree Street, N.E.
Atlanta, GA 30309
Telephone: (404) 572-4600
Facsimile: (404) 572-5100
klehman@kslaw.com
cpeterson@kslaw.com

</div>

| | |
|---|---|
| Paul R. Chavez<br>FL Bar No. 1021395<br>Maia Fleischman<br>FL Bar No. 1010709<br>**SOUTHERN POVERTY LAW CENTER**<br>2 S. Biscayne Blvd., Ste. 3200<br>Miami, FL 33101<br>Tel: (305) 537-0577<br>paul.chavez@splcenter.org<br>maia.fleischman@splcenter.org | Mark Andrew Prada<br>Fla. Bar No. 91997<br>Anthony Richard Dominguez<br>Fla. Bar No. 1002234<br>**PRADA URIZAR, PLLC**<br>3191 Coral Way, Suite 500<br>Miami, FL 33145<br>Tel.:  (786) 703-2061<br>Fax:   (786) 708-9508<br>mprada@pradaurizar.com<br>adominguez@pradaurizar.com |
| Lisa Lehner<br>Florida Bar No. 382191<br>**AMERICANS FOR IMMIGRANT JUSTICE**<br>5355 NW 36 Street, Suite 2201<br>Miami, FL 33166<br>Tel: (305) 573-1106 Ext. 1020<br>Fax: (305) 576-6273<br>Llehner@aijustice.org | Andrea Montavon McKillip<br>Florida Bar No. 56401<br>**LEGAL AID SERVICE OF BROWARD COUNTY, INC.**<br>491 North State Road 7<br>Plantation, Florida 33317<br>Tel. (954) 736-2493<br>Fax (954) 736-2484<br>amontavon@legalaid.org |

*Counsel for Petitioners-Plaintiffs*

## CERTIFICATION OF EMERGENCY

Undersigned counsel certifies that this is an emergency motion pursuant to Local Rule 7.1(d)(1).

Petitioners, and the class they represent, are at imminent risk harm due to the continuing COVID-19 crisis and Respondents' grossly inadequate steps to protect them from contracting the virus.

After reviewing the facts and researching applicable legal principles, I certify that this motion in fact presents a true emergency (as opposed to a matter that may need only expedited treatment) and requires an immediate ruling because the Court would not be able to provide meaningful relief to a critical, non-routine issue after the expiration of seven days due to the forthcoming expiration of the April 30 Temporary Restraining Order [ECF 76] (even as extended by the Court on May 15 [ECF 101]. I understand that an unwarranted certification may lead to sanctions.[8]

/s/ Scott M. Edson
Scott M. Edson, Esq.
Florida Bar No. 17258
**KING & SPALDING LLP**
1700 Pennsylvania Avenue NW, STE 200
Washington, DC 20006-4707
Telephone:  (202) 737-0500
Facsimile:  (202) 626-3737
sedson@kslaw.com
*Attorney for Petitioners-Plaintiffs*

---

[8] Petitioners' counsel believed that the Local Rule 7.1(d)(1) certification contained in the underlying Emergency Motion for Temporary Restraining Order and Motion for Preliminary Injunction for Proposed Class [ECF 4] satisfied the requirements under that provision for seeking emergency treatment, and they appreciate that the Court is considering this Motion on an emergency basis. However, to avoid any confusion, Petitioners' counsel provides the requisite certification in this reply.

## CERTIFICATE OF SERVICE

    I hereby certify that on the 26th day of May, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

    */s/ Scott M. Edson*
Scott M. Edson, Esq.
Florida Bar No. 17258
**KING & SPALDING LLP**
1700 Pennsylvania Avenue NW, STE 200
Washington, DC 20006-4707
Telephone:  (202) 737-0500
Facsimile:  (202) 626-3737
sedson@kslaw.com

*Attorney for Petitioners-Plaintiffs*