# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## Case No. 20-21553-Civ-COOKE/GOODMAN

PATRICK GAYLE, *et al.*,

      Petitioners,

vs.

MICHAEL W. MEADE, *et al.*,

      Respondents.

_____/

## OMNIBUS ORDER

**THIS MATTER** is before the Court on Petitioners' Emergency Motion for Temporary Restraining Order and Motion for Preliminary Injunction for Proposed Class, ECF No. 4, Petitioners' Expedited Motion for Class Certification, ECF No. 81, and Petitioners' Motion to Compel Compliance with the Court's April 30, 2020, Temporary Restraining Order, ECF 106.

Petitioners are immigration detainees being held at three detention centers in South Florida. Petitioners assert that Respondents failure to protect them from infection with the coronavirus disease ("COVID-19") while detained violates their constitutional rights. Petitioners also assert that they are at imminent risk of contracting COVID-19 because their detention renders them unable to comply with the Centers for Disease Control and Prevention's ("CDC") guidelines. Accordingly, Petitioners request, *inter alia*, emergency injunctive relief in the form of release from government custody, protective health measures that help prevent transmission of COVID-19, and to enjoin the transfer of the detainees to any other detention facility.

1

In addition, Petitioners are filing on behalf of a putative class of approximately 1,400 individuals in civil immigration detention at three Florida detention centers pursuant to Federal Rules of Civil Procedure 23(a) and (b)(2).

After considering the Motions and evidence submitted by the parties, arguments presented at the hearings held May 27, 2020 and June 2, 2020, and all relevant law, the Court **GRANTS** *in part* **and DENIES** *in part* Petitioners' Application, ECF No. 4, as a preliminary injunction, **GRANTS** *in part* **and DENIES** *in part* Petitioners' Expedited Motion for Class Certification, ECF No. 81, and **GRANTS** Petitioners' Motion to Compel Compliance with the Court's April 30, 2020 Temporary Restraining Order, ECF 106.

## I.   BACKGROUND

On April 13, 2020, 34[1] civil immigration detainees (hereinafter "Petitioners") filed the instant action alleging that they are being held by the Miami Field Office of Immigration and Customs Enforcement (hereinafter "ICE") and housed at three detention centers—the Krome Detention Center in Miami ("Krome"), the Broward Transitional Center in Pompano Beach ("BTC"), and the Glades County Detention Center in Moore Haven ("Glades")[2].

Petitioners all claim to be at imminent risk of contracting COVID-19 as a result of their inability to abide by the CDC's Guidelines and state and local directives during their continued detention. Each Petitioner further asserts that they are uniquely vulnerable to COVID-19 due to a range of serious chronic ailments including, *inter alia*, cancer, human immunodeficiency virus, and various respiratory issues. ECF Nos. 7; 8.

---

[1] The named Petitioners are 58 individuals detained by the U.S. Immigration and Customs Enforcement ("ICE") on civil immigration charges. At the onset, 34 petitioners filed the instant action. Petitioners subsequently filed an Unopposed Motion, ECF No. 60, to add named petitioners. The Magistrate Judge granted the Motion, amending this action to include 24 additional petitioners. ECF No. 65.

[2] As previously discussed in the Court's Order dated April 30, 2020, (ECF No. 76 at 3, n.9), this Court has jurisdiction to review claims related to conditions of confinement at Glades. *See Masingene v. Martin*, 424 F. Supp. 3d 1298, 1303 (S.D. Fla. 2020) ("[A] district court acts within its respective jurisdiction. . .as long as the custodian can be reached by service of process.")(internal citations omitted).

### A. Procedural History

On April 13, 2020, Petitioners filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241, ECF No. 1, and an Emergency Motion for Temporary Restraining Order ("TRO") and Motion for Preliminary Injunction for Proposed Class ("Motion for TRO/Preliminary Injunction"), ECF No. 4, alleging that Respondents are not taking proper measures to prevent the transmission of COVID-19. Petitioners assert three claims: (1) violation of the Due Process Clause of the Fifth Amendment (violation of detention standards), (2) violation of the Due Process Clause of the Fifth Amendment (violation of right to reasonable safety), and (3) violation of the Due Process Clause of the Fifth Amendment (state-created danger). In support of the Motion for TRO/Preliminary Injunction, Petitioners submitted the following declarations[3]:

1. Declaration of Dr. Joseph Shin, MD, MSc ("Shin Declaration," ECF No.1-2); and
2. Declaration of Dr. Pedro J. Greer, Jr., MD, FACP, FACG ("Greer Declaration," ECF No. 1-3).

In response to Magistrate Judge Jonathan Goodman's post-hearing administrative Orders, ECF Nos. 18; 19; 20, ICE submitted the following declarations:

1. Declaration of Juan A. Lopez Vega, Assistant Field Office Director ("Vega Declaration," ECF No. 30-1).[4]
2. Declaration of Liana J. Castano, Acting Officer in Charge of the Krome Service Processing Center. ("Castano Declaration," ECF No. 33-1).[5]

On April 14, 2020, the Court referred the Motion for TRO/Preliminary Injunction to Magistrate Judge. ECF No. 14. On April 17, 2020, the Magistrate Judge held a hearing[6] and subsequently issued a 69-page report and recommendation ("R&R") on the TRO concluding

---

[3] Admittedly, neither Doctor has personally examined any of the detention centers at issue in this matter. (ECF No. 63 at 42.) Both Doctors relied in part on declarations submitted by Liana J. Castano.
[4] The Vega Declaration discussed BTC.
[5] The Castano Declaration discussed Krome and Glades.
[6] All hearings in this matter have been conducted via remote video conference in light of the danger posed by COVID-19.

that the remedy of release is unavailable to the Detainees. (ECF No. 63 at 51-55). This Court issued a 14-day TRO instructing ICE to adhere to its own guidelines and the CDC's guidelines in assessing and evaluating whether any of the Petitioners should be released. (ECF No. 76.) On May 2, 2020, the Court issued an Order clarifying, *inter alia*, that ICE is permitted to transfer detainees from the three facilities at issue *only* after first evaluating and assessing each detainee's eligibility for release pursuant to ICE guidelines on the pandemic response. (ECF No. 78.)

On May 5, 2020, Petitioners filed a Motion for Class Certification. (ECF No. 81.) That same day, the Court referred the Motion for Class Certification to the Magistrate Judge. (ECF No. 82.) On May 14, 2020, the Magistrate Judge held a hearing on the Motion for Class Certification. (ECF No. 98.)

On May 15, 2020, the Court extended the TRO by 14 days pending the Magistrate Judge's R&R on the Motion for Class Certification and other hearings in the matter. (ECF No. 101.) On May 22, 2020, the Magistrate Judge issued an R&R recommending that the Court *deny* the Motion for Class Certification with respect to Petitioners' demand for habeas corpus release but *grant* Petitioners' Motion with respect to their conditions-of-confinement claims. (ECF No. 111 at 4-5.)[7]

On May 15, 2020, the Court set a Motion Hearing for May 27, 2020, regarding the Petitioners' Emergency Motion for TRO and Motion for Preliminary Injunction. (ECF No. 101.) On May 20, 2020, Petitioners filed an Emergency Motion to Compel Compliance with the Court's April 30, 2020, Order alleging that Respondents had not fully complied with the Court's April 30, 2020, Order. (ECF No. 106.) The Court set an expedited briefing schedule

---

[7] The Magistrate Judge did not view Petitioner's Motion for Class Certification as an "emergency" and designated the 14-day presumptive deadline for written objections established by Local Rule 4. However, on May 29, 2020, the Magistrate Judge *sua sponte* issued an Amended R&R on the Motion for Class Certification, which is "substantively identical to the first version." (ECF No. 123 at 1, n.1.). In so doing, the Magistrate Judge extended the parties time to file objections by an additional 14 days. To promote judicial economy and preserve resources, the Court requested that the parties consent to extend the TRO until June 15, 2020, to allow the parties the opportunity to submit any Objections to the Amended R&R before the Court issued an Order. Respondents did not consent to an additional extension. On June 1, 2020, the Court issued an Order instructing the parties to file all Objections to the R&R on June 3, 2020 pursuant to Local Rule 4(a).

on the Motion to Compel and instructed the parties to be prepared to discuss the Motion to Compel at the May 27, 2020, Motion Hearing. (ECF No. 107.)

On May 27, 2020, the Court held a hearing on Petitioners' Motion for TRO/Preliminary Injunction and Motion to Compel. (ECF No. 120.) On May 28, 2020, Respondents consented to an extension of the TRO for an additional seven days. (ECF No. 119.) On June 2, 2020, the Court held a second hearing on the Petitioners' Motion for TRO/Preliminary Injunction, during which Petitioners presented testimony from Dr. Joseph Shin. On June 3, 2020, the Court held a third hearing on the Petitioners' Motion for TRO/Preliminary Injunction, during which Petitioners presented testimony from three detainees—Steve Cooper, a 39-year-old Jamaican native currently detained at Glades, Alejandro Ferrera Borges, a 29-year-old Cuban native currently detained at BTC, and Deivys Perez Valladares, a 35-year old Cuban native currently detained at Krome.[8]

### B. Facts

#### i.   COVID-19 Transmission in Immigration Detention Facilities

Since the filing of this action, the coronavirus pandemic has continued to spread. To date, over 100,000[9] people have died from COVID-19 in America.[10] And at least two individuals have died in ICE custody due to COVID-19.[11] Some experts estimate that up to 400,000 Americans may die from COVID-19 in approximately one year.[12]

COVID-19 is a highly infectious deadly disease believed to transmit among people through respiratory droplets released by coughing or sneezing, as well as through contact with infected individuals. (Shin Decl. ¶7.) The medical and science community believe COVID-19

---

[8] Each witness also submitted a declaration regarding the conditions of confinement at each of the detention centers at issue. This Order is issued two days after the June 3, 2020, hearing. In light of the expeditious turnaround, the Court relied on a rough draft of the transcript the court reporter submitted to the Court.

[9] Johns Hopkins University Coronavirus Resource Center, https://coronavirus.jhu.edu/map.html (last updated June 5, 2020, 12:00 p.m. EST).

[10] There are over 6 million confirmed COVID-19 cases globally and over 380,000 deaths. At the commencement of this lawsuit in April 2020, there were over 1 million confirmed COVID-19 cases globally and over 380,000 deaths. (*See, e.g.* Shin Decl. ¶4.)

[11] https://www.ice.gov/coronavirus.

[12] https://abcnews.go.com/amp/Health/coronavirus-updates-us-100-million-doses-vaccine-end/story?id=71038663.

is an airborne virus spread by individuals who are pre-symptomatic (individuals who have contracted the disease but do not yet display symptoms of the disease), asymptomatic[13] (individuals displaying no symptoms despite having contracted the virus), and symptomatic (individuals that have contracted the virus and exhibit symptoms of the disease) spread the disease. (Shin Dec. ¶22.) Indeed, estimates suggest that as many as 15-57% of infected individuals display no symptoms at the time of testing. (Shin Decl. ¶ 7.)

Experts' collective knowledge about COVID-19 has continued to evolve exponentially over a short period of time. The virus' effect in individuals ranges from mild to severe, resulting in death in approximately 1-4% of confirmed cases. (Shin Decl. ¶9; Greer Decl. ¶19.) COVID-19, which was originally thought to primarily affect the elderly, has proven that no age demographic is spared from the virus. (Greer Decl. ¶18.) There have been reports of children as young as five years[14] dying after contracting the virus. There have also been reports of adults in the 20-40 age bracket being severely affected by the virus.[15] (Shin Decl. ¶10.) Most people who contract the disease will develop mild respiratory infection. (Greer Decl. ¶19.) However, serious illness occurs in at least 16% of cases and death is most common among people with underlying chronic health conditions, such as heart disease, lung disease, liver disease, and diabetes. (*Id.*) People with severe symptoms may require ventilation and intravenous antibiotics. (*Id.* at ¶20.) Further, COVID-19, originally believed to attack human lungs, demonstrably also affects various other organs, including the brain, heart, and kidneys.[16] Studies show that even where people recover from COVID-19, they may face serious permanent complications, including lung scarring.[17]

Detention centers are not isolated communities. Staff, visitors, contractors, and vendors can bring infectious diseases into facilities. (Greer Decl. ¶9.) COVID-19 has already started to spread inside prisons and detention centers across the United States. To date, there

---

[13]Recent data suggests that has almost 13% of transmission occurs from asymptomatic individuals before they start to show symptoms. (Greer Decl. ¶9.)

[14] https://www.cnn.com/2020/04/21/us/detroit-girl-dies-coronavirus/index.html

[15]https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/coronavirus-and-covid-19-younger-adults-are-at-risk-too.

[16]https://www.washingtonpost.com/health/2020/05/10/coronavirus-attacks-body symptoms/?arc404=true.

[17]https://www.sciencenews.org/article/coronavirus-covid-19-some-patients-may-suffer-lasting-lung-damage.

are over 1,600 confirmed COVID-19 cases among those detained in ICE custody nation-wide.[18] Moreover, congregate settings such as detention facilities where people share common dining areas, bathrooms, and other common areas allow for rapid spread of infectious diseases. (Greer Decl. ¶¶9-10; Castano Decl. ¶15.) Detention facilities are often over-crowded, under-resourced, and ill-equipped in the event of a contagion. (Shin Decl. ¶14; Greer Decl. ¶11.)

Detainees often have to wait several days to see a medical doctor for serious medical concerns. (Greer Decl. ¶25.) Further, detention facilities often lack onsite medical facilities or 24-hour medical care, which can be crucial in identifying and managing infectious disease. (Greer Decl. ¶¶12-13.) During a contagion, staff may fall ill and fail to attend work, which in turn increases the risk of spread because of the reduced level of care provided. (Greer Decl. ¶15.) Thus, the risk of wide-spread transmission of COVID-19 in detention centers is "significantly higher than in the community." (Shin Decl. ¶13.)

### ii.   CDC's and ICE's Pandemic Response Guidelines

There is no vaccine or cure for COVID-19. (Shin Decl. ¶11.) Public health strategies are the only effective methods to mitigate the spread and impact of the virus. (Shin Decl. ¶12; Greer Decl. ¶21.) Accordingly, both the CDC and ICE promulgated a set of guidelines and recommendations intended to protect detainees and staff from contracting the disease.

### a.   The CDC's Pandemic Response Guidelines

On March 23, 2020, the CDC issued an Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities (the "CDC's Guidelines"),[19] which applies to "incarcerated/detained persons, staff, volunteers, and visitors who enter correctional and detention facilities, as well as incarcerated/detained persons who are transferred to another facility or released from custody." The CDC's Interim Guidance on Management of Coronavirus Disease 2019 (COVID19) in Correctional and Detention Facilities (March 23, 2020) at 26.

---

[18] ICE Guidance on COVID-19 https://www.ice.gov/coronavirus
[19] Available at https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html

Due to the highly contagious nature of COVID-19 and its rapid spread, the CDC recommends, *inter alia*, frequent hand washing, use of hand sanitizers, and social distancing—maintaining a minimum of six feet between and among persons to mitigate transmission and minimize disease.[20]

On the subject of cohorting,[21] the CDC's Guidelines advise that people exposed to COVID-19 should be put in individual, not group, quarantine: "Facilities should make every possible effort to quarantine close contacts of COVID-19 cases individually." *Id.* at 15; 19. Further, "[o]nly individuals who are laboratory confirmed COVID-19 cases should be placed under medical isolation as a cohort. Do not cohort confirmed cases with suspected cases or case contacts." *Id.* at 16. Cohort quarantine "should only be practiced if there are no other available options," because "[c]ohorting multiple quarantined close contacts of a COVID-19 case could transmit COVID-19 from those who are infected to those who are uninfected." *Id.* at 15; 19. If cohorting of ill detainees is unavoidable, the CDC's Guidelines recommend "mak[ing] all possible accommodations until transfer occurs to prevent transmission of other infectious diseases to the higher-risk individual (For example, allocate more space for a higher-risk individual within a shared isolation room)." *Id.* at 17.

As for transfers, the CDC's Guidelines recognize that, "[t]here are many opportunities for COVID-19 to be introduced to a correctional or detention facility, including daily staff ingress and egress; transfer of incarcerated/detained persons between facilities and systems, to court appearances, and to outside medical visits; and visits from family, legal representatives, and other community members." *Id.* at 2. Thus, the CDC's Guidelines contemplate that transfers should be utilized as a last resort. The CDC's guidelines state that transfers should be restricted to and from other "jurisdictions and facilities unless necessary for medical evaluation, medical isolation/quarantine, clinical care, extenuating security concerns, or to prevent overcrowding." *Id.* at 9. The CDC's Guidelines specifically state,

---

[20] Centers for Disease Control, Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities (Mar. 23, 2020), Available at https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html

[21] Cohorting is "the practice of isolating multiple laboratory-confirmed COVID-19 cases together as a group or quarantining close contacts of a particular case together as a group." *Id.* at 3.

"[t]ransfer should be avoided due to the potential to introduce infection to another facility; proceed only if no other options are available." *Id.* at 16; 20. The CDC's Guidelines further state that confirmed cases should be restricted from leaving the facility while under medical isolation precautions, "unless released from custody or if a transfer is necessary for medical care, infection control, lack of medical isolation space, or extenuating security concerns." *Id.* at 17. To the extent that a transfer is "absolutely necessary," the CDC Guidelines call for ICE to "perform verbal screening and a temperature check as outlined in the [CDC Guidelines] before the individual leaves the facility." *Id.* at 9. If an individual does not clear the screening process, ICE is expected to "delay the transfer and follow the protocol for a suspected COVID-19 case— including putting a face mask on the individual, immediately placing them under medical isolation[22], and evaluating them for possible COVID-19 testing." (*Id.*) And "[i]f the transfer must still occur," ICE requires "ensur[ing] that the receiving facility has capacity to properly isolate the individual upon arrival." *Id.*

As for new entrants, the CDC also recommends "quarantining all new intakes for 14 days before they enter the facility's general population (SEPARATELY from other individuals who are quarantined due to contact with a COVID-19 case)." *Id.* at 14. (emphasis in original). The CDC further specifies that detention centers should conduct "pre-intake screening and temperature checks for all new entrants" and to put new intakes with symptoms (fever, cough, shortness of breath) in medical isolation. *Id.* at 10.

---

[22] Medical isolation is not the equivalent of quarantining. Rather, medical isolation "refers to confining a confirmed or suspected COVID-19 case (ideally to a single cell with solid walls and a solid door that closes), to prevent contact with others and to reduce the risk of transmission." *Id.* at 3.

**b.**      **ICE's Pandemic Response Guidelines**

Some ICE detention centers are subject to ICE's Performance-Based National Detention Standards 2011 ("PBNDS"),[23] while other detention centers are subject to ICE's National Detention Standards ("NDS").[24] Section 4.3(II)(10) of ICE's PBNDS requires that "Centers for Disease Control and Prevention (CDC) guidelines for the prevention and control of infectious and communicable diseases shall be followed." (PBNDS at 258.) Similarly, section 1.1(I) of the NDS, mandates "facilit[ies] will operate in accordance with all applicable regulations and codes, such as those of . . . the Centers for Disease Control and Prevention (CDC). . . ." (NDS at 1.) Accordingly, ICE issued its own set of directives and guidelines regarding the coronavirus pandemic that largely comports with the CDC's described guidelines.

On April 10, 2020, ICE released its COVID-19 Pandemic Response Requirements,[25] which include "specific mandatory requirements" and best practices for all facilities housing ICE detainees. ICE's COVID-19 April 10, 2020 Pandemic Response Requirements ("PRR") at 3, 4.) Like the CDC's Guidelines, ICE's PRR emphasizes that social distancing should be promoted within detention centers. Specifically, ICE's PRR states, "all staff and detainees should maintain a distance of six feet from one another." *Id.* at 12. Staff and detainees are also instructed to "avoid congregating in groups of 10 or more, employing social distancing strategies at all times." *Id.* at 13. The PRR goes on to state, "[i]f practicable, beds in housing units should be rearranged to allow for sufficient separation during sleeping hours." *Id.*

Similar to the CDC's Guidelines, the PRR cautions, "[o]nly individuals who are laboratory-confirmed COVID-19 cases should be isolated as a cohort. Do not cohort confirmed cases with suspected cases or case contacts." *Id.* at 14. "Cohorting should only be practiced if there are no other available options." *Id.* However, if cohorting of ill detainees is unavoidable, ICE is instructed to "make all possible accommodations until transfer occurs to

---

[23]ICE's COVID-19 April 10, 2020 Pandemic Response Requirements. Available at: https://www.ice.gov/doclib/detentionstandards/2011/pbnds2011r2016.pdf.
[24]Available at: www.ice.gov/doclib/detention-standards/2019/nds2019.pdf
[25]Available at: https://www.ice.gov/sites/default /files/documents /Document /2020 /eroCOYID19responseReqsCleanFacilities.pdf

prevent transmission of other infectious diseases to the higher-risk individual (For example, allocate more space for a higher-risk individual within a shared isolation room)." *Id.* at 15.

As to transfers, ICE's PRR also states, "[w]here possible, restrict transfers of detained non-ICE populations to and from other jurisdictions and facilities *unless* necessary for medical evaluation, isolation/quarantine, clinical care, or extenuating security concerns." *Id.* at 13. Notably, ICE's PRR make no mention of utilizing transfers as a means to control population size during the pandemic.[26]

The PRR calls for detainees to be quarantined for 14 days prior to entering the general population. *Id.* at 14. New entrants are to be assessed for fever and respiratory illnesses prior to entering the facility. (Castano Decl. ¶9.) Pursuant to the PRR, ICE should "consider cohorting daily intakes; two days of new intakes, or multiple days on new intakes, in designated areas prior to placement into the general population." *Id.*

ICE's PRR also states all facilities housing ICE detainees must:

- Ensure that all staff and detainees wear cloth face coverings (when protective equipment supply is limited) to help slow the spread of COVID-19;
- Instruct staff and detainees to wear cloth face coverings when protective equipment supply is limited;
- Provide staff and detainees with no cost unlimited access to supplies for hand cleansing, including liquid soap, water, paper towels or dryers, and no-touch receptacles;
- Instruct personnel that "[A]ll staff and detainees should maintain a distance of six feet from one another;" and
- Make efforts to reduce the population to approximately 75% of capacity, to promote social distancing.

(PRR at 7-14.)

---

[26] Beginning in 2004, Congress has appropriated funding to ICE for an Alternatives to Detention program created to provide supervised release and enhanced monitoring for a subset of foreign nationals subject to removal whom ICE has released into the United States. Detainees may be released on parole, bond, home detention, etc., through the Alternatives to Detention program. In fact, ICE has reportedly utilized its alternative detention program to release hundreds of immigrants in detention as coronavirus spreads in detention centers. (ECF No. 63 at 40, n.11.)

### iii.    Reported Facilities Conditions

Declarations submitted in this matter contain substantially similar allegations. Common to each detention facility at issue is that: (1) Petitioners are held in a cohort quarantine; (2) Petitioners cannot social distance; (3) Petitioners have developed a cough but has not been tested for COVID-19; (4) Petitioners sleep in bunkbeds less than a meter away from each other; (4) Petitioners do not have adequate amounts of soap throughout the day; (5) Petitioners have difficulty washing their hands for 20 seconds because the water turns off too quickly; (6) Petitioners are concerned that the crowded conditions will result icontracting COVID-19; (7) most officers do not wear masks when near the detainees; (8) petitioners typically eat less than six feet away from other detainees; (9) dozens of detainees in a pod must share one toilet or the toilets are too close together for social distancing to occur; (9) Petitioners do not have access to masks, gloves, or hand sanitizer; and (10) Petitioners who prepare the food do not wear masks and sometimes do not wear gloves." (ECF No. 63 at 20-21.)

### a.    Krome[27]

ICE owns the Krome detention center, but daily operations are contracted out to a private company, Akima Global Services. (Greer Decl. ¶7.)

At Krome, upon entering the facility, medical screenings are conducted on all detainees within a 12-hour time frame and detainees are screened for fevers and respiratory illnesses. (Castano Decl. ¶9.) During intake, detainees are asked to confirm if they have had close contact with a person with laboratory-confirmed COVID-19 in the past 14 days. (*Id.*)

Detainees at Krome are subject to group cohorting. In cases of known exposure to a person with confirmed COVID-19, asymptomatic detainees are placed in cohorts for 14 days after most the recent exposure to an ill detainee and are monitored daily. (*Id.* at ¶11.) Housing units in cohort status are issued surgical face masks. (*Id.*)

Detainees share a living unit with at least 65 bunk beds. (Greer Decl. ¶24.) The distance between beds varies from 3 feet 2 inches to 4 feet 9 inches. (ECF No. 63 at 38.) Detainees are

---

[27] Krome is subject to ICE's PBNDS.

forced to either sit close to one another while they eat meals since tables and chairs are fixed to the floor or forced to wait in line together for meals. (Greer Decl. ¶24.)

The Krome medical facility has only a "limited number" of COVID-19 test kits. (ECF No. 63 at 37.)

At the onset of this action there were no confirmed cases of COVID-19 at Krome and no detainees being cohorted at Krome for exhibiting symptoms of COVID-19. (ECF No. 63 at 35.) Now, 20 Krome detainees have tested positive for COVID-19.[28]

### b.      Glades[29]

Glades is a county jail, which houses immigration detainees pursuant to an inter-governmental service agreement with ICE. (Greer Decl. ¶7.)

Detainees at Glades share a clinic staff which manages male and female detainees and provides daily access to sick calls in a clinical setting, as well as mental health services and the ability to admit patients at the local hospital for medical and mental health care. (Castano Decl.at ¶13.) COVID-19 tests are available at the detention center. (*Id.* at ¶15.) However, Dr. Greer suspects that detainees often wait several days to have to see a medical doctor for serious medical concerns. (Greer Decl. ¶25.)

The detainee population at Glades is within its approved capacity and is "not overcrowded." (Castano Decl. ¶15.) Detainees share a living unit with at least 65 individuals. (Greer Decl. ¶24.) Glades issues male detainees four ounces of soap, twice a week, which is replenished as needed. (Castano Decl. ¶18.) Female detainees receive a 7.5-ounce bottle, at the same frequency. (*Id.*) The housing units have available running water and soap 24 hours a day, seven days a week. (*Id.* at ¶30.)

The detainees are housed in a dormitory-style setting. The bunks are approximately 12 inches apart from the head of one bed to the foot of the next bunk and about seven feet apart, side to side. (Castano Decl. ¶30.) The distance between the upper bunk and lower bunk is 34 inches, and the distance between beds is 7 feet, 2 inches. (Castano Decl. ¶30.)

---

[28] https://www.ice.gov/coronavirus.
[29] Glades is subject to ICE's NDS.

At present, ICE is cohorting 320 detainees "as a precautionary measure, per the established protocol."[30]

 At the onset of this action there were no confirmed cases of COVID-19 at Glades County Detention Center, and no detainee was subject to cohorting. (Castano Decl. ¶14.) To date, 60 Glades detainees have tested positive for COVID-19.[31]

### c.    BTC[32]

BTC is a private facility. The GEO Group operates the facility pursuant to an ICE contract. (Greer Decl. ¶7.)

At the BTC,upon entering the facility, medical screenings are conducted on all detainees within a 12-hour time frame and detainees are screened for fevers and respiratory illnesses. (Vega Decl. ¶9.) During intake, Detainees are asked to confirm if they have had close contact with a person with laboratory- confirmed COVID-19 in the past 14 days, and whether they have traveled from or through area(s) with sustained community transmission in the past two weeks (*Id.*)

Detainees are housed in rooms and separated by gender, with a maximum of six detainees per room. (*Id.* at ¶22.) Bunk beds in the male rooms are two feet apart. (*Id.*) Bunk beds in the female rooms are 6.5 feet apart. (*Id.*) Bunk beds in the male rooms are two feet apart. (*Id.*) Bunk beds in the female rooms are 6.5 feet apart. (*Id.*) The distance between chairs in the dining hall is four feet. (*Id.*) The facility is also practicing social distancing by staggering meal lines with reduced numbers of individuals in the dining room and markers have been added every six feet to visually facilitate social distancing. (*Id.*)

---

[30] To date, ICE houses 320 detainees at Glades. (ECF No. 131-1 ¶8.) ICE submission can be interpreted to mean that the entire detainee population at Glades is being cohorted together. ICE declares that the cohort is scheduled to end on June 3, 2020.

[31] At the June 3, 2020 Hearing, ICE admitted that it had discovered 58 COVID-19 cases at Glades. For that reason, it had determined to cease all transfers for a period of time. The Court notes that ICE's submissions to the Court differs from the statistics on its regularly updated website, which states that there are 60 confirmed COVID-19 cases at Glades to date. https://www.ice.gov/coronavirus (last updated June 5, 2020).

[32] BTC is subject to ICE's PBNDS.

In cases of known exposure to a person with confirmed COVID-19, asymptomatic detainees are placed in cohorts for 14 days after most recent exposure to an ill detainee and are monitored twice daily for fever and symptoms of respiratory illness. (*Id.* at ¶11.)

ICE states that BTC detainees are granted daily access to medical treatment at an onsite medical observation room, pharmacy, tele-psychiatry, and access to 24/7 specialty services and hospital care within the community. (*Id.* at ¶13.) However, Dr. Greer that detainees often wait several days to have access to a medical doctor for serious medical concerns. (Greer Decl. ¶25.)

At BTC, all detainees over 60 years of age have been released and the overall detention population has been reduced by 35 percent in accordance with ICE's Guidelines. (Vega Decl. ¶23.)

At the onset of this action there were no confirmed cases of COVID-19 at BTC and no detainees being cohorted for exhibiting symptoms of COVID-19. (ECF No. 63 at 35.) Now, 20 BTC detainees have tested positive for COVID-19.[33]

### iv.   Aftermath of Temporary Restraining Order

On April 30, 2020, the Court issued a TRO in which it instructed the parties as follows:

1. Evaluate each of the detainees in the instant action consistent with ICE's PRR and inform the Court who among them can be released promptly in light of COVID-19.
2. Submit a report the Court informing the Court as to how it intends to accelerate its review of its "Alternatives to Detention" program (or other protocols resulting in detainee release) with the goal of reducing the population to 75% of capacity at each of the three detention centers within two weeks of this Order.
3. Perform an internal review pursuant to ICE's PRR and file with the Court weekly reports on the following
    a. The number of detainees who have been released;
    b. Which facility they were released from; and
    c. The nature of the detainee released (e.g., in a high-risk category because of age or a specific, documented medical condition, etc.)
4. Submit reports on the following:
    a. How many detainees it is housing on the date of reporting;
    b. At which of the three centers the detainees are being housed;
    c. Which of the detainees are considered "mandatory detainees"; and
    d. Which of the detainees have no prior criminal convictions and no pending criminal charges.

---

[33] https://www.ice.gov/coronavirus

5. Immediately comply with the CDC and ICE guidelines on providing adequate amounts of soap and water and cleaning materials to detainees at each of the three detention centers at issue. ICE was also required to provide masks to all detainees and shall replace those masks at least once per week.

6. Provide education and training about measures to reduce the health risks associated with COVID-19 to all staff members and detainees and to any new detainees or employees. ICE was also required to provide such education and training without any costs to the detainees.

Since the filing of this suit, ICE has filed several reports assuring the Court that it is complying with the TRO. A mere seven days after the filing of the TRO, ICE submitted a Report stating it had successfully reduced the populations at each detention center below 75% capacity. (ECF No. 89-1 ¶3.) By May 7, 2020, ICE had reviewed each of the 58 petitioners and determined that only six[34] of the Petitioners were eligible for release. (*Id.* at ¶3.) In approximately that same time period, ICE released or removed a total of 60 detainees. (ECF No. 90-1 ¶3.) ICE had determined that the remaining petitioners were either subject to mandatory detention or facing pending criminal charges. (*Id.*) As to each detention center, ICE submitted Reports stating the following:

*Krome.* Upon intake, ICE detainees are given an opportunity to shower and are issued clean clothing, bedding, towels and personal items. (ECF No. 79-1 ¶4.) ICE staff at Krome issued every detainee a surgical mask. (*Id.* at ¶3.) Krome posted instructions in English, Spanish and Creole regarding the proper use of the masks and noting that masks will be replaced every Wednesday. (*Id.* at ¶4.)

*Glades.* Staff has issued every ICE detainee a surgical mask. (*Id.* at ¶8.) Staff also posted instructions in English, Spanish and Creole informing detainees about the proper use of the masks and noting that the masks will be replaced every Friday. (*Id.* at ¶8.) ICE detainees are provided adequate amounts of soap, water and cleaning materials. (*Id.* at ¶9.)

*BTC.* All detainees have been issued masks and encouraged to wear them in the presence of other detainees. (ECF No. 79-2 ¶4.) The masks are exchanged once a week. (*Id.* at ¶4.) Staff continues to provide detainees with adequate soap, hand sanitizers and other cleaning supplies. (*Id.* at ¶¶5-6.)

---

[34] To date, ICE has still released only six of the 58 Petitioners before the Court. (ECF No. 116-2 ¶29.) The Court's TRO and subsequent orders, if any, are moot as to the released Petitioners.

As to transfers between and among detention facilities, ICE explains that on May 5, 2020, after the TRO issued, ICE's Enforcement and Removal Operations division ("ERO") introduced a new COVID-19 checklist intended to provide ERO and contracted staff with steps to take prior to transferring, removing, or releasing an alien from ERO custody to further mitigate the spread of COVID-19. (ECF No. 116-2 ¶19.) The checklist requires verification of a detainee's current health status and exposure history prior to transfer. (*Id.* at ¶21.) According to ICE, Detainees scheduled for transfer must be cleared medically prior to the transfer. (*Id.* at ¶20.) Further, unless medically necessary, ICE does not transfer detainees that are in isolation, are symptomatic, have pending test results or that are cohorted due to exposure to a person with confirmed or suspected COVID-19. (*Id.*) ICE states that ERO reviews the custody status of each detainee prior to transfer and obtained a medical clearance for each detainee transferred in accordance with the detention standards and ERO's PRR. (*Id.* at ¶22.) Once detainees are cleared for transfer, detention and transportation staff provide each detainee with a mask prior to transfer and counsel them on proper mask use. (*Id.* at ¶¶24-25.) ICE submits that "[d]etainee transfers are based upon bed-space considerations and custody classification." (*Id.* at ¶24.)

 In evaluating the 58 Petitioners in the instant action, ICE populated a spreadsheet with information related to each Petitioner's chronic health conditions. (ECF No. 116-2 ¶¶5-6.) ICE then reviewed the custody status and other factors articulated by the court to determine who could be released. (*Id.* at ¶7.)

ICE does not deny that social distancing is not possible at the detention centers. Instead, ICE notes that the CDC Guidelines states that its guidance may need to be adapted to each facility. (ECF 116-1 ¶32.) ICE states that it "encourages" social distancing between detainees by "encouraging detainees to sleep head to toe, staggering of recreation and meals, and suspension of social visitation." (*Id.*) ICE goes on to submit that social distancing is not feasible because some of the furniture is fixed to the floor, making it impossible to rearrange furniture to allow for six feet of social distancing. (*Id.* at ¶30.)

ICE's Reports stand in stark contrast to the Petitioners' allegation. The Petitioners contend that ICE is not complying with the TRO and continues to fail to protect the safety

and well-being of Petitioners and others in its custody at Krome, Glades, and BTC.[35] On May 20, 2020, Petitioners filed a Motion to Compel alleging that although ICE touts population reductions at the three facilities, ICE actually utilizes transfers to "[shuffle] people around the country to make the population statistics at Krome, Glades, and BTC look better on paper." (ECF No. 106 at 2.)

Petitioners further allege that despite the aggressive utilization of transfers, ICE has not improved the conditions at any of the three detention centers. Most notably, social distancing is *still* not possible at these facilities. (ECF No. 106 at 2.) Further, access to soap, hand sanitizer, masks, gloves, and cleaning supplies is still not reliable or consistent. (ECF No. 106 at 2.) Petitioners request that this Court compel ICE to provide documentation of its determination for each detained individual before transferring them to a different facility.

The Petitioners' submitted declarations support these allegations. The submitted declarations allege that they were either given ripped masks during detention or they were given masks for the very first time during transfer. (ECF No. 106-2 at 4, 18.) Most disturbing, some detainees are being transferred to different facilities within Florida without being first evaluated for COVID-19. (ECF No. 106-2.) Some detainees allege that they are transferred to processing centers where their temperatures are checked upon arrival, however soap is not readily available at the processing centers. (ECF No. 106-2 at 5.) In sum, the declarations assert that social distancing is not possible at the detention centers at issue, hygiene products are still in limited supply, and the use and distribution of masks among staff and detainees is inconsistent. (ECF No. 106.)

By contrast, ICE asserts that it properly exercised its broad discretionary authority pursuant to 8 U.S.C. §1231(g)(1) to transfer detainees to other locations. (ECF No. 116 at 3-6.) ICE maintains that prior to transfer, ICE reviews the detainees' medical history and

---

[35] On June 3, 2020, Petitioners presented live witnesses currently held at each of the three detention centers and each testified that ICE had not educated the detainees on mask use or the importance of mask use. To the extent that ICE erected posters about COVID-19 and mask use, the posters were typically presented only in English. The witnesses also testified that during the transfer process there were not tested for COVID-19 and they were either not provided with masks or expected to use the same mask they'd been provided sometime during their detention. The witnesses also stated that mask use is inconsistent among staff and detainees. Each detainee testified that social distancing is still not possible at any of the detention centers.

obtains a medical clearance. (*Id.* at 7.) ICE also states that it created a new COVID-19 checklist to mitigate the effects of COVID-19 when transferring, removing, or releasing an alien from custody. (*Id.* at 7.) The checklist requires completion by ICE staff prior to a detainee being transferred out of the detention facility and is served on the detainee. (*Id.* at 7.) ICE admits that some detainees that were transferred from Krome to BTC have tested positive for COVID-19. However, ICE "does not believe that the transfer has resulted in an increase in COVID-19 cases at BTC." (*Id.* at 8.) ICE insists that the Court should defer to ICE's judgment on the management of detention facilities during the COVID-19 pandemic. (*Id.* at 10-11.) Last, ICE asserts that this Court lacks jurisdiction over detainees which ICE has transferred to locations outside of Florida. (*Id.*at 11-12.)

## II.    LEGAL STANDARD

### A. Class Certification

Federal Rule of Civil Procedure 23 governs class certification. Class certification is proper where the party seeking certification demonstrates that: (1) each of the prerequisites of Federal Rule of Civil Procedure 23(a) have been met; and (2) the proposed class satisfies at least one of the requirements listed in Rule 23(b). *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011). Rule 23(a) requires a showing that: (1) the proposed class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a).

In addition to meeting the four prerequisites in subdivision (a), a party must also demonstrate one of the following: (1) a risk that separate actions would create incompatible standards of conduct for the defendant or prejudice individual class members not parties to the action; (2) the defendant has treated the members of the class as a class, making appropriate injunctive or declaratory relief with respect to the class as a whole; or (3) common questions of law or fact predominate over questions affecting individual members and that a class action is a superior method for fairly and efficiently adjudicating the action. *See* Fed. R. Civ. P. 23(b)(1)-(3). Once the requirements of Rule 23(a) and 23(b) are met, a Court must certify the lawsuit in question as a class action. *Walco Investments, Inc. v. Thenen*, 168

F.R.D. 315, 323 (S.D. Fla. 1996). Generally, Rule 23 is liberally construed in order to further its objectives. *Id.*

Most importantly, in determining whether to certify a class, the Court is not to examine the underlying merits of the claims. *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78 (1974); *See also Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546, 1557 (11th Cir.1986), *cert. denied,* 479 U.S. 883 (1986).

### B. Preliminary Injunction

A preliminary injunction is appropriate if the movant demonstrates: (1) a substantial likelihood of success on the merits; (2) that the preliminary injunction is necessary to prevent irreparable injury; (3) that the threatened injury outweighs the harm the preliminary injunction would cause the other litigant; and (4) that the preliminary injunction would not be averse to the public interest. *Nken v. Holder*, 556 U.S. 418, 434 (2009).

"The first two factors of the traditional standard are the most critical." *Id.* However, "the movant may also have his motion granted upon a lesser showing of a 'substantial case on the merits' when 'the balance of the equities identified in factors 2, 3, and 4 weighs heavily in favor of granting the stay.'" *Garcia-Mir v. Meese*, 781 F. 2d 1450, 1453 (11th Cir. 1986) (quoting *Ruiz v. Estelle,* 650 F.2d 555, 565 (5th Cir.1981) (*per curiam*), *cert. denied,* 460 U.S. 1042 (1983)).

## III.   DISCUSSION

### A. Class Certification

Petitioners seek certification of the following class:

> All civil immigration detained individuals held by Respondents at the Krome Service Processing Center ("Krome"), the Broward Transitional Center ("BTC"), or at Glades County Detention Facility ("Glades") when this action was filed, since this action was filed, or in the future.

(ECF No. 81 at 5.) Petitioners assert that they have met all the requirements of Rule 23. ICE contends however, that Petitioners' Motion for Class Certification should be denied because (1) it is overbroad, (2) the proposed class is not adequately defined, and (3) the proposed class would include detainees not detained at any of the three detention centers, such as those

transferred to other detention centers. ICE also argues that this Court lacks jurisdiction over detainees transferred or released from ICE detention. The Magistrate Judge issued an Amended R&R recommending that the Court *deny* the class certification motion concerning the habeas corpus demand for release but *grant* the motion, in part, and certify a class of all current detainees at the three South Florida facilities for the conditions-of-confinement claims (as opposed to the claim for release). (ECF No. 123 at 4-5.)

### i.    Article III Standing

The Court must first address the threshold issue of standing as it applies to the proposed class. To satisfy constitutional standing in federal court, a habeas petitioner (like other litigants) "must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." Spencer v. Kemna, 523 U.S. 1, 7 (1998) (quoting Lewis v. Continental Bank Corp., 494 U.S. 472, 477 (1990)).

Here, Petitioners are threatened with a heightened risk of severe illness and death upon contracting COVID-19, and said threat is easily traceable to their confinement in ICE custody. Accordingly, the Court rules that the Petitioners easily meet Article III's standing requirements.

### ii.    Rule 23(a) Requirements
#### a.        Numerosity

Rule 23(a)(1) requires that the class be so numerous that joinder of all members is impracticable. The question of whether Rule 23(a)(1) has been satisfied depends on the facts of each case. *Walco Investments*, 168 F.R.D. at 324.

Although a plaintiff need not show the precise number and identity of class members, mere speculation as to the number of parties involved and general allegations of numerosity are insufficient to satisfy Rule 23(a)(1). *See Evans v. U.S. Pipe & Foundry Co.,* 696 F.2d 925 (11th Cir.1983). To satisfy this prerequisite, a plaintiff must ordinarily demonstrate some evidence or reasonable estimate of the number of purported class members. *See Zeidman v. J. Ray McDermott & Co., Inc.,* 651 F.2d at 1038; *See also Kreuzfeld A.G. v. Carnehammar,* 138 F.R.D. 594, 599 (S.D.Fla.1991) (there exists no definite standard as to the size a given class must attain in order to satisfy Rule 23(a)(1)). While there is no fixed rule, a class

size less than twenty-one is typically considered inadequate, while a class size of more than forty is generally adequate. *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 489-90 (S.D. Fla. 2003) (citing *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986)).

The number of class members, however, is not the determinative factor for establishing numerosity. Since the focus under Rule 23(a)(1) is on whether joinder of all members is practicable in view of the numerosity of the class, courts must consider a number of relevant factors, such as the geographic diversity of the class members, the nature of the action, the size of each plaintiff's claim, judicial economy and the inconvenience of trying individual lawsuits, and the ability of the individual class members to institute individual lawsuits. *See Zeidman v. J. Ray McDermott & Co., Inc.,* 651 F.2d at 1038; *See also Kreuzfeld A.G. v. Carnehammar,* 138 F.R.D. at 599.

Petitioners are filing on behalf of a putative class of approximately 1400 individuals. nIn addition to the large number of members here, the class is also geographically dispersed across different counties in South Florida—detainees are being held in three ICE detention centers. The size and geographical diversity of the class renders joinder of all members impracticable. *Gentry v. C & D Oil Co.,* 102 F.R.D. 490 (W.D.Ark. 1984) (joinder was impracticable where potential class members were located throughout a number of counties). For these reasons, the Court finds that the numerosity requirement of Rule 23(a)(1) has been met.

### b.      Commonality

The second prerequisite of Rule 23(a) requires that there be questions of law or fact common to the class. This prerequisite does not require that *all* of the questions of law or fact raised by the case be common to all the plaintiffs. *See Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546, 1557 (11th Cir.1986), *cert. denied*, 479 U.S. 883 (1986); *See also Haitian Refugee Center, Inc. v. Nelson,* 694 F.Supp. 864, 877 (S.D.Fla.1988), *affirmed,* 872 F.2d 1555 (11th Cir.1989). However, commonality "requires at least one question common to all of the class members, the answer to which is "apt to drive the resolution of the litigation." *Money v, Pritzker*, Nos. 20-cv-2093, 20-cv-2094, 2020 WL 1820660, at *14 (N.D. Ill. Apr. 10, 2020) (internal citation omitted). "Commonality [also] requires the plaintiff to demonstrate that the class members have suffered the same injury." *Dukes*, 564 U.S. at 350. The common

contention of injury "must be of such a nature that it is capable of class wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*

Petitioners admit that there are "some factual differences between the class members claims." (ECF No. 81 at 9). Nevertheless, Petitioners assert that the commonality requirement is a low threshold, which is satisfied here because controlling questions of law and fact are common to the entire class-- whether ICE has been deliberately indifferent to the risk that people detained at Krome, BTC, and Glades will contract COVID-19 due to the unhygienic conditions and an inability to protect themselves through social distancing and ICE's failure to implement its Alternatives to Detention Program. (*Id.* at 9-12.) Petitioners further argue that given how viruses spread, that deliberate indifference applies uniformly to all people in ICE custody at the three facilities at issue here. (*Id.*) Petitioners also assert that ICE's uniformly unsanitary practices and its consistent refusal to follow CDC Guidelines at Krome, BTC, and Glades expose each class member to the same "substantial risk of serious harm." (*Id.*)

ICE asserts that the Motion should be denied because Petitioners have not satisfied the commonality requirement due to the "dissimilarities within the proposed class." (ECF No. 92 at 6.) ICE points to the fact that each of the three facilities has a different physical plant, configuration, as well as capacity for detaining individuals. (*Id.*) ICE also argues that the Court cannot resolve claims central to each class member because whether a particular detainee's living arrangement meets CDC Guidelines, or demonstrates a lack of deliberate indifference, will depend upon an individualized determination. Thus, ICE contends that this is not a resolution of a claim central to each class member's claim "in one stroke." (*Id.*)

Petitioners claim entitlement to a comprehensive response to the pandemic. However, the Court observes that the relief sought by Petitioners is particularized and necessarily requires an individualized assessment of each detainees' vulnerabilities to COVID-19, as well as an individualized assessment as to each detainee's eligibility for release. It is feasible that at least some petitioners will be denied release. But, Petitioners also allege a course of common conduct, which includes failure to implement adequate precautionary measures and protocols, lack of access to hygiene products, health products, education, testing, and personal protective equipment, and most important, social distancing has not been achieved. (ECF No.

123 at 44.) The Petitioners share two main legal questions—whether ICE's conduct at the three detention centers amount to deliberate indifference and expose detainees to substantial risk of harm, and whether such conduct results in conditions of confinement that violate Petitioners constitutional rights. *See Wal-Mart*, 564 U.S. at 350 (commonality does not require perfect uniformity.) The existence, scope, and adequacy of those measures are central to all Petitioners' claims.

The Court finds that Petitioners have met the commonality requirement of 23(a)(2) only with respect to their conditions of confinement claim.

### c.     Typicality

Under this third requirement of Rule 23(a), the named plaintiffs must present claims that are typical of the claims of the class. The typicality requirement centers on the relationship between the proposed class representatives and the other members of the class. *Ibrahim v. Acosta*, 326 F.R.D. 696, 700 (S.D. Fla. 2018). The named plaintiffs' claims are typical if they stem from the same event, practice, or course of conduct that forms the basis of the class claims and are based upon the same legal or remedial theory. *Walco Investments*, 168 F.R.D. at 326 (internal citations omitted).

To meet the typicality requirement, the named plaintiffs must demonstrate that the members of the class have the same or similar grievances as themselves. *Id.* In other words, the named representatives must be able to establish the bulk of the elements of each class members' claims when they prove their own claims. *See General Telephone Company of Southwest v. Falcon*, 457 U.S. 147 (1982).

In the instant case, Petitioners allege that they've suffered the same injury because they're subject to the same confinement under the same unconstitutional conditions caused by the same entity, which is exposing them all to an unreasonable heightened risk of serious illness. (ECF No. 123 at 44.) These failures result in punitive conditions of confinement.

The Court finds that Petitioners have met the typicality requirement of 23(a)(3) only with respect to their conditions of confinement.

### d.      Fair and Adequate Representation

The final prerequisite of Rule 23(a) requires a showing that the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a)(4); *Walco Investments*, 168 F.R.D.at 327. Adequacy of the representation is a question of fact that depends on the assessment of two factors: "(1) whether plaintiffs' counsel are qualified, experienced, and generally able to conduct the proposed litigation and . . . (2) whether plaintiffs have interests antagonistic to those of the rest of the class." *See Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 496 (S.D. Fla. 2003) (quoting *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 726 (11th Cir. 1987)).

In determining whether a proposed class representative will adequately protect the interests of the class, the Court asks whether the proposed class representatives and their counsel have any conflicts of interest with any class members and whether the proposed class representatives and their counsel will prosecute the action vigorously on behalf of the class. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).

ICE has not challenged the adequacy of Petitioners' counsel. The Court notes that Petitioners' counsel have extensive experience in representing clients in class action suits throughout the United States.[36] There is no indication of a disqualifying conflict of interest. Accordingly, the Court is satisfied that Petitioners' counsel and the proposed class representatives will fairly and adequately represent the interest of the class as to conditions of confinement.

### iii.    Rule 23(b)

Having determined that the Petitioners have met the four prerequisites of 23(a), the Court must consider whether the class also satisfies one of the three provisions of Rule 23(b). In this action, Petitioners seek certification under Rule 23(b). Rule 23(b) sets out two requirements for the maintenance of a class action: (i) questions of law or fact common to the members of the class must predominate over any questions affecting only individual

---

[36] The proposed class counsel are King & Spalding LLP, the Immigration Clinic at the University of Miami School of Law, the Rapid Defense Network (a New York State nonprofit legal services organization), Prada Urizar, LLC, the Southern Poverty Law Center, Americans for Immigrant Justice, and the Legal Aid Service of Broward County.

members; and (ii) a class action must be superior to other available methods for the fair and efficient adjudication of the controversy at hand. Fed. R. Civ. P. 23(b)(3).

To certify a class under Rule 23(b)(2), the Court must first find that common issues of law or fact predominate over individual issues. The critical inquiry is "whether class members seek uniform relief from a practice applicable to all of them." *Rodriguez I*, 591 F.3d at 1125-26 (9th Cir. 2010) (internal citation and quotation marks omitted) (finding certification under Rule 23(b)(2) proper where "proposed members of the class each challenge Respondents' practice of prolonged detention of detainees without providing a bond hearing and seek as relief a bond hearing with the burden placed on the government").

Because ICE's actions and inactions apply to the class generally, the Court determines that Rule 23(b)(2)'s requirements are satisfied. *Parsons v. Ryan,* 754 F.3d 657, 689 (9th Cir. 2014) (finding Rule 23(b)(2) satisfied where the state department of corrections established policies and practices that placed "every inmate in custody in peril" and all class members sought essentially the same injunctive relief). In addition, it would be extremely inconvenient and a waste of valuable judicial resources to try several hundred individual lawsuits.

The Court finds that class certification is appropriate.

## B. Preliminary Injunction

The Court now considers whether a preliminary injunction is appropriate here. A preliminary injunction is an "extraordinary and drastic remedy," and a party seeking the relief bears the "burden of persuasion" to clearly establish all four prerequisites. *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1247 (11th Cir. 2016) (citing *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000)); *accord Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995). However, districts courts are empowered with broad equitable power— particularly in these uncertain times-- to grant a remedy that may present the only adequate remedy. *See Swann v. Charlotte-Mecklenburg Bd. Of Educ.,* 402 U.S. 1, 15-16 (1971) ("Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies.").

Prison health is public health. In the face of a pandemic that has claimed over 100,000 lives in America, the Court finds that Petitioners are likely to succeed on the merits of one or more of their claims, will suffer irreparable harm as a result of the deprivation of their rights,

and that the balance of equities and public interest heavily weigh in favor of granting preliminary relief.[37]

### i.   Success on the Merits

Petitioners assert three claims: (1) Fifth Amendment violation (violation of detention standards), (2) Fifth Amendment and Eighth Amendment violations (violation of right to reasonable safety), and (3) Fifth Amendment violation (state-created danger).

Immigration detainees, like the Petitioners here, are subject to the same rights as civil detainees. *Mehmood v. Guerra*, 783 F. App'x 938, 941 (11th Cir. 2019) (holding that the district court improperly classified immigration detainee as a prisoner rather than as a civil detainee). And civil detainees are afforded "more constitutional protection, more considerate treatment, and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg v. Romeo*, 457 U.S. 307, 321-22 (1982). The Government may not impose on civil detainees conditions that would violate a convicted prisoner's Eighth Amendment rights. *See Hamm v. DeKalb Cty.*, 774 F.2d 1567, 1573-74 (11th Cir. 1985) (citing *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983) ("[T]he due process rights of a [pretrial detainee] are at least as great as the Eighth Amendment protections available to a convicted prisoner.").

---

[37] Several district courts across the country have ordered the release of § 2241 alien detainee-petitioners, explaining that pressing health risks of COVID-19 combined with ICE detention necessitate release. *See , e.g. Castillo v. Barr*, No. 20-cv-00605, 2020 WL 1502864 (C.D. Cal. March 27, 2020) (releasing petitioners and granting petitioners' application for a TRO because "[u]nder the Due Process Clause, a civil detainee cannot be subject to the current conditions of confinement at Adelanto" even though there had been no confirmed cases reported at the facility); *Roman v. Wolf*, No. 20-cv-00768, 2020 U.S. Dist. LEXIS 72080 (C.D. Cal. Apr. 23, 2020)(granting immigration detainees' § 2241 petition for preliminary injunction and releasing them); *Essien v. Barr*, No. 20-cv-1034-WJM, 2020 U.S. Dist. LEXIS 72422 (D.Co. Apr. 24, 2020)(granting immigration detainee's § 2241 petition for preliminary injunction and releasing 55-year old petitioner who suffered from hypertension even though there were no confirmed COVID-19 cases at the immigration detention center); *Malam v. Adducci*, No. 20-cv-10829, 2020 U.S. Dist. LEXIS 59407 (E.D. Mich. Apr. 5, 2020)(granting TRO and releasing habeas petitioner because she was "likely to succeed on the merits of her claim that her continued confinement during the COVID-19 pandemic violates her Fifth Amendment rights.")

The minimum standard of care to be provided to civil detainees under the Due Process Clause of the Fifth Amendment is the same as that allowed by the Eighth Amendment for convicted persons. *Hamm*, 774 F.2d at 1574; *see also Bell v. Wolfish*, 441 U.S. 520, 535 n. 16 (1979) (holding that the Due Process rights of a civil detainee are at least as great as the Eighth Amendment protections available to a convicted prisoner). The Due Process Clause similarly "imposes a duty on state actors to protect or care for citizens when the state affirmatively places a particular individual in a position of danger the individual would not otherwise have faced." *Gregory v. City of Rogers, Ark*, 974 F.2d 1006, 1010 (8th Cir. 1992) (en banc).

The Eighth Amendment prohibits the infliction of cruel and unusual punishment. *Robinson v. California*, 370 U.S. 660 (1962). Under that provision, the Government may not impose punishments that shock the conscience, involve unnecessary and wanton infliction of pain, offend evolving notions of decency, or are grossly disproportionate to the offense for which they are imposed. *See Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976); *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *Trop v. Dulles*, 356 U.S. 86, 101 (1958). Various conditions, "alone or in combination, may deprive inmates of the minimal civilized measure of life's necessities. Such conditions could be cruel and unusual under the contemporary standard of decency." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). On that basis, courts have held that government actors violate the Eighth Amendment when they are deliberately indifferent to a detainee's serious medical needs. *See, e.g. Estelle*, 429 U.S. at 106.

### a.        Deliberate Indifference to Medical Needs

Deliberate indifference to serious medical needs of prisoners "constitutes unnecessary and wanton" infliction of pain proscribed by the Eighth Amendment. *Estelle*, 429 U.S. at 104. To state a cognizable claim, a detainee must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment. *Estelle*, 429 U.S. at 106.

To prove deliberate indifference in violation of Eighth Amendment, a detainee must satisfy three burdens. First, the detainee must satisfy the objective component by showing that she had a serious medical need. *Bozeman v. Orum,* 422 F.3d 1265, 1272 (11th Cir.2005) (per curiam). Second, the detainee must satisfy the subjective component by showing that ICE

officials acted with deliberate indifference to the serious medical need. *Id.* Third, the detainee must show that the injury was caused by ICE's wrongful conduct. *See Goebert v. Lee Cty.*, 510 F.3d 1312, 1326 (11th Cir. 2007) (citing *Hale v. Tallapoosa County,* 50 F.3d 1579, 1582 (11th Cir.1995).

Determining whether one had a serious medical need is an objective inquiry. A medical need satisfies the objective component when it "is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* While most cases are mild, COVID-19 has proven itself to be lethal in the most severe cases, with some portion of the infected expected to require either a ventilator or other intravenous treatment. (Greer Decl. ¶20.) Further, although experts agree that the most vulnerable demographics are the elderly or those with underlying medical conditions, COVID-19 attacks all age groups indiscriminately and it is impossible to determine who will succumb to the illness. It is possible that if Petitioners contract the disease, at least some of them will require a doctor's attention. *Helling v. McKinney*, 509 U.S. 25, 33 (1993) ("It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them.") Petitioners have satisfied the objective component of the deliberate indifference test.

A medical need satisfies the subjective component when a plaintiff shows (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than negligence." *Goebert*, 510 F.3d at 1327. Here, it's hard to imagine that ICE is unaware of the risk of serious harm involved in contracting COVID-19. Indeed, ICE's conduct—creating a set of guidelines and recommendations specifically addressing the pandemic—at least impliedly acknowledges a risk of serious harm.

As previously noted, the CDC's Guidelines are clear that that transfers should be avoided or restricted and utilized as a last resort "unless necessary for medical evaluation, medical isolation/quarantine, clinical care, extenuating security concerns, or to prevent overcrowding." (CDC's Guideline at 9.) The CDC's Guidelines further state that individuals with confirmed cases should be restricted from leaving detention facilities "unless released from custody or if a transfer is necessary for medical care, infection control, lack of medical isolation space, or extenuating security concerns." (*Id.* at 17.) The CDC Guidelines also state

that to the extent that a transfer is "absolutely necessary," ICE is to "perform verbal screening and a temperature check as outlined in the [CDC Guidelines] before the individual leaves the facility." (*Id.* at 9.) If an individual does not clear the screening process, ICE is expected to "delay the transfer and follow the protocol for a suspected COVID-19 case— including putting a face mask on the individual, immediately placing them under medical isolation[38], and evaluating them for possible COVID-19 testing." (*Id.*) And "[i]f the transfer must still occur, ensure that the receiving facility has capacity to properly isolate the individual upon arrival." (*Id.*)

ICE's PRR similarly states, "[w]here possible, restrict transfers of detained non-ICE populations to and from other jurisdictions and facilities *unless* necessary for medical evaluation, isolation/quarantine, clinical care, or extenuating security concerns." (PRR at 13.) ICE has submitted to the Court that it has created checklists utilized to evaluate each detainee.

Yet, the Court has been presented with declarations and live testimony claiming that ICE continues to flout this Court's Order by (1) failing to consistently evaluate detainees for COVID-19 before transferring them to other detention centers,[39] (2) failing to provide protective masks during the transfer process; and (3) failing to provide meaningful access to hygiene products soap, hand sanitizers, masks, gloves and cleaning supplies. (ECF Nos.106; 106-2.).

---

[38] Medical isolation is not the equivalent of quarantining. Rather, medical isolation "refers to confining a confirmed or suspected COVID-19 case (ideally to a single cell with solid walls and a solid door that closes), to prevent contact with others and to reduce the risk of transmission." (CDC Guidelines at 3.)

[39] ICE openly admits that testing at some of the detention centers are limited. (ECF No. 33-1 ¶15.) The Court is well aware that testing capabilities is limited nationwide. However, since the introduction of COVID-19, experts have developed antibody tests which effectively demonstrate whether an individual ever contracted the disease in the past. To the Court's knowledge, such antibody tests are more readily available and accessible than COVID-19 tests. Accordingly, the Court speculates that ICE may utilize such antibody tests in making a thorough assessment about a detainee's COVID-19 status, which may in turn inform whether a detainee should be transferred. While unproven, experts believe that people who have contracted the disease retain at least some immunity to the virus for a period of time. https://www.livescience.com/covid-19-immunity.html. Presumably, detainees who test positive for COVID-19 antibodies may have acquired immunity which would make them a candidate for transfer.

At the June 3, 2020, Hearing Mr. Borges provided testimony about his lived experience with ICE's transfer process. Mr. Borges testified that he was not tested for COVID-19 before he was transferred from BTC to Stewart Detention Center ("Stewart") in Georgia. He also testified that he was not processed at Stewart upon arrival. Rather, he was almost immediately transferred back to BTC. He was not tested before he was transferred from Stewart back to BTC. Mr. Borges also testified that he was not provided a mask during the transfer process, so he used the same mask, soiled from two days of wear, before his transfer from BTC to Stewart. Mr. Borges wore the same mask when he was transferred back to BTC. Disturbingly, guards did not wear masks during Mr. Borges' transfer process. Indeed, the ICE guard that escorted Mr. Borges to the Hearing was not donning a mask, despite being seated a mere two feet away from Mr. Borges. Such behavior not only violates the spirit and the letter of TRO, it also amounts to deliberate indifference because it demonstrates a blameworthy disregard of the risks posed by COVID-19 by exponentially increasing the risk of spreading the virus to other detention centers[40]—conduct that far exceeds mere negligence and evidences a reckless state of mind. ICE does not test all detainees before transferring them because it doesn't have enough tests to do so. (ECF No. 63 at 37.) Instead, ICE only tests people who display symptoms (*Id.*)—which may have resulted in the transfer of some detainees who are asymptomatic but still carry the virus. In fact, media reports state that an increase in COVID-19 cases across all three detention centers largely correlates with the increase in ICE transfers during the pandemic.[41]

Congress conferred broad discretionary authority to the Attorney General of the United States, to determine the places of detention for aliens detained pending removal or a decision on removal. 8 U.S.C. § 1232(g)(1). The same authority is conferred to ICE by extension. *CallaCollado v. Atty. General*, 663 F.3d 680 (3rd Cir. 2011). However, ICE's authority is not absolute. District Courts are granted authority to review agency action and hold unlawful and set aide agency action found to be "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(a). Transferring

---

[40] Such conduct could also have some ramifications for the public at large because staff or visitors may unwittingly carry the virus back into their communities.

[41] https://www.sun-sentinel.com/coronavirus/fl-ne-coronavirus-numbers-spike-at-broward-ice-facility-20200520-v62esjzwxrhn7pfjekta3ldegi-story.html

detainees without first screening them for COVID-19 or providing any protective equipment is not only a violation on ICE's authority, it is a violation of Petitioners' constitutional rights.

Further, the CDC's Guidelines state that the practice of cohorting should be utilized "only if there are no available options." (CDC's Guideline at 15.) Both the CDC's Guidelines and ICE's PRR state, "[o]nly individuals who are laboratory confirmed COVID-19 cases should be placed under medical isolation as a cohort. Do not cohort confirmed cases with suspected cases or case contacts." (*Id.* at 16; PRR at 14.) Despite the fact that its own Guidelines call for detention facilities to avoid group cohorting, ICE flagrantly flouts its own rules on the subject and groups asymptomatic[42] detainees together. ICE admits that it is currently cohorting 320 detainees at Glades—the entire detainee population—"as a precautionary measure, per the established protocol." On June 3, 2020, Mr. Borges testified that upon transferring back to BTC, he was quarantined for 14 days. During his quarantine he was taken to recreation at the same time as individuals known to be sick with COVID-19. Such practices substantially increase a detainee's exposure to COVID-19. And ICE's failure to comply with its own Guidelines, which explicitly acknowledges the risks involved in cohorting in the manner described herein is further evidence of deliberate indifference.

ICE's submissions to the Court establish that ICE considers a sizeable portion of its population to be mandatory detainees. However, 25.9% of the detainee's ICE classifies as mandatory detainees have no conviction or pending charges. (ECF No. 142 at p.60.) Notably, ICE does not claim mandatory detention for 23.3% of the populations across all three detention centers. (*Id.* at p.58.) But ICE has not released such individuals and has not provided any explanation as to why. Moreover, ICE's conduct flies in the face of directives from Attorney Gen. William Barr to the Federal Bureau of Prisons urging the prioritization of home confinement, noting "[w]e have to move with dispatch . . . to move vulnerable inmates out of these institutions."[43] Under such directives,[44] ICE would be expected to make

---

[42] It is unclear to the Court how ICE manages to determine which detainees are asymptomatic considering that COVID-19 tests are limited and ICE has stated that it only tests detainees for COVID-19 if they display symptoms. (ECF No. 63 at 37.)

[43] April 3, 2020 Memorandum of Hon. W. Barr to the Director of Bureau of Prisons, at 1.

[44] Although Mr. Barr's Memorandums are directed to the Federal Bureau of Prisons, ICE's guidelines contain specific standards that mirror Mr. Barr's directives with respect to which detainees should be immediately released.

meaningful utilize its "Alternatives to Detention Program" by determining who among the 23.3% can be released to alternative confinement.  Petitioners have satisfied the subjective component of the deliberate indifference test.

Pursuant to the PRR, ICE is tasked with maintaining social distancing among detainees, (PRR at 14), providing each detainee with hygiene products, (PRR at 8), and providing each detainee with masks, (PRR at 9)[45]. Credible testimony and sworn declarations filed in this matter after the issuances of the TRO suggest that ICE has only partially complied with its own directives or CDC Guidelines despite its submissions to the Court and paint a grim picture of an agency steeped in deliberate indifference. "During a pandemic, such as this, it is likely punitive for a civil detention administrator to fail to mandate compliance with widely accepted hygiene, protective equipment, and distancing measures until the peak of the pandemic." *Fraihat v. U.S. Immigration & Customs Enf't*, No. EDCV 19-1546 JGB (C.D. Cal. Apr. 20, 2020), ECF No. 132, at 34.

Petitioners are likely to succeed on their Fifth Amendment and Eighth Amendment claims.

### ii.    Likelihood of Irreparable Harm

The Court now turns to whether the Petitioners have established irreparable harm. A plaintiff must demonstrate she is likely to suffer irreparable harm in the absence of a preliminary injunction. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The showing of irreparable harm is "[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction. . .that if. . .not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered." *Great Am. Ins. Co. v. Fountain Eng'g, Inc.*, No. 15-CIV-10068-JLK, 2015 WL 6395283, at *3 (S.D. Fla. Oct. 22, 2015). In addition, the asserted irreparable harm must be "neither remote nor speculative, but actual and imminent." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000).

---

[45] The Court recognizes that the PRR does not explicitly mandate that ICE provide detainees with masks. However, the Court interprets the PRR's directive that "cloth face coverings should be worn by detainees and staff (when PPE supply is limited) to help slow the spread of COVID-19," (PRR at 9), implies such mandate because detainees are not in a position to freely procure masks for themselves given their detention.

To demonstrate irreparable harm, a movant must show "that the injury cannot be undone through monetary remedies." *Winmark Corp. v. Brenoby Sports, Inc.*, 32 F.Supp.3d 1206, 1223 (S.D.Fla.2014). "It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

Petitioners establish irreparable harm by alleging a deprivation of constitutional rights. The "*alleged* violation of a constitutional right ... triggers a finding of irreparable harm," *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996). Here, Petitioners allege that their substantive and procedural due process rights have been violated. Accordingly, "no further showing of irreparable injury is necessary." *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.").

Petitioners have established they will suffer the irreparable harm of increased likelihood of severe illness and death if a preliminary injunction is not entered. The Constitution protects those in detention against "a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year." *Helling v. McKinney*, 509 U.S. 25, 33 (1993) ("It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them."); *see also W. Alabama Women's Ctr. v. Miller*, 217 F. Supp. 3d 1313, 1334 (M.D. Ala. 2016) (recognizing that increased risk of medical complications constitutes irreparable harm.); *Unknown Parties v. Johnson*, 2016 WL 8188563, at *15 (D. Ariz. No. 18, 2016), *aff'd sub nom Doe v. Kelly*, 878 F.3d 710 (9th Cir. 2017) (finding evidence of "medical risks associated with . . . being exposed to communicable diseases" adequate to establish irreparable harm).

Even in the early days of the pandemic, and with few exceptions, courts did not hesitate to find irreparable harm as a result of potential COVID-19 exposure in prison and detention, including in facilities where there had not been a confirmed case.[46] At this stage of

---

[46] *See ,e.g. Basank v. Decker*, _ F. Supp. 3d_, No. 20-cv-2518, 2020 WL 1481503 (S.D.N.Y. Mar. 26, 2020) (granting TRO and releasing alien detainee § 2241 petitioners on their own recognizance who suffered from serious chronic medical conditions and were detained in connection with their removal proceedings in county jails where cases of COVID-19 had been identified); *Coronel v. Decker*, _ F. Supp. 3d_, No. 20-cv-2472, 2020 WL 1487274 (S.D.N.Y. Mar. 27, 2020) (granting TRO and releasing alien detainee § 2241 petitioners who

the pandemic, the threat is even clearer. As previously noted, the number of COVID-19 cases within each detention center at issue has risen, especially with the aggressive utilization of transfers—evidence that there truly is a heightened risk of contracting the disease within the detention centers. ICE does not argue that COVID-19 poses serious risk to detainees. Rather, ICE asserts that the Court should respect its unfettered authority to manage and maintain the detention centers.[47] The Court reminds ICE that it has not made any efforts to usurp its role in the administration of detention centers. Rather, the Court has ordered that ICE follow its own guidelines in its management of the pandemic within detention centers. ICE reports that it has complied with the TRO in this regard. Still, there are credible reports from the Petitioners stating otherwise. (ECF No. 106-2.)

### iii.    Balance of the Equities and Public Interest

Where the government is the opposing party, balancing of the harm and the public interest merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). Thus, the Court asks whether any significant "public consequences" would result from issuing the preliminary injunction. *Winter*, 555 U.S. at 24.

The balance of the equities weighs in favor of granting an injunction. The Petitioners face irreparable harm to their constitutional rights and health. Indeed, there is no harm to the Government from engaging in unlawful practices. *Fraihat*, 2020 WL 1932570, at *28 (C.D. Cal. Apr. 20, 2020) ("The balance of equities sharply incline in Plaintiffs' favor. 'It is always in the public interest to prevent the violation of a party's constitutional rights.'") (citation omitted); *Hernandez Roman v. Wolf*, 2020 WL 1952656, at *12 (C.D. Cal. Apr. 23, 2020) ("The balance of equities, here, tip sharply in favor of the class members; the class members

---

demonstrated a likelihood of success on claim government's actions constituted deliberate indifference to their medical needs which predisposed them to higher risk of COVID-19; *Kaur v. United States Dep't of Homeland Sec.*, No. 2:20-cv-03172-ODW, 2020 U.S. Dist. LEXIS 71228 (C.D. Cal. Apr. 22, 2020) (granting TRO and releasing alien detainee § 2241 petitioners who demonstrated a likelihood of success on their due process claim); *Durel B. v. Decker*, No. 20-cv-3430, 2020 U.S. Dist. LEXIS 69220 (D.N.J. Apr. 21, 2020) (granting TRO and releasing 2241 immigration detainee petitioner); *Leandro R. P. v. Decker*, 2020 U.S. Dist. LEXIS 67607 (D.N.J. Apr. 17, 2020) (same); *Jason Anthony W. v. Anderson*, 2020 U.S. Dist. LEXIS 69562 (D.N.J. Apr. 17, 2020) (same).

[47] It is true that ICE is granted broad authority to act, however, ICE may not use its powers to act in an arbitrary and capricious manner.

face irreparable harm to their constitutional rights and health. The Government is not harmed when a court prevents the Government from engaging in unlawful practices.").

**C. Motion to Compel**

Petitioners maintain ICE is merely "shuffling people around the country to make the population statistics at Krome, Glades, and BTC look better on paper." Rather than releasing detainees under its Alternatives to Detention Program. (ECF No. 106 at 2.) Petitioners assert that ICE conducts the transfers in highly unsanitary conditions and that detainees are then deposited into conditions that are at least as bad or worse than the conditions this Court outlined on April 30. (*Id.*) Petitioners allege that ICE's conduct is an effort to destroy this Court's jurisdiction over the detainees they have transferred. (*Id.* at 3.)

Conversely, ICE takes the position that it has complied with this Court's TRO by (1) providing adequate soap, water, and masks to all detainees, and (2) meeting all the reporting requirements pursuant to the Court's Order. (ECF No. 116 at 2-3.)

ICE further maintains that in an effort comply with the Court's TRO, ICE reduced its population size at the three detention centers by properly exercising its discretion in transferring detainees to other locations pursuant to 8 U.S.C. §1252. (*Id.* at 3-5.) ICE cites to *CallaCollado v. Atty. General*, 663 F.3d 680 (3rd Cir. 2011), stating, "the Third Circuit observed that as a part of DHS, ICE 'necessarily has the authority to determine the location of detention of an alien in deportation proceedings … and therefore, to transfer aliens from one detention center to another.'" (*Id.* at 4.) ICE alleges that it not only evaluates each detainee before transferring them, it has also evaluated every detainee at each detention facility. (*Id.* at 5-6) ICE also states that it uses a checklist prior to any transfer "ICE reviews the detainee's medical history and obtains a medical clearance." (*Id.* at 7.) ICE admits that detainees transferred from Krome to BTC tested positive for COVID-19. (*Id.*) However, ICE does not believe any of its practices led to the increase in cases because ICE isolates new transfers for a 14-day period and because detainees are given masks during the transportation process. (*Id.*) Further, while ICE stands by its reporting that it evaluated each detainee's eligibility for release, ICE argues it is not obligated to create a detailed analysis to support its decision not to release a particular detainee, nor is it required to provide a detailed explanation as to why a particular detainee is transferred. (*Id.* at 10-11.) ICE notes that it has grievance procedures

in place that detainees may utilize and that the Court should defer to ICE's judgment in its efforts to manage its facilities during the pandemic.[48]

ICE emphasizes that this Court lacks jurisdiction to review conditions of confinement at the locations to which detainees have been transferred. The Court disagrees. The Court maintains jurisdiction over all detainees in this action, even those who have been transferred outside of the state of Florida. *Ahrnes v. Clark*, 335 U.S. 188, 193 (1948) (stating, "jurisdiction of the District Court [is] not defeated [by transferring a habeas corpus petitioner to a different district and court], no matter how proper the motive behind the removal. . . in that situation the court can act as long as it can reach a person who has custody of the petitioner."); *see also Ex parte Mitsuye Endo*, 323 U.S. 283, 306 (1944); *Spears v. Thigpen*, 846 F.2d 1327, 1328 (11th Cir. 1988) (finding that claims specific to facility were mooted by transfer but challenge to systemic use of segregation remained live where plaintiff remained in segregation after transfer).

In sum, in this moment of worldwide peril from a highly contagious pathogen, the Court is not satisfied that ICE's commitment to detention has meaningfully shifted since the start of the pandemic. Even with the TRO in place, Detainees report that (1) social distancing is still impossible, (2) education on the use and importance of masks is inconsistent, (3) transfers are conducted haphazardly, and (4) cohorting is conducted in a manner that substantially increases the risk of spread of the contagion.

The Court is not persuaded by ICE's argument that each detainee must individually file grievance reports regarding their conditions of confinement. (ECF No. 116 at 8.) The CDC estimates approximately 16 days between the onset of symptoms and death with an incubation period between 2 and 14 days.[49] Thus, it is unreasonable to expect detainees to

---

[48] ICE raises this argument for the first time in its Response to the Motion to Compel. (ECF No. 116.)
[49] Stephen A. Lauer, MS, PhD, The Incubation Period of Coronavirus Disease 2019 (COVID-19) From Publicly Reported Confirmed Cases: Estimation and Application, Mar. 10, 2020, https://annals.org/aim/fullarticle/2762808/incubation-period-coronavirusdisease-2019-covid-19-from-publicly-reported.

first engage ICE's protracted grievance mechanisms. Accordingly, the Motion to Compel is **GRANTED**.[50]

## IV.   CONCLUSION

It is hereby **ORDERED and ADJUDGED** as follows:

1. The Amended R&R on Petitioners' Motion for Class Certification, ECF No. 123, is **AFFIRMED and ADOPTED** as the Order of this Court. It is hereby **ORDERED and ADJUDGED** that the Court now certifies the following class: All current civil immigration detainees who are now held by ICE at Krome, BTC, and Glades when this action was filed, since this action was filed, or in the future.

2. Petitioners' Emergency Motion for Temporary Restraining Order and Motion for Preliminary Injunction for Proposed Class and Incorporated, ECF No. 4, is **GRANTED** as a preliminary injunction as follows:

   a.   ICE shall immediately comply with the CDC and ICE guidelines by providing Petitioners and the class members with unrestricted access to hand soap, hand sanitizer, and disposable hand towels to facilitate handwashing.

   b.   Provide cleaning supplies for each housing area and CDC-recommended disinfectants in sufficient quantities to facilitate frequent cleaning, including in quantities sufficient for each inmate to clean and disinfect the floor and all surfaces of his own housing cubicle, and provide new gloves and masks for each inmate during each time they are cleaning or performing janitorial services.

   c.   Provide all inmates and staff members with masks and educate them on the importance and proper use of masks.

   d.   Increase regular cleaning and disinfecting of all common areas and surfaces, including common-use items such as television controls, books, and gym and sports equipment.

   e.   Limit transportation of detainees to only instances regarding immediately necessary medical appointments and release from custody.

---

[50]The Court understands that the TRO expires on June 5, 2020. However, because the TRO has been converted to a Preliminary Injunction, ICE is expected to also comply with the Preliminary Injunction.

f.  For transportation necessary for prisoners to receive medical treatment or be released, CDC-recommended social distancing requirements should be strictly enforced in buses, vans, and planes.

g.  Post signage and information in common areas that provides: (i) general updates and information about the COVID-19 pandemic; (ii) information on how inmates can protect themselves from contracting COVID-19; and (iii) instructions on how to properly wash hands. Among other locations, all signage must be posted in every housing area and above every sink.

h.  Educate inmates on the COVID-19 pandemic by providing information about the COVID-19 pandemic, COVID-19 symptoms, COVID-19 transmission, and how to protect oneself from COVID-19. A staff person at each detention center must give an oral presentation or show an educational video with the above-listed information to all detainees and give all detainees an opportunity to ask questions.

i.  ICE shall perform an internal review pursuant to ICE's PRR and file with the Court weekly reports (every Friday by 4:00 P.M.) on the following:

   i.   The number of detainees who have been released;

   ii.  Which facility they were released from; and

   iii. The nature of the detainee released (e.g., in a high-risk category because of age or a specific, documented medical condition, etc.).

j.  Within ten (10) days of this Order, ICE shall submit weekly (every Monday by 4:00 P.M.) reports on the following:

   i.   How many detainees it is housing on the date of reporting;

   ii.  At which of the three centers the detainees are being housed;

   iii. Which of the detainees are considered "mandatory detainees"; and

   iv.  Which of the detainees have no prior criminal convictions and no pending criminal charges.

3.  The Preliminary Injunction is in effect until a full trial in the matter and/or further order of the Court.

4.  Petitioners' Motion to Compel Compliance with the Court's April 30, 2020 Temporary Restraining Order, ECF 106, is **GRANTED** as follows:

    a. ICE is permitted to transfer detainees but **only** after performing a verbal screening and a temperature check as outlined in the CDC Guidelines before the individual leaves the facility.

    b. Within ten (10) days of this Order, ICE shall submit weekly Court documentation of its evaluations for release before any transfer is executed. The documentation must include an evaluation of each prospective transfer candidate for COVID-19.

    c. ICE must provide a new mask to each transferee before the transfer process begins.

5. The Court shall retain jurisdiction over all class members who are transferred to other facilities regardless of where those facilities are located.

6. ICE shall not engage in the practice of cohorting unless ICE confirms through testing or other means that a prospective cohort candidate is a confirmed COVID-19 case.

**DONE and ORDERED** in chambers, at Miami, Florida, this 5th day of June 2020.

MARCIA G. COOKE
United States District Judge

Copies furnished to:
*Jonathan Goodman, U.S. Magistrate Judge*
*Counsel of record*