UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-21553-CIV-COOKE

PATRICK GAYLE, et al.,

        Petitioners/Plaintiffs,

vs.

MICHAEL W. MEADE,
Field Office Director, Miami Field
Office, U.S. Immigration and
Customs Enforcement, et al.,

        Respondents/Defendants.
_____/

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants, by and through their undersigned counsel, file their Motion for Summary Judgment, and state:

### I.    INTRODUCTION

On April 13, 2020, plaintiffs filed their Verified Petition for Writ of Habeas Corpus and Complaint for Declaratory and Injunctive Relief.  D.E. 1.  They alleged three (3) causes of action:  Count One, a violation of detention standards under the Fifth Amendment (D.E. 1 at 98-104; Count Two, a violation of right to reasonable safety while in detention under the Fifth Amendment (conditions of confinement) (D.E. 1 at 104-105); and Count Three, state created danger under the Fifth Amendment (D.E. 1 at 106-107).

On April 30, 2020, this Court entered a temporary restraining order against defendants. D.E. 76.  On June 6, 2020, this Court entered a preliminary injunction against defendants.  D.E. 158.   Trial is scheduled for the two-week term commencing April 27, 2020, where plaintiffs seek a permanent injunction against defendants.

The undisputed material facts establish that plaintiffs are not entitled to a permanent injunction on any of the three claims asserted.

II.          DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINITFFS' REQUEST FOR A PERMANENT INJUNCTION

Permanent injunctive relief requires plaintiffs to establish three elements: (1) success on the merits; (2) continuing irreparable injury; and (3) no adequate remedy at law. Keener v. Convergys Corp., 342 F.3d 1264, 1269 (11th Cir. 2003), citing Newman v. Alabama, 683 F.2d 1312, 1319 (11th Cir. 1984).

In Count One, plaintiffs claim defendants have not followed the National Detention Standards in a variety of ways, relying upon declarations signed by plaintiffs. D.E. 1 at 98-104. In Count Two, plaintiffs allege a violation of the Fifth Amendment, which is a deliberate indifference claim. D.E. 1 at 104-105. In Count Three, plaintiffs allege a separate claim under the Fifth Amendment under the state created danger doctrine. D.E. 1 at 105-107.

A.      Deliberate Indifference Claim

In Hamm v. DeKalb County, 774 F.2d 1567 (11th Cir. 1985), the Eleventh Circuit held that "in regard to providing pretrial detainees with such basic necessities as food, living space, and medical care the minimum standard allowed by the due process clause is the same as that allowed by the eighth amendment for convicted persons." Id. at 1574. Applying the Eighth Amendment standard to a claim of inadequate medical care, the appellate court observed that, "[t]o recover on his claim of inadequate medical care, Hamm had to prove that jail officials engaged in 'acts or omissions sufficiently harmful to evidence deliberate indifference to [his] serious medical needs.'" Id. at 1574-75, citing Estelle v. Gamble, 429 U.S. 97, 106 (1976). In the specific context of COVID-19, the Eleventh Circuit has observed that while a pretrial

detainees' claim technically arises under the Fourteenth Amendment, the claim "is evaluated under the same standard as a prisoner's claim of inadequate care under the Eighth Amendment." Swain v. Junior, 961 F.3d 1276, 1285 (11th Cir. 2020)(citation omitted).

In Estelle, the Supreme Court found that deliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain." 97 S.Ct. at 291. In the medical context, the Court found that an inadvertent failure to provide adequate medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind."

> Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment. Id. (footnote omitted).

In Farmer v. Brennan, 511 U.S. 825, 114 S.Ct. 1970 (1994), the Supreme Court defined "deliberate indifference" as requiring that the prison official be subjectively aware of the risk in order to violate the Eighth Amendment:

> We hold instead that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

114 S.Ct. at 1979.

In Farmer v. Brennan, the plaintiff prisoner sought injunctive relief to prevent a

3

substantial risk of serious injury from ripening into actual harm. Plaintiff Farmer was a transsexual, who alleged he had been sexually assaulted when placed in the general population. 511 U.S. at 830. He claimed that placement in the general population showed a deliberate indifference to his personal safety because his feminine appearance made him more likely to be assaulted. He sought an injunction barring future confinement in any penitentiary, including USP-Terre Haute, where he was currently detained. Id. at 831.

Like Farmer, plaintiffs also seek an injunction to prevent a substantial risk of serious injury, but from the coronavirus, rather than other detainees. In Farmer, the Supreme Court observed that, insofar as Farmer's suit "seeks injunctive relief to prevent a substantial risk of serious harm, 'the subjective factor, deliberate indifference, should be determined in light of the prison authorities' current attitudes and conduct … their attitudes and conduct at the time suit is brought and thereafter.'" Id. at 845-46, citing Helling v. McKinney, 509 U.S. 25, 36 (1993). Further, in order to survive summary judgment, the plaintiff

> must come forward with evidence from which it can be inferred that the defendant officials were at the time suit was filed, and are at the time of summary judgment, knowingly and unreasonably disregarding an objectively intolerable risk of harm, and that they will continue to do so; and finally to establish eligibility for an injunction, the inmate must demonstrate the continuance of that disregard during the remainder of the litigation and into the future. In so doing, the inmate may rely, in the district court's discretion, on developments that postdate the pleadings and pretrial motions, as the defendants may rely on such developments to establish that the inmate is not entitled to an injunction. 511 U.S. at 846 (citation omitted).

The fundamental question in any deliberate indifference case is whether the defendants exhibited "a sufficiently culpable state of mind." Farmer, 511 U.S. at 834 (quotation omitted). In evaluating that question, a court "must focus not on isolated failures – or impossibilities, as the case may be – but rather on the defendants' entire course of conduct." Swain, 961 F.3d at

4

1287-1288.

As far as how defendants' entire course of conduct is to be evaluated, the Eleventh Circuit has stated that, "deliberate indifference is not a constitutionalized version of common-law negligence." Swain v. Junior, 961 F.3d at 1287-88. Indeed, on the issue of prisoners' medical care, the appellate court has held that the Eighth Amendment doesn't require it to be "perfect, the best obtainable, or even very good." Harris v. Thigpen, 941 F.2d 1495, 1510 (11th Cir. 1991)(quotation omitted). Instead, the Eleventh Circuit has emphasized, "[m]edical treatment violates the [E]ighth [A]mendment only when it is so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Id. at 1505 (quotation omitted).

In Hoffer v. Secretary, Fla. Dept. of Corrections, 973 F.3d 1263 (11th Cir. 2020), the Court of Appeals dealt with the appeal of a permanent injunction compelling the Florida Department of Corrections to provide all inmates with Hepatitis C (HCV) with direct acting antiviral (DAA) drugs. The DOC determined that inmates with no liver fibrosis (F0), or mild fibrosis (F1), would not get DAA drugs, while those with moderate fibrosis (F2); severe fibrosis (F3), or cirrhosis (F4), would be prescribed DAA drugs. Id. at 1267-68. The district court found the failure to prescribe F0 and F1 inmates with DAA drugs was deliberate indifference and a violation of the Eighth Amendment. Id. at 1269. After reviewing the deliberate indifference standard under the Eighth Amendment, the Eleventh Circuit stated:

> The question here, therefore, isn't whether, in the best of all possible worlds, F0- and F1-level HCV-positive inmates should receive treatment with DAAs. Nor is it whether, if we were doctors, we would prescribe DAAs to all F0 and F1 patients. Nor, for that matter, is it even whether, if we were sitting as a common-law court, we might conclude that ordinary prudence requires across-the-board DAA treatment. Rather, because the plaintiffs here have invoked the Eighth Amendment, the sole question before us is whether the Secretary's approach to

5

>the treatment of F0- and F1-level inmates is so reckless – so conscience-shocking – that it violated the Constitution.   As explained below, it is not.  Id. at 1271-72.

When this case began on April 13, 2020, plaintiffs sought release from detention, claiming their due process rights were being violated due to a dire and imminent threat to themselves, causing them to fear "that their confinement will result in a COVID-19 infection that will seriously injure and possibly kill them …"  D.E. 1 at 95, ¶ 311.  Implicit in plaintiffs' argument was the notion that their chances of avoiding COVID-19 infection were better if they were released, since they could employ measures like social distancing, which they claimed they were prevented from doing due to crowded conditions in detention.  This argument is fallacious because, "[a] prison is not required by the Eighth Amendment to give a prisoner medical care that is as good as he would receive if he were a free person, let alone an affluent free person." Maggert v. Hanks, 131 F.3d 670, 671 (7th Cir. 1997)(citations omitted).  By analogy, the Eighth Amendment does not require a prison to provide conditions that are as good as they would be in the general public, insofar as the opportunity to avoid infection by COVID-19.

From the beginnings of the coronavirus pandemic, defendants have diligently and conscientiously implemented measures to contain the spread of COVID-19 within its three facilities, and to provide medical care to detainees who were infected.  On March 23, 2020, the Centers for Disease Control and Prevention (CDC) issued its Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities (Mar. 23, 2020)(CDC Guidance).   On April 2, 2020, prior to the filing of the instant lawsuit, the U.S. Immigration and Customs Enforcement (ICE) issued its Pandemic Response Requirements, applicable to detention facilities in which ICE houses detainees.  Since before the filing of the lawsuit, ICE in Miami began to reduce the detainee population at all three facilities involved in

this lawsuit: Krome Detention Center; Broward Transitional Center; and Glades County Detention Center.  Exhibit 1, Declaration of Liana J. Castano, ¶¶ 50-51; Exhibit 2, Declaration of Juan Lopez Vega, ¶ 39.  Krome has been below 75% capacity every day since May 5, 2020, while Glades has been below 75% capacity every month, since May 6, 2020 . Castano Decl., ¶¶ 50-51.  Additionally, ICE took further measures to mitigate the spread of COVID-19, including curtailing social visitation; restricting visitation only to visits required by law, such as attorney visitation, and requiring attorney visitors to wear personal protective equipment during the visit. Castano Decl., ¶ 17; Lopez Vega Decl., ¶ 14.

Masks were distributed at all three facilities to detainees and staff members.  As of April 6, 2020, all staff at Krome were required to wear masks.  Castano Decl., ¶ 23.  On April 29, 2020, surgical masks were issued to every detainee.  Id.  At Glades, all staff were required to wear masks by April 18, 2020.  Id., ¶ 24.  On May 1, 2020, surgical masks were issued to every detainee.  Detainees were educated on the importance of wearing masks to curb infection, as well as personal hygiene practices to include frequent hand washing, and recognition of COVID-19 symptoms.  Castano Decl., ¶ 18; Lopez Vega Decl., ¶¶ 16-17.  The training came from detention and medical staff, as well as CDC signage posted in numerous locations, and videos placed on tablets issued to detainees.

Measures were implemented, where possible, to provide for adequate social distancing. At Krome and Glades, detainees were provided their meals in their dormitories, instead of eating at the dining hall.  Castano Decl., ¶ 20   This allowed for adequate social distancing while eating meals.  At BTC, the dining hall was reconfigured by removing tables, and designating seats which were not to be occupied, to ensure a detainee would not be seated across from, or next to, another detainee while eating.  Lopez Vega Decl., ¶ 18.  A fifty percent reduction of the total

occupancy rate, in the dining hall and wait line, was implemented. Id.

Sleeping arrangements were also reconfigured, where possible, to implement adequate social distancing. At Krome, bunks were skipped where possible, to allow for social distancing. Castano Decl., ¶ 30. Head-to-toe sleeping arrangements were also implemented. At Glades, the distance between bunk beds is 7 feet, 2 inches. Id., ¶ 31. Bed assignments were rearranged, where possible, to accommodate head to toe sleeping to maximize social distancing. At BTC, head to toe sleeping arrangements are encouraged to maximize social distancing between detainees. Lopez Vega Decl., ¶ 28.

One of the greatest challenges to mitigation of the spread of the COVID-19 virus is the dynamic nature of the detainee population at the three facilities. Each day, new detainees are admitted, and others depart the facility. In April through June, when testing supplies were not available in sufficient quantity, detention and medical staff monitored ICE detainees for symptoms of COVID-19 infection. Castano Decl., ¶ 37. On June 4, 2020, ICE directed that all new detainees to its Immigration Health Services Corps staffed detention centers should be tested during intake for COVID-19. Id., ¶ 44. Beginning June 8, 2020, all new intakes at Krome are tested for COVID-19. As of July 10, 2020, all new intakes at Glades are tested for COVID-19. At BTC, testing of all new intakes for COVID-19 began during the week of June 24, 2020. Lopez Vega Decl., ¶ 33.

Detainees who test positive are removed and medically isolated. Castano Decl., ¶ 45. Close contacts of positive cases are quarantined. These close contacts are tested for COVID-19, and have temperature checks and symptoms assessments completed at least twice daily. Lopez Vega Decl., ¶ 35. Detainees who test negative are placed in the general population.

The numbers of detainees who have tested positive at each facility, from March through

8

December 23, 2020, are provided.  For Krome, with an average monthly population of 393 detainees, the range of positives were from a low of zero, to a high of 99.  Castano Decl., ¶ 47.  At Glades, with an average monthly population of 329, the range of positives were from a low of zero, to a high of 52.  Castano Decl., ¶ 48.  At BTC, with an average monthly population of 389 detainees, the range of positives were from a low of zero, to a high of 75.  Lopez Vega Decl., ¶ 37.

ICE continues to follow the PRR and CDC Guidance so long as necessary to mitigate the spread of COVID-19.  Castano Decl., ¶ 52; Lopez Vega Decl., ¶¶ 40-41.   ICE will continue to follow all applicable CDC guidance regarding COVID-19 prevention and mitigation in its detention facilities until the CDC discontinues those recommendations, and adapt the follow the ICE PRR accordingly to prevent and mitigate the spread of COVID-19.  Guadian Decl., ¶ 17.

The efforts expended by defendants to combat and mitigate the spread of the COVID-19 virus, to include reducing the detainee population at all three facilities to 75% of capacity and maintaining such reduced levels; testing all incoming detainees; increased sanitation of the detention facilities; wearing of masks by all detention staff; distribution of masks to all detainees; education and training to all detainees on COVID-19 symptoms, proper hand hygiene and social distancing; implementation of satellite feeding at Krome and BTC; reconfiguring the dining hall at BTC and reducing its capacity at meal times by 50%; limiting the capacity of transportation vehicles when transfer of detainees is necessary; reconfiguring bunk beds and sleeping arrangements to increase social distancing, where feasible; and curtailment of social visitation, all demonstrate that ICE has been diligent and conscientious in its efforts to curb the spread of the COVID-19 virus in all three facilities, and to protect the health and well-being of detainees and staff at those facilities.

Nothing that defendants have done, or failed to do, demonstrates conduct that is "so reckless – so conscience shocking – that it violates the Constitution." Hoffer, 973 F.3d at 1272. To the contrary, defendants have acted reasonably in implementing, where feasible, CDC Guidance and ICE PRR requirements. "Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause." Farmer v. Brennan, 511 U.S. at 485. Defendants are entitled to summary judgment.

### III. PLAINTIFFS' VIOLATION OF DETENTION STANDARDS CLAIM, UNDER THE FIFTH AMENDMENT, FAILS TO STATE A CLAIM

In Count One, plaintiffs allege a violation of due process under United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260 (1954), because defendants have failed to abide by the 2011 Performance-Based National Detention Standards (PBNDS) at Krome and BTC, and the National Detention Standards (NDS) applicable to Glades. D.E. 1 at 98-99. Specifically, petitioners contend ICE has failed to follow the PBNDS and NDS, which in turn require compliance with CDC guidelines, and federal, state, and local laws, since it has "neither reduced the population of Krome, Glades, and BTC … nor have they done anything to ensure social distancing and proper hygiene." D.E. 1 at 99, ¶ 325. Further, plaintiffs alleged that defendants have failed to comply with CDC Guidelines. Id., ¶¶ 326-331.

In Accardi, petitioner Joseph Accardi, a citizen of Italy, was placed in deportation proceedings because he entered the United States without inspection in 1932, from Canada. 347 U.S. at 501. Deportation proceedings commenced in 1947. In 1948, Accardi applied for suspension of deportation pursuant to section 19(c) of the Immigration Act of 1917. Hearings on the deportation charge and Accardi's application for suspension of deportation were held before

Immigration and Naturalization Service officers from 1948 to 1952. Id. A hearing officer found Accardi deportable and recommended a denial of discretionary relief. On July 7, 1952, the Acting Commissioner of Immigration adopted the hearing officer's findings and recommendation. On April 3, 1953, the Board of Immigration Appeals affirmed the decision of the hearing officer.

Accardi filed a habeas petition, arguing that on October 2, 1952, while his case was pending decision before the Board of Immigration Appeals, the Attorney General announced at a press conference that he planned to deport certain "unsavory characters," and that he had prepared a confidential list of one hundred individuals, including Accardi, whose deportation he wished. Id. at 502. Accardi claimed that the issuance of the list and related publicity amounted to public prejudgment by the Attorney General so that fair consideration of Accardi's case by the BIA was made impossible. The district court denied the habeas, and the Second Circuit affirmed.

The Supreme Court granted certiorari. The Court observed that, "[t]he crucial question is whether the alleged conduct of the Attorney General deprived petitioner of any of the rights guaranteed him by the statute or by the regulations issued pursuant thereto." 347 U.S. at 265. Also, the Court noted that, "[r]egulations with the force and effect of law supplement the bare bones of section 19(c)." Id. (footnotes omitted). The Court cited 8 C.F.R. § 90.3(c)(1949) and 8 C.F.R. § 6.1(d)(1)(Rev. 1952), observing that the Board "is appointed by the Attorney General, serves at his pleasure, and operates under regulations providing that: 'in considering and determining * * * appeals, the Board of Immigration Appeals shall exercise such discretion and power conferred upon the Attorney General by law as is appropriate and necessary for the disposition of the case. The decision of the Board * * * shall be final except in those cases

11

reviewed by the Attorney General.'"

Continuing the Court found that, "[t]he regulations just quoted pinpoint the decisive fact in this case: the Board was required, as it still is, to exercise its own judgment when considering appeals." Id. at 266. As to Accardi's allegations, the Court found that the habeas petition "charges the Attorney General with precisely what the regulations forbid him to do: dictating the Board's decision." Id. at 267. The Supreme Court remanded the habeas, and stated that if Accardi could prove his allegation, he should receive a new hearing before the Board without the burden of previous proscription on the list. Id. at 268. In closing, the Court observed:

> Of course, he may be unable to prove his allegation before the District Court, but he is entitled to the opportunity to try. If successful, he may still fail to convince the Board or the Attorney General, in the exercise of their discretion, that he is entitled to suspension, but at least he will have been afforded that due process required by the regulations in such proceedings.

Id.

The issue in Accardi was whether the Attorney General "deprived petitioner of any of the rights guaranteed him by the statute or by the regulations issued pursuant thereto." Id. at 265. While plaintiffs contend their claim is based upon Accardi, the Fifth Amendment, and the APA, they cite to no statute or regulation as the basis for a due process claim. Instead, they rely upon the PBNDS, NDS, and CDC Guidelines, which are not regulations. This distinction was critical in Accardi as the Supreme Court noted that, "[r]egulations with the force and effect of law supplement the bare bones of section 19(c) [of the Immigration Act of 1917]. 347 U.S. at 265.

For a regulation to have the force and effect of law, and thus to be the source of an affirmative legal obligation, it must be a "substantive rule," as opposed to an interpretive rule, general statement of policy, or rules of agency, organization, procedure, or practice. Smith v. Russellville Production Credit Assoc., 777 F.2d 1544, 1547-48 (11th Cir. 1985), citing Chrysler

12

Corp. v. Brown, 441 U.S. 281, 301 (1979), and United States v. Harvey, 659 F.2d 62 (5th Cir. Unit B 1981).

The CDC Guidelines, PBNDS, and NDS, are not regulations at all, but general statements of policy and procedure in the operation of detention centers where ICE detainees are housed. These guidelines and internal standards do not have the force and effect of law, nor do they confer any substantive rights. Schweiker v. Hansen, 450 U.S. 785, 789 (1981)(Social Security Claims Manual is not a regulation, has no legal force, and did not bind Social Security Administration); Pasquini v. Morris, 700 F.2d 658, 662 (11th Cir. 1983)(INS Operating Instructions conferred no substantive rights); Dong Sik Kwon v. INS, 646 F.2d 909, 918-19 (5th Cir. 1981)(en banc)(same); and United States v. Craveiro, 907 F.2d 260, 263-64 (1st Cir. 1990)(internal guidelines of a federal agency, that are not mandated by statute or the Constitution, do not confer substantive rights on any party).

Accardi does not transform any internal agency policy, guideline, or manual, into a source of substantive enforceable rights. To the contrary, Accardi found that the Attorney General's actions may have deprived Accardi of "due process required by the regulations." The source of the procedural due process right was the regulations, which have the force and effect of law, not a set of agency internal performance standards or guidelines.

The text of the CDC Guidelines is written to provide ample flexibility to facility administrators, in recognition of the unique challenges posed by housing many people in a single physical setting. CDC Guidelines at 2-3. In recognition of the many differing conditions existing at correctional and detention facilities, the CDC states:

> **The guidance may need to be adapted based on individual facilities' physical space, staffing, population, operations, and other resources and conditions.**

13

CDC Guidelines at 1 (emphasis in original). The CDC clearly recognized that detention center administrators and health care professionals would need to exercise their judgment in applying the Guidelines to their facility. Instead of supplying a rigid set of standards, the CDC Guidelines was

> intended to provide guiding principles for healthcare and non-healthcare administrators of correction and detention facilities (including but not limited to federal and state prisons, local jails, and detention centers), law enforcement agencies that have custodial authority for detained populations (i.e., US Immigration and Customs Enforcement and US Marshals Service), and their respective health departments, to assist in preparing for potential introduction, spread, and mitigation of COVID-19 in their facilities. CDC Guidelines at 1.

The Eleventh Circuit recognized this flexibility in the CDC Guidelines, when it noted that, "the CDC's guidance -- on which the district court relied heavily – presupposes that some modifications of its social distancing recommendations will be necessary in institutional settings." Swain, 961 F.3d at 1288. Moreover, Swain noted that the CDC Guidelines provided that, while there should "ideally" be six feet between inmates, "[s]trategies will need to be tailored to the individual space in the facility and the needs of the population and staff," and that "[n]ot all strategies will be feasible in all facilities." Id.

There are few things "ideal" when it comes to the coronavirus pandemic. If Krome, BTC, or Glades was unable to maintain the ideal six feet of social distancing recommended by the CDC Guidelines, the same Guidelines allowed facility administrators to tailor the individual space to the needs of the population and staff. CDC Guidelines at 11. That is what defendants did. When the detainee population was reduced, ICE was able to stagger the occupancy of the bunkbeds to allow for social distancing, or in the case of BTC, to reduce the number of occupants in each room.

14

The CDC Guidelines do not have the force and effect of law, and create no substantive enforceable rights. Therefore, plaintiffs fail to state a claim.

### III. PLAINTIFFS' FAIL TO STATE A CLAIM OF A SUBSTANTIVE DUE PROCESS VIOLATION IN THEIR STATE CREATED DANGER CLAIM

Plaintiffs also claim they are entitled to release under the state-created danger doctrine. D.E. 1 at 105. In Perez-Guerrero v. U.S. Atty General, 717 F.3d 1224 (11th Cir. 2013), the Eleventh Circuit explained that "only custodial relationships automatically give rise to a governmental duty, under substantive due process, to protect persons from harm by third parties." Id. at 1233, citing Doe v. Braddy, 673 F.3d 1313, 1318 (11th Cir. 2012). Defendants agree that plaintiffs are in a custodial relationship, but the COVID-19 virus is not a third party. The cases in which individuals invoked the state created danger doctrine involved harm caused by individuals, not a communicable disease. White v. Lemacks, 183 F.3d 1253 (11th Cir. 1999)(nurse working in prison infirmary assaulted by inmate); Perez-Guerrero (alien claimed life would be threatened if deported to Mexico due to reprisals by persons he testified against in United States); and Doe v. Braddy (five-year old child sexually assaulted by teenaged minor placed by state social workers in adoptive home). Inasmuch as the coronavirus is not a third party, plaintiffs cannot claim a substantive due process right to protection from it.

As persons detained by the government, the Eighth Amendment affords protection to plaintiffs from deliberately indifferent conduct which poses a substantial risk of serious harm to their medical needs. There is no reason to construe another constitutional right, under the guise of substantive due process, that already exists under the Eighth Amendment.

In Graham v. Connor, 490 U.S. 386 (1989), the Supreme Court faced the issue of how claims of excessive force by law enforcement officers should be analyzed under the Constitution.

Many appellate courts framed the issue under substantive due process, finding the use of undue force to be a deprivation of liberty without due process of law. Id. at 392, citing Johnson v. Glick, 481 F.2d 1028 (1973). The Supreme Court observed that, in the years following Johnson v. Glick, "the vast majority of lower federal courts have applied its four-part 'substantive due process' test indiscriminately to all excessive force claims lodged against law enforcement and prison officials under § 1983, without considering whether the particular application of force might implicate a more specific constitutional right governed by a different standard." 490 U.S. at 393 (footnoted omitted). Further, the high Court noted that Johnson v. Glick "applied neither the Fourth Amendment nor the Eighth, the two most textually obvious sources of constitutional protection against physically abusive governmental conduct." Id. at 392 (footnote omitted).

The Supreme Court found that in addressing an excessive force claim, the analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force. In most instances, that would be under the Fourth Amendment's prohibition against unreasonable seizures of the person, or the Eighth Amendment's ban on cruel and unusual punishments. Id. at 394. Rather than apply some generalized "excessive force" standard, the validity of the claim must be judged by reference to the specific constitutional standard which governs that right. The Court found that, because the claim of excessive force arose out of an investigatory stop by Charlotte, North Carolina, police officers, the claim should be analyzed under the Fourth Amendment. Id. at 394. "Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." Id. at 395.

Graham's logic applies with equal force to plaintiffs' claim that a separate substantive

16

due process right exists which protects them from state created danger. The Eighth Amendment provides an explicit textual source of constitutional protection to detained persons against governmental conduct that poses a serious risk to their medical needs, due to deliberately indifferent conduct. Instead of applying some generalized notion of substantive due process which underlies the state created danger doctrine, the Eighth Amendment provides a clear standard for analyzing claims of inadequate medical care. Consequently, plaintiffs cannot claim a separate right against allegedly inadequate medical care under the Due Process clause.

Even if a separate substantive due process right exists for detained individuals, protecting them from state created danger, defendants are entitled to summary judgment on such a claim. In White v. Lemacks, supra, the Eleventh Circuit observed that, after the Supreme Court's decision in Collins v. City of Harker Heights, 503 U.S. 115 (1992), "it appears the only relationships that automatically give rise to a governmental duty to protect individuals from harm by third parties under the substantive due process clause are custodial relationships, such as those which arise from the incarceration of prisoners or other forms of involuntary confinement through which the government deprives individuals of their liberty and thus the ability to take care of themselves." 183 F.3d at 1257.

In the Eleventh Circuit, when the government has a custodial relationship with an individual, the individual suffering harm must establish two elements: (1) the failure to act must have been a substantial factor leading to the violation of a constitutionally protected liberty or property interest; and (2) the official having the responsibility to act must display deliberate indifference. Taylor v. Ledbetter, 818 F.2d 791, 794 (11th Cir. 1987)(en banc). The appellate court expressly referenced Estelle v. Gamble, 429 U.S. 97 (1976), in deciding that the deliberate indifference to a prisoner's serious illness or injury standard should also apply to claims by foster

17

children who are injured while in the custody of their foster parents. 818 F.2d at 795-96. In H.A.L, J.H.L. and S.L.L. v. Foltz, 551 F.3d 1227 (11th Cir. 2008), the Eleventh Circuit affirmed the lower court's denial of summary judgment based on qualified immunity, finding that the relevant issue was whether defendants "actually knew, and were deliberately indifferent to, a substantial risk of Plaintiffs being sexually abused in the Shick home." Id. at 1232.

Since a state created danger claim, based upon substantive due process, would apply the same deliberate indifference standard because of the custodial relationship, defendants are entitled to summary judgment for the same reasons as the Eighth Amendment deliberate indifference claim.

## CONCLUSION

Defendants are entitled to summary judgment on plaintiffs' deliberate indifference claim because the material, uncontroverted facts establish that defendants have acted reasonably in implementing measures to contain the spread of the COVID-19 virus at Krome, BTC, and Glades. Plaintiffs' due process claim under Accardi should be dismissed for failure to state a claim since the CDC Guidelines are not regulations with the force and effect of law. Similarly, plaintiffs' state created danger claim also fails to state a claim since the Eighth Amendment directly addresses the issue of obligations under the Constitution, insofar as serious medical needs, owed by custodians to individuals in their custody.

DATED:    January 4, 2021    Respectfully submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

By:    s/ Dexter A. Lee
DEXTER A. LEE
Assistant U.S. Attorney

    Fla. Bar No. 0936693
    99 N.E. 4th Street, Suite 300
    Miami, Florida 33132
    (305) 961-9320
    Fax: (305) 530-7139
    E-mail: dexter.lee@usdoj.gov

    s/Natalie Diaz
    NATALIE DIAZ
    ASSISTANT U.S. ATTORNEY
    Florida Bar No. 85834
    E-mail: Natalie.Diaz@usdoj.gov
    99 N.E. 4th Street, Suite 300
    Miami, Florida 33132
    Telephone: (305) 961-9306

ATTORNEYS FOR DEFENDANTS

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 4, 2021, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

    s/ Dexter A. Lee
    DEXTER A. LEE
    Assistant U.S. Attorney