**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**Case No. 20-21553-Civ-Cooke/Goodman**

PATRICK GAYLE, et al.,

      Petitioners-Plaintiffs, on behalf of
      themselves and those similarly situated,

vs.

MICHAEL W. MEADE, et al.,

      Respondents-Defendants.

_____/

**SPECIAL MASTER REPORT AND RECOMMENDATION**

Currently before the Court is the Petitioner-Plaintiffs ("Petitioners") second Motion to Compel Compliance with the Court's June 6, 2020 Preliminary Injunction. Based upon observations made personally by the undersigned during the facility inspections at the Krome Detention Center in Miami ("Krome"), the Broward Transitional Center in Pompano Beach ("BTC") and the Glades County Detention Center in Moore Haven ("Glades"), the Special Master recommends that the Court grant in part and deny in part the pending second motion to compel filed by the Petitioners.

Consistent with the Court's Order Appointing the Special Master ("Appointment Order"), the undersigned inspected each facility to include the following areas: all housing units where the Petitioners are housed, housing units where quarantined detainees are being held, the ingress/egress screenings, medical facilities, dining facilities, laundry facilities, shower/bathroom facilities, sleeping units/pods. Appointment Order at 7. In addition, the undersigned inspected the warehousing section of each facility. On July 31, 2020, the undersigned conducted the inspection

of Glades, including all of the facilities listed in the Appointment Order.  On August 3, 2020, the undersigned conducted the inspection of BTC including all of the facilities listed in the Appointment Order.  On August 5, 2020, the undersigned conducted the inspection of Krome, including all of the facilities listed in the Appointment Order.

At each facility, the undersigned was able to make certain observations regarding the cleanliness of the housing units, social distancing measures, availability and stock of cleaning supplies and personal protective equipment, and the availability and stock of hygienic and disinfecting supplies.  *Id*.  In addition, the undersigned requested follow up information from the facilities to assist in the preparation of this report.  The factual findings regarding the categories contained in the Appointment Order are detailed below.

## I.    Background

On April 13, 2020, the Petitioners who are a group comprised of civil immigration detainees filed an action alleging *inter alia* that they are at imminent risk of contracting COVID-19 while being held by the Miami Field Office of Immigration and Customs Enforcement ("ICE"). The Petitioners each allege a condition or combination of conditions that makes them particularly susceptible to the worst effects of the virus.  On May 20, 2020, Petitioners filed a Motion to Compel alleging that ICE was not complying with the Court's April 30, 2020 Temporary Restraining Order.  On June 6, 2020, the Court issued a Preliminary Injunction ruling on the Petitioner's initial Motion to Compel.  The Court's Preliminary Injunction Order detailed the measures that ICE must take or face being in violation of the Court's order.  On June 16, 2020, the Petitioners filed a motion to compel.  In answering the Petitioners claims made in connection with the Second Motion to Compel Compliance, including those made during a June 25, 2020 hearing on the motion to compel featuring live testimony, ICE states that it has complied with the Court's Preliminary Injunction Order.

The allegations contained in the petition, the declarations attached to the petition, the motions to compel and, the declarations attached to both the first and second motions to compel vary, but share some consistent themes including: (1) comingling detainees with confirmed cases of COVID-19 with those are with those who have not been confirmed to have the virus (2) a failure to provide cleaning supplies and masks to detainees and (3) a failure to educate detainees about COVID-19.  In addition, there are allegations surrounding a general lack of social distancing while the detainees are being housed in the facilities.  The declarations also contain allegations concerning a lack of testing and a failure to provide masks prior to transferring detainees.[1]  The fluid nature of the evolving science regarding transmission of COVID-19 combined with the contagious profile of the virus has made slowing its spread an extraordinary challenge throughout the world and across industries.  The challenge is amplified in a setting such as a detention facility that does not lend itself to the best current prevention tools available – consistent mask usage and social distancing used in conjunction with cleaning and disinfecting.

## II.    Glades

In order to achieve social distancing consistent with the Court's Preliminary Injunction Order and CDC Guidelines ICE would need space sufficient to achieve the required recommended distance of at least six feet between detainees.   During the inspection of Glades and in follow-up inquiries, the undersigned requested the architectural drawings of the floorplans of the facility to better assist the Court in making its credibility determinations and factual inferences.[2]   The

---

[1] The allegations contained in the declarations and the response of the United States to each of the allegations are reflected in the attached Excel spreadsheet found at Composite Exhibit 1.

[2] The United States objects to any publication of this report or its exhibits that reveals anything constituting mapping including square footage amounts of the facilities for security reasons.  The Petitioners requested a map of the sites in discovery.  The United States objected based upon a law enforcement and trade secrets privilege.  The undersigned has submitted this report that relies on the mapping in camera for the Court's determination regarding these issues.  Consistent with the Court's Appointment Order any publication of this report should redact the portions of this report and its exhibits reflecting mapping as well as any other references to security related concerns

architectural floorplans would enable the undersigned's expert Mr. Christopher Smith to calculate the space available within Glades in order to make inferences regarding a number of issues relevant to social distancing.[3]   Attached at Exhibit 3 is a scan of the blueprints made from the architectural floorplans received from ICE that reflects the square footage and measurements of the facility. Glades current reduction in capacity is based upon bed space with a maximum capacity of 378 male beds, and 85 female beds.  At the time of the inspection the percentage capacity was 72 % of male beds or 272 individuals.  At the time of the inspection the percentage capacity was 53 % of female beds or 42 individuals.  Attached, as Exhibit 4 is the Glades Fast Facts summary provided during the inspection.  CDC Guidelines require a distance of six feet for social distancing purposes. Bed capacity is not the most relevant measurement of the capacity of the facility for social distancing purposes.  Measurement for percentage population reduction should be based upon available square footage divided by the required six-foot distance not bed space.  Mr. Smith's calculations provide that analysis.  A map created by Mr. Smith and his calculations for capacity at Glades is attached at Composite Exhibit 2.

During the inspection the undersigned conducted a walk-through of the arrival procedure encountered by the detainees from the point of entry through the initial screening process into the medical unit and back to the housing/sleep areas.  The walk through culminated in the outdoor areas to include the warehouse storage facilities that house the supplies relevant to the Court's orders.  Prior to entry into the facility, on the buses the detainees are separated by empty seats

---

after consultation with ICE.  The undersigned received architectural floorplans for BTC, other plans for Glades and square footage totals for Krome.

[3] Stearns Weaver Miller, Geographical Information Systems expert Christopher Smith's curriculum vitae is attached as Composite Exhibit 2.  A geographic information system (GIS) is a computer-based tool for mapping that provides endless   opportunities to relate any type of data to geographic locations   Consistent with the Court's observation contained in footnote 7 of the Appointment Order predicated upon Magistrate Judge Goodman's recommendation, Mr. Smith ran an analysis to calculate the space available at each institution to establish a maximum capacity within the CDC recommended distance of six feet.

marked off to attempt social distancing.  Composite Exhibit 5 depicts the sally port and entry into the facility.  As depicted in composite Exhibit 5 the entry to Glades after the sally port includes the usual processing procedures such as fingerprinting in addition to signage regarding COVID-19 and a medical check.  Included in Composite Exhibit 5 are two videos MAH00065 and MAH00076 representing the processing portion at Glades.

One category of disputed allegations concerning the Glades facility consist of the cleanliness of the housing units.  Appointment Order at 7; Exhibit 1.  During the inspection at Glades, the undersigned witnessed generally clean housing units.  Of particular note was the fact that cleaning was taking place while the inspection was underway.  Attached as Composite Exhibit 5 is a composite exhibit of photographs and video taken during the inspection at Glades inside the housing units, screening area, medical facilities, dining facilities, laundry facilities, shower/bathroom facilities, and sleeping units.  Appointment Order at 7.

In addition, throughout the facility there were hand sanitizer stations as reflected in Composite Exhibit 6.  Those stations were located from the point of entering the facility, in the hallways and into the housing areas.  As reflected in Composite Exhibit 6, there was signage specifically regarding COVID-19 throughout Glades.  Inside the restroom facilities there was additional signage regarding hand washing procedures.  In addition to the posted signage, the restroom facilities were generally clean.  Overall, the living space was clean appearing like a space for the occupancy of multiple people that is in use.

Once inside the facility, ICE's attempts at social distancing through the use of alternating rooms and/or eliminating seating areas within each room are apparent.  Composite Exhibit 7 reflects the rooms inside the facility upon entry.  These rooms depict the waiting areas, medical check rooms, and fingerprinting area all within the entry of the facility.  There are hand sanitizers

visible on the walls throughout the entry part of the facility.  During the intake process, the detainees view a video that includes COVID-19 education.  A copy of the video is attached at Exhibit 8.

After exiting the intake portion of the facility, the walk-through proceeded down the corridors used by the detainees to gain access to the housing portion of the facility.  The hallways in the corridors had additional signage regarding COVID-19 and hand sanitizers installed. Composite Exhibit 9 reflects the hallways leading to the housing units that include both signs and hand sanitizer stations.

Once inside the housing units there are signs and telephone banks.  The signs provide additional information regarding COVID-19.  Alternating telephone bays have been blocked off in an attempt to achieve social distancing.  There are communal bunks bolted to the floor and tables where the detainees have their meals in light of the current conditions.  Composite Exhibit 9 contains photographs and videos of the inside of the housing units to include the sleeping areas. Included in Composite Exhibit 10 are video clips MAH00130, MAH00132 and MAH00144 reflecting the inside of the housing units.  There seems to be little dispute that social distancing is not possible in the housing units given the number of individuals housed and the configuration of the facilities.

Within the housing units are the bathroom/shower facilities that were again generally clean and reflected a highly trafficked communal living space.  Composite Exhibit 12 contains photographs of the bathroom/shower areas observed during the inspection.  The soap dispensers contained soap.  Glades maintains a log of when the soap and/or hand sanitizer is re-filled.  There exists a dispute noted among the parties regarding the availability of soap.  The logs contain notations regarding the refilling of these dispensers.  The undersigned requested additional logs to

check for the refilling of the soap and hand sanitizer.  The log reflects dates and times of the refill of the soap at various locations within the facility.  Composite Exhibit 12 is a sampling of the soap dispenser and hand sanitizer log for Glades.  Specifically photograph DSC 181 is a picture of the hand sanitizer log viewed upon the day of inspection.

The undersigned requested additional logs after the inspection and are included in Composite Exhibit 12.  In addition, there exists a general cleaning log that the undersigned requested and included as part of Composite Exhibit 12.  The general cleaning log reflects the schedule of the dates and times the facility was cleaned.  The dorm, the date and time, the officer's name are reflected on the cleaning logs.  The logs reflect that cleaning supplies were issued and returned by ICE staff.  For instance, on page 41 of the log there is a heading "disinfectant spray" dated July 1, 2020 with an entry time and the dorm listed.

There is a log entitled, "Hand Soap Dispenser Log" that is a part of Composite Exhibit 11.  The records for the months of June and July have a box for "checked by", "filled by", the POD that is being checked, and a section to be initialed.  The log indicates dates and times for the addition of soap to the dispensers during the relevant time period.  Soap is issued according to ICE declarations on Tuesdays and Fridays and additional soap is available to be replenished for free or purchased.  In addition there exists a similar, "Hand Sanitizer Dispenser Log" which contains the same fields.  The log for June and July has fields that are dated has a box for "checked by", "filled by", the POD that is being checked, and a section to be initialed

In light of the inspection of the soap dispensers, existence of the soap logs that were contemporaneously noted when refills were done, the existence of the hand sanitizer stations also with a refill log information in addition to the testimony of ICE regarding the availability of soap,

the logical inference is that ICE made soap and hand sanitizer, although perhaps at times imperfectly, available.

As to hand towels, according to ICE each detainee is issued a towel upon intake and there were rags being used for cleaning during the inspection. ICE maintains that there are security reasons, i.e. to prevent the clogging of toilets for not issuing disposable hand towels although paper towels were visible at the point of entry for use. No disposable or paper towels were visible during the inspection in the housing unit for cleaning. It makes sense that given the volume of paper towels required at the facility, shortness of supply on the market and security issues that the practice may have changed since the filing of the various declarations.

An additional category of disputed allegations consist of the availability of stock cleaning supplies and personal protective equipment. Appointment Order at 7. During the walk-through the undersigned observed stock cleaning supplies located in close proximity to the housing units. In addition, the undersigned requested and received access to the warehouse where the additional cleaning supplies are located. Composite Exhibit 13 contains photographs of the stock cleaning supplies in the hallway area and the warehouse. There is a log of the supplies located in the warehouse. One example of the dial soap log is included in the composite. Composite Exhibit 13 contains pictures of warehouse supplies including soap, body wash, gloves, and masks. In addition, the undersigned requested and received invoices of purchases for cleaning supplies, masks, and gloves. Included in Composite Exhibit 13 is a video MAH00197 of the warehouse unit. During the relevant time period, there is a marked uptick in the purchase history for the purchase of these various pieces of equipment consistent with what one would expect in responding to the crisis of COVID-19. Attached as part of Composite Exhibit 13 is a chart entitled

"GCDC COVID-19 Purchases" list reflecting a number of different items from soap dispensers to face masks that have been purchased by the facility during the relevant time period.

Another category of disputed allegations is the availability and stock of hygiene and disinfecting supplies. Appointment Order at 7. During the walk-through, the undersigned observed buckets for cleaning as well as cleaning products. At Glades the officers mix a cleaning solution that is provided to the detainees. Composite Exhibit 14 contains pictures of the cleaning and disinfecting supplies and a videotape MAH00195 of the guard explaining the process of mixing the cleaning solution. Buckets, mops, solution, and wiping down of surfaces was occurring during the inspection. The showers and bathrooms were also being cleaned in some areas.

There exist other miscellaneous allegations capable of recommended resolution at this point based upon observations made during the inspection. For instance, the allegations surrounding water temperature and availability were tested during the inspection. The water in the restroom in the housing facility was warm to the touch when tested during the inspection. In addition, when the undersigned measured with an infrared gauge the water registered as warm. The water stayed on for under twenty seconds when time out but can easily be restarted. A video is contained as part of Composite Exhibit 15 that reflects the test run on the water at Glades. Therefore, during the inspection the undersigned observed nothing giving any credence to the allegations regarding lack of warm water or the duration of water running for hand washing.[4]

In sum, the Glades facility appears to have sufficient cleanliness of housing units, supply of cleaning supplies and personal protective equipment, and stock of hygienic and disinfecting supplies, though the facility is not perfect in any of these areas. It appears, however, that Glades is

---

[4] The undersigned included the dining facility that is currently out of use at Glades in response to the pandemic. The Detainees are taking their meals inside the housing units using the tables depicted in the composite exhibits or on their beds.

not meeting the CDC's social distancing guidelines.  Glades appears to have an insufficient structural footprint to house detainees at the level witnessed during the inspection.

## III.    BTC

The undersigned requested GIS expert Mr. Smith to run an analysis based upon square footage using the architectural floorplans for BTC.  At BTC, ICE would need space sufficient to achieve the required recommended distance of at least six feet to comply with social distancing consistent with the Court's Order and CDC Guidelines.  During the inspection of BTC and follow-up inquiries, the undersigned requested and received the architectural floorplans of the facility to better assist the Court in making its credibility determinations and factual inferences.[5]

Using the information received, the undersigned's expert Mr. Smith calculated the space available within BTC to draw conclusions regarding social distancing.  Attached at Exhibit 16 is a map created by Mr. Smith based upon a scan of the architectural floorplans received from ICE that reflects the square footage and measurements of the facility.  BTC's current reduction in capacity is based upon bed space with a maximum capacity of 595 male beds and 105 female beds.  Attached as Exhibit 17 is the BTC Fast Facts summary provided during the inspection.  BTC current reduction in capacity is based upon bed space with a maximum capacity of 595 male beds, and 105 female beds.  At the time of the inspection, the percentage capacity was 53 % of male beds or 315 individuals.  At the time of the inspection, the percentage capacity was 53 % of female beds or 56 individuals.  CDC Guidelines require a distance of six feet for social distancing purposes.  Bed capacity is not the most useful measurement available to calculate the proper capacity of the facility to achieve six feet of social distancing.  Measurement for percentage

---

[5] The United States objects to any publication of this report or its exhibits that reveals anything constituting mapping of the facilities for security reasons.  Consistent with the Court's Appointment Order any publication of this currently sealed report should redact the exhibits reflecting mapping as well as any other references to security related concerns after consultation with ICE.

population reduction should be based upon available square footage and the required six-foot distance not bed space. Mr. Smith's calculations provide that analysis.

During the walk through at BTC, the undersigned followed the same procedure previously described above in section II relating to Glades by tracing the route used the detainees upon arrival at the facility. Attached in Composite Exhibit 18 is a sample of the photographs taken upon entering the facility. Included in Composite Exhibit 18 is video DSCF0083 and DSCF0085 that shows the processing area. Prior to entering the facility, the detainees are on the buses where the undersigned observed signage and attempts at social distancing by creating space. The undersigned noted signs inside the buses themselves and certain areas blocked off.

Once inside the facility, there were signage regarding COVID-19 in addition to marking for social distancing purposes. The initial screening room where the detainees are first brought has signs posted regarding six feet for social distancing and general COVID-19 information. Composite Exhibit 19 is a collection of photographs inside the entry of the facility reflecting signage and distancing measures. Composite Exhibit 20 also includes photographs of items issued to the detainees upon arrival including soap and other hygiene products. For instance, DCS00101 is a photograph of the items next to a brown bag issued to the detainees.

BTC differs from Glades in terms of its layout in some significant respects. BTC is a structure with dorm-like rooms built around two quad athletic fields. The facility is more outdoor in its design than Glades with less people housed together. Inside each of the dorm-like rooms there is a separate restroom facility for those occupants. Composite Exhibit 20 consists of a number of photographs inside the housing unit rooms. As part of Composite Exhibit 20 there are DSCF0155 showing the detainees lining up for lunch. DSCF0091 shows the detainees congregating in the quad. The rooms, which are the housing units, were clean. In addition, certain of the beds located

inside the rooms were not in use in an attempt at social distancing. There seems to be no dispute that social distancing at BTC is not possible given the numbers and configuration of the facilities.

Inside each of the rooms are televisions that have a sign posted for educational information regarding COVID-19 in Spanish and English. The signs posted inside the facility make note of the social distancing procedure for bed placement. DSC115 notes that the beds are spaced three feet apart. Composite Exhibit 21 contains various photographs of signs including in the restroom facilities regarding hand washing. There were posted signs regarding the availability for soap refills posted. An example of the posted sign is contained in Composite Exhibit 22. Further there is a sign posted by the Commissary indicated when refills of soap are available. The sign is dated April 30, 2020, states that re-fills of soap can be requested as needed, and that the soap is issued twice per week. The photograph is contained in Composite Exhibit 22 as DSC 000168. Composite Exhibit 22 also includes video DSCF00340 showing the markers on the floor for social distancing purposes.

The housing units were clean and the undersigned noted posted rules for cleaning procedure within the facility. Composite Exhibit 23 contains an array of photographs including one with the rules for cleaning that is posted in the facility. *See* DSCF 0295. In addition, there is a posted sign regarding the laundry schedule and a number of photographs of supplies including gloves, a phone bank alternating the phones in use with a cleaner. Included in Composite Exhibit 24 are photographs of the stock cleaning supplies available at the warehouse portion of the facility.

Some of the common areas throughout the facility have been modified to reflect the response to COVID-19. Every other phone in the phone bank has been taken out of use to encourage social distancing. Cleaning products were visible sitting on the phone banks during the inspection. Composite Exhibit 25 contains some photographs of phone banks. The "Day Room"

contains signage regarding the maximum occupancy and use of masks.  *See* DCS 00130 and DSC 00131 in Composite Exhibit 26.  There was a sign visible regarding ICE's mask issuing policy. DSF0174 is a photograph taken and included as part of Composite Exhibit 26.  According to the sign posted on or about April 17, 2020, masks are issued every Monday, Wednesday and Friday. In addition, there are guidelines regarding the use of the masks.

During some larger gathering times like meals, the detainees line up in order to enter the dining hall.  The undersigned noted a sign regarding social distancing measures, which is DSC 00145, contained in Composite Exhibit 27.  A sign announced limits on recreation in an effort to attain social distancing.  Composite Exhibit 27 contains photographs of the detainees lining up during lunchtime.  The undersigned noted that the floors have marks for social distancing as reflected in DSC 000134.  The detainees generally were using their masks while in line.  Once inside the dining areas ICE has removed every other seat to make attempts at social distancing. Composite Exhibit 26 contains DSCF00338 showing the detainees lining up for meal time.

On the floor leading into the dining area are makers indicating six feet of separation.  The undersigned observed detainees during lunchtime and noted the use of masks and following the procedures outlined regarding social distancing.  Attached on the walls outside of the dining area are hand sanitizer stations.  Each of these measures is depicted in Composite Exhibit 28.  Although there is an apparent attempt to increase spacing in there, it is clearly under the six feet recommended by CDC Guidelines.  Inside the food preparation area, those preparing and serving the meals worked in stalls separated by large plastic walls as depicted in DSCF 0219, 0220, 0221, and 0222 in Composite Exhibit 29.  Those preparing the food all were using masks and hair coverings.

There was personal protective equipment in the form of masks visible throughout the facility during the inspection.  Those nurses working inside the medical unit had more equipment in the form of gloves, gowns and scrubs.  There was soap visible inside the housing rooms and cleaning supplies visible on the phone banks.  There were hand sanitizer stations visible and signage regarding cleaning schedules posted inside the facility.  *See* Composite Exhibit 30.  In addition, there inside the warehouse stock hygiene products and cleaning supplies were visible. *See* Composite Exhibit 31.

The educational signage posted in the law library dated May 11, 2020, requests the use of masks and indicates the maximum capacity of room occupants.  *See* DSCF 0179 included in Composite Exhibit 25.  Composite Exhibit 32 contains photographs of various pieces of educational signage throughout the common areas at BTC.  The laundry facility had signage regarding COVID-19 posted outside.  In addition, the detainees wore masks while working inside the laundry room.  Further, there was a procedure regarding not comingling the used laundry from the various groups within the facility.  *See* Composite Exhibit 33.

In sum, the BTC facility appears to have sufficient cleanliness of housing units, supply of cleaning supplies and personal protective equipment, and stock of hygienic and disinfecting supplies, though the facility is not perfect in any of these areas. It appears, however, that BTC is not meeting the CDC's social distancing guidelines, except in the initial screening area.  BTC has an insufficient structural footprint to house detainees at the level witnessed during the inspection.

## IV.    Krome

The undersigned requested GIS expert Mr. Smith to run an analysis based upon square footage for Krome.  At Krome, ICE would need space sufficient to achieve the required recommended distance of at least six feet to comply with social distancing consistent with the Court's Order and CDC Guidelines.  During the inspection of Krome and follow-up inquiries, the

undersigned requested architectural floorplans of the facility to better assist the Court in making its credibility determinations and factual inferences.[6]   ICE provided less accurate square footage totals for the facility which Mr. Smith used for his analysis.  Using the data the undersigned's expert, Mr. Smith, calculated the space available within Krome to draw conclusions regarding social distancing.  Attached as Exhibit 34 is a map created by Mr. Smith and his calculations for capacity at Krome.   Krome's current reduction in capacity is based upon bed space with a maximum capacity of 682 male beds.  Krome has no female occupants.

Attached as Exhibit 35 is the Krome Fast Facts summary provided during the inspection. Krome current reduction in capacity is based upon bed space with a maximum capacity of 682 male beds.  At the time of the inspection, the percentage capacity was 65 % of male beds or 444 individuals.  Bed capacity is not the most accurate measure available to the Court in making its factual determination.  As noted above, the appropriate measurement for percentage reduction of population should be based upon available square footage divided by the required six-foot distance, not bed space.  Mr. Smith's calculations for Krome are the more accurate measure given the CDC's Guidelines.  ICE provided only total square footage in response to the request for documents not floorplans.  As a result, the calculation for Krome were estimated using the information provided.

During the inspection at Krome, the undersigned followed the same procedure previously described above in section II relating to Glades by tracing the route used the detainees upon arrival. Prior to entering the facility, the detainees are transported in buses with seats locked off to attempt

---

[6] The United States objects to any publication of this report or its exhibits that reveals anything constituting mapping of the facilities for security reasons.  Consistent with the Court's Appointment Order and the in camera submission of the report any publication of this currently sealed report should redact the exhibits reflecting mapping as well as any other references to security related concerns after consultation with ICE.

social distancing.  Included in Composite Exhibit 36 is MAH0255 a video of the entry into the facility.  MAH0283 is a video of the medical unit.

Attached in Composite Exhibit 37 are photographs reflecting the entry into the facility and the processing component of Krome.  As reflected in the photographs there is signage regarding COVID-19 and social distancing procedures.  In addition, the undersigned noted hand sanitizer stations throughout the facility.  The signs indicate the mask policy upon entering the facility.  The processing rooms have been reduced in their capacity in order to achieve a distance closer to compliance for social distancing guidelines.  Attached photographs DSC 0256 and 0257 reflect the altered capacity signs while inside the processing rooms at Krome.  In addition, DSC0264 is a photograph of the hygiene products issued to the detainees upon arrival at Krome.  Composite Exhibit 37 reflects the entry/processing area.  Included in Composite Exhibit 37 are photographs inside the buses that reflect these efforts.

Unlike Glades and BTC which lend themselves to more a communal environment given the structure of the buildings, Krome is set up by the separate nature of the physical structures to enhance distancing therefore promoting containment of the virus.  Prior to entering the housing unit there are signs regarding the use of masks displayed on the door of the housing/sleeping units.

Inside the housing units, the detainees generally were using their masks.  Composite Exhibit 38 contains photographs of detainees inside the housing unit.  There are signs regarding hand washing and COVID-19 visible inside the units.  The inside of the housing unit was generally clean.  MAH00368, MAH00395 and MAH00477 are videos depicting the inside of the housing unit contained within Composite Exhibit 38.

There were clearly visible signs regarding COVID-19, social distancing and the use of masks throughout the facility.  Composite Exhibit 39 contains photographs reflecting the

educational signage.  The housing facility was clean with indications of recent cleaning as well as products were visible.  Composite Exhibit 40 contains photographs inside the housing units and products for cleaning.  Inside the hand sanitizer station the package of when it was last refilled was dated.  The photograph that is contained in Composite Exhibit 40 as DSC 0460 depicts the date.

Krome has a separate building for those positive COVID-19 positive detainees which the undersigned inspected.  Composite Exhibit 41 contains photographs of the housing unit for COVID-19.  The separation methodology employed at Krome makes the most logical sense in an effort to contain the virus.  Contained within Composite Exhibit 41 are two videotapes MAH00522 and MAH00546 depicting the inside the COVID-19 building.

The undersigned inspected the warehouse for Krome to assess the availability of stock cleaning supplies, personal protective equipment, stock hygienic and disinfecting supplies. Composite Exhibit 42 contains photographs of the warehouse to include those of the cleaning products and personal protective equipment.  Included in Composite Exhibit 42 are two videos MAH00582 and MAH00584 that depict the inside of the warehouse at the facility.

In sum, the Krome facility appears to have sufficient cleanliness of housing units, supply of cleaning supplies and personal protective equipment, and stock of hygienic and disinfecting supplies, though the facility is not perfect in any of these areas. While Krome has a better footprint and layout for achieving social distancing, and appears to have made positive strides towards achieving social distancing, it too appears not to be meeting the CDC's social distancing guidelines.

## V.   Conclusion

As to the vast majority of the factual disputes raised by the detainees in their declarations and the responses by ICE, the testimony of the ICE declarants appears credible based upon the observations made during the inspections.  Any discrepancies have a logical explanation regarding

timing or are likely an aberration.  As Magistrate Judge Goodman pointed out in his Report and Recommendation, it is possible that both versions contained in the declarations for each side could be true at the time there were written.  While imperfect in its execution, ICE like the rest of the world was making adjustments to an ever changing landscape in the midst of an unprecedented global pandemic.

As the Court noted, the science has been evolving on almost a weekly basis throughout the crisis.  The housing units were generally clean, ICE makes attempts at social distancing, ICE had stock cleaning supplies and personal protective equipment visible during the inspection, ICE had stock hygienic and disinfecting supplies visible during the inspection.  Without question there is nothing the undersigned observed during the course of the inspections that would give rise to any inference that ICE has not been truthful, accurate and complete to the best of its ability given the difficulties involved in responding to this crisis.

However, ICE's position as to the ultimate issue in the case leaves much to be desired.  The Petitioners request immediate release in light of the threat the pandemic presents.  ICE contends that it has done all that it could to mitigate the risk based upon the available information and tools to combat the virus.  However the best tools for determining the percentage reduction of the overall number of individuals inside each facility is the empirical data regarding social distancing based upon math that does not require an inference.

The empirical data is in ICE's sole possession and ICE objects to the Petitioners reviewing it.  ICE's position as best as it could be determined from the limited record is that it objects to the Petitioners having the square footage information, i.e. the architectural floorplans requested by the undersigned for security reasons.  Without the information contained in the floor plans regarding square footage Petitioners cannot make the most accurate argument available based upon the only

relevant empirical data.[7]  At the same time, ICE argues it has done all it could to deal with the Petitioners allegations given the available tools to combat the virus citing the Eleventh Circuit precedent in *Gomez v. United States*, 899 F.2d 1124 (11th Cir. 1999).  ICE's articulates in its Response to the Objections to the Magistrate's Report and Recommendation the position of both parties regarding the challenge to the conditions of confinement.  [D.E. 72 at 5-6].  While whether ICE has done all it can, in fact, may or may not be true, the dire situation seems to demand more of ICE.  In light of the most recent scientific information regarding the virulent airborne respiratory nature of the virus especially in enclosed indoor spaces with recirculated air, ICE's response regarding social distancing is insufficient.

First, the undersigned addresses ICE's arguments regarding *Gomez* which is the backbone of the position of the United States.  There is no dispute that Gomez is the controlling law in the Eleventh Circuit on the issues of the conditions of confinement for individuals in federal custody. *Gomez* sets the standard for whether the conditions of confinement for individuals who are incarcerated violate the 8th Amendment to the United States Constitution for being deliberately indifferent to a person's serious medical need.  The changes in conditions of confinement are not effective in addressing the serious medical need in this case.  The Petitioners have exhaustively raised the concerns of the detainees.  The United States claims it has addressed these needs by implementing measures.  However, the ongoing threat of contracting COVID-19 in confined quarters that remains high given the virus' highly transmissible airborne respiratory nature. COVID-19 remains resistant to the risk mitigation strategy so far imposed.  While *Gomez* is

---

[7] ICE provided the last of the non-objectionable documents on August 21, 2020.  The Parties have not yet met to confer regarding the objections to the remaining requested information.  Therefore, the Court has yet to have this issue before it.

instructive, the facts in the time of COVID-19 appear beyond the conditions of confinement under the control of the United States.

Ultimately, it appears that ICE's position is a process issue, which is even more dangerous in light of the potentially fatal consequences of this particular virus.  ICE holds no one in permanent detention.  It is worth saying twice, none of these individuals will be in permanent detention or serving a sentence.  The detainees being held in civil detention at some point are either being deported to their country of origin or released within the United States.  In light of that eventual outcome, the detainees should not face an increased risk of coming into contact with the COVID-19 virus for any longer than necessary.

ICE's discretion to administer the Agency's regulations under the immigration statutes is not unfettered.  If the policies and procedures it sets in place to house individuals in its custody during its process result in a Constitutional violation by posing deliberate indifference to a serious medical need then the detainees have a recourse.

Second, it is undisputed that the best available tools that appear to be effective in combating the virus are:  hand washing, disinfecting, masking and social distancing.  If ICE can do no more as to hand washing, disinfecting, and masking then all that remains is social distancing.  Social distancing is not possible using the structures in place at or near their pre-pandemic levels.

Finally, in light of the ongoing discovery process, the parties have not submitted the issue of an asserted privilege surrounding square footage or mapping in camera to the Court.  The Court would be able to make its own determination regarding the extent of any law enforcement or trade secret privilege that exists.  Regardless of whether the privilege applies, the Court is free to examine the relevant documents for their probative value as to the issue of social distancing.  Instead of using bed space, the government has a more accurate measure in its possession.

In any event, this report has been provided to the Court in camera with the architectural floorplans for BTC containing the most accurate measurements attached in camera for its review to preserve the objection of the United States.[8]   The undersigned obtained the architectural floorplans or square footage information from the United States. The Court can make a determination as to the issue of privilege, what can be provided to the Petitioners and the probative value of the floorplans.   Having reviewed the plans in consultation with an expert in GIS, the undersigned believes the floorplans have great probative value as to the issue of social distancing that along with the wearing of masks are the best available tools to combatting the virus.   As noted above the floorplans were utilized to provide a more accurate level of capacity in each facility with a six-foot distance.   ICE can make its percentage reduction in facility population using the available space instead of the measurement currently being used.

Consistent with the Eleventh Circuit's holding in *Gomez* and limited to the unique, unprecedented factual circumstances of this global pandemic that presents a serious medical need to the class members the undersigned recommends that the Court deny the motion to compel as to the issues surrounding the conditions of confinement except for those regarding social distancing. The Court may be able to provide ICE the proper incentive to speed up the process of deportation or release that seems to present the increased risk for the detainees and lower the numbers to achieve social distancing closer to CDC Guidelines.   To the extent that the Court finds it within its authority to provide ICE an incentive to increase the speed of its process regarding deportation or release to limit the potential exposure to the detainees to the circumstances that increase the risk of contracting the virus it makes sense to do so in light of the current risk of exposure.

---

[8] For Glades and Krome other information was used to create the experts exhibits because the architectural floorplans were not available.

Dated: September 1, 2020              Respectfully submitted,

                                     By: /s/ *Matthew C. Dates*
                                     MATTHEW C. DATES
                                     Florida Bar No. 90994
                                     Email: mdates@stearnsweaver.com
                                     Secondary: cveguilla@stearnsweaver.com
                                     STEARNS WEAVER MILLER WEISSLER
                                       ALHADEFF & SITTERSON, P.A.
                                     Museum Tower, Suite 2200
                                     150 West Flagler Street
                                     Miami, Florida 33130
                                     Telephone: (305) 789-3200
                                     Facsimile:  (305) 789-3395
                                     *Court Appointed Special Master*

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 1st day of September 2020, the foregoing document was provided

via email to the Hon. Marcia G. Cooke, in camera, for her review.

*/s/ Matthew C. Dates*